# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |
| IN RE:  TERRORIST ATTACKS ON | ) | **Civil Action No. 03MDL1570 (RCC)** |
| SEPTEMBER 11, 2001 | ) | Relates to:  C.A. Nos. 1:02-6977 (RCC) |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ ) | | 1:02-7300 (RCC-FM) |
| | | 1:03-5071 (RCC) |
| | | 1:03-5493 (RCC) |
| | | 1:03-5738 (RCC) |
| | | 1:03-7036 (RCC) |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS
## AND TO QUASH SERVICE OF PROCESS
## OF HIS ROYAL HIGHNESS
## PRINCE TURKI AL-FAISAL BIN ABDULAZIZ AL-SAUD

KELLOGG, HUBER, HANSEN,
  TODD & EVANS, P.L.L.C.
Mark C. Hansen (MH0359)
Michael K. Kellogg (MK4579)
David C. Frederick (DF4906)
Michael J. Guzman (MG9623)
J.C. Rozendaal (JR1430)

Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036-3209
(202) 326-7900

March 19, 2004

## Table Of Contents

Table of Authorities ................................................................................................ ii

Standard Of Review For A Motion To Dismiss A Foreign Sovereign's Public Official ................ 3

Statement Of Facts ................................................................................................ 4

Summary Of Argument ................................................................................................ 8

Argument ................................................................................................ 9

I.      Under Well-Settled Principles, Prince Turki Is Immune From Suit For The Acts Alleged In The Complaint ................................................................................................ 9

        A.      The FSIA Requires Dismissal of the Claims Against Prince Turki ...................... 9

                1.      Plaintiffs' allegations concern Prince Turki's official acts ........................ 9

                2.      The allegations do not implicate the "commercial activities" or "state sponsors of terrorism" FSIA exceptions ........................... 11

                3.      The non-commercial torts exception does not confer jurisdiction over plaintiffs' suits ........................................... 12

        B.      Diplomatic Immunity Requires Dismissal ............................................. 17

II.     This Court Lacks Personal Jurisdiction Over Prince Turki ................................. 19

        A.      No Statute Provides for Personal Jurisdiction over Prince Turki ...................... 20

        B.      Prince Turki Lacks the Minimum Contacts with the Forum That the Constitution Requires ........................................... 21

Conclusion ................................................................................................ 25

# Table Of Authorities

Page

## CASES

Aidi v. Yaron,
    672 F. Supp. 516 (D.D.C. 1987) ........................................................................19

Argentine Republic v. Amerada Hess Shipping Corp.,
    488 U.S. 428 (1989)............................................................................ 9-10, 13, 16

Asahi Metal Indus. Co. v. Superior Court,
    480 U.S. 102 (1987)..................................................................................22, 23

Asociacion de Reclamantes v. United Mexican States,
    735 F.2d 1517 (D.C. Cir. 1984) .......................................................................16

Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,
    171 F.3d 779 (2d Cir. 1999)............................................................................24

Bergman v. De Sieyes,
    170 F.2d 360 (2d Cir. 1948)............................................................................19

Bersch v. Drexel Firestone, Inc.,
    519 F.2d 974 (2d Cir. 1975)............................................................................24

Bryks v. Canadian Broad. Corp.,
    906 F. Supp. 204 (S.D.N.Y. 1995)....................................................................10

Burger King Corp. v. Rudzewicz,
    471 U.S. 462 (1985).......................................................................................23

Burnett v. Al Baraka Inv. & Dev. Corp.,
    292 F. Supp. 2d 9 (D.D.C. 2003).........................................1, 2, 11, 12, 13, 14, 15, 21, 23

Calder v. Jones,
    465 U.S. 783 (1984).......................................................................................22

Carbone v. Carbone,
    123 Misc. 656, 206 N.Y.S. 40 (Sup. Ct. 1924)...................................................18

Cargill Int'l S.A. v. M/T Pavel Dybenko,
    991 F.2d 1012 (2d Cir. 1993).............................................................................4

Central States, S.E. & S.W. Areas Pension Fund v. Reimer Express World Corp.,
    230 F.3d 934 (7th Cir. 2000) ...........................................................................25

Chuidian v. Philippine Nat'l Bank,
    912 F.2d 1095 (9th Cir. 1990) .................................................................10

El-Fadl v. Central Bank of Jordan,
    75 F.3d 668 (D.C. Cir. 1996) ...................................................................10

Filetech S.A. v. France Telecom S.A.,
    157 F.3d 922 (2d Cir. 1998)......................................................................3

First Am. Corp. v. Sheikh Zayed Bin Sultan Al-Nahyan,
    948 F. Supp. 1107 (D.D.C. 1996) ...........................................................11

Foremost-McKesson, Inc. v. Islamic Republic of Iran,
    905 F.2d 438 (D.C. Cir. 1990) ..................................................................3

Grove Press, Inc. v. Angleton,
    649 F.2d 121 (2d Cir. 1981).....................................................................20

Helicopteros Nacionales de Colombia, S.A. v. Hall,
    466 U.S. 408 (1984)................................................................................22

Herbage v. Meese,
    747 F. Supp. 60 (D.D.C. 1990), aff'd, 946 F.2d 1564 (D.C. Cir. 1991) ...........................11

Holbrook v. Henderson,
    4 Sandf. 620, 6 N.Y. Super. Ct. 619 (N.Y. 1839) ..............................18

International Shoe Co. v. Washington,
    326 U.S. 310 (1945)................................................................................22

Jazini by Jazini v. Nissan Motor Co.,
    148 F.3d 181 (2d Cir. 1998).....................................................................25

Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan,
    115 F.3d 1020 (D.C. Cir. 1997) ..............................................................10

Keeton v. Hustler Magazine, Inc.,
    465 U.S. 770 (1984)................................................................................23

Kulko v. Superior Court,
    436 U.S. 84 (1978)..................................................................................22

Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc.,
    191 F.3d 229 (2d Cir. 1999).....................................................................21

Leasco Data Processing Equip. Corp. v. Maxwell,
 468 F.2d 1326 (2d Cir. 1972).........................................................23

Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,
 507 U.S. 163 (1993)...................................................................3

Lehigh Valley Indus., Inc. v. Birenbaum,
 527 F.2d 87 (2d Cir. 1975).........................................................24

Letelier v. Republic of Chile,
 488 F. Supp. 665 (D.D.C. 1980).............................................15, 16

Leutwyler v. Office of Her Majesty Queen Rania Al-Abdullah,
 184 F. Supp. 2d 277 (S.D.N.Y. 2001).......................................4, 10

Liu v. Republic of China,
 892 F.2d 1419 (9th Cir. 1989) ...................................................15

MacArthur Area Citizens' Ass'n v. Republic of Peru,
 809 F.2d 918 (D.C. Cir. 1987)...............................................14, 15

McGee v. International Life Ins. Co.,
 355 U.S. 220 (1957).................................................................23

Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,
 709 F. Supp. 1279 (S.D.N.Y. 1989)............................................21

Monell v. Department of Social Servs.,
 436 U.S. 658 (1978).................................................................10

Morgan v. International Bank for Reconstruction & Dev.,
 752 F. Supp. 492 (D.D.C. 1990) .................................................15

Nix v. Hoke,
 62 F. Supp. 2d 110 (D.D.C. 1999) .............................................21

Persinger v. Islamic Republic of Iran,
 729 F.2d 835 (D.C. Cir. 1984) ...................................................16

Phoenix Consulting, Inc. v. Republic of Angola,
 216 F.3d 36 (D.C. Cir. 2000)......................................................3

Price v. Socialist People's Libyan Arab Jamahiriya,
 294 F.3d 82 (D.C. Cir. 2002) .....................................................13

Robinson v. Government of Malaysia,
     269 F.3d 133 (2d Cir. 2001)................................................................3

