## IN THE UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ )<br>)<br>**In re Terrorist Attacks on September 11, 2001**   )<br>)<br>⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ ) | **03-MDL-1570**<br>**ECF Case** |

*Relates to:*
*Ashton v. Al Qaeda Islamic Army*, 02-CV-6977 (RCC)
*Burnett v. Al Baraka Investment & Development Corp.*, 03-CV-5738 (RCC)
*Federal Insurance Co. v. Al Qaida*, 03-CV-6978 (RCC)
*Barrera v. Al Qaeda Islamic Army*, 03-CV-7036 (RCC)
*Salvo v. Al Qaeda Islamic Army*, 03-CV-5071 (RCC)
*Burnett v. Al Baraka Investment & Development Corp.*, 03-CV-9849 (RCC)

## MEMORANDUM IN SUPPORT OF HIS ROYAL HIGHNESS
## PRINCE SALMAN BIN ABDULAZIZ AL-SAUD'S
## MOTION TO DISMISS THE COMPLAINTS

**TABLE OF CONTENTS**

Page(s)

TABLE OF AUTHORITIES .................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 3

    A.    The Saudi High Commission ................................................................................. 3

    B.    The Allegations Against Prince Salman ................................................................. 4

        1.    The SHC's Alleged Conduct ......................................................................... 4

        2.    Prince Salman's Alleged Conduct on Behalf of the SHC........................... 5

        3.    Prince Salman's Alleged Private Conduct .................................................. 5

ARGUMENT ...................................................................................................................... 8

    A.    Standard of Review............................................................................................... 8

    B.    This Court Lacks Subject-Matter Jurisdiction Because Prince Salman is
        Absolutely Immune From Suit Under the FSIA. .................................................. 10

        1.    The FSIA Applies to the Official Acts of Prince Salman......................... 10

        2.    The Commercial-Activity Exception Does Not Apply............................. 11

        3.    The Non-Commercial Tort Exception Does Not Apply........................... 13

            a.    Prince Salman Exercised a Discretionary Function...................... 13
            b.    The FSIA Exception for Providing Material
                Support to Terrorism Is Inapplicable ............................................ 14
            c.    The Causation Requirement of Section 1605(a)(5)
                Is Not Satisfied............................................................................. 15

    C.    This Court Has No Personal Jurisdiction Over Prince Salman............................ 17

    D.    The Complaints Do Not State a Claim Upon Which Relief Can Be Granted
        Because the Facts Alleged Fail to Establish That Prince Salman's Acts
        Proximately Caused the September 11th Attacks................................................ 20

## TABLE OF AUTHORITIES

**Page(s)**

### FEDERAL CASES

Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428 (1989) ...............................10

Berkovitz v. United States, 486 U.S. 531 (1988).............................................................................14

Boim v. Quranic Literacy Institute, 291 F.3d 1000 (7th Cir. 2002) .........................................23, 24

Burger King v. Rudzewicz, 471 U.S. 462 (1985).........................................................18, 19, 20, 21

Burnett v. Al Baraka Inv. & Dev. Corp., 292 F. Supp. 2d 9 (D.D.C. 2003).......................... *passim*

Christianson v. Colt Indus. Operating Corp., 486 U.S. 800 (1988)................................................9

Chrysler Credit Corp. v. Country Chrysler, Inc., 928 F.2d 1509 (10th Cir. 1991).........................9

Cicippio v. Islamic Republic of Iran, 30 F.3d 164 (D.C. Cir. 1994) .............................................12

Coulthurst v. United States, 214 F.3d 106 (2d Cir. 2000) .............................................................13

Crane Co. v. American Std., Inc., 603 F.2d 244 (2d Cir. 1979) .......................................................9

Degulis v. LXR Biotech., Inc., 928 F. Supp. 1301 (S.D.N.Y. 1996)...............................................9

Department of Educ. v. United States, 385 U.S. 355 (1966) .........................................................10

Departmentt of Employment v. United States, 385 U.S. 355, 359 (1966) .....................................10

Doe v. Islamic Salvation Front, No. 96-2792, 2003 U.S. Dist.
      LEXIS 5036 (D.D.C. Mar. 31, 2003) .................................................................................23

Fickling v. Commonwealth of Australia, 775 F. Supp. 66 (E.D.N.Y. 1991) ...........................10, 11

Filetech S.A. v. France Telecom S.A., 157 F.3d 922 (2d Cir. 1998)
      *aff'd*, 304 F.3d 180 (2002).....................................................................................................8

First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763 (2d Cir. 1994).................................22

Helicopteros Nacionales de Colombia, SA v. Hall, 466 U.S. 408 (1984).....................................20

Holmes v. Sec. Inv. Prot. Corp., 503 U.S. 258 (1992)..................................................................20

In re Am. Express Co. S'holder Litig., 39 F.3d 395 (2d Cir. 1994)...............................................20

In re Jackson Nat'l Life Ins. Co. Premium Litigation,
    209 F.R.D. 134 (W.D. Mich. 2002) ...................................................................9

In re Korean Air Lines Disaster, 814 F. Supp. 599 (S.D.N.Y. 1993) ...............................9

In re Papandreou, 139 F.3d 247 (D.C. Cir. 1998) ..........................................................1

Kline v. Kaneko, 685 F. Supp. 386 (S.D.N.Y. 1988) .....................................................12

Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,
    507 U.S. 163 (1993) ...........................................................................................8

Letelier v. Republic of Chile, 748 F.2d 790 (2d Cir. 1984) ...........................................12

Leutwyler v. Office of Her Majesty Queen Rania Al-Abdullah,
    184 F. Supp. 2d 277 (S.D.N.Y. 2001) ...............................................................10

Libutti v. United States, 178 F.3d 114 (2d Cir. 1999) ...................................................18

MacArthur Area Citizens Ass'n v. Republic of Peru, 809 F.2d 918 (D.C. Cir. 1987)..................13

Metropolitan Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560 (2d Cir. 1996) .......................17

Phoenix Consulting Inc. v. Republic of Angola, 216 F.3d 36 (D.C. Cir. 2000).............................1

Price v. Socialist People's Libyan Arab Jamahiriya, 294 F.3d 82 (D.C. Cir. 2002) ......................15

Republic of Argentina v. Weltover, Inc., 504 U.S. 607 (1992) .....................................................11

Robinson v. Government of Malaysia, 269 F.3d 133 (2d Cir. 2001) .....................8, 10, 15, 16, 22

Saudi Arabia v. Nelson, 507 U.S. 349 (1993) ......................................................................12, 14

Scott v. Sonnet, Sale & Keuhne, P.A., 989 F. Supp. 542 (S.D.N.Y. 1998)..................................19

Securities & Exch. Comm'n v. Alexander, 160 F. Supp. 2d 642 (S.D.N.Y. 2001) ......................20

Shapiro v. Republic of Bolivia, 930 F.2d 1013 (2d Cir. 1991)......................................................19

Surette v. Islamic Republic of Iran, 231 F. Supp. 2d 260 (D.D.C. 2002).....................................23

Ungar v. Islamic Republic of Iran, 211 F. Supp. 2d 91 (D.D.C. 2002) ...................................22, 23

Verlinden B.V. v. Cent. Bank of Nigeria, 461 U.S. 480, 493 (1983)............................................10

