# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

_____
                                            )
In Re TERRORIST ATTACKS on                  )        03 MDL 1570 (RCC)
SEPTEMBER 11, 2001                          )        ECF Case
                                            )
_____)

This document relates to:

   *Estate of John P. O'Neill, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.*, 04-CV-1923 (RCC)

   *Estate of John P. O'Neill, Sr., et al. v. The Republic of Iraq, et al.*, 04-CV-1076 (RCC)

## O'NEILL PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO SCHREIBER & ZINDEL TREUHAND ANSALT, FRANK ZINDEL, ENGELBERT SCHREIBER, SR. AND ENGELERT SCHREIBER, JR'S MOTION TO DISMISS

**LAW OFFICES OF JERRY S. GOLDMAN & ASSOCIATES, P.C.**

111 Broadway, 13th Floor
New York, NY 10006
212.242.2232

*Attorneys for the Plaintiffs*

On the Memorandum:

Jerry S. Goldman, Esquire (JG 8445)
Gina M. MacNeill, Esquire (GM 0581)
Frederick J. Salek, Esquire (FJS 8565)

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................... i

TABLE OF AUTHORITIES ............................................................................................. ii

INTRODUCTION .............................................................................................................. 1

FACTS ................................................................................................................................ 2

ARGUMENT ...................................................................................................................... 3

I. SERVICE OF PROCESS WAS SUFFICIENT AS PROVIDED FOR UNDER THE
FEDERAL RULES OF CIVIL PROCEDURE 4(f)(2)(C)(ii). ......................................... 3

    A.   Service is Valid Because Service Pursuant to the Federal Rules of Civil Procedure Rule
4(f)(2)(C)(ii) was not Prohibited by Liechtenstein Law. ........................................... 5

    B.   If the Court Finds That the Plaintiffs' Service Is Insufficient, Permission By the Court to
Remedy the Defects in Service is Appropriate. ....................................................... 10

II. THERE IS PROPER *IN PERSONAM* JURISDICTION OVER THE DEFENDANTS.......... 11

    A.   General. ...................................................................................................................... 11

    B.   The Defendants have been sued under Federal Statutes permitting NationWide Service of
Process and providing a basis for federal jurisdiction. ............................................ 13

    C.   The plaintiffs adequately allege Conspiracy as a basis for jurisdiction............................ 17

        1.The O'Neill Pleadings Adequately Demonstrate the Conspiracy and the Defendants'
Role Thereby Supporting Jurisdiction. ...................................................................... 20

    D.   The United States Due process protections to not apply to these foreign defendants. ..... 23

Conclusion ........................................................................................................................ 24

Certificate of Service ....................................................................................................... 25

APPENDIX I ................................................................................................................. 256

## TABLE OF AUTHORITIES

**Cases**

*A.I. Trade Finance, Inc. v. Petra Bank*, 989 F.2d 76(2d Cir. 1993) ........................................ 12, 18

*Allstate Life Ins. Co. v. Linter Grp. Ltd.,* 782 F. Supp. 215 (S.D.N.Y. 1992) .............................. 19

*Baker v. Great Socialist  People's Libyan Arab Jamahiriya*, CV 03-749, p.10 (D.D.C. June 30, 2005) ...................................................................................................................................... 23

*Best Cellars Inc. v. Grape Finds at Dupont, Inc.*, 90 F. Supp. 2d 431(S.D.N.Y. 2000) ............. 19

*Burger King v. Rudzewicz*, 471 U.S. 462 (1985) ..................................................................... 17, 18

*Busch v. Buchman, Buchman & O'Brien, Law Firm*, 11 F.3d 1225 (5th Cir. 1994).................... 15

*Calder v. Jones*, 465 U.S. 783 (1984)...................................................................................... 17, 18

*Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260 (S.D.N.Y. 1991)... 19, 20, 22

*Cleft of the Rock Foundation v. Wilson*, 992 F. Supp. 574 (E.D.N.Y. 1998) ........................ 19, 20

*Combs v. Adkins & Adkins Coal Co.*, 597 F. Supp. 122 (D.D.C. 1984)....................................... 15

*Davidson v. Jones,* 112 A.D. 254, 98 N.Y.S. 265 (1st Dept. 1906) ............................................... 1

*Dee-K Enterprises, Inc. v. Heveavil SDN. BHD.*, 174 F.R.D. 376 (E.D. Va. 1997) ..................... 6

*Distefano v. Carozzi North America, Inc.*, 286 F.3d 81 (2d Cir. 2001)................................... 11, 12

*Estate of Unger v. Palestinian Auth.*, 153 F. Supp. 2d 76 (D.R.I. 2001)................................ 14, 15

*Grannis v. Ordean*, 234 U.S. 385 (1914)....................................................................................... 9

*Grove Press, Inc. v. Angleton*, 649 F.2d 121 (2d Cir. 1981) ....................................................... 18

*Hanson v. Denckla*, 357 U.S. 235 (1958) .................................................................................... 18

*Howard v. Klynveld Peat Marwick Goerdeler*, 977 F. Supp. 654 (S.D.N.Y. 1997) ..................... 4

*In re Southold Dev. Corp.*, 148 B.R. 726 (E.D. N.Y. 1992)........................................................ 10

*In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d at 805 (S.D.N.Y. 2005) .......... 20

*International Shoe Co. v.  Washington*, 326 U.S. 310 (1945) ........................................... 14, 17, 23

*IUE AFL-CIO Pension Fund v. Hermann*, 9 F.3d 1049 (2d Cir. 1993) ................................. 14, 15

*Jefry v.  FAA,* 370 F.3d 1174 (D.C. Cir. 2004) ................................................................. 23

*Johnson v. Eisentrager*, 339 U.S. 763 (1950) ................................................................ 23

*Kashi v. Gratos,* 790 F.2d 1050 (1986). .......................................................................... 20

*Lehigh Valley Industries, Inc. v. Lehigh Colonia  Corp*, 527 F.2d 87 (2d Cir. 1975) ................. 19

*Lucas v. Natoli*, 936 F.2d 432 (9th Cir. 1991) .................................................................. 10

*Mariash v. Morrill*, 496 F.2d 1138 (2d Cir. 1974) ........................................................... 14

*Matesic v. Curtiss-Wright Corp.,* 128 F.R.D. 30 (W.D.N.Y. 1989) ........................................ 10

*McGann v. New York,* 77 F.3d 672 (2d Cir. 1996) ............................................................ 10

*Metropolitan Life Insurance Co. v. Robertson-Ceco Corp.,* 84 F.3d 560 (2d Cir. 1996) ............ 12

*Montalbano v. Easco Hand Tools, Inc.,* 766 F.2d 737 (2d Cir. 1985) ...................................... 10

*Mullane v. Central Hanover Bank & Tr. Co.*, 339 U.S. 306 (1950) ......................................... 9

*Mwami v. Osama Bin Laden*, 2005 U.S. App. LEXIS 16185 (D.C. Cir. August 5, 2005) ..... 14, 21

*Omni Capital Int'l Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 104 ............................................ 14

*People's Mojahedin Org. of Iran v. Dept. of State*, 182 F.3d 17 (D.C. Cir. 2003) ...................... 23

*People's Mojahedin Org. of Iran v. Dept. of State*, 327 F.3d 1238 (D.C. Cir. 1999) .................. 23

*Power Integrations, Inc. v. System General Corporation*, 2004 U.S. Dist. LEXIS 25414, 7 (N.D. Ca. 2004) ..................................................................................................................... 6

*Proctor & Gamble Cellulose Co. v. Viskoza-Loznica*, 33 f.Supp2d 622 (W.D. Tenn. 1998) ........ 7

*Republic of Panama*, 119 F.3d 941 .............................................................................. 14

*Resource Ventures, Inc. v. Resources Management International, Inc.*, 42 F.Supp. 2d 423 (D. Del. 1999) ................................................................................................................. 6, 7

*Rockland-Rockport Lime Co. v. LearyRockland-Rockport Lime Co. v. Leary*, 203 N.Y. 469 (1911) ......................................................................................................................... 1

*S.E.C. v. Vision Communications, Inc.*, 74 F.3d 287 (D.C. Cir. 1996) ...................................... 14

*Santos v. State Farm  Fire & Cas. Co.,* 902 F.2d 1092 (2d Cir. 1990) ....................................... 11

*SEC v. Carrillo*, 115 F.3d 1540 (11th Cir. 1997) ......................................................... 15

*Self International (HK)  Ltd. v. La  Salle National Bank, Chicago*, 2002 U.S. Dist. LEXIS 5631 (S.D.N.Y. 2002) ....................................................................................................... 11, 12

*Shaffer v. Heitner*, 433 U.S. 186 (1977) ................................................................ 18

*Simon v. Philip Morris, Inc.*, 86 F. Supp.2d 95 (E.D.N.Y. 2000)................................. 20

*Singer v. Bell*, 585 F. Supp. 300 (S.D.N.Y. 1984) ...................................................... 19

*Smith et al., v. The Islamic Emirate of Afghanistan*, 2001 WL 1658211, *2 (S.D.N.Y. Dec. 26, 2001.................................................................................................................. 11

*U.S. Fire Ins. Co. v. Jesco Construction Corp.*, 2003 U.S. Dist. LEXIS 12459, 10(S.D.N.Y. 2003) .................................................................................................................... 10

*Umbenhaur v. Woog*, 969 F.2d 25 (3d Cir. 1992) .................................................. 7, 10

*United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990)........................................... 23

*Whitaker v. American Telecasting, Inc.,* 261 F.3d 196 (2d Cir. 2001) ................................. 11, 12

*World-Wide Volkswagon Corp.*, 444 U.S. 295 (1980) ............................................... 22

*Yamataya v. Fisher*, 189 U.S. 86 (1903)................................................................ 23

*Yick Wo v. Hopkins*, 118 U.S. 356 (1886) ............................................................. 23

*Zola v. Gordon,* 685 F. Supp. 354 (S.D.N.Y. 1988) .................................................. 10

## Statutes

18 U.S.C. § 1956(a)(1)................................................................................. 16

18 U.S.C. § 1956(a)(3)............................................................................. 15, 16

18 U.S.C. § 1961 ..................................................................................... 16

18 U.S.C. § 1965(b) .............................................................................. 13, 15

18 U.S.C. § 2334(a) .............................................................................. 13, 14

18 U.S.C. §§ 2339 ............................................................................................................ 16

C.P.L.R. 302(a)(2) ........................................................................................................... 18

C.P.L.R. 302(a) ............................................................................................................... 13

## Rules

Federal Rules of Civil Procedure Rule 4(f) ..................................................................... 4,5

Federal Rules of Civil Procedure Rule 4(f)(2)(C)(ii) ................................................. passim

Federal Rules of Civil Procedure Rules 4(h) ..................................................................... 4

Federal Rules of Civil Procedure Rule 4(k)(1)(D) .......................................................... 14

Federal Rules of Civil Procedure Rule12(b)(4) ............................................................... 11

Federal Rules of Civil Procedure Rule 12(b)(5) ............................................................... 3

## Other Authorities

*Advisory Committee Notes of 1963 to Rule 4(i)* ............................................................... 6

*Advisory Committee Notes of 1993 Amendments to Rule 4(f)* ......................................... 7

EPTL Sec. 1-2.13, 1-2.7; S.C.P.A. 103 (2), (34) .............................................................. 1

## Treatises

*Moore's Federal Practice, Civil,*  Sec. 452 .................................................................... 10

## INTRODUCTION

Defendants Schreiber & Zindel Treuhand Anstalt, Frank Zindel, Engelbert Schreiber, Sr. and Engelbert Schreiber, Jr. (collectively referred to as "S & Z" or "Defendants") filed their Motion to Dismiss two of the cases which are part of *In re Terrorist Attacks on September 11, 2001*, 03 MDL 1570 (RCC): *Estate of John P. O'Neill, Sr., et al. v. Al Baraka Inv. & Dev. Corp.*, et al., 04-CV- 1923 (RCC) ("Al Baraka") and *Estate of John P. O'Neill, Sr. et al. v. The Republic of Iraq, et al.*, 04- CV- 1076 (RCC) ("Iraq") (collectively the "O'Neill cases" or "Plaintiffs").[1] Defendants' Motion to Dismiss raises two arguments and defenses - that service was improper; and that even if service were proper, personal jurisdiction is lacking.

