**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In re Terrorist Attacks on September 11, 2001* | 03 MDL 1570 (RCC) |
| | ECF Case |

This document relates to:

*Thomas Burnett, Sr., et al. v. Al Baraka Invest. & Develop. Corp., et al.*, No. 03-CV-5738
*Euro Brokers Inc., et al., v. Al Baraka, et al.*, No. 04-CV-7279
*WTC Properties LLC, et al. v. Al Baraka, et al.*, No. 04-CV-7280

**PLAINTIFFS' CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO THE**
**MOTION TO DISMISS OF DEFENDANT HAMAD AL-HUSAINI**

September 20, 2005

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................ 1

II.   FACTUAL BACKGROUND ............................................................................... 1

    A.   Al-Husaini Provided Material Support To Al Qaeda ................................ 1

    B.   Al Qaeda Openly And Publicly Announced Its Terrorist Agenda And
        Targeted The United States ........................................................................ 4

III.   APPLICABLE LAW .......................................................................................... 9

    A.   Prior To Discovery On A Rule 12(b)(2) Motion, A Plaintiff's *Prima
        Facie* Showing Of Personal Jurisdiction May Be Established Solely By
        Legally Sufficient Allegations Of Jurisdiction .......................................... 9

    B.   A Motion To Dismiss Under Rule 12(B)(6) Merely Tests The Legal
        Feasibility Of The Complaint ..................................................................... 9

IV.   ARGUMENT ...................................................................................................... 13

    A.   This Court Has Personal Jurisdiction Over Husaini .................................. 13

        1.   Personal Jurisdiction Exists Under New York's Long-Arm Statute ................... 14

        2.   The Exercise Of Jurisdiction Comports With Due Process ................................. 14

        3.   The Defendant Directed His Conduct At The United States ............................... 15

    B.   Plaintiffs Have Sufficiently Pled The Causal Connection Between
        Husaini And The September 11 Terrorist Attacks .................................... 16

    C.   Husaini Is Not Entitled To Dismissal Of Plaintiffs' Tort Claims .............. 17

        1.   Plaintiffs Sufficiently Plead Their Claims Under The ATA ................................. 17

        2.   Plaintiffs' Claims Under the Alien Tort Claims Act Should Not Be
            Dismissed ........................................................................................................ 18

        3.   Plaintiffs Sufficiently Plead Their Common Law Claims ................................... 18

        4.   Plaintiffs' Intentional Infliction Of Emotional Distress, Assault, And
            Battery Claims Are Not Barred By The Statute Of Limitations ........................... 18

        5.   Plaintiffs' Claims For Punitive Damages And Conspiracy Should Not
            Be Dismissed ................................................................................................... 19

D.    Plaintiffs Properly State RICO Claims Against Husaini ............................................ 20

E.    Plaintiffs Have Properly Served Husaini ..................................................................... 23

IV.   CONCLUSION ...................................................................................................................... 24

## TABLE OF AUTHORITIES

Page

### CASES

*Associated Gen'l Contractors of Cal., Inc. v. California State Council of Carpenters*,
    459 U.S. 519 (1983)...................................................................................................22

*Baisch v. Gallina*
    346 F.3d at 376 .................................................................................................. 21-22

*Ball v. Metallurgie Hoboken Overpelt, S.A.*,
    902 F.2d 194 (2d Cir.), cert. denied, 498 U.S. 854 (1990) ..................................9

*Boim v. Quranic Literacy Institute*,
    291 F.3d 1000 (7th Cir. 2002) ....................................................... 1, 3, 5, 16-17

*Burger King v. Rudzewicz*,
    471 U.S. 462, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985)..................................15

*Calder v. Jones*,
    465 U.S. 783, 104 S. Ct. 1482, 79 L. Ed. 2d 806 (1984)............................ 14-15

*Chance v. Armstrong*,
    143 F.3d 698 (2d Cir. 1998), *aff'd on appeal after remand*,
    159 F.3d 1345 (2d Cir. 1998)...........................................................................10

*Chrysler Capitol Corporation v. Sentry Power Corp.*,
    778 F. Supp. 1260 (S.D.N.Y. 1991)..................................................................14

*Conley v. Gibson*,
    355 U.S. 41 (1957).............................................................................................9

*Daliberti v. Iraq*,
    97 F. Supp. 2d 38 (D. D.C. 2000) ....................................................................15

*Davis v. Barrett Day Securities, Inc.*,
    1995 U.S. Dist. LEXIS 15434 (M.D.N.C. 1995)...............................................15

*De Falco v. Bernas*,
    244 F.3d 286 (2d Cir. 2001)..............................................................................21

*DiStefano v. Carozzi North America, Inc.*,
    286 F.3d 81 (2d Cir. 2001)..................................................................................9

*Dubai Islamic Bank v. Citibank, N.A.*,
    256 F. Supp. 2d 158 (S.D. N.Y. 2003)..............................................................21

*First Capital Asset Management v. Satinwood, Inc.*,
    385 F.3d 159 (2d Cir. 2004), *citing Baisch v. Gallina*, 346 F.3d 366
    (2d Cir. 2003).............................................................................................21

*Flatow v. Islamic Republic of Iran*,
    999 F. Supp. 1 (D.D.C. 1998) .......................................................................20

*Friedman v. Hartmann*,
    1994 WL 376058 (S.D. N.Y. July 15, 1994) ...................................................21

*Geisler v. Petrocelli*,
    616 F.2d 636 (2d Cir. 1980)..........................................................................10

*Holmes v. Security Investor Prot. Corp.*,
    503 U.S. 258 (1992).............................................................................. 22-23

*In re Issuer Plaintiff Initial Public Offering Antitrust Litigation*,
    2004 U.S. Dist. LEXIS 3892 (S.D. N.Y. Mar. 12, 2004) ..................................19

*Johnson v. Nyack Hospital*,
    86 F.3d 8 (2d Cir. 1996).................................................................................19

*Jones v. R.R. Donnelly & Sons Co.*, ,
    541 U.S. 369 (2004).......................................................................................18

*Leatherman v. Tarrant County*,
    507 U.S. 163 (1993).......................................................................................11

*Lerner v. Fleet Bank, N.A.*,
    318 F.3d 113 (2d Cir. 2003)...........................................................................22

*Linde, et al. v. Arab Bank, PLC*,
    2005 U.S. Dist. LEXIS 18864 (E.D. N.Y. September 2, 2005).................... 12-13

*In re: Magnetic Audiotape Antitrust Litigation*,
    334 F.3d 204 (2d Cir. 2003)......................................................................9, 15

*Morin v. Trupin*,
    832 F. Supp. 93 (S.D.N.Y. 1993)....................................................................22

*Mwani v. Bin Laden*,
    417 F.3d 1 (D.C. Cir. 2005) ...........................................................................15

*National Asbestos Workers Medical Fund v. Philip Morris, Inc.*,
74 F. Supp. 2d 221 (E.D.N.Y. 1999) ..............................................................22

*Pelman v. McDonald's Corp.*,
396 F.3d 508 (2d Cir. 2005)..........................................................................12

*Phelps v. Kapnolas*,
308 F.3d 180 (2d Cir. 2002)..................................................................... 10-12

*Pugh v. Socialist People's Libyan Arab Jamahiriya*,
290 F. Supp. 2d 54 (D. D.C. 2003) ...............................................................15

*Rachman Bag Co. v. Liberty Mutual Insurance Co.*,
46 F.3d 230 (2d Cir. 1995)..............................................................................1

*Rasul v. Bush*,
124 S. Ct. 2686 (2004)...................................................................................21

*Rein v. Socialist People's Libyan Arab Jamahiriya*,
995 F. Supp. 325 (E.D. N.Y. 1998) ...............................................................15

