**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____
                                        )
In Re TERRORIST ATTACKS on              )          03 MDL 1570 (RCC)
SEPTEMBER 11, 2001                      )          ECF Case
                                        )
_____)

This document relates to:

   *Estate of John P. O'Neill, Sr., et al. v. The Republic of Iraq, et al.*, 04-CV-1076 (RCC)

**O'NEILL PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
TAHA AL ALWANI'S MOTION TO DISMISS AND IN SUPPORT OF PLAINTIFFS'
CROSS MOTION**

**LAW OFFICES OF JERRY S. GOLDMAN &
ASSOCIATES, P.C.**

111 Broadway, 13th Floor
New York, NY 10006
212.242.2232

*Attorneys for the Plaintiffs*

On the Memorandum:

Jerry S. Goldman, Esquire (JG 8445)
Gina M. MacNeill, Esquire (GM 0581)
Frederick J. Salek, Esquire (FJS 8565)

## TABLE OF CONTENTS

TABLE OF CONTENTS .......................................................................................... 1

TABLE OF AUTHORITIES ................................................................................... 2

INTRODUCTION ................................................................................................... 1

FACTS .................................................................................................................... 3

ARGUMENT .......................................................................................................... 8

I.   THE COMPLAINT SHOULD NOT BE DISMISSED FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED. .......................................... 8

   A.   A MOTION TO DISMISS UNDER RULE 12(B)(6) MERELY TESTS THE LEGAL FEASIBILITY OF THE COMPLAINT. ................................................................... 8

   B.   DEFENDANT CONTENTION THAT THE WRONG PERSON WAS SERVED CAN NOT BE PROPERLY RAISED BY A MOTION TO DISMISS THE COMPLAINT UNDER FED. R. CIV. PROC. 12(B)(6); IN ANY EVENT THE CORRECT PERSON IS PROPERLY BEFORE THE COURT AS SET FORTH IN THE PLAINTIFFS' PLEADINGS ................ 12

   C.   THE PLAINTIFFS PROPERLY FILED THEIR MORE DEFINITE STATEMENT AND FIRST CONSOLIDATED COMPLAINT. ............................................................... 15

      1.   RICO STATEMENT OF AUGUST 26, 2005 ........................................... 16

      2.   THE FILING OF THE MORE DEFINITE STATEMENT- ADDITIONAL ALLEGATIONS OF SEPTEMBER 30, 2005 WAS PROPER AND ARE PART OF THE PLEADINGS. ....................................................................................... 19

      3.   THE SUBMISSION OF THE FIRST CONSOLIDATED COMPLAINT OF SEPTEMBER 30, 2005 WAS PROPER. ..................................................... 20

      4.   THE MOTION OF THE DEFENDANT IS UNTIMELY. ......................... 21

   D.   THE PLAINTIFFS HAVE ADEQUATELY PLED THEIR CAUSES OF ACTION. ..... 23

CONCLUSION ...................................................................................................... 24

APPENDIX I:  SUMMARY OF PLEADINGS REFERENCES TO TAHA JABIR AL ALWANI .............................................................................................................. 25

APPENDIX II – PROPOSED AMENDMENTS TO THE FIRST CONSOLIDATED COMPLAINT ........................................................................................................ 35

CERTIFICATE OF SERVICE .............................................................................. 37

# TABLE OF AUTHORITIES

*Cases*

*A. Terzi Prods. V. Theatrical Protective Union, Local No. One,* 2 F. Supp. 2d 485 (S.D.N.Y. 1998) .................17, 19

*Allen v. New World Coffee, Inc.,* 2001 U.S. Dist. LEXIS 3269 (S.D.N.Y. 2001) .................................17, 19

*Chance v. Armstrong,* 143 F.3d 698 (2d Cir. 1998) *aff'd. on appeal after remand,* 159 F.3d 1345 (2d Cir. 1998) ......9

*Commer. Cleaning Servs., L.L.C. v. Colin Serv. Sys.,* 271 F. 3d 374 (2d Cir. 2001)..................................18

*Conley v. Gibson,* 355 U.S. 41 (1957) ...........................................................................8, 9, 10

*Dempsey v. Sanders,* 132 F. Supp. 2d 222 (S.D.N.Y. 2001) ...............................................17, 19

*Foman v. Davis,* 371 U.S. 178, 182 (1962) ............................................................14

*Geisler v. Petrocelli,* 616 F.2d 636 (2d Cir. 1980) ...........................................................8

*Hadges v. Yonkers Racing Corp.,* 48 F3d 1320 (2d Cir. 1995) ............................................15

*Hance v. Armstrong,* 143 F.3d 698 (2d Cir. 1998), *aff'd. on appeal after remand,* 159 F.3d 1345 (2d Cir. 1998 .......9

*Harris v. City of New York,* 186 F.3d 243 (2d Cir. 1999)......................................................21

*Linde, et al. v. Arab Bank, PLC,* 2005 U.S. Dist. LEXIS 18864 (E.D. N.Y. September 2, 2005)..............11

*McLaughlin v. Anderson,* 962 F. 2d 187 (2d Cir. 1992) ...............................................17, 19

*Mega Tech Int'l. Corp. v. Al-Saghyir Establishment,* 1999 U.S. Dist. LEXIS 6381 (S.D.N.Y. 1999).................17, 19

*Mendoza v. Zirkle Fruit Co.,* 2000 U.S. Dist. LEXIS 21126 (D. Wash. 2000) ........................18

*Moses v. Martin,* 360 F. Supp. 2d 533 (S.D.N.Y. 2004).......................................................17, 19

*Pelman v. McDonald's Corp.,* 396 F.3d 508 (2d Cir. 2005) ...........................................10, 11

*Phelps v. Kapnolas,* 308 F.3d 180 (2d Cir. 2002)...........................................8, 9, 10

*Rachman Bag. Co. v. Liberty Mutu. Ins. Co.,* 46 F.3d 230 (2d Cir. 1995). ..............................14

*Sparrow v. United Airlines, Inc.,* 216 F.3d 1111 (D.C. Cir. 2000), *appeal dismissed after remand,* 2001 WL 936257 (D.C. Cir. July 12, 2001)................................................................9

*Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506 (2002) .......................................................9, 11

*Twombly v. Bell Atlantic Corp.,* 425 F.3d 99 (2d Cir. 2005) ...................................9, 11

*Wagh v. Metris Direct, Inc.,* 348 F. 3d 1101 (9th Cir. 2003), *cert. denied,* 541 U.S. 1043 (2004)............18

*Woodford v. Community Action Agency,* 239 F.3d 517 (2d Cir. 2001) .............................8, 9

*Wynder v. McMahon,* 360 F.3d 73 (2d Cir. 2004)...........................................................8, 9

2

### *Statutes*

18 U.S.C. § 1961 *et seq.* ...................................................................................................................8

### *Other Authorities*

Fed. R. Civ. Proc. 11 advisory committee's note (1993) ....................................................15

### *Rules*

Fed. R. Civ. Proc. Rule 10 ................................................................................................21

Fed. R. Civ. Proc. Rule 12 ......................................................................................7, 21, 22

Fed. R. Civ. Proc. Rule 12(a) ......................................................................................2, 6

Fed. R. Civ. Proc. Rule 12(e) ..............................................................................................19

Fed. R. Civ. Proc. Rule 55 ..................................................................................................22

Fed. R. Civ. Proc. Rule 6(a) ................................................................................................2

Fed. R. Civ. Proc. Rule 6(b) .....................................................................................7, 18, 21, 22

Fed. R. Civ. Proc. Rule 12(b)(6) ..............................................................................passim

Fed. R. Civ. Proc. Rule 15(a) ..............................................................................................20

Fed. R. Civ. Proc. Rule 8(a) ...........................................................................................passim

Fed. R. Civ. Proc. Rule 9(b) .........................................................................................9, 11

Fed. R.. Civ. Proc. Rule 12(c) ............................................................................................20

## INTRODUCTION

On September 11, 2001, thousands of innocent men, women, and children, in New York City, at the Pentagon, and aboard four airliners were horribly murdered – burned, suffocated, crushed, impact, and otherwise - as a result of an invidious criminal conspiracy targeting American lives and property.  They suffered pain and suffering.  They died.  They lost the opportunity to see their children and their grandchildren.  They were deprived of the chance to grow old with their spouses.  They lost their property and their livelihoods.  Thousands of others – their spouses, children, parents and other loved ones - had their lives irreparably shattered.

This lawsuit seeks to utilize the American system of justice to seek to partially recompense for this tragedy and to help prevent other families from suffering similar terrible losses.

This is what the O'Neill cases[12] are all about.

***

---

[1] The First Consolidated Complaint electronically served and then filed with the Clerk on September 30, 2005, will be cited as "FCC."

[2] The instant case, *Estate of John P. O'Neill, et. al. v. Republic of Iraq, et al.,* 04 CV 1076 (RCC) (*Iraq* or *O'Neill-Iraq)* is one of the cases which are part of *In re Terrorist Attacks on September 11, 2001,* 03 MDL 1570 (RCC) (collectively *O'Neill cases* or *O'Neill Litigation).*  The decedent, John P. O'Neill, Sr., was murdered on September 11, 2001 as a result of the activities committed by the Defendant named herein, and those named in the companion cases of *Estate of John P. O'Neill, Sr., et al. v. Al Baraka Inv. & Dev. Corp*., et al., 04-CV- 1923 (RCC) ("*Al Baraka*")  and *Estate of John P. O'Neill, et al. v. Kingdom of Saudi Arabia, et  al.,* 04-CV-1922 (RCC)*,* as well as the other cases part of the instant multi-district litigation, as alleged in the pleadings.  See, e.g.,  FCC Exhibit G, ¶ 2. .

Defendant Dr. Taha Al-Alwani,[3] who was personally served in this action in the State of Virginia on July 29, 2005 filed his Motion to Dismiss, ninety-eight (98) days later, on November 4, 2005, and served its proposed Rule 11 Motion upon counsel, on November 11, 2005, essentially complaining, notwithstanding that he is already appearing in two (2) other cases in the same multi-district litigation, that the wrong person was served, and seeking to dismiss the complaint, on that ground, based upon a purported insufficiency of pleading, pursuant to Fed. R. Civ. Proc. 12(b)(6), rather than by way of a putative summary judgment motion or by a determination by a jury.   He further complains, notwithstanding his unexcused failure to timely respond to the complaint for approximately 98 days,[45] in contravention of Fed. R. Civ. Proc. 12(a) which requires responses within twenty (20) days[6] that the Plaintiffs failed to properly comport with this Court's rules relative to timing and/or format of the RICO Statements, More Definite Statements and the tendering of Consolidated Complaint.

He is utilizing the wrong procedure to challenge this purported 'wrong.'

The complaint is sufficiently pled in accordance with the requirements of Rule 8(a).

He is <u>the</u> Dr. Taha Al-Alwani who the Plaintiffs' allege is liable for the horrendous events of September 11, 2001.

---

[3] The Defendant was served with the Summons and Complaint, Docket no. 1145, July 29, 2005.  A RICO Statement and a More Definite Statement was filed on August 26, 2005.  Docket 1157 and 1158.  Plaintiff incorporated the allegations of the RICO Statement within a More Definite Statement- Additional Allegations, on September 30, 2005, docket no. 1360, and then attached the same allegations as set forth in those pleadings, as Exhibit G, ("Exhibit G" or "MDS") , to the First Consolidated Complaint, pursuant FCC para. 220(g), which was filed and served by email on September 30, 2005 pursuant to CMO 2, ¶¶ 13, 14.

