# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (RCC)<br>ECF Case |

This document relates to:

*Cantor Fitzgerald & Co., et al. v. Akida Bank Private Ltd., et al.*, No 04-CV-7065
*Continental Casualty Co. et al, v. Al Qaida, et al.*, No. 04-CV-5970
*Estate of John P. O'Neill, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.,* No. 04-CV-1923
*Federal Insurance Co., et al. v. Al Qaida, et al.,* No. 03-CV-6978
*Kathleen Ashton, et al v. Al Qaida Islamic Army, et al.*, No. 02-CV-6977
*New York Marine & General Insurance Co. v. Al Qaida, et al.*, No. 04-CV-6105

# PLAINTIFFS' CONSOLIDATED MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION TO DISMISS FILED BY AL SHAMAL ISLAMIC BANK

## TABLE OF CONTENTS

**Page**

INTRODUCTION....................................................................................................... 1

I.      FACTUAL BACKGROUND ............................................................... 2

    A.  Al Shamal's History................................................................................. 2

    B.  Al Shamal and al Qaida ......................................................................... 3

    C.  Adel Batterjee ........................................................................................ 6

    D.  Faisal Islamic Bank (Sudan) .................................................................. 8

    E.  Tadamon Islamic Bank. ......................................................................... 8

    F.  Islamic Investment Company of the Gulf (Bahrain).............................. 9

    G.  Dar Al Maal Al Islami Trust ................................................................. 9

II.    AL SHAMAL MISAPPREHENDS THE PURPOSE OF A MOTION
       TO DISMISS ...................................................................................... 10

    A.  Al Shamal Cannot Introduce Outside Evidence At This Stage ......... 10

    B.  Al Shamal's Knowledge Has Been Sufficiently Pled.......................... 13

III.   PLAINTIFFS HAVE PROPERLY PLED THE LEGAL CASE FOR
       AL SHAMAL'S LIABILITY........................................................... 14

    A.  Extraordinary Banking Services .......................................................... 14

    B.  There Is No Heightened Pleading Standard for Conspiracy Allegations ......................... 16

IV.   AL SHAMAL'S SPECIFIC CONTENTIONS LARGELY LACK
       MERIT ............................................................................................... 17

    A.  RICO .................................................................................................... 17

    B.  Alien Tort Claims Act.......................................................................... 18

    C.  Various Remaining Al Shamal Arguments Need Not Be Rebutted Again ..................... 19

V.    JURISDICTION IS PROPER OVER AL SHAMAL ISLAMIC BANK ...................... 19

    A.  Prior To Discovery On A Rule 12(b)(2) Motion, A Plaintiff's Prima Facie Showing
        Of Personal Jurisdiction May Be Established Solely By Legally Sufficient
        Allegations Of Jurisdiction ................................................................. 19

    B.  The Exercise of Personal Jurisdiction Comports With Due Process. ............... 21

    C.  At A Minimum, Jurisdictional Discovery Is Warranted................................. 24

VI.   CONCLUSION ................................................................................. 25

# TABLE OF AUTHORITIES
## CASES

**Page**

A.I. Trade Finance, Inc. v. Petra Bank,
        989 F.2d 76 (2d Cir. 1993)........................................................................................21

Allstate Life Insurance Co. v. Linter Group Ltd.,
        782 F. Supp. 215 (S.D.N.Y. 1992)............................................................................23

Andre Emmerich Gallery v. Segre,
        1997 WL. 672009 (S.D.N.Y. Oct. 29, 1997) ...........................................................24

Asahi Metal Industry Co., Ltd. v. Superior Court of California,
        480 U.S. 102 (1987)...................................................................................................22

Baisch v. Gallina,
        346 F.3d 366, 376 (2d Cir. 2003)..............................................................................18

Ball v. Metallurgie Hoboken Overpelt, S.A.,
        902 F.2d 194 (2d Cir.1990).......................................................................................20

Boim v. Quranic Lit. Institute,
        291 F.3d 1000 (7th Cir. 2002) ....................................................................................1

Burger King v. Rudzewicz,
        471 U.S. 462 (1985)...................................................................................................22

Busch v. Buchman, Buchman & O'Brien, Law Firm,
        11 F.3d 1255 (5th Cir. 1994) ....................................................................................21

Chance v. Armstrong,
        143 F.3d 698 (2d Cir. 1998).......................................................................................11

Chrysler Capital Corp. v. Century Power Corp.,
        778 F. Supp. 1260 (S.D.N.Y. 1991)..........................................................................24

Combs v. Adkins & Adkins Coal Co.,
        597 F. Supp. 122 (D.D.C. 1984) ...............................................................................21

DM Research, Inc. v. College of American Pathologists,
        170 F.3d 53 (1st Cir. 1999)........................................................................................16

De Falco v. Bernas,
        244 F.3d 286 (2d Cir. 2001).......................................................................................17

DiStefano v. Carozzi North America, Inc.,
    286 F.3d 81 (2d Cir. 2001).............................................................................20

Dixon v. Mack,
    507 F. Supp. 345 (S.D.N.Y. 1980)...............................................................24

Dubai Islamic Bank v. Citibank, N.A.,
    256 F. Supp. 2d 158 (S.D.N.Y. 2003)...........................................................18

Estates of Ungar ex rel. Strachman v. Palestinian Authority,
    153 F. Supp. 2d 76 (D.R.I. 2001)..................................................................21

Farmer v. Brennan,
    511 U.S. 825 (1994).....................................................................................13

First Capital Asset Management v. Satinwood, Inc.,
    385 F.3d 159 (2d Cir. 2004)..........................................................................18

Flatow v. Islamic Republic of Iran,
    999 F. Supp. 1 (D.D.C. 1998).......................................................................22

Friedman v. Hartmann,
    1994 U.S. Dist. LEXIS 9727 (S.D.N.Y. July 15, 1994)..................................18

Halberstam v. Welch,
    705 F.2d 472 (D.C. Cir. 1983).....................................................................16

IUE AFL-CIO Pension Fund v. Herrmann,
    9 F.3d 1049 (2d Cir. 1993)...........................................................................21

International Shoe Co. v. Washington,
    326 U.S. 310 (1945).....................................................................................22

Investment Properties International, Ltd. v. 10S, Ltd.,
    459 F.2d 705 (2d Cir. 1972)..........................................................................25

Jazini v. Nissan Motor Co.,
    148 F.3d 181 (2d Cir. 1998)..........................................................................20

Kamen v. America Telegraph & Telephone Co.,
    791 F.2d 1006 (2d Cir. 1986)........................................................................25

Linde v. Arab Bank, PLC,
    384 F. Supp. 2d 571 (E.D.N.Y 2005) ....................................................... 15-16

In re Magnetic Audiotape Antitrust Litigation,
    334 F.3d 204 (2d Cir. 2003) ...........................................................................20

Marine Midland Bank, N.A. v. Miller,
    664 F.2d 899 (2d Cir. 1981) ...................................................................... 24-25

Morin v. Trupin,
    832 F. Supp. 93 (S.D.N.Y. 1993) ....................................................................18

Nagler v. Admiral Corp.,
    248 F.2d 319 (2d Cir. 1957) ...........................................................................17

PDK Laboratoriess, Inc. v. Friedlander,
    103 F.3d 1105 (2d Cir. 1997) .........................................................................20

Palestine Information Office v. Shultz,
    853 F.2d 932 (D.C. Cir. 1988) ........................................................................22

Pelman v. McDonald's Corp.,
    396 F.3d 508 (2d Cir. 2005) ...........................................................................14

Phelps v. Kanoplas,
    308 F.3d 180 (2d Cir. 2002) .................................................................. 11, 13-14

Salinas v. United States,
    522 U.S. 52, 65 (1997) ...................................................................................18

SEC v. Carrillo,
    115 F.3d 1540 (11th Cir. 1997) ......................................................................21

Simmons v. Abruzzo,
    49 F.3d 83 (2d Cir. 1995) ...............................................................................17

