# **EXHIBIT A**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: TERRORIST ATTACKS ON<br>SEPTEMBER 11, 2001 | Civil Action No.<br>03 MDL 1570 (GBD) |

*This document relates to: All Actions*

# PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY IN RELATION TO ALL PENDING MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM AND/OR <u>LACK OF PERSONAL JURISDICTION</u>

Cozen O'Connor
1900 Market Street
Philadelphia, PA 19103
February 4, 2009

# **TABLE OF CONTENTS**

|     |     |     | Page |
| --- | --- | --- | ---: |
| I   |     | BACKGROUND AND PROCEDURAL HISTORY OF THE *BOIM* LITIGATION | 1 |
| II  |     | THE *BOIM V* DECISION | 3 |
|     | A   | The ATA Imposes Liability Upon Extra-Territorial Donors to Organizations That Engage in Terrorism as Such Donors are Themselves Primary Wrongdoers Engaged in Acts of International Terrorism | 3 |
|     | B   | The ATA Imposes Liability for Any Knowing or Reckless Sponsorship of a Terrorist Organization | 4 |
|     | C   | The Fact That a Defendant's Contribution of Support is Indirect, De Minimus or Temporally Removed From The Attack At Issue is Not a Defense to ATA Liability | 5 |
| III |     | THE REASONING OF THE *BOIM V* DECISION COUNSELS IN FAVOR OF A RESTRAINED READING OF THE SECOND CIRCUIT'S DUE PROCESS HOLDING IN THIS LITIGATION | 10 |

# TABLE OF AUTHORITIES

**CASES**                                                 **PAGE(S)**

*Boim v. Quranic Literacy Institute*,
   549 F.3d 685 (7th Cir. 2008) .................................................................................. passim

*Boim v. Quranic Literacy Institute*,
   291 F.3d 1000 (7th Cir. 2002) ......................................................................................... 2

*Boim v. Quranic Literacy Institute*,
   511 F.3d 707 (7th Cir. 2007) ....................................................................................... 2, 3

*Boumediene v. Bush*,
   128 S. Ct. 2229 (2008) ................................................................................................. 12

*In Re: Terrorist Attacks on September 11, 2001*,
   538 F.3d 71 (2d Cir. 2008) ........................................................................................ 9, 10

*Jifry v. FAA*,
   370 F.3d 1174 (D.C. Cir. 2004) ................................................................................... 11

*Linde v. Arab Bank*,
   384 F. Supp. 2d 571 (E.D.N.Y. 2005) ........................................................................... 7

*TMR Energy Ltd. v. State Property Fund of Ukraine*,
   411 F.3d 296 (D.C. Cir. 2005) ..................................................................................... 11

*United States of America v. Baboolal*,
   2006 U.S. Dist. LEXIS 40645 (E.D. Wis. 2006) ......................................................... 11

*Veiga v. World Meteorological Org.*,
   568 F. Supp. 2d 367 (S.D.N.Y. July 15, 2008) ............................................................ 11

**STATUTES**

18 U.S.C. § 2333 ..................................................................................................................... 3

**OTHER AUTHORITIES**

National Commission on Terrorist Attacks Upon the United States, *The 9/11 Commission Report: Final Report of the National Commission on Terrorist Attacks Upon the United States* (July 2004) ................................................................................................ 7

National Commission on Terrorist Attacks Upon the United States, *Monograph on Terrorist Financing of the Staff of the National Commission on Terrorist Attacks Upon the United States* (August 2004) ...................................................................... 7

**PLAINTIFFS' NOTICE OF SUPPLEMENTAL AUTHORITY IN RELATION TO ALL PENDING MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM AND/OR LACK OF PERSONAL JURISDICTION**

