# EXHIBIT D

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| YASSIN ABDULLAH KADI, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action 09-0108 (JDB) |
| | ) | |
| vs. | ) | |
| | ) | |
| TIMOTHY GEITHNER, *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Dated:  May 22, 2009

Respectfully submitted,

TONY WEST
Assistant Attorney General

DOUGLAS N. LETTER
Terrorism Litigation Counsel

SANDRA M. SCHRAIBMAN
Assistant Branch Director (D.C. Bar #188599)

   /s/ Eric J. Beane
ERIC J. BEANE (Arizona Bar #023092)
Trial Attorney
U.S. Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Ave., NW., Room 7124
Washington, D.C.  20001
Telephone: (202) 616-2035
Fax: (202) 616-8470
Eric.Beane@usdoj.gov

*Counsel for Defendants*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

STATUTORY AND REGULATORY BACKGROUND ........................................... 3

    A.    Overview ............................................................................................ 3

    B.    IEEPA .............................................................................................. 4

    C.    Executive Order 13,224 .................................................................... 5

    D.    OFAC Regulations ........................................................................... 6

FACTUAL AND PROCEDURAL BACKGROUND ................................................ 7

STANDARD OF REVIEW .................................................................................. 12

ARGUMENT ..................................................................................................... 15

    I.    THE OFAC MAINTENANCE OF KADI'S DESIGNATION
        HAD A RATIONAL BASIS AND WAS SUPPORTED BY THE
        ADMINISTRATIVE RECORD ........................................................ 15

        A.    The Administrative Record Supports the Denial of Kadi's
            Request for Reconsideration and Maintenance of His
            Designation as an SDGT ........................................................ 15

            1.    Kadi Provided Support to Terrorism Through His
                Leadership in the Muwafaq Foundation ...................... 16

            2.    Kadi Admits That He Provided Financial Support to
                SDGTs ...................................................................... 19

            3.    Other Ties to Terrorism Also Justify the Sanctions
                Against Kadi .............................................................. 23

            4.    The Classified Record Includes Additional Evidence of
                Kadi's Ties to Terrorism ............................................. 24

        B.    Plaintiff's Challenge to His EU Designation Does Not Affect
            the Validity of OFAC's 2004 Action ..................................... 25

II.   PLAINTIFF'S CONSTITUTIONAL CLAIMS MUST BE
      DISMISSED BECAUSE KADI, AS A FOREIGN NATIONAL,
      LACKS CONSTITUTIONAL RIGHTS ............................................................ 26

III.  PLAINTIFF'S CONSTITUTIONAL CLAIMS ARE SUBJECT
      TO DISMISSAL FOR FAILURE TO STATE A CLAIM ................................. 30

      A.   OFAC's Blocking Action Satisfies Due Process ...................................... 30

           1.   Kadi Received Constitutionally Sufficient Process ..................... 31

           2.   OFAC May Rely on Classified Evidence ..................................... 34

           3.   Plaintiff Cannot State a Due Process Claim
                Concerning FOIA ......................................................................... 35

      B.   The Freezing of Assets Does Not Constitute a Taking
           Under the Fifth Amendment .................................................................... 35

      C.   The Blocking Action Does Not Violate the First
           Amendment ............................................................................................. 36

           1.   Freedom of Speech ...................................................................... 37

           2.   Freedom of Association ............................................................... 39

           3.   E.O. 13224 Does Not Contain a Specific Intent
                Requirement ................................................................................. 40

      D.   Plaintiff Cannot State a Claim Under the Fourth
           Amendment ............................................................................................. 41

           1.   The Executive's Authority to Block the Transfer of
                Assets Historically Has Not Been Constrained by
                the Fourth Amendment ................................................................ 42

           2.   Blocking Actions Pursuant to E.O. 13224 are *Per Se* "Reasonable"
                Because Governmental Interests Far
                Outweigh Any Privacy Concerns ................................................ 45

      E.   Plaintiff Cannot Sustain a Vagueness or Overbreadth
           Challenge ................................................................................................ 52

           1.   E.O. 13224 Is Not Unconstitutionally Overbroad ...................... 52

|   |   | 2. | Plaintiff's Challenge to the Phrase "Otherwise Associated With" Should be Dismissed | 53 |
|   |   | 3. | Terms Such As "Specially Designated Global Terrorist" Are Not Unconstitutionally Vague or Overbroad | 54 |
|   | F. |   | E.O. 13224 Is Not a Bill of Attainder | 56 |

CONCLUSION ........................................................................................................................ 59

## TABLE OF AUTHORITIES

### CASES

*32 County Sovereignty Comm. v. Dep't of State,*
    292 F.3d 797 (D.C. Cir. 2002) ................................................................. 28, 29

*Adams v. Hinchman,*
    154 F.3d 420 (D.C. Cir. 1998) ........................................................................ 36

*Aero Continente, S.A. v. Newcomb,*
    C.A. No. 04-1168 (D.D.C. July 16, 2004) ...................................................... 28

*Al-Aqeel v. Paulson,*
    568 F. Supp. 2d 64 (D.D.C. 2008) ..................................................... 29, 31, 32

*Al Haramain Islamic Found., Inc. ("AHIF") v. U.S. Dep't of the Treasury,*
    585 F. Supp. 2d 1233 (D. Or. 2008) ...................................................... *passim*

*Arbelaez v. Newcomb,*
    C.A. No. 00-5217, 2001 WL 50337 (D.C. Cir. Jan. 18, 2001) ....................... 30

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ........................................................................................ 15

*BellSouth Corporation v. FCC,*
    144 F.3d 58 (D.C. Cir. 1998) ............................................................. 58, 59, 60

*Berger v. State of New York,*
    388 U.S. 41 (1967) .......................................................................................... 51

*Boim v. Holy Land Found.,*
    549 F.3d 685 (7th Cir. 2008) .......................................................................... 19

*Broadrick v. Oklahoma,*
    413 U.S. 601 (1973) ........................................................................................ 53

*Cafeteria & Restaurant Workers Union v. McElroy,*
    367 U.S. 886 (1961) ........................................................................................ 33

*Camara v. Municipal Court of San Francisco,*
    387 U.S. 523 (1967) ........................................................................................ 46

*Camp v. Pitts,*
    411 U.S. 138 (1973) ........................................................................................ 13

*Cassidy v. Chertoff,*
   471 F.3d 67 (2d Cir. 2006) ........................................................................... 49

*Chandler v. Miller,*
   520 U.S. 305 (1997) ..................................................................................... 49

*Chas. T. Main Int'l Inc. v. Khuzestan Water & Power,*
   651 F.2d 800 (1st Cir. 1981) ....................................................................... 45

*Chichakli v. Szubin,*
   546 F.3d 315 (5th Cir. 2008) ....................................................................... 31

*Citizens to Preserve Overton Park, Inc. v. Volpe,*
   401 U.S. 402 (1971) ............................................................................... 13, 40

*Clifford v. Peña,*
   77 F.3d 1414 (D.C. Cir. 1996) ....................................................................... 5

*Cooperativa Multiactiva de Empleados de Distribuidores de Drogas "Coopservir*
   *LTDA." v. Newcomb,* 221 F.3d 195 (D.C. Cir. 2000) ......................... 3, 58, 60

*Ctr. for Nat'l Sec. Studies v. U.S. Dep't of Justice,*
   331 F.3d 918 (D.C. Cir. 2003) ..................................................................... 35

*\*Dames & Moore v. Regan,*
   453 U.S. 654 (1981) ........................................................... 4, 14, 43, 44

