# EXHIBIT E

Part 2

1  among other things, correct?
2       MR. HAEFELE: It's basically a general power of
3  attorney so that the Riyad office could act in the U.S. through
4  Mr. Al Khati. So anything that he used to open up and start
5  the U.S. branch office was covered by that power of attorney.
6       Exhibit 7 also shows it switches the OFAC directory,
7  Newcomb's memo about Al Haramain. He says the Al Haramain
8  Foundation headquarters under Al Akil's leadership provided
9  funding and instructions that governed the activities
10 throughout the world, including U.S. and elsewhere.
11      If we go to factor number seven, the parent's use of
12 subsidiary's property and assets as its own, just a variety of
13 the documents we submitted, including Exhibits 10, 14, 43 and
14 44, all go to this factor.
15      Again, 10 is the power of attorney. And in 14 we see
16 that Al Butay brought money from the Al Haramain headquarters
17 in Riyad to the U.S. to buy the U.S. branch property for the
18 branch office use. And he also brought money apparently from
19 the headquarters in Riyad to the U.S. to buy property in
20 Missouri to build a mosque, and the money went through Al
21 Haramain U.S. bank accounts to buy the property in Missouri.
22      Those factors also show the informal intercorporate
23 loan transactions that have -- that's factor number eight --
24 which shows that instead of making formal loan transactions,
25 they were just bringing money into the U.S. from the

0287TERC

1   headquarters to buy the properties both in Missouri and in
2   Oregon.
3        THE COURT:  One way in which to conclude that
4   documents of a foreign entity must be produced pursuant to a
5   document request or subpoena to a domestic entity is
6   practicability in the ordinary course of business to secure
7   such documents.  I guess that would be among others the Cooper
8   Industry case where Judge Edelstein basically ended up saying
9   it's inconceivable that they can't.
10       When I looked through the exhibits -- and I did --
11  most of them seemed to be the U.S. entity asking for permission
12  to do things, asking for money and the like.  I didn't notice
13  as I went through it -- and I can't say I studied each
14  document -- instances in which in effect the U.S. entity was
15  saying we need particular documents from you and showing a
16  degree of control, if you will, over the Saudi entity.
17       So, correct me if I'm wrong, it seems to me your
18  argument is that applying the factors you are going through,
19  they should be treated as alter egos of one another rather than
20  saying, as some of the cases say, the U.S. entity had
21  practicability to control what occurred in Saudi Arabia.
22       MR. HAEFELE:  Well, your Honor, I think the answer is
23  both really.  I think there is evidence that shows though
24  certainly the headquarters dominated and controlled the branch
25  office.  There is no doubt about that.

1           THE COURT:  No, I am asking whether there is an extent
2   to which and documents to support the conclusion that the U.S.
3   entity had a measure of control, or, forget control, just the
4   practicability to get documents that it wanted from Saudi
5   Arabia.
6           MR. HAEFELE:  I would say the latter, your Honor.
7   Certainly not the former, I don't think, because of the control
8   of the headquarters over the branch.  I think the
9   practicability is present as well because there are instances
10  where they asked for information and they got it.
11          In the normal course of business if the branch office
12  asked for information -- I think there is one instance where
13  they asked for Albanian literature to give out to the Albanian
14  refugees, and they wanted to be able to provide Islamic
15  literature for the Albanians.  They asked for it and got it.
16  And I think just the fact that they asked -- when they asked
17  for money for various things, they were able to get it.  So if
18  they asked for it, they were certainly able to get these
19  things.
20          THE COURT:  OK.  I interrupted you as you with going
21  through the list of factors.
22          MR. HAEFELE:  OK.  But to finish up your thought, your
23  Honor, yes, the other aspect is what I was working on, which is
24  that the evidence shows more than just that there is an ability
25  to get documents; it's that they are the alter ego of each

1  other. Ands that's the factors I was working on, so your Honor
2  is right on that.
3  THE COURT: I have had the issue, quite frankly, arise
4  with worldwide accounting firms, where typically there is the
5  U.S. entity, there is entities in a host of countries, and
6  frequently there is a logo but not a worldwide overseer in any
7  particular locality. And I have had that issue arise at least
8  twice with arguably inconsistent results but based on the way
9  in which particular accounting firms operated and held
10 themselves out. So, it seems to me that it's a very fact bound
11 inquiry.
12 MR. HAEFELE: I agree, your Honor, and I think that's
13 what the case law said, which is why I thought it helpful if I
14 went through and walked you through each of the factors, to
15 show you that there was some evidence indicating that at least
16 by my count nine or ten of the factors, if not more, weigh in
17 favor of alter ego relationship.
18 THE COURT: And I take it you don't dispute that as to
19 this issue the plaintiffs have the burden.
20 MR. HAEFELE: As to the issue of showing that there is
21 some evidence of this? Yeah. Which I think that we have.
22 THE COURT: Well, what I was referring to is that you
23 have the burden of establishing that there is a basis for
24 saying that the two should be treated as fungible in terms of
25 documents.

