# Exhibit E

# National Commission on Terrorist Attacks Upon the United States

## Monograph on Terrorist Financing



## Staff Report to the Commission

John Roth
Douglas Greenburg
Serena Wille

**41454**

BUR-PEC-031023

Case 1:03-cv-05071-GBD-SN   Document 306-5   Filed 01/14/13   Page 3 of 19

Chapter 7

# Al Haramain Case Study

The al Haramain Islamic Foundation (al Haramain or HIF) is one of the most important and prominent Saudi charities.[126] Al Haramain has been on the radar screen of the U.S. government as a potential terrorist-financing problem since the mid- to late 1990s, when the U.S. government started to develop evidence that certain employees and branch offices might be supporting al Qaeda and related terrorist groups.[127]

The U.S. government, however, never moved against al Haramain or pushed the Saudi government to do so until after 9/11. Terrorist financing simply was not a priority in its bilateral relationship with the Saudis before 9/11. Even when discussing terrorist financing with the Saudis, the U.S. government was more concerned about issues other than Saudi charities and al Haramain.[128] Meanwhile, the Saudis were content to leave the issue unexplored.

After the 9/11 attacks, a more focused U.S. government sought to work with the Saudis to stem the flow of funds from al Haramain to al Qaeda and related terrorist groups. Progress was initially slow; though some U.S.-Saudi cooperation on al Haramain occurred within the first six months after 9/11, it was not until the spring of 2003 that the U.S. government and the Saudi government began to make real strides in working together to thwart al Haramain.

## *Background*

Al Haramain, a Saudi Arabia–based nonprofit organization established in the early 1990s, has been described by several former U.S. government officials as the "United Way" of Saudi Arabia. It exists to promote Wahhabi Islam by funding religious education, mosques, and humanitarian projects around the world.[129]

At its peak, al Haramain had a presence in at least 50 countries. Al Haramain's main headquarters are in Riyadh, Saudi Arabia, but it maintains branch offices in a number of

---

[126] See chapter 1 for the scope of this analysis.
[127] This chapter is derived from a review of internal government document and interviews with government policy makers. It was especially aided by the commission staff's ability to access and review NSC subgroup minutes of meetings, as well as internal memoranda from the NSC, State, Treasury and the intelligence community.
[128] Our investigation has focused on al Haramain in the context of al Qaeda financing. Although much of our analysis may apply to the financing of other terrorist groups, we have made no systematic effort to investigate any of those groups, and we recognize that the financing of other terrorist groups may present the U.S. and Saudi governments with problems or opportunities not existing in the context of al Qaeda.
[129] The Web site uses the term *salafi*, which is the preferred term of Saudi practitioners of Wahhabism. Some argue that Wahhabism is a virulent form of religious extremism, while others have a more benign view of it. See chapter 2 for more information.

BUR-PEC-031138

countries to facilitate the distribution of charitable funds. Some of these offices are staffed by Saudi citizens; others are managed by the nationals of the countries involved. Estimates of its budget range from $30 to $80 million. It claims to have constructed more than 1,299 mosques, it funds imams and others to work in the mosques, and it sponsors more than 3,000 "callers to Islam" for tours of duty in different locations "to teach the people good and to warn them from wrongs." HIF provides meals and assistance to Muslims around the world, distributes books and pamphlets, pays for potable water projects, sets up and equips medical facilities, and operates more than 20 orphanages.

Although both the Saudi government and al Haramain say that it is a private organization, al Haramain has considerable ties to the Saudi government. Two government ministers have supervisory roles (nominal or otherwise) over al Haramain, and there is some evidence that low-level Saudi officials had substantial influence over various HIF offices outside of Saudi Arabia. The Saudi government has also historically provided financial support to al Haramain, although that may have diminished in recent years.

Charity and charitable organizations, like al Haramain, are extremely important to Saudi society. As discussed in more detail in chapter 2, religious and civic duty and government and religious functions in Saudi Arabia are intertwined. This dynamic creates complications for the Saudi government as it seeks to stem the flow of funds from Saudi Arabia to al Qaeda and related terrorist groups, and difficulties for the U.S. government as it seeks to engage the Saudis on terrorist financing.

## Before 9/11

After the East Africa bombings in the summer of 1998, the U.S. government began to give more attention to terrorist financing. The National Security Council established a subgroup of the Counterterrorism Security Group to focus the U.S. government's efforts on terrorist financing.[130] As a result of this focus, and the consequent discovery that al Qaeda was not financed from Bin Ladin's personal wealth, the NSC became increasingly interested in Saudi charities and Bin Ladin's use of charities to fund terrorism.[131]

By no later than 1996, the U.S. intelligence community began to gather intelligence that certain branches of HIF were involved in financing terrorism. Later, the U.S. intelligence community began to draw links among HIF, the 1998 East Africa bombings, jihad actions in the Balkans, Chechnya, and Azerbaijan, and support for al Qaeda generally. The United States shared some of its information with the Saudis in an effort to spur action, including evidence that al Haramain officials and employees in East Africa may have been involved in the planning of the 1998 embassy bombings. The United States sought information and reports from the Saudis on employees of al Haramain around the globe and their connections to Bin Ladin, but received no substantive responses.

---

[130] Terrorist financing was also a component of the larger strategic plan Richard Clarke developed after the embassy bombings.
[131] The U.S. government's efforts to understand al Qaeda financing, and its engagement with Saudi Arabia, are described in chapter 3.

