# Exhibit M

Exh. 154
#2

# Thomas H. Nelson & Associates

825 NE Multnomah • Suite 925
Portland, OR 97232-2150

office (503) 230-8311
fax (503) 230-8313

January 28, 2005

| | Name | Company | | Fax Number | Office Number |
|---|---|---|---|---|---|
| TO: | Cari Stinebower | Office of Foreign Assets Control | | 1-202-622-1911; 1-202-622-1657 | |
| FROM: | Thomas H. Nelson | | | E-mail: nelson@thnelson.com | |
| Client: | | | Matter: | | |
| No. of Pages: | 17 | Equipment: | SHARP UX-176 | In case of error call (503) 230-8311 | |

This facsimile may contain confidential information that is protected by the attorney-client privilege. If the reader of this message is not the intended recipient or an employee responsible for delivering the facsimile, please do not distribute this facsimile, notify us immediately by telephone, and return this facsimile by mail. Thank you.

**COMMENTS:** SDT-401; Request for Reconsideration of Designation

PUBLIC-AR0597

48621

BUR-PEC-040886

LAW OFFICES OF
# THOMAS H. NELSON & ASSOCIATES
825 NE MULTNOMAH, SUITE 825
PORTLAND, OR 97232
TELEPHONE: 503.230.8311
FAX: 503.230.8313

Thomas H. Nelson
E-Mail: nelson@thnelson.com
Mobile: 503.709.6397

Admitted in:
Oregon, Washington,
Idaho, and Connecticut

January 19, 2005

Robert W. Werner
Director, Office of Foreign Assets Control
U.S. Department of the Treasury
1500 Pennsylvania Avenue, N.W.
Washington, D.C. 20220

Re: SDT-401: Request for Reconsideration of Designation
of Soliman Al-Buthe Pursuant to 31 C.F.R. § 501.807 (2004)

Dear Mr. Werner:

I am writing on behalf of Soliman H. Al-Buthe, whom the Office of Foreign Assets Control ("OFAC") added to its SDN list as a Specially Designated Global Terrorist on September 9, 2004. The purpose of this letter is to request formally that OFAC reconsider his designation and remove Mr. Al-Buthe's name from the list for the reasons set forth herein.

### Background: The El-Fiki Travelers' Checks

The genesis of Mr. Al-Buthe's designation appears to be the result of his facilitation in March 2000 of the transfer of approximately $150,000 from a Dr. Mahmoud El-Fiki in Egypt through a bank in Ashland, Oregon, to Al Haramain Islamic Foundation ("AHIF") in Riyadh, Saudi Arabia. This letter explains the circumstances involved in that transfer with the expectation that the clearing of this issue should remove the last impediment to the removal of Mr. Al-Buthe's designation.

By way of background, Mr. Al-Buthe is a Saudi Arabian national who was born in Egypt in 1961. Mr. Al-Buthe is a practicing Muslim; as such, he has a religious obligation to provide assistance to those less fortunate (the obligation to pay "zakat," or a percentage of annual income in support of the poor, is one of the five pillars of Islam). Mr. Al-Buthe is a 1986 graduate from King Saud University in Riyadh, Saudi Arabia; he has a Bachelor of Science degree in Agriculture and is currently employed by the City of Riyadh as its director of landscape operations & beautifications. He is married and the father of five children, four of whom currently reside with him (his only son, who had heart problems, passed away in May 2002).

PUBLIC-AR0598

48621.001

BUR-PEC-040887

Robert W. Werner
Director, Office of Foreign Assets Control
January 19, 2005
Page 2

For several years Mr. Al-Buthe had served as an unpaid volunteer for Al-Haramain Islamic Foundation ("AHIF"); he terminated his relationship with AHIF in September 2002 largely as a result of the death of his son. According to press reports, AHIF was formed in 1988 by Aqil al-Aqil, who served as director until OFAC listed him as a SDN-SDGT.[1] In 1993 Mr. Al-Buthe began to work for Al Haramain as an unpaid consultant who was first tasked with developing the AHIF website; he had no specific job description. That role evolved over time to the point that Mr. Al-Buthe came to be responsible for Internet activities and then for charitable works in the United States.