Stauffacher v. Bennett,
     969 F.2d 455 (7th Cir. 1992) ...........................................................24

Tel-Oren v. Libyan Arab Republic,
     726 F.2d 774 (D.C. Cir. 1984) .........................................................16

United States v. First Nat'l City Bank,
     379 U.S. 378 (1965).........................................................................23

United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),
     467 U.S. 797 (1984)....................................................................14, 15

Virtual Countries, Inc. v. Republic of South Africa,
     300 F.3d 230 (2d Cir. 2002).............................................................4

Whitaker v. American Telecasting, Inc.,
     261 F.3d 196 (2d Cir. 2001).............................................................19

Wilson v. Blanco,
     4 N.Y.S. 714 (Super. Ct. 1889) .......................................................18

## CONSTITUTION, TREATIES, STATUTES, AND RULES

U.S. Const. Amend. V (Due Process Clause) .................................................21, 24

Vienna Convention on Diplomatic Relations, done Apr. 18, 1961, United States
     accession, Dec. 13, 1972, 23 U.S.T. 3227, T.I.A.S. No. 7502 ...................17, 18

Antiterrorism Act of 1990, 18 U.S.C. §§ 2331 et seq. ....................................20

     18 U.S.C. § 2331(5) ......................................................................21

     18 U.S.C. § 2334 ......................................................................20-21

     18 U.S.C. § 2337 ..........................................................................21

Diplomatic Relations Act, 22 U.S.C. § 254d....................................................1, 17

Federal Tort Claims Act, 28 U.S.C. §§ 2671 et seq.

     28 U.S.C. § 2680(a) ......................................................................14

Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1330, 1602 et seq. ..............................1

    28 U.S.C. § 1330................................................................................17

    28 U.S.C. § 1603(a) ...........................................................................10

    28 U.S.C. § 1603(b) ...........................................................................10

    28 U.S.C. § 1604................................................................................10

    28 U.S.C. § 1605(a)(2).................................................................11, 16

    28 U.S.C. § 1605(a)(5)...................................................11, 12, 13, 16

    28 U.S.C. § 1605(a)(5)(A)..................................................................14

    28 U.S.C. § 1605(a)(7).............................................................11, 12, 13

    28 U.S.C. § 1605(a)(7)(A)..................................................................11

Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 et seq. ......................20

    18 U.S.C. § 1965(b) .....................................................................20-21

Federal Rules of Civil Procedure:

    Rule 4(k)(2)........................................................................................21

    Rule 12(b) .......................................................................................1, 3

    Rule 12(h)(1).......................................................................................2

    Rule 12(h)(2).......................................................................................2

    Rule 12(h)(3).......................................................................................2

N.Y. C.P.L.R.:

    § 302(a)(2) ........................................................................................20

    § 302(a)(3) ........................................................................................20

**LEGISLATIVE AND OTHER MATERIALS**

ABC News:  Nightline, 2001 WL 21773072 (Dec. 10, 2001)........................................................7

H.R. Rep. No. 94-1487 (1976), reprinted in 1976 U.S.C.C.A.N. 6604.............................10, 14, 16

Prince Turki Al-Faisal, Allied Against Terrorism, Wash. Post, Sept. 17, 2002, at A21 .................2

His Royal Highness Prince Turki Al-Faisal bin Abdulaziz Al-Saud ("Prince Turki") has been named as a defendant in eight of the lawsuits consolidated in this proceeding.[1]  In the most advanced of those cases, Burnett v. Al Baraka Inv. & Dev. Corp. (D.D.C.), Prince Turki has already been dismissed on the grounds that the Foreign Sovereign Immunities Act ("FSIA") provides him with absolute immunity from suit.[2]  Prince Turki hereby moves pursuant to Federal Rule of Civil Procedure 12(b) to dismiss six of the remaining suits for want of jurisdiction and, pursuant to 22 U.S.C. § 254d, to quash service of process on grounds of diplomatic immunity.[3]

All of the suits against Prince Turki concern actions that he allegedly took in his official capacity as the Director of Saudi Arabia's Department of General Intelligence ("DGI"), also known by its Arabic name, Istakhbarat.  There is no material difference between the allegations against Prince Turki in Burnett and the allegations in the other five cases.  Accordingly, Judge Robertson's decision dismissing the Burnett complaint against Prince Turki is fully applicable to the remaining cases.

The principal allegation made against Prince Turki in each of these suits is that, in meetings in Kandahar over the summer of 1998, Prince Turki offered money and goods to the

---

[1] Burnett v. Al Baraka Inv. & Dev. Corp., C.A. No. 1:02-1616 (D.D.C.); Ashton v. Al Qaeda Islamic Army, C.A. No. 1:02-6977 (S.D.N.Y.); Salvo v. Al Qaeda Islamic Army, C.A. No. 1:03-5071 (S.D.N.Y.); Tremsky v. Osama bin Laden, C.A. No. 1:02-7300 (S.D.N.Y.); York v. Al Qaeda Islamic Army, C.A. No. 1:03-5493 (S.D.N.Y.); Federal Ins. Co. v. Al Qaida, C.A. No. 1:03-6978 (S.D.N.Y.); Burnett v. Al Baraka Inv. & Dev. Corp., C.A. No. 1:03-5738 (S.D.N.Y.); and Barrera v. Al Qaeda Islamic Army, C.A. No. 1:03-7036 (S.D.N.Y.).

[2] See Burnett v. Al Baraka Inv. & Dev. Corp., 292 F. Supp. 2d 9 (D.D.C. 2003).  The New York Burnett case (No. 1:03-5738) is just a shadow version of the D.C. case (on behalf of the same plaintiffs) that has already been dismissed.

[3] The plaintiffs in Federal Ins. Co. have only recently filed an amended complaint. Pursuant to the Court's scheduling order, Prince Turki will file his motion to dismiss that case within 60 days.  Prince Turki has not been and may not be lawfully served with process in any of these suits.  He has chosen, however, to appear voluntarily to object to jurisdiction.

Taliban in exchange for a promise that Osama bin Laden and Al-Qaeda would not commit acts of terrorism in Saudi Arabia.  These alleged meetings occurred three years before the September 11 attacks and have no asserted connection with them.  As explained in the attached declaration of Prince Turki, moreover, the actual purpose of the Kandahar meetings in the summer of 1998 was to obtain bin Laden's extradition from Afghanistan to Saudi Arabia for trial.  See pp. 6-7, infra.  In an interview with ABC News, bin Laden himself said that Prince Turki came to have him arrested, condemned Prince Turki as a tool of the American government, and boasted that Prince Turki "returned empty-handed."  See note 9, infra.  Prince Turki, in turn, has unequivocally condemned bin Laden and the attacks:  "For me, [September 11] was an especially calamitous event, as I had devoted all of my working life to combating such crimes.  It also brought back the pain and outrage I felt when my father, the late King Faisal, was killed in a terrorist attack."  Prince Turki Al-Faisal, Allied Against Terrorism, Wash. Post, Sept. 17, 2002, at A21.