Virgin Atlantic Airways, Ltd. v. Nat'l Mediation Bd., 956 F.2d 1245 (2d Cir. 1992) ...................9

Virtual Countries, Inc. v. Republic of S. Africa, 300 F.3d 230 (2d Cir. 2002) ........................8, 15

Weinstein v. Islamic Republic of Iran, 184 F. Supp. 2d 13 (D.D.C. 2002)....................................23

Zdanok v. Glidden Co., 327 F.2d 944, 953 (2d Cir. 1964)..............................................................9

## DOCKETED CASES

Ashton v. Al Qaeda Islamic Army, et al., 02-CV-6977........................................................... *passim*

Barrera v. Al Qaeda Islamic Army et al., 03-CV-7036 ......................................................... *passim*

Burnett v. Al Baraka Investment & Development Corp. et al., 03-CV-5738........................ *passim*

Burnett v. Al Baraka Investment & Development Corp. et al., 03-CV-9849........................ *passim*

Federal Insurance Co. v. Al Qaida, 03-CV-6978.................................................................. *passim*

In re Air Crash at Belle Harbor, New York, Nos. 1448 (RWS),
  02-Civ.-8411 (RWS) 2003 WL 124677 (S.D.N.Y. Jan. 15, 2003)......................................9

Salvo v. Al Qaeda Islamic Army et al., 03-CV-5071 .......................................................1, 4, 6, 21

Time, Inc. v. Simpson, No. 02 Civ. 4917 (MBM),
  2003 WL 23018890 (S.D.N.Y. Dec. 22, 2003) ..................................................................18

## STATUTES

18 U.S.C. § 2333...............................................................................................................25

28 U.S.C. § 1603...............................................................................................................10

28 U.S.C. § 1605........................................................................................................... *passim*

Federal Rule of Civil Procedure 12(b)(1) .................................................................8, 16

Federal Rule of Civil Procedure 12(b)(2) .......................................................................18

Federal Rule of Civil Procedure 12(h)(2) .........................................................................1

H.R. Rep. No. 94-1487 ....................................................................................................11

## MISCELLANEOUS

Decl. of Saud Bin Mohammad Al-Roshood ............................................................3, 4, 10, 12, 14

Decl. of Dr. Mutlib bin Abdullah Al-Nafissa ..........................................................................3, 10

Mot. to Dismiss of His Royal Highness Prince Sultan bin
  Abdulaziz Al-Saud, Mar. 19, 2004 .....................................................................................9

"Open Letter from Osama bin Laden to King Fahd Concerning
the Latest Cabinet Shuffle," Aug. 3, 1995, *reprinted in* Roland Jaquard,
In the Name of Osama Bin Laden (Durham: Duke Univ. Press 2002) ...........................................2

## INTRODUCTION

His Royal Highness Prince Salman bin Abdulaziz Al-Saud ("Prince Salman"), a senior member of the Saudi Arabian government, hereby moves this Court to dismiss with prejudice the claims asserted against him in <u>Ashton v. Al Qaeda Islamic Army, et al.,</u> 02-CV-6977, <u>Burnett v. Al Baraka Investment & Development Corp. et al.,</u> 03-CV-5738, ("<u>Burnett (NY)</u>") <u>Barrera v. Al Qaeda Islamic Army et al.,</u> 03-CV-7036, <u>Salvo v. Al Qaeda Islamic Army et al.,</u> 03-CV-5071, <u>Burnett v. Al Baraka Investment & Development Corp. et al.,</u> 03-CV-9849 ("<u>Burnett</u>") and <u>Federal Insurance Co. v. Al Qaida,</u> 03-CV-6978 (the "Complaints").[1] These cases must be dismissed because (1) Prince Salman is entitled to sovereign immunity, (2) the plaintiffs have not established a prima facie case for the exercise of personal jurisdiction, and (3) the complaints fail adequately to allege that any action taken by Prince Salman was the proximate cause of the plaintiffs' injuries.[2]

The plaintiffs in these cases seek to blame Saudi Arabia and its officials for the September 11, 2001 terrorist attacks on the United States. They ignore, however, that the actual perpetrator of the attacks, Osama bin Laden's Al Qaeda network, is a sworn and determined enemy of the Kingdom of Saudi Arabia, which in 1994 revoked bin Laden's Saudi citizenship and, prior to September 11, 2001, actively sought his extradition to face criminal charges in the Kingdom. Al Qaeda has for years loudly advocated the removal of the Saudi Royal Family,

---

[1] Prince Salman appears voluntarily in <u>Burnett</u>, <u>Burnett (NY)</u>, <u>Salvo</u>, <u>Ashton</u> and <u>Barrera</u> as he has not yet been properly served. He does not waive any jurisdictional arguments by so appearing.

[2] The claims against Prince Salman are also non-justiciable under the political question doctrine and other limitations on the Court's subject-matter jurisdiction. In the interest of efficiency, however, Prince Salman reserves argument on these defenses until the Court resolves the threshold questions of sovereign immunity and personal jurisdiction. <u>See</u> Fed. R. Civ. P. 12(h)(2), 12(h)(3); <u>see also</u> <u>Phoenix Consulting Inc. v. Republic of Angola</u>, 216 F.3d 36, 40 (D.C. Cir. 2000) (suggesting that non-merits grounds for relief should be decided first when an immunity defense is raised); <u>In re Papandreou</u>, 139 F.3d 247, 254 (D.C. Cir. 1998) (same).

1

most prominently evidenced by bin Laden's 1995 "open letter" to King Fahd, in which bin

Laden singled out the King and the "prince of Riyadh," Prince Salman, among others, as "the

source of the disease" in Saudi Arabia.[3] Moreover, the recent murderous attacks in the Kingdom

reflect Al Qaeda's determination to accomplish the removal of the Royal Family through violent

means.  In the past year alone, Al Qaeda has carried out three massive bombings within the

Kingdom, and Saudi security forces have thwarted numerous other attacks.  Given this

demonstrated mutual hostility between the Saudi government and Al Qaeda, the Plaintiffs'

allegation that Prince Salman and his fellow ministers (and indeed the Kingdom itself)

knowingly financed Al Qaeda's terrorist activities is as absurd as it is false.

   The accusations against Prince Salman are even more preposterous given his

responsibilities in the Saudi government.  Prince Salman is not only a member of the Council of

Ministers but also the governor of the province of Riyadh, the seat of the capital of Saudi Arabia

and the prime target of Al Qaeda's recent attacks.  Moreover, as President of the Saudi High

Commission for Bosnia and Herzegovina ("Saudi High Commission" or "SHC"), a Saudi

government agency,  Prince Salman has been the primary Saudi official responsible for

coordinating the massive humanitarian assistance effort undertaken by Saudi Arabia in response

to the slaughter of Bosnian Muslims by the former Serbian regime and its leader, accused war

criminal Slobodan Milosevic.  Prince Salman's humanitarian work in Bosnia is representative of

a public service career distinguished foremost by charity and generosity.  Ironically, however,

based upon his assistance to innocent genocide victims in Bosnia, Prince Salman stands accused

---

[3] See "Open Letter from Osama bin Laden to King Fahd Concerning the Latest Cabinet
Shuffle," Aug. 3, 1995, *reprinted in* Roland Jaquard, In the Name of Osama Bin Laden (Durham: Duke
Univ. Press 2002), at 172; http://www.jihadunspun.net/articles/05272002-Open.Letter.To.King.
Fahd/index.html.

of aiding in the murder of the innocent victims of September 11, 2001.  This accusation is

baseless and unfair.