The S & Z Defendants cannot escape their liability for the horrendous events of September 11, 2001, by way of either of these efforts. Service upon the Defendants, via Federal Rules of Civil Procedure Rule 4(f)(2)(C)(ii), was sufficient, and personal jurisdiction has been established, as  this Memorandum of Law clearly demonstrates.

---

[1] The named Plaintiffs consist of the Estate of the Decedent, together with certain named heirs at law, and a proposed class consisting of others similarly situated, in Al Baraka.  Al Baraka SAC 16, 18, 19, 20, 21.   Class certification has not yet been sought.

The decedent, John P. O'Neill, Sr., was murdered on September 11, 2001 as a result of the activities committed by the Defendants named herein, and in the other companion case of *Estate of John P. O'Neill, et al. v. Kingdom of Saudi Arabia, et al.*, 04-CV-1922(RCC), as alleged in the Complaint(s) and the companion RICO Statement(s).

The Estate is standing in the stead of the decedent in accordance with the laws of the State of New York, based upon an appointment by the Surrogate's Court.  Al Baraka SAC ¶17.    See, generally, EPTL §§ 1-2.13, 1-2.7; S.C.P.A. 103 (2), (34); Rockland-Rockport Lime Co. v. LearyRockland-Rockport Lime Co. v. Leary, 203 N.Y. 469 (1911); Davidson v. Jones, 112 A.D. 254, 98 N.Y.S. 265 (1st Dept. 1906); In addition to the named Plaintiffs, the SAC describes a proposed class in Al Baraka SAC ¶¶14, 15 and 127.

Iraq is not framed as a class action.

## FACTS

The S & Z Defendants are alleged[2] to have participated in a world-wide conspiracy which, culminated, for purposes of this case, in the attacks of September 11, 2001, causing massive death and destruction in New York, Pennsylvania, and the Washington, D.C. area. To seek monetary compensation for the wrongs committed by the conspirators, in the form of actual and punitive damages, the O'Neill Plaintiff have brought this action in a United States Court.

The horrific events of September 11th were the result of a world-wide terror conspiracy against the United States involving the S & Z Defendants and others, who have conspired for many years to attack the United States and murder United States' citizens. Defendants supported, conspired, aided and abetted, sponsored, planned and executed the September 11th terror attacks that killed thousands of people and injured many thousands more. (Iraq TAC ¶ 63).

In essence, as described at length in the O'Neill pleadings, and discussed in part, below,[3] the S & Z Defendants conspired with Osama Bin Laden ("Bin Laden"), Al Qaida, Iraq and the Taliban to raise, launder, transfer, distribute, and hide funds for Bin Laden and Al Qaida in order to support and finance their terrorist activities including, but not limited to, the September 11th attacks. Iraq TAC ¶¶ 38, 41; Al Baraka SAC ¶¶ 22, 23, 25.

Defendants' concert of action and conspiracy to support and promote Bin Laden and Al Qaida were a proximate cause of the September 11, 2001, terrorist attacks that killed and injured

---

2 The pleadings, pursuant to CMO No. 2, Para. 14, consist of the TAC in Iraq (hereinafter cited as IRAQ TAC ¶), the SAC in Al Baraka (hereinafter cited as Al Baraka SAC ¶), and the RICO Statement filed as to the S & Z Defendants on behalf of both the Iraq and the Al Baraka cases, Docket 988, and as amended, Docket 1105 (hereinafter cited as RICO ¶). See also, Amended RICO Statement, p 1, third introductory paragraph ("This filing is a supplemental pleading in accordance with 03 MDL 1570, CMO-2, Para. 14, and the Individual Rules of Judge Casey. It is designed to supplement the Plaintiff's complaint, as a whole, as amended from time to time…").

The Complaints and the RICO Statements will be collectively referred to herein as the O'Neill Pleadings.

3 Attached hereto and incorporated herein as Appendix I is a table summarizing the factual allegations relevant to the S&Z Defendants for purposes of the jurisdictional issues discussed in Point II of this Memorandum.

the Plaintiffs. Iraq TAC ¶ 252. As a result, Plaintiffs have suffered damages as set forth in the

Pleadings. Iraq TAC ¶ 253.

The injuries to business or property suffered by the O'Neill Plaintiffs, resulting from the

September 11th attack, include economic damages, including but not limited, to pecuniary losses,

past and future wage losses and profits, loss of business opportunities, loss of and/or damage to

tangible and intangible personal property, loss of currency, loss of support, funeral and burial

expenses, loss of prospective inheritance, and loss of other economic contributions to the

Plaintiffs'/Decedents' households.  Additionally, the Attack itself was intended to destroy the

leading symbol of the United States leader in world trade – The World Trade Center - and as

such, affected the O'Neill Plaintiffs' jobs, businesses, and livelihoods. RICO ¶¶ 15, 16

## **ARGUMENT**

## **I.   SERVICE OF PROCESS WAS SUFFICIENT AS PROVIDED FOR UNDER THE FEDERAL RULES OF CIVIL PROCEDURE 4(f)(2)(C)(ii).**

Notwithstanding their actual receipt of the summons and complaints in the instant

matters, the Defendants are seeking to dismiss the actions based upon a purported insufficiency

of service of process claiming that such means of service was not proper of the national laws of

the Principality of Liechtenstein.  F.R.C.P. 4, 12(b)(5). S&Z Memorandum of Law in Support of

Motion to Dismiss ("S&Z Mem.") p.5. [4]

The Plaintiffs, respectfully submit that they have met their burden of setting forth a prima

facie case of sufficiency of service and sufficiency of process of service (collectively referred to

as "sufficiency of service") as to the S & Z Defendants, by serving them with copies of the

---

[4] This is not a 'default' case where months after the purported service, the defendant cries that he was not aware of
the institution of the law suit.  Not only was the defendant actually served in this case, and appeared with counsel,
the instant litigation was subject to publication in newspapers around the world, with copies of the pleadings posted
on the internet.

summons and complaints, dispatched by the Clerk of the United States District Court for the Southern District of New York, via international registered mail, return receipt request, to Lichtenstein, pursuant to the Federal Rules of Civil Procedure Rule 4(f)(2(C)(ii)("FRCP 4(f)(2)(C)(ii)").  *Howard v. Klynveld Peat Marwick Goerdeler*, 977 F. Supp. 654, 658 (S.D.N.Y. 1997).

Plaintiffs served the Defendants pursuant to the FRCP 4(f)(2)(C)(ii), by directing the Clerk of the Southern District of New York to dispatch copies of the Summons and Complaints, for the above-referenced cases, via international registered mail, return receipt requested.  The Clerk, in fact, dispatched these packages.  See Docket 754, 755.  The Defendants received these service packages.  See Exhibit A.

The adequacy of service of process for entities and individuals located outside of the United States is governed by the Federal Rules of Civil Procedure Rules 4(h) and 4(f).  Rule 4(h) states that service may be effectuated "in any manner prescribed for individuals by subdivision (f) except personal delivery…"  Under Rule 4(f), service upon an "individual not within any judicial district of the United States" may be effected in a number of alternative means.[5]

---

[5]The alternative means set forth in Rule 4(f) are as follows:

  (1) by any internationally agreed means reasonably calculated to give notice, such as those means authorized by the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents; or

(2) if there is no internationally agreed means of service or the applicable international agreement allows other means of service, provided that service is reasonably calculated to give notice:

    A.  in the manner prescribed by the law of the foreign country for service in that country in an action in any of its courts of general jurisdiction; or

    B.  as directed y the foreign authority in response to a letter rogatory or letter of request; or

    C.  unless prohibited by the law of the foreign country, by

        (i) delivery to the individual personally of a copy of the summons and complaint; or

As Liechtenstein has not entered into a treaty or agreement regarding service, such as the Hague Convention, service under Rule 4(f)(2)(A) was not possible. Accordingly, Plaintiffs adequately served the Defendants pursuant to the FRCP 4(f)(2)(C)(ii), through the Clerk.

**A.  SERVICE IS VALID BECAUSE SERVICE PURSUANT TO THE FEDERAL RULES OF CIVIL PROCEDURE RULE 4(f)(2)(C)(ii) WAS NOT PROHIBITED BY LIECHTENSTEIN LAW.**

The Defendants assert that Plaintiffs' service upon the Defendants is not valid because Liechtenstein law "prohibits service of process in foreign actions by any means without the mutual legal assistance of the Liechtenstein courts," relying upon the Declaration of one Guntram Wolf ("Wolf"). In neither the Wolf Declaration nor the Liechtenstein code does it state that service, in the manner prescribed by the FRCP 4(f)(2)(C)(ii) is <u>prohibited</u> under Liechtenstein law; rather, they merely indicate that it may not be a <u>prescribed</u> manner of service as provided for in Rule 4(f)(2)(A).

The Defendants' argument rests upon the notion that service of process in Liechtenstein can only be validly effectuated by the court. However, service pursuant to the FRCP 4(f)(2)(C)(ii) does not seek service which is per se valid under a foreign law, as required under F.R.C.P. Rule 4(f)(2)(A) but instead seeks service which is not prohibited by a country's laws.

"An interpretation of subsection 4(f)(2)(C) properly begins with the Rule's language, specifically the pivotal term 'prohibit…' Thus the plain language of (f)(2)(C)(ii) permits service via any form of return receipt mail that is not 'forbidden by authority or command.' A form of service is not 'forbidden by authority' merely because it is not a form explicitly "prescribed" by

---

(ii) any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the party to be served; or

(3) by any other means not prohibited by international agreement as may be directed by the court.

(emphasis added).

the laws of a foreign country." *Dee-K Enterprises, Inc. v. Heveavil SDN. BHD.*, 174 F.R.D. 376,

380 (E.D. Va. 1997).  Accordingly, FRCP 4(f)(2)(C)(ii) allows for service in a manner that, is

not expressly prescribed by the laws of a foreign country, so long as it is not expressly prohibited

by those laws.  *Power Integrations, Inc. v. System General Corporation*, 2004 U.S. Dist. LEXIS

25414, 7 (N.D. Ca. 2004).

This conclusion is supported by the other provisions in subsection (f).  For example:

> "subsection (f)(2)(A) allows service to be effected in the manner
> prescribed by the law of the foreign country.  If subsection (f)(2)(A)
> cannot be satisfied, then a plaintiff may effect service under subsections
> (f)(2)(B) or (f)(2)(C).  Thus, if subsection (f)(2)(C) is inapplicable where a
> form of return receipt mail is not prescribed by the law of a foreign
> country, then a plaintiff's failure to satisfy (f)(2)(A) would preclude the
> availability of subsection (f)(2)(C) thereby making the latter subsection
> useless.   In order to give subsection (f)(2)(C) operative effect, the
> subsection should be interpreted to permit service of process by the
> alternative forms of service that, while not specifically prescribed by the
> laws of a foreign country, are also not prohibited by such laws."

*Resource Ventures, Inc. v. Resources Management International, Inc.*, 42
F.Supp. 2d 423, 430 (D. Del. 1999); *citing Dee-K*, 174 F.R.D. at 380; *See also Power
Integrations*, 2004 U.S. LEXIS at 7.