*Sparrow v. United Airlines, Inc.*,
216 F.3d 1111 (D.C. Cir. 2000), appeal dismissed after remand,
2001 WL 936257 (D.C. Cir. July 12, 2001) ...................................................10

*Swierkiewicz v. Sorema*,
534 U.S. 506 (2002)................................................................................10, 12

*In re Terrorist Attacks on September 11, 2001*,
349 F. Supp. 2d 765 (S.D.N.Y. 2005)...................................................... 14-17

*United States v. Allen*,
155 F.3d 35 (2d Cir. 1998)............................................................................21

*United States v. Coonan*,
938 F.2d 1553 (2d Cir. 1991).........................................................................20

*United States v. Turkette*,
452 U.S. 576 (1981).......................................................................................20

*U.S. v. Arnaout*,
Case #: 02 CR 892 (N.D.-Ill.) ..........................................................................7

*Von Bulow v. Von Bulow*,
634 F. Supp. 1284 (S.D. N.Y. 1986)..............................................................23

*Whyte v. Contemporary Guidance Servs.*,
  03 CV 5544  2004 U.S. Dist. LEXIS 12447 (S.D. N.Y. July 2, 2004)...............................1

*Woodford v. Community Action Agency*,
  239 F.3d 517 (2d Cir. 2001)....................................................................................10

*Wynder v. McMahon*,
  360 F.3d 73 (2d Cir. 2004)..................................................................................9-10

*Yeadon v. New York Transit Authority*,
  719 F. Supp. 204 (S.D. N.Y. 1989)........................................................................19

## RULES AND STATUTES

18 U.S.C. §§ 1962(a) ...............................................................................................20

18 U.S.C. § 2333 .....................................................................................................17

137 Cong. Rec. 54511 04 (April 16, 1991) ...............................................................19

42 Pa.C.S. § 5524 (2005)..........................................................................................18

Alien Tort Claims Act, 28 U.S.C. § 1350 ("ATCA") ....................................................18

Fed. R. Civ. P. 4(k)(1)...............................................................................................13

Fed. R. Civ. P. 8(a)(2)...............................................................................................10

Fed. R. Civ. P. 9(b) ..................................................................................................10

Fed. R. Civ. P. 12(b)(6)..............................................................................................9

Fed. R. Civ. P. 15(a) ..................................................................................................1

New York's Long-Arm Statute, N.Y. C.P.L.R. § 302(a)(2) (McKinney 2002)...............13

N.Y. Est. Powers & Trusts Law § 5-4.1 (2003)..........................................................19

Restatement (Second) of Torts § 302........................................................................17

Restatement (Second) of Torts §§ 876,  877.............................................................16

Torture Victims Protection Act ("TVPA"), 28 U.S.C. § 1350 ......................................17

## I.     INTRODUCTION

Plaintiffs allege that Hamad Al-Husaini knowingly participated in al Qaida's global conspiracy to commit terrorist attacks in the United States, of which the September 11, 2001 Attack was a natural, intended and foreseeable result.  When these factual assertions are taken as true, as they must be here, the Plaintiffs' allegations state valid claims against Husaini under the Anti-Terrorism Act (the "ATA"), the Alien Tort Claims Act (the "ATCA"), the Racketeering Influenced and Corrupt Organizations Act ("RICO"), and several state common law tort theories. Plainly, responsibility for international terrorism rests not only with those "who pull the trigger or plant the bomb" or pilot the airplanes, but also with those who facilitated such unlawful activities through financial or other means.  *Boim v. Quranic Literacy Inst.*, 291 F.3d 1000, 1021 (7th Cir. 2002).

Accordingly, Husaini's motion to dismiss must be denied in its entirety.  In the event, however, that this Court finds the Plaintiffs' Complaints lacking in detail, leave to amend should be granted.  *See* Fed. R. Civ. P. 15(a); *see also Rachman Bag Co. v. Liberty Mut. Ins. Co.*, 46 F.3d 230, 234-35 (2d Cir. 1995); *Whyte v. Contemporary Guidance Servs.*, 03 CV 5544 (GBD) 2004 U.S. Dist. LEXIS 12447, at *13-14 (S.D. N.Y. July 2, 2004).

## II.     FACTUAL BACKGROUND

### A.     Al-Husaini Provided Material Support To Al Qaeda

The evidence shows that Al-Husaini provided material support to Osama bin Laden and al Qaeda.  Indeed, it appears that he was one of the earliest contributors to al Qaeda, a member of the so-called "Golden Chain."[1]  The "Golden Chain" is a list of wealthy financial sponsors and supporters of al Qaeda; the document was seized by the Bosnian police on March 2002 and

---

[1] For a complete discussion of the Golden Chain, please refer to Plaintiffs' Memorandum of Law in Opposition to Motion to Dismiss of Yousef Abdul Latif Jameel, Docket No. 1243, at 10-16, and the Affidavit of David K. Draper and supporting exhibits attached as Exhibit 1 to the Decl. of Jodi Westbrook Flowers in Support of Plaintiffs' Memorandum of Law in Opposition to Motion to Dismiss Filed by Defendant Yousef Jameel, Docket No. 1244.

presented as evidence by the United States government in criminal prosecutions of al Qaeda. The Golden Chain document, in its original Arabic accompanied by an English translation, was presented by the United States government as an exhibit in the Department of Justice's Evidentiary Proffer Supporting the Admissibility of Co-conspirator Statements in the case of *U.S. v. Arnaout* (N.D.-Ill.) filed on January 29, 2003.  A copy of the government's proffer is annexed to the Affirmation of Andrea Bierstein dated June 30, 2004 ("Bierstein Aff.") as Exhibit 1. The "Golden Chain" document itself (including the English translation offered by the government) is Exhibit 2 to the Bierstein Aff.)  According to the United States government, the Golden Chain document is a list of people referred to within al Qaeda as the "Golden Chain," all wealthy donors to their extremist cause.  *See* Exhibit 1.  Al-Husaini's name appears on the Golden Chain document.  *See* Exhibit 2.[2]

Al-Husaini's connection to al Qaeda continued after his initial contributions: one of his family companies is a principal supporter of al-Waqf-al-Islami, a Dutch entity that has played a major role in the recruitment of terrorists, including six of the September 11 hijackers.  *See* Ian Johnson and David Crawford, "Radical Foundation:  In 'Law' Seminars, A Saudi Group Spreads Extremism," *The Wall Street Journal*, April 15, 2003.[3]  The *Wall Street Journal* reported:

> As European government investigators explore the roots of terrorism, they are discovering foundations such as Al-Waqf. Muslim foundations and charities initially came under the microscope for channeling money to terrorists. Now, investigators

---

[2]   Al Husaini's description of himself, in an affidavit submitted to this Court, as merely a "watch retailer in Damman, Saudi Arabia" is clever, but disingenuous.  In fact, Al Husaini is a co-founder and co-owner (with Abdulrahman Al Husaini) of Al Husaini and Co., which has eight offices in Saudi Arabia (in Jeddah, Riyadh, Damman, Al Hasar, Abha, Geizen, Mecca, and Medina).  Al Husaini and Co. is an importer, retailer, distributor, and wholesaler of watches, clocks, and accessories from Europe and the Far East. *See* Bierstein Aff., Exhibit 3.  It is affiliated with other companies owned by the Al Husaini family, including Al Husaini Trading Co., the distributor of Seiko and Longines watches in Saudi Arabia.  Hamad Al Husaini is also the chairman of Akel Trading Co., an importer and distributor of agricultural equipment, pumps, electrical and mechanical equipment and irrigation systems with offices in Dammam, Buraydah, Riyadh, Sajir, Hail, and Aljalah, Saudi Arabia. *See* Bierstein Aff., Ex. 4. He is also the CEO of Akel Agricultural Investment Co., wholesalers of farm and garden machinery. *Id.* at Ex. 5.