[4] Notably, the Defendant had previously filed a motion to dismiss relative to the claim of *Federal Insurance* and, in fact, a week before he filed the instant motion, he was part of a consolidated motion to dismiss aimed at the complaint filed by *New York Marine*. Docket 1450.  In neither case has a Rule 11 motion been threatened, let alone tendered.

[5] The period of time between August 25 and August 26, 2005 is excluded on consent of the Plaintiff, as outlined in Plaintiff's email to Defendant's counsel of August 25, 2005.

[6] See, Fed. R. Civ. Proc. 6(a) (the period of time begins to run the day after service of process and Saturdays, Sundays and legal holidays are excluded).

The Plaintiffs are further seeking, by way their cross motion, to:

1. Relative to the Plaintiffs' RICO Statement pertaining to Taha Al' Alwani:

   a.   Reconsidering the Court's Order relative to the Applicability of CMO 2, Par. 14 to Plaintiffs other than *Federal Insurance; or, in the alternative,*

   b.   Granting an Enlargement of Time pursuant to Rule 6(b) to Filing of a RICO Statement as to Taha Al' Alwani;  *or, in the alternative,*

   c.   Allowing Plaintiff to Withdraw its Previously Filed RICO Statement; and/or

2. Striking Defendant Taha Al' Alwani's Motion to Dismiss[7];

3. Granting Leave to Amend the Plaintiffs' Complaint as Set Forth in Exhibit A;

4. Granting Leave to Amend the Plaintiffs' Complaint in the Event that the Court finds a Deficiency in Pleading under Rule 12(b)(6).

In support of the Plaintiffs' Response to Defendant's Motion and in Support of the Plaintiffs' Cross motion are Declarations of Jerry S. Goldman, Esquire (hereinafter "Goldman, para." __ or "Goldman Exhibit __"); Gina M. MacNeill, Esquire (hereinafter "MacNeill, para. ___" or "MacNeill Exhibit __"); and Joshua M. Ambush, Esquire (hereinafter "Ambush, para. ___"), all of which, including their attached exhibits, and the pleadings, are incorporated herein.

## FACTS

The Defendant are alleged to have participated in a world-wide conspiracy which culminated, for purposes of this case, in the attacks of September 11, 2001, causing massive death and destruction in New York, Pennsylvania, and the Washington, D.C. area. To seek

---

[7] To the extent that this Court either grants the cross motion for leave to file a RICO Statement or grants the motion for reconsideration of its August ruling pertaining to RICO Statements, the Plaintiff would withdraw the request for the Motion to Strike.

monetary compensation for the wrongs committed by the conspirators, in the form of actual and punitive damages, the O'Neill Plaintiffs have brought this action in a United States Court.

The horrific events of September 11th were the result of a world-wide terror conspiracy against the United States involving the Defendant and others, who have conspired for many years to attack the United States, to destroy American property, and murder innocent United States' citizens. Defendants supported, conspired, aided and abetted, sponsored, planned and executed the September 11th terror attacks that killed thousands of people and injured many thousands more. FCC 1; see generally summary of O'Neill pleadings contained in Appendix 1, para. 1-33, 50-61. [8]

In essence, as described at length in the pleadings, and discussed in part, below, the Defendant conspired with Osama Bin Laden ("Bin Laden"), Al Qaeda, foreign states, and others to raise, launder, transfer, distribute, and hide funds for Bin Laden and the rest of the Enterprise in order to support and finance their terrorist activities including, but not limited to, the September 11th attacks. FCC paras. 22, 23, 25, 36, 41; see generally, FCC, Exhibit G.

The Defendants, including the Defendant herein, concert of action and conspiracy to support and promote Bin Laden and Al Qaeda were a proximate cause of the September 11, 2001 terrorist attacks that killed and injured the Plaintiffs, and damaged and/or destroyed their property. See, e.g., FCC 253, 272, 275. As a result, Plaintiffs have suffered damages as set forth in the pleadings. FCC 270-272, FCC Exhibit G paras. 14-5; see generally outline in Appendix I, paras. 62-9.[9]

---

[8] Attached hereto and incorporated herein as Appendix I is a table summarizing the factual allegations contained in the pleadings relevant to the Defendant.

[9] The injuries to business or property suffered by the O'Neill Plaintiffs, resulting from the September 11th attack, include economic damages, including but not limited, to pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic

4

During the summer of 2003, Joshua Ambush, Esquire drafted the original complaint in the above-referenced matter.  Ambush Para. 3.  He then caused to be filed, before the United States District Court of the District of Columbia, the complaint in the *O'Neill-Iraq* matter, on or about August 20, 2003.  Such complaint listed, as a Defendant, one Taha Al-Alwani, who Mr. Ambush intended to be an individual, who he then believed was living in northern Virginia, and who he understood was born in Iraq.  Ambush para. 4, 6. He had no knowledge, at that time, nor does he today, of any other individual, by the name of Taha Al-Alwani, who had connection with the 9/11 conspiracy, including the person referenced in the Defendant's motion. Ambush Para. 7. The person served on July 29, 2005, and who had appeared in the *Federal* and *New York Marine* cases, was the person who he included in the Complaint.  Dr. Al-Alwani was in the *Iraq* case from the very beginning of the litigation.

The Defendant herein is named in at least two (2) other of the related cases - the *Federal* case and the *New York Marine* case.

By way of an order signed on or about December 9, 2003 the MDL panel ordered the transfer of the instant case from the District of Columbia to the Southern District of New York, which is listed on the docket on December 10, and entered in January 8, 2004.  Ambush Para. 10.

The docket in the Southern District of New York reflects that the case was finally transferred into the Southern District of New York on March 11, 2004.  Ambush Para. 11.

At the time that the case was transferred in, all matters were stayed in the case, pending the discussions relative to and the entry of a Case Management Order, which was filed on June 16, 2004.  Ambush Para. 12.

---

contributions to the Plaintiffs'/Decedents' households.  Additionally, the Attack itself was intended to destroy the leading symbol of the United States leader in world trade – The World Trade Center - and as such, affected the O'Neill Plaintiffs' jobs, businesses, and livelihoods. Exhibit G,  ¶¶ 15, 16.

5

On October 14, 2004, the O'Neill Plaintiffs sought to have counsel for the Defendant in the companion *Federal* case accept service. They refused. MacNeill Para. 4. Thereafter, a waiver of service was unsuccessfully sought. O'Neill MacNeill Paras. 5, 6.

On July 29, 2005, in the Virginia, the Defendant was personally served. MacNeill, Exhibit D.[10]

On August 10, 2005, counsel for the Defendant requested an extension of time to plead or move under Rule 12(a). On August 11, 2005 a draft was tendered by Plaintiffs. Plaintiff, in accordance with the practice in the great majority of the cases in the instant litigation involving stipulations, requested, in exchange, a waiver of a service defense (in light of the personal service) and that the time for the filing of a RICO Statement, pursuant to CMO 2, Para. 14, be set. Defendant refused on August 11, 2005. Thereafter, Plaintiffs offered to withdraw their request for a waiver of a service defense. Defendant adamantly refused to change its position relative to the RICO Statement, insisting that the Plaintiffs were not timely as it was not filed within twenty (20) days of the filing of the pleading, in accordance with the Judge's Individual Rules, notwithstanding the fact that twenty (20) days after the filing of the pleading, the case was still pending in the District of Columbia. In fact, the case did not arrive in this court for almost seven (7) months. That is, the Plaintiffs could not have complied with such rule, let alone be aware of the existence of this Court's individual rules. Moreover, during the period of time from when the case arrived in the District in mid-March until mid-June, 2005, the discussions and the Court's decision over the scope of the Case Management Order were pending, and, it appears that all such procedural steps (e.g., the plaintiffs filing of RICO Statements, the defendants

---

[10] The Affidavit of Service has previously been docketed with the Clerk of the District Court.

6

responding to the various complaints, the plaintiffs responding to the defense motions, etc. were stayed).]

Following discussions with counsel for the Defendant,[11] it was apparent that they would not yield as to the issue of the filing of a RICO Statement, notwithstanding their requests for extensions of time to file their own response, despite the unequivocal mandate of Rule 12.

On August 26, 2005, docket no. 1157, Plaintiff electronically filed and served a RICO Statement Applicable to Taha Al' Alwani.[12]   On that same date, the Plaintiffs also filed a More Definite Statement- Additional Allegations applicable to the same Defendant.   Docket 1158.

On  September 30, 2005, docket no. 1360, Plaintiff electronically filed and served a More Definite Statement- Additional Allegations, pursuant to CMO 2, Para. 13 pertaining to the Defendant.   Such document contained substantially the same information as was previously disclosed in docket nos. 1157 and 1158.

On September 30, 2005, Plaintiff manually filed and electronically served on counsel its First Consolidated Complaint in the instant matter, in accordance with CMO 2, Para. 13 (last sentence).   Incorporated within such Complaint were numerous allegations against the Defendant, as reflected, in part in the More Definite Statement- Additional Allegations of September 30, 2006, docket 1360.  See, FCC Para. 220 (g), Exhibit G.

On November 4, 2005, Defendant filed the instant motion.  Defendant never sought leave from the Court to file same pursuant to Rule 6(b).  On November 11, 2005, he served, but did not

---

[11] The discussions were predominately by way of email.  They were not appended to Defendant's Declaration.

[12] The Plaintiff is withdrawing the RICO Statement of August, 2005, but by way of the cross motion, is seeking leave to file same, by for good cause. Fed. R. Civ. Proc. 6(b).  It is not withdrawing either its More Definite Statement- Additional allegations of August 2005, its More Definite Statement – Additional Allegations of September 30, 2005, or its First Consolidated Complaint of September 30, 2005.

file, a proposed Rule 11 Motion.  On November 18, 2005, the Plaintiffs filed the instant response

to the Defendant's motion and the instant cross motion.


## ARGUMENT

I.  **THE COMPLAINT SHOULD NOT BE DISMISSED FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.**

Plaintiffs have sufficiently alleged claims under the ATA ("ATA") (Count 8), RICO

(Count 9) and the common law.[13]  These claims should not be dismissed.

### A.  A MOTION TO DISMISS UNDER RULE 12(B)(6) MERELY TESTS THE LEGAL FEASIBILITY OF THE COMPLAINT.

Defendant moves to dismiss the Complaint pursuant to Fed. R. Civ. Proc. 12(b)(6), for

failure to state a claim upon which relief could be granted.  Such a motion must be denied unless

"it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which

would entitle him to relief."  *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Wynder v. McMahon*,

360 F.3d 73, 78 n.8 (2d Cir. 2004); *Phelps v. Kapnolas*, 308 F.3d 180, 184 (2d Cir. 2002) (*per

curiam*).  The Court's role is "not to assay the weight of the evidence which might be offered in

support" of the Complaint, but "merely to assess the legal feasibility" of the Complaint.  *Geisler

v. Petrocelli*, 616 F.2d 636, 639 (2d Cir. 1980).  Plaintiffs are not required to prove their case at

the pleading stage; indeed, the Second Circuit has cautioned that "[t]he pleading of evidence

should be avoided." *Woodford v. Community Action Agency*, 239 F.3d 517 (2d Cir. 2001). The

issue on Rule 12(b)(6) motion "is not whether a plaintiff is likely to likely to prevail ultimately,

---

[13] The common law claims are wrongful death (Count 1), survival (Count 2), intentional infliction of emotional distress (Count 4), consortium (Count 5), solatium (Count 6) conspiracy (Count 7), economic damages (Count 3) and punitive damages (Count 10).

but whether the claimant is entitled to offer evidence to support the claims." *Hance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998), *aff'd. on appeal after remand*, 159 F.3d 1345 (2d Cir. 1998).