Simon v. Philip Morris, Inc.,
    86 F. Supp. 2d 95 (E.D.N.Y. 2000) ................................................................24

Swierkiewicz v. Sorema NA,
    534 U.S. 506 (2002) ................................................................................. 13-14

In re Terrorist Attacks on September 11, 2001,
    349 F. Supp. 2d 765 (S.D.N.Y. 2005) ....................................................... passim

In re Terrorist Attacks on September 11, 2001,
    392 F. Supp. 2d 539, 557 (S.D.N.Y. 2005) .....................................................21

Twombly v. Bell Atlantic Corp.,
    425 F.3d 99 (2d Cir. Oct. 3, 2005) ........................................................ 16-17

United States v. Allen,
    155 F.3d 35 (2d Cir. 1998) ........................................................................17

Warren v. District of Columbia,
    353 F.3d 36 (D.C. Cir. 2004) ....................................................................13

Woodford v. Community Action Agency,
    239 F.3d 517 (2d Cir. 2001) ......................................................................11

World-Wide Volkswagen Corp. v. Woodson,
    444 U.S. 286 (1980) ..................................................................................22

Wynder v. McMahon,
    360 F.3d 73 (2d Cir. 2004) ........................................................................11

## STATUTES

Alien Tort Claims Act, 28 U.S.C. § 1350 ................................................................18

Anti-Terrorism Act, 18 U.S.C. § 2331 et seq ...............................................21-22
Racketeer Influenced and Corrupt Organizations Act ("RICO"),
    18 U.S.C. § 1961 et seq...........................................................17-18, 21-22

Torture Victims Protection Act ("TVPA"), 28 U.S.C. § 1350 ....................................19

Fed. R. Civ. P. 8 ...........................................................................................13, 16

Fed. R. Civ. P. 12 .........................................................................................19, 25

## MISCELLANEOUS

Final Report of the Nat'l Commission on Terrorist Attacks Upon the United States .............4, 7

Moore's Federal Practice (3d Ed. 2003) ...........................................................24

Wright & Miller Federal Practice & Procedure (2d Ed. 1990)....................................13

"The only way to imperil the flow of money and discourage the financing of terrorist acts is to impose liability on those who knowingly and intentionally supply the funds to the persons who commit the violent acts." <u>Boim v. Quranic Lit. Inst.</u>, 291 F.3d 1000, 1021 (7th Cir. 2002) (citing S. Rep. 102-342 at 22) (by imposing "liability at any point along the causal chain of terrorism, it would interrupt, or at least imperil, the flow of money" for attacks on America).

Al Shamal Islamic Bank played a knowing, intentional and material role in providing Osama bin Laden with the banking services he needed to help grow al Qaida in its early years. Al Shamal helped provide Osama bin Laden with the funding, banking services and financial infrastructure that he used to establish al Qaida training camps, train terrorists, and carry out terrorist attacks against the United States. Furthermore, Al Shamal was not an *unwitting* actor in bin Laden's grand plot to attack the United States on September 1lth. Instead, it took active and deliberate steps to become a fully integrated component of al Qaida's financial and logistical infrastructure by *knowingly* maintaining accounts for individuals and organizations involved in al Qaida's plot, including bin Laden himself, and by becoming *substantially involved* in other banks and organizations actively supporting al Qaida, fully aware that the material support it provided to Osama bin Laden was assisting him and al Qaida in their goal to attack America.

Al Shamal Islamic Bank has filed a motion to dismiss which primarily questions the factual sufficiency of the pleadings against it, offering what it claims to be rebuttal "evidence". Because Al Shamal misapprehends the requirements of notice pleading and cannot demand more of Plaintiffs than do the Federal Rules of Civil Procedure, that portion of the motion must be denied.  To the extent that Al Shamal raises other allegations regarding specific causes of action, those claims too are largely without merit, and for the reasons which follow, must be denied.

## I.    FACTUAL BACKGROUND

### A.    Al Shamal's History

The government of Sudan granted approval to Al Shamal Islamic Bank (herein "Al Shamal") in April 1983 in response to a request from the Northern State Government (under the control of the National Islamic Front and Hassan Al Turabi), Al Shamal Investment and Development Company and Saleh Abdullah Kamel.[1]  The bank received an initial capitalization of USD $20 million.  Al Shamal issued subscription shares in April 1984.  The Northern State Government, Omer Abdallah Kamel, Al Baraka Investment and Development Corporation, Saleh Abdullah Kamel and Faisal Islamic Bank (Sudan) purchased shares in this initial offering.

The government granted final approval to Al Shamal in July 1988. Its provisional board included Al Baraka Investment and Development Corporation as well as co-Defendants Faisal Islamic Bank (Sudan) and Tadamon Islamic Bank.  The bank commenced operation on January 2, 1990, with paid-up capital of Ls 17,671,071 (USD $3.9 million).  As of late 2001, co-Defendants Al-Bir International Organization (Benevolence International Foundation), Faisal Islamic Bank (Sudan), Tadamon Islamic Bank and Adel Abdul Jalil Batterjee remained major shareholders in Al Shamal, with Batterjee as its Chairman.

Governor Mutasim Abdul-Rahim, Secretary General of the National Congress Party in Khartoum, as well as a spokesman for, co-founder of and major shareholder in Al Shamal Islamic Bank issued a statement in 1998 promoting jihad as envisioned by the DMI Trust, urging "all those who are able to carry a gun to join the [military training] camps....Jihad has now become an obligation that comes before any other duty." [2]

---

[1]     The facts contained within this section are generally derived from the various complaints and other pleadings including the RICO statements filed against Al Shamal Islamic Bank in this matter, including the Complaints, the Federal, O'Neill, and Cantor Fitzgerald RICO Statements, and the More Definite Statement filed by the plaintiffs in Burnett, EuroBrokers and WTC Properties (collectively "pleadings").  Attached hereto and incorporated herein as Appendix I, is cross reference table to the allegations contained within the Pleadings.

[2]     Contrary to defendant's assertion, this article does exist and is easily located via LEXIS-NEXIS.  Mohamad Osman, "Sudanese students enroll for controversial military service," Associated Press Worldstream (June 6, 1998).

Al Shamal maintains correspondent banking relationships with institutions throughout Africa, Asia, Europe, the Middle East and North America.  In New York, Al Shamal holds correspondent bank accounts at Arab American Bank, American Express Bank and Citibank.

Al Shamal shareholders also maintain significant U.S. operations.  Faisal Islamic Bank (Sudan) is a subsidiary of Dar al Maal al Islami Trust, a financial institution that maintains significant holdings and business contacts in the United States.[3]  In addition, Al Shamal chairman Adel Abdul Jalil Batterjee established Benevolence International Foundation, now a Specially Designated Global Terrorist entity, in the United States in 1992.

B.    Al Shamal and al Qaida

Al Shamal knowingly and intentionally provided financial services to al Qaida (including maintaining and servicing al Qaida bank accounts and accounts used to fund and support al Qaida), and facilitating weapons and military equipment purchases for al Qaida.

Osama Bin Laden used Al Shamal extensively during his five-year stay in Sudan.  At the invitation of Hassan Al Turabi, leader of the Sudan's governing National Islamic Front party, Bin Laden moved to Khartoum in 1991 and developed a complex set of business and terrorist enterprises.  Bin Laden built highways and other infrastructure for Al Turabi, establishing accounts at Al Shamal used by these front companies and al Qaida.  Bin Laden even provided the institution with USD $50 million in capital.  According to a 1996 State Department report, "Bin Laden and wealthy National Islamic Front members capitalized the Al Shamal Islamic Bank in Khartoum. Bin Laden invested $50 million in the bank."  As the 9/11 Commission explained:

> By the fall of 1989, Bin Ladin had sufficient stature among Islamic
> extremists that a Sudanese political leader, Hassan al Turabi, urged
> him to transplant his whole organization to Sudan. Turabi headed
> the National Islamic Front in a coalition that had recently seized
> power in Khartoum. Bin Ladin agreed to help Turabi in an ongoing

---

[3]        As detailed in the RICO statements and other pleadings already filed against DMI Trust, and incorporated herein by reference

war against African Christian separatists in southern Sudan and also to do some road building. Turabi in return would let Bin Ladin use Sudan as a base for worldwide business operations and for preparations for jihad. While agents of Bin Ladin began to buy property in Sudan in 1990, Bin Ladin himself moved from Afghanistan back to Saudi Arabia. . . .