The Plaintiffs' Executive Committees submit this Notice to bring to the Court's attention the recent *en banc* decision of the 7th Circuit Court of Appeals in *Boim v Holy Land Foundation for Relief and Development,* 549 F.3d 685 (7th Cir December 3, 2008) *(en banc) (Boim V)* As discussed in further detail below, *Boim V* confirms that liability for Plaintiffs' injuries under the Anti-terrorism Act (ATA) extends to any person who knowingly or recklessly provided material support to al Qaeda, whether directly or indirectly. *Boim V* further establishes that Plaintiffs need not allege any factual or temporal link between a defendant's contribution of support and the September 11th Attacks in support of their ATA claims, and that even de minimus donations of support to al Qaeda give rise to ATA liability In these critical respects, *Boim V* directly repudiates the arguments the defendants in this litigation have repeatedly advanced in an effort to evade ATA liability, and confirms that Plaintiffs have stated valid claims against all of the defendants under the ATA. Moreover, because the reasoning and holdings of the *Boim V* Court derive from an informed and enlightened analysis of the nature of terrorism and primary role terrorist sponsors play in bringing about attacks against Americans, the decision also provides considerable guidance concerning the specific jurisdictional theories pending before this Court, and directly supports the arguments Plaintiffs have offered in support of the exercise of personal jurisdiction over al Qaeda's sponsors and supporters

**I.  BACKGROUND AND PROCEDURAL HISTORY OF THE *BOIM* LITIGATION**

The *Boim* litigation arises out of the 1996 shooting death of David Boim at a bus stop near Jerusalem. *Boim V* at 687-88. The murder was carried out by members of the Hamas terrorist organization In 2000, David Boim's parents filed suit in the United States against several alleged sponsors of Hamas, including several purported charitable organizations charged with funneling material support to Hamas in the years leading up to David Boim's murder *Id* at 688.

A three member panel of the 7th Circuit first considered the case in 2002, in the context of an interlocutory appeal of the district court's denial of the defendant's Motions to Dismiss the claims asserted against them under the ATA. *See Boim v. Quranic Literacy Institute*, 291 F.3d 1000 (7th Cir. 2002) (*Boim II*). The *Boim II* Panel adopted an expansive view of liability under the ATA, reasoning that Congress intended civil liability under the ATA to extend to the furthest reaches of the common law. *Id.* at 1021. In keeping with that objective, the *Boim II* Panel held that terrorism victims could sustain claims against secondary tortfeasors under the ATA pursuant to aiding and abetting theories. *Id.*

Following the *Boim II* decision, the case returned to the district court, where it proceeded for several years, ultimately culminating in the entry of summary judgment in favor of the plaintiffs with respect to the liability of three defendants, and a jury verdict in favor of the plaintiffs as to a fourth defendant. *See Boim V* at 688. The jury then assessed damages of $52 million against all of the defendants, jointly and severally. Consistent with the requirements of the ATA, the court trebled that award, resulting in a final judgment in an amount in excess $150 million against the defendants. *Id.*

Following the adverse judgments against them in the district court, the defendants again appealed to the 7th Circuit, advancing a variety of legal challenges to the propriety of the verdicts against them, to include challenges to the causation standard applied by the district court in determining liability under the ATA. In 2007, a second panel of the 7th Circuit, comprised of the same three judges who had issued the *Boim I* decision, issued an opinion vacating the judgments and directing the district court to re-determine liability. *Boim v. Quranic Literacy Institute*, 511 F.3d 707 (7th Cir. 2007) (*Boim IV*). In support of that decision, the *Boim IV* panel reasoned that a plaintiff seeking to hold a terrorist sponsor liable under the ATA is required to present some evidence that the defendant's conduct was "a cause in fact" of the plaintiff's injuries. *Id.* at 739. Although the *Boim IV* panel specifically noted that its articulated causation standard for ATA

2

cases was extremely flexible and rejected the notion that a plaintiff was required to show that a defendant's conduct was a "but for" cause of the plaintiff's injury, the defendants in this litigation urged this Court to read *Boim IV* otherwise.

Following the Second Panel decision, the *Boim* plaintiffs petitioned the 7th Circuit for rehearing *en banc*. The full Court granted that petition "primarily to consider the elements of a suit under 18 U.S.C. § 2333 against financial supporters of terrorism." *Boim V* at 688.