*District of Columbia v. Air Florida, Inc.,*
   750 F.2d 1077 (D.C. Cir. 1984) ................................................................... 26

*EEOC v. St. Francis Xavier Parochial Sch.,*
   117 F.3d 621 (D.C. Cir. 1997) ....................................................... 5, 6, 15, 54

*Florida Power & Light v. Lorion,*
   470 U.S. 729 (1985) ..................................................................................... 33

*Freedom to Travel Campaign v. Newcomb,*
   82 F.3d 1431 (9th Cir. 1996) ................................................................. 38, 45

*Gilbert v. Homar,*
   520 U.S. 924 (1997) ..................................................................................... 33

*\*Global Relief Found., Inc. ("GRF") v. O'Neill,*
   207 F. Supp. 2d 779 (N.D. Ill. 2002), *aff'd,* 315 F.3d 748
   (7th Cir. 2002) ................................................................................... *passim*

*Griffin v. Wisconsin,*
  483 U.S. 868 (1987) ................................................................................. 49, 51

*Haig v. Agee,*
  453 U.S. 280 (1981) ...................................................................................... 33

*Harisiades v. Shaughnessy,*
  342 U.S. 580 (1952) ........................................................................................ 3

*Holy Land Found. for Relief & Dev. ("HLF") v. Ashcroft,*
  333 F.3d 156 (D.C. Cir. 2003) ................................................................. *passim*

*Holy Land Found. for Relief & Dev. ("HLF") v. Ashcroft,*
  219 F. Supp. 2d 57 (D.D.C. 2002) ........................................................... *passim*

*Humanitarian Law Project v. Gonzales ("HLP/AEDPA"),*
  380 F. Supp. 2d 1134 (C.D. Cal. 2005), *aff'd,* 509 F.3d 1122 (9th Cir. 2007) .............. 19

*Humanitarian Law Project v. Reno ("HLP/AEDPA"),*
  205 F.3d 1130 (9th Cir. 2000) ................................................................. *passim*

*Humanitarian Law Project v. Treasury ("HLP/IEEPA"),*
  463 F. Supp. 2d 1049 (C.D. Cal. 2006) ............................................. 19, 41, 56

*Humanitarian Law Project v. Treasury ("HLP/IEEPA"),*
  484 F. Supp. 2d 1099 (C.D. Cal. 2007) ................................................. 19, 54

*In the Matter of the Extradition of Mousa Mohammed Abu Marzook,*
  924 F. Supp. 565 (S.D.N.Y. 1996) ........................................................... 20, 21

*Islamic American Relief Agency ("IARA") v. Gonzales,*
  477 F.3d 728 (D.C. Cir. 2007) ................................................................. *passim*

*Islamic American Relief Agency ("IARA") v. Unidentified FBI Agents,*
  394 F. Supp. 2d 34 (D.D.C. 2005) ........................................................... *passim*

*Jifry v. Fed. Aviation Admin.,*
  370 F.3d 1174 (D.C. Cir. 2004), *cert. denied* 125 S. Ct. 1299 (2005) ..................... 29

*Korte v. OPM,*
  797 F.2d 967 (Fed. Cir. 1986) ...................................................................... 58

*MacWade v. Kelly,*
  460 F.3d 260 (2d Cir. 2006) ........................................................................ 49

*Marshall v. Sawyer,*
   365 F.2d 105 (9th Cir. 1966), *cert. denied,* 385 U.S. 1006 (1967) ................................. 58

*Mathews v. Eldridge,*
   424 U.S. 319 (1976) ......................................................................................... 33

*Milena Ship Mgmt. Co. v. Newcomb,*
   995 F.2d 620 (5th Cir. 1993) ............................................................................. 5, 6

*Miranda v. Sec'y of Treasury,*
   766 F.2d 1 (1st Cir. 1985) ................................................................................. 45

*Mistretta v. United States,*
   488 U.S. 361 (1989) ......................................................................................... 43

*Morrissey v. Brewer,*
   408 U.S. 471 (1972) ......................................................................................... 33

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) ........................................................................................... 13

*Nielsen v. Sec'y of the Treasury,*
   424 F.2d 833 (D.C. Cir. 1970) ...................................................................... 36, 44, 45

*Nixon v. Administrator of General Servs.,*
   433 U.S. 425 (1977) ...................................................................................... 57, 59

*Ohio v. Robinette,*
   519 U.S. 33 (1996) ........................................................................................... 48

*Orvis v. Brownell,*
   345 U.S. 183 (1953) ........................................................................................ 4, 43

*Palestine Info. Office v. Shultz,*
   853 F.2d 932 (D.C. Cir. 1988) ...................................................................... 33, 38

*Paradissiotis v. Rubin,*
   171 F.3d 983 (5th Cir. 1999) ........................................................................ 36, 58

*Parker v. Levy,*
   417 U.S. 733 (1974) ......................................................................................... 56

*Pennsylvania v. Mimms,*
   434 U.S. 106 (1977) ......................................................................................... 46

*People's Mojahedin Org. of Iran ("PMOI") v. U.S. Dep't of State,*
    182 F.3d 17 (D.C. Cir. 1999) ................................................................ 27, 28

*Propper v. Clark,*
    337 U.S. 472 (1949) ...................................................................... 4, 43

*Regan v. Time, Inc.,*
    468 U.S. 641 (1984) .................................................................... 14, 56

*\*Regan v. Wald,*
    468 U.S. 222 (1984) ................................................................. 3, 4, 43

*Roberts v. United States Jaycees,*
    468 U.S. 609 (1984) ........................................................................ 40

*Sardino v. Fed. Reserve Bank of New York,*
    361 F.2d 106 (2d Cir. 1966) ............................................................. 45

*Selective Service Sys. v. Minnesota PIRG,*
    468 U.S. 841 (1984) .................................................................... 58, 59

*Skinner v. Ry. Labor Executives' Ass'n,*
    489 U.S. 602 (1987) .................................................................... 46, 49

*Soldal v. Cook County,*
    506 U.S. 56 (1992) ......................................................................... 46

*Terry v. Ohio,*
    392 U.S. 1 (1968) .......................................................................... 46

*Tran Qui Than v. Regan,*
    658 F.2d 1296 (9th Cir. 1981) ......................................................... 37

*United States v. Flores-Montano,*
    541 U.S. 149 (2004) ....................................................................... 47

*United States v. Knights,*
    534 U.S. 112 (2001) ................................................................... 46, 48

*United States v. O'Brien,*
    391 U.S. 367 (1968) ............................................................. 37, 38, 39

*United States v. One 1997 E35 Ford Van, et al.,*
    50 F. Supp. 2d 789 (N.D. Ill. 1999) ............................................. 20, 21

*United States v. Ramsey,*
    431 U.S. 606 (1977) ............................................................................ 47, 48

*United States v. Verdugo-Urquidez,*
    494 U.S. 259 (1990) ............................................................................ 27, 29

*United States v. Williams,*
    128 S. Ct. 1830 (2008) ............................................................................ 53

*Village of Hoffman Estates v. Flipside,*
    455 U.S. 489 (1992) ............................................................................ 56

*Virginia v. Hicks,*
    539 U.S. 113 (2003) ............................................................................ 53

*Walmer v. Dep't of Defense,*
    52 F.3d 851 (10th Cir.), *cert. denied,* 516 U.S. 974 (1995) ............................................ 58

*Walsh v. Brady,*
    927 F.2d 1229 (D.C. Cir. 1991) ............................................................................ 38