1                MR. HAEFELE:  Yes, I agree.

2                THE COURT:  OK.  Go on.  I'm sorry.

3                MR. HAEFELE:  I think we have indicated factor eight,

4       informal intercorporate loan transactions.  We have Exhibits 10

5       and 14.

6                Then we move to incorporation of the subsidiary by the

7       parent.  And the fact of the matter is that the Akil power of

8       attorney to Al Butay indicates that Mr. Al Butay was sent to

9       the U.S. for the purpose of setting up the entity that's the

10      U.S. branch.  And when it was eventually set up the directors

11      became directors that I referenced earlier, which is three of

12      them are headquarters people, and the fourth is Mr. Sayer or

13      Mr. Seragati, who is the local person in Oregon that they used

14      to be the person on the ground.

15               You also have Exhibit 44 which is a visit from a

16      headquarters person reporting on the U.S. office, saying that

17      Al Haramain took on a great responsibility when deciding to

18      open the office in the U.S.

19               Moving to factor eleven, decision making for the

20      subsidiary by the parent and the principals.  And the documents

21      we submitted are just rife with examples of that, including

22      Exhibit 7, 8 and 9.  Exhibit 7 is Director Newcomb's memo

23      regarding the degree of interaction among Al Haramain branches

24      and the headquarters in Riyad, noting that Al Akil had treated

25      the entirety of Al Haramain's one entity absolutely centralized

Case 1:03-cv-05071-GBD-SN   Document 286-74   Filed 11/29/10   Page 7 of 8
33

0287TERC

1  and that Al Haramain's director Al Khati characterized out
2  Akil's governance of Al Haramain as autocratic and centralist,
3  including all of the branch offices.
4      Al Akil was the quote only individual with the full
5  decision making on spending and the one with the authority to
6  hire employees, even if it was just a janitor.  And then if we
7  look at Exhibits 26, 27, 28, 29, 34, 36, 37 and 38, they all
8  show various examples of the U.S. office asking the Al Haramain
9  Riyad headquarters for funding for various things, from
10 electrical repairs, to building repairs, to property repairs,
11 to literature for the Albanians, the funds to shelter a camel
12 they had in the Oregon office.
13     And then one Exhibit, 29, the U.S. office is asking
14 Riyad for approval, advice and immediate support on these goals
15 and ambitions, and to give them future backing.
16     All of these documents show that the decision making
17 for the subsidiary came from the parent.
18     Factor Twelve is the subsidiary's directors do not act
19 independently in the interest of the subsidiary but in the
20 interest of the parent.  And this is important because I think
21 part of the evidence for this is that three of the four
22 individuals that run Al Haramain in the U.S. are Saudi
23 individuals that work with the headquarters.  Exhibits 7, 8 and
24 9 support the factors, especially because Al Akil was the
25 director of both the U.S. branch and the Riyad headquarters.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

0287TERC

And Exhibit 43, which is the letter from an attorney at Bernabei to OFAC recognizes that $150,000 in donations to the U.S. office were sent to the Riyad office.

Fact Fourteen is the nonobservance of formal legal requirements. And two instances of that that are evidenced are in Exhibit 14 which indicated in two instances Mr. Al Butay bringing substantial sums of money into the U.S. to buy property for the branch office, the property in Oregon and property again in Missouri.

And just some other factors that aren't in the 1 through 15 but I think that are important are the overlapping identification of the two offices. Exhibit 5 shows alphabetical listing of SBNs and block persons, and it lists the alternate name of Al Haramain Islamic Foundation as Al Haramain United States Branch.

THE COURT: I understand that aspect of it. I'm not sure how somebody from the Saudi entity bringing money to the U.S. falls under the category of nonobservance of formal legal requirements.

MR. HAEFELE: Well, instead of doing the formal loan transactions that ought to have been performed if they were considered to be separate entities, instead of making a loan or instead of putting on paper formal transactions, what they did is they just slipped money into the U.S. and put it into bank accounts for the U.S. entity and ran with it.