115

BUR-PEC-031139

National Commission on Terrorist Attacks Upon the United States

The Saudis took little initiative with respect to their charities. They did not make tough decisions or undertake difficult investigations of Saudi institutions to ensure that they were not being used by terrorists and their supporters. Although the Saudis did institute "Guidelines for Preventing Money Laundering" in 1995 and "Regulations on Charitable Organizations and Institutions" in 1990, these were very loose rules whose enforcement was doubtful. Moreover, the regulations covered only domestic charities, through the Ministry of Labor and Social Affairs, and exempted all charities set up by royal decree.

There may have been a number of reasons for Saudi inaction. Certainly, as we have discussed elsewhere (see chapter 2), the prominence of religion-based charities in Saudi culture may have made the Saudis reluctant to entertain the idea that charities might be involved in clandestine activities. Some in the United States suspected that the Saudis were complicit or at least turned a blind eye to the problem posed by charities during this period, although others vehemently disagreed.

Ultimately, however, the U.S. government simply did not ask much of the Saudis on terrorist financing, and the Saudis were content to do little. We did not provide sufficient information for the Saudis to act against charities like al Haramain, did not push the Saudis to undertake investigations of charities like al Haramain, and did not request real cooperation from the Saudis on intelligence or law enforcement matters relating to charities like al Haramain.

Other areas of U.S. policy involving the Saudis took precedence over terrorist-financing issues such as those concerning al Haramain. The U.S. government wanted the Saudis to support the Middle East peace process, ensure the steady flow of oil, cut off support to the Taliban, continue various mutually beneficial economic arrangements, and assist in the containment of Iraq. Given these other interests, stopping the money flow to terrorists was not a top priority in the U.S.-Saudi relationship.

Saudi policy was formulated at a very high level in the U.S. government. During the late 1990s, the U.S.-Saudi relationship was handled primarily by the U.S. government's most senior officials, including the secretaries of key departments (collectively referred to as the "Principals"), and often even by the President alone. This situation reflected the significance of the U.S. interests involved, considerable Saudi ties to senior U.S. officials, and U.S. willingness to accede to the strong Saudi preference for bypassing the U.S. bureaucracy. One former NSC official noted that before 9/11, lower-level officials in both governments generally handled terrorist financing, especially given the weakness of the intelligence on terrorist financing and the issue's low priority. The officials with knowledge about it were not the ones interacting with the Saudis, and those who were interacting with the Saudis did not push the issue of terrorist financing because their concerns were different.

Moreover, the U.S. government had too little unilateral intelligence on HIF and on al Qaeda's funding mechanisms generally to press the Saudis. The Principals did not want to confront the Saudis with suspicions; they wanted firm evidence. One NSC official

BUR-PEC-031140

indicated that there was some intelligence regarding charities, but it did not rise to the level of being actionable against any specific charity. As he said, "One individual could be dirty, but it would be difficult to justify closing down a charity on that basis." Occasionally the U.S. government provided select pieces of information out of context, but this method lessened the impact of the intelligence.

## After 9/11

As we described in chapter 3, the 9/11 attacks generated a sudden and high-level interest in terrorist financing. Attention invariably turned to Saudi Arabia. The U.S. and Saudi governments initially agreed on a joint strategy, represented by the mutual U.S.-Saudi action against two branches of al Haramain in March 2002 designating them as financiers of terror.[132] But it was not until the spring of 2003 that the U.S. government developed a coherent strategy on engaging the Saudis on terrorist financing and specified a senior White House official to deal with the Saudi government on these issues. These elements enabled the U.S. government to capitalize on a new Saudi commitment to countering the financing of terrorism after the Riyadh bombings on May 12, 2003.

## From 9/11 to March 2002: The U.S. government's initial efforts to organize the interagency process and engage the Saudis

Two things occurred immediately after 9/11: first, the U.S. government formed what turned out to be a generally effective interagency coordinating committee on terrorist financing; second, this group began discussing possible action to take against al Haramain.

Immediately after 9/11, the U.S. government, for the first time, developed a generally effective mechanism to coordinate agencies' approach to terrorist finance. Initially, an ad hoc gathering of agency representatives met under the auspices of the NSC to discuss and coordinate terrorist-financing issues. In March 2002, this ad hoc group was formalized by the NSC as the Policy Coordinating Committee (PCC), chaired by the Treasury Department with representatives from eight agencies with relevant subagencies. The PCC was designed to recommend to the President policy initiatives and actions aimed at destroying the financial infrastructure of terrorism.

After 9/11, there was constant discussion at the PCC about how to engage the Saudi government on terrorist financing. The U.S. government had new, aggressive legal authorities under Executive Order 13224 and UN Security Council Resolution 1373 (see chapter 5). The major issue was whether to use these coercive tools unilaterally or take a more diplomatic approach in engaging Saudi Arabia and their charities. On the one hand, using these tools against al Haramain, one of the most important Saudi charities, could be

---

[132] For an explanation of the IEEPA and UNSC process, see chapter 5, concerning al-Barakaat.

BUR-PEC-031141

counterproductive without Saudi support.[133] On the other hand, using these strong tools could send an unequivocal message that the U.S. government and the international community were serious about fighting terrorist financing.

After considering the options for designating al Haramain, the PCC decided to try to engage the Saudis constructively on this charity. The United States wanted many things from the Saudis: information about the hijackers, action against al Qaeda cells training and operating in Saudi Arabia, intelligence sharing, and access to detained individuals. Terrorist financing was not the only element of the U.S.-Saudi counterterrorism relationship, nor the only objective of U.S. counterterrorism policy. The concern was that if the U.S. government pressed the Saudis on al Haramain, the Saudis' cooperation with the United States on counterterrorism issues or other issues would be jeopardized.