AHIF first became interested in activities in the United States when it was contacted by Pirouz Sedaghaty (a.k.a. "Pirouz Seda Ghaty," commonly known in the West as "Pete Seda"), an Iranian-born Muslim then residing in Ashland, Oregon. Mr. Seda was then head of the Quran Foundation, an Oregon nonprofit domestic corporation which was formed in 1989 and which was actively distributing Islamic literature, primarily to prisons. AHIF had been involved in distributing such literature over the world, and had learned that the cost of international shipping of such materials could be prohibitive. It was thus decided that a representative from AHIF would meet with Mr. Seda to discuss how such Islamic literature could be obtained and distributed most effectively in the United States.

Mr. Al-Buthe first visited Mr. Seda in Ashland in 1997. At that time, Mr. Seda's religious activities were being conducted out of his home. Mr. Al-Buthe reported back to AHIF Director Al-Aqil that distributing literature through Mr. Seda could be much more cost effective than sending literature from the Middle East. Mr. Al-Aqil was solely responsible for making the decision to establish a branch in Ashland, Oregon, and he decided that AHIF should do so. Al Haramain Foundation, an Oregon assumed business name ("AHIF Oregon"), was registered with the Oregon Secretary of State on October 22, 1997. Mr. Seda located a building to acquire for those purposes and AHIF Oregon agreed with Mr. Seda's Quran Foundation that the AHIF Oregon property could be used for distributing religious literature "to promote peace through understanding of Islam." (Emphasis in original.) A "Declaration of Cooperation Statement" executed by AHIF Oregon and Quran Foundation states explicitly, "We all mutually stand against terrorism or ever engaging in any subversive activities against any governments, race or gender." A copy of the declaration is attached as Exhibit 1.

Mr. Al-Buthe was active in raising funds for the Ashland property from Saudi Arabian sources and, under the immediate and close supervision of Mr. Al-Aqil, was also responsible for disbursing the amounts required for ongoing operations. At a later time AHIF decided to assist in the purchase of a mosque in Springfield, Missouri, which was accomplished through AHIF

---

[1] See Exhibit 1, October 6, 2004, report, "Saudis shut down charity," Aljazeera article reprinted from http://english.aljazeera.net/NR/exeres/E358AE91-FAEC-407C-BDE9-31E80C0BA37B.htm.

THN&A    825 NE MULTNOMAH, SUITE 925    PORTLAND, OR 97232    TEL: 503.230.8311

PUBLIC-AR0599

BUR-PEC-040888

Robert W. Werner
Director, Office of Foreign Assets Control
January 19, 2005
Page 3

Oregon. Mr. Al-Buthe brought cash equivalents with him (usually in the form of travelers' checks) on his short visits to the United States, in all instances indicating on the appropriate customs forms required to be completed to enter the country that he was bringing money with him.

In March of 2000 Mr. Al-Buthe traveled to the United States for the purpose of assisting in establishing an Islamic website, IslamToday.[2] While en route to the United States, Mr. Al-Buthe learned that Dr. El-Fiki had contributed $150,000 to AHIF Oregon, designating it for Chechen relief efforts. Although Mr. Al-Buthe is uncertain why Dr. El-Fiki (whom Mr. Al-Buthe has never met) sent the contribution to the United States instead of Saudi Arabia, he speculates that there probably are fewer restrictions on effecting such transfers into the United States. He further speculates that it may have been the case that Dr. El-Fiki was responding to website instructions or advertisements that had been published in Islamic magazines directing contributions to the United States. In any event, desiring to accomplish as much as possible during the short business trip, Mr. Al-Buthe made arrangements to travel to Ashland to obtain Mr. El-Fiki's contribution for the purpose of turning it over to one of the fundraisers in the AHIF central office in Riyadh. Thus Mr. Al-Buthe flew from New York to San Francisco to Medford, Oregon, and then drove to Ashland.