Judge Robertson properly recognized in Burnett that plaintiffs' allegations fall clearly within the immunity conferred by the FSIA.[4]  Prince Turki can no more be haled into court here to answer for his official actions as head of Saudi intelligence than the head of the U.S. Central Intelligence Agency ("CIA") could properly be sued in a foreign tribunal in the Middle East or

---

[4] In Burnett, Prince Turki raised objections to the complaint based on sovereign immunity, diplomatic immunity, personal jurisdiction, nonjusticiability, and failure to state a claim on which relief may be granted.  Because he dismissed the case on grounds of FSIA immunity, Judge Robertson determined that "[i]t is unnecessary to reach or decide the other arguments advanced by Prince Turki . . . in [his] motion[] to dismiss."  292 F. Supp. 2d at 23.  The same is true here, although Prince Turki also notes his diplomatic immunity and asserts his personal jurisdiction defense in order to avoid any waiver of that defense.  See Fed. R. Civ. P. 12(h)(1).  His additional defenses based on justiciability and failure to state a claim are not subject to waiver and hence Prince Turki will reserve those claims.  See id. 12(h)(2), (3).  The pleadings on Prince Turki's motion to dismiss in Burnett are available via the D.C. District Court ECF system at items 142, 204, 239, 293, and 311.

elsewhere for his official actions in the Middle East or elsewhere.  In addition, as the current Saudi Ambassador to the United Kingdom, Prince Turki is entitled to diplomatic immunity in this country under the terms of the Vienna Convention on Diplomatic Relations and well-established precedent in this circuit.  Finally, Prince Turki has no ties to the United States that would warrant the exercise of personal jurisdiction over him.

**Standard Of Review For A Motion To Dismiss A Foreign Sovereign's Public Official**

Ordinarily, this Court would assume, for purposes of a motion to dismiss under Federal Rule of Civil Procedure 12(b), the truth of a complaint's allegations.  See, e.g., Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164 (1993) ("We review here a decision granting a motion to dismiss, and therefore must accept as true all the factual allegations in the complaint.").  Because these complaints contain allegations involving the official acts of a foreign sovereign, however, a different standard of review applies.  In resolving immunity claims under the FSIA, a district court must "look beyond the pleadings to factual submissions, including affidavits, submitted to the court in order to resolve a factual dispute as to whether" an exception under the FSIA applies.  Robinson v. Government of Malaysia, 269 F.3d 133, 140-41 (2d Cir. 2001).[5]  In so doing, a court must give "great weight to any extrinsic submissions made by the foreign defendants regarding the scope of their official

---

[5] See also Robinson, 269 F.3d at 141 (quoting Phoenix Consulting, Inc. v. Republic of Angola, 216 F.3d 36, 40 (D.C. Cir. 2000) ("[w]hen the defendant has . . . challenged the factual basis of the court's jurisdiction . . . the court must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss")); Filetech S.A. v. France Telecom S.A., 157 F.3d 922, 932 (2d Cir. 1998) (error for district court to "accept the mere allegations of the complaint as a basis for finding subject matter jurisdiction" in FSIA case); Foremost-McKesson, Inc. v. Islamic Republic of Iran, 905 F.2d 438, 448-49 (D.C. Cir. 1990) (holding that, where the "conclusory allegations" in a plaintiff's complaint are challenged by a sovereign defendant, "the district court must do more than just look to the pleadings to ascertain whether to grant the motion to dismiss").

responsibilities." Leutwyler v. Office of Her Majesty Queen Rania Al-Abdullah, 184 F. Supp.

2d 277, 287 (S.D.N.Y. 2001) (internal quotation marks omitted).  Thus, where a defendant

presents a "prima facie case that it is a foreign sovereign," the plaintiff "has the burden of going

forward with evidence showing that, under exceptions to the FSIA, immunity should not be

granted."  Virtual Countries, Inc. v. Republic of South Africa, 300 F.3d 230, 241 (2d Cir. 2002)

(quoting Cargill Int'l S.A. v. M/T Pavel Dybenko, 991 F.2d 1012, 1016 (2d Cir. 1993) (emphasis

added)); see also Leutwyler, 184 F. Supp. 2d at 287 (once defendant has proffered evidence of its

status as sovereign, plaintiff can "rebut the presumption of immunity for the foreign defendant

by proffering evidence of record that the defendant undertook certain activities that fall within

the scope of several specifically enumerated exceptions to FSIA immunity").  Accordingly, the

following statement of facts rebuts certain assertions in the complaints based on the

accompanying Declaration of Prince Turki ("Declaration," attached hereto as Exhibit 1).[6]

### Statement Of Facts

Although the complaints in these consolidated actions vary in length, they share the

common attribute that only a handful of paragraphs relate in any way to Prince Turki.  See Third

Amended Complaint, Ashton, C.A. No. 1:02-6977, ¶¶ 241, 252, 254, 256-263, 277, 288, 296

(S.D.N.Y. filed Sept. 5 2003).[7]  Because it is the most comprehensive, we set forth the

allegations in the Ashton complaint, which are mirrored in all material respects (though with less

_____

[6] Long before the current suits were filed, Prince Turki described most of the events
detailed in his Declaration in a speech to the Center for Contemporary Arab Studies at
Georgetown University on February 3, 2002.  That speech is attached as Exhibit 2.  A copy of
Prince Turki's Washington Post article mentioned in text at page 2, supra, is Exhibit 3.

[7] See Complaint, Salvo, No. 1:03-5071, ¶¶ 245-246, 248-255, 278 (S.D.N.Y. filed July 8,
2003); Complaint, York, No. 1:03-5493, ¶¶ 133-138 (S.D.N.Y. filed July 24, 2003); Complaint,
Tremsky, C.A. No. 1:02-7300, ¶¶ 180, 182-187 (S.D.N.Y. filed Sept. 11, 2002).  Compare Third
Amended Complaint, Burnett, C.A. No. 1:02-1616, ¶¶ 340-341, 343-350, 376, 381, 391, 516
(D.D.C. filed Nov. 22, 2002).

detail) in the other complaints.[8]  No complaint here alleges that Prince Turki had anything to do

with the events of September 11, and many allegations are, in any event, pure fabrication.

    A.    The <u>Ashton</u> complaint alleges that "Prince Turki was head of Saudi Arabia's

Department of General Intelligence (Istakhbarat) from 1977 until 2001." <u>Ashton</u> Compl. ¶ 256.

The complaint asserts that, in that capacity, "Prince Turki met personally with [Osama] bin

Laden at least five times while in Pakistan and Afghanistan during the mid-eighties to mid-

nineties.  Prince Turki also had meetings with the Taliban in 1998 and 1999." <u>Id.</u> ¶ 257.

    Plaintiffs claim that Prince Turki first met Osama bin Laden at the Royal Embassy of

Saudi Arabia in Islamabad, Pakistan, during the Soviet Union's occupation of Afghanistan in the

1980s.  <u>Id.</u> ¶ 254.  Plaintiffs further allege that, around the time Iraq invaded Kuwait in 1990, bin

Laden met with Prince Sultan bin Abdulaziz Al-Saud ("Prince Sultan"), then and now the

Minister of Defense of Saudi Arabia, and "offered the engineering equipment available from his

family's construction company and suggested bolstering Saudi forces with Saudi militants who

[he] was willing to recruit," <u>id.</u> ¶ 253, and that this offer was also made to Prince Turki, "the then

Chief of Saudi Intelligence, or Istakhbarat," <u>id.</u> ¶ 254.  Plaintiffs also allege that Prince Turki had

an "ongoing relationship" with Osama bin Laden and helped to arrange a meeting between Iraq's

ambassador to Turkey and bin Laden in 1998, all while he was serving as head of Saudi

intelligence.  <u>Id.</u> ¶¶ 254, 262.  The above-listed allegations draw no connection between Prince

Turki and support for terrorism, much less any connection with the events of September 11.

    Plaintiffs assert that the Saudi government gave "massive financial and material support"

through its intelligence service to Afghanistan's Taliban regime while Prince Turki was head of

_____

    [8] Attached to this motion as Exhibit 4 is a spreadsheet with cross-references to the
various complaints, so that the Court may easily reference the paragraphs in other complaints
containing allegations mentioning Prince Turki or ostensibly relating to him.

the intelligence service.  Id. ¶ 257.  But that claim as well – even if it were true, and it is not, see Decl. ¶ 16 – would not support any allegation that the Saudi government or its minister, Prince Turki, in any way aided or supported Al-Qaeda terrorism in the United States or elsewhere.