**BACKGROUND**

A.       **The Saudi High Commission**

The SHC was formed in 1993 by the President of Saudi Arabia's Council of

Ministers to organize and fund relief efforts in Bosnia-Herzegovina during the civil war in the

former Yugoslavia.  Decl. of Saud Bin Mohammad Al-Roshood ¶ 6, attached as Exhibit B.[4]  It is

an arm of the Saudi government and receives approximately 30 percent of its funding directly

from the Saudi Arabian budget.  Decl. of Dr. Mutlib bin Abdullah Al-Nafissa, attached as

Exhibit C ¶ 3; Al-Roshood Decl. ¶ 24.  The SHC is governed by an Executive Committee and a

Supreme Committee, both of which have been headed by Prince Salman since the SHC's

formation.  Al-Roshood Decl. ¶ 7. The SHC's staff consists of members of the Saudi civil

service, including those detailed from other ministries and agencies.  Al-Roshood Decl. ¶ 10.

The SHC's Executive Committee oversees the allocation of charitable

contributions and makes its funding decisions based on Saudi Arabia's foreign policy goals.  Al-

Roshood Decl. ¶ 8-9.  Contributions are largely allocated to help refugees and orphans of the

civil war in the former Yugoslavia, as reflected by an audit conducted by the Federal Ministry of

Finance of Bosnia Herzegovina for the years 1998 through 2001, which showed that SHC funds

had also been used to build mosques and cultural centers, purchase medical equipment, print

children's magazines, fund scholarships for children and provide transportation for municipal

elections.  Al-Roshood Decl. ¶ 13.  As part of its relief efforts, the SHC has worked closely with

---

[4] Attached as Exhibit A is a declaration by Abdulaziz Fahad, attesting to the accuracy of the translations of Dr. Mutlib and Mr. Al-Roshood's Arabic declarations.

3

the U.N. High Commission for Refugees and the U.N. Educational, Scientific and Cultural
Organization. Al-Roshood Decl. ¶ 15-18.

### B.     The Allegations Against Prince Salman

As with numerous other of the approximately 200 defendants, the Complaints
make the blanket accusation that Prince Salman "is engaged in the aiding and abetting and
material sponsorship of international terrorism, including Al Qaeda and Osama bin Laden."
Burnett (NY and DC) Compls. ¶ 403; Ashton Compl. ¶ 255; see also Federal Insurance Compl. ¶
455; Salvo Compl. ¶ 247. Yet, when it comes to supporting that accusation with facts, the
Complaints rely on nothing more than guilt by association and rhetorical smears. The specific
allegations against Prince Salman can be divided into three categories:[5] (1) allegations
concerning SHC and its actions, (2) allegations concerning Prince Salman's actions as the head
of the SHC, and (3) allegations concerning what the plaintiffs characterize as Prince Salman's
personal actions.

### 1.     The SHC's Alleged Conduct

The majority of the alleged links between Prince Salman and the September 11
attacks are not based on actions that he is alleged personally to have taken, but are derivative of
his leadership of the SHC, a government agency against which plaintiffs' allegations are patently
inadequate. The few allegations the plaintiffs do make against the SHC are:

> that it has been criticized by "aid agencies and Bosnian intellectuals
> for importing . . . Wahhabism" to Bosnia (Burnett (NY and DC) Compls. ¶
> 393; Ashton Compl. ¶ 447; Barrera Compl. ¶ 449; Salvo Compl. ¶ 291);
>
> that it employed an Algerian national as a language translator who is
> suspected of having ties Al Qaeda (Burnett (NY and DC) Compls. ¶¶ 394-

---

[5]     A summary of the allegations against the SHC and Prince Salman, including references to
paragraphs in each complaint, is attached as Exhibit D.

396; Ashton Compl. ¶¶ 448-450; Barrera Compl. ¶¶ 452, 454; Salvo Compl. ¶¶ 292, 294);

that suspicious material, most notably before and after pictures of the World Trade Center, were found on a computer located in offices used by the SHC in Bosnia (Burnett (NY and DC) Compls. ¶¶ 397, 398; Ashton Compl. ¶ 451; Fed. Ins. Compl. ¶¶ 186, 458; Barrera Compl. ¶ 453; Salvo Compl. ¶ 295);

that the SHC has been accused of using its funds for (unspecified) purposes other than relief work (Burnett (NY and DC) Compls. ¶¶ 404-407; Ashton Compl. ¶¶ 454-456; Fed. Ins. Compl. ¶¶ 184-185, 457, 460; Barrera Compl. ¶¶ 456-57; Salvo Compl. ¶¶ 301-02);

that in 1992, Al Qaeda fighters "disguised as relief workers for the Saudi High Commission" entered Bosnia Herzegovina (Fed. Ins. Compl. ¶ 183); and

that SHC has materially supported Al Qaeda (Fed. Ins. Compl. ¶ 182, 184, 188).

## 2.   **Prince Salman's Alleged Conduct on Behalf of the SHC**

As for Prince Salman's actions as the head of the SHC, the plaintiffs allege no

specific *facts*. The Complaints simply include conclusory statements that (1) Prince Salman was

aware that money was being diverted from the SHC for unspecified other purposes, (2) that he

"knowingly failed to take appropriate actions regarding the management and use of funds of the

Saudi High Commission," Burnett (NY and DC) Compls. ¶ 406; Ashton Compl. ¶ 457; Barrera

Compl. ¶ 459; Salvo Compl. ¶ 303, and (3) that he knew that the SHC supported Al Qaeda, Fed.

Ins. Compl. ¶ 456-57. As discussed in more detail below, such conclusory allegations cannot

form the basis of any claim against Prince Salman.

## 3.   **Prince Salman's Alleged Private Conduct**

As for specific actions taken by Prince Salman independent of the SHC, the

Complaints allege five: First, in 1981, Prince Salman is said to have chaired a Saudi government

committee that made a donation to the Afghanistan mujahadeen, who he described as "our

5

Afghan brothers." Burnett (NY and DC) Compls. ¶ 400; Ashton Comp. ¶ 289; Barrera Compl. ¶ 291; Salvo Compl. ¶ 298. Second, in 1999 Prince Salman is said to have donated $400,000 towards relief efforts in Bosnia and Chechnya during a fundraising campaign sponsored by the International Islamic Relief Organization ("IIRO") and other charities. Burnett (NY and DC) Compls. ¶ 401; Ashton Compl. ¶ 290; Fed. Ins. Compl. ¶ 461; Barrera Compl. ¶ 292; Salvo Compl. ¶ 299. Third, also in 1999, Prince Salman allegedly donated one million Saudi Riyals during a fundraising drive by the IIRO and another charity. Fed. Ins. Compl. ¶ 461. Fourth, in 1994, he allegedly stated during a news conference that he had raised 6 million riyals for the IIRO and another charity. Fed. Ins. Compl. ¶ 462. Fifth, in 2000 Prince Salman is alleged to have *received* a letter from the Palestinian Ambassador requesting that Saudi Arabia centralize its foreign aid to Palestine with the Palestinian Authority rather than dispersing it to separate groups characterized by the Ambassador as "radical." Burnett (NY and DC) Compls. ¶ 402; Ashton Compl. ¶ 291.