The Wolf Declaration never states that service was <u>prohibited</u>.  Mr. Wolf does state that,

"[u]nder Liechtenstein law, in order for the O'Neill Plaintiffs to make <u>proper</u> <u>service</u> on these

four Defendants, Plaintiffs were required to obtain letters rogatory and the Defendants should

have been served through that procedure."  (Wolf ¶12) [emphasis added].  Mr. Wolf states that

"because no other procedure is set forth in the Liechtenstein codes, the letters rogatory procedure

is the only method available."[6]  (Wolf ¶ 13).  Finally, Mr. Wolf states that, "these provisions of

---

[6] The Wolf declaration, while acknowledging the *potential* for the use of letters rogatory sets forth that local process
will not be issued in Liechtenstein in all instances where such a request is made. Taking the Defendants' analysis to
its conclusion, what they appear to be saying is that they can not be served pursuant to 4(f)(2)(c)(ii), and may not be
able to be served pursuant to 4(f)(2(B), leaving them free to avoid the consequences of their actions. The drafters of
the Rules of Civil Procedure certainly would not have envisioned that as a result. *See, e.g., Advisory Committee
Notes of 1963 to Rule 4(i)* (the predecessor to 4(f))("permitting service by certain types of mail, affords a manner of

the Liechtenstein Code of Civil Procedure do not permit judicial documents to be served in Liechtenstein by the mail by an American court or by a court officer, such as the Clerk of the Court."  But it is never stated that this service is prohibited by Liechtenstein law or the Liechtenstein courts. It is a matter of simple logic that something that is not permitted is not therefore prohibited.

Plaintiffs respectfully suggest that the overwhelming majority of the cases relied upon by the Defendants, are, in fact, supportive of the O'Neill contention, as they all rely upon means of service that were explicitly 'forbidden' or 'prohibited.'  *See, e.g.*, *Proctor & Gamble Cellulose Co. v. Viskoza-Loznica*, 33 f.Supp2d 622, 665 (W.D. Tenn. 1998)(service of process did not satisfy the requirements of Rule 4(f)(2)(C)(ii) when applicable law was <u>prohibitive</u> of such method of service." [emphasis added]; *Umbenhaur v. Woog*, 969 F.2d 25, 33 (3d Cir. 1992) (noting that Rule 4(f)(2)(C)(ii) "would preclude a district court clerk from serving process by signed receipt mail on a defendant in a country whose laws <u>forbid</u> that method of service" [emphasis added]; *Resource Ventures, Inc. v. Resources Mgmt. Int'l, Inc.*, 42 F.Supp.2d 423, 430 (D. Del 1999)(subsection 4(f)(2)(c)(ii) limits the forms of service to those that <u>do</u> <u>not</u> <u>violate</u> the law of the country where service is attempted).  [emphasis added].  Therefore service that may not be proper under the foreign law[7] (and thus may not qualify under 4(f)(2)(A)), it is not precluded, under 4(f)(2)(C)(ii).

---

service that is inexpensive and expeditious, and requires a minimum of activity within the foreign country"); *Advisory Committee Notes of 1993 Amendments to Rule 4(f)*.

[7] Had the O'Neill Plaintiffs attempted to serve in conformity with local law pursuant to 4(f)(2)(A), as opposed to 4(f)(2)(C)(ii), we would have had to comply with the process described in Wolf's Declaration, that is, "[i]n general, service of judicial documents in Liechtenstein must be made ex officio, that is, by <u>mail</u> or by a court officer."  (¶8) [Emphasis added].  Mr. Wolf does not provide any other cited reference, description, or the actual language of the code relating to the requirements of ex officio service, to support his position.  In fact, "notices from the court to parties are usually sent by registered mail." *Liechtenstein and Arbitration in Liechtenstein*, Batliner, Herbert, p.26-7.  Under Liechtenstein law, service by a court by registered mail is a permissible means of effectuating service.  Given the fact that local law utilizes mail for service, it is illogical that process sent by a United States Court would be <u>prohibited.</u>

Wolf specifically refers to and incorporates a purported the English translation of Sections 27 to 29 of the Liechtenstein Code of Jurisdiction in his declaration[8].  These sections of the Liechtenstein Code do not state that international service is *required* to be completed in this manner.  Rather, they provide a manner in which the Liechtenstein Courts *may* provide legal assistance to foreign courts.  Nowhere does it state that a foreign court is *required* to seek the assistance of the Liechtenstein courts.  Nor does it state that service dispatched by a clerk in the United States via registered mail, return receipt, pursuant to the FRCP 4(f)(2)(C)(ii), violates Liechtenstein law or is in any way prohibited.

The sole case cited in support of the Defendants' position, *Jung v. Neschis*, 2003 U.S. Dist. LEXIS 5569 (S.D.N.Y. 2003), Plaintiff submit, was erroneously decided.

First, the Liechtenstein Code of Judicial Procedure §§27-29, relied upon by the District Court and discussed in the Wolf Declaration does not state that service of foreign judicial documents *must* be effectuated by these means.  These sections of code merely set forth how the courts of Liechtenstein can (not <u>must</u>) assist a foreign court.  Therefore, the Court's finding that Liechtenstein *required* service pursuant to "mutual legal assistance" was in error.

Second, the *Jung* opinion denied the argument that service by registered mail is proper under Liechtenstein procedural statutes when effected ex officio, i.e. by the Clerk of the Court, as discussed in footnote 6, supra. The Court relied upon a statement by Wolf that the term "ex officio" within the meaning of these provisions of the Liechtenstein Code of Civil Procedure refers to service by the Liechtenstein courts and not by foreign courts." <u>Id</u>. 11.  Such statement

---

Nothing in the Federal Rules require an attempt to serve by way of 4(f)(2)(A) prior to using 4(f)(2)(C)(ii).

[8] There are no English translations available on the Code at any major law library in either New York or Philadelphia.

was not made however, in the declaration submitted in the case at bar.  Furthermore, neither in *Jung*, nor in the case at hand, was no support stated for this naked assertion of Mr. Wolf.

Third, the *Jung* Court failed to consider the argument differentiating the terms prohibit (4(f)(2)(C)(ii)) versus permit (4(f)(2)(A)).  The District Court never made a finding that service pursuant to FRCP 4(f)(2)(C)(ii) is <u>prohibited</u> by the Courts or the law of Liechtenstein.[9]

The Rules are designed to provide for flexibility in service, particularly in the international arena where countries may refuse to enter into an international agreement relative to the service of process.  Where, it can not be demonstrated that the procedure utilized was precluded under the laws of the foreign state, where the defendant received actual notice of the proceedings and timely filed a motion to dismiss,[10] where the Plaintiff have acted in good faith,

---

[9] Their argument, Plaintiffs suggest, further ignores the purpose and requirements of constitutional due process, to the extent that due process considerations even come into play, as discussed in Point II-D. Justice Jackson stated:

> An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.

*Mullane v. Central Hanover Bank & Tr. Co.*, 339 U.S. 306, 314 (1950).

At a minimum, in this instance there is constructive notice because the S & Z Defendants have appeared to defend this action.  As the Supreme Court stated in *Grannis v. Ordean*, 234 U.S. 385, 394 (1914), "the fundamental requisite of due process of law is the opportunity to be heard."  The record in this matter establishes that service by the Clerk was adequate, that the S & Z Defendants received notice of the suit, understood that it should retain counsel, and understood its rights because the S & Z Defendants instructed said counsel to file a motion to dismiss. This manifests the adequacy of the notice by publication. Justice Jackson succinctly summed up this matter:

> An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.  The notice must be of such nature as reasonable to convey the required information and it must afford a reasonable time for those interested to make their appearance.  But if with due regard for the practicalities and peculiarities of the case these conditions are reasonably met, the constitutional requirements are satisfied. ' The criterion is not the possibility of conceivable injury but the just and reasonable character of the requirements, having reference to the subject with which the statute deals.' *Mullane*, 399 U.S. at 314-15. (internal citations omitted).

[10] We are not confronted with a 'default' situation, where the defendant has sought to vacate a judgment some time after service, claiming that he was not aware of the proceeding.  To the contrary, Defendants promptly obtained US counsel, negotiated a briefing schedule, and otherwise fully have participated in this judicial proceeding.

where it cannot be demonstrated that letters rogatory would have been effective,[11] the relief requested should be denied.

**B.  IF THE COURT FINDS THAT THE PLAINTIFFS' SERVICE IS INSUFFICIENT, PERMISSION BY THE COURT TO REMEDY THE DEFECTS IN SERVICE IS APPROPRIATE.**

In the event that this court deems that service was incorrectly made, the Plaintiffs request that this court reject the relief sought by the Defendants, a dismissal; rather, it should quash the service and grant leave to re-serve as certain of the statutes of limitations may have run.

Upon determining that process has not been properly served on a defendant, a district court possess' discretion to either dismiss the plaintiff's complaint for failure to effect service or to simply quash service of process. However, dismissal of a complaint is inappropriate when there exists a reasonable prospect that service may yet be obtained. In such instances, the district court should, at most, quash service, leaving the Plaintiff free to effect proper service. *Umbenhauer*, 969 F.2d at 30.  *See also, Montalbano v. Easco Hand Tools, Inc.,* 766 F.2d 737, 740 (2d Cir. 1985)(Where service of process is insufficient, the courts have broad discretion to dismiss the action or to retain the case but quash the service that has been made on defendant, even though service will ordinarily be quashed and the action preserved where there is a reasonable prospect that plaintiff ultimately will be able to serve defendant properly); *Matesic v. Curtiss-Wright Corp.,* 128 F.R.D. 30, 32 (W.D.N.Y. 1989); *McGann v. New York,* 77 F.3d 672, 674 n.2 (2d Cir. 1996); *Zola v. Gordon,* 685 F. Supp. 354, 377 (S.D.N.Y. 1988); *U.S. Fire Ins. Co. v. Jesco Construction Corp*., 2003 U.S. Dist. LEXIS 12459, 10(S.D.N.Y. 2003).[12, 13]

---

[11] The methods of service in 4(f) are set forth in the alternative.  One need not utilize any particular mechanism.  In fact, arguably, a plaintiff could seek, in the first instance, alternative service pursuant to 4(f)(3).

[12]  The one hundred and twenty (120) day rule of F.R.C.P. 4(m) does not apply to service in foreign jurisdictions.[12] *Lucas v. Natoli*, 936 F.2d 432, 432-433 (9th Cir. 1991), *cert. denied,* 502 U.S. 1073 (1992); *Loral Fairchild Corp. v. Matsushita Elec. Indus. Co.*, 805 F. Supp. 3, 4-5 (E.D. N.Y. 1992); *In re Southold Dev. Corp*., 148 B.R. 726, 728-730 (E.D. N.Y. 1992); *See, Moore's Federal Practice, Civil,*  Sec. 452.

For these reasons, the Plaintiffs respectfully request that in the instance that the Court finds service to be insufficient, the Court merely quash service but preserve the action against these Defendants as there is a reasonable prospect that the Plaintiffs can serve the Defendants. [14]

## II.  **THERE IS PROPER *IN PERSONAM* JURISDICTION OVER THE DEFENDANTS.**

### A.  **GENERAL.**

Defendants have moved to dismiss the case, pursuant to the Federal Rules of Civil Procedure Rule12(b)(4) based upon a purported lack of personal jurisdiction over them.  They are seeking to challenge this court's assertion of long-arm jurisdiction over non-United States citizens, based upon statutory law and constitutional principles of due process.  *Santos v. State Farm  Fire & Cas. Co.,* 902 F.2d 1092, 1095 (2d Cir. 1990).  Plaintiffs suggest that they are wrong.