[3]   A copy of this article, as it appeared on *The Wall Street Journal* website, is Exhibit 6 to the Bierstein Aff.

> are taking another look at whether these groups are encouraging
> terrorism by teaching an intolerant and xenophobic strain of Islam.

*Id.*  Moreover, the *Journal* reported, Spanish terrorism investigators believe that the Al-Husaini family transferred money to Muhammad Galeb Zouaydi, who is awaiting trial in Spain as one of al Qaeda's principal financiers in Europe.  *Id.*

Al Qaeda could not have trained terrorists, including the 19 September 11 hijackers, and could not have carried out its attacks without financial assistance provided by men like Al-Husaini.  As the Seventh Circuit has explained:  "[T]here would not be a trigger to pull or a bomb to blow up without the resources to acquire such tools of terrorism and to bankroll the persons who actually commit the violence."  *Boim v. Quranic Literacy Institute*, 291 F.3d 1000, 1021 (7th Cir. 2002).  If you take away those resources, you cut off the life-blood of terrorist violence.  That is especially true here, where bin Laden set up a vast terrorist infrastructure to recruit, train, support, and equip the men who would carry out the attacks.  That infrastructure included sophisticated propaganda resources, including websites, videotapes, books, articles, and a network of clerics and zealots to spread bin Laden's message.  *See* Gabriel Weimann, www.terror.net:  How Modern Terrorism Uses the Internet, U.S. Institute of Peace (March 2004).  (A copy of this article is annexed to the Bierstein Aff. as Ex. 7.)  It also included a complex of approximately 20 training camps in Afghanistan, each one designed to train terrorists in a different aspect of their deadly tasks, and trucks to transport the trainees to the camps.  It was also necessary to obtain false documents for large numbers of persons so that the terrorists could travel to training centers, planning meetings, and ultimately, to their targets.  Surveillance of the intended targets was also a necessary component; so were the resources to support large numbers of terrorists while they planned and trained for their mission.  *See* Bierstein Aff., Ex. 8. While the actual equipment used to carry out any particular attack may not have been especially expensive, the support system that stood behind it and made it possible required large amounts of

money and further required that they money be transferred to the particular location where it was needed.  As noted above, Al-Husaini provided funds to al Qaeda in its early stages, when it was essentially a start-up operation.  As a member of the Golden Chain, he helped it to build the infrastructure that would eventually support the September 11 attacks.

In providing this financial assistance to al Qaeda, Al-Husaini purposefully directed his conduct at the United States because, as demonstrated below, the evidence that plaintiffs have gathered to date shows that, throughout the 1990's, al Qaeda's target was the United States. Moreover, Osama bin Laden announced this, repeatedly and publicly, so that individuals like Mr. Al-Husaini who provided material support in that period plainly knew that they were targeting the United States when they assisted al Qaeda with its terrorist agenda.

### B.     Al Qaeda Openly And Publicly Announced Its Terrorist Agenda And Targeted The United States

It has been publicly known since the mid-1990s, if not well before, that Osama bin Laden and his Al Qaeda terrorist network had launched an international campaign of terror directed at the United States.  In July 1996, bin Laden told the British newspaper, *The Independent*, that al Qaeda terrorists had "hit their main enemy, which is the Americans." *See* Youssef M. Ibrahim, "Saudi Exile Warns More Attacks Are Planned," *New York Times*, July 11, 1996, Bierstein Aff., Exhibit 9.  That same summer, the Committee for the Defense of Legitimate Rights (CDLR), a Saudi Islamist dissident movement affiliated with bin Laden, released Osama bin Laden's "Declaration of War" on the internet.  In the statement, bin Laden declared:  "My Muslim Brothers of The World: Your brothers in Palestine and in the land of the two Holy Places are calling upon your help and asking you to take part in fighting against the enemy - *your enemy and their enemy - the Americans* and the Israelis." (Emphasis added.) *See* Osama bin Laden, *'Declaration of War Against the Americans Occupying the Land of the Two Holy Places,'* August 1996, Bierstein Aff., Exhibit 10.

4

The following year, bin Laden told Peter Arnett, correspondent for CNN, "We declared *jihad against the US government* . . . ." *See* Osama bin Laden Interview with Peter Arnett, *CNN*, March, 1997, Bierstein Aff., Exhibit 11 (emphasis added).  Moreover, he added, "if the American government is serious about avoiding the *explosions inside the U.S*., then let it stop provoking the feelings of 1,250 million Muslims . . . ." *Id.*  (emphasis added).

In 1998, bin Laden made even more explicit his declaration of war against the United States and all Americans, wherever they happen to be.  He issued a *fatwa* in which he stated: "We—with God's help—call on every Muslim who believes in God and wishes to be rewarded to comply with God's order to *kill the Americans* and plunder their money wherever and whenever they find it." (Emphasis added.)  *See* Jihad Against Jews and Crusaders, *World Islamic Front Statement,* 23 February 1998, Bierstein Aff., Exhibit 12.  Osama bin Laden and other Middle Eastern terrorist leaders in attendance at the meeting agreed that "the ruling to *kill the Americans* and their allies—civilians and military—is an individual duty for every Muslim who can do it in any country in which it is possible to do it."  *Id*. (Emphasis added.)  In an interview with ABC television, bin Laden explained his targeting of the United States:

> Our battle with the Americans is larger than our battle with the Russians. The Americans made a very stupid mistake that no one has made before. They attacked the Muslim symbol, the Kibla [Saudi Arabia], of 200 million people. The reaction was very encouraging by the Muslim scholars and the youth. We predict a black day for America and the end of the United States as United States, and it will be separate states, and will retreat from our land and collect the bodies of its sons back to America, Allah willing.
>
> Once again, I have to stress the necessity of focusing on the Americans and the Jews for they represent the spearhead with which the members of our religion have been slaughtered. Any effort directed against America and the Jews yields positive and direct results, Allah willing. It is far better for anyone to kill a single American soldier than to squander his efforts on other activities.

Transcript of Interview with Osama Bin Laden, ABC News, May 28, 1998, Bierstein, Aff.,

Exhibit 13.  That same year, one of al Qaeda's spiritual leader, Sheikh Omar Abdel Rahman,

who led the 1993 World Trade Center bombing plot, issued his own *fatwa* which called on all

Muslims to kill American infidels:

> Oh, Muslims everywhere!  Cut the transportation of their
> countries, tear it apart, destroy their economy, burn their
> companies, eliminate their interests, sink their ships, shoot down
> their planes, kill them on the sea, air, or land.  Kill them when you
> find them, take them and encircle them, paralyze their every post.
> Kill those infidels . . . .

"Dr. Omar AbdurRahman's [*sic*] Latest Statement," Supporters of Shariah website archive,

Nov./Dec. 1998, Bierstein Aff., Exhibit 14.

In June, 2001, bin Laden was still urging his followers to attack the United States,

announcing: "to all mujahideens... it's time to penetrate America and Israel and hit them where it

hurts the most." *See* "Video Shows Bin Laden Urging Muslims to Prepare for Fighting,"

www.cnn.com, June 21, 2001, Bierstein Aff., Ex. 15.

These *fatwas* proved to be more than just empty, albeit virulent, threats.  Throughout the

1990's, Osama bin Laden and al Qaeda carried out a series of attacks on the United States that

removed any doubt about the seriousness of their intentions or the identity of their target. These

attacks included the 1993 World Trade Center bombing, the 1998 bombing of two U.S.

embassies in East Africa, and the 2000 attack on the *USS Cole*.  Other unsuccessful plots

included the plan to blow up the Lincoln and Holland tunnels in New York City and "Plan

Bojinka," a harrowing scheme developed in the Philippines to simultaneously blow up as many

as a dozen American commercial air flights over the Pacific Ocean.  The plan was foiled in 1995,

but there was no doubt that the terrorist threat was real and that it was directed against America.