In determining whether Plaintiffs could ultimately prevail, the Court must accept as true the facts alleged in the pleadings and draw all reasonable inferences in Plaintiffs' favor. *Wynder*, 360 F.3d at 78; *Phelps*, 308 F.3d at 184. Plaintiffs are not required to prove their case at the pleading stage. Indeed, the Second Circuit has cautioned that "[t]he pleading of evidence should be avoided." *Woodford v. Community Action Agency*, 239 F.3d 517, 526 (2d Cir. 2001). The issue in a Rule 12(b)(6) motion "is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims." *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998), *aff'd. on appeal after remand*, 159 F.3d 1345 (2d Cir. 1998).

A Rule 12(b)(6) motion is analyzed in the context of the requirements of Fed. R. Civ. Proc. 8(a), which are extremely permissive. *Swierkiewicz,* 534 U.S. at 512-13 (2002) . Indeed, Rule 8(a)(2) provides that a complaint only need include "a short and plain statement of the claim showing that the pleader is entitled to relief" and that such a statement simply shall "give the Defendant fair notice of what the plaintiffs claim is and the grounds upon which it rests." *Id.* at 512 (quoting *Conley*, 355 U.S. at 47 (1957)); *Wynder*, 360 F.3d at 77; *see also Sparrow v. United Airlines, Inc.*, 216 F.3d 1111, 1115 (D.C. Cir. 2000), *appeal dismissed after remand*, 2001 WL 936257 (D.C. Cir. July 12, 2001) (allegation "I was turned down for a job because of my race" would be sufficient to survive a Rule 12(b)(6) motion.). Furthermore, in the absence of averments of fraud or mistake, which must be pled with particularity pursuant to Fed. R. Civ. Proc. 9(b), a federal court is prohibited from imposing more demanding requirements than those proscribed under Rule 8(a). *Leatherman*, 507 U.S. at 168-69 (1993); *Twombly v. Bell Atlantic Corp.*, 425 F.3d 99, 106-7 (2d Cir. 2005).

Several recent Second Circuit cases underscore and re-affirm these cardinal principles. In *Phelps*, the Court of Appeals held that a district court "may not go beyond FRCP 8(a)(2) to require the plaintiff to supplement his pleadings with additional facts that support his allegation of knowledge either directly or by inference." *Id*. at 186-87. [14] The Court explained that dismissal was improper because, through discovery, the plaintiff might uncover direct evidence to support his allegations. *Phelps*, 308 F.3d at 187. Thus, the Second Circuit cautioned:

> Despite the pressures to weed out apparently meritless cases at the earliest point, courts must take care lest judicial haste in dismissing a complaint in the long run makes waste. Untimely dismissal may prove wasteful of the court's limited resources rather than expeditious, for it often leads to a shuttling of the lawsuit between the district and appellate courts. *Id*. at 185 (citations omitted).

In *Pelman v. McDonald's Corp.*, 396 F.3d 508 (2d Cir. 2005), the Second Circuit again vacated a district court's 12(b)(6) dismissal and reiterated the minimal pleading standards to be applied. [15] Quoting the unanimous Supreme Court ruling in *Swierkiewiez*, the Court reminded:

> This simplified notice pleading standard of Rule 8(a) relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims. The provisions for discovery are so flexible and the provisions for pretrial procedure and summary judgment so effective, that attempted surprise in federal practice is aborted very easily, synthetic issues

---

[14] In *Phelps*, the plaintiff alleged that the employees of the prison where he was incarcerated had violated his Eighth and Fourteenth Amendment rights by inflicting cruel and unusual punishment. 308 F.3d at 182. Plaintiff further alleged that Defendants "knew or recklessly disregarded" that the diet the Defendants had placed him on was inadequate and would cause pain and suffering. *Id*. The district court dismissed the complaint, finding that it failed to state a claim, in part because the court said plaintiff had not sufficiently alleged that Defendants acted with the requisite *scienter*, deliberate indifference. The district court found plaintiff's allegations of *scienter* conclusory and held that plaintiff failed to allege facts from which the Court could infer the Defendants' knowledge. *Id*. at 184.

The Court explained:

> It was improper to dismiss Phelps's Amended Complaint for failing to supplement Phelps's basic allegations with additional facts to support them by inference, for it does not appear from the face of the complaint beyond doubt that Phelps "can prove no set of facts in support of his claim which would entitle him to relief." *Phelps*, 308 F.3d at 187 (quoting *Conley*, 355 U.S. at 45-46).

[15] In *Pelman*, the district court had dismissed because, it had ruled, plaintiffs had failed to "draw an adequate causal connection between their consumption of McDonald's food and their alleged injuries." *Id*. at 511. The Second Circuit rejected this approach. It held that the information the district court found to be missing in the Complaint was "the sort of information that is appropriately the subject of discovery, rather than what is required to satisfy the limited pleading requirements of Rule 8(a)." *Id*. at 512.

10

detected, and the gravamen of the dispute brought frankly into the open for the inspection of the court.

*Pelman*, 396 F.3d at 512 (*quoting Swierkiewicz*, 534 U.S. at 512-13 ).

Again, last month, the Circuit reiterated that Rule 8(a) requires only (i) a short and plain statement of the grounds of the court's jurisdiction; (ii) a short and plain statement of the claim showing that the pleader is entitled to relief; and (iii) a demand for judgment for the relief which the pleader seeks.  *Twombly v. Bell Atlantic Corp*., 425 F.3d 99, 106-7 (2d Cir. 2005).  All that is required is that the pleading provide a Defendant with "fair notice" of the claim and the grounds upon which it rests; it is not meant to impose a great burden upon the plaintiff, or require the pleading of facts except in exceptional circumstances.  *Twombly*, 425 F. 3d at 106-7. Moreover, the requirement of a heightened pleading standard is narrowly circumscribed to averments of fraud and mistake only, *Twombly*, 425 F. 3d at 107-113 (more specified pleadings are not required in anti-trust cases); Fed. R. Civ. Proc. 9(b). [16,17]

---

[16] Claims of conspiracy in an anti-trust prosecution need not be pled by way of evidentiary allegations. The complaint merely needs to avoid the extremes of 'bare bones' or 'implausibility.' *Twombly,* 425 F.3d at 115-.7

[17] Notably, in *Linde, et al. v. Arab Bank, PLC*, 2005 U.S. Dist. LEXIS 18864 (E.D. N.Y. September 2, 2005), the District Court rejected the Defendant's invitation to impose a heightened pleading requirement in a case presenting claims nearly identical to those at issue here.  In *Linde*, the plaintiffs brought claims against Arab Bank for injuries resulting from terrorist attacks carried out by HAMAS and Palestine Islamic Jihad in Israel, based on the bank's sponsorship and support of those terrorist organizations. Id. at *11-23.  Arab Bank sought dismissal of the plaintiffs' Anti-Terrorism Act (ATA) and common-law claims "on the ground that plaintiffs have not sufficiently alleged knowledge and intent."  Id. at *42.  The Court rejected this argument, reasoning that Arab Bank was attempting to impose a heightened pleading standard not warranted by the Rules of Civil Procedure:

> To the extent the Defendant is arguing that plaintiffs have not alleged sufficient facts to establish an evidentiary basis for their allegations of knowledge and intent, Defendant simply misapprehends the pleading standard.  It is not entitled to dismissal based on the argument that plaintiff's must plead more than the requisite knowledge and intent, either as to their substantive claims or their claims of aiding and abetting a conspiracy.

*Id.*  The *Linde* court likewise rejected the Defendant's contention that plaintiffs were required to allege that senior officials of the bank were aware of the misconduct underlying plaintiffs' claims.  "Once again, Defendant attempts to impose a standard of pleading beyond that required by the rules.  It is sufficient, for pleading purposes, for plaintiffs to allege the knowledge and intent of Arab Bank and not spell out their proof."  *Id.* at *50.

11

Defendant does not, and can not, claim that it did not receive fair notice.  Defendant clearly knows what has been alleged.  Because the pleadings provide fair notice, there is no basis for a dismissal at this time.

**B.   DEFENDANT CONTENTION THAT THE WRONG PERSON WAS SERVED CAN NOT BE PROPERLY RAISED BY A MOTION TO DISMISS THE COMPLAINT UNDER FED. R. CIV. PROC. 12(B)(6); IN ANY EVENT THE CORRECT PERSON IS PROPERLY BEFORE THE COURT AS SET FORTH IN THE PLAINTIFFS' PLEADINGS.**

A key contention in Defendant's motion is a claim that the wrong person was served in the *O'Neill* case, notwithstanding the fact that he was served, appeared and has defended in two other cases in the same multi-district litigation, namely *Federal* (see, docket no. 290), and *New York Marine* (see, docket no. 1540).

First, as a 12(b)(6) motion tests the sufficiency of the pleadings, on its face, with all of its allegations presumed to be true for purposes of such examination, a motion to dismiss for insufficiency of pleading is not a proper vehicle.  Rather, summary judgment or a decision at the trial stage would be the only appropriate vehicles, and not an attack on the sufficiency of the pleadings.

Second, as indicated in the declaration of Joshua Ambush, Esquire, from the time of the very preparation and filing of the original complaint in the United States District Court for the District of Columbia in the summer of 2003, the person who was, in fact, served, was the person who was sued.  Ambush Paras. 6, 7.  When the undersigned became counsel in the *O'Neill-Iraq* litigation in the fall of 2004, attempts at service were directed towards this particular person.  MacNeill Paras. 3, 5, 6, 7, 8.   It was not until the Defendant's counsel, by way of their letter dated October 25, 2004, brought it to Plaintiffs' attention, were the O'Neill Plaintiff's even aware of another Taha Al Alawni.  See, MacNeill Exhibit A.

The Defendant alleges that the Plaintiff's have confused him with "Taha Badwi Hamid Al-Alwani or another Iraqi national," yet, the pleadings on their face, specifically refer to "Taha Al Alwani a/k/a Dr. Taha Jabir al'Alwani" (FCC para. 36; Exhibit G per para. 220).[18]   The addition of the 'a/k/a' was in the pleading filed September 28, 2004, *prior* to any attempted service on the Defendant or his counsel.[19,20]

The Complaint describes the Defendant as a "Dr."

The Defendant's Declaration, Exhibit A to the Barentzen Declaration refers to him as a "Dr. Taha Jabir Al-Alwani".