Bin Ladin moved to Sudan in 1991 and set up a large and complex set of intertwined business and terrorist enterprises. In time, the former would encompass numerous companies and a global network of bank accounts and nongovernmental institutions. Fulfilling his bargain with Turabi, Bin Ladin used his construction company to build a new highway from Khartoum to Port Sudan on the Red Sea coast. Meanwhile, al Qaida finance officers and top operatives used their positions in Bin Ladin's businesses to acquire weapons, explosives, and technical equipment for terrorist purposes.

Final Report of the Nat'l Commission on Terrorist Attacks Upon the United States at 57.

According to Khalid Khalil Assad's biography of Osama Bin Laden, A Fighter from Mecca (2000), Bin Laden himself owned shares in several Sudanese enterprises including Al Shamal and co-Defendants Faisal Islamic Bank and Tadamon Islamic Bank.

Jamal Ahmed Al-Fadl, a former financial officer for Osama bin Laden, testified in the 1998 Africa Embassy bombings trial that Osama bin Laden and at least six al Qaida operatives held accounts in their own names at the Al Shamal Islamic Bank.[4]  Wadi el-Hage, former personal secretary to bin Laden convicted for his role in the bombings, also testified before the investigating grand jury that bin Laden kept accounts at Al Shamal Bank:

> When you for Osama bin Laden in the Sudan, how much were you paid?
>
> *$1,200 a month.*
>
> For how long did you work for him [Osama bin Laden]?
>
> *Almost two years.*
>
> What Banks did he keep his money at?
>
> *Bank Al Shamar.[5]*

---

[4]     Testimony of Jamal Ahmed Al-Fadl, U.S. v. Usama bin Laden, et al. (Feb. 6, 2001).

[5]     The El-Hage testimony was read to the jury on February 20, 2001, during the trial of U.S. v. Usama bin Laden, et al.

In responding "Bank Al Shamar," El-Hage was referring to Al Shamal Islamic Bank. Al-Fadl also described acting as courier for a cash payment from al Qaida to Abu Ali, an affiliated jihadist organization in Jordan. Al Fadl flew from Khartoum to Amman, Jordan, on a fake passport to deliver USD $100,000 in cash to the group's leadership. When asked to identify the source of the funds, Al Fadl states they came from Al Shamal Bank:

> Who gave you the money?
> *Abu Fadhl, he bring it from Shamal Bank and he bring it to me.*
> Abu Fadhl brought it from the Shamal Bank?
> *Yes.*
> Is that a bank in the Sudan?
> *Yes.*[6]

In the same trial, another former al Qaida operative stated that al Qaida used Al Shamal for operational purposes. The witness was wired USD $250,000 via the Bank of New York for the purchase of an airplane which he delivered to Osama bin Laden. Upon presenting him with keys to the aircraft, the witness received a check from Al Shamal covering compensation for the trip and expenses incurred en route. The witness took the check to Al Shamal and cashed it.[7]

The General Manager of Al Shamal acknowledged in a September 2001 press release that Osama bin Laden held two accounts in the bank. Bin Laden opened the first account on March 30, 1992, for the company Al Hijrah for Construction and Development Ltd. According to the U.S. State Department, the company worked directly with Sudanese military officials to transport soldiers and materials to terrorist training camps in the Sudan. A second account was opened in 1993 under the name of Osama bin Laden's holding company Wadi Al Aqiq, a company registered in Saudi Arabia. This company, according to the U.S. State Department, exercised a monopoly over Sudanese agricultural exports.

---

[6]     Testimony of Jamal Ahmed Al-Fadl, <u>U.S. v. Usama bin Laden, et al</u> (Feb. 6, 2001).

[7]     Testimony of Essam Al Riddi, <u>U.S. v. Usama bin Laden, et al</u> (Feb. 14, 2001).

Sen. Carl Levin testified before the Senate Committee on Banking, Housing and Urban Affairs that evidence suggests that Osama bin Laden "remains the leading shareholder" of Al Shamal through trustees and may still use the bank's facilities,[8] and a 2002 Congressional Research Service Report on Near Eastern Groups and State Sponsors estimated that "some of [Osama Bin Laden businesses in Sudan] may still be operating."

Co-Defendant Yasin Al-Qadi wired more than $22 million from bank accounts in Switzerland to al Qaida operatives and entities between 1990 and 2003. Al-Qadi transferred nearly half of these funds through Al Shamal Bank.

In March 1991, Hassan Al Turabi's government instituted the Islamic Shariah Support Fund (ISSF) in accordance with presidential decree No. (239) dated March 7, 1991. The Fund's stated purpose: "aims in general at supporting the implementation of Shariah by deepening Islamic faith and practices spreading and encouraging holy war (Jihad) ... The Fund has the following specific objectives: to support institutions, corporations and projects which aim at spreading Islamic belief... mobilization and training of the popular defence forces; and providing for martyrs' families."

The ISSF jihad fund's largest public and private contributors were Faisal Islamic Bank (Sudan), which gave 7 million Sudanese Pounds, along with Al Shamal, which contributed 7 million Sudanese Pounds, and Tadamon Islamic Bank, which contributed 5 million Sudanese Pounds to support jihadist terrorist activities in Sudan and abroad.

C.    Adel Batterjee

Co-Defendant, SDGT and Al Shamal Chairman Adel Abdul Jalil Batterjee, shareholder in person since June 7, 1999, and through Al-Bir Organization since October 13, 1998, is the Chairman of Al-Bir Saudi Organization, whose American branch, Benevolence International

---

[8]     Statement of Sen. Carl Levin, Hearing on National Money Laundering Strategy for 2001, U.S. Senate Committee on Banking, Housing and Urban Affairs (Sept. 26, 2001).

Foundation (BIF), was subject to a criminal complaint in U.S. District Court on April 29, 2002, and was itself designated for SDGT status on November 19, 2002.

BIF itself held accounts at Al Shamal Bank from 1991 until 2002. These accounts were used for the benefit of al Qaida. Co-Defendant Enaam M. Arnaout, Chairman of Batterjee's BIF, had a relationship with Osama Bin Laden and key associates dating back more than a decade, and BIF provided fundraising and logistical support to al Qaida. On February 10, 2003, Arnaout pled guilty to criminal racketeering conspiracy for defrauding BIF donors by diverting funds to pay for supplies to jihadists active in Bosnia and Chechnya.

Documents recovered from March 2002 raids of BIF's offices in Bosnia illustrate Batterjee's instrumental role in the founding of al Qaida. The government's evidentiary proffer in United States v. Enaam Arnaout, No. 02-CR-892 (N.D. Ill), describes a document called the "Golden Chain": BIF possessed in the file a handwritten draft list of the people referred to within al Qaida as the "Golden Chain," wealthy donors to mujahideen efforts. At the top of the list is a Koranic verse stating: "And spend for God's cause." The list contains twenty names, and after each name is a parenthetical, likely indicating the person who received the money from the specified donor. "Usama" appears after seven of the listings, including the listing "Bin Laden Brothers." "Baterji", referring to Adel Batterjee, appears after six of the listings.[9]

Stuart Levey, Undersecretary for the Treasury Department's Office of Terrorism and Foreign Intelligence, stated upon Batterjee's designation that "Adel Batterjee has ranked as one of the world's foremost terrorist financiers, who employed his private wealth and a network of charitable fronts to bankroll the murderous agenda of al Qaida. A worldwide asset freeze,

---

[9]    The National Commission On Terrorist Attacks Upon the United States embraced this interpretation of the document in its Final Report. See Final Report of the 9/11 Commission, Note 21 to Chapter 2. The Treasury Department has similarly concluded that the "Golden Chain" is an authentic list of al Qaida's principal individual financiers, and in fact used Adel Batterjee's inclusion in the document as a basis for designating him as a terrorist sponsor under Executive Order 13224. See December 21, 2004 Treasury Department Press Release Regarding the Designation of Adel Batterjee, available at http://www.treas.gov/press/releases/js2164.htm

including in his home country of Saudi Arabia, will deal a serious blow to this key terrorist facilitator."[10]

D.    Faisal Islamic Bank (Sudan)

The Faisal Islamic Bank (Sudan) ("FIBS") was chartered in Khartoum in 1983.  Its first director, Abd al-Rahim Hamdi, was a member of the Muslim Brotherhood and a friend of Hassan Al Turabi.  In 1983, Turabi and the National Islamic Front began to convert Sudanese banks toward an Islamic banking system.  FIBS is a major shareholder of Tadamon Islamic Bank and a founding member and principal shareholder of Al Shamal.