## II. THE *BOIM V* DECISION

In a decision authored by Judge Posner, a seven judge majority of the 7th Circuit rejected the *Boim IV* panel's analysis of causation under the ATA, and confirmed that the ATA establishes sweeping standards of civil liability applicable to all persons who "knowingly" provide material sponsorship to a terrorist organization, whether directly or indirectly. *Id.* at 688–94. In reaching that decision, the *Boim V* Court concluded that financial sponsors of terrorism are primary wrongdoers under the ATA, and cannot evade ATA liability by channeling their contributions through an alleged charity intermediary. *Id.* at 689-91, 701-02. The Court further held that a plaintiff need not demonstrate any factual or temporal link between a defendant's contribution to a terrorist organization and the specific attack at issue. *Id.* at 694-700. In these respects, *Boim V* further confirms that the arguments advanced by the defendants in this litigation concerning the substantive standards of liability applicable to plaintiffs' ATA claims are fundamentally wrong.

    A.    The ATA Imposes Liability Upon Extra-Territorial Donors to Organizations That Engage in Terrorism as Such Donors are Themselves Primary Wrongdoers Engaged in Acts of International Terrorism

At the outset of its decision, the majority favorably resolved the question of whether the ATA imposes liability on "donors to groups that [in turn] sponsor or engage in terrorism." *Boim V* at 688-89. Although the majority acknowledged that the ATA is silent on the subject of secondary liability, it found this fact of no consequence, because the definition of "international

3

terrorism" under the ATA treats financiers and other material sponsors of terrorism as "primary" wrongdoers. *Id.* at 690, 692. Accordingly, the majority held that it followed from the text of the ATA that "a donation to a terrorist group that targets Americans outside of the United States" constitutes a primary violation of the ATA, if provided knowingly. *Id.*

Not insignificantly, the majority concluded that the extension of ATA liability to sponsors of terrorism was compelled not only by the text of the statute, but by policy considerations as well. According to the Court:

> [D]amages are a less effective remedy against terrorists and their organizations than against their financial angels. Terrorist organizations have been sued under §2333, but *to collect* a damages judgment against such an organization, let alone a judgment against the terrorists themselves (if they can even be identified and thus sued), is, as the first panel opinion pointed out, well-nigh impossible. These are foreign organizations and individuals, operating abroad and often covertly, and they are often impecunious as well. So difficult is it to obtain monetary relief against covert foreign organizations like these that Congress has taken to passing legislation authorizing the payment of judgments against them from U.S. Treasury funds. But that can have no deterrent or incapacitative effect, *whereas suits against financiers of terrorism can cut the terrorists' lifeline.*

*Id.* at 690-91 (emphasis added) (internal citations omitted).

B. The ATA Imposes Liability for Any Knowing or Reckless Sponsorship of a Terrorist Organization

Having resolved that the ATA imposes liability on extraterritorial financiers of terrorism, Judge Posner and the majority next considered "the knowledge that the donor to a terrorist organization must be shown to possess in order to be liable under the ATA." *Id.* at 691. Recognizing that the ATA targets intentional forms of wrongdoing, the majority logically held that liability requires some showing of "knowledge" on the part of the defendant. However, in keeping with well settled legal principles, the Court found that this element of an ATA claim could be established not only through proof that the defendant "knows" that the organization receiving his support engages in terrorism, but also through a showing that the defendant is

4

"deliberately indifferent to whether it does or not, meaning that one knows there is a substantial probability that the organization engages in terrorism, but one does not care." *Id* at 693. In other words, the scienter element of an ATA claim can be established by a showing of reckless indifference on the part of the defendant, as opposed to a showing of some subjective knowledge and intent.