*Wayte v. United States,*
    470 U.S. 598 (1985) ............................................................................ 33

*\*Youngstown Sheet & Tube Co. v. Sawyer,*
    343 U.S. 579 (1952) ............................................................................ 43, 44, 48

## STATUTES AND REGULATIONS

Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706 ............................................ 1, 13

Antiterrorism and Effective Death Penalty Act ("AEDPA"), 18 U.S.C. § 2339B ...................... 27

International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-06 ......... *passim*

22 U.S.C. § 287c ............................................................................ 5

28 U.S.C. § 1491 ............................................................................ 36

50 U.S.C. app. § 5(b) ............................................................................ 4

50 U.S.C. § 1701(a) ............................................................................ 4, 49

50 U.S.C. § 1702(c) ............................................................................ *passim*

28 U.S.C. § 1491 ................................................................................................ 36

31 C.F.R. §§ 501.806-807 ................................................................................... 7

31 C.F.R. § 536.312 ........................................................................................... 56

31 C.F.R. § 594.310 .................................................................................. 6, 7, 55

31 C.F.R. § 594.311 ..................................................................................... 7, 55

31 C.F.R. § 594.316 ....................................................................... 7, 12, 54, 55

31 C.F.R. § 594.802 ............................................................................................ 6

## MISCELLANEOUS

Executive Order No. 13224 ("E.O. 13224"), 66 Fed. Reg. 49,079 (2001) ......................... *passim*

Fed. R. Civ. P. 12(b)(6) .................................................................................. 15, 30

Pub. L. No. 107-56, § 106, 115 Stat. 272, 278 (2001) ................................ 5

U.S. Const. art I, § 9, cl. 3 .............................................................................. 57, 58

U.S. Const. amend. IV .................................................................................... 46, 51

## INTRODUCTION

In order to preserve the national security of the United States in times of national emergency, the President depends on his authority to use all the tools that are placed at his disposal by the U.S. Constitution and by Acts of Congress. Pursuant to Article II of the Constitution and powers conferred on him by Congress in the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-06, the President has the authority to impose economic sanctions on terrorists and those who provide financial or other support to them. Acting pursuant to IEEPA and Executive Order No. 13224 ("E.O. 13224"), 66 Fed. Reg. 49,079 (2001), the Department of the Treasury's Office of Foreign Assets Control ("OFAC") issued a notice on October 12, 2001, designating Yassin Abdullah Kadi ("Plaintiff" or "Kadi") a supporter of terrorism and blocking all property and interests in property of Kadi in the United States or in the possession or control of a U.S. person. Plaintiff sought administrative reconsideration of that decision, which was denied on March 12, 2004 on the basis of an updated administrative record that included Kadi's submissions to OFAC and additional classified and unclassified evidence compiled by OFAC. Almost five years later, on January 16, 2009, Plaintiff filed this lawsuit challenging the evidentiary basis for his designation pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, and raising a variety of constitutional challenges to the economic sanctions program administered by OFAC pursuant to E.O. 13224. For the reasons that follow, this entire action should be dismissed and judgment should be entered for Defendants.

The administrative record amply supports the designation of Kadi as a specially designated global terrorist ("SDGT") and the denial of Kadi's request for reconsideration. Kadi has extensive ties to an international terrorist network through his leadership of the Muwafaq Foundation, a

charitable organization that OFAC reasonably believed was also being used as a cover for funding

terrorism in Africa, Eastern Europe, the Middle East, and Central Asia. Kadi admits that he directly

provided substantial financial support to numerous individuals who were sanctioned, indicted, or

deported for terrorist activity. The wide breadth and depth of information describing Kadi's integral

role in a vast network of terrorism and extremism provides more than sufficient information to

uphold the regulatory decision to impose sanctions under E.O. 13224. Accordingly, summary

judgment should be entered for Defendants on Plaintiff's APA claim.

Plaintiff's scattershot of constitutional claims should be dismissed for at least two reasons.

First, as a foreign national who has not alleged substantial connections to the United States, Kadi

is not entitled to assert rights arising from the U.S. Constitution. Second, even if Plaintiff were

entitled to assert constitutional rights, each of his various constitutional claims is readily subject to

dismissal. Numerous courts in this circuit have upheld the constitutionality of sanctions imposed

under E.O. 13224 against First, Fourth, and Fifth Amendment challenges. Other SDGTs have

challenged the sufficiency of process and the use of classified evidence, but the D.C. Circuit has

rejected all such challenges. *Holy Land Found. for Relief & Dev. ("HLF") v. Ashcroft*, 333 F.3d

156, 163 (D.C. Cir. 2003) (rejecting due process challenge). Other SDGTs have tried – without

success – to invoke the First Amendment to shield themselves from sanctions that attach to

unprotected *conduct. See Islamic American Relief Agency ("IARA") v. Gonzales*, 477 F.3d 728, 735

(D.C. Cir. 2007) (rejecting First Amendment claim). And other SDGTs have argued that a blocking

of assets constitutes an unreasonable seizure for Fourth Amendment purposes or an unconstitutional

"Bill of Attainder." Courts have rejected these challenges. *IARA v. Unidentified FBI Agents*, 394

F. Supp. 2d 34, 48 (D.D.C. 2005) (rejecting Fourth Amendment challenge); *HLF v. Ashcroft*, 219

F. Supp. 2d 57, 78-79 (D.D.C. 2002) (same); *Cooperativa Multiactiva de Empleados de Distribuidores de Drogas "Coopservir LTDA." v. Newcomb*, C.A. No. 98-0949 slip op. at 10 (D.D.C. Mar. 29, 1999), *aff'd*, 221 F.3d 195 (D.C. Cir. 2000) (table)) (rejecting Bill of Attainder claim), attached hereto as Exhibit A.

Deference to the political branches of the United States government is never greater than in the present circumstances, where the Legislative and Executive Branches are acting in concert, and where foreign policy and national security concerns are paramount. As the Supreme Court stressed in *Regan v. Wald*, "[m]atters relating 'to the conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'" 468 U.S. 222, 242 (1984) (quoting *Harisiades v. Shaughnessy*, 342 U.S. 580, 589 (1952)). Accordingly, Defendants request that the Court enter judgment for Defendants and dismiss Plaintiff's complaint in its entirety.

## STATUTORY AND REGULATORY BACKGROUND

### A.    Overview

For many years the United States has utilized economic sanctions to further its foreign policy and national security goals. In much of the 20th century, U.S. sanctions programs were governed by the Trading With the Enemy Act ("TWEA"), enacted in 1917. *See* 40 Stat. 411 (codified as amended at 50 U.S.C. app. §§ 1-44). As amended in 1933, TWEA granted the President "broad authority" to "investigate, regulate . . . prevent or prohibit . . . transactions" in times of war or declared national emergencies. 50 U.S.C. app. § 5(b); *Dames & Moore v. Regan*, 453 U.S. 654, 670-72 (1981). Although TWEA does not use the term "block," the authority it conveyed to the Executive to regulate, prevent, or prohibit transactions consistently has been interpreted to

encompass the power to block or freeze an entity's property. *See, e.g., Orvis v. Brownell*, 345 U.S.

183, 187-88 (1953); *Propper v. Clark*, 337 U.S. 472, 483-84 (1949).

**B.    IEEPA**

In 1977, Congress amended TWEA and enacted IEEPA to delineate "the President's

authority to regulate international economic transactions during wars or national emergencies." S.