Moreover, as was the case before 9/11, the intelligence was simply not strong enough against the HIF headquarters to push the Saudi government to take aggressive action against the whole organization. As an early 2002 strategy paper emphasized, the United States needed to gather more solid, credible evidence on al Haramain, which could be released to the Saudi government as a way to ensure continued Saudi cooperation. Although the intelligence community expressed repeated concerns that al Haramain was deeply corrupted, others argued that there was little actionable intelligence on the charity. The intelligence presented to the policymakers was either dated, spoke to fund-raising for "extremism" or "fundamentalism" and not for terrorism, or lacked specificity. Indeed, because of the lack of specific intelligence, the U.S. government was in "asking mode" on al Haramain when interacting with the Saudis.

There was also the sense that the Saudi government would prefer to cooperate quietly with the U.S. government for internal political reasons. Perhaps they did not want to create the impression that charities were under attack. U.S. officials agreed to pursue quiet cooperation as long as the U.S. government saw concrete results. Although the United States saw no concrete results until 2003, it stuck with its plan to engage the Saudis quietly on terrorist-financing matters.

This cooperative approach was in evidence in the first interactions between U.S. and Saudi officials on al Haramain. In late November 2001, Assistant Secretary of State William Burns traveled to the Kingdom and shared U.S. concerns about terrorist financing with his Saudi interlocutors.[134] Al Haramain was not a subject of the questions but was listed in the talking points for the trip as an entity of concern.

Then, on January 17, 2002, Assistant Secretary Burns and Ambassador Robert Jordan provided the Saudi Crown Prince Abdullah and Foreign Minister Prince Saud al Faisal with a proposal for a joint U.S.-Saudi freeze of the accounts of eight Saudi entities and

---

[133] Within weeks after 9/11, the United States used its new powers of designation to freeze the assets of a prominent Saudi citizen, Yasin al Qadi. Apparently this unilateral action had created backlash in the Saudi government.

[134] An OFAC team received a one page response in Arabic from Saudi Arabia to these concerns in January 2002. This response was never supplemented by the Saudi government.

118

BUR-PEC-031142

Terrorist Financing Staff Monograph

individuals, including the al Haramain offices in Bosnia and Somalia. In their discussions, the governments focused their attention on the U.S. proposal relating to the two al Haramain branch offices.

In Saudi Arabia at the end of January, Richard Newcomb, the director of Treasury's Office of Foreign Assets Control (OFAC), also raised the possibility with his Saudi interlocutors of joint designations. His talking points included two pages of classified intelligence on al Haramain (and other charities) to provide the Saudis. The Saudis agreed to "look into" the U.S. concerns on al Haramain. In addition to proposing joint designations, the U.S. delegation expressed "concern" over several other HIF branches, including those in Pakistan and Kenya (both designated in January 2004), and requested information from the Saudis.

On February 5, 2002, the Saudi government issued an official statement acknowledging "reports" of abuses by individuals affiliated with foreign offices of HIF and committed publicly to take actions to prevent such abuse. However, the Saudis were slow to respond to the U.S. proposal on the two al Haramain offices. The issue was taken up by senior levels in the U.S. government. For example, Treasury Secretary Paul O'Neill raised the proposal on his March 2002 trip to Saudi Arabia.

Eventually, the Saudi government agreed to the joint designation of the two al Haramain offices, although it did not agree to designate the other six entities or individuals originally proposed. On March 11, 2002, the U.S. and Saudi governments designated the Somali and Bosnian offices of al Haramain, freezing their assets and prohibiting transactions with them. Two days later the United Nations added the two branch offices to its list of sanctioned entities under UNSCR 1267 and subsequent related resolutions.

## *From March 2002 to January 2003: The U.S. loses traction*

In early 2002, senior-level government officials started developing a new U.S. strategy toward Saudi Arabia on counterterrorism generally; terrorist financing would necessarily play a part. Because the strategy was so politically sensitive, the task of developing it was given to a small group within the NSC. As a result, PCC efforts to deal with the Saudis on terrorist financing were placed on hold for most of 2002, while the NSC drafted the strategy with a small team of agency representatives.

During that time, the U.S. government engaged the Saudis only sporadically on HIF. Although in the spring of 2002 the U.S. government requested specific information from Saudi Arabia on HIF associates, no action was to take place until the larger Saudi strategy on counterterrorism had been finalized.

During the summer and fall of 2002, the U.S. government received information that the Bosnian and Somali offices of al Haramain, whose assets were supposed to have been frozen and offices shut down, had reopened or were still active in some fashion. In September 2002, the U.S. government decided to approach the Saudi government about

119

National Commission on Terrorist Attacks Upon the United States

the reopenings of the Bosnian and Somali branches of HIF. The topic was raised at a senior level by U.S. government officials in Washington and through official visits to the region in the fall of 2002. The Saudis indicated they were unaware of the reopenings but said they would work with the U.S. government on the issue.

During 2002, the Saudis repeatedly said they would be prepared to act against al Haramain if the U.S. government provided them with more information, especially about specific branch offices and individuals. Some thought that this was perhaps simply lip service. For instance, in October 2002 Under Secretary of State Alan Larson raised with the Crown Prince strong concerns about the activities of several al Haramain offices. The Crown Prince responded that he was ready to act on any specific information the United States could provide. Some viewed Saudi requests for information from the United States as somewhat disingenuous given Saudi Arabia's ability to gather information on HIF and its supporters. Others were not so sure the Saudis had that ability. Perhaps even a tit-for-tat dynamic was at work: the U.S. government did not share intelligence that the Saudis thought we had, and which in many cases we did have, so the Saudi government feigned ignorance in order not to share its intelligence with the United States.