When Mr. Al-Buthe arrived in Ashland, Mr. Seda went to the Bank of America branch in which AHIF Oregon had its account and requested to withdraw the $150,000 El-Fiki contribution. Mr. Seda requested $130,000 in travelers' checks, for his prior experience had established that travelers' checks were the easiest form for transporting significant amounts of money equivalents (cashier's checks require a significant amount of time to "clear" when deposited in overseas banks). According to the Affidavit of Colleen Anderson in Support of Search Warrant for the Ashland Al-Haramain premises ("Anderson Affidavit"), "the bank employee tried to convince SEDA to take a cashier's check instead [of travelers' checks.]" In any event, on March 10, 2000, Mr. Al-Buthe obtained 130 American Express travelers' checks (serial nos. GB019-375-240 through GB019-375-369), and the following day he obtained a cashier's check in the amount of $21,000. Mr. Al-Buthe took the both the travelers' checks and the cashier's check with him when he departed the United States and ultimately turned them over to AHIF personnel in Riyadh.

The surrounding circumstances clearly indicate that Mr. Al-Buthe's conduct was completely innocent. First, had Mr. Seda and Mr. Al-Buthe accepted the bank's urging and taken a cashier's check for the entire amount instead of $130,000 in travelers' checks, there almost certainly would be no basis for any claim of wrongdoing. This is because (as is implicit in the Anderson Affidavit at ¶ 46) bank checks that are not immediately negotiable by the bearer

---

[2] See www.islamtoday.net.

THN&A        825 NE MULTNOMAH, SUITE 925        PORTLAND, OR 97232        TEL: 503.230.8311

PUBLIC-AR0600

BUR-PEC-040889

Robert W. Werner
Director, Office of Foreign Assets Control
January 19, 2005
Page 4

do not trigger liability under transaction reporting rules.[3] Second, the circumstances involved clearly indicate an innocent intent. Had Mr. Al-Buthe known of and intended to violate the reporting requirement, he certainly would not have insisted upon taking the entire $130,000 in travelers' checks from one bank; rather, he likely would have attempted to "structure" the withdrawals to avoid detection. Furthermore, had Mr. Al-Buthe known of the reporting requirements, he also most likely would have known that banks are required by law to report any suspicious transactions in an amount in excess of $5000,[4] and therefore realized that the Bank of America almost certainly would report his withdrawal. There was nothing clandestine in Mr. Al-Buthe's conduct. For its part, certainly the bank *knew* that Mr. Al-Buthe was not a permanent resident of the United States, and certainly the bank *knew* that Mr. Al-Buthe intended to take the money with him when he left the United States (indeed, why else would a departing foreigner ask for travelers' checks?). Quite simply, Mr. Al-Buthe did not report that he was carrying travelers' checks when he left the Unite States because *he did not know* that such reporting was required for money *leaving* the United States.[5] In sum, it is clear that Mr. Al-Buthe did not intend to conceal the fact that he was planning on taking the funds out of the United States.[6]

Addressing the events in Chechnya, Mr. Al-Buthe has never traveled to that country and has no first-hand knowledge of the AHIF's activities there. At no time has he ever had any control over AHIF's activities in Chechnya. Any funding of activities in Chechnya was by officials in Saudi Arabia, including Saudi governmental authorities; indeed, in 1999 the Saudi Arabian government began controlling and coordinating AHIF's charitable activities in the area. See Exhibit 2, a January 8, 1999, telegram from the President of the Council of Ministers to Saudi governmental authorities asserting governmental control over four charities, including AHIF, that were providing aid to Kosovo refugees. Moreover, the Saudi activities in support of Chechyn refugees were welcomed by the Russian government. See Exhibit 3, translation of

---

[3] The definition of "monetary instruments" excludes negotiable instruments (including bank checks) that are not in bearer form, endorsed without restriction, made out to a fictitious payee, or otherwise such that title passes on delivery. 31 C.F.R. § 103.11(u)(1)(iii). The Anderson Affidavit strongly suggests that the cashier's check was not in bearer form and otherwise not susceptible to immediate passage of title upon presentation. See also Hardy v. Harada, 762 F. Supp 1403 (D. Hawaii 1991) (prior definition excludes "bank check" from definition of "transaction in currency").