In paragraph 258 of the complaint, plaintiffs state that an alleged Al-Qaeda financier – a Syrian-born businessman named Zouaydi – "had close financial ties" with Prince Turki, but the complaint nowhere specifies what those "ties" were.  Although the complaints do allege that Zouaydi funneled money from a Saudi-based company through certain unnamed Spanish corporations to persons associated with Al-Qaeda in Europe, Ashton Compl. ¶ 241, no facts are alleged to explain how Prince Turki is "implicated" in those transactions, id.  Moreover, Prince Turki has never in fact met Zouaydi, has no financial ties that he knows of to such a person, and had never even heard the name before this complaint was filed.  Decl. ¶ 17.

Plaintiffs assert that Prince Turki attended a meeting in July 1998 at which he is alleged to have promised oil and financial assistance to the Taliban (not to Al-Qaeda) in Afghanistan and Pakistan.  Ashton Compl. ¶ 261.  Plaintiffs claim that, "[a]fter the meeting, 400 new pick-up trucks arrived in Kandahar for the Taliban, still bearing Dubai license plates."  Id.  Plaintiffs also allege that, as part of an agreement supposedly reached at the meeting, "the Saudis would make sure that no demands would be acceded to for the extradition of terrorist individuals, such as [Osama] bin Laden, nor permit the closure of terrorist facilities and camps."  Id.

Even if true, those claims still would not implicate Prince Turki in the September 11 attacks.  The allegations are, in any event, flatly false.  Prince Turki never promised oil and financial assistance to the Taliban.  Prince Turki never arranged for the delivery to the Taliban of any pick-up trucks.  And Prince Turki never agreed not to make demands for the extradition of terrorist individuals, such as Osama bin Laden.  Decl. ¶ 16.  To the contrary, Prince Turki met

with the Taliban expressly to obtain the extradition of bin Laden, as bin Laden himself has confirmed.[9]  When the Taliban ultimately refused to extradite bin Laden, Prince Turki recommended that Saudi Arabia suspend diplomatic relations with the Taliban government, which Saudi Arabia did in September 1998.  Id. ¶¶ 11-13.

Only two paragraphs in the Ashton complaint (¶¶ 241, 259) allege that Prince Turki supported Al-Qaeda and Osama bin Laden (though they still say nothing about the events of September 11).  Some plaintiffs claim, without any elaboration, that Prince Turki was "the facilitator" of "the transfer of funds from wealthy Saudis directly to al Qaeda and [Osama] bin Laden in Afghanistan."  Id. ¶ 259.  Plaintiffs also claim that DGI, which Prince Turki headed, "served as a facilitator of Osama bin Laden's network of charities, foundations, and other funding sources."  Id. ¶ 263.  Even these allegations – which do not specify a time period and are, in any event, false, see Decl. ¶ 14 – do not suggest that those funds had any relation to the September 11 attacks, or that Prince Turki was acting in anything other than his official capacity.

Taken together, plaintiffs' allegations do not even come close to suggesting that Prince Turki knew of, much less intended to assist, the planned terrorist attacks on the United States that are the subject of the complaints, or that he took any affirmative steps to facilitate those attacks.  No nexus has been alleged between Prince Turki and plaintiffs' injuries.  Indeed, the last alleged act of Prince Turki occurred in 1998, three full years before the September 11 attacks.

---

[9] In an interview with John Miller of ABC News, "bin Laden told ABC News he had heard of Turki's secret mission" to arrest him.  Bin Laden stated:  "He returned empty-handed. He looked ashamed, as if he had come at the request of the American government.  It's none of the business of the Saudi regime to come and ask for handing over Osama bin Laden."  ABC News:  Nightline, 2001 WL 21773072 (Dec. 10, 2001).  A full transcript of the program is attached hereto as Exhibit 5.

**B.**     The attached Declaration of Prince Turki sets forth the following additional facts: Prince Turki served as Director of the DGI from September 1977 until August 2001.  The DGI carries out functions similar in many respects to those of the CIA, including the collection and analysis of foreign intelligence and the conduct of foreign operations.  See id. ¶ 5.  The DGI's activities are an integral part of Saudi Arabia's foreign and national security policies.

Among his other duties as DGI Director, Prince Turki was actively involved in Saudi Arabia's efforts to combat international terrorism generally and the threat posed by Osama bin Laden and Al-Qaeda in particular.  In so doing, he shared information and cooperated closely with other intelligence agencies, including the CIA.  Id. ¶ 6.  All interactions with bin Laden, Al-Qaeda, and the Taliban were in his official capacity as Director of the DGI.  Id. ¶ 5.

Prince Turki currently serves as the Ambassador of Saudi Arabia to the United Kingdom. Id. ¶ 19 & Attachment A (Letter from U.K. Foreign & Commonwealth Office confirming diplomatic status).  His duties as Ambassador oblige him to reside in London.  His domicile is and always has been Saudi Arabia.  Id. ¶ 21.  Prince Turki owns no property and conducts no business in the United States.  He has not lived in this country since 1967, when he attended college here.  In the course of his official duties for the DGI, he traveled to Washington, D.C. to confer with U.S. officials on intelligence and diplomatic matters.  He has also made occasional trips to the United States for medical reasons and on holiday.  Id. ¶ 20.

### Summary Of Argument

Despite their length, none of the complaints presents a "plain statement" of facts and an articulation of a viable theory of liability that may sustain this Court's jurisdiction.  In plaintiffs' various iterations of their claims against Prince Turki, Prince Turki's name appears in just a few paragraphs, all of which concern alleged actions taken in his official capacity as DGI Director,

and none of which alleges any meaningful connection between Prince Turki and the September 11 attacks.  The claims against Prince Turki must accordingly be dismissed.

**I.**      Prince Turki's alleged acts all concededly involve his duties as head of Saudi intelligence and represent the sovereign acts of Saudi Arabia, carried out in many instances in conjunction with the United States.  It is simply inconceivable that such a lawsuit can be allowed to proceed, particularly in the courts of a close ally.  Prince Turki has sovereign immunity for his official acts under the FSIA (Point I.A).  As Saudi Arabia's current Ambassador to the United Kingdom, Prince Turki is also entitled to diplomatic immunity, which must be honored to quash any official service of process against Prince Turki and thereby prevent plaintiffs from subjecting him to the burdens of discovery and defense of suit during his diplomatic service (Point I.B).

**II.**      Prince Turki lacks the minimum contacts with New York in particular and the United States in general that are necessary to enable this Court to exercise personal jurisdiction over him.  Because New York's long-arm statute and constitutional due process standards do not permit the Court to exercise jurisdiction over Prince Turki, this suit must be dismissed (Point II).

**Argument**

**I.      Under Well-Settled Principles, Prince Turki Is Immune From Suit For The Acts Alleged In The Complaint**

      **A.      The FSIA Requires Dismissal of the Claims Against Prince Turki**

As explained in the motion to dismiss filed today by Prince Sultan (Sultan Motion at 10-13), Judge Robertson's FSIA ruling in <u>Burnett</u> constitutes law of the case, and there is no reason to depart from it in the consolidated cases.  That decision, moreover, is unquestionably correct.

      1. <u>Plaintiffs' allegations concern Prince Turki's official acts</u>.  The FSIA provides "the sole basis for obtaining jurisdiction over a foreign state in our courts."  <u>Argentine Republic v.</u>

9

Amerada Hess Shipping Corp., 488 U.S. 428, 434 (1989).  It prescribes "when and how parties

can maintain a lawsuit against a foreign state or its entities in the courts of the United States

and . . . when a foreign state is entitled to sovereign immunity."  H.R. Rep. No. 94-1487, at 6

(1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6604.  The FSIA provides a general grant of

immunity to "foreign states":

> Subject to existing international agreements to which the United States is a party
> at the time of enactment of this Act a foreign state shall be immune from the
> jurisdiction of the courts of the United States and of the States except as provided
> in sections 1605 to 1607 of this chapter.  28 U.S.C. § 1604.