The allegation that Prince Salman may have been involved in the Saudi government's support of the Afghan mujahadeen in the early 1981 would, if nothing else, place him in good company, along with the CIA and the Reagan Administration. It certainly would not implicate him in the perpetration of terrorist attacks carried out two decades later. Prince Salman's receipt of a letter from the Palestinian Ambassador concerning alleged Saudi government funding to Palestinian-based organizations is equally irrelevant to this lawsuit. It is not alleged that Prince Salman directed or controlled such funding, that he initiated or responded to the Ambassador's correspondence, or that there is any connection whatsoever between the Saudi Arabian government's support for Palestine, on the one hand, and Al Qaeda and the September 11 attacks on the other.

6

As will be discussed in more detail below, the other allegations concerning Prince Salman's personal donations are also specious.  Unless one accepts the plaintiffs' apparent belief that donating to any charitable campaign associated with the IIRO or any charity named in the Complaints—for any purpose, anywhere in the world—constitutes providing material support for Al Qaeda, the allegations in the Complaints are entirely benign as they relate to Prince Salman and do nothing to distinguish him from the hundreds of others who may have donated to the same campaigns.[6]

Finally, the Complaints assert no basis whatsoever for an exercise of personal jurisdiction over Prince Salman.  They allege no "minimum contacts" with the United States, nor do they allege conduct intended to have a "direct effect" in the United States.  The only allegation in the Complaints concerning personal jurisdiction—that the "Saudi Royal family members own substantial assets in the United States of America [and] do substantial business in the United States of America"—says nothing about Prince Salman.  Burnett (NY and DC) Compls. ¶ 431; Ashton Compl. ¶ 296; Barrera Compl. ¶ 298.  There is no allegation in any Complaint of conduct by Prince Salman in the United States, nor could such an allegation be made in good faith.

---

[6] If these allegations were deemed sufficient to state a claim for relief, it would open a Pandora's box of tort suits against individuals wholly unconnected to the alleged tort.  Sexual abuse claims could proceed against any donor to a Catholic church parish in the last decade.  Terrorism claims could go forward against the head of any charity that employed an alleged sympathizer of the Irish Republican Army, the apartheid-era African National Congress, or other reputed "terrorist" organizations.  Wrongful death claims would lie against the head of the Christian Coalition by virtue of its alleged support of Operation Rescue, whose followers have been implicated in the killing of doctors who perform abortions. The possibilities abound.

## ARGUMENT

### A.    Standard of Review.

In considering a typical motion to dismiss, the Court must accept as true all well-pleaded factual allegations in the complaint. See, e.g., Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 164 (1993).  Under the Foreign Sovereign Immunities Act ("FSIA"), however, the Court must "look beyond the pleadings to factual submissions, including affidavits, submitted to the court in order to resolve a factual dispute as to whether" an exception to the FSIA applies. Robinson v. Gov't of Malaysia, 269 F.3d 133, 140-41 (2d Cir. 2001); Filetech S.A. v. France Telecom S.A., 157 F.3d 922, 932 (2d Cir. 1998), aff'd, 304 F.3d 180 (2002).  Where a defendant presents a "prima facie case that it is a sovereign," the plaintiff "has the burden of going forward with evidence showing that, under exceptions to the FSIA, immunity should not be granted." Virtual Countries, Inc. v. Republic of S. Africa, 300 F.3d 230, 241 (2d Cir. 2002).  Thus, when a FSIA claim is raised, the plaintiff bears a much higher burden at the dismissal stage that it does on an ordinary motion under Federal Rule of Civil Procedure 12(b)(1).

In November 2003, before the transfer of this case by the Multidistrict Litigation Panel to New York, Judge Robertson granted the motions to dismiss of HRH Prince Sultan bin Abdulaziz ("Prince Sultan"), the defense minister and third highest ranking government official in Saudi Arabia, and HRH Prince Turki Al-Faisal, the former director of the Saudi Arabian Department of General Intelligence. Burnett v. Al Baraka Inv. & Dev. Corp., 292 F. Supp. 2d 9 (D.D.C. 2003).  In so doing, Judge Robertson held that, to the extent the charitable contributions attributed to Prince Sultan were in fact Saudi government grants authorized by him in his official capacity, the FSIA provides him absolute immunity from suit.  And to the extent the alleged

contributions were personal in nature, Judge Robertson held that the courts of the United States lack personal jurisdiction over Prince Sultan.

As more fully explained in Prince Sultan's March 19, 2004 motion to dismiss certain of the consolidated cases, these rulings are law of the case in Burnett and should be afforded substantial deference in the remaining cases. See Mot. to Dismiss of His Royal Highness Prince Sultan bin Abdulaziz Al-Saud, Mar. 19, 2004, at 10-13. The law-of-the-case doctrine prevents relitigation of issues in a single case once they have been decided. Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 815-16 (1988). It "promotes the finality and efficiency of the judicial process," id. at 816, saves litigants and the courts from duplication of efforts, and furthers the goal of consistency in judicial decisions. Crane Co. v. Am. Standard, Inc., 603 F.2d 244, 248 (2d Cir. 1979) (quoting Zdanok v. Glidden Co., 327 F.2d 944, 953 (2d Cir. 1964)). The law-of-the-case doctrine requires an "extremely deferential" standard of review.[7] In re Air Crash at Belle Harbor, New York, Nos. 1448 (RWS), 02-Civ.-8411(RWS), 2003 WL 124677, at *2 (S.D.N.Y. Jan. 15, 2003).

---

[7] Although the Court has the *power* to modify an interlocutory order of an MDL transferor court, see Degulis v. LXR Biotech., Inc., 928 F. Supp. 1301, 1309 (S.D.N.Y. 1996), courts should be "loathe" to revisit a previously decided issue, "except for rare circumstances." In re Air Crash at Belle Harbor, N.Y., 2003 WL 124677, at *2; see also Chrysler Credit Corp. v. Country Chrysler, Inc., 928 F.2d 1509, 1516 (10th Cir. 1991) ("[T]raditional principles of law of the case counsel against the transferee court reevaluating the rulings of the transferor court."); see also In re Korean Air Lines Disaster, 814 F. Supp. 599, 601 (S.D.N.Y. 1993) (holding that, under law of the case, motion for reconsideration of decision after MDL transfer "would have to prove especially meritorious to justify a departure from the prior ruling"); In re Jackson Nat'l Life Ins. Co. Premium Litig., 209 F.R.D. 134, 138 (W.D. Mich. 2002) (holding that law of the case is "particularly applicable in multidistrict litigation where the claims of numerous diverse parties might otherwise result in continuous relitigation of the same issues"). As the Second Circuit explained forty years ago, "'where litigants have once battled for the court's decision, they should neither be required, nor without good reasons permitted, to battle for it again.'" Virgin Atlantic Airways, Ltd. v. Nat'l Mediation Bd., 956 F.2d 1245, 1255 (2d Cir. 1992) (quoting Zdanok, 327 F.2d at 953).