The burden is on the plaintiff of establishing that the court has jurisdiction over the defendant.  *Whitaker v. American Telecasting, Inc.,* 261 F.3d 196, 208 (2d Cir. 2001); *Distefano v. Carozzi North America, Inc.*, 286 F.3d 81, 84 (2d Cir. 2001); *Self International (HK)  Ltd. v. La  Salle National Bank, Chicago,* 01 CV 4291 (RCC) 2002 U.S. Dist. LEXIS 5631, note 4 (S.D.N.Y. 2002).  The plaintiff may meet this burden by way of pleadings and affidavits.

---

[13] The plaintiff would seek leave to serve by certified mail (or 'overnight' mail such as FedEx or DHL), receipt requested, by the Clerk pursuant to 4(f)(3).  Conceivably, Plaintiff could seek letters rogatory pursuant to 4(f)(2)(B), and upon the denial of such action by the local authorities, come back for service pursuant to 4(f)(3).  We suggest that neither is required, for the reasons set forth herein.  *See also Smith et al., v. The Islamic Emirate of Afghanistan*, No. 01-CV-10132, 2001 WL 1658211, at *2 (S.D.N.Y. Dec. 26, 2001) (Fed. R. Civ. P. 4(f)(3) was "adopted in order to provide flexibility and discretion to the federal courts in dealing with questions of alternative methods of service of process in foreign countries[.]")

[14] To the extent that due process considerations are even applicable (see Point II-D, below). *See S.E.C. v. Tome*, 833 F.2d 1086, 1092 (2nd Cir. 1987) ("To submit a party to the jurisdiction of a court, due process has long been held to require the giving of notice in such a manner that there can be little doubt that the party has actual notice of the claims in order to appear and defend.") (citing Wuchter v. Pizzutti, 276 U.S. 13, 24 (1928)).

*Whitaker,* 261 F.3d at 208 (2d Cir. 2001) (affidavits); *Distefano,* 286 F.3d at 84 (2d Cir. 2001)

(pleadings and affidavits).

To survive a motion to dismiss, plaintiff is "required to make only a prima facie showing

that [defendant] is amenable to personal jurisdiction in New York. *A.I. Trade Finance, Inc. v.*

*Petra Bank,* 989 F.2d 76, 79 (2d Cir. 1993); *Metropolitan Life Insurance Co. v. Robertson-Ceco*

*Corp.,* 84 F.3d 560, 566-7 (2d Cir. 1996); *Whitaker,* 261 F.3d at 208 (2d Cir. 2001).  All

allegations are construed in the light most favorable to the plaintiff and all doubts are resolved in

the plaintiff's favor, notwithstanding a controverting presentation by the moving party.  *A.I.*

*Trade Finance, Inc.*, *supra*, at 79-80; *Distefano*, 286 F.3d at 84 (2d Cir. 2001); *Self International*

*(HK) Ltd.*, 2002 U.S. Dist. LEXIS 5631 at 4 ("Where the court relies on pleadings and affidavits,

rather than conducing an evidentiary hearing, the plaintiff need only make a prima facie showing

that the exercise of jurisdiction is proper.  Moreover, the pleadings and affidavits are construed

in the light most favorable to the plaintiff and all doubts are resolved in the plaintiff's favor.")

Personal jurisdiction in a diversity cases, or in federal question cases where the statute,

unlike the case at bar, does not provide for national service of process, is governed by the law of

the forum state, in this case, New York..  *A.I. Trade Finance, Inc.*, 989 F.2d at 80 (2d Cir. 1993);

*Whitaker,* 261 F.3d at 208 (2d Cir. 2001); *Distefano,* 286 F.3d 81 at 84 (2d Cir. 2001); *Self*

*International (HK) Ltd.*, 2002 U.S. Dist. LEXIS 5631 at 5.  If jurisdiction is found to be

appropriate under the laws of the forum state, the court must then determine, if applicable, if the

requisites of due process are satisfied.  *Whitaker,* 261 F.3d at 208 (2d Cir. 2001); *Self*

*International (HK) Ltd.* 2002 U.S. Dist. LEXIS 5631 at 5.

Plaintiffs contend that service was proper under the federal statutes permitting nationwide

service of process as well as under the New York long-arm statute.  Plaintiffs further contend

that while due process standards were complied with, as the D & Z Defendants claim to have

absolutely no United States contacts, due process considerations do not even come into play.

**B.  THE DEFENDANTS HAVE BEEN SUED UNDER FEDERAL STATUTES PERMITTING NATIONWIDE SERVICE OF PROCESS AND PROVIDING A BASIS FOR FEDERAL JURISDICTION.** [15]

As an initial matter, the Plaintiffs have brought federal statutory claims that permit

nationwide service of process. ATA, 18 U.S.C. § 2334(a) ("Process in such a civil action may be

served in any district where the defendant resides, is found, or has an agent."); RICO 18 U.S.C. §

1965(b) ("process . . .  may be served in any judicial district of the United States by the marshal

thereof"). Indeed, the D.C. Court has already recognized that nationwide service of process is an

appropriate tool in this case. In denying defendant Khudeira's motion to dismiss *Burnett v. Al*

*Baraka* (*Burnett I*), the court held that "a plaintiff may utilize a statutes nationwide service of

process to establish personal jurisdiction, however, if the plaintiff asserts merely a colorable

---

[15] This Court also has personal jurisdiction over the Plaintiffs' claims pursuant to New York's Long Arm Statute. N.Y. C.P.L.R. § 302(a)(2). At this point in the litigation, the parties have extensively briefed the applicability of the New York Long Arm Statute. Rather than burdening the Court with a restatement of those same arguments herein, Plaintiffs incorporate by reference the discussion of the applicability of the New York Long Arm Statute set forth in the various previously filed Plaintiffs' Memorandum of Law, such as the Federal Plaintiffs' Opposition to the Motion to Dismiss of National Commercial Bank at pp. 10-11.

CPLR Section 302(a) provides, in pertinent part, that there is personal jurisdiction over non-domiciliaries, "who in person or through an agent:

(1)        transacts any business within the state or contracts anywhere to supply goods or services in the state; or

(2)        commits a tortuous act within the state, except as to a cause of action for defamation of character arising from the act; or

(3)        commits a tortuous act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he

i        regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods  used or consumed or services rendered, in the state, or

ii        expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or *international* commerce; or

iii        owns, uses or possesses any real property situated within the state.

(emphasis added).

claim under the statute." *Burnett I*, 274 F. Supp.2d 84, 97-98 *citing Republic of Panama*, 119

F.3d 941-42; *IUE AFL-CIO Pension Fund v. Hermann*, 9 F.3d 1049, 1056 (2d Cir. 1993), *cert.*

*denied*, 513 U.S. 822, 115 S.Ct. 86, 130 L.Ed.2d 38 (1994).

 The United States Court of Appeals for the District of Columbia, just last week, in

another terrorism case, highlighted the broad reach of this doctrine.  *Mwami v. Osama Bin*

*Laden*, 04-5266, 2005 U.S. App. LEXIS 16185 (D.C. Cir. August 5, 2005).

 Accordingly, contrary to the Defendants' position, the Court need not refer to the forum

state long-arm statute in determining whether the first prong of *International Shoe Co. v.*

*Washington*, 326 U.S. 310, 316 (1945) ) is satisfied, if it applies at all.  *See Omni Capital Int'l*

*Ltd. v. Rudolf Wolff & Co.*, 484 U.S. at 104; *See also* Fed. R. Civ. P. 4(k)(1)(D) (Service of

summons may establish personal jurisdiction when "authorized by a statute of the United

States"); *S.E.C. v. Vision Communications, Inc.*, 74 F.3d 287, 290 (D.C. Cir. 1996); *Mariash v.*

*Morrill*, 496 F.2d 1138 (2d Cir. 1974); *Estate of Unger v. Palestinian Auth.*, 153 F. Supp. 2d 76

(D.R.I. 2001); *Mwami* 2005 U.S. App. LEXIS 16185.

 It is beyond question that if Plaintiff *do* state a claim against S & Z under ATA or

RICO,[16] this Court may assert personal jurisdiction over S & Z to adjudicate the ATA and RICO

Claims, as well as all of the other claims asserted in the complaints.  The ATA provides that

claims may be brought in "any district where any plaintiff resides" and that process "may be

served in any district where the defendant resides, is found, or has an agent." 18 U.S.C. §

2334(a). RICO similarly provides that "process . . . may be served in any judicial district of the

---

[16] The Defendants allege at Mem.10-12, that the Plaintiffs' allegations as to these causes of action were insufficient. They provide no legal argument in support of this contention, nor cite any reference to the allegations contained within the pleadings.  Plaintiffs allege that they are incorrect as a matter of law, and such unsupported allegation, should be denied.  They elected not to pursue a motion to dismiss for a failure to state a claim, unlike, apparently, all of the other defendants.

United States . . ." 18 USC §1965(b).  Because both statutes provide for nationwide service of

process, the relevant Due Process inquiry for personal jurisdiction purposes "is whether the

defendant has had minimum contacts with the United States." *Busch v. Buchman, Buchman &*

*O'Brien, Law Firm*, 11 F.3d 1225, 1258 (5th Cir. 1994) (citations omitted); *see also SEC v.*

*Carrillo*, 115 F.3d 1540, 1543 (11th Cir. 1997); *Estates of Unger* 153 F.Supp2d at 88; *Combs v.*

*Adkins & Adkins Coal Co.*, 597 F. Supp. 122, 125 (D.D.C. 1984).  Moreover, if the court has

personal jurisdiction over S & Z with respect to Plaintiffs' ATA or RICO claims, then it may

also assert pendent personal jurisdiction over the remaining claims that derive from the same

events.  *IUE AFL-CIO Pension Fund* at 1056-57.

Because the Plaintiffs' RICO claims, and other allegations, against the Defendants herein

arise from their money laundering activities on behalf of al Qaida in furtherance of al Qaida's

conspiracy to attack America, this Court necessarily possesses personal jurisdiction over the

Defendants. Pursuant to 18 U.S.C. § 1956(a)(3), a financial institution engages in money

laundering if it conducts or attempts to conduct a financial transaction involving property used to

conduct or facilitate specified unlawful activity, with the intent:

> (A) to promote the carrying on of specified unlawful activity;
>
> (B) to conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of specified unlawful activity; or
>
> (C) to avoid a transaction reporting requirement under State or Federal law.

Under subsection (b)(2) of that same statute:

> the district courts shall have jurisdiction over any foreign person, including any financial institution authorized under the laws of a foreign country, against whom the action is brought, if service of process upon the foreign person is made under the Federal Rules of Civil Procedure or the laws of the country in which the foreign person is found, and –
>
> (C) the foreign person is a financial institution that maintains a bank account at a financial institution in the United States.

The conduct underlying Plaintiffs' RICO claims subjects the Defendants to personal jurisdiction under the anti-money laundering statute.

Defendants knowingly facilitated financial transactions on behalf of Osama bin Ladin and others in order to further al Qaida's terrorist activities.  Importantly, 18 U.S.C. § 1961 defines "specified unlawful activity" to include conduct in violation of 18 U.S.C. §§ 2339A, 2339B and 2339C, which criminalize the provision of material support or resources to terrorists. Thus, S & Z has engaged in acts of money laundering within the meaning of 18 U.S.C. § 1956(a)(3).[17] See, e.g., Iraq TAC ¶38, 43, 44, 45, 46, 47, 48, 50; Al Baraka SAC ¶22, 24. 25, 76, 77, 78, 79, 80, 81, 82, 83, 85; RICO Statement, *passim;* see generally, Appendix I.

As various co-conspirators maintain correspondent bank accounts with United States Banks (e.g., S&Z with Chase Manhattan Bank, a U.S. based financial institution), the money laundering activities underlying the Plaintiffs' RICO claims confer personal jurisdiction over Defendants in this case.