*See* Evan F. Kohlmann, "Al Qaida Openly Targeted the United States," (May 10, 2004), a copy

of which is annexed to the Bierstein Aff. at Exhibit 16; *see also* 3AC at pp. 216-217 & ¶ 493

(alleging that al Qaeda's attacks were aimed at the United States and its citizens and that defendants who supported al Qaeda were on notice of that fact).

Even al Qaeda's activities elsewhere were designed to further its ultimate attack on the United States.  Thus, Al Qaeda member Abu Adel Aziz told the FBI about his directives from Osama bin Laden and indicated that al Qaeda was seeking to use regional jihads such as those in Bosnia and Kashmir as "a base for operations... against al Qaeda's true enemy, the United States." "Government's Response to Defendant's Position Paper as to Sentencing Factors," *U.S. v. Arnaout*,  Case #: 02 CR 892 (N.D.-Ill.) at 31-32.  (Bierstein Aff., Ex. 17)

Al Qaeda's calls for attacks on the United States were not kept secret; rather they were spread through a multitude of books, statements, magazines, publications, and other propaganda openly calling for America's destruction.  Before (and after) the September 11 attacks, thousands of global jihad websites have assisted al Qaeda in publicizing its message.  *See* www.terror.net, Bierstein Aff., Ex. 7.  Featuring up-to-date news from various lands of jihad, claims for attacks, communiqués and statements from various al Qaeda leaders and operatives, analytical pieces on global jihad strategies and tactics, and even gruesome terrorist manuals and handbooks, these websites have served to extol al Qaeda's campaign of destruction and to recruit additional members and financiers for al Qaeda's war against America.   This propaganda ensured that those who supported al Qaeda were well aware that al Qaeda's main target was the United States.  Defendant and others like him nonetheless provided assistance to bin Laden and al Qaeda; in doing so, they purposefully directed their conduct at the United States, al Qaeda's avowed target.

Moreover, it is clear that bin Laden's messages were heard.  For example, on July 15, 1999, Sheikh Omar Bakri Mohammed issued an open letter over the Internet to Usama Bin Laden titled "O' Osama, Let Us Hear the Good News."  Omar Bakri lauded as a victory the

"decision to confront the American alliance."  Moreover, Bakri characterized Muslim insurgencies in "Afghanistan, Palestine, Lebanon, Bosnia, Somalia, Arabia, Tanzania, Kenya, Eritrea, The USA, Chechenya [*sic*], Philippines, Burma, China, Kashmir, Uzbekistan and others" as "a victory which America and its alliance never expected," clearly reflecting an understanding that wherever bin Laden and al Qaeda struck, their target was "America and its alliance."  *See* Bierstein Aff., Ex. 18.   The U.S., too, understood bin Laden's message targeting America; the FBI named him as a "Ten Most Wanted Fugitive" and offered a $5 million reward for his capture.  *See* Bierstein Aff., Ex. 19.  And a press release issued by the office of the United States Attorney for the Southern District of New York in November, 1998, described bin Laden and al Qaeda as engaged in a worldwide terrorist conspiracy "to murder United States nationals."  *See* Bierstein Aff., Ex. 20.  That this interpretation was correct was confirmed in Sheikh Omar Bakri's July, 1999 open letter, which deemed the designation of bin Laden as "public enemy number one against the interests of the USA" a victory for al Qaeda.  *See* Bierstein Aff., Ex. 18.

In sum, bin Laden announced loud and clear and repeatedly that he and al Qaeda were targeting the United States.  These pronouncements were heard and understood in the Middle East and in the United States.  Those, including Al-Husaini, who provided material support to bin Laden and al Qaeda knew that the purpose of this terrorist organization was to attack the United States and its nationals.  In providing support to a terrorist campaign that was specifically focused on the United States, they purposefully directed their conduct at the United States and cannot claim surprise at being made answerable for their acts in an American court.  No more is required to satisfy the demands of due process.

### III.    APPLICABLE LAW

#### A.    Prior To Discovery On A Rule 12(b)(2) Motion, A Plaintiff's *Prima Facie* Showing Of Personal Jurisdiction May Be Established Solely By Legally Sufficient Allegations Of Jurisdiction

In this Circuit, the nature of the plaintiff's obligation to allege and prove personal jurisdiction varies depending upon the procedural posture of the litigation.

> Prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, [citation omitted] legally sufficient allegations of jurisdiction.  At that preliminary stage, the plaintiff's *prima facie* showing may be established solely by allegations.  After discovery, the plaintiff's *prima facie* showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant. [citations omitted].  At that point, the *prima facie* showing must be factually supported.

*Ball v. Metallurgie Hoboken Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir.), cert. denied, 498 U.S. 854 (1990).  Thus, in order to defeat a motion challenging jurisdiction under Rule 12(b)(2), a plaintiff need only present allegations that connect the defendant with the applicable forum, here, the United States.  In deciding such a motion, the plaintiff's jurisdictional averments must be taken as true.  *Id.*; *In re: Magnetic Audiotape Antitrust Litigation*, 334 F.3d 204, 206 (2d Cir. 2003).  Moreover, the court must construe the pleadings in a light most favorable to plaintiff, resolving all doubts in his favor.  *DiStefano v. Carozzi North America, Inc.*, 286 F.3d 81 (2d Cir. 2001).

#### B.    A Motion To Dismiss Under Rule 12(B)(6) Merely Tests The Legal Feasibility Of The Complaint

Husaini moves to dismiss the Complaints pursuant to Fed. R. Civ. P. 12(b)(6), for failure to state a claim upon which relief could be granted.  Such a motion must be denied unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Wynder v. McMahon*,

360 F.3d 73, 78 n.8 (2d Cir. 2004); *Phelps v. Kapnolas*, 308 F.3d 180, 184 (2d Cir. 2002) (per

curiam).  The Court's role is "not to assay the weight of the evidence which might be offered in

support" of the Complaint, but "merely to assess the legal feasibility" of the Complaint.  *Geisler*

*v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980).

      In evaluating whether Plaintiffs ultimately could prevail, the Court must accept as true

the facts alleged in the Complaints and RICO Statements and draw all reasonable inferences in

Plaintiffs' favor.  *Wynder*, 360 F.3d at 78; *Phelps*, 308 F.3d at 184.  Plaintiffs are not required to

prove their case at the pleading stage.  Indeed, the Second Circuit has cautioned that "[t]he

pleading of evidence should be avoided."  *Woodford v. Community Action Agency*, 239 F.3d 517,

526 (2d Cir. 2001).  The issue on a Rule 12(b)(6) motion "is not whether a plaintiff is likely to

prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims."

*Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998), *aff'd on appeal after remand*, 159 F.3d

1345 (2d Cir. 1998).

      A Rule 12(b)(6) motion is analyzed in the context of the requirements of Fed. R. Civ. P.

8(a)(2), which is extremely permissive.  *Swierkiewicz v. Sorema*, 534 U.S. 506, 512-13 (2002).

Indeed, Rule 8(a)(2) provides that a complaint only need include "a short and plain statement of

the claim showing that the pleader is entitled to relief" and that such a statement simply shall

"give the defendant fair notice of what the plaintiffs claim is and the grounds upon which it

rests."  *Id*. at 512 (quoting *Conley*, 355 U.S. at 47 (1957)); *Wynder*, 360 F.3d at 77; *see also*

*Sparrow v. United Airlines, Inc.*, 216 F.3d 1111, 1115 (D.C. Cir. 2000), appeal dismissed after

remand, 2001 WL 936257 (D.C. Cir. July 12, 2001) (allegation "I was turned down for a job

because of my race" would be sufficient to survive a Rule 12(b)(6) motion.).  Further, in the

absence of averments of fraud or mistake, which must be pled with particularity pursuant to Fed.