Defendant further alleges, in both his instant motion and his proposed Rule 11 motion, that the allegation in FCC para. 36, linking him to Iraq, may be incorrect, claiming he was never a 'leader, official, agent, or *employee*" of Iraq, and that he left the country in 1969 and has never returned, having moved to the United States in 1984.  By way of our cross-motion, in accordance with Rule 11 and Rule 15(a) and CMO 2, para. 13, we are seeking to amend same, without prejudice, in the interest of justice, as set forth, in full, at Appendix II, which is attached hereto

[18] The Plaintiffs' cross motion is also seeking, in part, leave to amend, paragraph 41, where there is an additional reference to "Taha al Alwani," to read "Taha Al Alwani a/k/a Dr. Tahan Jabir al' Alwani" and to amend the caption to correct a typographical error to fix "Taha Al Alwani a/k/a Dr. Taha Jabit al'Alwani" *to* "Taha Al Alwani a/k/a Dr. Taha Jabir al'Alwani."

[19] Counsel for the Dr. Al Alwani who had appeared in the *Federal* action was first contacted several weeks *after* the filing of the amended pleading containing the 'a/k/a,' seeking an acceptance of service, by way of a letter dated October 14, 2004, sent to Ms. Luque.  MacNeill para. 3.  On or about October 25, 2004, almost a month after the pleading containing the 'a/k/a' was filed with the Clerk, Mr. Hanson, another attorney for the Defendant, replied and advised that he believed that we were seeking to serve the incorrect person, notwithstanding his presence in the case, and not withstanding that his full name appeared on the face of the amended complaint.  MacNeill para. 4. A waiver of service by the Defendant was unsuccessfully sought in February.  While received, it was not responded to. MacNeill para. 5-7.  The Defendant was eventually personally served on July 29, 2005.  MacNeill para. 8..

[20] The individual who the Defendant claims the Plaintiffs' intended to sue, has a different name (Taha *Bdewi Hamid* Al Alwani) and apparently does not have a doctorate.  See, e.g., Goldman Exhibit E.  He apparently became mayor of Fallujah *after* the United States military action in that country, and there is no evidence of his participation in the conspiracy, as charged, provided by either the Defendant nor his counsel.  See, e.g., Goldman Exhibits E, F. What his position was on or before September 11, 2001, is unknown to Plaintiffs.

and incorporated herein.[21]   It is incontrovertible that he is, as pled, a "natural person" of Iraq, and our allegation is that he participated in the "acts and conspiracy described below," that is, in the Complaint.

In his declaration, Defendant admits being born in Iraq, that is, as a matter of nationality, or national origin, he is a 'natural person' of Iraq (i.e., an Iraqi), and there are numerous references, to his nationality on the web, including biographical information presumably provided by the Defendant him in connection with his participation at the World Economic Forum (WEF) of Davos, Switzerland, and the organization which he purportedly runs. Goldman Para. 3; see e.g., Goldman Exhibits A-C. While the Defendant alleges that he is a naturalized United States citizen, claiming to have moved permanently to the United States in 1984, he never alleges that he renounced his Iraqi citizenship. Curiously, in none of his own published biographical information, where he portrays his Iraqi nationality, does he represent his United States citizenship, or even his residency. See Goldman Exhibits A-D.

As to employment, on information and belief, at least at one point in time, the Defendant was an employee of Iraq. See Goldman, Exhibit B, a biographical sketch from the Word Economic Forum, copyrighted 2003 and last updated December 5, 2004, wherein it indicates that from 1963-9, he was a Lecturer of Islamic Studies, "Military Academy, Baghdad, Iraq" (and was also a lecturer at the Islamic College in Baghdad (1965-6). Thereafter he was a 'founder-member' of the Council of the Muslim World League, another Defendant in the *O'Neill*

---

[21] Fed. R. Civ. Proc. 15(a) ("leave shall be freely given when justice so requires"). *Foman v. Davis*, 371 U.S. 178, 182 (1962); *Rachman Bag. Co. v. Liberty Mutu. Ins. Co.,* 46 F.3d 230, 235 (2d Cir. 1995)...  In the particular circumstances of this extraordinarily complex case, at the present stage where discovery has not even commenced, and where this particular individual is already named in and defending two related case, the exceptions to the rule of liberal amendments (undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, and futility of the amendment) can not apply to the extremely limited amendments proposed.. See, Rule 11 (c)(1)(A) permitting withdrawal of challenged allegations..

litigation, as well as a professor in Saudi Arabia, including serving as "Legal Adviser, Interior Ministry & Lecturer in the Inst. Of Officers of Security" (1975), as well as other positions within the Kingdom, on information and belief, from 1976-1984.  Goldman Exhibit B.[22,23]

We are withdrawing, however, by way of the proposed amendment, the allegation that, the participation in the conspiracy was necessarily part of the 'course and scope of' his employment. Fed. R. Civ. Proc. 11(c)(1)(A); Fed. R. Civ. Proc. 11 advisory committee's note (1993); *Hadges v. Yonkers Racing Corp.*, 48 F3d 1320, 1328 (2d Cir. 1995).  We are not withdrawing any of the other substantive allegations in the amended pleading.[24]

### C.  THE PLAINTIFFS PROPERLY FILED THEIR MORE DEFINITE STATEMENT AND FIRST CONSOLIDATED COMPLAINT.

Defendant further contends that the Plaintiff's RICO Statement and More Definite Statement- Additional Allegations of August 26, 2005 (docket 1157, ("RICO Statement") and docket 1158 ("More Definite Statement")), their More Definite Statement-Additional Allegations of September 30, 2005 (Docket 1360), and their First Consolidated Complaint of September 30, 2005, should be disregarded in connection with the determination of the instant motion, because *inter alia*, they allegedly were not timely filed (RICO Statement, docket 1157), they were not allegedly a proper pleading because a More Definite Statement was not demanded by the Defendant (More Definite Statement), and that allegedly the First Consolidated Complaint did not comport with the Case Management Order.

---

[22] In his declaration, the Defendant indicates that he 'moved permanently to the United States in 1984' (Al-Alwani Declaration para. 3).  In his biography, Exhibit B, it indicates that he was a founding member of the IIIT in Herndon starting in 1981, which appears to overlap his time Riyadh at the Univ. of Imam Muhammad ibn Saud.

[23] In Mr. Al Alwani's declaration he declares, under penalty of perjury, that he was never an employee of the Iraq government.  Alwani para. 4.

[24] We are also proposing to add some 'and/ors'. A copy of the proposed amendment to Paragraph 36, as well as the existing Paragraph 36, is set forth in Appendix II, attached hereto and incorporated herein.

The Plaintiffs respectfully suggest that they are wrong.  Alternatively, Plaintiffs request, by way of the instant cross motion, a) reconsideration of the Court's determination of August 22, 2005, docket 1144, relative to the late filing of a RICO Statement and the applicability of CMO 2, para. 14; b) leave under Fed. R. Civ. Proc. 6(b) file a RICO Statement, and c) to strike the Defendant's instant motion as untimely.

### 1.   RICO Statement of August 26, 2005.

Following the personal service on the Defendant, in then reliance upon its consistent interpretation of CMO 2, Par. 13, Plaintiff's prepared and then filed, on August 26, 2005, both a RICO Statement, docket 1157, and a More Definite Statement – Additional Allegations, docket 1158, relative to the Defendant.

This Court, however, entered an order, on August 22, 2005, docket 1157, apparently treating all Plaintiffs other than *Federal* differently.[25]  CMO 2, Para. 13, provides that rather than forcing Plaintiffs to prepare detailed allegations as to hundreds of Defendants and file the RICO Statements prior to determining, in an orderly fashion, which Defendants, in fact, would be participating in the litigation,[26]  the RICO Statements were to be filed within the <u>later</u> of thirty (30) days after the entry of the order[27] adopting the Case Management Order *or* thirty (30) days

---

[25] In February, 2005, counsel for *Cantor-Port Authority* sought a clarification by the Court pertaining to CMO 2, para. 13, as to its applicability to Plaintiffs other than *Federal*.  Peter Kahan, Esquire, by way of a letter addressed to the Court dated July 18, 2005, in response and on behalf solely of his client, to a letter submitted by Sean Carter, Esquire, dated July 15, 2005, on behalf of all of the Plaintiffs, seeking an extension of the then July 31, 2005 amendment as of right deadline, raised the issue of the RICO Statements applicability to other defendants apparently for the first time. This particular issue was responded to, on behalf of the Plaintiffs, by Jerry S. Goldman, Esquire, by way of a letter dated July 19, 2005.  Mr. Kahn submitted another communication dated August 8, 2005, which was responded to by Mr. Goldman on August 9, 2005.

[26] Many of the Defendants who were served in the *O'Neill* cases, as well as those brought by the co-Plaintiffs have failed to appear.

[27] The filing of RICO Statements were stayed during the pendency of the negotiations and the Court's decision on the CMO.

16

after the filing of an entry of appearance by counsel in that particular action.[28]  It also provided,

consistent with the case law that the RICO Statement would be deemed an amendment to the

Complaint. See, e.g., *McLaughlin v. Anderson*, 962 F. 2d 187, 195 (2d Cir. 1992); *Moses v.*

*Martin*, 360 F. Supp. 2d 533, 539 n. 22 (S.D.N.Y. 2004); *Allen v. New World Coffee, Inc.,* 2001

U.S. Dist. LEXIS 3269, n. 3 (S.D.N.Y. 2001); *Dempsey v. Sanders,* 132 F. Supp. 2d 222, 224

(S.D.N.Y. 2001); *Mega Tech Int'l. Corp. v. Al-Saghyir Establishment*, 1999 U.S. Dist. LEXIS

6381 (S.D.N.Y. 1999); *A. Terzi Prods. V. Theatrical Protective Union, Local No. One,* 2 F.

Supp. 2d 485, 509, n. 16 (S.D.N.Y. 1998).

      Accordingly, the instant filing as to this particular Defendant may not have been timely.

      Plaintiff's are respectfully requesting that this Court reconsider its decision in this regard

(and as set forth in the Plaintiffs' proposal in the pending CMO 4).[29]  Plaintiffs' believe that such

a determination as to the 'timing' is unduly prejudicial to the Plaintiffs; pose an horribly

excessive and unnecessary burden on the Plaintiffs in light of the notice pleading requirements

and due to the fact that it is not known, after the filing of the pleadings in this case as to who

among the hundreds of defendants in this complex case would appear to defend; is inappropriate

in a case such as this, consolidated under the Multi-District Litigation rules, to treat one Plaintiff

differently than the others; and, is contrary to the generally uniform interpretation of the CMO 2,

para. 14, as utilized and relied upon by various other plaintiffs and defendants as reflected in the

court approved stipulations for over a fourteen (14) month period of time.  Moreover, the *O'Neill*

---

[28] While counsel for the Defendant haves filed a motion in the instant action, and filed entries of appearance in the *Federal* action, they did not file an entry of appearance in the *O'Neill* matter.  Procedurally, they could not have, until on or after July 29, 2005, when their client was served.

[29] In the recent submissions pertaining to CMO 4, this issue was raised by the Plaintiffs and responded to by the Defendants.

plaintiffs could not have complied with the Court's individual rules if it wanted to.[30]  This case was filed in August, 2003, in the District of Columbia and was not placed upon this Court's docket until March, 2004.  That is, upon being placed on the docket, it was already in 'default' of the Individual Rule's requirement to file a RICO Statement within twenty (20) days of the filing of a pleading.  Moreover, all filings were being stayed during the pendency of the discussions over CMO 2.  Plaintiffs request reconsideration of the August ruling in light of same.