FIBS soon became a key bank for the National Islamic Front and for Turabi.  The bank supplied loans to the National Islamic Front and to its prominent members.  In fact, the relationship remained so close that FIBS permitted the National Islamic Front to operate, at least as late as 1992, from the penthouse of the bank's headquarters.  Through this association, Turabi's party became the best financed in the Sudan.  Former al Qaida financier Jamal Ahmed Al-Fadl testified in the 1998 Africa Embassy bombings trial that Faisal Islamic Bank in Khartoum held bank accounts for al Qaida operatives during bin Laden's time in Sudan.[11]

E.    Tadamon Islamic Bank.

Founded on November 28, 1981, Bank Al-Tadamon Al-Islami (literally translated "Islamic Solidarity Bank," herein referred to as "Tadamon Islamic Bank") became a major shareholder of Al Shamal on March 26, 1986.  Tadamon Islamic Bank continued to hold a significant stake in Al Shamal through September 11, 2001.  According to testimony from former al Qaida financier al-Fadl, Tadamon Islamic Bank held accounts for al Qaida operatives.  During the 1998 embassy

---

[10]    U.S. Treasury press release, "U.S. Treasury Designates Two Individuals with Ties to al Qaida, UBL Former BIF Leader and al-Qaida Associate Named Under E.O. 13224" (Dec. 21, 2004).

[11]    Testimony of Jamal Ahmed Al-Fadl, U.S. v. Usama bin Laden, et al., Feb. 6, 2001.

bombings trial, al-Fadl testified that Osama Bin Laden's assistant, Abdouh al Mukhlafi, used the bank at Bin Laden's behest.[12]

  F.  <u>Islamic Investment Company of the Gulf (Bahrain)</u>

  Islamic Investment Company of the Gulf, the parent of Al Shamal shareholders Tadamon Islamic Bank and Faisal Islamic Bank (Sudan), is based in Bahrain. The bank recently merged with Faisal Islamic Bank group, creating a new entity called Al-Shamil Islamic Bank, a direct subsidiary of DMI Trust.  One of Al-Shamil's directors is or was Hyder Mohammed Bin Laden, half-brother of Osama Bin Laden.

  G.  <u>Dar Al Maal Al Islami Trust</u>

  Dar Al Maal Al Islami Trust ("DMI Trust") is an Islamic financial institution founded in 1981.  Al Shamal is an indirect subsidiary of DMI Trust through its shareholders Tadamon Islamic Bank and Faisal Islamic Bank (Sudan).[13]  In their published materials, they claim that "DMI acts as a bridge between the world's leading financial centers and the Islamic countries with which the group has a special relationship."

  DMI and its related companies are purposefully structured, in part, to conceal the means by which they have promoted Islamic radical activities, including those of Osama bin Laden.

  According to its spokesmen, DMI is one important element of an "entire series of measures aimed at setting up an integrated network of institutions that will form the basis of an Islamic economy and announce to the Umma (Muslim Community) that an era of prosperity and power in the world is opening up to it, God willing, the path to paradise."  "It is in Islam in all its power and its momentum that the Lord blesses; there resides the difference between the strong Muslim and

---

[12]  <u>Id.</u>

[13]  The network of DMI companies or entities are or were also known or referred to as "Dar Al Maal Al Islami" (or "House of Islamic Money").  DMI's main subsidiaries and affiliates are DMI S.A., Islamic Investment Company of the Gulf, the Faisal Islamic Bank of Bahrain, Shamil Bank of Bahrain (also referred to as Al Shamil Islamic Bank), Faisal Islamic Bank of Sudan, Tadamon Islamic Bank, Faisal Finance S.A. (Switzerland), Faisal Islamic Bank of Egypt, and Al Shamal Islamic Bank.

the weak Muslim.  The strong engages in jihad, in the name of Islam, in order to thwart the blemishes that sully his era, while the weak renounces all form of jihad and prefers to hide away, choosing rituals as his only refuge, surrendering the way to seeds of evil."

Significantly, the DMI spokesman quoted above refers to his brothers in the banking industry as Mujahideen.  As this is the title given to warriors engaged in violent jihad, it is apparent that the DMI spokesman intended to advance a violent form of jihad through his comments, and not merely a peaceful and legitimate form of jihad (referring to a Muslim's strife or struggle for the advancement of Islam).  In a 1984 letter to the Directors of DMI Trust, Chairman Mohammed Al Faisal Al Saud reaffirmed DMI's commitment to financial jihad:  "May Allah bless your Jihad and all your efforts.  May He aid you and affirm your faith."

In addition, DMI Trust itself laundered money for al Qaida, knowingly and intentionally providing financial services to al Qaida (including maintaining and servicing al Qaida bank accounts and accounts used to fund and support al Qaida), and/or facilitating weapons and military equipment purchases and money transfers for al Qaida.

## II.      AL SHAMAL MISAPPREHENDS THE PURPOSE OF A MOTION TO DISMISS

Before this brief addresses Al Shamal's legal contentions, we must briefly concern ourselves with the factual assertions which Al Shamal attempts to wedge into its motion to dismiss, as well as its allegation that its knowledge of bin Laden's activities has been insufficiently pled.  Neither contention is meritorious.

### A.      Al Shamal Cannot Introduce Outside Evidence At This Stage

In pages 7-9 of its motion to dismiss, Al Shamal seeks to challenge the factual allegations by presenting allegedly contrary outside evidence.  Such consideration is unwarranted.

As evaluating whether Plaintiffs ultimately could prevail, the Court must accept as true the facts alleged in the Complaints and RICO Statements and draw all reasonable inferences in

Plaintiffs' favor of them.  Wynder v. McMahon, 360 F.3d 73, 77 (2d Cir. 2004); Phelps v.

Kanoplas, 308 F.3d 180, 184 (2d Cir. 2002).  Plaintiffs are not required to prove their case at the

pleading stage.  Indeed, the Second Circuit has cautioned that "[t]he pleading of evidence should

be avoided." Woodford v. Community Action Agency, 239 F.3d 517 (2d Cir. 2001).  The issue on

a Rule 12(b)(6) motion "is not whether a plaintiff is likely to prevail ultimately, but whether the

claimant is entitled to offer evidence to support the claims."  Chance v. Armstrong, 143 F.3d 698,

701 (2d Cir. 1998), aff'd on appeal after remand, 159 F.3d 1345 (2d Cir. 1998).

  A motion to dismiss is not the proper forum for debating over the relative truth of pieces of

evidence.  That said, however, the credibility and probative value of much of the "evidence"

counsel for Al Shamal has provided can be strongly questioned, especially the documents issued

under the auspices of ministries of the government of Sudan.  The Sudanese regime openly

harbored and supported Osama bin Laden and the al Qaida terrorist network for a period of many

years, during which Sudan permitted bin Laden to establish terrorist training camps within the

country and use the country as a base to grow his organization.  Despite the compelling evidence

of its complicity in al Qaida's conspiracy to attack America, the Sudanese regime has consistently

denied any links to al Qaida, and steadfastly maintained that Osama bin Laden spent his years in

Sudan as a peaceful Islamic investor with no terrorist ambitions.  As such, the Sudanese

government's calculated efforts to deny its clear support for al Qaida undermine the credibility of

the Sudanese government in any matter concerning Osama bin Laden or his terrorist organization.