In discussing the rationale for this rule in the context of the factual pattern at issue, the Court insightfully explained as follows: "a knowing donor to Hamas – that is, a donor who knew the aims and activities of the organization – would know that Hamas was gunning for Israelis... that Americans are frequent visitors to and sojourners in Israel, that many U.S. citizens live in Israel, and that donations to Hamas, by augmenting Hamas' resources, would enable Hamas to kill or wound, or try to kill, or conspire to kill more people in Israel. And given such foreseeable consequences, such donations would appear to be intended... to intimidate or coerce a civilian population" in violation of the ATA. *Id* at 693-94.

C.  The Fact That a Defendant's Contribution of Support is Indirect, <u>De Minimus</u> or <u>Temporally Removed from the Attack At Issue is Not a Defense to ATA Liability</u>

Finally, the Court turned to the question of the standard of causation for suits under the ATA. Although the Court noted at the outset that "it is black letter" law that tort liability requires proof of causation, it noted that "the black letter is inaccurate if treated as exceptionless." *Id* at 695. The majority then embarked on a thorough exposition of concepts of causation in more traditional tort contexts, citing to a variety of scenarios in which the law dispenses with the requirement that a plaintiff prove that a defendant's misconduct was a "but for" cause of the plaintiff's injuries. *Id* at 695-697.

Although the majority found those precedents from other tort areas instructive, it expressly resisted rigid application of any traditional causation standards to terrorism cases, reasoning that terrorism is *sui generis*, and therefore held that the causation analysis in such cases must take into account terrorism's singularly unique character. *Id* at 698. Given the

5

manner in which terrorist organizations raise and aggregate funds, the Court rejected out of hand the notion that a donor's contribution to a terrorist organization must be substantial, or directly linked to the attack at issue, in order to sustain liability. *Id.* In support of this conclusion, the Court pointed out that terrorist organizations aggregate minimal contributions and use the total aggregated resources "to recruit, train, equip and deploy terrorists who commit a variety of terrorist acts." *Id.* Accordingly, the Court held that <u>all</u> knowing contributors to a terrorist organization "significantly enhance the risk of terrorist acts and thus the probability that (the plaintiff) would be a victim." *Id.*

The Court also rejected the theory that a defendant can avoid liability by arguing that he intended to fund only the legitimate or humanitarian works of a terrorist organization or one of its charitable sponsors, holding as follows:

> If you give money to an organization that you know to be engaged in terrorism, the fact that you earmark it for the organization's non-terrorist activity does not get you off the liability hook.. The reasons are twofold. The first is the fungibility of money.
>
> Second, [a terrorist organization's] social welfare activities reinforce its terrorist activities both directly by providing economic assistance to the families of killed, wounded, and captured fighters... and indirectly by [enhancing the terrorist organizations' popularity among local communities].

*Id*

In recognition of these fundamental truths regarding the nature of terrorism, the majority held that "anyone who knowingly contributes to the non-violent wing of an organization that he knows to engage in terrorism, is knowingly contributing to the organization's terrorist activities. That is the only knowledge that can reasonably be required as a premise for liability. To require proof that the donor *intended* that his contribution be used for terrorism – to make a benign intent a defense – would as a practical matter eliminate donor liability except in cases in which the donor was foolish enough to admit his true intent." *Id.* at 698-99.

6

The majority likewise reaffirmed that a donor may not escape liability simply by channeling his donations to a terrorist organization through a chain of intermediary organizations. *Id.* at 701. Addressing a hypothetical scenario in which "donor A gives to innocent appearing organization B which gives to innocent appearing organization C which gives a donation to Hamas," the Court concluded that A would be liable "as long as A either knows or is reckless in failing to discover that donations to B end up with Hamas." *Id.* at 702. The Court reasoned that "to set the knowledge and causal requirement higher than we have done in this opinion would be to invite money laundering, the proliferation of affiliated organizations, and two-track terrorism (killing plus welfare). Donor liability would be eviscerated, and the [ATA] would be a dead letter." *Id.*; *see also Linde v. Arab Bank*, 384 F. Supp. 2d 571 (E.D.N.Y. 2005) (finding ATA liability extends to "welfare" activities which serve as inducement for terrorist activity).