Rep. No. 95-466 at 2, *reprinted in* 1977 U.S.C.C.A.N. 4540, 4541.   IEEPA limited TWEA's

application to periods of declared wars and to certain existing TWEA programs, with IEEPA

available during other times of declared national emergency. *See Regan v. Wald*, 468 U.S. at 227-

28. With limited exceptions, the broad authorities granted to the President under IEEPA remained

largely the same as those under TWEA. If the President declares a national emergency concerning

"any unusual and extraordinary threat, which has its source in whole or substantial part outside the

United States, to the national security, foreign policy, or economy of the United States," *see* 50

U.S.C. § 1701(a), IEEPA authorizes the President to:

> investigate, block during the pendency of an investigation, regulate, direct and
> compel, nullify, void, prevent or prohibit, any acquisition, holding, withholding, use,
> transfer, withdrawal, transportation, importation or exportation of, or dealing in, or
> exercising any right, power, or privilege with respect to, or transactions involving,
> any property in which any foreign country or a national thereof has any interest by
> any person, or with respect to any property, subject to the jurisdiction of the United
> States.

*Id.* § 1702(a)(1)(B).  Pursuant to this expansive authority, Presidents have blocked assets of

designated governments, individuals, and entities in response to a variety of declared national

emergencies, including those relating to Iran, Sudan, Burma, Syria, Lebanon, and Zimbabwe, as well

as relating to narcotics trafficking; terrorism; and proliferation of weapons of mass destruction. *See* Declaration of Adam J. Szubin ("Szubin Decl."), ¶ 4.[1]

In October 2001, Congress amended IEEPA to provide that, in case of judicial review of an action taken under IEEPA, an agency record containing classified information "may be submitted to the reviewing court ex parte and in camera," *see* 50 U.S.C. § 1702(c), *added by* Pub. L. No. 107-56, § 106, 115 Stat. 272, 278 (2001).

### C.    Executive Order 13,224

The President issued E.O. 13224, effective September 24, 2001, declaring a national emergency with respect to the "grave acts of terrorism . . . and the continuing and immediate threat of further attacks on United States nationals or the United States." *See* E.O. 13224, Preamble. In determining that actual and threatened terrorist acts constituted "an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States," the President invoked the authority of IEEPA and the United Nations Participation Act.[2] *See id.*

The annex to E.O. 13224 listed 27 foreign terrorists, terrorist organizations, and their supporters – that is, it ordered the blocking of their property and interests in property that are in the United States, subsequently come within the United States, or come within the "possession or control" of U.S. persons. *Id.* § 1 & Annex. The Order further authorized the Secretary of the

---

[1] The Declaration of Adam J. Szubin, Director of OFAC, is attached hereto as Exhibit B. The OFAC Director's Declaration is provided as background information for IEEPA blocking actions and is thus properly before the Court, notwithstanding the fact that it is not part of the administrative record. *See Clifford v. Peña*, 77 F.3d 1414, 1418 (D.C. Cir. 1996).

[2] The United Nations Participation Act ("UNPA") authorizes the President to implement measures adopted by the United Nations Security Council pursuant to Article 41 of the U.N. charter. *See* 22 U.S.C. § 287c; *Milena Ship Mgmt. Co. v. Newcomb*, 995 F.2d 620, 622 (5th Cir. 1993).

Treasury, in consultation with the Secretary of State and the Attorney General, to designate "persons" (defined as individuals or entities) whose property or interests in property should be blocked because they "act for or on behalf of" or are "owned or controlled by" designated terrorists, or because they "assist in, sponsor, or provide financial, material, or technological support for," or financial or other services to or in support of," or are "otherwise associated" with them. *Id.* § 1(c)-(d).[3] Persons designated under E.O. 13224 are referred to as specially designated global terrorists ("SDGTs"). *See* 31 C.F.R. § 594.310.

The Executive Order authorized the Secretary of the Treasury to "employ all powers granted to the President by IEEPA and UNPA," and to promulgate rules and regulations to carry out the purposes of the Order and to re-delegate such functions if he so chose. *See* E.O. 13224, § 7; *see also* 31 C.F.R. § 594.802 (delegating the Secretary of the Treasury's authorities under E.O. 13224 to the Director of OFAC). Due to the exigencies of the national emergency, the President declared that:

> because of the ability to transfer funds or assets instantaneously, prior notice to such [designated] persons of measures to be taken pursuant to this order would render these measures ineffectual. I therefore determine that for these measures to be effective in addressing the national emergency declared in this order, there need be no prior notice of a listing or determination made pursuant to this order.

*Id.* § 10.

### D.   OFAC Regulations

OFAC has published various regulatory definitions of certain words and phrases, many of which are mentioned in Plaintiff's complaint, and has issued regulations setting forth an administrative process. With respect to specific terms, OFAC has made clear that "otherwise

---

[3] These provisions of E.O. 13224 were subsequently amended by E.O. 13284 to provide for a consultative role for the Secretary of Homeland Security.

associated with" means "(a) To own or control; or (b) To attempt, or to conspire with one or more persons, to act for or on behalf of or to provide financial, material, or technological support, or financial or other services, to." 31 C.F.R. § 594.316. Both "specially designated global terrorist" and "terrorism" also are defined by OFAC regulations. *See* 31 C.F.R. § 594.310 ("The term specially designated global terrorist or SDGT means any foreign person or person listed in the Annex or designated pursuant to Executive Order 13224 of September 23, 2001."); 31 C.F.R. § 594.311 (listing activities that constitute terrorism). OFAC also has regulations describing the process by which SDGTs may seek administrative reconsideration of their designations. *See* 31 C.F.R. §§ 501.806-807, 594.201 note 3.

## FACTUAL AND PROCEDURAL BACKGROUND[4]

On October 12, 2001, OFAC designated Plaintiff Kadi an SDGT pursuant to E.O. 13224. On October 17, 2001, pursuant to United Nations Security Council Resolutions 1267 and 1333, Kadi also was listed on the United Nations' Consolidated List established and maintained by the 1267 Committee with respect to Al-Qaida, Usama bin Laden, and the Taliban and other individuals, groups, undertakings, and entities associated with them, which obligated all United Nations member states to freeze Kadi's assets pursuant to paragraph 8(C) of Resolution 1333. *See* http://www.un.org/sc/committees/1267/pdf/consolidatedlist.pdf. Accordingly, the European Union froze his assets, pursuant to Council Regulation (EC) No. 467/2001 "imposing certain specific restrictive measures directed against certain persons and entities associated with Usama bin Laden, the Al-Qaida network and the Taliban."

---

[4] Pursuant to Local Rule 7(h)(2), this factual background is provided in lieu of a statement of material facts because judicial review in this case is based solely on the administrative record.

Kadi received notice of his designation under E.O. 13224 through a press release issued by the Department of the Treasury on October 12, 2001. AR 123-126; 348-351. On October 15, 2001, OFAC sent additional notice in the form of a "Notice of Blocking" informing Kadi of the blocking action, advising him of rules governing licensing and penalties, and notifying him of available administrative procedures for challenging the blocking action. *See* AR 2784-2785. Kadi acknowledged receipt of the Notice of Blocking in a December 21, 2001 letter he sent to OFAC. AR 25 n.4. Notice of the designation was published in the *Federal Register* on October 26, 2001. *See* Final Rule, Blocked Persons, Specially Designated Nationals, Specially Designated Terrorists, Foreign Terrorist Organizations, and Specially Designated Narcotics Traffickers: Additional Designations of Terrorism-Related Blocked Persons, 66 Fed. Reg. 54404 (Oct. 26, 2001).