In December 2002, the Deputies Committee (DC), which consists of deputy secretaries of key departments and generally oversaw the activities of the PCC, approved the 12-step program for reinvigorating U.S. policy toward Saudi Arabia on counterterrorism overall. Much of the Saudi strategy dealt with terrorist financing. The steps included naming a senior interlocutor on terrorist finance, sharing more concrete and actionable intelligence with the Saudis, providing expertise in money laundering and investigative techniques, encouraging more public discussion of the business risks generated by opaque financial structures, pressuring Saudi nongovernmental organizations (NGOs) to adopt better oversight practices, and encouraging better use of the media to combat terrorist financing.

Concurrently with the approval of the Saudi strategy, the DC formally pushed forward a "nonpaper"[135] on al Haramain. Its goal was to compile U.S. government information on HIF, urge the Saudis to take specific actions, and set time frames for such actions. Agencies were tasked and the nonpaper was finalized by January 2003. Attention from the DC gave the nonpaper sufficient strategic importance for agencies to devote resources to developing it and motivated the approval of the release of information.

Two relatively new appointees, State Department Coordinator for Combating Terrorism Cofer Black and Special Assistant to the President and Senior Director on Combating Terrorism at the NSC Rand Beers, presented the nonpaper on al Haramain to Saudi officials during a previously planned trip on counterterrorism at the end of January 2003. At last, the U.S. government was providing the Saudis with the information that they had long requested and that the U.S. government had previously failed to supply. The mood was optimistic. A Department of State memo from January 2003 referring to al Haramain and other cases of concern suggested that "there is every indication that the Saudis are

---

[135] A "nonpaper" is generally understood to be an official but not definitive statement on an issue by a U.S. government agency.

120

BUR-PEC-031144

ready to work with us on these specific cases now that we have specific information for them to act upon."

The nonpaper set out al Haramain's ties to terrorism, with details on various individuals, branch offices, and methods of transferring funds. The nonpaper suggested that many al Haramain field offices and representatives operating throughout the world, as well as its headquarters in Saudi Arabia, appeared to be providing important support to al Qaeda. The nonpaper recited prior U.S. requests for information from the Saudis and specific points of intelligence the United States had shared with the Saudis since 1998, and it noted that the United States had shared with the Saudis very little information between 9/11 and its delivery.[136] The nonpaper contained substantial information, including details on the role of the HIF headquarters in supporting terrorist organizations. Reflecting the new U.S. strategy, the U.S government was more direct and forceful in its message and gave the Saudi government concrete challenges to meet.

While the nonpaper represented a new and effective tactic, its delivery illustrated a shortcoming in the U.S. government's approach to Saudi Arabia on terrorist financing: Cofer Black and Rand Beers were new faces for the Saudis on this issue, and their portfolios were much broader than the fight against terrorist financing. The U.S. government had used a number of messengers, and there was no single person sending the Saudi government a clear message; each individual spoke about terrorist financing and HIF in the context of his or her predetermined and wide-ranging agenda; each individual spoke to different interlocutors with differing responsibilities and chains of command; and despite the sensitivity of the issue, not all the officials were senior. A U.S. official on the PCC said that Saudi representatives complained that junior U.S. officials were, in essence, bothering them. This failure to focus U.S. engagement of the Saudis was most apparent during our efforts to raise the reopenings of the Bosnian and Somali offices with Saudi officials. Within a six-week period in the fall of 2002, about five emissaries from the United States approached the Saudi government. Our efforts suffered from the diffusion of the message and, in the words of one senior U.S. official, the U.S. government allowed itself to be "gamed" by the Saudis because it failed to speak with one voice.

Moreover, it was acknowledged that the Saudis would be more likely to follow the leadership of the U.S. government on this subject if a senior White House official served as the interlocutor on terrorist financing to the Saudi government. In fact, the Saudis requested such an appointment in the fall of 2002. The U.S. government agreed the idea was a good one, but could not settle on an appropriate individual for the role until more than six months later. This failure to appoint a senior White House official in a timely fashion arguably caused a crucial delay in U.S. efforts to engage the Saudis on terrorist financing and al Haramain. One U.S. terrorist-financing official said the Saudis did not take terrorist financing seriously until this appointment was made. They looked at U.S. actions and concluded that terrorist financing was not as important to the United States as other issues.

---

[136] At that time, most of the intelligence on HIF released to the Saudis since 9/11 related to the Bosnian and Somali offices of HIF, in connection with the U.S.-Saudi joint designation of these offices in March 2002.

121

BUR-PEC-031145

National Commission on Terrorist Attacks Upon the United States

## *From 9/11 to May 2003: A lack of real cooperation from the Saudis*

After 9/11, Saudi government officials appeared to be in denial that vast sums of money were flowing from Saudi Arabia to al Qaeda and related terrorist groups, or that the government had any responsibility in connection with these money flows. Some in the U.S. government thought that it simply never occurred to the Saudi government that a charity could be a conduit for terrorist financing. As well, some argued that charities' record keeping and the Saudi government's controls were insufficient for the Saudi government to know of al Haramain's links to terrorist organizations.