[4] See 31 C.F.R. § 103.18 (2004).

[5] The only indication in the Anderson Affidavit to the effect that Mr. Al-Buthe knowingly violated the reporting requirement is an assertion that because Mr. Al-Buthe speaks and reads English he must have known that he had to declare the travelers' checks. Anderson Affidavit ¶ 44.

[6] Although OFAC is not charged with prosecuting violations of Currency and Monetary Instrument Report requirements set forth in 31 U.S.C. section 5316, it bears emphasis at this point that a violation of that statute *must* be predicated upon actual knowledge of the reporting requirement. United States v. Ibarra-Alarez, 830 F.2d 968, 974 (9th Cir. 1987). As the court stated,

> In a prosecution pursuant to 31 U.S.C. § 5316(a), the government is required to prove that the defendants knew (1) they were transporting funds in excess of $10,000 and (2) that the law required them to file a report. See *United States v. Carrier*, 654 F.2d 559, 561 (9th Cir. 1981) (requirement that act be "willful" means that it must be done "deliberately and with knowledge").

Robert W. Werner
Director, Office of Foreign Assets Control
January 19, 2005
Page 5

telegraph from Deputy Prime Minister Abdullah bin Abdulaziz Al-Saud to His Royal Highness the Minister of the Interior dated October 11, 1999. And, on a more personal note, Mr. Al-Buthe is opposed to all forms of terrorism – as evidenced not only by his signature on the declaration executed by AHIF Oregon and the Qur'an Foundation but also by his personal life style.

Impact of the Designation

OFAC's designation of Mr. Al-Buthe in September has had profound effects upon his personal life and his ability to support his family, and those effects involve basic constitutional safeguards. First, when the United States government formally accused him of being a "specially designated global terrorist," international scorn, hatred, and contempt were brought down upon him and those with whom he associates. As a result, he has received hate e-mails threatening him (one instance was reported to the Portland office of the Federal Bureau of Investigation), and many of his friends and acquaintances have treated him much differently. Second, his continued employment is in jeopardy. In addition, as a result of the designation the Kingdom of Saudi Arabia has frozen Mr. Al-Buthe's personal bank account into which the City of Riyadh pays Mr. Al-Buthe's salary. This means that, although Mr. Al-Buthe reports daily to work, he cannot enjoy the fruits of those labors. Moreover, as a result of the designation Mr. Al-Buthe has been prohibited from leaving the kingdom; in effect, he is under house arrest.

Request for Reconsideration of Designation

Based upon the foregoing, Mr. Al-Buthe respectfully submits that OFAC should reconsider its designation of him as a specially designated global terrorist. OFAC's regulations – specifically, 31 C.F.R. section 501.807 – authorize the reconsideration of a person's designation as a specially designated national or terrorist if certain circumstances are established. The cited regulation provides in part:

> A person may seek administrative reconsideration of his, her or its designation ... or assert that the circumstances resulting in the designation no longer apply, and thus seek to have the designation rescinded pursuant to the following administrative procedures:
>
> (a) A person blocked under the provisions of any part of this chapter, including a specially designated national, specially designated terrorist, or specially designated narcotics trafficker (collectively, "a blocked person") ... may submit arguments or evidence that the person believes establishes that insufficient basis exists for the designation. The blocked person also may propose remedial steps on the person's part, such as corporate reorganization, resignation of persons from positions in a blocked entity, or similar steps, which the person believes would negate the basis for designation. ...