The Act defines the term "foreign state" to include a "political subdivision of a foreign

state or an agency or instrumentality of a foreign state."  Id. § 1603(a).  Courts have expressly

recognized that "[a]n individual can qualify as an 'agency or instrumentality of a foreign state' "

for FSIA purposes.  El-Fadl v. Central Bank of Jordan, 75 F.3d 668, 671 (D.C. Cir. 1996)

(quoting 28 U.S.C. § 1603(b); citing Chuidian v. Philippine Nat'l Bank, 912 F.2d 1095, 1101-03

(9th Cir. 1990) (finding Philippine government official entitled to immunity under FSIA));

Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan, 115 F.3d 1020, 1027 (D.C. Cir. 1997)

(individuals acting in official capacity are considered "agencies or instrumentalities of a foreign

state"); Leutwyler, 184 F. Supp. 2d at 286-87 ("it has been generally recognized that individuals

employed by a foreign state's agencies or instrumentalities are deemed 'foreign states' [under the

FSIA] when they are sued for actions undertaken within the scope of their official capacities")

(citing Bryks v. Canadian Broad. Corp., 906 F. Supp. 204, 210 (S.D.N.Y. 1995)).  The rationale

for that principle stems from the common-sense recognition that "a suit against an individual

acting in his official capacity is the practical equivalent of a suit against the sovereign directly."

Chuidian, 912 F.2d at 1101-02 (citing, inter alia, Monell v. Department of Social Servs., 436

U.S. 658, 690 n.55 (1978)).  FSIA immunity thus is not based on the identity of the defendant so

much as the "nature of the act for which the person or entity is claiming immunity." First Am.

Corp. v. Sheikh Zayed Bin Sultan Al-Nahyan, 948 F. Supp. 1107, 1120 (D.D.C. 1996) (quoting

Herbage v. Meese, 747 F. Supp. 60, 66 (D.D.C. 1990), aff'd, 946 F.2d 1564 (D.C. Cir. 1991)).

Plaintiffs acknowledge that Prince Turki was head of the DGI from September 1977 until

August 30, 2001.  Ashton Compl. ¶ 256.  All of the allegations pertaining to Prince Turki relate

to actions that he is alleged to have taken in his official capacity.  See id. ¶¶ 257-263, 288; note

9, supra.  As Judge Robertson explained, plaintiffs "have made no showing that any of Prince

Turki's alleged actions were taken other than in his official capacity.  The absence of such a

showing compels the conclusion that the allegations against Prince Turki only relate to actions he

took in his official capacity."  Burnett, 292 F. Supp. 2d at 15.  Prince Turki is thus immune from

suit unless the claims against him fall within one of the exceptions to FSIA immunity.

2.  The allegations do not implicate the "commercial activities" or "state sponsors of

terrorism" FSIA exceptions.  The complaints recognize the FSIA's applicability, but purport to

base jurisdiction on three exceptions:  commercial activities, 28 U.S.C. § 1605(a)(2); state

sponsors of terrorism, id. § 1605(a)(7); and non-commercial torts committed in the United States,

id. § 1605(a)(5).  See Ashton Compl. ¶ 2.  Those exceptions do not apply to the allegations

against Prince Turki.  The complaints nowhere allege that Prince Turki engaged in any

commercial activity under § 1605(a)(2), either in the United States or abroad.  The second

exception – which exempts from sovereign immunity a defendant who, among other things, is

alleged to provide "material support or resources" to terrorists – does not apply because Saudi

Arabia has not been designated by the Department of State as a state sponsor of terrorism, which

is a prerequisite for the § 1605(a)(7)(A) exception.

3.  <u>The non-commercial torts exception does not confer jurisdiction over plaintiffs' suits</u>.
The non-commercial torts exception permits, with certain exceptions, actions "in which money
damages are sought against a foreign state for personal injury or death . . . occurring in the
United States and caused by the tortious act or omission of that foreign state or any official or
employee of that foreign state while acting within the scope of his office or employment."
28 U.S.C. § 1605(a)(5).  The non-commercial torts exception does not apply here.

<u>First</u>, as Judge Robertson recognized, the allegations against Prince Turki (and Prince
Sultan) "amount to claims that Prince Turki and Prince Sultan, acting in their official capacities,
funded or provided material resources to those who funded or provided material resources to the
terrorists who perpetrated the September 11th attacks."  292 F. Supp. 2d at 19.  Such claims must
be brought, not under § 1605(a)(5), but under § 1605(a)(7), which expressly covers allegations of
"the provision of material support or resources" for terrorist actions.  28 U.S.C. § 1605(a)(7).
Section 1605(a)(7) requires that, for immunity to be denied to a foreign state or official of a
foreign state, the State Department must determine whether that state is sponsoring terrorism
through "material support or resources" in the conduct of a terrorist act.  By suing under
§ 1605(a)(5), plaintiffs are simply attempting an end run around this requirement.

Congress made a deliberate legislative choice to confer on the State Department the
important role of designating state sponsors of terrorism in order to avoid the potential clash of
judicial findings about a state's involvement in terrorism with decisions of the Executive Branch,
which is entrusted to conduct the foreign affairs of the Nation.  If plaintiffs cannot sue Saudi
Arabia for allegedly aiding terrorist acts – because Saudi Arabia is not on the State Department's
list of state sponsors of terrorism – then they cannot sue its top government officials under that
same theory, simply by citing § 1605(a)(5) instead of § 1605(a)(7).  To hold otherwise would

render § 1605(a)(7) meaningless and launch suits that Congress sought to prevent against foreign states that have not been designated sponsors of terrorism.  See, e.g., Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82, 88 (D.C. Cir. 2002) (holding that original FSIA did not encompass claims of state-sponsored terrorism because that was considered an "immunized form[] of state activity").  See also id. (the amendments added a "new class of claims for which certain foreign states would be precluded from asserting sovereign immunity" that included when a state provides "material support or resources" for terrorists, 28 U.S.C. § 1605(a)(7)).

In granting Prince Turki's motion to dismiss in Burnett, Judge Robertson expressly adopted this reasoning.  He concluded that the omission of the "provision of material support" as an act giving rise to liability under § 1605(a)(5) "should be treated as intentional" by Congress. 292 F. Supp. 2d at 20 (internal quotation marks omitted).  Accordingly, because the FSIA exception that specifically addresses the "provision of material support" – § 1605(a)(7) – does not apply here because the State Department has not designated Saudi Arabia as a state sponsor of terrorism, plaintiffs cannot evade that Executive Branch determination by invoking § 1605(a)(5).  See 292 F. Supp. 2d at 20 n.5.

Second, plaintiffs' claims – concerning alleged official support by the Saudi government of the Taliban and other groups – fall far afield of Congress's primary purpose in enacting the non-commercial torts exception, which was to treat foreign sovereigns like other employers with respect to respondeat superior liability for injuries caused by their employees acting within the scope of their employment.  Congress thus sought "to eliminate a foreign state's immunity for traffic accidents and other torts committed in the United States, for which liability is imposed under domestic tort law." Amerada Hess, 488 U.S. at 439-40.  None of the complaints alleges the types of routine tort or respondeat superior claims the exception was intended to address.