**B.     This Court Lacks Subject-Matter Jurisdiction Because Prince Salman is Absolutely Immune From Suit Under the FSIA.**

The FSIA is the sole method by which the plaintiffs can assert subject-matter jurisdiction over foreign sovereigns in federal court. Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434 (1989). Immunity is a threshold question that the Court must resolve first. Robinson, 269 F.3d at 139 (citing Verlinden B.V. v. Cent. Bank of Nigeria, 461 U.S. 480, 493 (1983)). Under the FSIA, "foreign states" and their "instrumentalities" are absolutely immune from suit unless one of several narrowly-drawn exceptions applies. 28 U.S.C. §§ 1603, 1604; Robinson, 269 F.3d at 138.

**1.     The FSIA Applies to the Official Acts of Prince Salman**

As the President of the SHC, a government agency, there can be no doubt that Prince Salman is an instrumentality of the Kingdom of Saudi Arabia for purposes of the FSIA. See 28 U.S.C. § 1603(a); see also Fickling v. Commonwealth of Australia, 775 F. Supp. 66, 68 (E.D.N.Y. 1991) (government official deemed an instrumentality of foreign state). Indeed, the Federal Insurance complaint acknowledges that the SHC is "an agency, instrumentality and organ of the Kingdom of Saudi Arabia." Fed. Ins. Compl. ¶ 181. This Court may also consider evidence concerning the official status of the SHC. Leutwyler v. Office of Her Majesty Queen Rania Al-Abdullah, 184 F. Supp. 2d 277, 287 (S.D.N.Y. 2001). The declarations attached to this Motion make clear that the SHC is a governmental instrumentality. Al-Roshood Decl. ¶ 3 ("Actions taken by the Saudi High Commission may be viewed as actions of the government of Saudi Arabia"); Al-Nafissa Decl. ¶ 6-11. That the SHC receives some of its funding from non-government sources, Al-Roshood Decl. ¶ 24, does not preclude immunity. Dep't of Employment v. United States, 385 U.S. 355, 359 (1966) (holding that the American Red Cross was a

10

government instrumentality even though "its operations are financed primarily from voluntary private contributions").

Because Prince Salman has made a prima facie showing that he is entitled to immunity, the burden shifts to the plaintiffs to "come forward with some facts which would allow this Court to find that an exception to the [FSIA] applies." Fickling, 775 F. Supp. at 69. The only exceptions plaintiffs have advanced are the commercial-activity exception in 28 U.S.C. § 1605(a)(2), and the non-commercial tort exception in 28 U.S.C. § 1605(a)(5).

### 2. The Commercial-Activity Exception Does Not Apply

As Judge Robertson has already concluded, the "commercial-activity" exception to sovereign immunity does not apply to these allegations. Burnett, 292 F. Supp. 2d at 18. This exception provides that a foreign sovereign is not immune in any case:

> in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

28 U.S.C. § 1605(a)(2).

The Supreme Court has stated that only "when a foreign government acts, not as a regulator of the market, but in the manner of a private player within it, [are the foreign sovereign's] actions . . . 'commercial' within the meaning of the FSIA." Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 614 (1992) (holding that Argentina's issuance of bonds was commercial activity). The relevant inquiry is "whether the particular actions that the foreign state performs . . . are the type of actions by which a private party engages in 'trade . . . or commerce.'" Id. at 614.

11

The acts of the foreign sovereign at issue here – foreign assistance in furtherance of Saudi Arabia's national interests – are not the type of activity that can be undertaken by a private party. As Judge Robertson noted, the legislative history of the FSIA clearly shows that this is precisely the kind of activity Congress *did not* intend to be defined as "commercial activity": "[A] foreign state's mere participation in a foreign assistance program administered by the Agency for International Development (AID) is an activity whose essential nature is public or governmental, and it would not itself constitute a commercial activity." H.R. Rep. No. 94-1487, at 16, reprinted in 1976 U.S.C.C.A.N. at 6615; see Burnett, 292 F. Supp. 2d at 18.  Indeed, none of the conduct alleged with respect to Prince Salman or the SHC was undertaken for a commercial purpose because there was no intent that he or the SHC would receive anything in return for their charity.  Al-Roshood Decl. ¶ 14.

Re-characterizing Prince Salman's activity as supporting terrorist organizations – as the plaintiffs have attempted to do – cannot convert it into "commercial activity," even if plaintiffs made any allegations to support the re-characterization.  See Burnett, 292 F. Supp. 2d at 17.  Under Supreme Court and Second Circuit precedent, criminal activities cannot be "commercial" in nature.  Saudi Arabia v. Nelson, 507 U.S. 349, 361 (1993) (alleged detention and torture cannot be commercial activity of foreign state); Letelier v. Republic of Chile, 748 F.2d 790, 797 (2d Cir. 1984) (criminal activity cannot be "commercial activity"); Kline v. Kaneko, 685 F. Supp. 386, 391 (S.D.N.Y. 1988) ("Kidnapping could not be considered commercial activities because a private person could not engage in such activity lawfully."); see also Cicippio v. Islamic Republic of Iran, 30 F.3d 164, 167-68 (D.C. Cir. 1994) (holding that Iran's kidnapping of Joseph Cicippio in Lebanon was not commercial activity and noting that Congress intended for the exception to remove a "cloak of protection over *typical commercial*

*activities*, not to reach out to cover all sorts of alleged nefarious acts that are the grist for John Le

Carre novels") (emphasis added).

### 3.        The Non-Commercial Tort Exception Does Not Apply

The "non-commercial tort" exception to sovereign immunity also does not apply

here.  This exception provides that a foreign sovereign is not immune in any case

> in which money damages are sought against a foreign state for
> personal injury or death, or damage to or loss of property,
> occurring in the United States and caused by the tortious act or
> omission of that foreign state or of any official or employee of that
> foreign state while acting within the scope of his office or
> employment . . . .

28 U.S.C. § 1605(a)(5).  Congress provided, however, that the non-commercial tort exception

*does not apply* to "any claim based upon the exercise or performance or the failure to exercise or

perform a discretionary function regardless of whether the discretion be abused . . . ."  Id. §

1605(a)(5)(A).  Nor does the exception encompass claims for injuries resulting from providing

material support to terrorists, which Congress explicitly assigned to a different exception not

applicable here.  Id. § 1605(a)(7); Burnett, 292 F. Supp. 2d at 20 n.5.

### a.        Prince Salman Exercised a Discretionary Function

In overseeing the SHC's use of its funds, Prince Salman was manifestly

exercising a discretionary function.  Although the Second Circuit has not defined standards for

the discretionary function exception in the FSIA, other federal courts have borrowed

jurisprudence from an identical provision in the Federal Tort Claims Act.  See, e.g., MacArthur

Area Citizens Ass'n v. Republic of Peru, 809 F.2d 918, 919 (D.C. Cir. 1987).  Challenged acts

are immune as an exercise of a discretionary function where (1) the acts alleged "involve an

'element of judgment or choice'" and (2) the "judgement or choice in question must be grounded

13

in 'considerations of public policy' or susceptible to policy analysis." <u>Coulthurst v. United States</u>, 214 F.3d 106, 109 (2d Cir. 2000) (citations omitted).

Prince Salman's actions manifestly involved an "element of judgement or choice." There are no specific regulations in Saudi Arabia mandating that the SHC disburse funds for any particular purpose or to any particular individual or entity. Al-Roshood Decl. ¶ 9; <u>see also</u> <u>Berkovitz v. United States</u>, 486 U.S. 531, 536 (1988) (analyzing FTCA and concluding that "the discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action"). Also, Prince Salman's actions as the head of the SHC were executive decisions grounded in "social, economic and political policy." The SHC – and Prince Salman's decisions as its President – work to effect the foreign policy interests of Saudi Arabia through its relief efforts. Al-Roshood Decl. ¶ 20.