Even if Plaintiffs do not state a claim under the ATA or RICO, that statutes nonetheless provide a basis for the assertion of jurisdiction over S&Z, so long as Plaintiffs' claims under either the ATA or RICO are at least colorable. As the Second Circuit explained in *Herrmann*:

> Dismissal for lack of jurisdiction is not appropriate merely because the legal theory alleged is probably false, but only because the right claimed is so insubstantial, implausible, foreclosed by prior decisions of this Court,

---

[17] 18 U.S.C. § 1956(a)(1) further provides that a financial institution is guilty of money laundering in the event that it conducts or attempts to conduct such a financial transaction, knowing that the property involved in that financial transaction represents the proceeds of some form of unlawful activity, with the intent to promote the carrying on of specified unlawful activity. As alleged in the pleadings, al Qaida has, from its inception, depended on the diversion of contributions to ostensible charities to support its global operations. The funds obtained through this process necessarily represent the proceeds of unlawful activity, in that many well meaning contributors are defrauded in the process. Given the relationship between the Defendants, various other co-conspirators and al Qaida during al Qaida's formative years, the Defendants were aware that the funds deposited in the al Qaida accounts it maintained were generated through illegal means, and were being channeled to support al Qaida's terrorist ambitions. As such, Defendants are guilty of money laundering under § 1956(a)(1) as well. The violations of that subsection also give rise to personal jurisdiction over the S&Z Defendants under § 1956(b)(2).

or otherwise completely devoid of merit as not involved a federal controversy.

*Id.* at 1055.

Here, regardless of whether the Court finds that Plaintiffs have stated a claim under the ATA or RICO, Plaintiffs' claims against S & Z under those statutes are not "so insubstantial, implausible, foreclosed by prior decisions. . .  or otherwise completely devoid of merit" so as to preclude the exercise of jurisdiction.

### C.  THE PLAINTIFFS ADEQUATELY ALLEGE CONSPIRACY AS A BASIS FOR JURISDICTION.

Moreover, personal jurisdiction over the Defendants is appropriate because the D & Z Defendants Bank purposefully directed its activities towards the United States through its active, knowing assistance to al Qaida.[18] In *Burger King v. Rudzewicz*, 471 U.S. 462 (1985), the Supreme Court held that the requirements of due process were satisfied "if the defendant has 'purposefully directed' his activities at residents of the forum and the litigation results from alleged injuries that 'arise out of or relate to' those activities." 471 U.S. at 472. Physical presence is not a requirement. *Id*. at 475. In the context of an intentional tort claim, the Supreme Court has held that intentional conduct calculated to cause injury in the forum state satisfies the due process requirements for jurisdiction, even if none of the defendant's conduct took place in the forum. *Calder v. Jones*, 465 U.S. 783, 789 (1984).

The Supreme Court, in *International Shoe Co. v.  Washington*, 326 U.S. 310, 316 (1945), set forth a two-part test for jurisdiction – minimum contacts and fundamental fairness.  That is, if the defendant is not present in the territory of the forum, he has "certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and

---

[18] As indicated in Point II- D, below, the Plaintiffs do not believe that this Court need even reach this due process argument.

substantial justice." 326 U.S. at 316.  It depends on the 'quality and nature' of the defendant's forum related activities.  326 U.S. at 317.

In *Hanson v. Denckla*, 357 U.S. 235, 253 (1958), the Supreme Court ruled that minimum contacts can not exist unless "there be some act by which the defendant *purposely avails* itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws."  357 U.S. at 253; *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985).  *A. I. Trade Finance, Inc. v. Petra Bank*, 989 F.2d 76, 82 (2d Cir. 1993).  It is a question of foreseeability- did the defendant have reason to foresee being 'haled' before the forum court. *Shaffer v. Heitner*, 433 U.S. 186, 216 (1977).

In *Burger King*, *supra*, the Supreme Court ruled that specific jurisdiction requires a showing by the plaintiff that (i) the non resident defendant had  purposefully established significant (i.e., not 'random, fortuitous or attenuated") contact with the forum state; and (ii) the plaintiff's cause of action arises out of or is related to the defendant's forum  state contacts.  471 U.S. at 472, 486.

"Purposefully directed" includes situations where the nonresident defendant's act is geographically intentionally directed at the plaintiff in the forum state.  *See*, 16-108 *Moore's Federal Practice- Civil* Sec 108.42[3][b][i].  Thus, causing an effect in the forum state constitutes purposeful availment. *See, e.g., Calder v. Jones*, 465 U.S. 783, 790 (1984) (writing and publishing article about California resident knowing that it would be distributed in California, made them subject to California jurisdiction).

In certain situations, a defendant may be considered to have established contacts through the acts of a third party, such as the actions by a co-conspirator.[19]  By joining a conspiracy,

---

[19] For purposes of the New York long arm statute, C.P.L.R. 302(a)(2), a co-conspirator may be an agent.  *Grove Press, Inc. v. Angleton*, 649 F.2d 121, 122-3 (2d Cir. 1981); *Cleft of the Rock Foundation v. Wilson*, 992 F. Supp.

knowing that acts in furtherance of the conspiracy have taken place or will take place in the forum state, the defendant purposefully avails himself of the privileges of the forum state and should reasonably expect to be haled into court there.  *See, e.g., Cleft of the Rock Foundation v. Wilson*, 992 F. Supp. 574, 581-2 (E.D.N.Y. 1998); *Allstate Life Ins. Co. v. Linter Grp. Ltd.,* 782 F. Supp. 215, 220-222 & n.6 (S.D.N.Y. 1992) (plaintiff must "(1) make a prima facie factual showing of a conspiracy, (2) allege specific facts warranting the *inference* that the defendant was a member; and (3) show that defendant's co-conspirator committed a tortuous act pursuant to the conspiracy in this jurisdiction" citing *Chrysler Capital Corp. v. Century Power Corp.*, 778 F. Supp. 1260 (S.D.N.Y. 1991); *Singer v. Bell*, 585 F. Supp. 300, 302-3 (S.D.N.Y. 1984) (same);[20,] [21]  *Best Cellars Inc. v. Grape Finds at Dupont, Inc.*, 90 F. Supp. 2d 431, 446 (S.D.N.Y. 2000) (the third element is changed to "demonstrate the commission of an overt act in New York during, and pursuant to, the conspiracy.")  *See, Lehigh Valley Industries, Inc. v. Lehigh Colonial Corp*, 527 F.2d 87, 93 (2d Cir. 1975).  Mere assertions of conspiracy may not be insufficient to establish jurisdiction for purposes of CPLR 302(a)(2).  *Cleft of the Rock Foundation v. Wilson*, 992 F. Supp. 574, 582 (E.D.N.Y. 1998) (plaintiff "must demonstrate (i) a prima  facie factual showing of a conspiracy to commit a tort in New York; and (ii) allege specific facts warranting the *inference* that the defendant was a member of the conspiracy").[22]

---

574, 581 (E.D.N.Y. 1998); *Best Cellars Inc. v. Grape Finds at Dupont, Inc.*, 90 F. Supp. 2d 431, 445 (S.D.N.Y. 2000).

[20] Jurisdictional discovery should be had if this court determines that the record is presently inadequate.  *See, Lehigh Valley Industries, Inc. v. Lehigh Colonial  Corp*, 527 F.2d 87, 93 (2d Cir. 1975).  If this court so determines, such relief is specifically sought.

[21]  The court notes that a conspiracy can rarely be proved by direct evidence and usually is established by circumstantial evidence and the totality of conduct of the parties and the reasonable inferences which can be drawn therefrom.  Mere speculation and conjecture are not enough.  303-4.

[22] It should be noted that most of these cases are prior to the Supreme Court's re-emphasis of the concept of 'notice pleading.'

To make a prima facie showing of conspiracy, the Plaintiff must allege the primary tort and the following four elements:

(i)     a corrupt agreement between two or more parties;

(ii)    an overt act in furtherance of the agreement;

(iii)   the parties intentional participation in the furtherance of the plan or purpose; and,

(iv)    the resulting damage or injury.

*Cleft of the Rock Foundation v. Wilson*, 992 F. Supp. 574, 582 (E.D.N.Y. 1998), citing *Kashi v. Gratos,* 790 F.2d 1050, 1055 (1986).

The prima facie showing of conspiracy requires allegations of the primary tort (in this case, the attacks of September 11) and four additional elements: (1) a corrupt agreement between two or more parties; (2) an overt at in furtherance of the agreement; (3) the defendant's intentional participation in the furtherance of a plan; and (4) resulting damage or injury. *See Simon v. Philip Morris, Inc.*, 86 F. Supp.2d 95, 120 (E.D.N.Y. 2000); *see also Chrysler Capital*, 778 F. Supp. at 1267. This Court has further held that: "[t]o warrant the inference that a defendant was a member of the conspiracy, Plaintiffs must show that "(a) the defendant had an awareness of the effects in New York of its activity; (b) the activity of the co-conspirators in New York was to the benefit of the out-of-state conspirators; and (c) the co-conspirators acting in New York acted 'at the direction or under the control' or 'at the request of or on behalf of' the out-of-state defendant.'" *In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d at 805 (citations omitted).

**1.   The O'Neill Pleadings Adequately Demonstrate the Conspiracy and the Defendants' Role Thereby Supporting Jurisdiction.**

S & Z is subject to jurisdiction here because, as alleged in the complaints and RICO Statements, he conspired with al Qaida to attack the United States.  The Plaintiffs have satisfied

these elements here. Fairly read, the complaints and RICO Statements allege that S & Z,

personally and through the entity defendant, knowingly provided funds to al Qaida and/or

otherwise assisted in their financial activities in furtherance of the conspiracy.  Moreover, al

Qaida's ambition to attack the United States, and New York in particular, was well known for

many years prior to the September 11th Attacks, as evidenced by the 1993 bomb attack on the

World Trade Center and the foiled plot to simultaneously attack the George Washington Bridge

and Holland Tunnel.  Thus, the potential effects in New York of contributing to al Qaida were

undeniably foreseeable to that terrorist organization's sponsors and supporters, including S & Z.

Further, the Plaintiff have specifically alleged that "the September 11th Attack was a direct,

intended and foreseeable product" of the material support provided by S & Z and al Qaida's

other sponsors and facilitators. Indeed, given that al Qaida had repeatedly declared that its

primary objective was to conduct terrorist attacks against the United States, it is self evident that

the entities and people who chose to knowingly sponsor al Qaida did so in order to assist that

terrorist organization in mounting successful attacks, and that the individuals chosen to carry out

such attacks, and that the individuals chosen to carry out such attacks act "for the benefit" and

"on behalf" of all of the organization's members and sponsors.  When read in a light most

favorable to the Plaintiff, the allegations of the complaints and RICO Statements give rise to a

reasonable inference that S & Z was a member of al Qaida's conspiracy to attack America. As a

result, the actions of S & Z's co-conspirators, including the September 11th Hijackers

themselves, are imputable to S & Z for jurisdictional purposes and serve to establish minimum

contact with New York sufficient to satisfy Due Process.  *See*, *Mwami v. Osama Bin Laden*, 04-

5266 2005 U.S. App. LEXIS 16185 (D.C. Cir. August 5, 2005). [23]

---

[23] By imputing forum acts of their co-conspirators to non-resident defendants, this court has repeatedly found that non-resident defendants have minimum contacts wit the forum to satisfy Due Process. *Dixon v. Mack*, 507 F.Supp

For example, it is alleged that the S&Z Defendants were members of the conspiracy (Iraq TAC 38, Al Baraka SAC 22), that they were engaged in money laundering activities on behalf of the conspiracy, including, without limitation, on behalf of Al Qaida, sovereign defendants, and other co-conspirators, including Al Taqwa (Iraq TAC 48, Al Baraka SAC 25) and that the hijackings causing the death and destruction on September 11 were the culmination of a conspiracy among the Defendants to attack the United States and murder United States citizens and to disrupt economic activities within the United States and of the victims of the attacks. Iraq TAC 213. The attacks of September 11, 2001 were not isolated incidents, but rather the coordinated effort of a terrorist organization, after years of planning, and utilizing an extensive network of support and aid, by various individuals, including the Defendants herein. Al Baraka. 2. The Defendants, who conspired with each other, knew or should have known that their actions in furtherance of a conspiracy to commit international terrorist acts against the United States and its nationals, including the events of September 11, would result in the murder of innocent persons. Al Baraka SAC. 151, 152.