R. Civ. P. 9(b), a federal court is prohibited from imposing more demanding requirements than

those proscribed under Rule 8(a).  *See, e.g., Leatherman v. Tarrant County*, 507 U.S. 163, 168-69(1993).

Two recent Second Circuit cases underscore and re-affirm these principles.  In *Phelps*, the plaintiff alleged that the employees of the prison where he was incarcerated had violated his Eighth and Fourteenth Amendment rights by inflicting cruel and unusual punishment.  308 F.3d at 182.  Plaintiff further alleged that defendants "knew or recklessly disregarded" that the diet the defendants had placed him on was inadequate and would cause pain and suffering.  *Id*.  The district court dismissed the complaint, finding that it failed to state a claim, in part because the court said plaintiff had not sufficiently alleged that defendants acted with the requisite *scienter*, deliberate indifference.  The district court found plaintiff's allegations of *scienter* conclusory and held that plaintiff had failed to allege facts from which the Court could infer the defendants' knowledge.  *Id*. at 184.  The Second Circuit reversed, holding that a district court "may not go beyond FRCP 8(a)(2) to require the plaintiff to supplement his pleadings with additional facts that support his allegation of knowledge either directly or by inference."  *Id*. at 186-87.  The Court explained:

> It was improper to dismiss Phelps's Amended Complaint for
> failing to supplement Phelps's basic allegations with additional
> facts to support them by inference, for it does not appear from the
> face of the complaint beyond doubt that Phelps "can prove no set
> of facts in support of his claim which would entitle him to relief."

*Phelps*, 308 F.3d at 187 (quoting *Conley*, 355 U.S. at 45-46).

Moreover, the Court explained that dismissal was improper because, through discovery, the plaintiff might uncover direct evidence to support his allegations.  *Phelps*, 308 F.3d at 187.  Thus, the Second Circuit cautioned:

> Despite the pressures to weed out apparently meritless cases at the
> earliest point, courts must take care lest judicial haste in dismissing
> a complaint in the long run makes waste. Untimely dismissal may
> prove wasteful of the court's limited resources rather than

11

> expeditious, for it often leads to a shuttling of the lawsuit between
> the district and appellate courts.

*Id*. at 185 (citations omitted).

In *Pelman v. McDonald's Corp.*, 396 F.3d 508 (2d Cir. 2005), the Second Circuit again vacated a district court's 12(b)(6) dismissal and reiterated the minimal pleading standards to be applied. In *Pelman*, the district court had dismissed because, it had ruled, plaintiffs had failed to "draw an adequate causal connection between their consumption of McDonald's food and their alleged injuries." *Id*. at 511. The Second Circuit rejected this approach. It held that the information the district court found to be missing in the Complaint was "the sort of information that is appropriately the subject of discovery, rather than what is required to satisfy the limited pleading requirements of Rule 8(a)." *Id*. at 512. Quoting the unanimous Supreme Court ruling in *Swierkiewiez*, the Court reminded:

> This simplified notice pleading standard of Rule 8(a) relies on
> liberal discovery rules and summary judgment motions to define
> disputed facts and issues and to dispose of unmeritorious claims.
> The provisions for discovery are so flexible and the provisions for
> pretrial procedure and summary judgment so effective, that
> attempted surprise in federal practice is aborted very easily,
> synthetic issues detected, and the gravamen of the dispute brought
> frankly into the open for the inspection of the court.

*Pelman*, 396 F.3d at 512 (*quoting Swierkiewicz*, 534 U.S. at 512-13).

More recently, in *Linde, et al. v. Arab Bank, PLC*, 2005 U.S. Dist. LEXIS 18864 (E.D. N.Y. September 2, 2005), the United States District Court for the Eastern District of New York rejected the defendant's invitation to impose a heightened pleading requirement in a case presenting claims nearly identical to those at issue here. In *Linde*, the plaintiffs brought claims against Arab Bank for injuries resulting from terrorist attacks carried out by HAMAS and Palestine Islamic Jihad in Israel, based on the bank's sponsorship and support of those terrorist organizations. *Id.* at *11-23. Arab Bank sought dismissal of the plaintiffs' Anti-Terrorism Act (ATA) and common-law claims "on the ground that plaintiffs have not sufficiently alleged

knowledge and intent."  *Id.* at *42.  The Court rejected this argument, reasoning that Arab Bank was attempting to impose a heightened pleading standard not warranted by the Rules of Civil Procedure:

> To the extent the defendant is arguing that plaintiffs have not alleged sufficient facts to establish an evidentiary basis for their allegations of knowledge and intent, defendant simply misapprehends the pleading standard.  It is not entitled to dismissal based on the argument that plaintiff's must plead more than the requisite knowledge and intent, either as to their substantive claims or their claims of aiding and abetting a conspiracy.

*Id.*  The *Linde* court likewise rejected the defendant's contention that plaintiffs were required to allege that senior officials of the bank were aware of the misconduct underlying plaintiffs' claims.  "Once again, defendant attempts to impose a standard of pleading beyond that required by the rules.  It is sufficient, for pleading purposes, for plaintiffs to allege the knowledge and intent of Arab Bank and not spell out their proof."  *Id.* at *50.

Nowhere does Husaini claim not to have fair notice of the allegations being lodged against him.  Husaini clearly knows what has been alleged, and has even attempted to suggest factual evidence at this early stage rebutting Plaintiffs' claims.  Because the complaints provide fair notice, these are properly matters to be resolved after discovery is complete, and this is no grounds for dismissal here.

## IV.   ARGUMENT

### A.   This Court Has Personal Jurisdiction Over Husaini

Husaini contests this Court's authority to exercise personal jurisdiction over him, arguing that the personal jurisdiction requirements of New York's Long-Arm Statute, N.Y. C.P.L.R. § 302(a)(2) (McKinney 2002), and the requirements under Fed. R. Civ. P. 4(k)(1)(D), are not satisfied.

1. **Personal Jurisdiction Exists Under New York's Long-Arm Statute**

Husaini's arguments regarding the applicability of New York's Long-Arm Statute are simply wrong.  As this Court has previously recognized, "acts committed by a co-conspirator of an out-of-state defendant pursuant to a conspiracy may subject the out-of-state defendant to jurisdiction under C.P.L.R. 302(a)(2)."  *In Re Terrorists Attacks*, 349 F. Supp. 2d at 805 (*quoting*, *Chrysler Capitol Corporation v. Sentry Power Corp.*, 778 F. Supp. 1260, 1266 (S.D.N.Y. 1991).  Plaintiffs have adequately alleged that Husaini was an active and knowing participant in al Qaida's conspiracy to attack America.  Without question, those who knowingly contribute to a terrorist organization do so in order to see the organization successfully carry out terrorist attacks.  Indeed, in recognition of that fact, the United States Government has declared that those who support terrorists are as culpable as those who carry out the attacks.  Thus, the operatives who carried out the September 11th Attack necessarily were acting for the benefit of al Qaida's material sponsors and supporters, and the New York Long-Arm Statute consequently provides a statutory basis for exercising personal jurisdiction over al Qaida's co-conspirators, including Husaini.[4]

2. **The Exercise Of Jurisdiction Comports With Due Process**

The defendant's assertion that the exercise of personal jurisdiction over him would violate due process is equally unconvincing.  The Supreme Court has consistently held that the due process clauses of the Fifth and Fourteenth Amendments permit personal jurisdiction so long as the defendant has certain minimum contacts with the forum such that maintaining the suit there does not offend traditional notions of fair play and substantial justice.  *Calder v. Jones*, 465 U.S. 783, 788, 104 S. Ct. 1482, 79 L. Ed. 2d 806 (1984).  Under these standards, due process