Alternatively, as the Plaintiffs have demonstrated good cause, leave is sought to file a RICO Statement, if the Court deems it necessary, pursuant to Rule 6(b).[31]

Should this Court deny both of those requests, the Plaintiffs are withdrawing the filing RICO Statement only of August, 2005, and with regard to the RICO Count, will rely solely upon the allegations contained in the September 30, 2005 filings.  Such action would not preclude the pursuit of the RICO claim by the plaintiffs. The Second Circuit has taught us that a RICO Statement is, at best, a case management tool, and can not be utilized to enhance the notice pleadings under Rule 8.  *Commer. Cleaning Servs., L.L.C. v. Colin Serv. Sys.,* 271 F. 3d 374, 387 (2d Cir. 2001); *Wagh v. Metris Direct, Inc.,* 348 F. 3d 1101, 1107-1109 (9th Cir. 2003), *cert. denied*, 541 U.S. 1043 (2004); *Mendoza v. Zirkle Fruit Co.,* 2000 U.S. Dist. LEXIS 21126 (D. Wash. 2000).

As to the contention that the matters contained within the RICO Statement/More Definite Statement are not part of the Pleadings, we suggest that irregardless of this Court's determination as to the applicability of CMO 2, Para. 14 to the *O'Neill* litigation, they are to be treated as

---

[30] The undersigned, while counsel of record in the *Al Baraka* and *Kingdom of Saudi Arabia* cases, initially serving as local counsel starting on March 11, 2004, did not  enter an appearance on *Iraq* until approximately some time in September, 2004.

[31] The Plaintiffs have included all of the allegations set forth on the Court's website relative to RICO Statements in the More Definite Statement/Additional Allegations.

18

pleadings.   There is uniform judicial precedent that RICO Statements are part of pleadings. *McLaughlin v. Anderson,* 962 F. 2d 187, 195 (2d Cir. 1992); *Moses v. Martin*, 360 F. Supp. 2d 533, 539 n. 22 (S.D.N.Y. 2004); *Allen v. New World Coffee, Inc.,* 2001 U.S. Dist. LEXIS 3269, n. 3 (S.D.N.Y. 2001); *Dempsey v. Sanders,* 132 F. Supp. 2d 222, 224 (S.D.N.Y. 2001); *Mega Tech Int'l. Corp. v. Al-Saghyir Establishment*, 1999 U.S. Dist. LEXIS 6381 (S.D.N.Y. 1999); *A. Terzi Prods. V. Theatrical Protective Union, Local No. One,* 2 F. Supp. 2d 485, 509, n. 16 (S.D.N.Y. 1998).   Moreover, the allegations pertaining to the RICO causes of action are amply pled in the filings of September 30, 2005.

### 2.   The Filing of the More Definite Statement- Additional Allegations of September 30, 2005 Was Proper and Are Part of the Pleadings.

Defendant further contends that the More Definite Statement- Additional Allegations filed on or about September 30, 2005 (docket 1360) were improper, as they purported did not comport with the Federal Rules of Civil Procedure.

Defendant is correct when he claims that he never moved, under 12(e) for a More Definite Statement.   However, he clearly claimed that he believed that the Plaintiffs had served the wrong al Alwani (a claim which he is repeating in the instant motion), and Plaintiff had the right, to supplement the pleading to avoid such a misinterpretation.   Moreover, CMO 2, para. 13, unequivocally states that

> "[p]laintiffs may file more definite statements and/or additional allegations against existing Defendants by filing statements to this effect, which will be treated and accepted as pleadings and deemed amendments to the previously-filed Complaints or Amended Complaints, in lieu of filing an additional Amended Complaint."

Plaintiffs in their filings, including the one applicable to the Defendant, specifically relied upon such provision in the CMO.

Such provision of the CMO simply provided a means to better manage a case of this complexity and is within the discretion of the Court in the proper implementation of the liberal amendment provisions of Rule 15..  If Plaintiffs were allowed to file a full amended complaint, certainly they could have filed, prior to the answer, supplemental allegations relative to the Defendant.

### 3.   The Submission of the First Consolidated Complaint of September 30, 2005 Was Proper.

CMO 2, Paragraph 13 refers to the filing by September 30, 2005,[32] of "an amended complaint that includes all amendments made prior to that date, whether made pursuant to Rule 12(c) *or otherwise.*" (emphasis added).   Prior to September 30, 2005, Plaintiff had filed in the instant case and the companion O'Neill prosecutions, a number of amendments to the complaints, in a variety of forms.  In certain instances, including in the *O'Neill - Iraq* case, the Complaint was amended (e.g., the December, 2004 amendment adding IRAN and certain other parties).  In many other instances, in this and the companion cases, Plaintiffs, in accordance with CMO 2, Para. 13, 14, and the Court's Individual Rules, filed a number of RICO Statements and More Definite Statements- Additional Allegations.

In response to CMO 2, para. 13, on September 30, 2005, Plaintiffs served, electronically, a copy of the First Consolidated Complaint on counsel, and then delivered a hard copy of a First Consolidated Complaint in each of the three (3) *O'Neill* cases to the Clerk of the District Court, and received a time-stamped copy, in accordance with the District Court's procedural requirements.[33]   Such consolidated complaints included each and every allegation which the

---

[32] The original date was July 31, 2005.  Upon a joint application of the Plaintiffs, the Court extended same to September 30, 2005.

[33] In response to a request by the Clerk, we subsequently assembled on a CD-ROM a PDF version of each of the three (3) First Consolidated Complaints and have sent them in to the Clerk.

Plaintiffs have in each of the respective complaints.  As for 'dismissed' Defendants, a copy of the then-existing RICO statement was attached.  As for the others, where one had already been filed and served, the More-Definite Statements-Additional Allegations of late September, 2005[34] were substantially[35] included.

The submission fully complied with the potential requirements of the CMO 2 as to the filing of a Consolidated Complaint.  It further fully complied with the requirements of Rule 10, as there were separate statements in numbered paragraphs and Rule 10(c) specifically permits the adoption of reference of items in another part of the pleading (let alone another pleading or other filing), as well as the use of exhibits.  The Defendant's claim is devoid of merit.

### 4.   The Motion of the Defendant is Untimely.

Defendant, having been served on July 29, 2005, neither filed a response to the Complaint within twenty (20) days as required in Rule 12, nor move, as mandated under Rule 6(b), for an enlargement of time based upon good cause and lack of willful neglect.  Rather, he chose to attack Plaintiff's counsel, file a response in the *New York Marine* matter, threaten Rule 11 sanctions, and wait until November 4, 2005 to file the instant motion.   His motion should be stricken as untimely.

---

[34] As indicated above, in light of the potential uncertainty as to the effectiveness of the previously filed RICO Statements, the allegations of contained within those documents were incorporated into More Definite Statements/Additional Allegations pursuant to CMO 2, para. 13, served and filed.  We did NOT include, in the respective First Consolidated Complaints both the RICO Statement and the More Definite Statement/Additional Allegations, so as to avoid burdening the Court and defense counsel with duplicative allegations.

[35] The substantive allegations contained within the Exhibits and the those in the More Definite Statements filed at the end of September are identical.  Instead of listing all of the victims, in each and every Exhibit (as was done with the RICO Statements and the More Definite Statements), we filed, a Victims List (Exhibit A), and incorporated that into each of the separate Exhibits, by reference. See, e.g., Exhibit F, para. 3.

To the extent that it is determined that the More Definite Statements – Additional Allegations were not properly filed, in any event, as the allegations are contained within the Complaint, they must be considered as part of the pleadings.  See, e.g., FCC para. 220 ("Attached hereto as Exhibits and incorporated herein as if set forth at length are the following More Definite Statements/Additional Allegations…..").

The amended Complaint is the legally effective pleading for 12(b)(6) purposes.  *Harris v. City of New York*, 186 F.3d 243, 249 (2d Cir. 1999).

As set forth above, after he declined to have his counsel accept process, or execute a waiver of process, Defendant was personally served in Virginia.  His counsel thereupon sought to negotiate a schedule of filings.   While he was desirous of extensions for his filings, notwithstanding the fact that he had already been engaged relative to *Federal* and *New York Marine,* his counsel was unwilling to agree to either of the requests of the Plaintiff's – i.e., a schedule re: the filing of RICO Statements and a waiver of a service defense.  As to the latter, the Plaintiff believed then, and believes now, that there was no colorable argument for a deficiency of service, but withdrew that request.  Notably, Defendant never raised that issue in the instant motion.  As to the former, as this Court is well aware based upon the plethora of scheduling stipulations signed by the parties and approved by the Court, a provision for scheduling of the filing of RICO Statements was quite common in the instant litigations.   Negotiation involves discussion and compromise.   Defendant requested significant time to respond so as to avoid a default under the strictures of Ruled 12 and 55; Plaintiff's asked for agreement relative to the timing of the filing of a RICO Statement.  Plaintiff was willing to offer an accommodation to the Defendant's request; Defendant preferred to threaten and cajole.   Given this unfortunate stalemate, Defendant could have either promptly filed a response, or, pursuant to Rule 6(b) sought, from this Court, an extension based upon good cause and excusable neglect.   Instead, he chose to wait.  Accordingly, in the absence of such a motion, and particularly in light of the nature of the motion, concentrating his claims relative to the filing of RICO Statements, a More Definite Statement- Additional Pleadings, and the First Consolidated Complaint, rather than on the substance of the pleadings,[36] the Defendant's Motion should be stricken.

---

[36] Compare, for example, the instant motion with his Motion to Dismiss filed with regard to the *New York Marine* action, a week earlier. Docket 1450.

### D.  THE PLAINTIFFS HAVE ADEQUATELY PLED THEIR CAUSES OF ACTION.

The Defendant allocates a mere two (2) pages in his attempt to dismiss the Complaint for 'substantive grounds.'

Plaintiffs' position as to the applicable legal principals have been adequately addressed in other filings submitted to this Court, including the recent Memorandum of Law in Opposition to the *Banco Del Gottardo* Motion to Dismiss,  and are incorporated herein by reference, as well as the upcoming Plaintiff's Memorandum of Law being filed as part of a consolidated response relative to the Defendant's filing in the *New York Marine* case.

Plaintiff recognizes this Court's decision as to the Complaint brought by *Federal,* and respectfully disagrees with the Court's determination of the law, and application to the pleadings.

We suggest that even if such legal determinations and application were correct, the *O'Neill* complaint contains sufficient allegations, for notice pleading purposes, to link the Defendant to this conspiracy, and be liable for its consequences.  It provides adequate notice of the claim of material support for terrorists, particularly based upon the alternative pleadings, by the O'Neill plaintiffs as to the scope of the conspiracy.   See, Appendix I, paras. 1-33, 50-61, as to the conspiracy;[37] paras. 62-9 as to the damages.  Paragraphs 34-49 of Appendix I, clearly highlight how the Plaintiffs, in their pleadings, provide this type of notice, to the Defendant herein.

In the event that this Court determines that the Plaintiffs' pleadings are insufficient, it is respectfully requested that such determination be made without prejudice, with leave to amend.