Furthermore, given its direct and undeniable financial interest in Al Shamal Islamic Bank, the

government of Sudan cannot be viewed as impartial in this context.

  At most, the documents (some of which appear to date from 1985) indicate that Osama bin

Laden was not an original shareholder and subsequently did not make an open and publicly

disclosed capital contribution to Al Shamal Islamic Bank.  However, by all credible accounts, bin

Laden spent his time in Sudan developing an international network to <u>covertly</u> raise and move funds on behalf of his terrorist organization.  For a financial institution to be useful for that purpose, bin Laden could hardly have publicly disclosed his capital investment in that enterprise.

Finally, the fact that Al Shamal Islamic Bank has not been designated as a terrorist sponsor by the United States Government is by no means equivalent to a finding that Al Shamal is not guilty of sponsoring al Qaida.  As Treasury Department officials have explained during testimony before Congress, the designation process is but one of many tools available to the United States government when seeking to modify the behavior of terrorist sponsoring organizations.  For a variety of reasons, the Policy Coordinating Council, which makes the final determination as to whether designation represents the appropriate strategy, frequently declines to formally designate organizations even though the Treasury Department has assembled compelling evidence of their involvement in sponsoring terrorist activity.  This Court recognizes that reality, as reflected by the denial of the Motions to Dismiss of several non-designated entities, including that of the International Islamic Relief Organization.[14]

In short, the "evidence" offered by Al Shamal cannot be considered at all; even if it were considered, it does not absolve Al Shamal of liability here, as Section III will review.

---

[14]     Moreover, the "shareholder records" presented by counsel for Al Shamal are rife with contradictions.  The "certified" audit by Ahmed Osman & Co. purportedly verified that Osama bin Laden's companies, al Hijra Construction and Wadi el Aqiq Company, did not hold accounts at al Shamal Islamic Bank at any time between 1990 and 2002.  This is not surprising.  Shareholders, investors and account holders do not often show up in financial statements and final accounts.

Moreover, in his letter to Senator Carl Levin, A. Hassan of Al Shamal Islamic Bank's legal department specifically acknowledged that both companies held accounts at Al Shamal Islamic Bank, and that the bank executed transactions on their behalf.  Our research indicates that Al Shamal has affirmed that both companies held accounts at the Bank in previous statements as well.  Thus, the weight of the evidence appears to establish that Al Shamal did provide banking services to al Qaida front companies in which Osama bin Laden had a disclosed interest.  Similarly, whereas Al Shamal has previously identified Adel Batterjee as a "principal" shareholder of the Bank, his name does not appear to be included on the list of shareholders set forth within the documents provided.

B.      Al Shamal's Knowledge Has Been Sufficiently Pled

Al Shamal claims that knowledge and causation have not been averred sufficiently.  This is incorrect.  In its decisions in the post-Swierkiewicz era,[15] the Second Circuit has consistently and uniformly read the notice pleading standards to hold that a plaintiff is not required to plead particularized facts regarding a defendant's state of mind.  For example, in Phelps v. Kanoplas, the Second Circuit reversed a district court ruling which had dismissed a complaint for failure to plead specific facts in support of allegations of the defendant's knowledge, holding instead that such a heightened pleading standard was "unwarranted" under Fed. R. Civ. P. 8(a).  308 F.3d 180, 186 (2d Cir. 2002).  "A plaintiff's allegation of knowledge is itself a particularized factual allegation, which he will have the opportunity to demonstrate at the appropriate time 'in the usual ways'."  Id. at 187 n. 6 (citing Farmer v. Brennan, 511 U.S. 825, 842 (1994)).

As the Phelps court further instructed: "However unlikely it may appear to a court from a plaintiff's complaint that he will ultimately be able to prove an alleged fact such as mental state, the court may not go beyond Fed. R. Civ. P. 8(a) to require the plaintiff to supplement his pleadings with additional facts that support his allegation of knowledge either directly or by inference." Phelps, at 186-87.  Instead, the court held, the weight of the evidence can only be assessed at the time of summary judgment proceedings.  Phelps at 187.[16]

More recently, in Pelman v. McDonald's Corp., 396 F.3d 508 (2d Cir. 2005), the Second Circuit again vacated a district court's 12(b)(6) dismissal and reiterated the minimal pleading standards to be applied.  In Pelman, the district court had dismissed because, it had ruled, plaintiffs

---

[15]      Swierkiewicz v. Sorema NA, 534 US 506 (2002).

[16]      This view is shared by the U.S. Court of Appeals for the District of Columbia Circuit, which has sharply disagreed with protests that a plaintiff's allegations were too "conclusory".  In Warren v. District of Columbia, 353 F.3d 36 (D.C. Cir. 2004), the D.C. Circuit employed nearly identical reasoning to that of Phelps in reversing the dismissal of a complaint in which the plaintiff had failed to plead "facts" establishing knowledge.  Applying the "short and plain statement of the claim" standard from Rule 8(a), the Court held:  "It is of no moment that [plaintiff's] allegation of actual or constructive knowledge on the part of the District was conclusory.  Many well-pleaded complaints are conclusory.  And while we do not have to accept conclusions of law as true, conclusions of fact are another matter."  Id. at 39 (citing 5 Wright & Miller Federal Practice & Procedure § 1218 (2d ed. 1990)).

had failed to "draw an adequate causal connection between their consumption of McDonald's food and their alleged injuries." Id. at 511. The Second Circuit rejected this approach. It held that the information the district court found to be missing in the Complaint was "the sort of information that is appropriately the subject of discovery, rather than what is required to satisfy the limited pleading requirements of Rule 8(a), Fed. R. Civ. P." Id. at 512. Quoting the unanimous Supreme Court ruling in Swierkiewicz, the Court reminded:

> This simplified notice pleading standard of Rule 8(a) relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims. The provisions for discovery are so flexible and the provisions for pretrial procedure and summary judgment so effective, that attempted surprise in federal practice is aborted very easily, synthetic issues detected, and the gravamen of the dispute brought frankly into the open for the inspection of the court.

Pelman, 396 F.3d at 512 (quoting Swierkiewicz, 534 U.S. at 512-13).

## III. PLAINTIFFS HAVE PROPERLY PLED THE LEGAL CASE FOR AL SHAMAL'S LIABILITY

Al Shamal disputes whether the provision of "ordinary banking services" to Osama bin Laden and Al Qaida could lead to liability, and whether bin Laden's use of the bank or any other investor's behavior could lead to liability. Beyond that, Al Shamal raises specific questions regarding the causes of actions pled here. We now address each contention in turn.

### A.   Extraordinary Banking Services

Al Shamal's pervasive support of Osama bin Laden through the years, as listed above, is far more than mere "ordinary banking services." Given that this court must accept plaintiff's pleadings as true for purposes of ruling on this motion, it must adjudicate these claims based on the facts as pled. Plaintiffs have alleged that the ruling National Islamic Front of the Sudan and the Northern State Government knowingly and consciously collaborated with bin Laden to provide him with a safe haven for hosting terrorist camps and building al Qaida's infrastructure

while using financial institutions like Al Shamal Islamic Bank to build and distribute capital, in exchange for bin Laden's assistance with local construction projects.

Contrary to the cases cited by Al Shamal, there certainly can be civil liability in this jurisdiction for the knowing provision of such financial services to avowed terrorists. In a recent Eastern District of New York case, Arab Bank was alleged to have provided material and financial to terrorists by collecting and receiving account funds for the benefit of designated terrorists groups. Arab Bank, like the instant Defendant, attempted to recast Plaintiffs' allegations as evidence of merely "routine banking services."