Finally, the majority rejected the defendants' argument that a terrorism victim must allege a close temporal connection between the defendants' contribution to the responsible terrorist organization and the terrorist attack which produced the plaintiff's injuries. *Boim V*, 549 F.3d at 700. In this regard, the Court concluded that the imposition of ATA liability on a 1995 donor to a terrorist organization for an attack carried out fifty (50) years later "would not be as outlandish, given the character of terrorism, as one might think." Citing Ireland, Sri Lanka, the Philippines, Columbia, Kashmir and Palestine as examples, the Court noted that terrorism campaigns often last many decades and that "seed money for terrorism can spread acts of violence long after the investment."[1] *Id.*

---

[1] The September 11th Attack is a perfect example of this principle. As the 9/11 Commission noted in its Final Report, the Attack was made possible by resources and a global infrastructure developed over more than a decade by al Qaeda, and sustained at an annual cost exceeding $30 million. *See* National Commission on Terrorist Attacks Upon the United States, *The 9/11 Commission Report. Final Report of the National Commission on Terrorist Attacks Upon the United States* (July 2004) at pp. 47-70, 172-73; National Commission on Terrorist Attacks Upon the United States, *Monograph on Terrorist Financing of the Staff of the National Commission on Terrorist Attacks Upon the United States* (August 2004).

7

The holdings and reasoning of the *Boim V* Court confirm that Plaintiffs have asserted viable claims against the defendants under the ATA. As primary defenses to the theories of substantive liability Plaintiffs have advanced under the ATA, the defendants have sought refuge in three principal arguments relating to causation: (1) that the ATA requires a showing of some direct nexus between the defendants' support for al Qaida and the September 11th Attacks; (2) that the defendants cannot be held liable under the ATA for contributions to ostensible humanitarian organizations, regardless of whether the defendants may have been aware that those organizations were sponsoring al Qaida; and (3) that the defendants' conduct is far too attenuated, in either a temporal or factual sense, to support liability for the September 11th Attack. The majority's decision in *Boim V* lays bare each of these defenses.

The decision of the *Boim V* Court also undermines defendants' arguments regarding the sufficiency of plaintiffs' pleadings, and in particular the defendants' arguments regarding the adequacy of the allegations relating to the scienter component of plaintiffs' ATA claims. Of particular note in this respect, the *Boim V* Court held that ATA liability does not "require proof that the donor intended that his contribution be used for terrorism," reasoning that making "a benign intent a defense would as a practical matter eliminate donor liability except in cases in which the donor was foolish enough to admit his true intent." *Id* at 698-99. In a similar vein, the Court held that ATA liability did not hinge on proof that a defendant possessed specific knowledge that his contribution to a charity intermediary was being funneled to a terrorist organization, explaining that liability would also attach where a defendant was recklessly indifferent to whether the organization receiving his support was involved in terrorist activity. As a component of that ruling, the *Boim V* Court also made clear that recklessness is a "relative" standard, which requires an analysis by the *trier of fact* of various factors, including the gravity of risk imposed by the conduct at issue. According to the Court "the greater the risk, moreover,

8

the more obvious it will be to the risk taker, enabling the *trier of fact* to infer the risk takers knowledge of the risk with greater confidence." *Id.* at 694

The *Boim V* Court exposition on the scienter element of an ATA claim demonstrates that the analytical framework the defendants have proposed for reviewing plaintiffs' pleadings is deeply flawed. As a preliminary matter, in confirming that a plaintiff pursuing a claim under the ATA is under no obligation to demonstrate that the defendant possessed specific knowledge and intended that his contribution of support would be used for terrorist purposes, the *Boim V* Court directly rejected as a matter of law two of the central arguments the defendants have advanced regarding the sufficiency of plaintiffs' pleadings. Stated simply, there is no requirement that plaintiffs allege that any defendant explicitly knew and intended that his contribution of support would be employed for any terrorist attack, let alone a requirement that plaintiffs allege that a defendant "knew" and "intended" to support the September 11th Attack itself, as many of the defendants have wrongly argued.