Following the U.S. Government's designation of Kadi, the Department of the Treasury faxed a two-page document to governmental officials in the United Kingdom in response to a request for additional information on Kadi. AR 39-40. The document explained Kadi's role in the Muwafaq Foundation, "an al-Qaeda front that receives funding from wealthy Saudi businessmen," which Usama bin Laden described as part of his organization in an interview, and listed other parts of Kadi's "vast financial empire linked to terrorist activity," including his role in a Hamas funding network. AR 39. Kadi was provided with a copy of this document by the U.K. government and reviewed it prior to filing a petition for reconsideration with OFAC.

On December 21, 2001, Kadi requested reconsideration of his designation. In support of his request for reconsideration, Kadi provided substantial supplementary material to OFAC, and Kadi or his representatives met with OFAC officials on several occasions. In support of his petition to be delisted, Kadi presented the following material: Witness Statement of Yassin Abdullah Kadi,

dated December 17, 2001, at AR 92-280; Supplemental Witness Statement of Yassin Abdullah Kadi, dated July 23, 2002, at AR 281-505; Yassin Abdullah Kadi Summary Presentation for OFAC, August 1, 2002, at AR 1068-1085; Statement of Yassin Abdullah Kadi, dated December 19, 2002, at AR 689-1067; Presentation for February 28th Meeting with OFAC, dated February 28, 2003, at AR 1184-1351.

On April 28, 2003, OFAC sent Kadi a five-page letter with questions addressing twelve areas of concern – "the answers to which w[ould] help [OFAC] issue a determination on the petition." AR 1352-1356. The letter specifically advised Kadi that OFAC had outstanding concerns about, *inter alia*, the lack of recordkeeping and auditing of numerous Muwafaq Foundation offices, "[i]ntermingling of funds between Muwafaq Foundation" and other Kadi businesses, assistance to terrorist groups, and ties to and support for Usama bin Laden, Al Qaeda, Chafiq Ayadi, Wa'el Julaidan, Asbat al-Ansar, Abdul Latif Saleh, Tunisian Islamic Front, Quranic Literacy Institute, and Muhammad Salah. *Id.* at 1353-1356. OFAC waited to receive a written response from Kadi, including additional exhibits, prior to rendering its decision on his request for reconsideration. *See* Answers to Questions Concerning the Petition to Delist Yassin Abdullah Kadi, dated July 11, 2003, at AR 1357-1391; Submission of Yassin Abdullah Kadi to the Deputy Attorney General of Switzerland, Mr. Claude Nicati, Further to the Meeting at the Swiss Embassy in Riyadh on 1 July 2003, dated August 22, 2003, at AR 2020-2406.

In reviewing Kadi's request for reconsideration, OFAC considered the compiled administrative record, which contains both classified and unclassified information, as well as Kadi's submissions to OFAC. On March 12, 2004, R. Richard Newcomb, then-director of OFAC, sent a letter to Kadi's counsel informing him that Kadi's request for reconsideration was denied because

"OFAC has determined that, based on the totality of the classified and unclassified evidence, a reasonable basis remains to continue the designation of Mr. Al-Qadi under E.O. 13224."[5] OFAC's letter enclosed a 20-page Memorandum explaining the basis for OFAC's decision. The Memorandum included a statement of the legal standard for designation, a description of the procedural history, and a summary of evidence pertaining to "Al-Qadi's Links To Terrorists, Extremists, and Terrorism-Related Activities." The Memorandum included separate sections addressing Kadi's various links to an extensive network of terrorist financing:

- The Muwafaq Foundation – Kadi was a member of the Board of Trustees and responsible for the day-to-day operations of the Muwafaq Foundation, a purported charitable organization with extensive ties to terrorism. AR 5-7.

- Affiliation with Al-Qaida and SDGT Makhtab al-Khidamat – According to information available to the U.S. Government, Muwafaq developed a global reach through its affiliations with several charities and mosques throughout the world and continued to operate until mid-2001 under the umbrella of Makhtab al-Khidamat, an SDGT listed in the Annex to E.O. 13224 that is considered to be the precursor to al-Qaida. In 2001, Makhtab al-Khidamat dissolved and was absorbed into Usama bin Ladin's al-Qaida organization. Subsequently, Muwafaq, along with a number of non-governmental organizations and organizations formerly affiliated with Makhtab al-Khidamat, joined al-Qa'ida. AR 14-15.

- Muwafaq's European Offices – The Memorandum notes that Kadi "hired Chafiq Ayadi, an SDGT designated at the same time as [Kadi] on October 12, 2001, to head Muwafaq's European operations upon the recommendation of Wa'el Julaidan," who himself was "jointly designated as an SDGT by the United States and Saudi Arabia on September 6, 2002." AR 7. Julaidan had extensive ties with well-known terrorists, including Usama bin Laden, and Ayadi was expelled from Tunisia for his involvement in the Tunisian Islamic Front. Kadi acknowledges transferring substantial sums of money to Ayadi's *personal* bank account. AR 7-10. At least two organizations currently listed as SDGTs received financial support from Muwafaq's European operation. AR 9-10.

---

[5] Al-Qadi is an alternate transliteration of Kadi. In order to remain consistent with Plaintiff's complaint, Defendants generally will refer to Plaintiff as "Kadi."

- Muwafaq's Albania Office – According to information available to the U.S. Government, Dr. Abdul Latif Saleh, Kadi's business partner in Albania and the head of operations in Muwafaq's Albania office, was the founder and organizer of the Albanian Islamic Jihad ("AIJ"). AR 10-11. Kadi was known to be an active supporter of, and fundraiser for, the AIJ and other radical activities of Dr. Saleh. Dr. Saleh was expelled from Albania in 1999 due to his close association with known terrorists, including Usama bin Ladin. *Id.*

- Muwafaq's Pakistan Office – Kadi hired Amir Mehdi to be the local director of Muwafaq's operation in Pakistan in 1992. In 1995, the Pakistani Government raided the offices and arrested Mehdi after he had handled and distributed Muwafaq funds for over two years. AR 13.

- Muwafaq's Sudan Office – According to information available to the U.S. Government, Kadi acknowledged in 2001 that the Khartoum office of Muwafaq had provided assistance to jihad activities in the Middle East and the Balkans. AR 14.

- Other Ties Directly to SDGT Usama Bin Ladin – Kadi acknowledges that he has had meetings with Usama Bin Ladin. "A letter found in 2002 and apparently addressed to Usama bin Ladin referenced [Kadi's] managing money for Bin Ladin in Sudan. The letter also referred to [Kadi] as one of Bin Ladin's former managers. . . . [Kadi] often boasted of personally knowing and occasionally meeting with Bin Ladin in Afghanistan, Saudi Arabia and the Sudan." AR 15. Additionally, Kadi owned several firms in Albania that funneled money to extremists or employed extremists in positions where they controlled the firms' funds. Bin Ladin allegedly provided the working capital for four or five of Kadi's companies in Albania, according to information available to the U.S. Government. AR 11.

- Support for SDGT Asbat al-Ansar – Kadi maintained a relationship with and promised fund transfers to an official of the al-Qaida supported terrorist group Asbat al-Ansar, an SDGT listed in the Annex to E.O. 13224. AR 16.

- Provision of Funds to SDGT Wa'el Julaidan – Kadi directly transferred $1.25 million to SDGT Wa'el Julaidan in 1998. AR 16.