Even after the Saudi government froze the assets of the Bosnian office in March 2002, one senior Saudi government official denied in the press that the al Haramain office in Sarajevo was engaged in illicit activities. He claimed that the U.S. government had apologized to HIF for designating the wrong office. Another senior Saudi official characterized any terrorist financing out of the Kingdom as involving isolated cases and government controls as sufficient to prevent further problems; a third described HIF's clandestine activities as outside activities. We know these descriptions were inaccurate, as the U.S. and Saudi governments continued to take action against al Haramain and its employees.

Despite having frozen the accounts of entities and individuals listed by the United Nations under UNSCR 1373, the Saudis did little else initially. They insisted that their then 12-year-old charities law would suffice, as would their then 7-year-old anti-money-laundering statute. Foreign operations of charities were not regulated until 2002, when the Ministry of Islamic Affairs was put in charge of overseeing them. In the summer of 2002, the Saudis claimed that all out-of-country charitable activities had to be reported to the Foreign Ministry, but later in the year a representative of the Foreign Ministry said he knew of no such regulation. They claimed that they were reviewing all domestic charities in 2002 but took no actions and did not inform the U.S. government of any findings, even while clandestine activity continued. They repeated promises throughout 2002 to establish a High Commission that would oversee all charitable activities, and then claimed to have created such an entity in December 2002. By late fall of 2002 the Saudi government said it was moving to regulate charities further, but the U.S. government had not seen any documentation to that effect as of spring of 2003.

The Saudis responded to the increase in U.S. pressure, exemplified by the delivery of the al Haramain nonpaper in early 2003, by articulating additional counterterrorism policies. The measures were to include Ministry of Islamic Affairs preclearance of transfers of charitable funds overseas, host government approval of all incoming charitable funds from Saudi Arabia, and monitoring of charities' bank accounts through audits, expenditure reports, and site visits. Also in the spring of 2003, the Saudi Arabia Monetary Authority (SAMA) was said to have instituted a major technical training program for judges and investigators on terrorist financing and money laundering.

122

Terrorist Financing Staff Monograph

On al Haramain, the Saudi press reported in February 2003 that the Saudi government was planning to restructure the charity. The Saudi government had also reportedly initiated an investigation of al Haramain and was examining the personal accounts of senior officers. However, the Saudis resisted taking action against a top HIF executive despite U.S. requests. In April 2003, the Saudi government said that a new Board of Directors would be appointed for al Haramain, no new offices would be permitted, no third-country nationals would be hired, all overseas offices were to have their own local lawyers and accountants, and a licensing procedure would be implemented. Again, there was a sense that the Saudis wished to take such actions quietly. On May 8, 2003, the U.S. embassy in Riyadh reported that the Saudi government would close ten al Haramain branch offices pending review of their finances. This claim was reiterated several times by Saudi or HIF officials over the summer of 2003.

Although these measures were all steps in the right direction, the Saudi government generally failed to carry out a number of the actions pledged. For instance, they did not close the branch offices of HIF as promised. As well, the Saudi government remained cautious about speaking publicly about counterterrorism issues and ramping up its reforms. Some in the U.S. government thought that public statements by the Saudi government could have gone a long way toward deterring Saudi financial support for terrorists. Admittedly, the Saudis were, and still are, cautious about how any reforms and close cooperative efforts with the United States are perceived in the Kingdom.

Underlying the Saudi government's reluctance to act against charities funneling money to terrorists lay several issues.[137] First, at the time the Saudi government did not view al Qaeda as a domestic threat. The Saudis simply may not have believed that al Qaeda would attack it, despite the known hatred of al Qaeda and Bin Ladin for the Saudi regime. The signs were there, however, and even the U.S. government had warned the Saudis of possible upcoming attacks in the Kingdom.

Second, the Saudi government's efforts on terrorist financing were domestically unpalatable. It had been content for many years to delegate all religious activities, including those of charities, to the religious establishment and was reluctant to challenge that group. Since the Saudi government did not view al Qaeda as a domestic threat at that time, it could not justify the potential domestic rancor that would have resulted from a strong program against terrorism financing. The challenge was to find a way to increase oversight over charities, mosques, and religious donations without endangering the country's stability. Of course, by failing to reassert some measure of control over the religious establishment, the House of Saud was just as likely to endanger its stability.

---

[137] In addition to the points stated below, some with the U.S. government have speculated that the Saudi government resisted investigating al Haramain and other charities for fear that such investigations might unearth information implicating, or at least unflattering to, senior members of the Saudi government in the clandestine activities of the charity. The Commission staff has found no evidence that the Saudi government as an institution or as individual senior officials individually funded al Qaeda.

123

National Commission on Terrorist Attacks Upon the United States

Third, the Saudi government did not have the technical capabilities to stem the flow of funds to terrorists from charities in Saudi Arabia. The Mubahith lacked the necessary investigative expertise to track financial crimes. In addition, as described in an internal OFAC document from April 2002, "The SAG [Saudi Arabian government] does not have the legal or operational structures in place at this time to effectively implement the U.N. resolutions relating to the prevention and suppression of the financing of terrorist acts."[138] Although the Saudis claimed to be developing procedures to track all donations to and from charities in October 2002, by January 2004 they were described as just starting to have such capabilities. Moreover, tighter control over money flows can be achieved only if the banks in Saudi Arabia are capable of monitoring and freezing funds. In 2002, the U.S. intelligence community was highly skeptical that Saudi banks had the necessary technical abilities.