Robert W. Werner
Director, Office of Foreign Assets Control
January 19, 2005
Page 6

> (b) The information submitted by the blocked person seeking unblocking
> ... will be reviewed by the Office of Foreign Assets Control, which may request
> clarifying, corroborating, or other additional information.
>
> (c) A blocked person seeking unblocking ... may request a meeting with
> the Office of Foreign Assets Control; however, such meetings are not required,
> and the office may, at its discretion, decline to conduct such meetings prior to
> completing a review pursuant to this section.
>
> (d) After the Office of Foreign Assets Control has conducted a review of
> the request for reconsideration, it will provide a written decision to the blocked
> person ....

According to the United States Department of State's website, removals most often occur when the "petitioner established that he is no longer engaging in the activity or activities that qualified him for designation under the applicable Executive Order."[7] The same document states that the basic issue is "nearly always whether the petitioner has made a demonstrable break with the designated entity."

Mr. Al-Buthe has not been involved with AHIF since September 2002, and thus there is simply no basis to continue the designation of Mr. Al-Buthe. Indeed, AHIF has been effectively disbanded and Saudi Arabian charities are now under very close and strict supervision of the Saudi (and, one suspects, the American) authorities. Mr. Al-Buthe never had any involvement with AHIF activities in Chechnya other than to arrange for the transfer of Dr. El-Fiki's donation from Ashland to Saudi Arabia. AHIF Oregon is inactive, and the only steps that remain to be taken involve the winding up of its property affairs. The designation has had a profoundly negative and unfair impact upon his personal and professional life. *All* of the criteria that OFAC and the Department of State have posited for removing designations apply with full force to the Al-Buthe designation, and no legitimate purpose is served by continuing the designation. For all of these reasons, Mr. Al-Buthe respectfully requests that the designation be rescinded and that he be allowed to attempt to return to a normal, productive life.

Mr. Al-Buthe is ready to take any steps reasonably necessary to remove the designation, including responding to questions that OFAC or law enforcement officials may have regarding the basis for the designation. In furtherance of this effort, I specifically request a formal meeting with OFAC personnel in order to discuss this matter more thoroughly and completely.

---

[7] http://www.state.gov/s/ct/rls/fs/2002/8565.htm.

THN&A          525 NE MULTNOMAH, SUITE 925          PORTLAND, OR 97232          TEL: 503.230.8311

PUBLIC-AR0603

BUR-PEC-040892

    I look forward to working with your office on this matter. Please let me know if you have any questions.

Very truly yours,

Thomas H. Nelson

Enclosures

cc:   Emily Clay
      Client

Authobillahi minashitanirajjim Bismillahi Rahmani Rahim

**Statement of Purpose**
**Declaration of Cooperation Statement**

Statement of declaration between Qur'an Foundation and Al-Haramain Foundation.

To spread the message that **NONE HAS THE RIGHT TO BE WORSHIPPED EXCEPT ALLAH** and **MUHAMMAD IS THE MESSENGER OF ALLAH** to the world.

We all mutually stand against terrorism or ever engaging in any subversive activities against any governments, race or gender.

We mutually agree to cooperate for the purpose of Islamic education; **to promote peace through understanding of Islam**.

We mutually agree to NEVER support or approve any statement or acts of terrorism. Such is totally against our beautiful religion of Islam.

We shall not break any governmental laws or cause any mischief on earth.

We mutually agree to uphold the Qu'ran and the Sunnah of our kind, gentle and loving Prophet, peace be upon him.

Qur'an Foundation executives and board of directors

Al-Haramain Foundation executives and board of directors

Exhibit 1
Page 1 of 1

PUBLIC-AR0605

48621.002



LAW OFFICE OF HASSAN MAHASSNI

### Certificate

The Translation Department of the Law Office of Hassan Mahassni, hereby certifies that it is an office licensed to perform translation work from and into English and Arabic, and that the translation of the attached copies of documents, from Arabic into English, is a full and correct translation.