As Judge Robertson agreed in <u>Burnett</u>, " 'the legislative history [of the FSIA] counsels that the exception should be narrowly construed so as not to encompass the farthest reaches of common law.' " 292 F. Supp. 2d at 19 (quoting <u>MacArthur Area Citizens' Ass'n v. Republic of Peru</u>, 809 F.2d 918, 921 (D.C. Cir. 1987)).  Here, plaintiffs allege a novel and attenuated theory of causation in an attempt to hold foreign government officials responsible for the actions of terrorists in the United States.  This theory extends far beyond any conceivable purpose for the exception as designed by Congress.  As Judge Robertson concluded in dismissing the claims against Prince Turki and Prince Sultan, "[i]n the FSIA context, plaintiffs' allegations that (i) Prince Turki or Prince Sultan funded (ii) those who funded (iii) those who carried out the September 11 attacks would stretch the causation requirement of the noncommercial tort exception not only to 'the farthest reaches of the common law,' but perhaps beyond, to terra incognita." <u>Id.</u> at 20.

<u>Third</u>, the non-commercial torts exception does not apply to "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused." 28 U.S.C. § 1605(a)(5)(A).  The FSIA's discretionary function exception is modeled on a similar exception to jurisdiction under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 2680(a).  <u>See</u> H.R. Rep. No. 94-1487, at 20-21, <u>reprinted in</u> 1976 U.S.C.C.A.N. 6604, 6619-20.  The purpose of both exceptions is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort."  <u>United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)</u>, 467 U.S. 797, 814 (1984) (construing FTCA).

As Judge Robertson concluded, plaintiffs' allegations against Prince Turki (and Prince Sultan) involve purely "official acts . . . squarely covered by the 'discretionary function'

language of subsection A."  Burnett, 292 F. Supp. 2d at 20.  "Prince Turki, as director of

intelligence, taking acts to protect Saudi Arabia from terrorism . . . [was] clearly making

'decisions grounded in social, economic, and political policy.' "  Id. at 20-21 (quoting Varig

Airlines, 467 U.S. at 814).  The acts Prince Turki is alleged to have committed all occurred –

according to plaintiffs' own representations – in the exercise of his discretion in carrying out the

foreign intelligence and international security policies of Saudi Arabia.  Under the FSIA, those

policies are not subject to attack through a tort suit, any more than the official actions of the CIA

Director could be attacked through an FTCA tort suit.  See, e.g., MacArthur Area Citizens Ass'n,

809 F.2d at 923 (finding immunity based on exercise of discretionary function); Morgan v.

International Bank for Reconstruction & Dev., 752 F. Supp. 492, 495 (D.D.C. 1990) (same).

That is even true for the allegation that Prince Turki "facilitate[d]" the transfer of money to Al-

Qaeda, a claim he strenuously denies.  Prince Turki has stated that all of his dealings with Al-

Qaeda were in his official capacity, Decl. ¶ 5, so any such action also would be immune.

     In Burnett, plaintiffs invoked Letelier v. Republic of Chile, 488 F. Supp. 665, 673

(D.D.C. 1980), and Liu v. Republic of China, 892 F.2d 1419 (9th Cir. 1989), to argue that

terrorist acts can never be considered "discretionary."  But the relevant question is whether the

acts of the official in question were discretionary.  As Judge Robertson correctly noted, those

cases "involved causal links significantly shorter and more direct than those alleged here:  in

Letelier, the foreign sovereign and sovereign officeholders were alleged to have 'caused or

aided' in the assassinations; in Liu, the foreign state was held vicariously liable for the actions of

its employee, criminal acts of a rather different character and order."  292 F. Supp. 2d at 21.  The

assassins in Letelier and Liu were thus agents of the foreign government.  No claim has been

made here that the September 11 hijackers were in any respect agents of Prince Turki or the
government of Saudi Arabia.

Fourth, for § 1605(a)(5) to apply, the tortious act itself, and not merely the injury caused
by it, must occur in the United States.  See, e.g., Persinger v. Islamic Republic of Iran, 729 F.2d
835, 842 (D.C. Cir. 1984); see also H.R. Rep. No. 94-1487, at 7, 20-21, reprinted in 1976
U.S.C.C.A.N. 6604, 6605, 6619 ("the tortious act or omission must occur within the jurisdiction
of the United States").  Prince Turki is not even alleged to have been in the United States, much
less to have committed any tortious act in this country.  Nor can Prince Turki have aided and
abetted (from outside the United States) tortious acts that occurred within the United States; such
a contention would fail as a matter of law.  The "entire tort" for which the defendant is to be held
responsible must occur in the United States.  Asociacion de Reclamantes v. United Mexican
States, 735 F.2d 1517, 1524-25 (D.C. Cir. 1984).  Effect in the United States is not enough.  Id.
at 1524 (comparing § 1605(a)(5) with § 1605(a)(2)'s language concerning acts "outside the
territory of the United States in connection with a commercial activity of the foreign state
elsewhere and that act causes a direct effect in the United States").[10]  All of Prince Turki's

_____

[10] Judge Robertson rejected this argument, but in doing so made no effort to distinguish
Amerada Hess or Asociacion de Reclamantes.  Instead, he relied on a concurring opinion by
Judge Edwards in a case that pre-dated Asociacion de Reclamantes, Tel-Oren v. Libyan Arab
Republic, 726 F.2d 774, 775 (D.C. Cir. 1984).  But that reference to Tel-Oren is inapposite.
Judge Edwards nowhere addressed the "entire tort" principle of § 1605(a)(5) as later explicated
in Asociacion de Reclamantes.  Rather, he made the unexceptional statement that the FSIA
barred Libya from suit because the injuries and death at issue in that case occurred abroad.  See
726 F.2d at 775 n.1.  But that statement fails to address the issue here – whether alleged acts
committed abroad can be deemed to be part of a tort that causes injury here in the United States.
Likewise, Judge Robertson's citation of Letelier is misplaced, because (1) Letelier pre-dated and
was authoritatively superseded on this point by Asociacion de Reclamantes; (2) the Letelier court
did not address the argument made here, see 488 F. Supp. at 672-73; and (3) the only "act"
alleged to have been committed abroad was an alleged governmental decision to carry out the

16

alleged actions occurred overseas.  <u>See</u> <u>Ashton</u> Compl. ¶ 254 (meeting in Islamabad, Pakistan),

¶ 257 (meetings in Pakistan and Afghanistan), ¶ 261 (meeting in Kandahar, Afghanistan).  The

non-commercial torts exception, therefore, simply does not apply.

Because plaintiffs' allegations against Prince Turki involve his actions as head of the

DGI, and because the statutory exceptions to sovereign immunity do not apply, this Court must

dismiss for lack of jurisdiction under the FSIA.  <u>See</u> 28 U.S.C. § 1330.

### B.      Diplomatic Immunity Requires Dismissal

1.  Since January 28, 2003, Prince Turki has served as the Saudi Ambassador to the

United Kingdom.  At the time of his appointment, Prince Turki had not been served with any of

the complaints in this consolidated action.  Proof of Prince Turki's diplomatic status is attached

hereto.  (Decl. Attach. A).

2.  As a diplomat, Prince Turki is entitled to diplomatic immunity pursuant to well-

established principles of international law and the Vienna Convention on Diplomatic Relations,

<u>done</u> Apr. 18, 1961, <u>United States accession</u>, Dec. 13, 1972, 23 U.S.T. 3227, T.I.A.S. No. 7502

(the "Vienna Convention").  As codified in United States law, "[a]ny action or proceeding

brought against an individual who is entitled to immunity with respect to such action or

proceeding under the Vienna Convention on Diplomatic Relations, under section 254b or 254c of

this title, or under any other laws extending diplomatic privileges and immunities, shall be

dismissed."  22 U.S.C. § 254d.  Article 31.1 of the Vienna Convention provides that diplomatic

agents enjoy comprehensive immunity from civil jurisdiction in their respective receiving states,

subject to narrow exceptions not applicable here (<u>e.g.</u>, actions involving real estate).  Vienna

_____

assassination, and no evidence was presented that that decision was in fact made in Chile (as
opposed to in the United States by a Chilean government official).