### b. The FSIA Exception for Providing Material Support to Terrorism Is Inapplicable

The gravamen of the plaintiffs' allegations is that Prince Salman provided material resources and support to terrorists. Such claims are not actionable under 28 U.S.C. § 1605(a)(5), but rather under section 1605(a)(7), the so-called state-sponsored-terrorism exception to FSIA immunity. Plaintiffs cannot claim that the state-sponsored-terrorism exception confers subject-matter jurisdiction as to their claims against Prince Salman because Saudi Arabia has not been designated as a state sponsor of terrorism by the U.S. Department of State. 28 U.S.C. § 1605(a)(7)(A); <u>Burnett</u>, 292 F. Supp. 2d at 16 n.3. Plaintiffs cannot be allowed to avoid the explicit limitation placed by Congress on suits against instrumentalities of foreign states for providing material support and resources to terrorists, by purporting to rely upon the non-commercial tort exception. To do so would eviscerate the very purpose of section 1605(a)(7), which was to provide a vehicle for actions against those who materially support and provide

14

resources to terrorists who are designated state-sponsors of terrorism, while maintaining foreign

sovereign immunity for similar claims against those *not* so designated.  See, e.g., Price, 294 F.3d

at 88 (holding that original FSIA did not encompass claims of state-sponsored terrorism because

it was considered an "immunized form[] of state activity"); see also Burnett, 292 F. Supp. 2d at

20 n.5.

### c. The Causation Requirement of Section 1605(a)(5) Is Not Satisfied[8]

As previously mentioned, the plaintiffs bear the burden of going forward with

some evidence showing that an exception to immunity applies.  Virtual Countries, 300 F.3d at

241.  In this instance, the plaintiffs must present evidence that Prince Salman's acts *caused* the

their injuries.  So while the FSIA may not alter the substantive showing of causation ultimately

required under the plaintiffs' substantive claims, Robinson, 269 F.3d at 143, it *does* require, in

essence, a heightened pleading standard with respect to the factual predicates underlying the

plaintiffs' substantive tort claims.  In Robinson, the issue was whether the alleged conduct was

even tortious.  In affirming the district court's dismissal, the Court in Robinson was concerned

that,

> To sustain federal jurisdiction on generic allegations of
> [negligence] absent an assertion or evidence of a factual predicate
> for such jurisdiction, would invite plaintiffs to circumvent the
> jurisdictional hurdle of the FSIA by inserting vague and
> conclusory allegations of tortious conduct in their complaints – and
> then to rely on the federal courts to conclude that some
> conceivable non-discretionary tortious act falls within the purview

---

[8] While concluding in Burnett that the non-commercial tort exception did not apply, Judge Robertson nevertheless rejected Prince Sultan's argument that the exception did not apply because the "entire tort" (including the acts of Prince Sultan which undeniably occurred in Saudi Arabia) must have occurred in the United States.  Burnett, 292 F. Supp. 2d 19 n.4.  The allegations against Prince Salman make clear that any activities taken by the SHC or by Prince Salman as its head, or in his individual capacity, occurred in Saudi Arabia or in Bosnia.  Prince Salman will not reargue Judge Robertson's ruling in the present motion, but preserves his right to challenge that portion of the ruling on appeal.

> of these generic allegations under the applicable substantive law.
> This is at odds with the goal of the FSIA to enable a foreign
> government to obtain an early dismissal when the substance of the
> claim does not support jurisdiction.

269 F.3d at 146. Judge Robertson's decision in Burnett recognizes this heightened standard.

While declining to decide whether the plaintiffs' attenuated allegations of causation would

survive a motion to dismiss on non-FSIA grounds, Burnett, 292 F. Supp. 2d at 19, Judge

Robertson recognized that Congress sets the subject-matter jurisdictional limits of the lower

federal courts, and, under the FSIA, Congress has concluded that foreign sovereigns ought to be

generally immune from suit. Id. To effectuate this broad, congressionally mandated immunity,

the courts have required plaintiffs to come forward with some evidence and offer more than mere

assertions, lacking any factual predicates, to survive a motion to dismiss on FSIA grounds. See

Robinson, 269 F.3d at 146. The plaintiffs' allegations of causation must meet this same exacting

standard. However, like the allegations in Burnett, the causal chain alleged here "stretch[es] the

causation requirement of the noncommercial tort exception . . . to terra incognita," Burnett, 292

F. Supp. 2d at 20.

      Not only is a factual predicate for these allegations entirely lacking in the Federal

Insurance complaint, but the causal link between Prince Salman's role as President of the SHC

and the SHC's alleged donation of funds to Al Qaeda is too attenuated to impose liability. This

argument is presented in more detail in Section D below.

      Because none of the exceptions to immunity apply, this Court has no subject-

matter jurisdiction over Prince Salman, and the Complaints should be dismissed as to him under

Federal Rule of Civil Procedure 12(b)(1).

**C.       This Court Has No Personal Jurisdiction Over Prince Salman.**

As described above, some of the allegations against Prince Salman concern actions allegedly taken by him in a personal capacity.  Prince  Salman does not concede that any of this alleged conduct was personal as opposed to official in nature.  The Court need not address that distinction, however, because even if some of the alleged conduct was personal, as Judge Robertson held in Burnett with respect to Prince Sultan, these actions must nevertheless be dismissed for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2).  The burden is on the plaintiffs to establish that this Court has personal jurisdiction over Prince Salman by presenting "legally sufficient allegations of jurisdiction." Metro. Life Ins. Co. v. Robertson-Ceco Corp., 84 F.3d 560, 566 (2d Cir. 1996).  Prince Salman has no traditionally recognized minimum contacts with the United States, and plaintiffs' allegations fall far short of alleging that Prince Salman's actions were "expressly aimed" or "purposefully directed" at the United States.

None of the Complaints allege that Prince Salman had the requisite minimum contacts with the United States. Burnett, Barrera and Ashton  allege that certain unnamed members of the Saudi Royal Family own substantial assets in the United States and do substantial business in the United States.  Burnett (NY and DC) Compls. ¶ 431; Ashton Compl. ¶ 296; Barrera Compl. ¶ 298.  Such allegations are clearly insufficient to support personal jurisdiction over Prince Salman.  There are many thousands of members of the "Royal Family of Saudi Arabia," whose contacts with the United States undoubtedly range from extensive to nonexistent.  That fact is irrelevant to assessing whether this Court has personal jurisdiction over Prince Salman.

Nor do any of the Complaints even allege that Prince Salman purposefully directed any actions at the United States. Burger King v. Rudzewicz, 471 U.S. 462, 472 (1985)

17

("Where a forum seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there, this 'fair warning' requirement is satisfied if the defendant has 'purposefully directed' his activities at residents of the forum . . . ."); see also Libutti v. United States, 178 F.3d 114, 123 (2d Cir. 1999) (purposefully directing conduct at forum state required).