Details as to the scope of the conspiracy are set forth at various locations in the pleadings, including Iraq TAC ¶¶248-253, Al Baraka SAC ¶¶156-161, the RICO Count, and the RICO Statements. Attached hereto and incorporated herein as Appendix I, is a detailed summary of the various allegations expressly set forth in the pleadings, setting forth the conspiracy and the

---

345, 352 (S.D.N.Y. 1980)("The act of the conspiracy in allegedly abducting plaintiff in New York, which is on the acts, of course, complained of in the suit, supplies the necessary minimum contacts . . ."); *Andre Emmerich Gallery v. Segre*, 1997 WL 672009 (S.D.N.Y Oct. 29, 1997) (imputation of forum activities of co-conspirator to non-resident defendant establishes minimum contact satisfying Due Process). The conspiracy jurisdiction cases from this Court explain that when non-resident defendants enter into a conspiracy knowing that the forum acts their co-conspirators (done in furtherance of the conspiracy) would impact the forum, such non-resident defendants should "reasonably anticipate being held into court there." *Dixon*, 507 F. Supp. at 352; *Andre Emmerich*, 1997 WL 672009, *6 (both citing *World-Wide Volkswagon Corp.*, 444 U.S. at 295 (1980)); see also *Chrysler Capital Corp.*, 778 F.Supp. at 1270 (asserting personal jurisdiction over non-resident co-conspirator where conspiracy "could reasonably have been expected to have effects" in the forum). Thus, the exercise of personal jurisdiction over non-resident defendants based on forum acts of their co-conspirators satisfies Due Process. In that Defendant was not a "non-resident" until recently, these cases are instructive, but not necessary for a finding of jurisdiction.

relationship of the Defendants to such conspiracy.  Such specific allegations, to the extent that

they are required under notice pleading, coupled with reasonable inferences, clearly support a

finding of *in personam* jurisdiction for the D & Z Defendants.

### D.  THE UNITED STATES DUE PROCESS PROTECTIONS TO NOT APPLY TO THESE FOREIGN DEFENDANTS.

The Defendants further challenge the assertion of an American court over them on the

ground that they lack the 'minimum contacts' and other requirements of the due process clause

as set forth in *International Shoe* and its progeny.  In support of such position, they have

submitted lengthy affidavits detailing their purported lack of ties with the United States[24].  Their

position, in brief, is that they have absolutely no direct contacts with the United States nor any

presence in the United States.

Their due process challenge, however, must fail, as it is premised upon a flawed

assumption- that is, that they are subject to the due process protections of the Fifth Amendment.

To the contrary, non-resident aliens who do not have sufficient contacts with the United States

are not entitled to Fifth Amendment protections.  *Jefry v.  FAA,* 370 F.3d 1174, 1182-3 (D.C.

Cir. 2004), citing, *United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990), *Johnson v.

Eisentrager*, 339 U.S. 763, 771 (1950), *Yamataya v. Fisher*, 189 U.S. 86, 101 (1903), *Yick Wo v.

Hopkins*, 118 U.S. 356 (1886); *People's Mojahedin Org. of Iran v. Dept. of State*, 327 F.3d 1238

(D.C. Cir. 1999); *People's Mojahedin Org. of Iran v. Dept. of State*, 182 F.3d 17 (D.C. Cir.

2003)

In *Baker v. Great Socialist  People's Libyan Arab Jamahiriya*, CV 03-749, p.10 (D.D.C.

June 30, 2005) (Kessler, J)(attached as Exhibit B), involving another terrorist attack, in this case

---

[24] Such arguments are also in support of their position that this court could not assert general jurisdiction under New York law over them.  The Plaintiff are not advancing such an argument.

a hijacking of an airplane in Greece, the District Court in the District of Columbia, following this analysis, denied a motion to dismiss filed by Libyan nationals who, identical to the situation in the case at bar, denied having any presence in the United States.

## CONCLUSION

For the reasons set forth herein, and as addressed at argument, which is requested, the Defendants' Motion should be denied.

Alternatively, with regard to the issue of service, Plaintiff should be granted leave to reserve the summons and complaint.

Dated: August 9, 2005

Respectfully submitted

LAW OFFICES OF JERRY S. GOLDMAN &
    ASSOCIATES, P.C.


By: _____
    JERRY S. GOLDMAN, ESQ. (JG8445)
    FREDERICK J. SALEK, ESQ. (FS8565)
    GINA M. MAC NEILL, ESQ. (GM0581)

*Attorneys for the Plaintiff,*
*Estate of John P. O'Neill, et al.,*

    111 Broadway, 13th Floor
    New York, N.Y. 10006
    212.242.2232

## <u>CERTIFICATE OF SERVICE</u>

I, GINA M. MAC NEILL, ESQUIRE, do hereby certify that I served the within

Plaintiffs' Memorandum of Law in Opposition to the Defendants' Motion to Dismiss, on this

date, on all of the parties in the case via filing with the Court's electronic case filing (ECF)

system.

Dated: August 9, 2005

_____
GINA M. MACNEILL, ESQUIRE

**APPENDIX I**

**Table of Summary O'Neill Pleading References to the Conspiracy and the S&Z Defendants For Purposes of Jurisdiction**

The Conspiracy For Purposes of Jurisdiction

1. On September 11, 2001, approximately 3,000 individuals were murdered in New York, Virginia and Pennsylvania. RICO Statement (Attacks). RICO Statement, *passim.*

2. The attacks of September 11, 2001, were not isolated incidents, but rather a coordinated effort by the al Qaeda terrorist organization, planned for years by an extensive network of Islamic militants with the support, aid and assistance of banks, governments, and individuals. Al Baraka SAC ¶2.

3. The hijackings referenced above were the culmination of a conspiracy among the Defendants to attack the United States and murder United States citizens and to disrupt economic activities within the United States and of the victims of the attacks. Iraq TAC ¶213.

4. As set forth in the pleadings,[25] the Defendants unlawfully, willfully and knowingly combined, conspired, confederated, aided and abetted, tacitly and/or expressly agreed to participate in unlawful and tortious acts pursuant to a common course of conduct, resulting in the death and injury of Plaintiffs. Iraq TAC ¶249.

5. As set forth in the pleadings, the Defendants conspired with and agreed to provide material support, funding, sponsorship and/or resources to Al Qaeda, Osama bin Laden, and the sponsors of terror. Iraq TAC ¶250.

6. As set forth in the pleadings, Defendants engaged in common, concerted and conspiratorial acts, efforts, transactions, and activities designed and intended to cause a terrorist attack on the United States, its citizens and society, and attack those foreign citizens found within the United States, resulting in the harm to Plaintiffs, which was done pursuant to and furtherance of this common scheme. Iraq TAC ¶251.

7. Defendants' concert of action and conspiracy to support and promote Osama bin Laden and Al Qaeda were a proximate cause of the September 11, 2001, terrorist attacks that killed and injured the Plaintiffs. Iraq TAC ¶252.

8. As a result of Defendants' concert of action and conspiracy to further terror, Plaintiff has suffered damages as set forth herein. Iraq TAC ¶253.

9. As set forth in the pleadings, all Defendants conspired to commit acts of international terrorism against the United States, its nationals and allies, which conspiracy included the provision of material support and resources to al Qaeda, Osama bin Laden, the hijackers, and affiliated foreign states, FTO's, persons, organizations, commercial entities and other parties. Al Baraka SAC ¶157.

---

[25] There are references in the complaints to incorporating various paragraphs in the pleadings without setting them forth at length. See, e.g., Iraq TAC ¶248; Al Baraka SAC ¶156

10.    As set forth in the pleadings, all Defendants engaged in concerted efforts and activities designed to attack the United States and inflict harm on U.S. citizens and property. Al Baraka SAC ¶158.

11.    As set forth in the pleadings, the Defendants' conspiracy resulted in the September 11th terrorist attacks that killed the Decedents. Al Baraka SAC ¶159.

12.    The September 11th attack was a direct, foreseeable, and intended product of the conspiracy among the Defendants, As set forth in the pleadings, to commit acts of international terrorism against the United States, its nationals and allies.  Al Baraka SAC ¶160.

13.    As a result of the Defendants' conspiracy, as set forth in the pleadings, Plaintiffs and the Class have suffered damages as fully set forth in the paragraphs above which are incorporated herein by reference. Al Baraka SAC ¶161.

14.    The conspiracy among the Defendants to commit acts of international terrorism against the United States, its nationals and allies, included the provision of material support and resources to al Qaida, Osama bin Ladin, the hijackers, affiliated foreign states, foreign terrorist organizations, persons, organizations, commercial entities, and other parties. Al Baraka SAC ¶162.

15.    By virtue of their participation in the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001 attack, the Defendants negligently, intentionally, recklessly, willfully and wantonly breached duties of care owed to the Plaintiffs, the Class, and Decedents. Al Baraka SAC ¶163.

16.    In furtherance of their conspiracy to commit acts of international terrorism against the United States, its nationals and allies, the Defendants engaged in a pattern of racketeering activity which included, without limitation: acts of murder, kidnapping, arson, robbery, and extortion; dealings in controlled substances and listed chemicals; the falsification of identification documents; the unlawful procurement, reproduction, sale and use of naturalization and citizenship papers, passports and visas; the obstruction of federal and state criminal investigations; and financial institution and mail fraud.

17.    "In furtherance of their conspiracy to commit acts of international terrorism against the United States, its nationals and allies, the Defendants engaged in a pattern of racketeering activity which included, without limitation: acts of murder, kidnapping, arson, robbery, and extortion; dealing in controlled substances and listed chemicals; the falsification of identification documents; the unlawful procurement, reproduction, sale and use of naturalization and citizenship papers, passports and visas; the obstruction of federal and state criminal investigations; and financial institution and mail fraud.  Al Baraka SAC ¶177; see Iraq TAC ¶266 (alleging violations of 18 USC 1962 (b), (c) and/or (d)).

18.    They intended to cause damage to business and property and did in fact cause damage to business and property, and the damages suffered were the direct and proximate result of the pattern of racketeering activity of the Defendants, acting individually and in concert with each other. SAC ¶178-180; see Iraq TAC ¶267-8, 269-72.

19.    The Defendants performed acts directly or participated in activities and conspired to participate. Iraq TAC ¶267.

20. The Defendants aided and abetted al Qaida, OBL and the hijackers in their campaign to commit acts of international terrorism against the US, its nationals and allies. Al Baraka SAC ¶162.

21. The Defendants unlawfully, willfully and knowingly combined, conspired, confederated, aided and abetted, tacitly and/or expressly agreed to participate in unlawful and tortious acts pursuant to a common course of conduct, resulting in the death and injury of Plaintiffs. Iraq TAC ¶ 249.

22. Defendants engaged in common, concerted and conspiratorial acts, efforts, transactions, and activities designed and intended to cause a terrorist attack on the United States, its citizens and society, and attack those foreign citizens found within the United States, resulting in the harm to Plaintiffs, which was done pursuant to and furtherance of this common scheme. Iraq TAC ¶ 251.