---

[4] The plaintiffs have asserted claims against these defendants under the ATA and Civil RICO, both of which include nationwide service of process provisions.  As such, the exercise of personal jurisdiction also is authorized under Fed. R. Civ. P. (4)(k)(1)(D), provided that the exercise of jurisdiction comports with due process.  For the reasons set forth in greater detail in Sections D2 and D3, the exercise of personal jurisdiction over these defendants does comport with due process.

considerations are satisfied so long as the defendant has "fair warning" that he may be haled into court in the forum to respond for his actions. *Burger King v. Rudzewicz*, 471 U.S. 462, 474, 105 S. Ct. 2174, 85 L. Ed. 2d 528 (1985). In an action involving harm caused by an intentional tort, the plaintiff's contacts to the forum "may be so manifold as to permit jurisdiction when it would not exist in their absence." *Calder*, 465 U.S. at 788. Consistent with this principle, the courts have found that due process is not violated by the exercise of jurisdiction over those who deliberately target our citizens. *Pugh v. Socialist People's Libyan Arab Jamahiriya*, 290 F.Supp.2d 54 (D. D.C. 2003); *Daliberti v. Iraq*, 97 F. Supp. 2d 38, 54 (D.C. 2000); *Rein v. Socialist People's Libyan Arab Jamahiriya*, 995 F. Supp. 325 (E.D. N.Y. 1998); *Mwani v. Bin Laden*, 417 F.3d 1, 28 (D.C. Cir. 2005) (finding that al Qaida and its co-conspirators have "engaged in unabashedly malignant actions directed at and felt in" the United States).

### 3.   The Defendant Directed His Conduct At The United States

In the present case, Plaintiffs have satisfied their burden to make a *prima facie* showing of personal jurisdiction over Husaini, pursuant to the applicable standards set forth above. As described above, the defendant, for a period of many years, directly channeled financial and logistical support to al Qaida. In knowingly sponsoring and directly participating in al Qaida's campaign to attack America, the defendant necessarily directed his conduct at the United States, as it has been publicly known, since at least the mid-1990's, that al Qaida was engaged in a global campaign of terror directed against the United States. *In re Terrorists Attacks*, 349 F. Supp. 2d at 813 ("This Court's record … contains many examples of Osama bin Laden's and al Qaeda's public targeting of the United States"). Thus, the exercise of jurisdiction over the defendant for claims arising from their sponsorship of al Qaida complies with due process.[5]

---

[5] Plaintiffs' allegations of conspiracy are, in and of themselves, sufficient to satisfy due process at this stage of the litigation. *In Re Magnetic Audiotape Antitrust Litig.*, 334 F.3d at 208; *see also Davis v. Barrett Day Securities, Inc.*, 1995 U.S. Dist. LEXIS 15434, *11-12 (M.D.N.C. 1995).

**B.    Plaintiffs Have Sufficiently Pled The Causal Connection Between Husaini And The September 11 Terrorist Attacks**

Husaini argues that Plaintiffs have not sufficiently pled a causal connection between his actions and the September 11 attacks.  This is not the case.   Husaini is alleged to have provided funding to al Qaeda through his role as a member of the Golden Chain while also engaging in support of al-Waqf-al-Islami and allegedly transferring money to one of the principal al Qaeda financiers in Europe.  Those allegations properly allege that Husaini's support and assistance were a proximate cause of the September 11 attacks.

Plaintiffs allege that "The financial resources and support network of . . . Defendants – charities, banks, front organizations and financiers – are what allowed the attacks of September 11, 2001 to occur.  Terrorists like Osama bin Laden and his al Qaeda network . . . cannot plan, train and act on a massive scale without significant financial power, coordination and backing." *See WTC* ¶ 1; *Federal* 1AC ¶ 74.  *See also Boim*, 291 F.3d at 1021 ("[T]here would not be a trigger to pull or a bomb to blow up without the resources to acquire such tools of terrorism and to bankroll the persons who actually commit the violence.").  Moreover, this Court has already held that "[i]n light of Al Qaeda's public acknowledgments of its war against the United States, the September 11 attacks may be the natural and probable consequence of knowingly and intentionally providing material support to al Qaeda."  *See In re Terrorist Attacks on September 11, 2001*, 349 F. Supp. 2d 765, 826 (S.D.N.Y. 2005) ["January 18 Order"].  Finally, as this Court has previously recognized, "Plaintiffs do not have to allege that Defendants knew specifically about the September 11 attacks or that they committed any specific act in furtherance of that attack."  *Id.* at 829.

Plaintiffs have alleged that Husaini has engaged in a long-standing effort to finance al Qaeda dating back to his inclusion as a member of the Golden Chain.  If so, then Husaini is legally responsible for the September 11 attacks.  *See* Restatement (Second) of Torts §§ 876,

877; *see also* January 18 Order, 349 F. Supp. 2d at 826.  Plaintiffs are entitled to the opportunity to take discovery and prove their allegations and establish that Husaini knowingly and intentionally participated in the sponsorship of al Qaida.

### C.     Husaini Is Not Entitled To Dismissal Of Plaintiffs' Tort Claims

Plaintiffs have sufficiently alleged claims under the Anti-Terrorism Act ("ATA"), the Alien Tort Claims Act ("ATCA"), and the common law.  These claims should not be dismissed.[6]

### 1.     Plaintiffs Sufficiently Plead Their Claims Under The ATA

Under the ATA,[7] a defendant is liable if it provided any material support to al Qaida with knowledge of its terrorist agenda or if it aided and abetted al Qaida or Osama bin Laden in their course of terrorist conduct.  *See Boim*, 291 F.3d at 1021 ("[I]f we failed to impose liability on aiders and abettors who knowingly and intentionally funded acts of terrorism, we would be thwarting Congress' clearly expressed intent to cut off the flow of money to terrorists at every point along the causal chain of violence.") (emphasis added).[8]

Furthermore, this Court has already recognized that, under the ATA, "material support includes money [and] financial services . . . ."  January 18 Order, 349 F. Supp. 2d at 825.  As demonstrated above, Plaintiffs have alleged that Husaini knowingly and intentionally provided money and financial services to Osama bin Laden and al Qaida.  Accordingly, under the

---

[6]  Plaintiffs recognize that this Court has dismissed negligence claims against certain defendants on the basis that defendants owed no duty to Plaintiffs.  *See* January 18 Order, 349 F. Supp. 2d at 830-31.  Plaintiffs respectfully disagree with this ruling and refer this Court to the prior briefing on this issue.  *See* Restatement (Second) of Torts § 302 (stating that as a general principle of tort law, every individual has a duty to exercise reasonable care to avoid physical harm to others' person and property).  Plaintiffs also note that they do not currently intend to pursue their claims under the Torture Victims Protection Act ("TVPA"), 28 U.S.C. § 1350, against this defendant.  Plaintiffs reserve the right to replead this claim against Husaini should additional information become available in discovery demonstrating that he acted "under actual or apparent authority or color of law, of any foreign nation" in connection with his support of al Qaeda.

[7]  The Anti-Terrorism Act ("ATA") provides a civil action for "[a]ny national of the United States injured in his person, property or business by reason of an act of international terrorism[.]"  18 U.S.C. § 2333.

[8]  Reviewing the legislative history, the Seventh Circuit concluded:  "All of this history indicates an intent by Congress to allow a plaintiff to recover from anyone along the causal chain of terrorism."  291 F.3d at 1011.

standards set forth in this Court's January 18, 2005 Order, Plaintiffs have properly pled a claim under the ATA.