---

[37] See Exhibit G, para 2 defining the wrongdoers as the Defendants in the 3 O'Neill cases, the 'other cases brought by other plaintiffs' in the instant litigation, 'and others.' See, also, caption listing a number of 'John Does'.  It is the intention to include Hamas, which is also a Defendant in certain of the other 9/11 actions, including *Ashton*.

## <u>CONCLUSION</u>

For the reasons set forth herein, and as addressed at argument, which is requested, the Defendants' Motion should be denied, with prejudice. Alternatively, as requested and if required, Plaintiffs' cross motion should be granted, and if required under Rule 12(b)(6), leave to replead should be granted.


Dated:  November 18, 2005

Respectfully submitted

LAW OFFICES OF JERRY S. GOLDMAN &
        ASSOCIATES, P.C.

By: _/s/_____
        JERRY S. GOLDMAN, ESQ. (JG8445)
        FREDERICK J. SALEK, ESQ. (FS8565)
        GINA M. MAC NEILL, ESQ. (GM0581)

*Attorneys for the Plaintiffs,*
*Estate of John P. O'Neill*, et al.,

        111 Broadway, 13TH Floor
        New York, N.Y. 10006
        212.242.2232

24

# APPENDIX I:  SUMMARY OF PLEADINGS REFERENCES TO TAHA JABIR AL ALWANI

## The Conspiracy.[38],[39]

1.   On September 11, 2001, approximately 3,000 individuals were murdered in New York, Virginia and Pennsylvania. The attacks of September 11, 2001, were not isolated incidents, but rather were the culmination of a conspiracy among the al Qaida network and the Defendants to attack the United States and murder United States citizens and to disrupt economic activities within the United States and of the victims of the attacks. Burnett 228, Continental Casualty 27, 429, Federal Ins. First Amended Complaint ("FAC") 72; N.Y. Marine Second Amended Complaint ("NYMSAC") 44, 45, 508; O'Neill v. Iraq First Consolidated Complaint ("O'Neill Iraq FCC" or "FCC") ¶ 1; O'Neill v. Al Baraka First Consolidated Complaint ("O'Neill Al Baraka FCC") ¶¶ 1, 6-10 22-5, Tremsky ¶ 120, WTC ¶ 365.

2.   The conspirators consist of the Defendants named in the in the three O'Neill actions (O'Neill v. Al Baraka, et al, 04 CV 1923 (RCC), O'Neill v. Kingdom of Saudi Arabia, 04 CV 1922 (RCC), O'Neill v. Iraq, 04 CV 1076) (with such complaints also including 'John Does', as well as the cases brought by the other plaintiffs in *In Re Terrorist Attacks of September 11, 2001,* 03-MDL- 1570 (RCC) and others. O'Neill Iraq FCC, Exhibit G, ¶ 2.

3.   The complaint lists certain John Doe Defendants who performed acts which resulted in acts of terrorism, including September 11.  O'Neill Iraq FCC ¶62; O'Neill Al Baraka FCC ¶27.

4.   On the morning of September 11, 2001, certain of the conspirators hijacked four (4) aircraft flying within the United States, causing the damages described in the Complaint. O'Neill Iraq FCC ¶ 3-7; O'Neill Al Baraka FCC ¶ 6-9.

5.   All 19 hijackers were members of the al Qaida network. O'Neill Iraq FCC ¶ 7; O'Neill Al Baraka FCC ¶6-9.

6.   All of the hijackers received sponsorship, funding, training and other support through the al Qaida network. O'Neill Iraq FCC ¶ 7; O'Neill Al Baraka FCC ¶10.

7.   The Defendants unlawfully, willfully and knowingly combined, conspired, confederated, aided and abetted, tacitly and/or expressly agreed to participate in unlawful and tortious acts pursuant to a common course of conduct, resulting in the death and injury of Plaintiffs.

---

[38] There are references preceding the various substantive causes of actions incorporating the various paragraphs in the pleadings without setting them forth at length.  See, e.g., FCC ¶221.

[39] The pleadings consist of the First Consolidated Complaint, filed on September 30, 2005, as may be amended, from time to time, pursuant to Fed. R. Civ. Proc. 15.  Incorporated into the First Consolidated Complaint are the various other pleadings filed in the matter, such as the RICO Statements and the More Definite Statements/Additional Allegations (MDS).  These items, all separately docketed, were physically appended to the hard copy of the FCC filed with the clerk on the evening of September 30, 2005, and emailed to counsel of record. Paragraph 220 of the FCC lists these various Exhibits.  The More Definite Statement-Additional Allegations pertaining to the instant Defendant were, pursuant to FCC Para. 220 (g), appended as Exhibit G (hereinafter cited as "MDS" or "Exhibit G").

O'Neill Iraq FCC ¶¶ 23, 38, 41, 63, 83, 250, 251; Burnett ¶¶ 649, 650, 654, Continental Casualy ¶ 26, Federal Insurance FAC ¶ 622.

8.      The Defendants conspired with and agreed to provide material support, funding, sponsorship and/or resources to al Qaida, Osama bin Laden, and the sponsors of terror. O'Neill Iraq FCC ¶ 38; Continental Casualty ¶¶ 26, 603, Federal Insurance FAC ¶¶ 66, 632; NYMSAC ¶ 509.

9.      Absent the material support and resources provided by the co-Defendants, both directly and indirectly, al Qaida would not have possessed the financial resources, physical assets, membership base, technological knowledge, communication skills, and global reach required to conceive, plan and execute the September 11th Attack. Federal Insurance FAC ¶ 74.

10.     The Defendants engaged in common, concerted and conspiratorial acts, efforts, transactions, and activities designed and intended to cause a terrorist attack on the United States, its citizens and society, and attack those foreign citizens found within the United States, resulting in the harm to Plaintiffs, which was done pursuant to and furtherance of this common scheme. O'Neill Iraq FCC ¶ 252; Burnett, Introduction, page 217; Continental Casualty ¶¶ 605, 613, 617; Federal Insurance FAC ¶¶ 615, 616, 617, 619, 620; NYMSAC ¶¶ 509-511; O'Neill Al Baraka FCC ¶ 144.

11.     Defendants' concert of action and conspiracy to support and promote Osama bin Laden and al Qaida were a proximate cause of the September 11, 2001, terrorist attacks that killed and injured the Plaintiffs. Burnett ¶ 649; Continental Casualty ¶¶605, 613, 617; Federal Insurance FAC ¶¶594, 608, 617, 620, 622, 623, 624, 634; NYMSAC ¶¶511, 515, 518, 531; O'Neill Iraq FCC ¶ 253;  O'Neill Al Baraka FCC ¶ 144.

12.     Certain of the conspirators are banks, financial organizations, and companies, located throughout the world, who conspired with Osama Bin Laden a/k/a Usama bin Laden (OBL) and al Qaida in order to support and finance their terrorist activities, including, without limitation, the September 11, 2001 attacks. O'Neill Iraq FCC ¶ 38; O'Neill Al Baraka FCC ¶22

13.     Certain of the conspirators are businessmen, individuals, bankers, financiers, organizations, and/or operatives who conspired with OBL and al Qaida to raise, launder, transfer, distribute, and hide funds for OBL and al Qaida in order to support and finance their terrorist activities including, but not limited to, the September 11 attacks or otherwise assisted them in their terrorist activities. O'Neill Al Baraka FCC ¶ 23.

14.     Certain of the conspirators are charities and charitable foundations which are used as terrorist fronts to mask money transfers and to provide cover for terrorist operations and operatives.  O'Neill Iraq FCC ¶¶ 38, 41; O'Neill Al Baraka FCC ¶ 24.

15.     The conspirators conspired with each other, including OBL and al Qaida to raise, launder, transfer, distribute, and hide funds for conspirators in order to support and finance their terrorist activities, including, but not limited to the September 11 attacks. O'Neill Iraq FCC ¶¶ 38, 41.

16.     The damages suffered by plaintiffs and plaintiffs' assignors, as described in greater detail herein and in the Exhibits attached hereto, were the direct and proximate result of the aforesaid pattern of racketeering activity by the Defendants, acting individually and in

26

concert with one another. Burnett ¶ 662; Federal Insurance FAC ¶ 620; O'Neill Iraq FCC ¶¶ 270-272; O'Neill Al Baraka FCC ¶¶177-180.

17.     As set forth in the pleadings, all of the Defendants conspired to commit acts of international terrorism against the United States, its nationals and allies, which conspiracy included the provision of material support and resources to al Qaida, Osama bin Laden, the hijackers, and affiliated foreign states, FTO's, persons, organizations, commercial entities and other parties.  O'Neill Iraq FCC ¶¶ 23, 251; O'Neill Al Baraka FCC ¶157.

18.     As set forth in the pleadings, all of the Defendants engaged in concerted efforts and activities designed to attack the United States and inflict harm on U.S. citizens and property. O'Neill Iraq FCC ¶¶ 250-252; O'Neill Al Baraka FCC ¶158.

19.     As set forth in the pleadings, the conspiracy resulted in the September 11, 2001 terrorist attacks. O'Neill Iraq FCC ¶ 253; O'Neill Al Baraka FCC ¶159.

20.     The September 11th attack was a direct, foreseeable, and intended product of the conspiracy among the Defendants, as set forth in the pleadings, to commit acts of international terrorism against the United States, its nationals and allies.  Federal Insurance ¶¶ 629, 631; O'Neill Iraq FCC ¶ 272; O'Neill Al Baraka FCC ¶¶160, 163, 167.

21.     As a result of the Defendants' conspiracy, Plaintiffs and the Class have suffered damages as fully set forth in the paragraphs preceding O'Neill Al Baraka FCC ¶ 161, which were incorporated by reference. O'Neill Al Baraka FCC ¶161.   As a result of the Defendants' conspiracy, Plaintiffs and the Class have suffered damages as set forth in O'Neill Iraq FCC ¶¶ 254, 270, 271.

22.     Through the material support and resources provided to al Qaida, the Defendants aided and abetted al Qaida, OBL, and the other conspirators in their campaign to commit acts of international terrorism against the United States, its nationals and allies. O'Neill Iraq FCC ¶ 63; O'Neill Al Baraka FCC ¶ 162.

23.     OBL and the hijackers acted in concert with the other co-conspirators. O'Neill Iraq FCC ¶¶ 223, 228, 242; O'Neill Al Baraka FCC ¶165.

24.     The conspiracy among the Defendants to commit acts of international terrorism against the United States, its nationals and allies, included the provision of material support and resources to al Qaida, Osama bin Ladin, the hijackers, affiliated foreign states, foreign terrorist organizations, persons, organizations, commercial entities, and other parties. O'Neill Iraq FCC ¶ 251; O'Neill Al Baraka FCC ¶168.

25.      By virtue of their participation in the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001 attack, the Defendants negligently, intentionally, recklessly, willfully and wantonly breached duties of care owed to the Plaintiffs, the Class, and Decedents. Federal Insurance ¶642; O'Neill Al Baraka FCC ¶169.

26.     In furtherance of their conspiracy to commit acts of international terrorism against the United States, its nationals and allies, the Defendants engaged in a pattern of racketeering activity which included, without limitation: acts of murder, kidnapping, arson, robbery, and extortion; dealing in controlled substances and listed chemicals; the falsification of identification documents; the unlawful procurement, reproduction, sale and use of

27

naturalization and citizenship papers, passports and visas; the obstruction of federal and state criminal investigations; and financial institution and mail fraud.  Federal Insurance ¶ 628, O'Neill Iraq FCC ¶267; O'Neill Al Baraka FCC ¶177.