In an order dated September 2, 2005, Judge Nina Gershon properly disagreed, and held that "[n]othing in the complaints suggests that Arab Bank is a mere unknowing conduit for the unlawful acts of others, about whose aims the Bank is ignorant.  Although the Bank would like this court to find . . . that it is engaged in routine banking services . . . given plaintiffs' allegations regarding the knowing and intentional nature of the Bank's activities, there is nothing 'routine' about the services the Bank is alleged to provide." Linde v. Arab Bank, PLC, 384 F. Supp. 2d 571, 588 (E.D.N.Y 2005).  As in the Linde case, plaintiffs herein have all pled that Al Shamal knew that the funds it received as deposits and transmitted to various organizations were to be used for conducting acts of international terrorism.

This also ties into Al Shamal's questions regarding the relevance of the information provided by plaintiffs regarding its investors, such as DMI Trust and Faisal Islamic Bank (Sudan), as well as those of directors such as Batterjee.  These allegations further demonstrate the interrelatedness of all the entities involved in assisting al Qaida and facilitating al Qaida's growth. Furthermore, the actions of each entity and individual, including Batterjee, only reinforce the proof of Al Shamal's knowledge and intend to further the conspiracy.

This factual basis demonstrates that Al Shamal fits within the framework for establishing conspiracy liability against banks for terrorist support which the <u>Linde</u> decision affirms:

> As to conspiracy, they adequately allege that Arab Bank knowingly and intentionally agreed to provide services to organizations it knew to be terrorist organizations and that they were injured by an overt act which was done in furtherance of the common scheme. It is not necessary that they allege that Arab Bank either planned, or intended, or even knew about the particular act which injured a plaintiff. *See* <u>Halberstam</u>, 705 F.2d at 487. The factual allegations of the complaints sufficiently support an inference that Arab Bank and the terrorist organizations were participants in a common plan under which Arab Bank would supply necessary financial services to the organizations which would themselves perform the violent acts.

<u>Linde</u>, 384 F. Supp. 2d at 584.

B.   <u>There Is No Heightened Pleading Standard for Conspiracy Allegations</u>

All the above is equally true on conspiracy claims, which form much of the basis of claims against Al Shamal.  Subsequent to this Court's ruling of September 21, the Second Circuit affirmed that no heightened pleading requirement was permitted for conspiracy claims.  In <u>Twombly v. Bell Atlantic Corp.</u>, 425 F.3d 99 (2d Cir. Oct. 3, 2005), the Second Circuit overturned a district court's dismissal of a class action complaint alleging unlawful conspiracy in the antitrust context, holding instead that  Fed. R. Civ. P. 8(a) required a short and plain statement of the claim, nothing more:

> If a pleaded conspiracy is implausible on the basis of the facts as pleaded -- if the allegations amount to no more than "unlikely speculations" -- the complaint will be dismissed. <u>DM Research, Inc. v. College of American Pathologists</u>, 170 F.3d 53, 56 (1st Cir. 1999). But short of the extremes of "bare bones" and "implausibility," a complaint in an antitrust case need only contain the "short and plain statement of the claim showing that the pleader is entitled to relief"  that Rule 8(a) requires.

<u>Twombly</u>, 425 F.3d at 111.  Indeed, the Court held, the emphasis should be on notice pleading, and not a preemptive display of all the possible evidence:

> The complaint should not "be burdened with possibly hundreds of specific instances" of the antitrust violations alleged. <u>Nagler v. Admiral Corp.</u>, 248 F.2d 319, 326 (2d Cir. 1957). "Such pleading of the evidence is surely not required and is on the whole undesirable." <u>Id</u>. "It is a matter for the discovery process, not for allegations of detail in the complaint." <u>Id</u>.

Finally, the Second Circuit addressed concerns regarding whether Defendants had an undue burden under this standard of facing potentially meritless claims:

> We are not unsympathetic to these concerns, but we find the arguments based on them ultimately unconvincing. **At the pleading stage, we are concerned only with whether the defendants have "fair notice" of the claim**, and the conspiracy that is alleged as part of the claim, against them -- that is, enough to "enable [the defendants] to[, inter alia,] answer and prepare for trial," <u>Simmons v. Abruzzo</u>, 49 F.3d 83, 86 (2d Cir. 1995)  -- not with whether the conspiracy can be established at trial.

<u>Twombly</u> at 116 (emphasis added). Nowhere does Al Shamal lack fair notice.  It clearly understands the nature of the claims against the Bank, regarding its early and conscious involvement in supporting Al Qaida's growth from Sudan to a worldwide conspiracy.  The complaint and supporting pleadings provide all the fair notice which the Federal Rules require.

## IV.    AL SHAMAL'S SPECIFIC CONTENTIONS LARGELY LACK MERIT

Beyond the general fact-pleading issues addressed above, Al Shamal has also raised particularized concerns regarding several causes of action.  These concerns are dealt with herein.

### A.    <u>RICO</u>

Al Shamal's allegations regarding the RICO claim are largely derivative of its general contentions regarding pleading knowledge and pleading conspiracy.  Because conspiracy and knowledge have been well-pleaded, the RICO claims are valid.

Al Shamal is correct that a plaintiff asserting a civil claim under 1962(c) must allege that the defendant participated in the operation or management of the enterprise.  <u>Dubai Islamic Bank v. Citibank, N.A.</u>, 256 F. Supp. 2d 158, 164 (S.D.N.Y. 2003).  But Al Shamal is wrong about the implications.  Such "discretionary authority" generally has been described as "a relatively low

hurdle for plaintiffs to clear" in the Second Circuit.  See First Capital Asset Mgmt. v. Satinwood, Inc., 385 F.3d 159, 176 (2d Cir. 2004), citing Baisch v. Gallina, 346 F.3d 366, 377 (2d Cir. 2003); De Falco v. Bernas, 244 F.3d 286, 309 (2d Cir. 2001) and United States v. Allen, 155 F.3d 35, 42-43 (2d Cir. 1998).  Moreover, as a general rule, it is not "reasonable to expect that when a defrauded plaintiff frames his complaint, he will have available sufficient factual information regarding the inner workings of a RICO enterprise to determine whether [a defendant] was merely 'substantially involved' in the RICO enterprise or participated in the 'operation or management' of the enterprise." Friedman v. Hartmann, 1994 U.S. Dist. LEXIS 9727, at *4 (S.D.N.Y. July 15, 1994).  Through discovery, this allegation will be buttressed.

Moreover, "[T]he requirements for RICO's conspiracy charges under 1962(d) are less demanding." Baisch, 346 F.3d at 376.  All that is required is that the conspirator "intend to further an endeavor which, if completed, would satisfy all the elements of the substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." Id. at 376-77 (quoting Salinas v. United States, 522 U.S. 52, 65 (1997)).  "Although parties who do not control the organization cannot be liable under § 1962(c), they may still conspire to do so and therefore be liable under § 1962(d)." Morin v. Trupin, 832 F. Supp. 93, 100 (S.D.N.Y. 1993).

Al Shamal had such intentions and goals.  The Plaintiffs have satisfied the pleading standards applicable to their 1962(a), 1962(c), and 1962(d) claims, as set forth above.

B.      Alien Tort Claims Act

Al Shamal avers that claims under the Alien Tort Claims Act must fail "because none of the Plaintiffs have been identified as aliens."  While some plaintiffs are non-aliens, these claims have only been raised on behalf of alien plaintiffs.  This Court has previously recognized that such claims may proceed as such.  See In re Terrorist Attacks on September 11, 2001, 349 F. Supp. 2d 765, 826 (S.D.N.Y. 2005) ("Certain Plaintiffs in these actions are aliens and the complaints all

allege common law torts. . . .  the ATCA may provide a basis for a concerted action claim of material support by alien-Plaintiffs here.")  Al Shamal's contention lacks merit. [17]

C.     Various Remaining Al Shamal Arguments Need Not Be Rebutted Again

Al Shamal alleges that Plaintiffs have failed to identify a duty owed to Plaintiffs by which Al Shamal breached.  Plaintiffs recognize that this Court has dismissed negligence claims against certain defendants on the basis that defendants owed no duty to Plaintiffs.  Plaintiffs respectfully disagree with this ruling and refer this Court to the prior briefing on this issue. [18]

Plaintiffs do not currently intend to pursue their claims under the Torture Victims Protection Act ("TVPA"), 28 U.S.C. § 1350, against this defendant.  Plaintiffs reserve the right to replead this claim against Al Shamal should additional information become available in discovery demonstrating it acted "under actual or apparent authority or color of law, of any foreign nation" in connection with its support of Al Qaida.