Rather, it is sufficient at the pleading stage for a plaintiff merely to present allegations which, when read collectively and in a light most favorable to the plaintiff, give rise to an inference that the defendant was recklessly indifferent to whether the organization receiving his support was associated with terrorist activities, a standard plaintiffs easily have met here. Indeed, plaintiffs' pleadings offer extensive detail regarding the inter-relationships among the defendants and terrorist elements, as well as the extensive involvement of ostensible charities sponsored by many of the defendants in terrorist activities during the years prior to the September 11th Attack, which involvement was the subject of extensive public reporting throughout the Arab and Muslim world. In fact, the Second Circuit made a specific point of noting that plaintiffs' Complaints contained a "wealth of detail (conscientiously cited to published and unpublished sources) that, if true, reflect close working arrangements between ostensible charities and terrorist networks, including al Qaeda." *In Re Terrorist Attacks on*

9

*September 11, 2001*, 538 F.3d 71, 76 (2d Cir. 2008). At a minimum, such allegations give rise to a logical inference of reckless indifference on the part of the defendants,[2] and it is the province of the *trier of fact* to determine whether those facts warrant imposition of liability upon any individual defendant. *Boim V*, 549 F.3d at 694.

### III. THE REASONING OF THE *BOIM V* DECISION COUNSELS IN FAVOR OF A RESTRAINED READING OF THE SECOND CIRCUIT'S DUE PROCESS HOLDING IN THIS LITIGATION

Although *Boim V* focuses on principles of substantive liability under the ATA, Plaintiffs respectfully submit that its provides considerable guidance concerning the personal jurisdiction questions pending before this Court, and compellingly counsels in favor of a restrained reading of the Second Circuit's Due Process holding in this litigation. Although the *Boim V* Court did not have occasion to address the Due Process clause directly, its rulings derive from a thorough and enlightened analysis of the fundamental nature of terrorism, and the integral role extra-territorial sponsors play in bringing about terrorist attacks against Americans. *See Boim V* at 698. In that context, the *en banc* Court made a number of important findings, which must inform the analysis of personal jurisdiction in a terrorism case. Of particular note in this regard, the *Boim V* Court correctly recognized that every contribution to a terrorist organization, regardless of how de minimus it may be, "significantly enhance[s] the risk of terrorist attacks, and thus the probability that [the plaintiff] would be a victim." *Id.* For this reason, the *Boim V* Court properly found that any rule of law which serves to immunize "knowing" sponsors of terrorism from liability for their actions – whether grounded in principles of jurisdiction or substantive liability – would not only undermine Congress' objectives in passing the ATA, but in fact

---

[2] As plaintiffs have maintained throughout this litigation, the allegations are in fact sufficient to demonstrate that the defendants possessed specific knowledge that their contributions were being used to support terrorism, and their intent to advance al Qaeda's terrorist agenda, even though those are not required showings under the ATA. The defendants' constant effort to brand the allegations as conclusory flies in the face of the specific finding of the Second Circuit regarding the level of detail contained in the pleadings, has no basis in fact, and amounts to nothing more than an empty rhetorical slogan.

10

*encourage* the sponsorship of terrorism against America from abroad by "invit[ing] money laundering, the proliferation of affiliated organizations, and two-track terrorism..." *Id.* at 698-99, 702

In view of those undeniable facts, Plaintiffs respectfully submit that it would be illogical and ultimately dangerous to read the Second Circuit's decision to limit this Court's jurisdiction over extra-territorial sponsors of al Qaida to persons who directly participated in the September 11th Attack itself, as the defendants have advocated.[3] Indeed, such a construction of the Second Circuit's Due Process decision would effectively provide a road-map for the financing of terrorist attacks against the United States from abroad, as sympathizers of al Qaida and other terrorist organizations at war with the United States would need only avoid any direct role in the conduct of an actual terrorist attack in order to preserve immunity from any claims by victims of their conduct. Under such circumstances, and in an environment where many foreign governments have refused to take action against known terrorist financiers operating within their borders,[4] there would simply exist no disincentive to engaging in forms of conduct that are specifically intended to promote the murder of American citizens, and the "ATA would be a dead letter." *Id.* at 702. Such a result would, as Justice Scalia recently observed in a related