- Provision of Funds to Admitted Hamas Operative – Kadi provided hundreds of thousands of dollars to Muhammad Salah, an admitted Hamas operative and an SDT (Specially Designated Terrorist) under Executive Order 12947. During the time period that Kadi was providing money directly to Salah, Salah admitted to Israeli officials that he engaged in activities in the United States and abroad for Hamas. AR 17-18.

- Investment in BMI – Kadi provided financial support to BMI, a company whose money, according to its accountant, may have been transferred overseas to finance the U.S. embassy bombings in Kenya and Tanzania in 1998. AR 20-21.

The Memorandum concludes, *see* AR 22, with a statement of the specific grounds on which OFAC determined that there was "reason to believe" Kadi was subject to designation pursuant to E.O. 13224:

- acting for or on behalf of al Qaida, Usama bin Ladin, and Makhtab al-Khidamat, persons listed in the Annex to E.O. 13224;

- assisting in, sponsoring, or providing financial, material, or technological support for, or financial or other services to or in support of, among others, al Qaida, Usama bin Ladin, Makhtab al-Khidamat, HAMAS, the Revival of Islamic Heritage Society, Al-Haramayn (Bosnia), Chafiq Ayadi, and Wa'el Julaidan, persons subject to E.O. 13224; and

- associated with, among others, al Qaida, Usama bin Ladin, Makhtab al-Khidamat, HAMAS, the Revival of Islamic Heritage Society, Al-Haramayn (Bosnia), Chafiq Ayadi, and Wa'el Julaidan, persons subject to E.O. 13224.[6]

Kadi did not challenge OFAC's March 12, 2004 decision denying his request for reconsideration and maintaining his designation as an SDGT until filing his complaint in the present case on January 16, 2009. He made no attempt during that almost five-year period to respond to OFAC's twenty-page Memorandum or to submit additional materials or argument to OFAC.

## STANDARD OF REVIEW

Pursuant to the APA's limited waiver of sovereign immunity, a reviewing court must uphold an agency decision unless it is (1) arbitrary and capricious; (2) an abuse of discretion; or

---

[6] Defendants are not moving for summary judgment on the basis of this third prong. Subsequent to the March 12, 2004 decision challenged here, OFAC published a regulatory definition of the phrase "otherwise associated with" that clarified the potential reach of the provision. *See* 31 C.F.R. § 594.316. Although Defendants submit that this provision, as narrowed by definition, applies to Kadi's conduct, this alternative basis for designation is largely duplicative of the other grounds and need not be considered.

(3) otherwise not in accordance with law. *See* 5 U.S.C. § 706(2)(A); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971); *HLF*, 333 F.3d at 162. The scope of judicial review under this standard is a narrow and deferential one, and a court cannot substitute its judgment for that of the agency. *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Under arbitrary and capricious review, the court does not undertake its own fact-finding; rather, the court must review the administrative record as prepared by the agency. *See Camp v. Pitts*, 411 U.S. 138, 142 (1973); *HLF*, 333 F.3d at 162. As long as the agency's decision was supported by a rational basis, it must be affirmed. As the D.C. Circuit explained in a similar challenge to an IEEPA-based action, "[w]e may not substitute our judgment for OFAC's, but we will require it to 'examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *IARA*, 477 F.3d at 732 (citing *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

The deference due OFAC's decision is at its zenith here because it relates to the President's exercise, through OFAC, of his vast authority in the field of foreign affairs. As the Supreme Court has explained, TWEA and IEEPA grant the President "broad authority" during times of war or declared national emergencies to impose economic sanctions on "any property in which any foreign country or a national thereof has any interest." *See, e.g., Dames & Moore*, 453 U.S. at 663. For decades, courts consistently have accorded broad deference to sanctions programs and actions under both IEEPA and TWEA. *Id.* at 672 (noting the "broad authority of the Executive when acting under this congressional grant of power"). Thus, in addition to the deference ordinarily due an agency, actions taken in the context of foreign affairs are entitled to even greater deference, and the judiciary's role is correspondingly limited. *See Regan*, 468 U.S. at 242-43 ("Matters related 'to the

-13-

conduct of foreign relations . . . are so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'") (citation omitted). That high level of deference consistently has been applied in cases challenging designations under E.O. 13224. *See Global Relief Found., Inc. ("GRF") v. O'Neill*, 207 F. Supp. 2d 779, 787-88 (N.D. Ill. 2002) (GRF is "asking this court to approach the outer limits of its constitutional authority"), *aff'd*, 315 F.3d 748 (7th Cir. 2002); *HLF*, 219 F. Supp. 2d at 84 ("[b]locking orders are an important component of U.S. foreign policy, and the President's choice of this tool to combat terrorism is entitled to particular deference"), *aff'd*, 333 F.3d 156 (D.C. Cir. 2003); *IARA*, 394 F. Supp. 2d at 45 (same), *aff'd* 477 F.3d 728 (D.C. Cir. 2007); *Al Haramain Islamic Found., Inc. ("AHIF") v. U.S. Dep't of the Treasury*, 585 F. Supp. 2d 1233, 1249 (D. Or. 2008) (same).

Because administrative actions are reviewed on the basis of a certified administrative record compiled by the agency, the determination to maintain Kadi's designation should be reviewed on the basis of the full administrative record before the agency at that time, including the classified and unclassified documents. The administrative record filed with the Court in this action includes the full record for the denial of Kadi's request for reconsideration and the maintenance of his designation. AR1-2817. The classified portion of the administrative record is filed with the Court for its *ex parte*, *in camera* review. *See* 50 U.S.C. § 1702(c).

To withstand a motion to dismiss for failure to state a claim, *see* Fed. R. Civ. P. 12(b)(6), the complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (footnote omitted)

(citations omitted).   In evaluating the sufficiency of the complaint, the Court considers only "the

facts alleged in the complaint, any documents either attached to or incorporated in the complaint and

matters of which [the Court] may take judicial notice." *See EEOC v. St. Francis Xavier Parochial*

*Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).   The rules of pleading require factual allegations

"plausibly suggesting," and "not merely consistence with," the elements of a valid claim for relief.

*See Bell Atl. Corp.*, 550 U.S. at 557.

## ARGUMENT

I.      **THE OFAC MAINTENANCE OF KADI'S DESIGNATION HAD A RATIONAL
         BASIS AND WAS SUPPORTED BY THE ADMINISTRATIVE RECORD**

   A.      **The Administrative Record Supports the Denial of Kadi's Request for
            Reconsideration and Maintenance of His Designation as an SDGT.**

   In its 2004 Memorandum to Kadi, OFAC was careful to stress that "[n]o one element, no one

contact, no one accusation of funding is taken as being determinative of the assessment that [Kadi]

has been providing support to terrorists through his actions.   Rather, when considering the number

of sources, the numbers of activities and length of time, the totality of the evidence, both classified

and unclassified, this provides a reason to believe [Kadi] has funded terrorist and extremist

individuals and operations." AR 22.  The wide breadth and depth of information describing Kadi's

integral role in a vast network of terrorism and extremism provides more than sufficient information

to uphold this regulatory decision under the APA standard of review.  *See IARA*, 477 F.3d at 734

(the D.C. Circuit noted the "extremely deferential" standard of review and concluded that "the

record – containing various types of evidence from several different sources, and covering an

extended period of time – provides substantial evidence for the conclusion that IARA-USA is part

of IARA.").