The U.S. government was willing, and made several offers, to provide the Saudis with the necessary training. In 2002, the Saudis were described as "reluctant to host trainers from U.S. agencies on issues related to terrorist financing. This reluctance is partly cultural—an attitude that training implies a lack of equality between the parties." The U.S. government sent a Financial Services Assessment Team (FSAT) to Saudi Arabia in April 2002 to learn about Saudi financial systems and structures and ascertain opportunities for U.S. assistance and training, but the Saudis failed to schedule several key meetings during this trip.

## *May 2003: Turning a corner*

On May 12, 2003, al Qaeda operatives detonated three explosions in an expatriate community in Riyadh, killing Westerners and Saudi Arabians. Since then, the Saudi government has taken a number of significant, concrete steps to stem the flow of funding from the Kingdom to terrorists. The Saudi government, in one of its more important actions after the bombings, removed collection boxes in mosques, as well as in shopping malls, and prohibited cash contributions at mosques. This action was important because terrorist groups and their supporters have been able to siphon funds from mosque donations. Its sensitivity cannot be overestimated. U.S. Ambassador to Saudi Arabia Jordan described the removal of the collection boxes as a "cataclysmic event." It was a real action that the Saudi public has both seen and been affected by; it has forced everyone to think about terrorist financing.

On May 24, 2003, the Saudi government followed up with comprehensive new restrictions on the financial activities of Saudi charities. These included a requirement that charitable accounts can be opened only in Saudi riyals; enhanced customer identification requirements for charitable accounts; a requirement that charities must consolidate all banking activity into one principal account, with subaccounts permitted for branches but for deposits only, with all withdrawals and transfers serviced through the main account; a prohibition on cash disbursements from charitable accounts, with

---

[138] Department of the Treasury, "Note to File," undated, but probably October 2002.

124

Terrorist Financing Staff Monograph

payments allowed by check payable to the first beneficiary and deposited into a Saudi bank; a prohibition on the use of ATM and credit cards by charities; and a prohibition on transfers from charitable accounts outside of Saudi Arabia.

Also, after the May 12 bombings the Saudis initiated action to capture or otherwise deal with known al Qaeda operatives, financial facilitators, and financiers in Saudi Arabia. Early in this campaign, the Saudis killed a key al Qaeda leader and financial facilitator known as "Swift Sword" in a firefight. The arrests and deaths of financial facilitators such as Swift Sword have been a blow to al Qaeda and have hampered its fund-raising efforts in the Kingdom.

The May 12 bombings caused the Saudis to become more receptive to disrupting al Qaeda financing than ever before; the Saudis appeared ready to take seriously the cooperative aspect of "quiet cooperation." At the same time, the U.S. government finally developed a coherent approach to working with the Saudis on combating terrorist financing. The United States had an agenda, the Saudi strategy, and was able to engage the Saudis more forcefully on the issues than it could have otherwise. Most importantly, the U.S. government raised the terrorist-financing dialogue to the highest levels. Fran Fragos Townsend, then deputy assistant to the President and deputy national security advisor for combating terrorism, was designated the senior White House liaison on terrorist financing, and President Bush has publicly stated his confidence in her.

The U.S. government was therefore in a position to test the Saudis' new focus on terrorist financing. Townsend traveled to Saudi Arabia in early August 2003 and again in September 2003. One product of the early high-level meetings was the establishment of the joint task force on terrorist financing, described below.

Despite the positive atmosphere of the August meetings, one area of continuing concern was that the ten al Haramain branches the Saudi government had committed to closing in May 2003, before the bombings, were apparently still operating. There was apparently some question as to whether the al Haramain head office really had control over its branch offices and therefore whether closing the branch offices was the responsibility of the Saudi government or the host governments. Some in the U.S. government believe this discussion to be specious, since resources regularly flow from the head office to the branches. They argue, plausibly, that even if the Saudi government itself cannot control the flows of funds, it can pressure the headquarters to cut off these resources to the branches or pressure the heads of governments of the countries where the branch offices are located to close those offices.

In the fall of 2003, the Saudi government passed new anti-money-laundering and terrorist-financing legislation. This law updated the 1995 anti-money-laundering law and improved reporting and record-keeping requirements, created new interagency coordination mechanisms, and established a financial intelligence unit to collect and analyze suspicious financial transactions. Also that fall, the Saudi government permitted a team of assessors from the Financial Action Task Force (FATF) and the Gulf Cooperation Council to visit the Kingdom to evaluate its anti-money-laundering and

125

BUR-PEC-031149

National Commission on Terrorist Attacks Upon the United States

terrorist-financing laws and regulations. Finally, in September 2003 the Saudi government questioned the executive director of HIF, Abd al-Rahman Bin Aqil.

The joint task force on terrorist financing started operations in the fall of 2003 as well. The task force consists of staff from both the United States and Saudi Arabia. The task force seeks to identify and financially investigate persons and entities suspected of providing financial support to terrorist groups. The U.S. government offered the Saudis training in conducting financial investigations, and the Saudis "readily accepted." This training focused on the value of tracking financial transactions in an investigation and provided practical case studies. The Saudi trainees were dedicated and enthusiastic, although very much in need of training. One FBI official said, "I cannot overemphasize the importance of this initiative and the efforts on the part of both our countries to make it work."[139]

In November 2003, another bombing in Riyadh further jolted the Saudi government to take action on terrorist-financing issues and cooperate with the U.S. government. One U.S. government assessment described the impact of the 2003 Riyadh bombings on the Saudis, in conjunction with the May 12 bombings, as "galvanizing Riyadh into launching a sustained crackdown against al-Qaida's presence in the Kingdom and spurring an unprecedented level of cooperation with the United States." Similarly, it noted that "the attack of 9 November [2003], which resulted in the deaths of a number of Muslims and Arabs during the holy month of Ramadan, transformed Saudi public acceptance of the widespread nature of the threat in the Kingdom."[140] As a result, the Saudi government may have more latitude to act against terrorist financing than ever before.