Jeddah on:

Translation Department

Hassan Mahassni



Exhibit 3
Page 1 of 3

PUBLIC-AR0611

48621.003

BUR-PEC-040895

In the Name of Allah, the Merciful, Most Compassionate

| | |
|---|---|
| Kingdom of Saudi Arabia | No. 7/B/12089 |
| Diwan of Presidency of Council of Ministers | Date: 12/8/1420AH |
| | Attachments: |

## Telegraph

To: His Royal Highness Minister of Interior
Supervisor of Saudi Joint Relief Committee (SJRC) for the Aid of the People of Kosovo

C.C. His Royal Highness Minister of Foreign Affairs

C.C. His Excellency Minister of Information

C.C. His Excellency Minister of Finance and National Economy

We have read your telegraph No. 733/R Dated 22/7/1420 H. in which Your Highness refers to the repercussions of the war in Chechnya on Muslims, where it displaced more than two hundred thousand people and made them refugees on Chechnya's borders with Angushtia and Dagestan.

Your Highness has also noted in your telegraph that many Saudi nationals and relief agencies have contacted the SJRC to express their desire to provide relief aid to their Muslim brethren there. This fact was supported by His Excellency Minister of Islamic Endowment, Call & Guidance Affairs and His Excellency Secretary General of the Muslim World League. His Excellency the President of the Board of Directors of the Saudi Red Crescent Society held a meeting with His Excellency the Russian Ambassador to Riyadh at the request of the latter and the consent of Your Highness. In the meeting, the Russian Ambassador emphasized that the Russian government will accept and welcome Saudi relief aid, adding that this would underline the bright image of Saudi humanitarian relief aid and dismiss attempts in the media to distort the Saudi image and its ties with Russia. In fact, relief agencies have started to provide relief aid to the displaced Chechnyans. We noted the suggestion of Your Highness to send relief aid and assign the SJRC to oversee the relief work and underline the contributions of Saudi Arabia in the media and in the international arena.

Please be advised of our consent in this regard and you may proceed.

Abdullah bin Abdulaziz Al-Saud
Deputy Prime Minister

> Official Seal
> Diwan of Presidency Council of Ministers
> Telegraphs

-1-

Exhibit 3
Page 2 of 3

PUBLIC-AR0612

BUR-PEC-040896

برقية

من سعادة السيد تلفكي وزير الداخلية
المشرف العام على اللجنة السعودية المشتركة لإغاثة شعب كوسوفو
نسخة لصاحب السمو الملكي وزير الخارجية
سمو ولي العهد وزير الدفاع ...... الخ
نسخة لمعالي وزير المالية والاقتصاد الوطني

شهد سيرى يا سمو سمو لخطيب راه ٣٣ رت بريخ ٦٦ ٣٠ عد الشف
ريا إلى اختفت يحرب الشيشان من أثر على المسلمين هناك أ رفضت حروب
أكثر من مائتي ألف لا جيء يسى لحدود الشيشانية مع اتيشيا رباطستان
وبإوضعمره - سموركم - من أنه قد تمثل بالنجدة السعودية المشتركة لإغاثة شعب
توستس التخفيف من المعاناة وإعتبـــارت الأذيــة بوتســن عيشهم على أن يتم
المساعدت لإخوتنا المســلمين هناك. ويقد أيد ذلك كل من معالي وزير الشئون
الإسلامية والأوقاف والدعوة والإرشاد ومعالي الأمين العام لرابطة العالم الإسلامي كما
اجتماعي رئيس حمعية الهلال الأحمر السعودي لجنبا من سعادة السفير الروسي بالمملكة
ـــ ـــ ـــ وبمقابلة سموركم على ذلك رقد اتخو السفير الروسي بأن رحب بسعة
ذلك ترحب بقبول اتصالات سعودية بين اتها ستزاد عمل التسوية السياسية لهذه
المشكلة رحب بذلك الإغاثة الإنسانية ويبدا الشعورة انني نفيرت بعض رسائل الإعلام في
تشوية سمعة المملكة وعلاقتها مع روسيا كما أن البعثيات الأذنية قد حات تشجيعا
لي السامة تقديم تعريات مساعدات للمشردين الشيشان ... وأخرج سموركم ----
تقديم أنسا حاصت وان جاء بأسحة السعودية المشتركة الإغاثة الأخف على أعضاء الإغاثة عند
براء دائشد اتحركة إعلامية وتوقيع هذه تحملت دولية ...
ونحو كم بموافقة على ذلك .. فأكبتوا بينم بوحب ...