Convention at 14.  Article 39.2 provides that immunity extends to a diplomatic agent throughout the course of his or her service.  Id. at 19.

3.  The fact that Prince Turki is a diplomat in a country other than the United States does not affect his immunity from plaintiffs' lawsuits.  Under Article 40.1 of the Vienna Convention, "[i]f a diplomatic agent passes through or is in the territory of a third State . . . while proceeding to take up or to return to his post, or when returning to his own country, the third State shall accord him inviolability and such other immunities as may be required to ensure his transit or return."  Id. at 20.  Here, plaintiffs do not even have the excuse that Prince Turki is "in the territory" of, or "pass[ing] through," the United States.  They are trying to use service of process to compel him to come here from the country to which he is posted.  But New York courts have long applied principles of international law to deny process to be served against third-country diplomats against whom process is attempted while in the United States.[11]  Had Prince Turki traveled to the United States and been personally served with the complaint, therefore, Article 40 would have ensured his immunity from such service.  Instead, Prince Turki appeared voluntarily to assert his diplomatic immunity.  The end result is the same – this Court may not exercise jurisdiction over him.

The rationale for protecting foreign diplomats, even those posted to other countries, from suits in the United States has long been understood by the federal courts.  As the Second Circuit has explained, the need for immunity in countries other than the one where the diplomat is

---

[11] See, e.g., Wilson v. Blanco, 4 N.Y.S. 714, 714 (Super. Ct. 1889) (holding that Venezuelan envoy to France could not be served with civil summons while in New York because of diplomatic immunity recognized by international law); Holbrook v. Henderson, 4 Sandf. 620, 6 N.Y. Super. Ct. 619 (N.Y. 1839) (Ambassador from Republic of Texas entitled to immunity from process while in transit in New York on return from mission to France); Carbone v. Carbone, 123 Misc. 656, 656-57, 206 N.Y.S. 40, 41 (Sup. Ct. 1924) (quashing summons on Panamanian attaché to Italy for divorce proceeding filed in New York).

posted is, if anything, greater than in the receiving country itself.  Bergman v. De Sieyes, 170

F.2d 360, 362-63 (2d Cir. 1948) (L. Hand, J.).  In quashing service of process in New York on a

diplomat accredited by France to Bolivia, the Bergman court noted that two main concerns

underlie diplomatic immunity:  "[1] the indignity to the sovereign from the arrest of his

representative, or even from subjecting him to suit; and [2] the interference with his duties which

either arrest or service entails."  Id. at 362.

    Plaintiffs' suit against Prince Turki presents both concerns.  Attempting to use U.S.

process on the Saudi Ambassador to the United Kingdom to compel his attendance in a U.S.

court undermines the dignity of Saudi Arabia and interferes with its ability to conduct its foreign

relations through its chosen diplomatic personnel.  See id.  Plaintiffs command the Saudi

Ambassador to appear and defend in a series of massive lawsuits 3,000 miles and across an

ocean from his diplomatic post.  As Bergman recognized, suit in a third country "will ordinarily

more interfere with the discharge of [the diplomat's] duties . . . than . . . one pending in the state

of his post."  Id. at 363.  For those reasons, this Court should quash service of process on Prince

Turki and dismiss all claims against him.  See Aidi v. Yaron, 672 F. Supp. 516, 517 (D.D.C.

1987) (granting motion to quash process based on diplomatic immunity because, "if jurisdiction

is not available, then service of process is void, making a motion to quash service of process a

valid remedy").

## II.    This Court Lacks Personal Jurisdiction Over Prince Turki

    In addition to Prince Turki's entitlement to sovereign and diplomatic immunity, plaintiffs

cannot meet their burden of making a prima facie showing of facts sufficient to support this

Court's exercise of personal jurisdiction over Prince Turki.  See, e.g., Whitaker v. American

Telecasting, Inc., 261 F.3d 196, 208 (2d Cir. 2001).  No statute provides a basis for exercising

jurisdiction over Prince Turki, and he lacks the minimum contacts with New York (and the United States) necessary to meet due process standards for personal jurisdiction.

### A.  No Statute Provides for Personal Jurisdiction over Prince Turki

The New York long-arm statute does not permit the exercise of personal jurisdiction over Prince Turki.  The only even arguably applicable provisions of that statute require that the defendant or his agents committed a tortious act in New York, C.P.L.R. § 302(a)(2), or a tortious act outside New York causing injury to person or property in New York, id. § 302(a)(3).  Actions outside New York will give rise to jurisdiction, however, only if the defendant either

> (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or
> (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce.

Plaintiffs have not alleged facts to come within those provisions.  They do not allege that the September 11 hijackers were agents of Prince Turki,[12] that Prince Turki engages in any persistent course of conduct in New York, or that Prince Turki either should have reasonably expected his official acts to have consequences in this state or personally derives substantial revenue from interstate or international commerce.

The nationwide service of process provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO") and the Antiterrorism Act of 1990 ("ATA") do not directly confer jurisdiction because Prince Turki was not served with process in the United States.  See 18

---

[12] The Second Circuit has held that, "before an agency relationship will be held to exist under section 302(a)(2), a showing must be made that the alleged agent acted in New York for the benefit of, with the knowledge and consent of, and under some control by, the nonresident principal."  Grove Press, Inc. v. Angleton, 649 F.2d 121, 122 (2d Cir. 1981).  With regard to the September 11 attacks, plaintiffs have not alleged the requisite benefit to, knowledge or consent of, and control by Prince Turki, nor could plaintiffs responsibly do so.

U.S.C. §§ 1965(b), 2334; see also, e.g., Michelson v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 709 F. Supp. 1279, 1285 (S.D.N.Y. 1989) (holding that RICO does not provide for international service).  Nor can either of those provisions confer jurisdiction indirectly, through Federal Rule of Civil Procedure 4(k)(2),[13] because plaintiffs have failed to state a claim against Prince Turki under either federal statute.[14]  Upon dismissal of these claims, plaintiffs will have no statutory claim providing for nationwide service of process and no basis for claiming jurisdiction over Prince Turki based on his contacts with the United States as a whole, rather than his contacts with New York in particular.  See, e.g., Nix v. Hoke, 62 F. Supp. 2d 110, 115 (D.D.C. 1999) (where RICO claim is dismissed, nationwide service of process provision is inapplicable).  In any event, even looking at Prince Turki's contacts with the United States as a whole, it is clear that the Court lacks personal jurisdiction over him.

### B.   Prince Turki Lacks the Minimum Contacts with the Forum That the Constitution Requires

Even if the applicable statutes provided for personal jurisdiction, the Due Process Clause limits this Court's authority to assert personal jurisdiction over Prince Turki.  Plaintiffs cannot show sufficient minimum contacts between Prince Turki and this forum (or the U.S. as a whole) so that the exercise of personal jurisdiction over him would not "offend traditional notions of fair

---

[13] Rule 4(k)(2) provides that, "[i]f the exercise of jurisdiction is consistent with the Constitution and laws of the United States, serving a summons or filing a waiver of service is also effective, with respect to claims arising under federal law, to establish personal jurisdiction over the person of any defendant who is not subject to the jurisdiction of the courts of general jurisdiction of any state."

[14] Plaintiffs lack standing to bring a RICO claim (as Judge Robertson has already ruled in the Burnett case, see 292 F. Supp. 2d at 23 & n.6) because their injuries are personal in nature, rather than being injuries to business or property, as that statute requires.  See Laborers Local 17 Health & Benefit Fund v. Philip Morris, Inc., 191 F.3d 229, 241 (2d Cir. 1999) (noting "the lack of a RICO damages remedy for even direct personal injuries").  Plaintiffs' ATA claims fail because that Act does not apply to acts of foreign government officials, see 18 U.S.C. § 2337, or to acts of domestic terrorism such as the attacks of September 11, see id. § 2331(5).

play and substantial justice."  International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945)
(internal quotation marks and citation omitted); Calder v. Jones, 465 U.S. 783, 788 (1984).