Plaintiffs do not allege that Prince Salman had any personal involvement in the September 11th attacks, or any prior knowledge of them. See Time, Inc. v. Simpson, No. 02 Civ. 4917 (MBM), 2003 WL 23018890, at *5, (S.D.N.Y. Dec. 22, 2003) (conclusory allegations cannot suffice to show personal jurisdiction based on defendants' personal involvement in conduct giving rise to plaintiff's injuries). At best, then, the plaintiffs' allegations state a theory that Prince Salman (1) oversaw an organization that employed one member of Al Qaeda and sent millions of dollars to Bosnia, some of which made its way to Al Qaeda, and (2) knowingly made donations to and engaged in fundraising efforts for charities that allegedly support Al Qaeda. The Federal Insurance plaintiffs—though not the remaining plaintiffs—additionally allege that Prince Salman "knew" his charitable donations would be used to support Al Qaeda. Fed. Ins. Compl. ¶ 463. None of the Complaints come close to alleging, much less offering any factual support of such an allegation, that Prince Salman purposefully intended any donations or monies he raised or oversaw would support any terrorist acts against the United States. Even if the plaintiffs had made such an allegation, and supported it with well-pleaded factual assertions (which they did not), Judge Robertson concluded in Burnett that foreseeability of harm in the United States does not satisfy the "purposefully directed" test. 292 F. Supp. 2d at 22-23. Both this Court and the U.S. Supreme Court have explicitly rejected the plaintiffs' foreseeability argument as a substitute for rigorous minimum contacts analysis:

> Although it has been argued that foreseeability of causing *injury* in another [forum] should be sufficient to establish such [minimum] contacts there

> when policy considerations so require, the Court has consistently held that
> this kind of foreseeability is not a 'sufficient benchmark' for exercising
> personal jurisdiction.

Burger King, 471 U.S. at 474 (internal citation omitted);[9] Scott v. Sonnet, Sale & Keuhne, P.A.,

989 F. Supp. 542, 544 (S.D.N.Y. 1998). Accordingly, the Burger King Court found that the

defendant (a Burger King franchisee in Michigan) had minimum contacts with the forum state

(Florida) not because it was foreseeable to him that his actions could result in injury to Florida

residents, but because he engaged in specific actions that created a "substantial connection" with

the forum, Burger King, 471 U.S. at 475-76,  including negotiating a franchise agreement with

Burger King's Miami headquarters calling for a "20-year relationship that envisioned continuing

and wide-reaching contacts with Burger King in Florida," agreeing to a contractual provision that

all disputes would be governed by Florida law, "carr[ying] on a continuous course of direct

communications by mail and by telephone [with Burger King's Miami headquarters]," failing to

make contractually-required payments in Miami, and using and maintaining Burger King's

proprietary information. Id. at 479-81.  None of the Complaints here point to any such quantum

of contacts.

      Furthermore, Burger King also held that the "purposefully directed" standard

"ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,'

---

[9] The Burger King holding that foreseeability cannot suffice to establish personal jurisdiction where traditional minimum contacts are absent further underscores why the non-commercial tort exception to FSIA immunity cannot apply.  Congress made clear that the burden for establishing subject-matter jurisdiction under the FSIA is *higher* than the burden for establishing personal jurisdiction.  Shapiro v. Republic of Bolivia, 930 F.2d 1013, 1020 (2d Cir. 1991).  Thus, if the Court were to find that the plaintiffs' paltry allegations of causation – which, like their allegations of personal jurisdiction, amount to nothing more than a foreseeability argument without any factual predicate to support them – satisfy the non-commercial tort exception, the Court would necessarily be finding that the plaintiffs have cleared a higher hurdle of subject-matter jurisdiction based on allegations that cannot even clear the *lower* hurdle of personal jurisdiction under Burger King.  Such a result would violate the Due Process Clause and conflict with the purposes of the FSIA: to enable a foreign government to obtain an early dismissal when the substance of the claim does not support jurisdiction.

'fortuitous,' or 'attenuated' contacts, . . . or of the 'unilateral activity of another party or a third

person.'" <u>Id.</u> at 475 (quoting <u>Helicopteros Nacionales de Colombia, SA v. Hall</u>, 466 U.S. 408,

417 (1984)); <u>accord</u> <u>SEC v. Alexander</u>, 160 F. Supp. 2d 642, 656 (S.D.N.Y. 2001) (finding that

foreseeability can be *relevant* but holding that jurisdiction cannot be based on "'random,'

'fortuitous,' or 'attenuated' contacts") (quoting <u>Burger King</u>, 471 U.S. at 474, 475). The

causation theory espoused in all the Complaints here simply ignores the "unilateral activity" of

the actual September 11th terrorists—with which Prince Salman is not alleged to have any

connection. Personal jurisdiction cannot be exercised over Prince Salman on the basis of their

actions.

> **D.    The Complaints Do Not State a Claim Upon Which Relief Can Be Granted Because the Facts Alleged Fail to Establish That Prince Salman's Acts Proximately Caused the September 11th Attacks**

Because this case sounds in tort, each of the Complaints' causes of action[10]

requires that Prince Salman's alleged actions proximately caused the plaintiffs' injury.[11]

Proximate cause requires "some direct relation between the injury asserted and the injurious

conduct alleged." <u>Holmes v. Sec. Inv. Prot. Corp.</u>, 503 U.S. 258, 268 (1992). The plaintiffs bear

the burden of showing that Prince Salman's acts were a "substantial factor" that foreseeably led

to their injury, and that the September 11th attacks would not have occurred "but for" his actions.

<u>In re Am. Express Co. S'holder Litig.</u>, 39 F.3d 395, 402 (2d Cir. 1994); <u>see also</u> <u>Holmes</u>, 503

U.S. at 268.

---

[10]  A chart summarizing the counts against Prince Salman is attached as Exhibit E.

[11]  The <u>Burnett</u>, <u>Burnett (NY)</u> and <u>Federal Insurance</u> complaints raise RICO claims. However, in <u>Burnett</u>, Judge Robertson dismissed all of the RICO claims holding that the plaintiffs had alleged only "personal injuries, and economic losses derived therefrom." 274 F. Supp. 2d 86, 100 (D.D.C. 2003). RICO does not allow recovery for these types of losses. <u>Id.</u> The plaintiffs in these cases have also claimed only personal injuries and economic losses incurred as a result of those injuries. As such, the RICO claims in these two complaints should be dismissed as to Prince Salman.

Thus, it is insufficient for the plaintiffs simply to assert that Prince Salman knew or should have known that funds donated by the SHC or his alleged personal charitable donations were being forwarded to Al Qaeda; rather, they must allege facts that his oversight of the SHC or personal charitable donations were a substantial factor that foreseeably led to the September 11th attacks and that the attacks would not have occurred but for his actions. The plaintiffs have failed to do so.

The plaintiffs have attempted to allege facts showing three separate causal chains linking Prince Salman to the September 11th attacks. First, several of the complaints claim that Prince Salman, as the president of the SHC, "failed to take appropriate actions regarding SHC management and use of funds," that the SHC in the past employed a person alleged to be part of the Al Qaeda network, and that it has been accused of diverting its funds to unspecified recipients. Burnett (NY and DC) Compls. ¶¶ 406, 394-96, 404-07; Ashton Compl. ¶¶ 457, 448-50, 454-56; Barrera Compl. ¶¶ 456-57, 459; Salvo Compl. ¶¶ 301-03. Notably, these four complaints do not allege that the SHC funded terrorism, nor do they allege that the supposedly "missing" funds were diverted to Al Qaeda for that purpose. Further, mere negligence is not a basis for liability to plaintiffs in this case. Burnett v. Al Baraka Inv. & Dev. Corp., 274 F. Supp. 2d 86, 108 (D.D.C. 2003).