23. The 9/11 attacks were the direct, intended and foreseeable product of aiding and abetting. Al Baraka SAC ¶163.

The Relationship Between the S & Z Defendants and the Conspiracy

24. Defendants Schreiber & Zindel, Dr. Frank Zindel, Engelbert Schreiber, Engelbert Schreiber, Jr.,  along with others, are natural persons, organizations, and/or banks, and charities located all over the world who conspired with Osama Bin Laden, Al Qaeda, Iraq and the Taliban to raise, launder, transfer, distribute, and hide funds for Bin Laden and Al Qaeda in order to support and finance their terrorist activities including, but not limited to, the September 11th attacks. Iraq TAC ¶ 38, 41, 250; Al Baraka SAC ¶ 22 (without Iraq and Taliban), 23, 25.

25. Some of the businesses, banks and charities operate legitimately but also maintain a secret dual role as Al Qaeda front organizations and actively support its terrorist activities. Some of those organizations are purely sham fronts for Al Qaeda.  Iraq TAC ¶ 38, 42; Al Baraka SAC ¶ 25, 26, 77.

26. The defendant charities (as named in the complaints) were used as terrorist fronts to mask money transfers and provide cover for terrorist operatives and operations. Al Baraka SAC ¶ 24.

27. Defendant Youssef M. Nada & Co., a co-conspirator of Defendant Bank al-Taqwa Limited, has aided, abetted, and materially sponsored and al Qaeda and international terrorism.

28. Defendants Schreiber & Zindel, Dr. Frank Zindel, Engelbert Schreiber, Engelbert Schreiber, Jr., Martin Wachter, Erwin Wachter, Sercor Treuhand Anstalt, Albert Friedrich Armand Huber, a/k/a Ahmed Huber  a/k/a Albert Huber a/k/a Armand Albert Friedric  a/k/a Armand Huber a/k/a/ Ahmad Huber-el Biali, Ali Ghaleb Himmat, al Taqwa bank a/k/a Bank Al Taqwa, a/k/a Bank al Taqwa Limited a/k/a Bank of Taqwa Limited, al Taqwa Trade, Property and Industry, Ltd. a/k/a al Taqwa Trade, Property and Industry Company Limited, a/k/a al Taqwa Trade, Property and Industry Establishment a/k/a Himmat Establishment a/k/a Hochburg a/k/a Waldenburg a/k/a Al Taqwa Trade, Property and Industry Limited, Akida Bank Private Limited, Akida Investment Co. Ltd, NADA Management Organization, S.A., Youssef M. Nada a/k/a Yousseff Mustafa Nada a/k/a Youssef Nada, Youssef M. Nada & CO. Gesekkscgaft, M.B.H., Nada International Anstalt, Youssef M. Nada & Co., Nasco Business

Residence, CenterSAS DI Nasreddin Ahmed Idris EC, Nasco Nasreddin Holding A.S., Nascoservice S.R. L., Nascotex S.A., BARZAN E-TIKRITI a/k/a/ Barzan Ibrahim Hasan a/k/a Barzan Ibrahim Hasan al-Tikriti, METALOR a/k/a La Groupe Metalor a/k/a La Groue Metalor Technologies a/k/a Metalor Group a/k/a Metalor Technologies SA, Babca Dek Gottardo a/k/a Banca Del'Gottardo,  Nasreddin Company Nasco SAS DI Ahmed Idris Nasreddin EC, Nasreddin Foundation, Nasreddin Group, International Holding Limited, Nasreddin International Group Limited Holding,  Ahmad I. Nasreddin a/k/a  Hadj Ahmed Nasreddin a/k/a Ahmed Idriss Nasreddin *AND* Nasreddin Group International Limited Holdings a/k/a Nasreddin International Group Holdings Limited *a/k/a* Nasreddin International Group Ltd., Asat Trust Reg., have aided, abetted, and materially sponsored and al Qaeda and international terrorism.  Al Baraka SAC ¶76.

29.    Defendant Schreiber & Zindel of Vaduz, Liechtenstein, is a legal entity involved in money laundering activities on behalf of Al Qaeda and Al Taqwa Bank, according to documents from the Government of Liechtenstein.  Upon information and belief, revenues from the sale of Iraqi oil under the United Nation's food-for-oil program were laundered to help finance Al Qaeda.  Laundering activity, undertaken with the knowledge of Iraqi officials including Defendant the late Uday Hussein, the eldest son of Saddam Hussein, was undertaken through many of the same middlemen in Switzerland, Liechtenstein, and Italy that administered funds on behalf of sanctioned Al Taqwa bank and other fiduciaries associated with the Muslim Brotherhood. Iraq TAC ¶48.

30.    Defendants Al Taqwa and Nada Management Organization are banks who had their origin in the late 1980's, during which time the leaders of the Muslim Brotherhood formed financial management firms and banks called "Al Taqwa" ("Fear of God"), that were dedicated to the overthrow of Western nations, and the creation of a worldwide Islamic government.   Headquartered in Lugano, Switzerland, with branches in Italy, Algeria, Liechtenstein, Malta, Panama and the Bahamas, they consist of the Al Taqwa Bank, Al Taqwa Management Organization SA, Al Taqwa Trade, Property and Industry, Ltd. and The Asat Trust. Iraq TAC ¶ 43; Al Baraka SAC ¶ 78.

31.    Upon information and belief, the Al Taqwa Defendants have financed and laundered money for Arab and Islamic political and militant groups including the Algerian Armed Islamic Group (GIA) and the Egyptian Gala'a al-Islamiya, Islamic terrorist groups with links to Bin Laden and his Al Qaeda organization.   Additionally, international investigations indicate that Al-Taqwa facilitated the movement of Bin Laden's money around the world in the late 1990's, a task made easier because its complex structure was designed to prevent scrutiny of its operations. Iraq TAC ¶ 44; Al Baraka SAC ¶ 79.

32.    The Al Taqwa Defendants were founded by Defendant Yousef M. Nada, and its other principals are Defendants Ali G. Himmat, Ahmed Huber and Mohamed Mansour. Defendants Huber and Mansour are senior members of the Muslim Brotherhood. Iraq TAC ¶ 45; Al Baraka SAC ¶80.

33.    Defendant Al Taqwa Bank is part of Defendant Al Taqwa Trade, Property and Industry Company which is located in Vaduz, Liechtenstein.  This entity is also known as Himmat Establishment, run by a partner of Nada who, like Nada, is a member of the Egyptian Islamic Brotherhood.  Although Egyptian-born, Mr. Nada is a naturalized citizen of Italy.  Mr. Nada also is a member of Jamaa al-Islamiya, which is directly allied to Al Qaeda through Dr.

Ayman al Zawahiri, second in command to Osama Bin Laden. Iraq TAC ¶ 46; Al Baraka SAC ¶ 81.

34.    Shortly after dual U.S. Embassy bombings in Kenya and Tanzania by Al Qaeda in 1998, U.S. intelligence agencies tracked telephone contact between Al Taqwa, members of Bin Laden's inner circle, and Albert "Ahmed" Huber, a convert to Islam in the 1960's who has publicly expressed support for Al Qaeda. Huber has acknowledged that Ahmad I. Nasreddin, a/k/a Hadj Ahmed Nasreddin, a/k/a Ahmed Idriss Nasreddin, is, in fact, an Al Taqwa founding member and bank shareholder who was very active in financing and operating the Islamic Cultural Institute of Milan, which follows the violent teachings of convicted terrorist Omar Abdul Rahman. The Institute was frequently visited by known Al Qaeda terrorists. Upon information and belief, the Institute is known in Western intelligence communities as one of the main Al Qaeda stations in Europe and was used to move weapons, men, and money around the world. Iraq TAC ¶ 47; Al Baraka SAC ¶ 82.

35.    After September 11, 2001, Al Taqwa changed its name to the Nada Management Organization SA in an attempt to avoid scrutiny. Al Taqwa and the Nada group, as well as their four principals – Nada, Himmat, Huber, and Mansour, have had their assets frozen and are believed by the U.S. Department of Justice to be co-conspirators of Al Qaeda. Iraq TAC ¶ 47; Al Baraka SAC ¶ 83.

36.    A direct link between Iran and the joint activities of Hezbollah and Al Qaeda is the Al-Taqwa bank of Switzerland and Liechtenstein. The link primarily is through Ahmad Huber-El Biali (aka Ahmed Huber). Huber is a principal shareholder of Al-Taqwa bank which was sanctioned by the U.S. government for helping to finance Al Qaeda.  Since 1983, Huber has repeatedly visited Iran. In 1988, Huber first met Youssef Nada in Iran. Nada, an Egyptian belongs to the Muslim Brotherhood. Like Nada, Huber embraced the Muslim Brotherhood. At a conference in Iran in 1988, Nada asked Huber to participate in the founding of al-Taqwa.Al-Taqwa bank has been been a funding source for activities involving Hamas, which has received direct funding from Iran.  Hamas, an outgrowth of Palestinian Muslim Brotherhood founder Abdullah Azzam, is closely associated with Hezbollah. Azzam, along with Osama bin Laden, were cofounders of the Maktab al-Khidamir (MAK), a precursor to Al Qaeda. Iran is known to have appointed Hezbollah's terrorist chief, Imad Mughniyeh as coordinator of Iran's activities with the Hamas and the Palestinian Islamic Jihad in Lebanon. Al Baraka SAC ¶ 84.

37.    Defendant Asat Trust Reg. of Baduz, Liechtenstein, is another money laundering organization whose assets were frozen after the events of September 11, 2001. Defendant Yousef M. Nada founded and operated Asat Trust Reg. (Al Baraka SAC ¶ 85).

38.    Defendant Schreiber & Zindel of Vaduz, Liechtenstein, is a legal entity involved in money laundering activities on behalf of Al Qaeda and Al Taqwa Bank, according to documents from the Government of Liechtenstein. Upon information and belief, revenues from the sale of Iraqi oil under the United Nation's food-for-oil program were laundered to help finance Al Qaeda. Laundering activity, undertaken with the knowledge of Iraqi officials including Defendant the late Uday Hussein, the eldest son of Saddam Hussein, was undertaken through many of the same middlemen in Switzerland, Liechtenstein, and Italy that administered funds on behalf of sanctioned Al Taqwa bank and other fiduciaries associated with the Muslim Brotherhood. (Iraq TAC ¶ 48).

39.     Upon information and belief, Defendants Martin Wachter, Erwin Wachter, and Schreiber and Zindel engaged in money laundering on behalf of Al Taqwa and Al Qaeda. Their assets have not been frozen by the United States after the events of September 11, 2001. Iraq TAC ¶ 50.

40.     The horrific events of September 11th were the result of a world-wide terror conspiracy against the United States involving Defendants, Schreiber & Zindel, Dr. Frank Zindel, Engelbert Schreiber, Engelbert Schreiber, Jr., and others, who have conspired for many years to attack the United States and murder United States' citizens. Defendants supported, conspired, aided and abetted, sponsored, planned and executed the September 11th terror attacks that killed thousands of people and injured many thousands more. Iraq TAC ¶ 63.

41.     By virtue of the predicate acts described in this Complaint, including without limitations, engaging in the predicate acts of terrorism, murder, kidnapping, forgery, false use and misuse of passports, fraud and misuse of visas, laundering of monetary instruments, engaging in monetary transaction in improperly derived from unlawful activity, the use of interstate commerce, interstate transportation of terrorist property, and bringing in and harboring illegal aliens, and aiding and assisting illegal aliens in entering the United States, Osama bin Laden and Al Qaeda, along with other non-sovereign Defendants herein, transferred, received, and supplied financing and income that was derived, both directly and indirectly, from a pattern of racketeering activity in which each of them participated as a principal, and used and invested, both directly and indirectly, such income and the proceeds of such income, in establishing and operating terrorist enterprises in violation of 18 U.S.C. § 1962(b), (c) and/or (d). Iraq TAC ¶ 266.