### 2.   Plaintiffs' Claims Under the Alien Tort Claims Act Should Not Be Dismissed

Husaini contends that the Plaintiffs' claims under the Alien Tort Claims Act, 28 U.S.C. § 1350 ("ATCA"), should be dismissed because he is not a state actor and did not engage in specific kinds of conduct that give rise to jurisdiction under that statute.  Plaintiffs have addressed this argument in Plaintiffs' Consolidated Memorandum of Law in Opposition to the Motion to Dismiss of Defendant Dr. Abdullah Naseef.  Rather than repeat those arguments here, Plaintiffs instead respectfully refer the Court to, and incorporate by reference, that discussion.

### 3.   Plaintiffs Sufficiently Plead Their Common Law Claims

Husaini claims that Plaintiffs' common law claims, including claims for intentional infliction of emotional distress, assault and battery, wrongful death, survival, and property destruction should be dismissed because the Plaintiffs have failed to adequately allege causation. This is merely a repetition of Husaini's argument with respect to the ATA and causation generally and should be rejected for the reasons described above.

### 4.   Plaintiffs' Intentional Infliction Of Emotional Distress, Assault, And Battery Claims Are Not Barred By The Statute Of Limitations

Contrary to Husaini's assertion, the Plaintiffs' claims for assault and battery and for intentional infliction of emotional distress are not demonstrably time-barred.  At this stage of these proceedings, the substantive law governing most of the claims remains to be determined. As such, it would be manifestly premature to dismiss Plaintiffs' assault, battery and intentional infliction of emotional distress claims, under the mere assumption that the law of New York law applies.  *See* 42 Pa.C.S. § 5524 (2005) (establishing two year limitation period for assault, battery and intentional tort claims under Pennsylvania law); *Jones v. R.R. Donnelly & Sons Co.*,

541 U.S. 369 (2004) (holding that federal common law claims arising under Act of Congress after 1990 are governed by a four year limitations period).[9]

Moreover, all of Plaintiffs' claims arise from Husaini's participation in the conspiracy to conduct terrorist attacks against the United States, a conspiracy designed to hide the identity of the participants from disclosure to the outside world.  As a result, the statute of limitations was tolled until Plaintiffs reasonably should have become aware of Husaini's involvement within the conspiracy, itself a question of fact to be determined through discovery.  *Yeadon v. New York Transit Authority*, 719 F. Supp. 204, 209 (S.D. N.Y. 1989); *In re Issuer Plaintiff Initial Public Offering Antitrust Litigation*, 2004 U.S. Dist. Lexis 3892 at *17-18 (S.D. N.Y. Mar. 12, 2004).  Given the clandestine nature of the conspiracy in which Husaini participated, equitable principles require that the statute of limitations be tolled.  *See Johnson v. Nyack Hospital*, 86 F.3d 8, 12 (2d Cir. 1996) (holding that "[e]quitable tolling allows courts to extend the statute of limitations beyond the time of expiration as necessary to avoid inequitable circumstances").[10]

### 5.    Plaintiffs' Claims For Punitive Damages And Conspiracy Should Not Be Dismissed

Defendants correctly argue that no independent causes of action exist under New York law for conspiracy or punitive damages.  However, at this stage of these proceedings, the substantive law governing each of Plaintiffs' individual claims remains to be determined.  Thus, it would be premature to dismiss those causes of action at this time.  Moreover, there can be little dispute that Plaintiffs' are entitled to recover punitive damages in the event that they prevail

---

[9] The ATA imports "the remedies of American tort law," 137 Cong. Rec. 54511 04 (April 16, 1991), thus giving rise to federal common law assault, battery and intentional infliction of emotional distress claims thereunder.  On this point, Plaintiffs refer the Court to the discussion included in their Consolidated Opposition to the Motion to Dismiss of Perouz Sedaghaty at pp. 16-17, incorporated herein by reference.

[10]  Arguably, they are also extended by way of action of the New York Survival cause of action, which the New York legislature specifically extended from 2 years to 2.5 years for 9/11 cases.  *See* N.Y. Est. Powers & Trusts Law § 5-4.1 (2003).

against these defendants under the theories advanced.[11]  Under these circumstances, dismissal of the conspiracy and punitive damages counts would be inappropriate.

### D. Plaintiffs Properly State RICO Claims Against Husaini

Husaini also contends that none of the Plaintiffs have properly pleaded their RICO claims.  Husaini is wrong.[12] [13]

Plaintiffs' complaints and RICO Statements assert RICO claims against Husaini pursuant to 18 U.S.C. §§ 1962(a), (c) and (d).  The enterprise - the al Qaeda movement, also referred to as Radical Muslim Terrorism - is an association in fact of terrorists and an ongoing terrorist organization with a definitive structure.  *See, e.g., WTC* ¶ 1081-85.  Its well documented purpose is to perpetrate acts of terrorism.  Thus, Plaintiffs have sufficiently pled that al Qaida is "a group of persons associated together for a common purpose of engaging in a course of conduct." *United States v. Turkette*, 452 U.S. 576, 583 n.5 (1981); *United States v. Coonan*, 938 F.2d 1553, 1559-60 (2d Cir. 1991).

Plaintiffs further allege that Husaini engaged in conduct in furtherance of the enterprise which is actionable under § 1962(a).  Pursuant to that section: "it shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt … to use or invest directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest

---

[11] Punitive damages are designed "to punish [a defendant] for his outrageous conduct and to deter him and others like him from similar conduct in the future."  *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 32 (D.D.C. 1998). If the Plaintiffs prove their allegations that Husaini knowingly financed and provided material support to al Qaida giving its purpose to commit terrorist acts against innocent persons in the United States, Husaini's conduct is sufficiently egregious and outrageous to warrant the imposition of punitive damages.

[12] Defendant challenges the standing of the *Burnett* Plaintiffs to pursue RICO claims.  The *Burnett* Plaintiffs do not intend to pursue those claims at this time, and therefore do no address the defendant's standing argument herein.

[13] As a preliminary matter, defendant argues that Plaintiffs in all cases other than *Federal* are barred from pursuing RICO claims, because they have not filed RICO Statements applicable to the defendant.  Plaintiffs have addressed this argument in Plaintiffs' Consolidated Memorandum of Law in Opposition to the Motion to Dismiss of Defendant Adnan Basha, n. 10.  Rather than repeat that argument here, Plaintiffs instead respectfully refer the Court to, and incorporate by reference, that discussion.

in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect interstate or foreign commerce."  In the present case, Plaintiffs allege that Husaini availed himself of financing al Qaeda for an extended period of time from the late-1980s through the 1990s and beyond.  As the Supreme Court has explicitly recognized that al Qaida's terrorist endeavors, including the September 11th attacks, directly affect interstate commerce, Plaintiffs have undeniably stated RICO claims under Section 1962(a).  *See Rasul v. Bush*, 124 S. Ct. 2686, 2690 (2004) (stating that the September 11th attacks "severely damaged the U.S. economy").

Plaintiffs' similarly allege sufficient involvement by Husaini in the enterprise to sustain claims under both §§ 1962(c) and (d).  Although a plaintiff asserting a civil claim under § 1962(c) must allege that the defendant participated in the operation or management of the enterprise, *see Dubai Islamic Bank v. Citibank, N.A.*, 256 F. Supp. 2d 158, 164 (S.D. N.Y. 2003), such "discretionary authority" has been described by the Second Circuit as "a relatively low hurdle for plaintiffs to clear."  *See First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 176 (2d Cir. 2004), *citing Baisch v. Gallina*, 346 F.3d 366, 377 (2d Cir. 2003); *De Falco v. Bernas*, 244 F.3d 286, 309 (2d Cir. 2001) and *United States v. Allen*, 155 F.3d 35, 42-43 (2d Cir. 1998).  Moreover, as a general rule, it may not be "reasonable to expect that when a defrauded plaintiff frames his complaint, he will have available sufficient factual information regarding the inner workings of a RICO enterprise to determine whether [a defendant] was merely 'substantially involved' in the RICO enterprise or participated in the 'operation or management' of the enterprise."  *Friedman v. Hartmann*, 1994 WL 376058, *2 (S.D. N.Y. July 15, 1994).