27.    The conspirators intended to cause damage to business and property and did in fact cause damage to business and property, and the damages suffered were the direct and proximate result of the pattern of racketeering activity of the Defendants, acting individually and in concert with each other. Burnett 662, O'Neill Iraq FCC ¶267; O'Neill 272; Al Baraka FCC ¶ ¶178-180.

28.    The Defendants aided and abetted al Qaida, OBL and the hijackers in their campaign to commit acts of international terrorism against the US, its nationals and allies. Federal Insurance FAC ¶ 622, O'Neill Iraq FCC ¶ 63; O'Neill Al Baraka FCC ¶162.

29.    The 9/11 attacks were the direct, intended and foreseeable product of aiding and abetting. Federal Insurance FAC ¶ 623; O'Neill Al Baraka FCC ¶163.

30.    All Defendants knew or should have known that their actions in furtherance of the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001, attacks, would result in the murder of innocent persons, leaving family members with severe and permanent physical, psychological, and emotional injuries.  Burnett ¶ 674, Continental Casualty ¶ 604, Federal Insurance FAC ¶ 606; O'Neill Al Baraka FCC ¶ 152.

31.    The actions of the Defendants in furtherance of the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001, attacks, were intentional, malicious, willful, unconscionable, reckless, and/or negligent.  Burnett ¶ 673, Federal Insurance FAC ¶ 633; O'Neill Al Baraka FCC ¶152, 169.

32.    The Enterprise is alternatively pled as Radical Muslim Terrorism, al Qaida or the International Islamic Front for the Jihad Against Jews and Crusaders.  O'Neill Iraq FCC ¶263, 264, 265; O'Neill Iraq FCC, Exhibit G, ¶6a.

33.    The attacks of September 11, which caused the deaths and damages to the Plaintiffs, constitute an act of international terrorism within the meaning of 18 U.S.C. Sec. 2331. O'Neill Al Baraka FCC  ¶¶ 139, 172.

## The Relationship between Taha Jabir al Alwani and the Conspiracy.

34. The Defendant is referred to in the caption of the FCC Complaint as "TAHA AL ALWANI a/k/a Dr. Taha Jabit al'Alwani", and is referred to as "Taha Jabir Al Alwani" in the MDS.  O'Neill Iraq FCC; O'Neill Plaintiffs' More Definite Statement /Additional Allegations as to Defendant Taha Al Alwani a/k/a Dr. Taha Jabir Al'Alwani ("MDS") Para. 22

35. The Defendant is alleged to be one of the Defendants who, along with Defendants Saddam Hussein and a long list of Iraqis, "are natural persons, subjects and/or citizens of Iraq and/or leaders, officials, agents/or employees of Iraq and/or its Intelligence Agency, and/or are the personal representatives of their estates, and, as to the agents, employees,

28

leaders and officials" who  participated in the acts and conspiracy described in the
pleadings. O'Neill Iraq FCC ¶ 36 (as amended).

36. The Defendant is alleged to be one of the Defendants who, along with Defendants
Saddam Hussein and others, "are natural persons(or the personal representatives of their
estates), subjects and citizens of Iraq and leaders, officials, agents/or employees of Iraq
and/or its Intelligence Agency or other agents or instrumentalities of Iraq and/or are
natural persons, subjects and citizens of Iran and leaders, officials, agents/or employees
of Iran and/or its Intelligence Agency or other agents or instrumentalities of Iran and/or
are natural persons (or the personal representatives of their estates), organizations, banks,
and charities located all over the world, who participated in the acts and conspiracy
described below, in their individual capacities and while acting in the course and scope of
their employment. and/or who conspired with Osama Bin Laden, Al Qaeda, Hezbollah,
Iran, and the Taliban to raise, launder, transfer, distribute, and hide funds for Bin Laden
and Al Qaeda in order to support and finance their terrorist activities including, but not
limited to, the September 11th attacks.  Some of the businesses, banks and charities
operate legitimately but also maintain a secret dual role as front organizations for
Hezbollah and Al Qaeda and actively support its terrorist activities.  Some of those
organizations are purely a sham front for Hezbollah and Al Qaeda."  O'Neill Iraq FCC ¶
41.

37. "The horrific events of September 11th were the result of a world-wide terror conspiracy
against the United States involving Defendants Saddam Hussein ….Taha Al Alwani
…[and others who] … have conspired for many years to attack the United States and
murder United States' citizens.  Defendants supported, conspired, aided and abetted,
sponsored, planned and executed the September 11th terror attacks that killed thousands
of people and injured many thousands more." O'Neill Iraq FCC ¶ 63.

38.  "Defendants Saddam Hussein … Taha Al Alwani … [and others] … caused the
extrajudicial killing of John Patrick O'Neill, Sr." O'Neill Iraq FCC ¶ 276.

39. Taha Jabir Al Alwani (Al Alawani) is President of the Graduate School of Islamic and
Social Sciences (GSISS) in Leesburg, Virginia. The Graduate School for Social and
Islamic Sciences (GSISS), trains Islamic clerics to minister to Muslim soldiers in the U.S.
military, however, it is suspected by the U.S. government of raising funds for terrorism.
O'Neill Plaintiffs' More Definite Statement /Additional Allegations as to Defendant Taha
Al Alwani a/k/a Dr. Taha Jabir Al'Alwani. Exhibit G Para. 22.

40. Al Alwani is also a founding member and president of the International Institute of
Islamic Thought ("IIIT"). The IIIT is a self-described "Islamic think tank" started by
Sami Al-Arian, who was arrested by the U.S. government and is awaiting trial on charges
that he was a key figure in the terrorist group Palestinian Islamic Jihad. MDS Para. 23.

41. Taha Jabir Alawani was publicly identified in an affidavit by U.S. Customs special agent
David Kane ("Kane") as a director of "Safa Group companies including International
Institute of Islamic Thought (IIIT), FIQH council of North America, Graduate School of

29

Islamic & Social Sciences, and Heritage Education Trust." In the affidavit, Kane wrote that "there is probable cause to believe that Alawani, along with others, conspired to commit various offenses, including the providing of material support or resources to foreign terrorist organizations in violation of 18 U.S.C. Para 2339B." MDS para. 24.

42. The Articles of Incorporation for the IIIT, dated October 8, 1980, which were included with the IIIT Application for Recognition of Exemption from Federal Income Tax (Form 1023), dated June 3, 1982, identify other individuals who were directors of WAMY, a co-Defendant, at that time. These include Dr. Taha Jaber, whom I (Kane) believe to be the same as Taha Jaber Al- Alwani, Dr. Abdul Hamid Abu Sulayman, and Dr. Jamal Barzinji." On this document Al- Alwani, Barzinji and Abu Sulayman listed their address as World Assembly of Muslim Youth, P.O. Box 5472, Riyadh, Saudi Arabia. MDS para. 25.

43. According to a second affidavit filed by Kane in the US District Court in Eastern Virginia, Al-Awani's home was listed as a location to be searched: "The Residence of Al-Alwani at 1105 Safa Street, Herndon, Virginia 1105 Safa Street in Herndon is the residence of Taha Jaber Al-Alwani, an officer and/or director of Safa Group companies including International Institute of Islamic Thought ("IIIT"), FIQH Council of North America ("FIQH"), Graduate School of Islamic & Social Sciences ("GSISS") (formerly known as the School of Islamic and Social Sciences ("SISS")) and Heritage Education Trust." MDS para. 26.

44. Kane further stated: "Various documents and videotapes obtained in Tampa searches show that Al Alwani, attended and spoke at Islamic Concern Project ("ICP") conferences with Al- Arian, Shallah, Sheik Odeh (spiritual leader and co-founder of Palestinian Islamic jihad ("PIJ")) and Sheik Rahman (the "Blind Sheik" convicted of conspiracy to blow up New York tunnels and the United Nations in New York in October 1995). Inasmuch as ICP conferences were, in essence, PIJ conferences, I know that Al-Alwani has long been a supporter of PIJ." MDS para. 27.

45. Additionally, Kane said, "In October 1999, a confidential asset of the FBI, who has provided reliable information in the past, furnished the Washington Field Office of the FBI a copy of a fatwa 36 (declaration) signed by Al-Alwani at some point between December 1988 and November 1989, proclaiming the truth by the powers invested in us by Allah, that Jihad is the only way to liberate Palestine; that no person or authority may settle the Jews on the land of Palestine or cede to them any part thereof, or recognize any right therein for them." MDS para. 28.

46. Plaintiffs herein incorporate by reference throughout this document the factual averments and arguments which are contained within its More Definite Statement Applicable to WAMY, relating to *Estate of John P. O'Neill, et al. v. Al Baraka, et al.*, 04-CV-1923 (RCC).

47. Public documents show that the SAAR network was the primary backer of the PIJ front groups in the United States, World and Islam Studies Enterprise ("WISE") and Islamic Concern Project ("ICP"). MDS para. 29.

48. In fact, previously released correspondence and bank checks reveal that SAAR affiliates IIIT and Safa Trust funneled tens of thousands of dollars to the PIJ fronts. Al Alwani, in his capacity as President of the International Institute of Islamic Thought and an officer of the Heritage Education Trust and Safa Trust, has committed multiple acts of conspiracy to commit murder and arson, money laundering, tax fraud, Travel Act violations, filing a false tax return, and impeding and impairing the collecting of federal taxes, all in furtherance of the Enterprise's common goals and ultimate plan of launching an attack on America. MDS para. 30.

49. As the foregoing demonstrates, Al Alwani thereby knowingly has, for a period of many years, provided critical financial and logistical support to al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders, to support the terrorist organization's global jihad. The September 11th Attack was a direct, intended and foreseeable product of Al Alwani's participation in the jihadist campaign for al Qaida, and/or Radical Muslim Terrorism, and/or the International Islamic Front for the Jihad Against Jews and Crusaders. MDS para. 31.

## Certain Additional Allegations Material to the RICO Counts, and Otherwise, in the Complaint.

50. At all relevant times, all Defendants were associated with an enterprise engaged in, and whose activities affected, interstate commerce.  That enterprise, which is the association-in-fact of Defendants, functioned as a continuing unit and had an existence prior to, and separate from, perpetration of the predicate acts herein alleged. Continental Casualty ¶ 609.

51. At all times relevant hereto, each of Defendants conducted or participated in, directly or indirectly, the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961 (1) and (5) and §1962 (c).  This pattern of racketeering activity entailed at least two acts of racketeering activity by each Defendant, one of which occurred after the 1970 effective date of RICO, and the last of which occurred within ten years after the commission of a prior act of racketeering activity. Continental Casualty ¶ 610.

52. In furtherance of their conspiracy to commit acts of international terrorism against the United States, its nationals and allies, the Defendants engaged in a pattern of racketeering activity which included, without limitation:  acts of murder, kidnapping, arson, robbery, and extortion; dealings in controlled substances and listed chemicals; the falsification of identification documents; the unlawful procurement, reproduction, sale and use of naturalization and citizenship papers, passports and visas; the obstruction of federal and state criminal investigations; and financial institution and mail fraud.  Federal Insurance ¶ 619; O'Neill Iraq FCC ¶ 267; O'Neill Al Baraka FCC ¶177.