## V.     JURISDICTION IS PROPER OVER AL SHAMAL ISLAMIC BANK

Al Shamal argues that plaintiffs lack jurisdiction over it.  This argument lacks merit.  For participating in a conspiracy directed towards the United States as a whole, Al Shamal Islamic Bank is properly within the jurisdiction of this Court.

A.     Prior To Discovery On A Rule 12(b)(2) Motion, A Plaintiff's <u>Prima Facie</u> Showing Of Personal Jurisdiction May Be Established Solely By Legally <u>Sufficient Allegations Of Jurisdiction</u>

---

[17]     For similar reasons, Al Shamal's motion to dismiss the Cantor Fitzgerald and Port Authority plaintiffs' international law claims must fail.  Plaintiffs' incorporate by reference their prior arguments made in favor of their international law claims.  *See* Cantor Fitzgerald and Port Authority Plaintiffs' Memorandum of Law In Opposition to the Motion to Dismiss of Defendant Faisal Islamic Bank (Sudan), 04 CV 7065 (June 27, 2005) (Docket Entry No. 112); Cantor Fitzgerald and Port Authority Plaintiffs' Memorandum of Law In Opposition to the Motion to Dismiss of Defendant Sulaiman Al Rahji, 04 CV 0765 (June 28, 2005) (Docket Entry No. 116).

[18]     This also includes incorporation by reference of the Port Authority Plaintiffs' arguments in favor of their contribution claims.  *See* Cantor Fitzgerald and Port Authority Plaintiffs' Memorandum of Law In Opposition to the Motion to Dismiss of Defendant Faisal Islamic Bank (Sudan), 04 CV 7065 (June 27, 2005) (Docket Entry No. 112); Cantor Fitzgerald and Port Authority Plaintiffs' Memorandum of Law In Opposition to the Motion to Dismiss of Defendant Sulaiman Al Rahji, 04 CV 0765 (June 28, 2005) (Docket Entry No. 116).

In this Circuit, the nature of the plaintiff's obligation to allege and prove personal jurisdiction varies depending upon the procedural posture of the litigation:

> Prior to discovery, a plaintiff challenged by a jurisdiction testing motion may defeat the motion by pleading in good faith, [citation omitted] legally sufficient allegations of jurisdiction. At that preliminary stage, the plaintiff's *prima facie* showing may be established solely by allegations. After discovery, the plaintiff's *prima facie* showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant. [citations omitted]. At that point, the *prima facie* showing must be factually supported.

Ball v. Metallurgie Hoboken Overpelt, S.A., 902 F.2d 194, 197 (2d Cir.), cert. denied, 498 U.S. 854 (1990). In order to defeat such a motion, a plaintiff need only present allegations that connect the defendant with the applicable forum – here, the United States. In deciding such a motion, the plaintiff's jurisdictional averments must be taken as true. Id.; In re Magnetic Audiotape Antitrust Litigation, 334 F.3d 204, 206 (2d Cir. 2003). Moreover, the court must construe the pleadings in a light most favorable to plaintiff, resolving all doubts in his favor. DiStefano v. Carozzi North America, Inc., 286 F.3d 81 (2d Cir. 2001). As this Court has held:

> Because these motions are brought before discovery and decided without an evidentiary hearing, Plaintiffs need only make a prima facie showing that personal jurisdiction exists. PDK Labs, Inc. v. Friedlander, 103 F.3d 1105, 1108 (2d Cir. 1997); A.I. Trade Finance, Inc. v. Petra Bank, 989 F.2d 76, 79 (2d Cir. 1993). Plaintiffs may rely entirely on factual allegations, Jazini v. Nissan Motor Co., 148 F.3d 181, 184 (2d Cir. 1998), and they will prevail even if Defendants make contrary arguments, A.I Trade, 989 F.2d at 79. In resolving the motions, the Court will read the complaints and affidavits in a light most favorable to Plaintiffs. PDK Labs, 103 F.3d at 1108.

In re Terrorist Attacks on September 11, 2001, 349 F. Supp. 2d. at 804.

B.      The Exercise of Personal Jurisdiction Comports With Due Process.

Among the claims against Al Shamal  are claims under the Anti-Terrorism Act ("ATA")

and RICO.  It is beyond question that if plaintiffs <u>do</u> state valid claims under those federal statutes,

this Court may assert personal jurisdiction over them to adjudicate the ATA and RICO claims as

well as all of the other claims asserted in the complaints. The ATA provides that claims may be

brought in "any district where any plaintiff resides" and that process "may be served in any district

where the defendant resides, is found, or has an agent." 18 U.S.C. § 2334(a). RICO similarly

provides that "process … may be served in any judicial district of the United States…" 18 U.S.C.

§ 1965(b).[19]

Because both statutes provide for nationwide service of process, the relevant Due Process

inquiry for personal jurisdiction purposes "is whether the defendant has had minimum contacts

with the United States." <u>Busch v. Buchman, Buchman & O'Brien, Law Firm</u>, 11 F.3d 1255, 1258

(5th Cir. 1994) (citations omitted); <u>see also</u> <u>SEC v. Carrillo</u>, 115 F.3d 1540, 1543 (11th Cir. 1997);

<u>Estates of Ungar ex rel. Strachman v. Palestinian Auth.</u>, 153 F. Supp. 2d 76, 88 (D.R.I. 2001);

<u>Combs v. Adkins & Adkins Coal Co.</u>, 597 F. Supp. 122, 125 (D.D.C. 1984).

1.      Personal jurisdiction is satisfied under a general jurisdiction standard.

As previously stated, Al Shamal maintains correspondent banking relationships with

institutions throughout Africa, Asia, Europe, the Middle East and North America.  In New York

alone, Al Shamal holds correspondent bank accounts at Arab American Bank, American Express

Bank and Citibank.  Al Shamal shareholders also maintain significant U.S. operations, including

Faisal Islamic Bank (Sudan) and DMI Trust, as detailed in other pleadings already filed against

DMI Trust and incorporated herein by reference.  In addition, Al Shamal chairman Batterjee

established Benevolence International Foundation, now an SDGT, in the United States in 1992.

---

[19]      This Court has furthermore recognized that "In situations in which Defendants were not served in the United
States pursuant to the ATA, Rule 4(k)(2) acts as a personal jurisdiction gap-filler "in the enforcement of federal law."
Fed. R. Civ. P. 4(k)(2) advisory committee's note." <u>In re Terrorist Attacks on September 11, 2001</u>, 392 F. Supp. 2d
539, 557 (S.D.N.Y. 2005).

Because the court has personal jurisdiction over Al Shamal with respect to plaintiffs' ATA or RICO claims, then it may also assert pendent personal jurisdiction over the remaining claims that derive from the same events.  IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1056-57 (2d Cir. 1993).

2.   Jurisdiction is proper under an "purposeful direction" theory

Al Shamal is subject to personal jurisdiction here because, in providing support to Osama bin Laden and al Qaeda, which had long publicly announced its intentions to attack the United States, it purposefully directed its conduct here. In re Terrorist Attacks on September 11, 2001, 349 F. Supp. 2d at 810. Each case should be evaluated in light of its own unique facts and circumstances, in order to ensure that the exercise of jurisdiction complies with "fair play and substantial justice." International Shoe Co. v. Washington, 326 U.S. 310, 316 (1945). The issue is whether the defendant should "reasonably anticipate being haled into court." World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980); Asahi Metal Industry Co., Ltd. v. Superior Court of California, 480 U.S. 102 (1987).