---

[3] Of course, the defendants' personal jurisdiction arguments presume that non-resident aliens who have established no ongoing contacts with the United States are entitled to claim Constitutional protections, itself a dubious proposition rejected or called into question in several recent cases. *See Veiga v. World Meteorological Org.*, 568 F. Supp. 2d 367 (S.D.N.Y. July 15, 2008); *TMR Energy Ltd. v. State Property Fund of Ukraine*, 411 F.3d 296 (D.C. Cir. 2005); *Jifry v. FAA*, 370 F.3d 1174 (D.C. Cir. 2004); *United States of America v. Baboolal*, 2006 U.S. Dist. LEXIS 40645 (E.D. Wis. 2006).

[4] For example, in a September 2007 interview with ABC News, Treasury Undersecretary on Terrorism and Financial Intelligence Stuart Levey stated that Saudi Arabia has failed to impose sanctions upon a single designated terrorist financier operating within the Kingdom even when "the evidence is clear that these individuals have funded terrorist organizations, and knowingly done so..." Underscoring the threat posed by the Saudi's government's inaction in the war against terror financing, Levey stated "if I could somehow snap my fingers and cut off the funding from one country, it would be Saudi Arabia." ABC News, *U.S.: Saudis Still Filling Al Qaeda's Coffers*, (September 11, 2007) *available at* http://blogs.abcnews.com/theblotter/2007/09/us-saudis-still.html

11

context, "almost certainly cause more Americans to be killed." *Boumediene v. Bush*, 128 S. Ct. 2229, 2294 (2008) (J. Scalia, dissenting).

Dated: February 4, 2009                     Respectfully submitted,

                                            _____/s/_____
                                            Sean P. Carter, Esquire
                                            Elliott R. Feldman, Esquire
                                            Cozen O'Connor
                                            1900 Market Street
                                            Philadelphia, PA 19103
                                            (215) 665-2000

                                            *Co-Chairs, Plaintiffs' Executive Committee for Commercial Claims*


                                            _____/s/_____
                                            Ronald L. Motley, Esquire
                                            Motley Rice, LLC
                                            28 Bridgeside Boulevard
                                            Mount Pleasant, SC 29465
                                            (843) 216-9000

                                            *Co-Chair, Plaintiffs' Executive Committee for Personal Injury and Wrongful Death Claims*


                                            _____/s/_____
                                            James P. Kreindler, Esquire
                                            Kreindler & Kreindler, LLP
                                            100 Park Avenue
                                            New York, NY
                                            (212) 687-8181

                                            *Co-Chair, Plaintiffs' Executive Committee for Personal Injury and Wrongful Death Claims*

12

/s/
Andrea Bierstein, Esquire
Hanley, Conroy, Bierstein, Sheridan, Fisher &
Hayes, LLP
112 Madison Avenue
New York, NY 10016
(212) 784-6400

Attorney for *Burnett*, *EuroBrokers* and
*WTC Properties* Plaintiffs


/s/
Jerry S. Goldman, Esquire
Anderson Kill & Olick, P.C.
1251 Avenue of the Americas
42nd Floor
New York, NY 10020
(212) 278-1498

Attorney for *O'Neill* Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify, on this 4th day of February 2009, that a true copy of the foregoing Plaintiffs' Notice of Supplemental Authority in Relation to all Pending Motions To Dismiss For Failure to State a Claim and/or Lack of Personal Jurisdiction was served electronically via the Court's Electronic Case Filing ("ECF") System upon all 03 MDL 1570 Counsel of Record.

/s/
Sean P. Carter, Esquire