1.   **Kadi Provided Support to Terrorism Through His Leadership in the Muwafaq Foundation.**

OFAC reasonably concluded that there is "substantial and credible evidence that both Muwafaq as an entity, and many of the individuals charged with operating it and distributing its funds, were engaged in a longstanding pattern of supporting terrorist and extremist causes." AR 21. Kadi operated at the helm of this vast network with operations in, *inter alia*, Sudan, Pakistan, Afghanistan, Ethiopia, Somalia, Bosnia/Herzegovina, and Albania. AR 7. In Kadi's own words, he was "the driving force behind the administration of the [Muwafaq] Foundation." AR 6. As a trustee and the one responsible for running the organization, he selected the managers who ran operations in various countries and delegated authority to them. *Id.*

OFAC made the following specific findings regarding the Muwafaq Foundation's ties to terrorism:

- Kadi hired Amir Mehdi to be the local director of Muwafaq's operation in Pakistan in 1992. In 1995, the Pakistani Government raided the offices and arrested Mehdi after he had handled and distributed Muwafaq funds for over two years. Mem. at 11. A news organization reported that the arrest of Ramzi Yousef for the first World Trade Center bombing prompted the raid on the Muwafaq office in Islamabad. AR 2425-2427.

- Muwafaq provided logistical support and financial support for Al-Gama'at Al-Islamiya, a mujahadin battalion in Bosnia. That organization was designated as an SDGT on October 31, 2001. AR 9.

- Muwafaq transferred $500,000 to terrorist organizations in the Balkans in the mid-1990s. AR 9.

- "[I]n the mid-1990s, Muwafaq was involved in providing financial support for terrorist activities of the mujaheddin, as well as arms trafficking from Albania to Bosnia. Some involvement in the financing of these activities had also been provided by Usama bin Ladin." AR 9.

-16-

- "As of late 2001, . . . [Kadi] continued to finance various fundamentalist institutions and organizations in the Balkans after Muwafaq ceased operations there in 1996," including two entities that were designated as SDGTs in early 2002 – The Revival of Islamic Heritage Society's Pakistan and Afghanistan offices and the Bosnia-Herzegovina branch of the Al-Haramain Foundation. AR 9-10.

In an apparent attempt to avoid responsibility for the activities of an organization that he led, Kadi stressed that he "administered the Foundation as a highly decentralised operation and accordingly the Foundation had no central administration." AR 1358. Kadi acknowledged that he "selected the managers responsible for the various countries," but then quickly added that he "delegated authority to the various country managers who in turn took day-to-day responsibility for running the Foundation in the relevant locations." *Id.* Kadi similarly adopted a posture of willful blindness on financial records. When asked about auditing practices, Kadi responded as follows: "As stated above the Foundation was highly decentralized. Therefore it had no central accounting systems nor any central bank accounts. The individual country managers opened bank accounts for the Foundation in the various locations where the Foundation operated." *Id.* Kadi acknowledged that "there are no meaningful financial records available" for countries including Bosnia/Herzegovina, Croatia, Somalia, Ethiopia, Germany, and Austria. *Id.* at 1359. OFAC considered this information and reasonably concluded that "[i]t strains credulity that [Kadi] could have unintentionally found himself in a repeating cycle of hiring individuals based on his assessment of their character, and that these individuals kept deceiving him about their intents on [sic] providing his funds to terrorists and extremists. These are individuals who [Kadi] had opportunity to personally observe over a period of years, and he gave them significant sums of money to handle on his behalf." AR 22.

Kadi deflected attention from the murkier areas of Muwafaq's history by explaining in his witness statements that Muwafaq was engaged in legitimate charitable activities. It is widely known, however, that terrorist organizations have exhibited a pattern of abusing charities as a cover for raising funds for terrorist activities. *See* Szubin Decl. ¶¶ 25-26. OFAC reasonably concluded that "[t]hough Muwafaq was a charitable foundation, and [Kadi] in his submissions to OFAC has provided evidence that it was involved in substantial charitable activities, this by no means undermines the determination that the charity was, in addition, used to fund terrorism. The use of an ostensible charitable foundation is a frequently used mechanism for covertly supporting terrorism." AR 2788. Numerous courts, including the D.C. Circuit, have upheld the designation of charitable organizations that provided financial or other support to terrorist financing networks. *See IARA*, 477 F.3d 728; *HLF*, 333 F.3d 156; *GRF*, 315 F.3d 748; *AHIF*, 585 F. Supp. 2d 1233.

Even if Kadi could document every expenditure made by the Muwafaq Foundation – which he cannot, since Kadi did not require audits of Muwafaq branches or maintain adequate financial records – such an accounting could not alter the reality that money is fungible, and money intended for humanitarian purposes can free up other funds for terrorist activities. *See Humanitarian Law Project v. Reno*, 205 F.3d 1130, 1136 (9th Cir. 2000), *partially aff'd en banc*, 393 F.3d 902 (9th Cir. 2004), and on remand, *Humanitarian Law Project v. Gonzales*, 380 F. Supp. 2d 1134 (C.D. Cal. 2005), *aff'd*, 509 F.3d 1122 (9th Cir. 2007)[7]; *HLF*, 219 F. Supp. 2d at 82; *IARA*, 394 F. Supp. 2d at

---

[7] These cases will be referred to in this brief as "*HLP/AEDPA*" in order to distinguish them from another case brought by the Humanitarian Law Project challenging IEEPA and E.O. 13224, in which there are two opinions. Those opinions – *Humanitarian Law Project v. Treasury*, 463 F. Supp. 2d 1049 (C.D. Cal. 2006), and on reconsideration, *Humanitarian Law Project v. Treasury*, 484 F. Supp. 2d 1099 (C.D. Cal. 2007), *appeal docketed*, No. 07-55893 (9th Cir. June 26, 2007) – will be cited as "*HLP/IEEPA*."

49-50; *AHIF*, 585 F. Supp. 2d at 1253. Moreover, charities provide convenient and plausible cover for transfers, and insofar as the money actually reaches bona fide recipients of aid, terrorist organizations benefit from the accompanying public good will and recruiting efforts. *See* Szubin Decl. ¶ 25; *Boim v. Holy Land Found.*, 549 F.3d 685, 698 (7th Cir. 2008) (en banc) ("Hamas's social welfare activities reinforce its terrorist activities both directly . . . and indirectly by enhancing Hamas's popularity among the Palestinian population and providing funds for indoctrinating schoolchildren.").

### 2.   Kadi Admits That He Provided Financial Support to SDGTs.

OFAC had a reasonable basis to believe that Kadi provided financial support to SDGTs, thus rendering him susceptible to designation pursuant to E.O. 13224, § 1(d)(i). In fact, Kadi admitted providing money directly to Muhammad Salah, who is a Specially Designated Terrorist ("SDT") under E.O. 12947 and who has admitted his role as an operative and recruiter for the military wing of Hamas, which itself is designated under E.O. 13224. Kadi also has admitted providing financial support to SDGT Chafiq Ayadi and to Wa'el Julaidan, an SDGT with close ties to Usama bin Ladin. *See* AR 5. These three examples are especially illustrative of the integral role that Kadi played in providing financial support to terrorism.