Similarly, FBI officials have ranked Saudi cooperation on terrorist-financing issues as "good" since the May 12 and November 8, 2003, Riyadh bombings. The Saudis have aggressively interrogated people in their custody about financial matters, including questions posed by the U.S. government, and have provided actionable intelligence to the U.S. government. A senior CIA counterterrorism official agreed that there had been progress in our cooperation with the Saudis. He described it as "not perfect" but a big improvement from the difficult days before 9/11. In a sign of the level of U.S. confidence in the Saudi effort, the U.S. government is now releasing very sensitive intelligence to the Saudis.

By late fall of 2003, Saudis confirmed that since 9/11 they had taken several significant steps to modify their rules and regulations to stem the flow of funds to terrorists. In addition to the new charities regulations, the removal of zakat boxes, and the task force, as described above, the Saudi government said it had established the High Commission to oversee all charities, contributions, and donations; required all charities to undergo audits and institute control mechanisms to monitor how and where funds are dispersed; directed all Saudi charities to suspend activities outside Saudi Arabia; and investigated numerous

---

[139] Testimony of Thomas J. Harrington, Deputy Assistant Director, Counterterrorism Division, Federal Bureau of Investigation, before the House International Relations Subcommittee on the Middle East and Central Asia, March 24, 2004.
[140] Department of State, *Patterns of Global Terrorism 2003*, April 2004, p. 67.

126

BUR-PEC-031150

Terrorist Financing Staff Monograph

banks accounts suspected of having links to terrorism and frozen more than 40 such accounts. The Saudi government has apparently also regulated hawalas through a mandatory licensing requirement and legal, economic, and supervisory measures and sought to decrease demand for unlicensed hawalas.

With respect to al Haramain, the Saudi and U.S. governments took further action at the end of 2003 and into 2004. On December 22, 2003, the U.S. and Saudi governments designated Vazir, an NGO in Bosnia, and its representative a terrorist supporter. It was determined that Vazir was simply another name for the previously designated al Haramain office in Bosnia. Then, in January 2004 the United States and Saudi Arabia jointly designated four additional branches of al Haramain, in Indonesia, Kenya, Tanzania, and Pakistan. The two governments held an unprecedented joint press conference in Washington to announce the designation. The names of these branches were subsequently submitted to the United Nations, which instituted an international freeze on their assets. Also, in January 2004 Executive Director Aqil was removed from his position. One public explanation was that the firing related to recent incidents involving HIF's operations in Bosnia.

On February 19, 2004, federal law enforcement took action against both the al Haramain branch in Ashland, Oregon, and the imam of the HIF mosque in Springfield, Missouri. The FBI and the IRS conducted searches of the Ashland offices of HIF as part of an investigation into alleged money laundering and income tax and currency reporting violations. Treasury took the additional step of freezing, during the pendency of an investigation, the accounts of the branch in Oregon and the mosque in Missouri.

The Saudis continue to make changes to their charities laws and regulations. Rules implementing the anti-money-laundering and terrorist-financing law were issued in February 2004. Also in February 2004, FATF issued its report indicating that Saudi Arabia was in compliance or near-compliance with international standards for almost every indicator of effective instruments to combat money laundering and terrorist financing.

On February 29, 2004, the Saudi government announced that it had approved the creation of the Saudi National Commission for Relief and Charity Work Abroad to take over all aspects of overseas aid operations and assume responsibility for the distribution of charitable donations from Saudi Arabia. Although the U.S. government had no details about this commission as of the end of March 2004, one former U.S. government counter-terrorist-financing official said that such an entity could, in theory, replace charities such as al Haramain by subsuming all of HIF's activities into its own. Al Haramain was said to be in the process of restructuring its administration and revising its financial regulations. Al Haramain was planning to refocus its charity work on Saudi Arabia, according to a statement by its new director, Sheikh Dabbas al Dabbas.

Continuing the pressure on al Haramain, the U.S. and Saudi governments jointly designated five additional branches of al Haramain (Afghanistan, Albania, Bangladesh, Ethiopia, and the Netherlands) on June 2, 2004. The United States also designated former

BUR-PEC-031151

Executive Director Aqil. These names were subsequently submitted to the United Nations for an international freeze on their assets.

## *Lessons Learned*

The U.S. government's efforts to address issues raised by al Haramain before and after 9/11 teach some critical lessons. First, to cause the Saudi government to move against terrorist financiers, the U.S. government has to acquire and release to the Saudis specific intelligence that will enable them to take the necessary action. Thus, the U.S. government was able to get the Saudis to take concrete actions against al Haramain, and charities generally, after it released the nonpaper containing specific intelligence about al Haramain and its employees to the Saudis in January 2003. Previously, the U.S. government appears, for the most part, to have tried to encourage the Saudis to act on the basis of little more than U.S. suspicions or assurances that the United States had intelligence it could not release.