عبدالله بن عبدالعزيز

Exhibit 3
Page 3 of 3

PUBLIC-AR0613

BUR-PEC-040897

## Certificate

The Translation Department of the Law Office of Hassan Mahassni, hereby certifies that it is an office licensed to perform translation work from and into English and Arabic, and that the translation of the attached copies of documents, from Arabic into English, is a full and correct translation.

Jeddah on:

Translation Department

Hassan Mahassni

Exhibit 2
Page 1 of 5

PUBLIC-AR0606

48621.004

BUR-PEC-040898

In the name of God, the Compassionate, the Merciful

No. 7/B/1863

Date: 3/2/1420

(Saudi Emblem)

Kingdom of Saudi Arabia

Enclosures:

Diwan of Presidency of Council of Ministers

Urgent Telegram

His Royal Highness the Minister of Interior

CC: His Royal Highness the Second Deputy President of Council of Ministers, Minister of Defense and Aviation and Inspector General

CC: His Royal Highness the Deputy President of the National Guard

CC: His Royal Highness the Minister of Foreign Affairs

CC: His Royal Highness the President of General Intelligence

CC: His Excellency the Minister of Islamic, Endowment, Call and Guidance Affairs

CC: His Excellency the Minister of Health and President of the Board of Directors of the Saudi Red Crescent Society

CC: His Excellency the Minister of Information

CC: His Excellency the Minister of Labor and Social Affairs

CC: His Excellency the Minister of Finance and National Economy

CC: His Excellency the Secretary General of the Muslim World League

We have reviewed Ministerial Committee minutes of meeting No. (51) dated 2/21/1420 H. concerning the study of the subject of relief that is given by the Kingdom of Saudi Arabia, at the governmental and public levels, to Albanian refugees from Kosovo, which contained the following recommendations:

First, to restrict relief work for Kosovo refugees to the Saudi Red Crescent

Exhibit 2
Page 2 of 5

PUBLIC-AR0607

Society and to form a Committee under the chairmanship of His Excellency the President of the Society and a membership of representatives of high rank from the Presidency of the National Guard, the Ministry of Defense and Aviation, the Ministry of Interior, the Presidency of General Intelligence, the Ministry of Finance and National Economy, the Ministry of Information, the Ministry of Labor and Social Affairs and a representative from each Saudi society or charitable foundation that participates in relief work, namely

- International Islamic Relief Organization
- World Assembly of Muslim Youth
- Al-Haramain Charitable Foundation
- Islamic Endowment Foundation

Second, this Committee shall be under the supervision of His Royal Highness the Minister of Interior.

Third, the objectives and responsibilities of this Committee shall be as follows:

1- To oversee the collection of assistance and in kind and cash contributions, their receipt according to manifests from the sources, coordination of receipt, determination of type, organization of delivery, method of distribution and the taking of all necessary arrangements for the foregoing.

2- To make known the role played by the Kingdom in relief and humanitarian work outside the Kingdom and to contract with a public relations firm to undertake this task and publicize this role through the media so that citizens know that their contributions are delivered to the intended beneficiaries.

3- To document the assistance that is provided by the Kingdom with International Organizations and Commissions.

Fourth, that this Committee shall have the authority to decide all matters relating to relief to Kosovo refugees, and report to the Presidency of the Council of Ministers as it sees necessary in this regard so that it may receive appropriate instructions.

Since we approve these recommendations we ask that you do what is necessary accordingly. A copy of this Order has been provided to concerned parties for observance.