      Prince Turki "own[s] no property, conduct[s] no business, and hold[s] no bank accounts
in the United States."  Decl. ¶ 20.  His only non-official contacts with the United States are an
occasional trip "over the years for medical reasons or on holiday."  Id.  These sporadic contacts
have nothing to do with plaintiffs' purported causes of action and thus cannot form a basis for
personal jurisdiction.  Kulko v. Superior Court, 436 U.S. 84, 93-94 (1978) (holding temporary
visits to forum insufficient bases for personal jurisdiction over unrelated action).[15]

      Nor do Prince Turki's actions abroad suffice to create the necessary contacts with New
York or the United States.  Plaintiffs must establish that Prince Turki had a "substantial
connection" with the forum state, as demonstrated by "an action of the defendant purposefully
directed toward the forum State."  Asahi Metal Indus. Co. v. Superior Court, 480 U.S. 102, 112
(1987) (plurality op.) (emphasis added).  Even if it were true that Prince Turki somehow
facilitated payments to the Taliban or Al-Qaeda, it would not follow that Prince Turki
"purposefully directed" any of his actions toward the United States, much less toward New York.
Id.  Just as "[t]he placement of a product into the stream of commerce, without more, is not an
act of the defendant purposefully directed toward the forum State," id., so, too, an individual
alleged to have facilitated (in an unspecified way, at an unspecified time) payments by others "in

_____

     [15] Depending on the nature and extent of a foreign defendant's contacts with the forum, a
federal court may obtain either specific or general jurisdiction over him.  Only specific
jurisdiction is at issue here (i.e., the suit arises out of or is related to the defendant's contacts with
the forum).  The complaints do not allege that Prince Turki has the substantial, continuous, and
systematic contacts with this forum necessary for him to be subject to the general jurisdiction of
this Court, for matters unrelated to his contacts with the forum, see Helicopteros Nacionales de
Colombia, S.A. v. Hall, 466 U.S. 408, 413-15 & n.9 (1984).  In any event, Prince Turki's
Declaration makes clear that he does not have such contacts.  Decl. ¶ 20.

support of . . . international terrorism," <u>Ashton</u> Compl. ¶ 259, does not establish "an act" that is "purposefully directed toward the forum State," <u>Asahi</u>, 480 U.S. at 112 (plurality op.).  <u>See also</u> <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 474 (1985) ("foreseeability" of injury in the forum state "is not a sufficient benchmark for exercising personal jurisdiction") (internal quotation marks omitted).

     " 'Great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field.' " <u>Asahi</u>, 480 U.S. at 115 (plurality op.) (quoting <u>United States v. First Nat'l City Bank</u>, 379 U.S. 378, 404 (1965) (Harlan, J., dissenting)); <u>see also</u> <u>Leasco Data Processing Equip. Corp. v. Maxwell</u>, 468 F.2d 1326, 1341 (2d Cir. 1972) (Friendly, J.) (principles of extraterritorial exercise of personal jurisdiction "must be applied with caution, particularly in an international context").  Furthermore, by requiring that "contacts proximately result from actions by the defendant <u>himself</u> that create a 'substantial connection' with the forum State," the Constitution ensures that "a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts."  <u>Burger King</u>, 471 U.S. at 475 (quoting <u>McGee v. International Life Ins. Co.</u>, 355 U.S. 220, 223 (1957), and <u>Keeton v. Hustler Magazine, Inc.</u>, 465 U.S. 770, 774 (1984)).

     Applying these principles, Judge Robertson ruled in <u>Burnett</u> that, notwithstanding allegations that Prince Sultan "personally donated money to [certain charities], knowing that those foundations funded terrorist organizations including Al Qaeda," the complaint "stops well short of alleging that Prince Sultan's actions were 'expressly aimed' or 'purposefully directed' at the United States."  <u>Burnett</u>, 292 F. Supp. 2d at 22-23.  Judge Robertson therefore dismissed these personal activity claims for lack of personal jurisdiction.  The allegations against Prince Turki, who is not alleged to have personally donated money, directly or indirectly, in support of

terrorism, stop even farther short of alleging that his actions were purposefully directed at the

United States, let alone at New York.  Absent any purposeful availment by Prince Turki, the Due

Process Clause prevents this Court from exercising personal jurisdiction over him.

Plaintiffs cannot fill that gap in their respective complaints with a conclusory allegation

of conspiracy or aiding and abetting.  "The cases are unanimous that a bare allegation of a

conspiracy between the defendant and a person within the personal jurisdiction of the court is not

enough."  Stauffacher v. Bennett, 969 F.2d 455, 460 (7th Cir. 1992) (Posner, J.).  "Otherwise

plaintiffs could drag defendants to remote forums for protracted proceedings even though there

were grave reasons for questioning whether the defendant was actually suable in those forums."

Id.  See also Lehigh Valley Indus., Inc. v. Birenbaum, 527 F.2d 87, 93-94 (2d Cir. 1975) ("[t]he

bland assertion of conspiracy . . . is insufficient to establish [personal] jurisdiction"); Bank

Brussels Lambert v. Fiddler Gonzalez & Rodriguez, 171 F.3d 779, 793 (2d Cir. 1999) (holding

that conclusory statements about defendant's role in conspiracy were insufficient to establish

jurisdiction on conspiracy theory).  Even when it can be shown that a defendant's acts outside

the United States have "some causal relation to the alleged injuries" within the United States,

"the test for in personam jurisdiction is somewhat more demanding" and requires at least that

any injury be a "direct and foreseeable result of the conduct outside the territory."  Bersch v.

Drexel Firestone, Inc., 519 F.2d 974, 1000 (2d Cir. 1975) (Friendly, J.) (internal quotation marks

omitted).  Plaintiffs have utterly failed to allege facts suggesting that the September 11 attacks

were in any way the direct and foreseeable result of any act by Prince Turki or the Saudi

government, acting on its own or in conjunction with the United States government.

Accordingly this Court cannot properly exercise personal jurisdiction over Prince Turki.

Finally, plaintiffs' failure to allege <u>any</u> factual basis for personal jurisdiction also precludes them from obtaining jurisdictional discovery.  <u>See</u> <u>Jazini by Jazini v. Nissan Motor Co.</u>, 148 F.3d 181, 185-86 (2d Cir. 1998) (plaintiffs must allege facts establishing <u>prima facie</u> showing of personal jurisdiction before getting jurisdictional discovery); <u>Central States, S.E. & S.W. Areas Pension Fund v. Reimer Express World Corp.</u>, 230 F.3d 934, 946 (7th Cir. 2000) ("plaintiff must establish a colorable or prima facie showing of personal jurisdiction before discovery should be permitted").

## Conclusion

For the foregoing reasons, the complaints against Prince Turki should be dismissed in their entirety.

Respectfully submitted,

KELLOGG, HUBER, HANSEN,
  TODD & EVANS, P.L.L.C.

By: <u>/s/                                    </u>
Mark C. Hansen (MH0359)
Michael K. Kellogg (MK4579)
David C. Frederick (DF4906)
Michael J. Guzman (MG9623)
J.C. Rozendaal (JR1430)

Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036-3209
(202) 326-7900

March 19, 2004

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this 19th day of March 2004, I caused copies of the

<u>Memorandum of Law in Support of Motion To Dismiss and To Quash Service of Process of His</u>

<u>Royal Highness Prince Turki Al-Faisal bin Abdulaziz Al-Saud</u> to be served electronically

pursuant to the Court's ECF system and by United States first-class mail on any parties not

participating the Court's ECF system as thereafter advised by the Court.


/s/ _____

Michael J. Guzman