Second, the Federal Insurance complaint alleges that Prince Salman (i) founded the SHC to support Al Qaeda and (ii) knew the SHC was funding Al Qaeda based on evidence of the SHC's allegedly non-charitable work and (iii) the September 11th attacks were a direct and foreseeable result of SHC's support of Al Qaeda. Fed. Ins. Compl. ¶ 456-57, 189. These conclusory and outrageous allegations are a blatant attempt to cure the pleading deficiencies in the complaints dismissed in Burnett. They entirely fail to offer any *facts* supporting these legal

conclusions.  Such vague allegations of causation, offered without supporting proof, are simply

insufficient to withstand the higher pleading requirement in an FSIA case.  See Robinson, 269

F.3d at 146;  First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 772 (2d Cir. 1994)

("[C]ourts do not accept conclusory allegations on the legal effect of the events plaintiff has set

out if these allegations do not reasonably follow from his description of what happened.").

Additionally, as shown below, the causal link between Prince Salman's role as President of the

SHC and the SHC's alleged donation of funds to Al Qaeda is too attenuated to impose liability

on Prince Salman even if the allegations against the SHC were somehow sufficient.

Third, the Burnett, and Ashton complaints allege that Prince Salman donated

funds to, and raised funds on behalf of, several Islamic charities.  Burnett  (NY and DC) Compls.

¶ 401; Ashton Compl. ¶ 290.  The Federal Insurance complaint goes on to allege that he knew

his donations to these groups would be used to fund Al Qaeda.  Fed. Ins. Compl. ¶ 461-63.  Even

if these allegations were true, they are insufficient under applicable case law to establish

proximate cause.

Although the Second Circuit has not addressed directly the standard for analyzing

causation in terrorism cases, case law from other circuits is instructive.  Judge Robertson's

opinion in Burnett held that similar allegations against Prince Sultan "would stretch the causation

requirement of the noncommercial tort exception [of the FSIA] not only to 'the farthest reaches

of the common law,' but perhaps beyond, to terra incognita." 292 F. Supp. 2d at 20.  This

holding is consistent with the D.C. district court's earlier decision, Ungar v. Islamic Republic of

Iran, 211 F. Supp. 2d 91 (D.D.C. 2002). In Ungar, the court refused to issue a default judgment

against Iran and Iran's Ministry of Information and Security (MOIS) because the plaintiffs – the

family of a couple killed by members of Hamas – had failed to show a direct link between Iran,

Hamas and the injury in question.  Although the "plaintiffs [] established that Iran provided extensive support to HAMAS . . . their proof [did] not link that support to the Ungar murders specifically." Id. at 99.  This requirement of a specific, identifiable link between the accused terrorist and the attacks in question has been applied consistently by district courts in the District of Columbia following Ungar.[12]  The Plaintiffs here have not come close to alleging the causal link required by these cases.

The Seventh Circuit's analysis of causation under 18 U.S.C. § 2333 in Boim v. Quranic Literacy Institute, 291 F.3d 1000 (7th Cir. 2002), is not at odds with the holding in Ungar and Burnett, but in fact supports dismissal of all the claims against Prince Salman.  In Boim, the parents of an American student killed in Israel by members of Hamas accused two charitable organizations of providing direct, material support for the terrorist operations that claimed the life of their son.  The Seventh Circuit first held that "funding simpliciter" does not constitute an act of terrorism without a showing that the injury "was the reasonably foreseeable result of the donation." Id. at 1012.  In other words, section 2333 requires a showing of the traditional tort theory of causation, proximate cause.  The Boim court went on to permit the imposition of liability "on those who knowingly and intentionally supply the funds to the persons who commit the violent acts." Id.  Therefore, Burnett, Ungar and Boim stand for the proposition that the plaintiffs must show (and allege in the first instance) that Prince Salman's grants to the

---

[12] See, e.g., Doe v. Islamic Salvation Front, 257 F. Supp. 2d 115 (D.D.C. 2003) (holding that the plaintiffs had failed to show a link between a member of the Islamic Salvation Front and alleged acts of terrorism committed by the group because the plaintiffs offered only "conclusory statements about [the defendant's] role" and did not "link [the defendant] to any specific acts"); Surette v. Islamic Republic of Iran, 231 F. Supp. 2d 260, 267-68 (D.D.C. 2002) (holding it was "conclusive that defendants had caused Buckley's death by providing material support and resources for Hizballah to abduct Buckley, torture him and deny him essential medical care"); Weinstein v. Islamic Republic of Iran, 184 F. Supp. 2d 13, 21-22 (D.D.C. 2002) (holding that defendant Iran, MOIS, and three Iranian officials were liable to defendants for a suicide bombing in Israel because "the defendants not only provided the terrorists with the technical

charitable organizations were a knowing contribution in aid of some specified, or at least reasonably foreseeable, terrorist act.

In this case, the plaintiffs attempt to take the <u>Boim</u> decision far beyond its holding. While <u>Boim</u> held that charities who knowingly and directly fund terrorist acts can be liable for those acts, plaintiffs here seek to impose liability on <u>contributors</u> to well-established charities, which indisputably support praiseworthy humanitarian work around the world. The <u>Boim</u> plaintiffs alleged that money raised and funneled to Hamas by the charity defendants was used directly to fund the terrorist attack that killed their son, including to purchase the weapons and vehicles used in the attack, to train the individual perpetrators, and even to provide a stipend to the family of one of the perpetrators who later was killed while conducting a suicide bombing in Israel. <u>Id</u>. at 1004.   In contrast, there is <u>no</u> allegation that any funds <u>provided by Prince Salman</u> were used to fund terrorist acts.

Also, as weak as the allegations against the charity defendants here are, the allegations against Prince Salman are even farther afield from those that were allowed to proceed in <u>Boim</u>. Unlike the <u>Boim</u> defendants, Prince Salman is not alleged to have made grants directly to the organization that conducted the terrorist acts. Nor is he alleged to have made grants to an organization – like Hamas in <u>Boim</u> – that was officially designated as a "terrorist organization" by the United States government. Indeed, in stark contrast to <u>Boim</u>, the Plaintiffs allege no facts to suggest that Prince Salman's actions were the proximate cause of their injuries.

---

knowledge required to carry out the February 25, 1996 attack on the Number 18 Egged bus but also gave HAMAS the funding necessary to do so").

24

Because the Complaints do not allege any facts showing that Prince Salman proximately caused the Plaintiffs' injuries, each of the specific counts against Prince Salman which require a showing of causation must be dismissed.

Dated: May 10, 2004                              Respectfully submitted,

   S/ _____
William H. Jeffress, Jr. (admitted *pro hac vice*)
D.C. Bar No. 041152

Christopher R. Cooper (admitted *pro hac vice*)
D.C. Bar No. 453387

Jamie S. Kilberg (admitted *pro hac vice*)
D.C. Bar No. 480207

Sara E. Kropf (admitted *pro hac vice*)
D.C. Bar No. 481501

BAKER BOTTS, LLP
1299 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2400
Phone:      (202) 639-7700
Fax:          (202) 639-7890