42.     The Defendants named in the Complaint herein conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself. Such Defendants conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Iraq TAC ¶ 267.

43.     The Enterprise was formed and funded for the purpose of extortion: to force the United States, Israel, and other Western nations, and their citizens, to discontinue support of certain governments in the Middle East and otherwise to disengage from the Middle East. The extortion was carried out under the threat and practice of the predicate acts of murder, kidnapping, piracy, bombing, and other crimes directed at the citizens, business, and economic infrastructure of the target countries. Over time, these threats have escalated into threats and accompanying efforts to inflict the maximum possible damage through each such predicate act. Iraq TAC ¶ 268.

44.     In the mid-1990's to September 11, 2001, Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.[26]  Schreiber and Zindel, Frank Zindel, Engelbert Schreiber

---

[26] The Enterprise is defined in Rico Statement ¶ 6 as:

    a.  The Enterprise ("Radical Muslim Terrorism") is comprised of the Defendants named in the First Amended Complaint well as the Defendants in *Estate of John P. O'Neill, Sr., et al. v.*

and Engelbert Schreiber, Jr. conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. RICO ¶5(b).

45.     In the mid-1990'2 to September 11, 2001, Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. conspired to support terrorism and to obfuscate the roles of the various participants and conspirators in Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, which conspiracy culminated in the Attack.   RICO ¶5(b).

46.     In the mid-1990'2 to September 11, 2001, Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. RICO ¶5(b).

47.     From the late 1990's to September 11, 2001, Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. RICO ¶5(b).

48.     From the late 1990's to September 11, 2001, Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. undertook the above named actions as part of a conspiracy to commit murder and arson, in that they knew that the Enterprise in which it was participating, Radical Muslim Terrorism, and/or al Qaida and/or the International Islamic Front for the Jihad Against Jews and Crusaders, planned to and would commit an act of deadly aggression against the United States in the near future, using the resources and support supplied by Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. RICO ¶5(b).

49.     Thus, although al Qaida, for example, had its own membership roster and a structure of "committees" to guide and oversee such functions as training terrorists, proposing targets,

---

*Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

*Alternatively*, the Enterprise ("al Qaida") is comprised of the Defendants named in the First Amended Complaint well as the Defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

 *Alternatively*, the Enterprise ("International Islamic Front for the Jihad Against   Jews and Crusaders") is comprised of the Defendants named in the First Amended Complaint well as the Defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.

financing operations, and issuing edicts, the committees were not a hierarchical chain of command but were instead a means for coordinating functions and providing material support to operations. Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. fit neatly into this framework by raising funds for and providing funding to an otherwise providing material support for the members of the Enterprise who engaged in the Attack. RICO ¶6(b).

50. The Enterprise is a sophisticated global terrorist network which uses a variety of business and financial transactions to further its operations. These transactions include but are not limited to transferring funds between accounts to purchase communications equipment, electronics equipment, and land (for use as training camps and to store explosives and weapons). These transactions are accomplished through, *inter alia*, the use of wire transfers and electronic transmissions. RICO ¶6(b).

51. On information and belief, at the time of the September 11th attack, the al Qaida's annual income was approximately $50 million and its assets over a ten-year period ranged between $300 and $500 million dollars. The Enterprise relies upon a global network of banks and financial institutions, including Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr., and illegal activity to generate material support to continue its terrorist operations. RICO ¶6(b).

52. The Enterprise conducts terrorism all over the world; the racketeering activity conducted by Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. funds that activity, which activity culminated in the Attack. The usual and daily activities of the Enterprise include recruitment, indoctrination, and the provisioning and operation of training camps, all of which activities are funded by the racketeering activities described herein. RICO ¶8.

53. The history of the conspiracy behind Radical Muslim Terrorism, or the al Qaida, or the International Islamic Front for the Jihad Against Jews and Crusaders could, and has, filled many books, but for purposes of the present RICO Statement, the following is offered. After being turned out of the Sudan in May 1996, al Qaida established itself in Afghanistan, and relied on well-placed financial facilitators, including Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr., who laundered funds from Islamic so-called charities and corporations and raised money from witting and unwitting donors. They also relied heavily on certain imams at mosques who were willing to divert the *Zakat*, the mandatory charitable contributions required of all Muslims. Radical Muslim Terrorism, and/or al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders also collected money from employees of corrupted charities. The money raised from these various sources (the "Funds"), including Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr., were used by the Enterprise to accomplish its goals, with the knowledge and awareness of Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr., of both those goals and the uses to which the Funds were put. RICO ¶14.

54. The Funds were used to organize and conduct a complex international terrorist operation intended to inflict catastrophic harm on the United States. The Funds enabled the Enterprise to identify, recruit, groom and train leaders who were able to evaluate, approve and supervise the planning and direction of the Enterprise. The Funds also provided communications

sufficient system that gathered information on and formed assessments of the Enterprise's enemies' strengths and weaknesses. RICO ¶14.

55.     The Funds enabled the Enterprise to establish a personnel system by which, among other things, it recruited and trained persons to inflict the harm (the "Operatives") and provided planning and direction to the Operatives.  The funds thus raised were used to, among other things, operate terrorist training camps in Afghanistan, where some recruits were trained in conventional warfare but where the best and most zealous recruits received terrorist training. The curriculum in the camps placed with great emphasis on ideological and religious indoctrination.  All trainees and other personnel were encouraged to think creatively about ways to commit mass murder. RICO ¶14.

56.     The camps were able to operate only because of the worldwide network of recruiters, travel facilitators, and document forgers who vetted recruits and helped them get in and out of Afghanistan.  From the ranks of these recruits the nineteen perpetrators of the Attack were selected.  None of this would have been possible without the funds supplied by participants and conspirators like Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr.  Indeed, the Enterprise would not have been successful without enthusiastic participation of all of the conspirators, including Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr.  In order to identify nineteen individuals willing, able and competent to carry out the Attack, Radical Muslim Terrorism, and/or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders needed to select from a vast pool of recruits and trainees, which pool would not have been available to it without the assistance provided by Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr.  Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr., with knowledge and intent, agreed to the overall objectives of the conspiracy, and agreed to commit at least two predicate acts and all agreed to participate in the conspiracy, either expressly or impliedly. Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the operation or management of the operation of the Enterprise itself. Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. also, with knowledge and intent, agreed to and did aid and abet all of the above illegal activities, RICO predicate acts, and RICO violations. RICO ¶14.

57.     Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. have long provided financial support and other forms of material support to terrorist organizations including Radical Muslim Terrorism, or the al Qaida, and/or the International Islamic Front for the Jihad Against Jews and Crusaders.  Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. conducted or participated, directly or indirectly, in the conduct of the Enterprise's affairs and participated in the operation or management of the operation of the Enterprise itself.  Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. conspired to conduct or participate, directly or indirectly, in the conduct of the Enterprise's affairs and conspired to participate in the

operation or management of the operation of the Enterprise itself. RICO Question 2, Exhibit A.

58.    For many years, the firm of Schreiber and Zindel has been used to launder money for Abdullah Omar Naseef, an individual associated with the SAAR Foundation and Rabita Trust[i], both of which are co-Defendants in the above-referenced actions.  Laundering the money occurred through the Al Taqwa Bank, also a co-defendant in the above-referenced cases.  All three entities, SAAR, Rabita Trust and Al Taqwa Bank have been sanctioned by the U.S. Government. RICO Question 2, Exhibit A. RICO Question 2, Exhibit A.

59.    Documents from the Government of Liechtenstein reveal that Schreiber and Zindel were "gatekeepers" for laundering funds through Al Taqwa for terrorist recipients, for many years. Some sources in Liechtenstein say that Schreiber and Zindel were instrumental in establishing Al Taqwa Bank as a shell for this purpose. RICO Question 2, Exhibit A.

60.    Schreiber and Zindel is run by Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. Liechtenstein officials and separate documentation from a variety of sources also claim that Schreiber and Zindel were involved in laundering money from the Iraqi Oil-For-Food Program, along with the Al Qaida.  RICO Question 2, Exhibit A.

61.    According to a published report, Engelbert Schreiber and Engelbert Schreiber, Jr. are listed on corporate documents for Nasreddin International Group Ltd. Holding, a co-defendant in this case, and a company which was also sanctioned by the United States Government.  This company is owned by Ahmed Idris Nasreddin, the principal owner of Al Taqwa Bank, is an individual who has also been sanctioned United States Government. Since 1993, Engelbert Schreiber, who was later replaced by his son, Engelbert Schreiber, Jr., have been trustees of Nasreddin Group International Limited Holdings, also known as Nasreddin International Group Ltd. RICO Question 2, Exhibit A.

62.    In April 1999, the German intelligence service (BND) reported that Engelbert Schreiber was arrested in August 1997 for money laundering.  The 1999 BND report identified Engelbert Schreiber as a significant money launderer, who has had a close relationship with the Caracas/Venezuela mafia families Cuntrera-Caruana-Caldarella. RICO Question 2, Exhibit A.

63.    As a owners and directors of Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. oversaw the activities and had knowledge of the activities that supported the al Qaida and/or Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders. RICO Question 2, Exhibit A.

64.    Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. have long known that accounts, under their control, which were maintained, and assisted, were being used to solicit and transfer funds to terrorist organizations, including al Qaida and/or Radical Muslim Terrorism and/or the International Islamic Front for the Jihad Against Jews and Crusaders. Despite this knowledge, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. continued to permit, make available, assist, and maintain those accounts. RICO Question 2, Exhibit A.

65.    As the foregoing demonstrates, Schreiber and Zindel, Frank Zindel, Engelbert Schreiber and Engelbert Schreiber, Jr. thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or

the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad.  The September 11th Attack was a direct, intended and foreseeable product of Schreiber and Zindel's, Frank Zindel's, Engelbert Schreiber's and Engelbert Schreiber, Jr.'s participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. RICO Question 2, Exhibit A.

66.     The actions of Defendants, acting in concert to carry out their unlawful objectives, were malicious and willful, wanton and reckless in their disregard of the life of John Patrick O'Neill, Sr. and the other victims of the September 11 terrorist attacks.     Defendants intended to carry out actions that would end the lives of persons at the World Trade Center, including the life of John Patrick O'Neill, Sr.  Iraq TAC ¶ 274.

67.     Defendants Schreiber & Zindel, Dr. Frank Zindel, Engelbert Schreiber, Engelbert Schreiber, Jr., Martin Wachter, Erwin Wachter, along with others, caused the extrajudicial killing of John Patrick O'Neill, Sr. Iraq TAC ¶ 275.

Consequences of the Conspiracy

68.     Defendants' concert of action and conspiracy to support and promote Osama bin Laden and Al Qaeda were a proximate cause of the September 11, 2001, terrorist attacks that killed and injured the Plaintiffs. Iraq TAC ¶ 252.

69.     As a result of Defendants' concert of action and conspiracy to further terror, Plaintiff has suffered damages as set forth herein. Iraq TAC ¶ 253.

70.     These Defendants, located all over the world, conspired with Osama bin Laden, al Qaeda, Iraq, and the Taliban to raise, launder, transfer, distribute, and hide funds for Osama bin Laden and al Qaeda in order to support and finance their terrorist activities including but not limited to, the September 11th attacks. Some of the banks, companies, and charities operate legitimately but also maintain a secret dual role as al Qaeda front organizations and actively support its terrorist activities and goals. Some of those organizations are purely a sham front for al Qaeda. Al Baraka SAC ¶25.

71.     All Defendants knew or should have known that their actions in furtherance of the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001, attacks, would result in the murder of innocent persons, leaving family members with severe and permanent physical, psychological, and emotional injuries.  Al Baraka SAC¶151.

72.     The actions of the Defendants in furtherance of the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001, attacks, were intentional, malicious, willful, unconscionable, reckless, and/or negligent.  Al Baraka SAC ¶152.