With respect to a RICO conspiracy under § 1962(d), the requirements "are less demanding."  *Baisch*, 346 F.3d at 376.  All that is required is that the conspirator "intend to further an endeavor which, if completed, would satisfy all the elements of the substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal

endeavor." *Id*. at 376-77 (*quoting Salinas v. United States*, 522 U.S. 52, 65 (1997)).  Thus, "[a]lthough parties who do not control the organization cannot be liable under § 1962(c), they may still conspire to do so and therefore be liable under § 1962(d)." *Morin v. Trupin*, 832 F. Supp. 93, 100 (S.D.N.Y. 1993).

Here, Plaintiffs have satisfied the pleading standards applicable to their § 1962(c) and § 1962(d) claims.  The Plaintiffs allege that Husaini was actively involved as a financier of al Qaeda through his role as a member of the Golden Chain and beyond.  In view of these allegations regarding Husaini's integral and pervasive sponsorship of al Qaida's operations throughout the world, Plaintiffs have adequately alleged that Husaini played a direct and active role in the management and operation of al Qaida's fundraising scheme.  Plaintiffs have, accordingly, met their pleading burden in relation to their claims under §§ 1962(c) and 1962(d), particularly given the fact that Plaintiffs have not been afforded the opportunity to take discovery.

Plaintiffs also have adequately alleged proximate cause under RICO.  This requirement is satisfied if plaintiffs allege that defendant's injurious conduct is both the factual and the proximate cause of the injury alleged.  *Lerner v. Fleet Bank, N.A*., 318 F.3d 113, 120 (2d Cir. 2003).  Because "[t]he legal concept of proximate causation mandates a multi-faceted and highly fact-specific inquiry," dismissal at the pleadings stage of a RICO claim is generally imprudent. *National Asbestos Workers Medical Fund v. Philip Morris, Inc.*, 74 F. Supp. 2d 221, 225 (E.D.N.Y. 1999).  This Court's decision "should be guided by a flexible, case-by-case approach."  *Id.* (citing *Associated Gen'l Contractors of Cal., Inc. v. California State Council of Carpenters*, 459 U.S. 519, 536-37 (1983), and *Holmes v. Security Investor Prot. Corp.*, 503 U.S. 258, 272 n.20 (1992)).  Indeed, this Court's analysis of proximate causation "must remain flexible, rather than static:  as society, its needs, and its norms change, so too must the contours

of tort liability and enforcement procedures."  *Id.*  Further, failure to explain the alleged injury in detail is not fatal.  *Von Bulow v. Von Bulow*, 634 F. Supp. 1284, 1309 (S.D. N.Y. 1986). Allegations of injury, because they necessarily involve questions of fact, must be construed liberally on a motion to dismiss under Rule 12(b)(6).  *Id.*  The Complaint need only "allege[] compensable injury flowing from the commission of the predicate acts."  *Id.* (citations omitted).

Here, Plaintiffs allege that they were directly injured by Husaini's participation in al Qaida's campaign to attack the United States, and in particular, by his provision of "material support and resources to al Qaeda."  *See generally WTC* Compl., *Euro Brokers* Compl.  Husaini participated extensively in al Qaida's global operations and specifically in furthering al Qaida's goal of committing acts of terrorism against the United States by providing al Qaida with the "financial resources, physical assets, membership base, technological knowledge, communication skills, and global reach required to conceive, plan and execute the September 11th attack."  *Federal* 1AC ¶ 74.  Accordingly, Plaintiffs have sufficiently pled causation for purposes of their RICO claims.

**E.      Plaintiffs Have Properly Served Husaini**

Husaini alleges that the Plaintiffs failed to properly serve him in accordance with the Federal Rules of Civil Procedure and that the notices published in the *USA Today, International Herald Tribune, and Al-Quds Al-Arabi* were not proper as a matter of law.  Husaini makes the identical arguments about service by publication made by his co-defendants Sheikh Safer Al-Hawali and Sheikh Salman Al-Oadah.  Plaintiffs have addressed each of those arguments in Plaintiffs' Consolidated Memorandum of Law in Opposition to the Motion to Dismiss of Defendant Sheikh Safer Al-Hawali and Sheikh Salman Al-Oadah.  Rather than repeat those arguments here, Plaintiffs instead respectfully refer the Court to, and incorporate by reference, that discussion.

As demonstrated in Plaintiffs' Memorandum of Law in Opposition to the Motion to Dismiss of Sheikh Safer Al-Hawali and Sheikh Salman Al-Oadah, service by publication on Husaini was proper.[14]  By its September 15, 2004 Order, this Court agreed that publication in the *USA Today*, *International Herald Tribune*, and the *Al Quds Al Arabi* newspapers was "reasonably calculated" to notify Husaini of the suit against him so as to satisfy due process. Husaini was served by publication in the *USA Today* and *Al Quds Al Arabi* newspapers on December 23, 2004, December 30, 2004, January 6, 2005, and January 13, 2005.  Husaini was similarly served in the *International Herald Tribune* on December 22, 2004, December 27, 2004, January 5, 2005, and January 10, 2005.  Thereafter, Husaini appeared and filed this motion to dismiss.

In sum, Plaintiffs obtained permission from this Court to serve Husaini by publication. Husaini was served in this manner and in fact received notice of the pendency of the action.  The action should not be dismissed for improper service of process.

## IV.   CONCLUSION

For the reasons stated above, Plaintiffs respectfully request that Hamad Al-Husaini's Motion to Dismiss be denied in all respects, with prejudice.

Respectfully submitted,

---

[14] It is significant to point out that Husaini was represented by counsel in the consolidated action (03 MDL 1570) at the time of the Order permitting publication and was arguably notified that the Plaintiffs intended to serve him in this manner.  The MDL docket clearly shows that Ms. Bernabei and Mr. Kabat were counsel of record for Husaini as of March 11, 2004 when this Court signed their *pro hac* admissions and subsequent entry of appearance.  *See* MDL 1570 Docket entries #20 and #21.  Husaini was sufficiently on notice of the Plaintiffs' claims against him at that time, and has been for the past **18** months.

| | |
|---|---|
| | COZEN O'CONNOR |
| Dated: September 20, 2005 | BY: _____ |
| | Ronald L. Motley, Esq. (RM-2730) |
| | Jodi Westbrook Flowers, Esq. |
| | Donald A. Migliori, Esq. |
| | Michael Elsner, Esq. (ME-8337) |
| | MOTLEY RICE LLC |
| | 28 Bridgeside Boulevard |
| | P.O. Box 1792 |
| | Mount Pleasant, South Carolina 29465 |
| | Telephone: (843) 216-9000 |
| | Paul J. Hanly, Jr., Esq. (PH-5486) |
| | Jayne Conroy, Esq. (JC-8611) |
| | Andrea Bierstein, Esq. (AB-4618) |
| | HANLY CONROY BIERSTEIN & SHERIDAN, LLP |
| | 415 Madison Avenue |
| | New York, NY 100 17-11 1 1 |
| | Telephone: (212) 401-7600 |
| | Attorneys for *Burnett*, *EuroBrokers* and *WTC Properties* Plaintiffs |

PHILA1\2347315\2 117430.000

25