53. The acts of racketeering activity (predicate acts) include:

   a.  acts that involve murder and robbery which are chargeable under State Law and punishable by imprisonment for more than one year and are within the scope of 18 U.S.C. § 1961(l)(B);

31

b.  acts that are indictable under 18 U.S.C. § 1028 (relating to fraud in connection with identification documents) and are within the scope of 18 U.S.C. § 1961(1)(B);

c.  acts that are indictable under 18 U.S.C. §§ 1542, 1543, 1544 and 1546 (relating to forgery, fraud and misuse of passports) and are within the scope of 18 U.S.C. § 1961(l)(B);

d.  acts that are indictable under 18 U.S.C. §§ 1956 and 1957 (relating to money laundering) and are within the scope of 18 U.S.C. § 1961(1)(B);

e.  acts that are indictable under 18 U.S.C. § 2314 (relating to interstate transportation of stolen property) and are within the scope of 18 U.S.C. § 1961(1)(B);

f.  acts that are indictable under 18 U.S.C. §§ 1512 and 1951 (relating to obstruction of justice and extortion) and are within the scope of 18 U.S.C. § 1961(l)(B); and

g.  acts that are indictable under 18 U.S.C. §§ 2332b, 2339A and 2339B (relating to acts of terrorism and providing material support to terrorism) and are within the scope of 18 U.S.C. §1961(1)(B)

O'Neill Iraq FCC, Exhibit G, ¶ 5(a); Continental Casualty ¶ 611.

54.  Each of Defendants' racketeering activities was taken for the purpose of furthering Defendants' common scheme to commit acts of terrorism against the United States, its nationals and its allies. Each racketeering act had similar purposes, involving the same or similar participants and methods of commission and had similar results. Continental Casualty ¶ 612. The pattern of racketeering is more fully set forth in O'Neill Iraq FCC, Exhibit G, ¶ 5(b), (f), and (g)

55.  As a direct and proximate result of the foregoing, plaintiffs have been damaged in their business and property in an amount to be determined at trial but believed to be in excess of $212,500,000 and such damages are trebled pursuant to 18 U.S.C. § 1964. Continental Casualty ¶ 613.

56.  The damages suffered by plaintiffs and plaintiffs' assignors, as described in greater detail herein and in the Exhibits attached hereto, were the direct and proximate result of the aforesaid pattern of racketeering activity by the Defendants, acting individually and in concert with one another. Federal Insurance ¶ 620; O'Neill Iraq FCC ¶ 272.

57.  The enterprise ("Radical Muslim Terrorism") is comprised of the Defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint, and any additionally complaint filed in this action as well as the Defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact. _Alternatively_, the enterprise ("al Qaida") is comprised of the Defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint, and any additionally complaint filed in this action as well as the Defendants in *Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al.* (SDNY 04-CV-1922 (RCC)) and *Estate of John P. O'Neill, et al. v. Iraq, et al.* (SDNY 04-CV-1076 (RCC)), and others, and is a

32

collection of the persons, organizations, businesses, and nations associated in fact. _Alternatively_, the enterprise ("International Islamic Front for the Jihad Against Jews and Crusaders") is comprised of the Defendants named in the Complaint, the First Amended Complaint, the Second Amended Complaint, and any additionally complaint filed in this action as well as the Defendants in _Estate of John P. O'Neill, Sr., et al. v. Kingdom of Saudi Arabia, et al._ (SDNY 04-CV-1922 (RCC)) and _Estate of John P. O'Neill, et al. v. Iraq, et al._ (SDNY 04-CV-1076 (RCC)), and others, and is a collection of the persons, organizations, businesses, and nations associated in fact.  _See e.g.,_ O'Neill Iraq FCC, Exhibit G, ¶ 6; O'Neill Iraq FCC ¶ 263-5.

58.    The Enterprise is described, at length, in O'Neill Iraq FCC, Exhibit G, ¶ 6(b), (c).

59.    The activities of the Enterprise relate to the commission of world-wide terrorism.  The Defendant's activities help in the funding of such Enterprise, which culminated in the Attack. The usual activities of the Enterprise include recruitment, provisioning, operating of training camps, all of which were funded by the Racketeering activities complained of.  O'Neill Iraq FCC, Exhibit G, ¶¶ 7-10.

60.    Allegations relative to 18 U.S.C. Sec. 1962(c) are specifically set forth in Paragraph 12 of O'Neill Iraq FCC, Exhibit G.

61.    The conspiracy relating to 18 U.S.C. Sec. 1962(d) is described further in Paragraph 13 of O'Neill Iraq FCC, Exhibit G.


**Consequences of the Conspiracy.**

62.    Defendants' concert of action and conspiracy to support and promote Osama bin Laden and al Qaida were a proximate cause of the September 11, 2001, terrorist attacks that killed and injured the Plaintiffs. Burnett, Introduction, page 217; Continental Casualty ¶¶ 605, 613, 617; Federal Insurance FAC ¶¶ 594, 608, 617, 620, 622, 623, 624, 634; NYMSAC ¶¶ 511, 515, 518, 531; O'Neill Iraq FCC ¶¶ 253, 272; O'Neill Al Baraka FCC ¶¶ 140, 144, 170, 173.[40]

63.    These Defendants, located all over the world, conspired with Osama bin Laden, al Qaida, Iraq, and the Taliban to raise, launder, transfer, distribute, and hide funds for Osama bin Laden and al Qaida in order to support and finance their terrorist activities including but not limited to, the September 11th attacks. Some of the banks, companies, and charities operate legitimately but also maintain a secret dual role as al Qaida front organizations and actively support its terrorist activities and goals. Some of those organizations are purely a front for al Qaida. Federal Insurance FAC ¶¶ 80, 118, 187, 234, 361, 459, 501; O'Neill Iraq FCC ¶ 38, 41; O'Neill Al Baraka FCC ¶ 25.

64.    All Defendants knew or should have known that their actions in furtherance of the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001, attacks, would result in the murder of innocent persons, leaving family members with severe and permanent physical, psychological, and emotional injuries.  Federal Insurance FAC ¶ 606; O'Neill Al Baraka FCC ¶ 152.

---

[40] A list of the decedents is contained within Exhibit A.

65.     The actions of the Defendants in furtherance of the conspiracy to commit acts of international terrorism against the United States, its nationals and allies, including the September 11, 2001, attacks, were intentional, malicious, willful, unconscionable, reckless, and/or negligent.  O'Neill Iraq FCC ¶ 275; O'Neill Al Baraka FCC ¶153.

66.     The damages suffered by plaintiffs and plaintiffs' assignors, as described in greater detail herein and in the Exhibits attached hereto, were the direct and proximate result of the aforesaid pattern of racketeering activity by the Defendants, acting individually and in concert with one another. Federal Insurance FAC ¶ 620; O'Neill Iraq FCC ¶ 272.

67.     The Defendants intended to cause damage to business and property.  O'Neill Iraq FCC ¶ 271; O'Neill Al Baraka FCC ¶ 178.

68.     Plaintiffs suffered damage to business and property as a result of the Defendants actions.  O'Neill Iraq FCC ¶¶ 270,271; O'Neill Al Baraka FCC ¶¶ 179, 180.

69.     The resulting injuries to Plaintiffs' business or property resulting include pecuniary losses, past and future wage losses and profits, loss of business opportunities, loss of and/or damage to tangible and intangible personal and real property, loss of currency, loss of support, funeral and burial expenses, loss of prospective inheritance, and loss of other economic contributions to the Plaintiffs'/Decedents' households.  O'Neill Iraq FCC ¶¶ 271; O'Neill Al Baraka FCC ¶ 146; O'Neill Iraq FCC, Exhibit G ¶¶ 14-15.

                                                  ***

## APPENDIX II – PROPOSED AMENDMENTS TO THE FIRST CONSOLIDATED COMPLAINT

Note: Changes are marked in **BOLD**

### PROPOSED AMENDMENT NO. 1

Caption (p. 2, 13th entry)

**Current Version**

Taha al Alwani a/k/a Dr. Taha Jabit Al'Alwani

**Current Version**

Taha al Alwani a/k/a Dr. Taha Jabir Al'Alwani

### PROPOSED AMENDMENT NO. 2

Paragraph 36

**Current Version**

36. Defendants Saddam Hussein, the Estate of  Qusay Hussein, the Estate of Uday Hussein, Husham Hussein, Tahya Yassin Ramadan a/k/a Taha Yassin Ramadan, Muhammed Madhi Salah a/k/a Muhhamed Mahdi Salah, Faruq Al-Hijazi, Salah Suleiman, Ahmed Khalil Ibrahim Samir al-Ani, Habib Faris Adullah al-Mamouri, Abdel Hussein, a/k/a "The Ghost," Haqi Ismail a/k/a Haqui Ismail, Taha Al Alwani a/k/a Dr. Taha Jabir al'Alwani, Abu Agab, and Abu Waiel a/k/a Abu Aw'el a/k/a Sadoun Abdul Latif are natural persons, subjects and citizens of Iraq and leaders, officials, agents/or employees of Iraq and/or its Intelligence Agency, or are the personal

35

representatives of their estates, who participated in the acts and conspiracy described below while acting in the course and scope of their employment.

**Proposed Modified Version**

36.   Defendants Saddam Hussein, the Estate of  Qusay Hussein, the Estate of Uday Hussein, Husham Hussein, Tahya Yassin Ramadan a/k/a Taha Yassin Ramadan, Muhammed Madhi Salah a/k/a Muhhamed Mahdi Salah, Faruq Al-Hijazi, Salah Suleiman, Ahmed Khalil Ibrahim Samir al-Ani, Habib Faris Adullah al-Mamouri, Abdel Hussein, a/k/a "The Ghost," Haqi Ismail a/k/a Haqui Ismail, Taha Al Alwani a/k/a Dr. Taha Jabir al'Alwani, Abu Agab, and Abu Waiel a/k/a Abu Aw'el a/k/a Sadoun Abdul Latif are natural persons, subjects and**/or** citizens of Iraq and**/or** leaders, officials, agents/or employees of Iraq and/or its Intelligence Agency, **and/**or are the personal representatives of their estates, who participated in the acts and conspiracy described below, **and as to those employees, leaders, officials and agents only,** while acting in the course and scope of their employment **and/or position**.


**PROPOSED AMENDMENT NO. 3**

Paragraph 41, line 5

**Current Version:**

Laden, Haqui Ismail, Taha Al Alwani, Abu Agab, and Abwaiel, Osama Bin Laden

**Proposed Modified Version**:

Laden, Haqui Ismail, Taha Al Alwani **a/k/a Dr. Taha Jabir al'Alwani**, Abu Agab, and Abwaiel, Osama Bin Laden

## <u>CERTIFICATE OF SERVICE</u>

I, GINA M. MAC NEILL, ESQUIRE, do hereby certify that I served the within Plaintiffs' Memorandum of Law in Opposition to the Defendant's Motion to Dismiss, on this date, on all of the parties in the case via filing with the Court's electronic case filing (ECF) system.

Dated: November 18, 2005

_____
JERRY S. GOLDMAN, ESQUIRE

38