The Supreme Court has further stated that reasonableness "considerations sometimes serve to establish the reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." Burger King v. Rudzewicz, 471 U.S. 462, 487 (1985); see Palestine Info. Office v. Shultz, 853 F.2d 932, 942 (D.C. Cir. 1988); see also Flatow v. Islamic Republic of Iran, 999 F. Supp. 1, 22 (D.D.C. 1998) (policy behind statute giving terrorism victims remedy "could significantly lower the threshold of constitutional requirements"). The reasonableness of subjecting defendants to jurisdiction in the U.S. must be assessed in light of the horrific manner in which U.S. residents were attacked for no reason other than that they were in the United States. The policies of "fair play" and "substantial justice" cannot be applied without recognizing the deliberate attacks on the U.S. that gave rise to Plaintiffs' claims.  Case law makes clear that where

terrorists target Americans, they should reasonably foresee being haled into court in the United States, such that due process is not violated by the exercise of jurisdiction. In re Terrorist Attacks on September 11, 2001, 349 F.Supp. 2d. at 807-12.

The record before this Court demonstrates that bin Laden and al Qaeda had publicly and repeatedly announced their intention to attack the United States from the early 1990s on, and that during the time Al Shamal provided significant financial support to Osama bin Laden and his growing al Qaida enterprise.  Because of bin Laden's public urging of violence against American interests as early as 1992 and his arrangement with the Sudanese government and its subsidiaries, Al Shamal knew that its support would further acts of international terrorism directed at the United States. In this context, Al Shamal's amounts to purposeful direction at the United States sufficient to satisfy the "minimum contacts" test. No more is required to satisfy the "minimum contacts" test and subject Al Shamal to jurisdiction in the United States.

> 3.      Additionally, Jurisdiction Is Proper Under Conspiracy Theory

Al Shamal is subject to jurisdiction here because, as alleged in the complaints and RICO Statements, it conspired with al Qaida to attack the United States. Courts within this circuit have recognized that they may assert jurisdiction over a defendant based on the activities of co-conspirators in the forum, including those of the September 11 hijackers. See In re Terrorist Attacks on September 11, 2001, 349 F. Supp. 2d at 805 (acts committed in New York by co-conspirators subject out of state defendant to jurisdiction under CPLR 302(a)(2)); Allstate Life Ins. Co. v. Linter Group Ltd., 782 F. Supp. 215, 221 (S.D.N.Y. 1992) (noting that "[m]any courts in this Circuit have asserted personal jurisdiction over absent defendants pursuant to a conspiracy theory" and asserting personal jurisdiction over absent defendants pursuant to a conspiracy theory by imputing forum acts of coconspirators done in furtherance of conspiracy); Chrysler Capital Corp. v. Century Power Corp., 778 F. Supp. 1260, 1266-70 (S.D.N.Y. 1991) (asserting personal

jurisdiction over non-resident defendant via conspiracy theory). The actions of the co-conspirators within the forum serve to establish minimum contacts sufficient to satisfy Due Process over the non-resident defendant. Dixon v. Mack, 507 F. Supp. 345, 352 (S.D.N.Y. 1980) ("The act of the conspiracy in allegedly abducting plaintiff in New York, which is one of the acts, of course complained of in the suit, supplies the necessary minimum contacts."); Andre Emmerich Gallery v. Segre, 1997 WL 672009 (S.D.N.Y. Oct. 29, 1997) (imputation of forum activities of co-conspirator to nonresident defendant establishes sufficient minimum contacts.

The prima facie showing of conspiracy requires allegations of the primary tort (in this case, the attacks of September 11) and four additional elements: (1) a corrupt agreement between two or more parties; (2) an overt act in furtherance of the agreement; (3) the defendant's intentional participation in the furtherance of a plan; and (4) resulting damage or injury. See Simon v. Philip Morris, Inc., 86 F. Supp. 2d 95, 120 (E.D.N.Y. 2000); see also Chrysler Capital, 778 F. Supp. at 1267. This Court has further held that: "[t]o warrant the inference that a defendant was a member of the conspiracy," Plaintiffs must show that "(a) the defendant had an awareness of the effects in New York of its activity; (b) the activity of the co-conspirators in New York was to the benefit of the out-of-state conspirators; and (c) the co-conspirators acting in New York acted 'at the direction or under the control' or 'at the request of or on behalf of' the out-of-state defendant." In re Terrorist Attacks on September 11, 2001, 349 F. Supp. 2d at 805 (citations omitted). Plaintiffs have met this burden.[20]

C.   At A Minimum, Jurisdictional Discovery Is Warranted

If the Court has any doubt about its jurisdiction, it should exercise its broad discretion to order jurisdictional discovery. See, e.g., Marine Midland Bank, N.A. v. Miller, 664 F.2d 899, 904

---

[20]   Alternatively, Al Shamal is subject to jurisdiction on account of its money laundering activities.  This topic has been briefed extensively; see, e.g., Plaintiffs' Consolidated Memorandum of Law in Opposition to the Motion to Dismiss of Dubai Islamic Bank at 8-10.

(2d Cir. 1981) (district court may permit jurisdictional discovery to help resolve Rule 12(b)(2)

motion); Moore's Federal Practice § 12.31 [7] (3d ed. 2003). This Court has done so with regards

to other defendants, and at a minimum should do so here, especially since pertinent jurisdictional

facts lie within the control and knowledge of the defendant contesting jurisdiction. See Kamen v.

Am. Tel. & Tel. Co., 791 F.2d 1006, 1010-11 (2d Cir. 1986); Investment Properties Intl., Ltd. v.

10S, Ltd., 459 F.2d 705, 707-08 (2d Cir. 1972).

## VI.   CONCLUSION

Plaintiffs have properly pleaded their case against Al Shamal Islamic Bank under the

Federal Rules of Civil Procedure.  Pursuant to the limited exceptions listed in section IV-C of this

memorandum of law, Al Shamal's motion to dismiss must be denied.


Respectfully submitted,

COZEN O'CONNOR

Dated: March 20, 2006                    BY: _____/s/_____

Stephen A. Cozen, Esquire
Elliott R. Feldman, Esquire
Sean P. Carter, Esquire
Adam C. Bonin, Esquire
1900 Market Street
Philadelphia, PA 19103
Tele: (215) 665-2000
Fax: (215) 665-2013

Attorneys for *Federal Insurance* Plaintiffs
Jerry S. Goldman
LAW OFFICES OF JERRY S. GOLDMAN
AND ASSOCIATES, P.C.
111 Broadway, 13th Floor
New York, New York 10006
Tel.: (212) 385-1005
Fax: (212) 346-4665

Attorney for *O'Neill* Plaintiffs

25

Kenneth L. Adams
Richard W. Fields
Stacey A. Saiontz
DICKSTEIN SHAPIRO MORIN &
OSHINSKY LLP
1177 Avenue of the Americas
New York, N.Y. 10036-2714
Telephone: (212) 835-1400
Facsimile: (212) 997-9880
Attorneys for *Cantor Fitzgerald* Plaintiffs

James P. Kreindler, Esq.
Justin T. Green, Esq.
Andrew J. Maloney III, Esq.
KREINDLER & KREINDLER LLP
100 Park Avenue
New York, New York 10017-5590
Phone (212) 687-8181

Attorneys for *Ashton* Plaintiffs
Robert M. Kaplan
FERBER FROST CHAN & ESSNER, LLP
530 Fifth Avenue, 23rd Floor
New York, New York 10036-5101
(212) 944-2200

Attorneys For *Continental* Plaintiffs
David H. Fromm, Esq. (DH-9334)
Frank J. Rubino, Jr., Esq. (FR-6202)
BROWN GAVALAS & FROMM LLP
355 Lexington Avenue
New York, New York 10017
(212) 983-8500
Attorneys for Plaintiff *New York Marine &
General Insurance Company*