**Financial Support to Hamas via SDT Salah:**   Kadi provided hundreds of thousands of dollars to Muhammad Salah, who pled guilty in Israel to illegally channeling funds to Hamas. AR 2450-2487. Salah was listed as an SDT on July 27, 1995 under Executive Order 12947, which prohibits transactions with, and freezes the assets of, terrorists who threaten to disrupt the Middle East peace process. Hamas was listed by the President as an SDT in the Annex to E.O. 12947 in 1995 and designated as an SDGT by the Secretary of State on October 31, 2001. *See* Designations

of Terrorists and Terrorist Organizations Pursuant to Executive Order 13224 of September 23, 2001, 67 Fed. Reg. 12,633 (Mar. 19, 2002). Some of the funds Kadi provided were in cash, while the majority were tied up in a complicated land deal in Woodridge, Illinois related to the Quranic Literacy Institute ("QLI"). OFAC noted that "[d]uring the time period that [Kadi] was providing money directly to Salah, Salah admitted to Israeli officials that he engaged in activities domestically and abroad for HAMAS." AR 17-18; *see also United States v. One 1997 E35 Ford Van, et al.*, 50 F. Supp. 2d 789 (N.D. Ill. 1999), at AR 2667-2688 (discussing Kadi's financial support to Salah in a case involving a civil forfeiture claim against Salah and lending support to the conclusion that Kadi's support to Salah was intended to support Hamas).

During the same period in which Kadi was providing financial support to Salah, Salah also was receiving substantial sums of money from SDT and SDGT Mousa Mohamed Abu Marzook and other HAMAS operatives. AR 2470, 2473-77, at paras. 38, 45-54; *see also In the Matter of the Extradition of Mousa Mohammed Abu Marzook ("Marzook Extradition")*, 924 F. Supp. 565, 592 (S.D.N.Y. 1996), AR 2710-2735. Salah admitted that "these funds were intended for and used to purchase weapons to carry out specified terrorist actions against Israel." *See* AR 2457-2460, at paras. 12-13, 15-19; *Marzook Extradition*, 924 F. Supp. at 587-89, AR 2710-2735.

In the civil forfeiture action against Salah, the Northern District of Illinois examined the circumstances surrounding the Woodridge land deal and concluded the following:

> These facts, taken as a whole, raise the inference that the funds used to finance the Woodridge land deal were transferred from outside the United States with the intent that they be used to promote HAMAS' alleged campaign of violence against Israel and its citizens. The circumstances surrounding the Woodridge land deal, the relationship between QLI and Salah, and the efforts of QLI to provide financial support to Salah all raise the inference that QLI ordered Kadi to transmit the money used to purchase the Woodridge land with the

-20-

> intent that it would be used to support Salah in his activities on behalf
> of HAMAS. . . .
>
> In conclusion, we find that the government has alleged a reasonable
> basis for its belief that QLI arranged for Kadi to transfer the funds to
> purchase the Woodridge land from abroad with the intent that they
> would be used to promote the carrying on of specified unlawful
> activity.

*One 1997 E35 Ford Van*, 50 F. Supp. 2d at 805-06. OFAC's designation of Kadi could be sustained

solely on the basis of Kadi's ties to Salah, given the abundant evidence of Salah's support for and

actions on behalf of Hamas.

**Financial Support to SDGT Julaidan:** Kadi also provided financial support to SDGT

Wa'el Julaidan. Kadi admitted to OFAC that he transferred $1.25 million in 1998 for the alleged

purpose of funding a housing development for Al Emam University in Sanaa, Yemen. AR 16.

Instead of sending the money directly to the university, Kadi "accomplished this transfer by sending

money from the account of his company Karavan Development Group directly to SDGT Wa'el

Julaidan." *Id.* Notably, the Kingdom of Saudi Arabia also imposed sanctions on Julaidan and

agreed that he had ties to Usama bin Ladin and "funneled money to al-Qaeda." AR 2689-2691.

**Financial Support to SDGT Ayadi:** Upon the recommendation of SDGT Julaidan, Kadi

hired SDGT Ayadi to serve as director of Muwafaq's European operations from 1992 to 1995 or

1996. During that period, Kadi transferred substantial sums to Ayadi's *personal* account. Kadi also

granted SDGT Ayadi control of his shares in Depositna Bank. AR 1377. Kadi asserts "that these

transfers were for the sole purpose of the charitable objectives of Muwafaq." AR 8. Kadi states that

he "had no reasons to undertake any special financial reviews of the activities of the Foundation

offices headed by Chafiq Ayadi while they were in operation" because Ayadi had been

-21-

recommended by SDGT Wa'el Julaidan. AR 1376. Ayadi was deported from Bosnia because of his ties to terrorism. AR 22.

Any one of these three scenarios would be sufficient to support designation pursuant to E.O. 13224, § 1(d)(i), but OFAC did not rely exclusively on any particular piece of evidence in concluding that Kadi provided financial support to designated terrorists. As OFAC summarized in its 2004 Memorandum, "[Kadi] admits his longstanding and intimate association with SDGT Julaidan, SDGT Chafiq Ayadi, Dr. Abdul Latif Saleh, and Amir Mehdi. The latter three individuals have been, according to the information available to OFAC, arrested and/or deported from their countries of operation because of associations with terrorists, and Julaidan is a known close associate of Usama bin Ladin. Each of these individuals handled significant sums of money provided to him by [Kadi]." AR 22.

Plaintiff mistakenly assumes that he cannot be sanctioned for providing support to terrorists so long as he "did not and does not have a specific intent to further the illegal aims of any terrorist group or individual." Compl. ¶ 64. The D.C. Circuit has already considered and rejected this argument because proof of "specific intent" is not required in order to block one's assets pursuant to E.O. 13224. *See IARA*, 477 F.3d at 737 ("[W]e do not require a showing that IARA-USA intended its funding to support terrorist activities.").

Kadi also suggests that he should be held blameless for providing support to terrorists because the financial transactions occurred prior to indictment or prosecution. For example, Kadi states that "when [he] learned of Mr Salah's arrest in Israel, [he] immediately instructed his bank to stop payment of the one pending wire transfer." AR 1391-1392. Although Kadi claims that he merely intended to support charitable activities of QLI – and not to support terrorism – he

-22-

transferred money directly into Salah's personal bank account. AR 1390-1392. If Kadi's theory were to prevail, financiers simply could shift their resources to new extremists who have not been indicted or prosecuted for terrorist acts and thereby avoid accountability for their actions. Szubin Decl. ¶ 42. In order to combat terrorism by blocking sources of funding, OFAC reasonably concluded that an arms-length operator with extensive ties to terrorists, like Kadi, must be sanctioned.

Kadi similarly suggests that OFAC should ignore any support that he provided to SDGTs prior to their designation. As the D.C. Circuit has concluded, it is "clearly rational" for OFAC to consider context and history when examining an SDGT's relationship with terrorism. *HLF*, 333 F.3d at 162 ("HLF also argues that Treasury was arbitrary and capricious in relying on information that predated the 1995 designation of Hamas as a terrorist organization. However, as the district court noted, it was clearly rational for Treasury to consider HLF's genesis and history, which closely connect it with Hamas.") (citing *HLF*, 219 F. Supp. 2d at 74). Accordingly, OFAC properly considered Kadi's financial support to SDGT Julaidan and SDGT Chafiq Ayadi. *See* AR 289-290 (Kadi's admission that he "transferred substantial sums of money to the accounts of Muwafaq in Bosnia and Croatia" – accounts that Kadi admits he never audited); AR 291 (Kadi's admission that he "transferred sums of money to Chafiq Ayadi's personal account"); AR 2044 (Kadi's admission that he provided $1.25 million to SDGT Julaidan).

### 3.   Other Ties to Terrorism Also Justify the Sanctions Against Kadi.

Kadi engaged in other activities that provide additional support for OFAC's determination that Kadi was involved in funding terrorism.

- Throughout the 1990s, Kadi engaged in numerous business enterprises with Dr. Abdul Latif Saleh, who was deported from