Second, counter-terrorist-financing efforts are an essential part of the overall set of counterterrorist activities and must be fully integrated into the broader U.S. counterterrorism strategy toward Saudi Arabia. Without such integration, those working on terrorist financing might not be aware of other bilateral counterterrorism issues. The U.S. government might then have the appearance of sending mixed or inconsistent messages on counterterrorism to the Saudis. Once the broader Saudi strategy was approved, the U.S. government was able to develop a consistent message across counterterrorism issues. It could push the Saudis more forcefully on terrorist-financing issues, including al Haramain, by, for example, delivering the nonpaper in January 2003. In direct response to the nonpaper, the Saudi government announced its decision to close ten branch offices of al Haramain.

Third, U.S. counter-terrorist-financing strategy must be presented to the Saudi government by a high-level U.S. government representative. The perils of not speaking through a single high-level interlocutor were clear in the case of the reopenings of the Bosnian and Somali offices of al Haramain, as discussed above, when, as one key terrorist-financing official believed, the Saudis "gamed" us. It was not until the appointment of a senior White House official that the U.S engagement of the Saudi government on terrorist financing yielded its most concrete results. A PCC participant said the Saudis did not take terrorist financing seriously until Townsend was appointed. She has been able to apply consistent pressure, over a period of time, with the full backing of the White House.

Fourth, the U.S. government needs a distinct interagency coordinating committee focused on terrorist financing to ensure that terrorist-financing issues are not lost in the overall counterterrorism effort. The PCC proved to be generally effective in focusing the U.S. government on terrorist financing and retaining the momentum of the immediate post-9/11 period. It enabled different branches of the U.S. government to vet the information on al Haramain and assess the options. It ensured that al Haramain–related issues were

BUR-PEC-031152

not lost in the larger counterterrorism picture but were assessed periodically with the full attention of the interagency representatives.

At the same time, the coordinating committee must be fully integrated with the overall counterterrorism effort so that terrorist financing can be made part of the high-level diplomacy necessary to win the cooperation of key allies like Saudi Arabia. One way to achieve this goal is give the NSC the lead on the PCC, as is currently the case. The NSC is better able than any individual agency to integrate terrorist financing into counterterrorism through its leadership of the Counterterrorism Security Group; the NSC is better able to see how the different terrorist-financing tools fit together; the NSC is better able to task agencies and force agencies to reallocate resources; NSC leadership is more efficient because it has the authority to resolve more issues rather than forcing them up to the DC level; the NSC has the best access to information, especially regarding covert action; and the NSC is not operational and is therefore more neutral. Throughout the interagency process on al Haramain, NSC leadership of the PCC might have been useful to expedite the process and clarify the U.S. position.

The concept of a "terrorist-financing czar" has been proposed at times; while perhaps it could have been useful before 9/11, it would serve little purpose today and could detract from the U.S. government's current efforts and recent successes. Terrorist financing is already on the agenda of senior officials, so there is no need for a czar to draw attention to the issue. Each of the relevant agencies has established new sections on terrorist financing or augmented existing groups to work on terrorist-financing issues. Further elevating the issue might overemphasize it or, at the very least, detract from current progress in the larger counterterrorism fight. Action against terrorist financing is only one tool in the fight against terrorism and must be integrated into counterterrorism policy and operations. A czar would undermine this goal. Such a position would also dilute the power of a unified message and the benefits of a single messenger on all terrorism-related issues that the leadership of the NSC seeks to provide.

## Challenges Ahead

Much remains to be done to address terrorist-financing issues in Saudi Arabia and the activities of Saudi charities, such as al Haramain, around the globe. Saudi Arabia has worked hard to institute an improved legal and regulatory regime. It remains to be seen if the new laws and regulations will be fully implemented and enforced, and if further necessary legal and regulatory changes will be made. The Saudis still have not established the National Commission as they promised in February 2004 and have not demonstrated that they are willing and able to serve as the conduit for all external Saudi donations in lieu of Saudi charities.[141] Moreover, it is imperative that the Saudi government develop its capabilities to monitor cash flows; otherwise, it will not be able to assess a given entity's or individual's compliance with the new laws and regulations. The Saudi government's acceptance of training from the United States and other

---

[141] The impact of the Saudi government's June 2004 announcement of the formation of such a commission remains to be seen.

129

BUR-PEC-031153

National Commission on Terrorist Attacks Upon the United States

countries would demonstrate its willingness to assure that gains in expertise and capabilities are ongoing.

It remains to be seen whether the Saudi government will be willing to make politically and religiously difficult decisions. The action it has taken in 2004 against several al Haramain branch offices is unquestionably significant. Although the government has frozen the assets of branches of al Haramain, it has not used its leverage with the head office to ensure that no funds flow to the designated branches.[142] Similarly, the Saudis have yet to hold prominent individuals—like the former head of al Haramain, for instance—accountable for terrorist financing. Such actions would send a signal both to potential targets and to the Saudi public that the Saudi government is serious about stemming the flow of funds to terrorists and their supporters.

We are optimistic that the U.S. and Saudi governments are on the right track in their mutual efforts on terrorist financing. Neither country can afford to lessen the intensity of its current approach. The Saudi government has come far in recognizing the extent of its terrorist-financing problem. We cannot underplay, however, the reluctance of the Saudi government to make the necessary changes between 9/11 and late spring of 2003. It remains to be seen whether it has truly internalized its responsibility for the problem. A critical part of the U.S. strategy to combat terrorist financing will be monitoring, encouraging, and nurturing Saudi cooperation while simultaneously recognizing that terrorist financing is only one of a number of crucial issues on which the U.S. and Saudi governments need each other.

---

[142] Again, the impact of the Saudi government's June 2004 announcement dissolving al Haramain remains to be seen.

BUR-PEC-031154