Faisal bin Abdulaziz

President of Council of Ministers

-2-

Exhibit 2
Page 3 of 5

PUBLIC-AR0608




المملكة العربية السعودية
ديوان رئاسة مجلس الوزراء

برقية

صاحب السمو الملكي وزير الداخلية
نسخة لصاحب السمو الملكي النائب الثاني لرئيس مجلس الوزراء
ووزير الدفاع والطيران والمفتش العام
نسخة لصاحب السمو الملكي ذات ورئيس الحرس الوطني
نسخة لصاحب السمو الملكي وزير الخارجية
نسخة لصاحب السمو المهندس رئيس الاستخبارات العامة
نسخة لمعالي وزير الشئون الإسلامية والأوقاف والدعوة والإرشاد
نسخة لمعالي قائد الصحة ونائب مجلس إدارة جمعية الهلال الأحمر السعودي
نسخة لمعالي وزير الإعلام
نسخة لمعالي وزير العمل والشئون الاجتماعية
نسخة لمعالي وزير المالية والاقتصاد الوطني
نسخة لمعالي الأمير العام لرابطة العالم الإسلامي

اطلعت على محضر اللجنة الوزارية ... تاريخ ...
بشأن دعوة ومرضى الأمانة التي تقدم من المملكة العربية السعودية على اللاجئين
...ومحبي ولأسرى اللاجئين الآتين من كوسوفو. والمتضمن توصيات تنص...
بأن: جميع أعمال الإغاثة للاجئي كوسوفو في جمعية الهلال الأحمر تستعين وتتعاون
... وذلك معنا برئاسة الجمعية وعضوية ... عن ... ورئيس من ... الدفاع
الوطني ووزارة ... والطيران ووزارة الداخلية ووزارة الخارجية ورئاسة الاستخبارات ...
ووزارة المالية والاقتصاد الوطني ووزارة الأعلام ووزارة العمل والشئون الاجتماعية ويتكون
من إطار ... ودراسة من شخصيات ومؤسسات خيرية السعودية المتبرعة في أعمال
الإغاثة وهي
جمعية الدعوة الإسلامية العالمية
الندوة العالمية للشباب الإسلامي

Exhibit 2
Page 4 of 5

PUBLIC-AR0609

- مؤسسة الحرمين الخيرية.
- مؤسسة الوقف الإسلامي.

ثانياً: تكون هذه اللجنة تحت إشراف صاحب السمو الملكي وزير الداخلية.
ثالثاً: تكون مهمة رئيسية هذه اللجنة على النحو التالي:

١ - الإشراف على استحصال المساعدات والتبرعات النقدية والعينية واستخدامها وفرز بياناتها من جهاتها، وتسيير استقبالها وتجنيد توجيها ترتيب إرسالها وأسلوب توزيعها واتخاذ كافة الإجراءات اللازمة لذلك.

٢ - إبراز دور المملكة بصورة ضخمة ومتكاملة لإيضاح دورها الأساسي وبالتنسيق لهذا الغرض مع شركة إعلامية تصوير هذا الجهد مع أبرز من البلد إعلامياً لتصوير دخل المملكة لضمان إلى أن تبرعات تصل إلى مستحقيها.

٣ - توثيق المساعدات التي تقدمها المملكة لهذي المنظمات وهيئات الدولية.

رابعاً: أن تكون لهذه اللجنة صلاحية البت في كافة الأمور المتعلقة بالمساعدات للاجئي كوسوفا، وترفع للمقام السامي ما ترى ضرورته في ذلك لأخذ التوجيه اللازم، ونعرض عليكم تلك التوصيات ... ونرى أن يكون إكمالها للأذن بموجبه رئيس الديوان السعودي بنسخة من أمرنا هذا للاجتماع...

فهد بن عبدالعزيز

رئيس مجلس الوزراء

Exhibit 2
Page 5 of 5

PUBLIC-AR0610