# Exhibit N

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 1 of 122   Page ID#: 4326
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 2 of 91

1

```
1                  IN THE UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF OREGON

3    UNITED STATES OF AMERICA,       )
                                     )
4                    Plaintiff,      ) No. 05-60008-2-HO
                                     )
5      v.                            ) August 31, 2010
                                     )
6    PIROUZ SEDAGHATY, et al.,       ) Eugene, Oregon
                                     )
7                    Defendants.     )

8

9          PARTIAL TRANSCRIPT OF TRIAL PROCEEDINGS

10          BEFORE THE HONORABLE MICHAEL R. HOGAN

11      UNITED STATES DISTRICT COURT JUDGE, AND A JURY

12         DAY 2 A.M. SESSION - PAGES 1 - 122

13

14                        -:-

15

16

17

18

19

20

21

22

23              Deborah Wilhelm, CSR, RPR
                       Court Reporter
24                    P.O. Box 1504
                  Eugene, OR  97440
25                   (541) 431-4113
```

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 5 of 122   Page ID#: 4330
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 3 of 91
Czemerys - D by Mr. Cardani                                    5

1              THE CLERK:  Please take the witness stand and

2    please watch your step.  Your microphones are the two

3    buttons along here, so if you would watch your paperwork

4    along here.

5              THE WITNESS:  Okay.

6              THE CLERK:  There is water here.  Let me get

7    you a glass.

8              THE WITNESS:  There is some here.

9              THE CLERK:  Thank you.  Would you please state

10   your name for the record, spelling your last name.

11             THE WITNESS:  Linda Czemerys, C-Z-E-M-E-R-Y-S.

12                       DIRECT EXAMINATION

13   BY MR. CARDANI:

14      Q.    Good morning.

15      A.    Good morning.

16      Q.    What is your occupation?

17      A.    Right now I am a supervisory special agent for

18   the Boise, Idaho, office.

19      Q.    Of what?

20      A.    Of the -- I'm sorry -- IRS Criminal Division.

21      Q.    Okay.  Internal Revenue Service's Criminal

22   Investigation Division.  And you are a supervisor in

23   Boise?

24      A.    That's correct.

25      Q.    Okay.  How long have you been with the IRS?

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 6 of 122   Page ID#: 4331
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 4 of 91
Czemerys - D by Mr. Cardani                                    6

 1      A.      I've been with the IRS for 26 years.

 2      Q.      Were you working on the morning of February 18,

 3  2004?

 4      A.      Yes, I was.

 5      Q.      And what did you do that morning?

 6      A.      That morning, we executed a search warrant in

 7  Ashland, Oregon.  One of my responsibilities at that

 8  warrant was the seizing officer.

 9      Q.      What's the address of the building?

10      A.      3800 South Highway 99, Ashland, Oregon.

11      Q.      Prior to executing the search warrant, did you

12  have an opportunity to review and discuss what items

13  were relevant to the search warrant?

14      A.      Yes.

15      Q.      Were there a number of agents that participated

16  in this warrant?

17      A.      Yes, there was approximately 17 agents.

18      Q.      Is that custom in a search warrant of -- for

19  IRS of a business?

20      A.      Yes.

21      Q.      What time of day was the warrant served?

22      A.      The warrant was served at 7:55 a.m. that

23  morning.

24      Q.      All right.  You said that your role was what,

25  seizing?

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 7 of 122   Page ID#: 4332
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 5 of 91
Czemerys - D by Mr. Cardani                                    7

1     A.     I was the seizing officer.

2     Q.     All right.  What does a seizing officer do?

3     A.     What the seizing officer does is make sure that

4  the evidence that is being seized at the site is

5  seizable per Attachment B part of the affidavit with a

6  list of items to be seized.  So I make sure that when

7  the agents find something, they leave it there in place,

8  I look at it, they photograph it, they bring it up to

9  the table, it's logged in, and then it's bagged.  What

10 we call bagged and tagged, and then put in a box.

11    Q.     Are you the case agent in this investigation?

12    A.     No, I am not.

13    Q.     Who is the case agent?

14    A.     Special Agent Colleen Anderson.

15    Q.     Was she present at the warrant as well?

16    A.     Yes, she was.

17    Q.     And was she there to be able to consult with

18 concerning items within the scope of the warrant?

19    A.     Yes, she was.

20    Q.     I'd like to show the witness SW-66, please.

21 Agent Czemerys, can you identify the picture in SW-66?

22    A.     Yes.  That is the residence where we executed

23 the search warrant.  That photo is also attached to the

24 affidavit.

25    Q.     Can you describe the premises.

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 8 of 122   Page ID#: 4333
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 8 of 91
Czemerys - D by Mr. Cardani                                            8

```
 1     A.    The premises was a single level house with a

 2   basement underneath.  And it's approximately over

 3   4000 square feet, on some acreage.

 4     Q.    And I'd like to next show you SW-64, a picture

 5   of that same building in the upper left-hand corner.

 6     A.    Yes.

 7     Q.    Have you had an opportunity prior to coming

 8   into court to examine SW-64 to determine whether it's a

 9   fair depiction roughly of the internal premises of the

10   al-Haramain building?

11     A.    Yes, I have.

12     Q.    Is it?

13     A.    Yes, it is.

14     Q.    Let's go to the second page first.  This was a

15   multistory building.

16     A.    Correct.

17     Q.    Is this the upper level?  Can you describe

18   generally the premises of the upper level.

19     A.    Yes.  As you walk in the front door, there was

20   a living room, quite a large living room, on the

21   right-hand side.  Left-hand side was an open room that

22   appeared to be the prayer room.  There was the kitchen

23   attached to the living room.  And as you went further

24   down to the kitchen area, there was an office with

25   several smaller rooms off on the right-hand side there.
```

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 9 of 122   Page ID#: 4334
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 7 of 91
Czemerys - D by Mr. Cardani                                    9

1    And on the left-hand side, there were several bedrooms

2    and a bathroom.

3       Q.    All right.  Now, there is references to -- if

4    we go to the living room, we see Seda 1 and 2 computer

5    tower bar code.  Can you explain that reference?

6       A.    That is where a computer was found in the

7    living room on the floor.  Within that computer, there

8    were two hard drives within the computer tower.

9       Q.    All right.  Why does it say Seda 1 and 2 on

10   that?

11      A.    That is the names that the computer forensic

12   person gave to the two hard drives that were found in

13   that computer.

14      Q.    Okay.  And you mentioned earlier about

15   taking -- customary to take pictures and try to document

16   where evidence was before it's seized.

17      A.    Yes.

18      Q.    All right.  To the best of your knowledge, does

19   Exhibit 64 fairly depict the location of various

20   computers that were taken pursuant to the warrant?

21      A.    Yes, it does.

22      Q.    So room A, if we can go into room A for a

23   minute on that same diagram, you see a number of other

24   computer, electronic types of evidence that were taken?

25      A.    Yes.

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 10 of 122   Page ID#:
2335
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 8 of 91
Czemerys - D by Mr. Cardani                          10

1      Q.     We'll come back to upstairs in a few minutes.

2    But could we go downstairs now.  Okay.  Please describe

3    the downstairs of this building.

4      A.     Well, there was a downstairs living area, and

5    then to the front of that was an office, and then you

6    could go to -- through the office you could go to a

7    bedroom on the left.  And then there was a bedroom on

8    the right, but you have to enter through another door.

9    And through that office, you could also enter out the

10   back onto the back porch there.  And then to the left,

11   there was a kitchen area, and then also it led out into

12   the garage.

13     Q.     Okay.  So if we could focus on room X for a

14   minute.  Once again, there are references to computers

15   6, and then 8 and 9, and 10, do you see that?

16     A.     Yes.

17     Q.     All right.  We have a picture of this room, I

18   think, later on in this exhibit, the last page of SW-64.

19   Does this -- are these pictures of room X?

20     A.     Yes, they are.

21     Q.     Taken the day of the warrant?

22     A.     Correct.

23     Q.     Okay.  And we see some computers there?

24     A.     Yes.

25     Q.     Okay.  Okay.  If we go back to the lower level

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 11 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 9 of 91
2336
Czemerys - D by Mr. Cardani                                    11

 1    and blow up room X again, please.  All right.  So,

 2    again, those references to the computer in the upper --

 3    Seda 8 and 9 was a Hewlett-Packard Pavilion computer.

 4    And there are numbers associated with that.  Is that

 5    internal record keeping for IRS purposes?

 6        A.    Yes.  Normally they try to write down the

 7    serial numbers on the computers so they are easily

 8    matched to that unit.

 9        Q.    Again, to the best of your knowledge, does the

10    location of Seda 8 and 9, and the one down below it,

11    Seda 6, fairly depict where in room X these computer

12    hard drives were found?

13        A.    Yes, it does.

14        Q.    If we go back to -- there we go.  Now, Agent

15    Czemerys, was there anybody present physically when you

16    and the other agents served the search warrant?

17        A.    Yes.  When we were getting ready to make entry,

18    Jonah Sedaghaty was present.  He came out.  And also

19    present was his girlfriend.

20        Q.    Did they appear to live there?

21        A.    Yes, on the bottom floor, yes.

22        Q.    And at the time the warrant was served, was

23    there anybody else present?

24        A.    No, there was not.

25        Q.    Was the defendant Pirouz Sedaghaty there?

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 12 of 122   Page ID#: 4337
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 10 of 91
Czemerys - D by Mr. Cardani                    12

1      A.    No, he was not there.

2      Q.    What's the procedure in terms of seizing

3  computers when there is a large amount of information on

4  them?

5      A.    Well, when computers are found at the site,

6  we -- we always have a computer forensic person who is a

7  special agent who is special trained to take possession

8  of the computers.  So when we find one, we call them

9  down.  They look at it.  They kind of do a -- look at it

10 to see if there is -- whether they need to image it

11 right there on site, if they have the time to do that,

12 or if we just need to take it and then image it at our

13 office because it's going to take too long.

14         And at this site, finding as many as we did,

15 there was no way that they could be imaged on-site.  So

16 he came down, he takes down all the serial information

17 off the computers, we photograph it in place, and then

18 he takes possession of those computers.

19     Q.    This was Rick Smith?

20     A.    That's correct.

21     Q.    And what's his role within IRS?

22     A.    Rick Smith is a special agent with the IRS, but

23 he's our computer specialist, computer forensic person

24 who examines -- who images the hard drives, and then

25 examines and takes out the information.

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 13 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 11 of 91
4358

Czemerys - D by Mr. Cardani                    13

1      Q.     To the best of your knowledge, were the

2  computers referenced in here taken by IRS pursuant to

3  the warrant, copies made, mirror copies made, and the

4  originals returned to the owner of the premises?

5      A.     That's correct.

6      Q.     Now, if we go back to the diagram of the

7  upstairs, you have -- do you have a file in front of

8  you, an Exhibit SW-1?

9      A.     I don't have those in front of me.

10     Q.     All right.  I'd ask that the clerk get SW-1.

11  And before you move on, when you said there were two

12  people present, did you identify who they were?

13     A.     Yes.

14     Q.     All right.  Who were they?

15     A.     It was Jonah Sedaghaty.

16     Q.     Who do you understand him to be?

17     A.     The son of the defendant.

18     Q.     Okay.

19     A.     And his girlfriend Christina Kaiser --

20  Stephanie, excuse me, Stephanie Kaiser.

21     Q.     SW-1, do you see that in front of you?

22     A.     Yes.

23     Q.     What is it?

24     A.     It is two videotapes.

25     Q.     Okay.  Were those taken pursuant to the search

Case 6:05-cr-60008-HO    Document 456    Filed 09/11/10    Page 14 of 122    Page ID#:
Case 1:03-cv-05071-GBD-SN    Document 308-14    Filed 01/15/13    Page 12 of 91
4333
Czemerys - D by Mr. Cardani                    14

 1    warrant?

 2        A.    Yes, they were.

 3        Q.    Where were they found?

 4        A.    They were found in the living room on some

 5    metal shelving.

 6        Q.    Okay.  And in conjunction here, if you point to

 7    your screen, if you could just touch the screen and

 8    roughly show us where those videotapes were found.

 9        A.    Okay.  Can we make it a little bigger?  There

10    we go.  They were found right over here in this area.

11        Q.    Was there a TV near there?

12        A.    No.  The TV is over by the fireplace area.

13    The -- there was a metal shelving, and then there were

14    sliding glass doors that went out onto the deck.

15        Q.    There are two videotapes in SW-1?

16        A.    Yes.

17        Q.    Did you find other videotapes in that same

18    vicinity?

19        A.    Yes.  There were several videotapes in that --

20    on that shelving area.

21        Q.    About how many?

22        A.    I would say there is approximately 25 to 30

23    videotapes in that area.

24        Q.    All right.  Could you take a look at SW-2 on

25    the screen.

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 15 of 122   Page ID#:
2343
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 13 of 91
Czemerys - X by Mr. Wax                          15

 1      A.      (Witness complies.)

 2      Q.      Can you identify that?

 3      A.      That is photographs that were found at the

 4   scene that were taken.

 5      Q.      All right.  And SW-3?

 6      A.      Same, photographs that were taken at the

 7   warrant site.

 8      Q.      And SW -- does that look familiar as the -- do

 9   you know if that is a picture taken inside the premises

10   or not?

11      A.      Yes.  They are inside the kitchen at the search

12   warrant site.

13      Q.      Okay.  And those weren't the day of the

14   warrant, those were just photos found during the

15   warrant?

16      A.      Correct.

17      Q.      Likewise SW-4?

18      A.      Yes, photos found at the search warrant site.

19              MR. CARDANI:  That's all I have.  Thank you.

20              THE COURT:  Cross.

21                        CROSS-EXAMINATION

22   BY MR. WAX:

23      Q.      Good morning.

24      A.      Good morning.

25      Q.      Tell me, please, the pronunciation of your

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 16 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 14 of 91
2341
Czemerys - X by Mr. Wax                    16

1    name.

2       A.      Czemerys.

3       Q.      So, Agent Czemerys, this search was conducted

4    in 2004, correct?

5       A.      That's correct.

6       Q.      The issues in this indictment involve activity,

7    as you understand it, in and around the year 2000 in

8    part, do you understand that to be true?

9       A.      I understand that the -- it was an issue with

10   regards to a 2000 tax return.

11      Q.      Okay.  In the year 2000, do you know where

12   Mr. Seda was living?

13      A.      I don't have that knowledge, no.

14      Q.      Okay.  Are you aware that he was at that point

15   living at Valley View Road, and that this home and

16   prayer house that you searched was not in use at that

17   time?

18      A.      I'm not aware of that, no.

19      Q.      Do you know where the computers that were

20   seized were located or if they were even present in

21   their existing configuration in 1999 or 2000?

22      A.      I don't have that knowledge, no.

23      Q.      In looking at the diagrams that you were just

24   shown, I believe that they depicted kitchens on both

25   floors of the building?

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 17 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 15 of 91
4342

Czemerys - X by Mr. Wax                    17

 1      A.      Correct.

 2      Q.      There are bedrooms on both floors of the

 3  building?

 4      A.      Correct.

 5      Q.      You've indicated that the time that you

 6  conducted the search, it was apparent to you that at

 7  least one, if not both, of Mr. Seda's sons were residing

 8  there?

 9      A.      When we executed the warrant, Jonah Seda was

10  there with his girlfriend.

11      Q.      In looking around the place, I've got a teenage

12  son, and I don't know what your background is, but did

13  it appear as though some of the area was in the type of

14  disarray that one might find with late teenage boys or

15  early 20-year-old boys living someplace?

16      A.      Yes, it was messy.

17      Q.      In part, sort of teenagey messy?

18      A.      Could be teenagey messy, yes.

19      Q.      Okay.  With respect to the few photographs that

20  you indicated were taken during the search, if I recall

21  correctly, during the course of the search, you found or

22  observed many hundreds of photographs that you did not

23  take; is that correct?

24      A.      Well, they took a whole box of photographs,

25  from my recollection, that was down in the downstairs

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 18 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 16 of 91
4343
Czemerys - X by Mr. Wax                    18

1    office.

2        Q.    Okay.  But in terms of that box -- whole box of

3    photographs that was taken, do you recall that many of

4    them were family type photographs?

5        A.    I don't recall.

6        Q.    Do you recall that some of them depicted

7    activities in and around Ashland, Oregon?

8        A.    I don't recall because I did not go through

9    them.

10       Q.    All right.  Do you recall that some of them

11   showed Mr. Seda engaged in his business as an arborist?

12       A.    I don't recall that.

13       Q.    Do you recall that some of them showed Mr. Seda

14   engaged in Fourth of July activities in the city of

15   Ashland?

16       A.    I don't recall.

17       Q.    But there is no question that there were many,

18   many, many photographs that were there and the few that

19   you have just identified are a very small section or

20   subset of a large collection of photos; is that correct?

21       A.    That's correct.

22       Q.    Now, with respect to the items that you

23   observed in the house, in looking through the notes or

24   reports that were made, I thought I saw that you had

25   observed a rather lengthy list of book -- books, do you

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 19 of 122   Page ID#:
2344
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 17 of 91
Czemerys - X by Mr. Wax                    19

1    recall that?  Did you check your notes -- well, first of

2    all, do you recall that?

3        A.    Like a handwritten list?

4        Q.    No, no, a typed inventory type list, many, many

5    pages of books.

6        A.    I don't recall that.

7        Q.    Would it help you to look through your notes to

8    see -- or the notes of the search to see if it was

9    reported that there was a typewritten list of books that

10   was observed?

11       A.    Was it something that we seized or it was

12   something --

13       Q.    No, it was something that you left.

14       A.    Yeah.  Can I look real quick?

15       Q.    Yes, please.

16       A.    I see on my list of photos that were taken that

17   there was -- there is two items here.  Books, then it

18   says sample of books, and then there is another one

19   sample of books.

20       Q.    All right.  Do you recall there being many,

21   many books in the premises?

22       A.    There were several books, yes.

23       Q.    Well, it was more than several, wasn't it?

24   Perhaps thousands?

25       A.    I don't remember there being thousands, but I

Case 6:05-cr-60008-HO    Document 456    Filed 09/11/10    Page 20 of 122    Page ID#:
Case 1:03-cv-05071-GBD-SN    Document 308-14    Filed 01/15/13    Page 18 of 91
2945
Czemerys - X by Mr. Wax                    20

1    just don't have that recollection.

2        Q.    Do you recall there being books on shelves?

3        A.    Yes.

4        Q.    Do you recall there being books in boxes?

5        A.    Yes.

6        Q.    Do you recall there being many different books

7    around?

8        A.    Yes.

9        Q.    Did you look through all those books?

10       A.    No.

11       Q.    Do you -- did you seize all those books?

12       A.    No.

13       Q.    In fact, you seized very few books, is that not

14   correct?

15       A.    That's correct.

16       Q.    Do you recall that of the many books that were

17   there, some had nothing to do with Islam?

18       A.    I don't have that knowledge, but it could

19   probably be true.

20       Q.    Do you recall that of the many books that were

21   there that did involve Islam, many were of a very

22   moderate nature?

23       A.    I don't know that.  I didn't read them.

24       Q.    Do you recall that there were any number of

25   Qur'ans in the premises?

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 21 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 19 of 91
4348
Czemerys - X by Mr. Wax                              21

 1      A.      I don't know.

 2      Q.      Do you recall that of the many Qur'ans that

 3  were there, some had the call to jihad that Mr. Cardani

 4  mentioned in his opening statement and many did not?

 5      A.      I don't recall that.

 6      Q.      Did you look through all of the Qur'ans that

 7  were there?

 8      A.      I did not, no.

 9      Q.      Did you look through and see if there were, in

10  addition to the Noble Qur'an, the one that Mr. Cardani

11  mentioned, there were other Qur'ans?

12      A.      I don't recall.

13      Q.      I don't know what your faith is, and pardon me

14  if this question is not one that relates, but are you

15  familiar with various versions of the Christian Bible,

16  that there are a number of versions of the Christian

17  Bible?

18      A.      Yes, I'm familiar with that.

19      Q.      And are you aware that there are a number of

20  versions of the Holy Qur'an?

21      A.      That, I don't know.  I don't have particular

22  knowledge of that.

23      Q.      In the course of the search, you have indicated

24  you did not make any effort to inventory the many, many

25  books that were present?

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 22 of 122   Page ID#:
2347
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 20 of 91
Czemerys - X by Mr. Wax                      22

1      A.     No.  Correct.

2      Q.     You did not make an effort to determine how

3  many of those books might have had a call to jihad in

4  them and how many did not?

5      A.     No.

6      Q.     You did not make an effort to determine how

7  many of those books had nothing to do with religion?

8      A.     No.

9      Q.     How many of those books were of a completely

10  moderate mainstream description of Islam?

11      A.     No.

12      Q.     How many of those books describe a Westernized

13  view of how Muslims might or might not live in America?

14           MR. CARDANI:  Judge, I object at this point,

15  she doesn't know.

16           THE COURT:  Go on to the next, please.

17           MR. WAX:  Thank you.

18  BY MR. WAX:

19      Q.     With respect to the videotapes, you have

20  identified these two tapes in front of you.  I believe

21  that you indicated that your recollection is there were

22  perhaps 25 or 30 tapes on the metal shelves that you

23  described; is that correct?

24      A.     Correct, that's correct.

25      Q.     Do you recall that in another place in the

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 23 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 808-14   Filed 01/15/13   Page 21 of 91
4848
Czemerys - X by Mr. Wax                    23

1   building in what might have -- be described as a prayer

2   room, there was a set of wooden bookshelves, perhaps an

3   entertainment center, do you recall that?

4      A.    I do recall there being an entertainment

5   center, and there was a TV there, and next to the TV,

6   there were also several videos in that area.

7      Q.    Do you recall there being another 25 or 30

8   videos in that area?

9      A.    Yeah, I think there were probably a few less in

10  that area, but, yes, there were probably 20 to 25 videos

11  in that area.

12     Q.    Do you recall that in the search, you also

13  located another, perhaps, 350 videos in two -- I'm not

14  sure exactly how to describe them.  And they sort of

15  look like storage units, but -- well, first of all, do

16  you recall there being several green metal structures

17  that you also searched?

18     A.    Yes.  There were two what we called trailers

19  out in the back that were green that were also searched.

20     Q.    And do you recall that one of them looked like

21  it might have been set up as an office with a desk in

22  it?

23     A.    I don't recall that there is a desk in it,

24  but --

25          MR. WAX:  May I have a moment, please, Your

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 24 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 22 of 91
4345
Czemerys - X by Mr. Wax                         24

 1   Honor?

 2              THE COURT:  Yes.

 3              (Discussion held off the record.)

 4         MR. WAX:  Your Honor, I'm not sure how you want

 5   to handle this.  We have marked one of the photographs

 6   that I would like to show the witness.

 7              THE COURT:  The clerk will assist you.

 8         MR. WAX:  I have it electronically.  I'm not

 9   sure that I have it in hard copy.  So if we can show it

10   just to the witness, please.

11              THE COURT:  Has it been received?

12         MR. WAX:  It has not.  I was not aware that I

13   would need to show it to refresh her recollection, which

14   is what I would need to do right now.  I have a hard

15   copy, I believe, that I can show to the witness if that

16   would be easier at this point.

17              THE COURT:  Yes.  Please give it a number.

18         MR. WAX:  We have this marked for

19   identification as Exhibit 1034.

20              THE COURT:  Thank you.

21   BY MR. WAX:

22      Q.    Do you have 1034 in front of you now?

23      A.    Yes, I do.

24      Q.    Is that one of the photographs that was taken

25   during the course of the search provided to the

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 25 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 23 of 91
4356

Czemerys - X by Mr. Wax                          25

 1   government, which the government then provided to us?

 2       A.    Yes.

 3             MR. WAX:  I would offer that exhibit, Your

 4   Honor.

 5             MR. CARDANI:  Can we identify what it is?

 6   Where it was taken from?  Just in aid of objection, I'm

 7   not going to object to this, I just want to know where

 8   it was taken from.

 9             THE COURT:  Do you know where it was taken

10   from?

11             THE WITNESS:  Yes.  It appears to be one of the

12   trailers.  I have all the photos here, to see if I have

13   the exact same one, if that's okay.

14             MR. CARDANI:  One of the trailers, no

15   objection.

16             THE COURT:  It's received.

17   BY MR. WAX:

18       Q.    Do you also recall in the trailers there being

19   perhaps another 350 videotapes?

20       A.    Yes.  We took several boxes of videotapes out

21   of the trailer.

22       Q.    Did you go through those videotapes?

23       A.    I did not go through them.

24       Q.    Do you know whether some of them are copies of

25   news stories from CNN?

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 26 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 24 of 91
4351

Czemerys - X by Mr. Wax                    26

1      A.     I don't have that knowledge, no.

2      Q.     Do you know whether some of them are copies of

3   new stories from the History Channel?

4      A.     I do not know.  I didn't look at them.

5      Q.     You didn't look at them at all?

6      A.     No.

7      Q.     Do you recall that among the items that you

8   saw, there was a box -- there were several boxes that

9   had a label on them called "Pete's cloth" or "Pete's

10  tapes" or things of that nature?

11     A.     I do recall there were several boxes that said

12  "Pete's clothes," I thought.

13     Q.     Do you recall a box that said "Pete's tapes"?

14     A.     As I recall when I looked through my photos,

15  the majority of the boxes said "tapes" on them.  Whether

16  they said "Pete's tapes" on them, I don't recollect

17  that.

18           MR. WAX:  Your Honor, could we show the witness

19  an item we've had marked as Exhibit 1047 for

20  identification.

21           THE COURT:  Yes.

22  BY MR. WAX:

23     Q.     Do you have 1047 in front of you?

24     A.     Yes, I do.

25     Q.     Do you recall boxes of that nature being

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 27 of 122   Page ID#:
1352
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 25 of 91
Czemerys - X by Mr. Wax                    27

 1   observed, having the photograph taken, or seeing the

 2   photograph?

 3        A.    Yes, I do.

 4        Q.    Does that refresh your recollection that there

 5   was a box that was identified as "Pete's" something and

 6   then the word "tapes" on it?

 7        A.    Yes, I do.

 8        Q.    All right.  With respect to the house and the

 9   living arrangements in the house, do you have any

10   knowledge of the number of people who might have lived

11   there, whether on a prolonged basis or a temporary

12   basis, from the time that Mr. Seda first moved in until

13   the time of the search?

14        A.    No, I do not.

15        Q.    Do you have any knowledge of the number of

16   people who might have brought books or tapes or other

17   literature into the premises?

18        A.    No, I do not.

19        Q.    Do you know -- have any idea how many people or

20   which people would have access to or used what computers

21   at what different times?

22        A.    No, I do not.

23              MR. WAX:  Thank you.  I have no further

24   questions.

25              THE COURT:  Redirect.

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 28 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 26 of 91
4353
Czemerys - ReD by Mr. Cardani                    28

```
1                     REDIRECT EXAMINATION

2    BY MR. CARDANI:

3         Q.    Mr. Wax asked you about whether you were aware

4    of all this other material that was in the building.

5    Were you part of the actual searching team looking for

6    items pursuant to the warrant?

7         A.    No.

8         Q.    What was your role?

9         A.    My role was a seizing officer, to make sure

10   whatever the searching team found fit into the items to

11   be seized, and then to take possession of it.

12        Q.    I'm sorry?

13        A.    And then to take possession of it and get it

14   logged in.

15        Q.    So others are out there, looking for items,

16   they bring them to you, you compare it to the warrant,

17   right?

18        A.    That's correct, that's correct.

19        Q.    And Special Agent Anderson is there for

20   guidance as well?

21        A.    Yes.

22        Q.    And the mindset is, is this within the scope of

23   the warrant?

24        A.    That's correct.

25        Q.    Okay.  Now, Mr. Wax asked you about green
```

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 29 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 408-14   Filed 01/15/13   Page 27 of 91
4354
Czemerys - ReD by Mr. Cardani                        29

1    trailers.  So how many trailers were on the premises, if

2    you know?

3        A.     There were two trailers on the back of the

4    premises.

5        Q.     All right.  And if we could bring up SW-66.  Do

6    you know the acreage of the property, roughly?

7        A.     Roughly, as I recall, I thought it was at least

8    on a couple of acres.

9        Q.     Okay.  Now, where, in connection with this

10   picture, were the trailers, can you point?

11       A.     Well, you can't -- they are kind of behind the

12   house.  If you go around the right corner, they are

13   right back there.

14       Q.     Okay.  And how far were they from the house,

15   roughly?

16       A.     Roughly, I'm really not good with measurements,

17   but like -- they were like from me to that white board,

18   so they were very close to the residence.

19       Q.     Are you aware of other items that were found in

20   the green trailers?

21       A.     Yes, I am.

22       Q.     Are you aware of whether there were firearms in

23   the green trailers?

24       A.     Yes, there were.

25       Q.     Do you know about how many firearms were in the

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 30 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 28 of 91
2355
Czemerys - ReD by Mr. Cardani                    30

1    green trailers?

2        A.     We found approximately ten firearms.

3            MR. WAX:  Your Honor, I object on grounds of

4    relevance, and it's beyond the scope of anything that

5    was asked.

6            THE COURT:  Mr. Cardani.

7            MR. CARDANI:  I think it's directly related to

8    the cross-examination talking about the nature of

9    Pete's -- the defendant's --

10           THE COURT:  Overruled.  Go ahead.

11   BY MR. CARDANI:

12       Q.     Are you aware of the number and type of

13   firearms that were found in the green trailers?

14       A.     There were ten firearms found in the green

15   trailers.

16       Q.     Did they include a 9-millimeter semiautomatic

17   pistol, Glock?

18       A.     Yes.

19       Q.     With fully loaded magazines?

20       A.     Yes.

21       Q.     Did it include another 9-millimeter

22   semiautomatic pistol?

23       A.     Yes.

24       Q.     With three pre-band fully loaded magazines?

25       A.     Yes.

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 31 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 808-14   Filed 01/15/13   Page 29 of 91
4358

Czemerys - ReD by Mr. Cardani                    31

1      Q.      And two more of those same weapons?

2      A.      Yes.

3      Q.      .44 Magnum revolver?

4      A.      Correct.

5      Q.      .22 semiautomatic pistol?

6      A.      Yes.

7      Q.      Ruger P89, two fully loaded magazines?

8      A.      Yes.

9      Q.      12-gauge shotgun?

10     A.      Yes.

11     Q.      Ruger .22 carbine?

12     A.      Yes.

13     Q.      With a scope?

14     A.      Yes.

15     Q.      And another .22 carbine?

16     A.      Yes.

17     Q.      Now, were those taken?

18     A.      No, they were not.

19     Q.      Why not?

20     A.      They were not within the scope of the items to

21   be seized.

22     Q.      But documents -- the weapons were inventoried,

23   nevertheless?

24     A.      They were inventoried and photographed,

25   correct.  I shouldn't really say inventoried.  We wrote

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 32 of 122   Page ID#: 4857
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 30 of 91
Czemerys - ReX by Mr. Wax                           32

1    down the weapons and the serial numbers, but we did not

2    seize them.

3              MR. CARDANI:  That's all I have.

4                        RECROSS-EXAMINATION

5    BY MR. WAX:

6        Q.    Are you aware that all those weapons were

7    lawfully possessed?

8        A.    I did not have direct knowledge of that, but I

9    believe we had somebody from ATF run their serial

10   numbers.

11       Q.    And you learned that they were all lawfully

12   possessed?

13       A.    Correct.

14       Q.    So it wasn't just that they were not within the

15   scope of the warrant, there was nothing illegal about

16   them, the handguns or the long guns, correct?

17       A.    I believe that's correct.

18       Q.    You also don't have any personal knowledge

19   about whether or not they were all owned by Mr. Seda?

20       A.    I do not know that, no.

21       Q.    And you've indicated that Mr. Seda was not

22   present at the time of the search?

23       A.    That's correct.

24             MR. WAX:  Thank you.

25             MR. CARDANI:  No further.

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 33 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 808-14   Filed 01/15/13   Page 31 of 91
1358
Czemerys - ReX by Mr. Wax                          33

 1              THE COURT:  You may step down.  Call your next

 2     witness, please.

 3              MR. CARDANI:  Jeremy Christianson.

 4              MR. WAX:  Your Honor, I don't believe I offered

 5     the second exhibit.  I would do so now.

 6              MR. CARDANI:  No objection.

 7              THE COURT:  Received, 1047.  Thank you.

 8              MR. WAX:  Could we show both of those to the

 9     jury?  I'm not sure if they were shown to the jury

10     during the testimony.

11              THE COURT:  I want to put this witness on the

12     stand now.  You can do that later.  Go ahead.

13              MR. WAX:  Thank you.

14              THE CLERK:  Sir, please step forward and raise

15     your right hand.

16              (The witness was sworn.)

17              THE CLERK:  Thank you.  Please step forward.

18     Please watch your step.  There is a couple of steps

19     there.  Your microphones are the buttons under here, so

20     if you would watch your paperwork.

21              Sir, would you please state your full name for

22     the record, spelling your last name.

23              THE WITNESS:  Jeremy William Christianson,

24     C-H-R-I-S-T-I-A-N-S-O-N.

25

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 37 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 32 of 91
4362
Christianson - D by Mr. Cardani                    37

 1    Computer Examiners.  And also I'm an EnCase certified

 2    examiner, again, which is the software that we use to

 3    conduct our analysis.

 4        Q.    Now, at some point in time when you were with

 5    the -- still with the Internal Revenue Service, did you

 6    get involved in an attempt to analyze the contents of

 7    certain hard drives seized from 3800 South Highway 99,

 8    Ashland, Oregon?

 9        A.    Yes.

10        Q.    Do you know when that was?

11        A.    It was approximately January of 2008.

12        Q.    2008?

13        A.    That's correct.

14        Q.    Okay.  And do you know how many hard drives you

15    were asked to help examine?

16        A.    It was requested that I analyze five hard

17    drives.

18             MR. CARDANI:  If I may have a moment.

19             (Discussion held off the record.)

20             MR. CARDANI:  Judge, I'd like to just read a

21    stipulation at this point with the consent of Mr. Wax.

22             THE COURT:  Go ahead.

23             MR. CARDANI:  The parties stipulate that in

24    February of 2004, the United States government obtained

25    eight computer hard drives from the premises of

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 38 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 33 of 91
1363
Christianson - D by Mr. Cardani                    38

1    al-Haramain Ashland in Ashland, Oregon.  The government

2    made mirror images of those hard drives and provided

3    them to its computer expert, Richard Smith.

4           Mr. Smith subsequently provided the hard drives

5    to government's computer expert, Jeremy Christianson.

6    The government's exhibits in the SW series were derived

7    from those computers.

8           THE COURT:  Mr. Wax, do you so stipulate?

9           MR. WAX:  Yes, Your Honor.

10           THE COURT:  Members of the jury, that means you

11    are to accept that as facts in the case.  Go ahead.

12    BY MR. CARDANI:

13    Q.    What does -- the term "mirror" showed up in

14    that stipulation in terms of the hard drive.  Can you

15    explain that?

16    A.    Yes.  A mirror copy of a hard drive is simply

17    an exact copy of a hard drive that we can authenticate

18    as being an exact copy.

19    Q.    So what you were given came from Oregon were

20    exact copies of basically the guts, the hard drives of

21    the computers?

22    A.    Yes.

23    Q.    To the best of your knowledge, were those same

24    copies provided to the defense?

25    A.    Yes.

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 39 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 34 of 91
4364
Christianson - D by Mr. Cardani                    39

1     Q.     If we could bring up SW-64, please.  If we

2  could go to room X.  Now, are you familiar with the

3  monikers there, Seda 8, 9, 6 and 10?

4     A.     Yes.

5     Q.     And, Mr. Christianson, were those among the

6  hard drives that you attempted to analyze?

7     A.     Yes.

8     Q.     Did you say there were five that you analyzed?

9     A.     Five.

10     Q.     Do they include all of these?

11     A.     They do include all of these.

12     Q.     And a couple of others from the upstairs

13  office?

14     A.     Yes, Seda number 7.

15     Q.     Now, before attempting to do your work as a

16  computer forensic expert with IRS, did you talk to

17  anybody about what you were needed to do?

18     A.     I spoke with Special Agent Anderson and Special

19  Agent Rick Smith, who was the seizing agent for the

20  digital evidence.  He preserved it.  And she requested

21  that I conduct a recovery for documents, financial data

22  files like QuickBooks and e-mail.

23     Q.     Did that help shape the nature of your work

24  after that?

25     A.     It did, yes.

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 40 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 35 of 91
4365
Christianson - D by Mr. Cardani                    40

1      Q.     Were there any specific requests about any

2  problems they were having in the field accessing the

3  contents of the hard drives?

4      A.     One of the problems that they had was that

5  they, utilizing the software that they were using, they

6  were unable to identify things like e-mail.

7      Q.     More specifically about the e-mail that they

8  were having trouble locating particular e-mails or what?

9      A.     They were having trouble locating -- I believe

10 it was any e-mail at all.

11     Q.     Okay.  And so did you then conduct an

12 examination of the computer hard drives?

13     A.     I did.

14     Q.     How long do you typically spend in analyzing

15 the contents of a hard drive?

16     A.     It's hard to put in an exact time of how long I

17 actually spend.  Each case is unique.  But usually data

18 is readily accessible in -- at least in my experience

19 with the cases that I've worked on.  And it usually

20 doesn't take a long time for turnaround.  I'd say a

21 couple of weeks to conduct a preliminary examination.

22     Q.     And in your four years with IRS, do you have a

23 rough estimate of how many computer hard drives you were

24 engaged in analyzing?

25     A.     It was a lot.

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 41 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 36 of 91
4368
Christianson - D by Mr. Cardani                    41

 1      Q.      Over 100?

 2      A.      Not over 100.

 3      Q.      Less than 100?

 4      A.      Less than 100 but very close.

 5      Q.      Now, were you able to access eventually the

 6   information contained in some of the computers?

 7      A.      Yes, I was.

 8      Q.      Did it take much work?

 9      A.      It took a tremendous amount of work.

10      Q.      Please, what do you mean by a "tremendous

11   amount of work"?

12      A.      It took a lot of time, so that the data

13   recovery techniques that I employed to recover the data

14   were very manual, very time intensive.

15      Q.      Why?

16      A.      Because of the state of the data.  The data

17   that I recovered existed in what I call residual areas

18   of the hard drive.  It wasn't accessible by a user of

19   the computer.

20      Q.      Can you break that down a little bit, it's not

21   accessible to a user?

22      A.      Sure.  If I'm a user of a computer, and I'm

23   sitting in front of it, and I turn the power on, and

24   Windows comes up, for example, the files and folders

25   that I see, that's easily accessible data.

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 42 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 37 of 91
4867
Christianson - D by Mr. Cardani                    42

1          When you delete a file, the file is not visible

2    to you anymore, but it's still on the hard drive until

3    it's overwritten.

4          So those areas of the hard drive that the user

5    cannot see or access, there could still be residual data

6    there.

7     Q.    Can be?

8     A.    Can be.

9     Q.    All right.  What does that mean?  How do you

10   know if it's still there or not?

11    A.    It's still there until it's overwritten by new

12   data, by new files.

13    Q.    How long did you work on these computers?  You

14   said you got them in January of 2008.

15    A.    Again, it's very hard to quantify in hours how

16   many -- how much time I spent, but it took me several

17   months, at least upfront, to recover a lot of this data.

18    Q.    And were you working primarily on this?

19    A.    I was working primarily on this, yes.

20    Q.    For months?

21    A.    For months.

22    Q.    In terms of your comparison with your other

23   work, was this routine?

24         MR. WAX:  Objection, Your Honor.

25         MR. CARDANI:  For the amount of time.

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 43 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 38 of 91
4868
Christianson - D by Mr. Cardani                    43

1            THE COURT:  Did you say "was it routine"?

2            MR. CARDANI:  Yes, in comparison to the amount

3    of time compared to working on other projects.

4            THE COURT:  The objection is overruled.

5            THE WITNESS:  It was -- to spend as much time

6    as I did simply relates to the volume of information

7    that I was able to identify and recover.  So I spent

8    more time than usual, yes.

9    BY MR. CARDANI:

10       Q.    Have you ever worked on a project as large as

11   this before?

12       A.    This was one of the largest I've worked on.

13       Q.    Now, were you able to recover all of the

14   information from the contents of these hard drives?

15       A.    Can you define "all"?

16       Q.    Well, specifically you said when something is

17   deleted, it goes into this unallocated space?

18       A.    Yes.

19       Q.    And did you spend a lot of time forensically

20   sifting through the unallocated space?

21       A.    Yes, I did.

22       Q.    Now, did you find anything in the unallocated

23   space that led you to conclude that there were other

24   things there that were gone, that had been overwritten?

25       A.    In particular, we used e-mail, for example, the

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 44 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 39 of 91
4563

Christianson - D by Mr. Cardani                    44

 1    method that I employed to -- very manual method to

 2    recover some of the e-mail, it was incomplete with the

 3    recovery, so I had to employ some tools to actually --

 4    for example, Microsoft Outlook e-mail, I was actually

 5    able to recover an entire mailbox associated to that

 6    program.  And I use an analogy -- and, again, this is an

 7    oversimplified analogy -- to a mailbox out in front of a

 8    house that has letters inside.

 9           I wasn't only able to recover one of those

10    letters, I was able to recover the entire mailbox.  And

11    that process, because of the volume of e-mail, took a

12    very substantial amount of time to recover, and to

13    repair.  And that tells me that it was probably deleted

14    at some point in time, which I couldn't determine, and I

15    had to run some repair tools to recover most of the

16    e-mail.

17    Q.    We're going to get into the e-mails, but just

18    to be clear, you just used an analogy about a missing

19    mailbox, so when somebody turns on a computer, and looks

20    for e-mails as a file, Outlook or something like that,

21    that you would ordinarily look for an e-mail?

22    A.    Yes.  Microsoft Outlook stores its e-mail in a

23    single file.  It's called a personal storage folder.

24    And that single is just like a mailbox.  All of your

25    e-mail is inside that one file.  And I was able to

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 45 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 40 of 91
2878
Christianson - D by Mr. Cardani                    45

1    recover that one file, actually, on several hard drives.

2        Q.    From the deleted parts of the computer?

3        A.    From the unallocated, nonuser accessible areas

4    of the hard drive.

5        Q.    So when you turn on a computer, it would be,

6    like, apparent to the user, was there any e-mail system

7    apparent?

8        A.    There wasn't -- Microsoft Outlook was not

9    apparent on the computers.  If I were the one to sit

10   down and turn it on, Microsoft Outlook was not there.

11       Q.    Okay.  So the whole mailbox was actually

12   missing?

13       A.    Yes.

14       Q.    But you were able to use tools to get into the

15   deleted portions and find some e-mail?

16       A.    Yes.

17       Q.    You mentioned the word "repair."  What does

18   that mean?

19       A.    Again, if you are using Microsoft Outlook as

20   your e-mail program, and something happens to your

21   mailbox, it gets corrupted and you can't open it,

22   Microsoft has a tool that is specifically made to help

23   repair that for you so that you can save your e-mail.

24       Q.    Now, what was your goal in terms of -- were you

25   working with Special Agent Anderson quite a bit on this

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 46 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 41 of 91
2871
Christianson - D by Mr. Cardani                    46

1    project?

2        A.    Yes, I was.

3        Q.    Did you talk to her on the phone quite a bit?

4        A.    I did quite a bit, yes.

5        Q.    All right.  What was your goal in rebuilding

6    these computers, especially the deleted aspects of them?

7        A.    My role primarily was to simply be the

8    technician, to identify and recover the types of data

9    that Special Agent Anderson identified upfront, and to

10   reconstruct that into a user accessible form so that she

11   could review and search the data.

12       Q.    And how?  How could you search the data then?

13       A.    Through different types of software that we

14   have that allows you to search a large volume of

15   information, files.

16       Q.    Were you ultimately successful?

17       A.    I believe so.

18       Q.    Okay.  But not entirely because there were --

19   there was material that was entirely overwritten, or do

20   you know?

21       A.    It's hard to determine, but there was a lot of

22   deleted data on the computers.

23       Q.    Did you find any e-mails that were like strings

24   of text but then just stopped so they are partially --

25       A.    There were several, for example, Web pages that

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 47 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 42 of 91
4872
Christianson - D by Mr. Cardani                    47

 1    used to be on the computer at one point in time and

 2    accessible to a user.  You could definitely see that

 3    there were blocks of text for files and stuff of that

 4    type that were not complete.

 5         Q.    Meaning they were gone?

 6         A.    Meaning that the likely scenario is that they

 7    were partially overwritten.

 8         Q.    And if they are partially overwritten, is there

 9    any way at that point for you to recover them?

10         A.    No.

11         Q.    Gone forever?

12         A.    Gone forever.

13         Q.    Okay.  Now, in preparation for your testimony

14    today, were you asked to prepare a summary of certain SW

15    series, search warrant series, of exhibits that came out

16    of these computers?

17         A.    Yes.

18         Q.    And is that what's been identified as JC-4?

19         A.    Yes.

20         Q.    Did you help prepare this?

21         A.    Working with Special Agent Anderson, I did help

22    prepare this.

23         Q.    So to the best of your knowledge, does the

24    information depicted in here accurately show the nature

25    of the material in the report?

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 48 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 43 of 91
2873
Christianson - D by Mr. Cardani                      48

1      A.      Yes.

2      Q.      Before we bring it up -- okay.  If we could

3   bring up the first page of JC-4.  This is titled Summary

4   Report, Search Warrant Series Deleted Items Recovered

5   From Seized Al-Haramain Computers.  All right.  Now that

6   word "deleted" does that mean -- does that mean that

7   this is in the unallocated space, not in the apparent

8   portion of the computers?

9      A.      That's correct.

10      Q.      All right.  Let's talk about the fields first.

11   We see the exhibit numbers for trial, so the first one

12   would be SW-5.  Do you see that on the first line?

13      A.      Yes.

14      Q.      And then next to it is a description?

15      A.      Yes.

16      Q.      E-mail with attachment from Abdul Qaadir dated

17   such-and-such.  Whose description is that?

18      A.      Special Agent Anderson.

19      Q.      And then the next column is the hard drive?

20      A.      That is the evidence item it came from.

21      Q.      I'm sorry?

22      A.      That's the evidence item that it came from,

23   yes.

24      Q.      Okay.  Were a lot of these from Seda 8?

25      A.      It appears that way, yes.

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 49 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 44 of 91
2874

Christianson - D by Mr. Cardani                    49

1      Q.     From room X.  And then the "from," "to," and

2  the "CC," is -- who put -- whose information is that?

3      A.     Those are standard fields in an e-mail.  So

4  when e-mails are sent and received, it's who it came

5  from, who it went to.

6      Q.     So that's from the e-mail itself, not from

7  any --

8      A.     Correct, that is --

9      Q.     -- government -- I'm sorry?

10      A.     That is from the e-mail itself, yes.

11      Q.     And the subject line?

12      A.     That is from the e-mail.

13      Q.     And then the date of e-mail or document on the

14  right?

15      A.     That is also from the e-mail.

16      Q.     Did you -- were you asked to do, as best you

17  could, a chronological list of these search warrant

18  items?

19      A.     Yes.  Once the -- this spreadsheet was put

20  together, you could sort chronologically based on the

21  data.

22      Q.     Okay.  But this particular exhibit starts

23  January 4, 2000, then runs for several pages.  And

24  eventually we take you through September of '01.  So

25  where possible, chronologically?

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 50 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 45 of 91
2873
Christianson - D by Mr. Cardani                        50

1       A.      Yes.

2       Q.      Now, are many of these items depicted recovered

3  e-mails?

4       A.      These are recovered e-mails from what we talked

5  about earlier of one of those mailbox files.

6       Q.      Okay.  But you -- there are other types of

7  information depicted on here as well?

8       A.      There is.  There are several Web pages and Word

9  documents.

10      Q.      We're having a little trouble hearing you.  If

11 you could move a little closer to the microphone.  It's

12 down there.

13      A.      Sure.

14              THE COURT:  The mikes are those little silver

15 buttons in front of you.

16              THE REPORTER:  You may slow down, too.  I think

17 that would help.

18 BY MR. CARDANI:

19      Q.      She slows me down a lot, too.  Now, one thing

20 before we get into some of these, were you asked to

21 determine whether it was possible that these e-mails

22 we're about to get into were spam?  Are you familiar

23 with spam?

24      A.      Yes, I am.

25      Q.      What's spam?

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 51 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 46 of 91
13778
Christianson - D by Mr. Cardani                51

```
 1      A.      Spam is, for lack of a better definition, junk

 2   mail, things that you don't want, or ads and other

 3   things.

 4      Q.      So you can just simply delete it without even

 5   opening it?

 6      A.      You could, yes.

 7      Q.      And where would it go on the computer if you

 8   did that?

 9      A.      If you were using, again, a program like

10   Microsoft Outlook, there's actually a recycle bin inside

11   Outlook, so it would simply be in the deleted folder.

12      Q.      Okay.  So were you asked to determine whether

13   these e-mails were of the spam nature?

14      A.      I was.

15      Q.      What was the result of your work?

16      A.      Basically what we determined that these -- the

17   location of each one of these e-mails, and most of them

18   were in the in box folder.  And I was asked to determine

19   whether they were read or unread.  And we determined

20   that all of these e-mails in this particular spreadsheet

21   were marked as read.

22      Q.      Okay.  So would that require somebody to

23   physically open it on a computer?

24      A.      Yes.

25      Q.      Okay.  Now, all of these were opened?
```

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 52 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 47 of 91
2877
Christianson - D by Mr. Cardani                    52

 1      A.     Yes.

 2      Q.     So, for example, if we could go to page 5 of

 3   this.  And then the second line down there,

 4   Mr. Christianson, SW-30, you say that that is -- or

 5   stated that the e-mail to Sheeshaan group dated March 8,

 6   2000, at such-and-such a time containing fatwa from

 7   Jibreen, right?

 8      A.     Yes.

 9      Q.     Okay.  And then moving over in that field, you

10   are saying it's from Seda 8, deleted?

11      A.     Yes.

12      Q.     And then AQ@Yahoo with the address of the

13   sender?

14      A.     Yes.

15      Q.     And then to the Sheeshaan eGroups.  Now, are

16   you familiar with the -- if we can go back to the left

17   just a little bit.  Okay.  This Sheeshaan eGroups, are

18   you familiar with that based on this investigation?

19      A.     No.

20      Q.     All right.  Do you know what an eGroup is?

21      A.     I do.

22      Q.     What's an eGroup?

23      A.     An eGroup is simply a group of -- a

24   distribution list, if you will, for a particular topic

25   for a particular entity.

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 53 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 48 of 91
2878
Christianson - D by Mr. Cardani                    53

1    Q.    Did you find a number of e-mails that were

2    associated with this Sheeshaan eGroups --

3    A.    Yes.

4    Q.    -- on the computer?

5    A.    Yes.

6    Q.    And then so if we could bring up the exhibit

7    itself, SW-30, please.  If we look at that first part up

8    top, is this an example of an e-mail that made its way

9    into the summary, SW-30?

10   A.    Yes.

11   Q.    Okay.  So there is the address up at the top,

12   and a date sent, date delivered.  And so you took this

13   information and worked with Agent Anderson and put this

14   into the JC-4 exhibit?

15   A.    Yes.

16   Q.    Okay.  Can we go to SW-51, please.  In addition

17   to e-mails, did you find other type of information

18   within the deleted section of the computers?

19   A.    Yes, several -- there were quite a bit of

20   documents and Web pages, for example.

21   Q.    What is this?

22   A.    This is a Web page.

23   Q.    Okay.  And what can I do to help the jihad and

24   mujahideen?  Now, this is SW-51.  And I see in the last

25   page of JC-4 -- we don't need to see it right now, keep

Case 6:05-cr-60008-HO    Document 456    Filed 09/11/10    Page 54 of 122    Page ID#:
Case 1:03-cv-05071-GBD-SN    Document 308-14    Filed 01/15/13    Page 49 of 91
2373
Christianson - D by Mr. Cardani                    54

1    this up here for a second, but you put the date of the

2    e-mail or document not applicable in your summary, why

3    is that?

4        A.    When you recover files from unallocated space,

5    you lose all of that information, the dates, times, and

6    the source of where it existed, when it was accessible

7    by the user.

8        Q.    But the contents of this in the deleted section

9    of Seda 8, does this indicate that somebody actually

10   visited a Web site on this computer?

11       A.    It's logical to assume that, yes.  At one point

12   in time, this Web page existed and was accessible to the

13   user.

14       Q.    But then was deleted?

15       A.    Yes.

16       Q.    Okay.  I'm going to ask you about a few other

17   e-mails and ask you if you did some work forensically

18   that helps explain some of the e-mail traffic in this.

19   Could we start with SW-56, please.

20            Are you familiar, Mr. Christianson, with this

21   exhibit?

22       A.    Yes.

23       Q.    And did this come from Seda 8?

24       A.    Yes.

25       Q.    All right.  Profile commander of the foreign

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 55 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 50 of 91
4588
Christianson - D by Mr. Cardani                    55

1    mujahideen in the Caucasus.  And this is a multiple page

2    exhibit.  Could we go to page 6, please.  All right.

3    Could we expand this part right here (indicating).

4    Thank you.

5          Do you see that?  It's from this Khattab

6    interview, Mr. Christianson.  Do you need any support?

7    What support in particular do you need?

8    A.    Yes.

9    Q.    And then the answer, "The Chechen Republic has

10   been surrounded from all sides.  However, the Russian

11   Army is prepared to sell everything for a price.  As for

12   previous affairs of the Muslims, one would always find

13   Islamic charities and organizations present.  I'm sorry

14   to say there is not a single Islamic charity

15   organization active inside Chechnya at present.  Only

16   the Red Cross is present in Chechen towns and cities.

17   Therefore, we advise the Muslims in the Muslim countries

18   to take a sincere stand with the mujahideen in the land

19   of the Caucasus."  Do you see that?

20   A.    Yes.

21   Q.    Now, can we go to SW-52.  Does this -- this

22   came also from Seda 8, according to page 1 of your

23   summary?

24   A.    Yes.

25   Q.    And it's listed here as having been created on

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 56 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 51 of 91
4861
Christianson - D by Mr. Cardani                    56

 1   January 22, 2000?

 2       A.     Yes.

 3       Q.     So tell us about that.  How -- what is this?

 4       A.     This is a recovered Microsoft Word document.

 5   And Microsoft Word when you create a new Microsoft Word

 6   document stores internal dates and times.  And those

 7   internal dates and times are reflective of when it was

 8   created based on the time zone settings were for Windows

 9   at the time it was created.

10       Q.     So this document, is that the entire document?

11       A.     That is the entire document.

12       Q.     Okay.  So someone singled off this particular

13   question and put it into a Word document?

14       A.     It would appear so.

15       Q.     And then if we could go -- are you familiar

16   with the term "cut and paste"?

17       A.     I am.

18       Q.     Can you go onto a Web site and highlight

19   material and save it to the Word document?

20       A.     You can, yes.

21       Q.     That would be a cut and paste?

22       A.     Yes.

23       Q.     Okay.  And the language here is identical to

24   that other one?

25       A.     It was identical, yes.

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 57 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 52 of 91
4562
Christianson - D by Mr. Cardani                    57

1    Q.    All right.  The next exhibit, SW-11, now this

2    is dated the same day.  You said in your summary that

3    the Word document was created on January 22nd --

4    A.    Yes.

5    Q.    -- on the computer.  This is a new exhibit,

6    SW-11, which is listed on page 2 of your summary as an

7    e-mail contained within Seda 6, from P@qf.org.  Do you

8    see that?

9    A.    Yes.

10   Q.    To al-But'he, right?

11   A.    Yes.

12   Q.    And then it says "what support"?

13   A.    Yes.

14   Q.    And that's the subject line?

15   A.    That is the subject line.

16   Q.    Typically in -- who would have typed "what

17   support"?  Would that have been from the sender of this

18   e-mail?

19   A.    That would have been from the sender, yes.

20   Q.    And this same question down below, the verbiage

21   is identical to the Khattab interview and the Word

22   document you just talked about?

23   A.    It is, yes.

24   Q.    Do you know if this was sent?

25   A.    It appears that it was sent, yes.

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 58 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 53 of 91
2583
Christianson - D by Mr. Cardani                    58

1    Q.    And then if we go to SW-36, please.  Okay.

2    Blowing up the first half of that one, SW-36,

3    Mr. Christianson, does this appear to be an e-mail from

4    looking at your -- this lists as coming from that same

5    computer, Seda 6 from room X?

6    A.    Yes.

7    Q.    Okay.  So the same computer listed on your

8    summary here on page 5, from the same sender, P@qf.org

9    to Sheeshaan owner at eGroups, dated September 18, 2000.

10   And down below is Red Commie in red?

11   A.    Yes.

12   Q.    Now, it's in red.  Do you know if that was in

13   its original form or whether someone from the government

14   made it red?

15   A.    No one from the government made it red.  At

16   least not from the recovery that I did.  It is in the

17   state that it was in when I recovered it.

18   Q.    Both in size and color?

19   A.    Both in size and color.

20   Q.    And then three lines down it says AU?

21   A.    Yes.

22   Q.    And are you familiar that the defendant's --

23   one of his names is Abu Yunus?

24   A.    Yes, Special Agent Anderson told me that was.

25   Q.    And down below it says The Arborist, Ashland,

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 59 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 54 of 91
4364
Christianson - D by Mr. Cardani          59

 1    Oregon, Pete Seda, urban forester, certified arborist?

 2        A.    Yes.

 3        Q.    So it's a contact with the issuer of Sheeshaan

 4    eGroups?

 5        A.    Yes.

 6        Q.    If we could move on to SW-23.  If we could just

 7    see who is sending this.  Was this also recovered from

 8    the computers?

 9        A.    Yes.

10        Q.    I'm looking at your summary, and you have it

11    from hard drive Seda 8 in the deleted section?

12        A.    Yes.

13        Q.    So this is just from soliman@albuthi.com dated

14    February 23rd of 2000 to Pete?

15        A.    Yes.

16        Q.    Regarding FBI witch hunt to target Islamic

17    charities?

18        A.    Yes.

19        Q.    I'd like to go to the second page of that and

20    if we could go down towards the bottom.  Do you see that

21    red paragraph?

22        A.    Yes.

23        Q.    Before getting into the contents of it, it's in

24    red.  And the same question from before.  Is -- did

25    someone put this in red in its original form in the

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 60 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 55 of 91
4585
Christianson - D by Mr. Cardani                    60

 1  computers?

 2      A.      It appears that way, yes.

 3      Q.      Changed the color, but I'm saying you didn't do

 4  it?

 5      A.      I did not do it.

 6      Q.      Okay.  And to the best of your knowledge, she

 7  didn't do it?

 8      A.      To the best of my knowledge, she did not do it

 9  either.

10      Q.      All right.  So if you went in there today and

11  looked at this computer, you'd find this in red, this

12  section?

13      A.      I would find it exactly the same way, yes.

14      Q.      Okay.  U.S. officials also said they have

15  discovered through the massive probe that a significant

16  number of Islamic terrorists are concealing their

17  activities and sources of funds by using charitable

18  organizations as fronts.  Since many of these charities

19  do substantial community service work, investigating

20  them is not easy and can subject the FBI or foreign law

21  enforcement authorities to allegations of targeting

22  religious or ethnic groups, sources said.

23      A.      Yes.

24      Q.      Okay.  If we could go back to page 1 at the top

25  there.  This was sent by someone using the

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 61 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 56 of 91
                                    2388
                    Christianson - D by Mr. Cardani                    61

1  soliman@albuthi address to Pete, and it was found in

2  this deleted section of Seda 8?

3      A.    Yes.

4      Q.    A few other things.  I'd like to go to SW-8,

5  please.  Mr. Christianson, in addition to a lot of these

6  e-mails, were there pictures and maps also found in

7  deleted sections of these hard drives?

8      A.    Yes.

9      Q.    And does this one here, SW-8 that's before you,

10  from AQ@Yahoo, Friday, January 14th, news from the

11  mujahideen in Chechnya, news and photos, and then there

12  are attachments.  What do those refer to before we get

13  into them?

14      A.    Attachments are simply, in this particular

15  case, pictures that were sent with the e-mail.

16      Q.    And there is a thing at the end of these

17  addresses, JPG, like p4@JPG.  What does JPG mean?

18      A.    That is a particular type of picture file.

19      Q.    J-peg, is that how you guys say it?

20      A.    J-peg, yes.

21      Q.    That means the picture.  All right.  And this

22  is talking about a Russian plane shot down January 2000,

23  70 Russians killed, 4 vehicles destroyed?

24      A.    Yes.

25      Q.    And then pictures from operations, see

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 62 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 57 of 91
4387
Christianson - D by Mr. Cardani                         62

1    attached.  All right.  If we could go on to the second

2    page of this.  And I want to go through some of these

3    pictures.  Are these the attachments that were on that

4    particular e-mail, Mr. Christianson?

5         A.    Yes.

6         Q.    All right.  We just scrolled through all of

7    those pictures.  And those were all the pictures that

8    were attached as these JPGs to the e-mail?

9         A.    Yes.

10        Q.    Did you find photos SW-45?  Was this found in

11   the deleted sections of these hard drives?

12        A.    Yes.

13        Q.    Do you know who these fellas are?

14        A.    I don't know specifically, but I was told they

15   were -- by Special Agent Anderson that these are

16   pictures of mujahideen fighters.

17        Q.    All right.  SW-44, that was in the computer?

18        A.    Yes.

19        Q.    46.  47.  Now, what is this?

20        A.    That is a picture.

21        Q.    Was it found attached to anything, if you know,

22   or randomly in the computers?

23        A.    That was not an attachment to an e-mail.  That

24   was found on the hard drive as a recovered picture.

25        Q.    It was just a JPG photo --

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 63 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 58 of 91
4368
Christianson - D by Mr. Cardani                    63

1    A.    Yes.

2    Q.    -- found on the computer.  Okay.  48.  Can you

3    enlarge that a little bit.  It's really hard to make out

4    on this, but do you have any idea what that sign says?

5    A.    I do not.

6    Q.    Okay.  We'll have another witness talk about

7    that later, but I just wanted to ask you that.  Okay.

8    49.  Just another JPG in the computer?

9    A.    Yes.

10   Q.    And 50, same type of thing?

11   A.    Yes.

12   Q.    All right.  SW-59, this is listed in your

13   summary as coming also from Seda 8, undated, but a JPG

14   photo of the map of a battle in Grozny?

15   A.    Yes.

16   Q.    And the next one, SW-60, also you say comes

17   from Seda 8 in the deleted section?

18   A.    Yes.

19   Q.    Titled Mujahideen Tactical Movements Out of

20   Grozny?

21   A.    Yes.

22   Q.    And the bottom, mujahideen movement?

23   A.    Yes.

24   Q.    All right.  I'd like to move on to a slightly

25   different subject now.  SW-17, please.  Okay.  At the

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 64 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 59 of 91
2585
Christianson - D by Mr. Cardani                    64

 1    top it says Hotmail, Ptichka1@hotmail.com.  Do you see

 2    that?

 3        A.    Yes.

 4        Q.    So this is on page 2 of your summary, also from

 5    the same hard drive, Seda 8, as -- it says here,

 6    original sent February 6, 2000.  So can you describe

 7    what this is?

 8        A.    This is a -- looks like an e-mail message from

 9    someone with Ptichka1@hotmail.com composing a message

10    using Web based e-mail, Hotmail.

11        Q.    And when you do e-mails like this, it's just

12    reflected in the computer like this?

13        A.    The behavior of Internet Explorer, which is the

14    Web browser that was used to generate this, was to store

15    remnants of that particular Web mail on the computer.

16        Q.    Okay.  And this is to -- regarding the "to"

17    line here, Qoqaznet@yahoo.co.uk?

18        A.    Yes.

19        Q.    And regarding translations?

20        A.    Yes.

21        Q.    And then down below, if we could highlight the

22    snap -- you've said -- you used the word snapshot

23    before?

24        A.    I did not say snapshot.

25        Q.    Oh.

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 65 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 60 of 91
4396
Christianson - D by Mr. Cardani                65

1    A.    But essentially that's what this is.

2    Q.    Okay.  Well, I don't know what I mean by

3    snapshot.  Tell me what this is.

4    A.    This is just an -- this is the original portion

5    as if I was replying to an e-mail, so the original

6    e-mail thread would be part of that.

7    Q.    Okay.  And -- okay.  So if we go -- this is

8    from Qoqaz Web site to Ptichka at Hotmail.  And, again,

9    this is coming from Ptichka1 stuff is in the Seda 8?

10   A.    Yes.

11   Q.    Regarding translation, February 2000, talking

12   about -- down here, dear sister, the work seems to be

13   going on well?

14   A.    Yes.

15   Q.    Okay.  So does it appear that somebody was

16   using this computer to do translations for Qoqaz?

17        MR. WAX:  Objection.

18        MR. CARDANI:  Well --

19        MR. WAX:  I don't know how this witness can

20   answer that.

21        THE COURT:  Yeah.  Go on.

22   BY MR. CARDANI:

23   Q.    But the subject is "translations"?

24   A.    The subject is translations, yes.

25   Q.    All right.  And it's going in the -- if we

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 66 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 61 of 91
Christianson - D by Mr. Cardani                    66

 1    could go back to the exhibit, up top, this is someone

 2    communicating with Qoqaznet about translations?

 3        A.    Yes.

 4        Q.    Okay.  All right.  And it was found in the

 5    computers in Ashland, Oregon?

 6        A.    It was, yes.

 7        Q.    From someone using this Ptichka address?

 8        A.    Yes.

 9        Q.    Now, can we go to SW-61, please.  All right.

10    What's this?

11        A.    This is a recovered Web page for a Web site The

12    PROMT's Online Translator, and this was also again a

13    recovered Web page.

14        Q.    All right.  And in the microphone, a little

15    louder, I'm having trouble.

16        A.    This is a recovered Web page for this, what

17    appears to be an online translation service.

18        Q.    Okay.  Are you familiar with online

19    translations services?

20        A.    Vaguely.

21        Q.    Okay.  Do you know if there are services

22    available online where you can put information in to get

23    help translating into various language?

24        A.    I do know there are some, yes.

25        Q.    So we see here the English part of it, "wait

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 67 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 62 of 91
4392
Christianson - D by Mr. Cardani                    67

 1   until we post the details of the aid organization able

 2   to collect these donations and then send your money to

 3   them.  We do not accept or collect donations ourselves

 4   as we are only a news outlet."  And then talks about the

 5   mujahideen down below.  "Urgent need of doctors, medical

 6   personnel, and medical supplies."

 7        A.    Yes.

 8        Q.    Do you see that?  And then right below that, it

 9   says English-Russian translation?

10        A.    Yes.

11        Q.    And then down below -- do you speak Russian?

12        A.    I do not.

13        Q.    Okay.  Have you ever seen Russian before?

14        A.    I have seen Russian before.

15        Q.    Does this appear to be Russian?

16        A.    It appears that way.

17        Q.    Okay.  Could we go to the overall page and then

18   highlight down below, too.  More of translation stuff?

19        A.    Yes.

20        Q.    Did you find a number of these types of things

21   in the computer?

22        A.    I did.

23        Q.    Seda 8?

24        A.    Seda 8, yes.

25        Q.    All right.  Now, I'd like to move to a

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 68 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 63 of 91
                                    4593
Christianson - D by Mr. Cardani            68

 1   different subject, Mr. Christianson.  Later on you said

 2   that your job was to put this in a searchable format for

 3   Agent Anderson?

 4       A.    Yes.

 5       Q.    Were you able to search, too?

 6       A.    I was able to search, too, if she requested it,

 7   yes.

 8       Q.    And can I show you AHIF-2.  If we could blow up

 9   that first paragraph.  This references an agreement

10   between Soliman and Abu Yunus about turning all monies

11   and responsibilities collected for the brothers and

12   sisters of Chechnya to Brother Soliman.  And then

13   Soliman states he has received monies in the amount of

14   such-and-such and fully relieves Abu Yunus of all

15   responsibilities for the monies.

16       A.    Yes.

17       Q.    Were you asked to do a text search to determine

18   if these were in any of the computers?

19       A.    Yes.

20       Q.    And what were the results of that search?

21       A.    I did not find this in any of the computer

22   evidence that I searched.

23       Q.    Okay.  That references $186,000, do you see

24   that?

25       A.    Yes.

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 69 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 64 of 91
13924
Christianson - D by Mr. Cardani                   69

1      Q.    And if you could go a little bit lower, okay.

2    Do you see the signatures there, two signatures up here

3    (indicating), that and that?

4      A.    Yes.

5      Q.    Okay.  Hold that thought.  And let's go to

6    AHIF-3, okay.  Now, you've seen this before?

7      A.    Yes.

8      Q.    Okay.  The same language in whatever this is,

9    but the same text?

10     A.    Yes.

11     Q.    And the signatures are in -- references

12   188,000, not 186,000?

13     A.    Yes.

14     Q.    And then the signatures here are reversed?

15     A.    Yes.

16     Q.    Okay.  So this would have been the same -- did

17   you search the computers for this one as well?

18     A.    Yes.

19     Q.    Did you find them at all?

20     A.    No.

21          MR. CARDANI:  Thank you, Mr. Christianson.  I

22   have no other question for you.

23          THE COURT:  Cross.

24          MR. WAX:  May I proceed, Your Honor?

25          THE COURT:  Please.

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 70 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 65 of 91
4393
Christianson - X by Mr. Wax                          70

 1                    CROSS-EXAMINATION

 2   BY MR. WAX:

 3       Q.     Is it Mr. Christianson or Agent Christianson?

 4       A.     Mr. Christianson.

 5       Q.     Good morning.  And thank you.

 6   Mr. Christianson, I'd like to ask you a few questions

 7   about the items recovered, and then go into some of the

 8   computerese, and ask you a few questions about that.

 9            Let me start with what was recovered at the end

10   of the day.  Do you have any count of the total number

11   of e-mails that you recovered?

12       A.     I don't have that in front of me.  I don't

13   recall how many total e-mails there were.

14       Q.     Would something in the order of 20 to 25,000

15   sound like the right ballpark?

16       A.     That sounds like the right ballpark.

17       Q.     Did you also look for, I think you said,

18   financial records?

19       A.     Yes.

20       Q.     Okay.  Did you recover any files from the

21   QuickBooks program?

22       A.     I did, yes.

23       Q.     Do you recall roughly how many either complete

24   or fragments of QuickBooks files you were able to

25   recover?

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 71 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 66 of 91
7398
Christianson - X by Mr. Wax                    71

1    A.    If I recall correctly, it was approximately at

2    least 20 to 30.

3    Q.    Do you recall there being more than that,

4    perhaps as many as 300 either complete files or

5    fragments of files?

6    A.    If we include fragments, I don't know if the

7    number was quite that high, but that sounds right.

8    Q.    Now, in terms of the recovery process,

9    Mr. Cardani asked you whether you were aware that the

10   defense was provided mirror copies of the hard drives

11   that we believe are identical to the mirrors that you

12   were working with, and I think you said you were aware

13   of that.

14   A.    Yes.

15   Q.    Okay.  In terms of the recovery process, is

16   there, in the way in which different forensic examiners

17   approach their work, a likelihood that you could have

18   recovered something perhaps that the forensic people

19   working with us did not?

20   A.    It's possible, yes.

21   Q.    And vice versa, that they might have recovered

22   some things that you did not?

23   A.    Yes, that's possible, too.

24   Q.    In terms of the specific items that are in this

25   JC-4 exhibit, 50 some items, that is clearly an

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 72 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 67 of 91
1397
Christianson - X by Mr. Wax                              72

 1    exceedingly small percentage of the total number of

 2    e-mails recovered?

 3        A.     Yes.

 4        Q.     Far less than 1 percent?

 5        A.     Yes.

 6        Q.     In terms of the items recovered, I believe that

 7    you had put up on the screen, or Mr. Cardani had put up

 8    on the screen, one document that had been copied into

 9    Microsoft Word?

10        A.     That was one of them, yes.

11        Q.     Do you recall that there were many Microsoft

12    Word documents that you observed?

13        A.     There were many, yes.

14        Q.     The items that were put up on the screen

15    included a number of items from ListServs?

16        A.     Yes.

17        Q.     And I believe that you were shown ListServs

18    with an AQ initial, Sheeshaan group?

19        A.     Yes.

20        Q.     And AQ, by the way, that is the initials of a

21    man named Abdul Qaadir, are you aware of that?

22        A.     That's what I'm told, yes.

23        Q.     All right.  Do you recall that in terms of

24    ListServs, there were scores of ListServs found on the

25    computers?

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 73 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 68 of 91
                                    4593
                      Christianson - X by Mr. Wax                    73

 1      A.    Yes, there was.

 2      Q.    Okay.  And do you recall that of those scores

 3   of ListServs, some had absolutely nothing to do with

 4   religion, Islam or Chechnya?

 5      A.    Yes.

 6      Q.    Peace activist work from Ashland, Oregon?

 7      A.    That sounds right.

 8      Q.    Urban forestry work?

 9      A.    Yes.

10      Q.    *New York Times*?

11      A.    Yes.

12      Q.    The Ashland Patriots?

13      A.    I'm not familiar with that one.

14      Q.    Canadian urban forestry conference?

15      A.    I'm not familiar with that one either.

16      Q.    Do you recall -- did you ever do a count of the

17   number of ListServs from whom items were sent that were

18   found on the computers?

19      A.    I did not do a count.

20      Q.    Would something in the order of 50 sound like a

21   reasonable approximation of what you saw?

22      A.    Based on the contents that Special Agent

23   Anderson asked me to review, that's possible.

24      Q.    Okay.  The government asked you to put together

25   this exhibit, JC-4; is that correct?

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 74 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 69 of 91
                                    2399
                        Christianson - X by Mr. Wax                    74

 1      A.      Yes.

 2      Q.      And did I understand correctly that the primary

 3   direction for putting that together came from Agent

 4   Anderson?

 5      A.      That's correct.

 6      Q.      Did you make any effort to, you know, look at

 7   the total number of e-mails sent in the time period from

 8   the end of December 1999 through the beginning of March

 9   of 2000?

10      A.      I did not.

11      Q.      We just went through a number of ListServ

12   e-mails from Mr. Abdul Qaadir.

13      A.      Yes.

14      Q.      Do you recall that there were at least a half a

15   dozen e-mails from an organization called Islamic

16   Relief?

17      A.      I believe I recall that, yes.

18      Q.      Do you recall that there was a series of

19   photographs that was from *Time*, *Time* magazine Web site

20   from mid February of 2000?

21      A.      As far as the photographs, I'm not sure I

22   recall seeing photographs.

23      Q.      Could we please show the witness Exhibit

24   Number 692 and then 692A through G.  692A, please.  Do

25   you recall the recovery of this e-mail on --

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 75 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 70 of 91
                        4468
                    Christianson - X by Mr. Wax                    75

 1      A.      Yes, I do.

 2      Q.      All right.  And do you see that this has a --

 3   from Q to Sunnah?

 4      A.      Yes.

 5      Q.      Do you recognize Sunnah as one of the

 6   ListServs?

 7      A.      I'm not sure if that was a ListServ.

 8      Q.      Okay.  But there is no question that this would

 9   have been one of the recovered e-mails?

10      A.      There is no question.

11      Q.      The subject line on this, do you recall

12   documented cases of 26,500 rape victims?

13      A.      Yes.

14      Q.      And then the salutation Salam, and LOOOOK in

15   capital letters?

16      A.      Yes.

17      Q.      Then down below that, a path to a computer Web

18   page of some sort?

19      A.      Yes.

20      Q.      And you recall -- do you recall that -- and

21   this is all, obviously, part of this e-mail?

22      A.      That is all part of this e-mail, yes.

23      Q.      If we could go to, please, 692B.  Do you recall

24   seeing this recovered photo essay from the computer?

25      A.      I didn't until I got to review this exhibit

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 76 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 71 of 91
2461
Christianson - X by Mr. Wax                              76

 1    prior to the trial.  I didn't recall actually seeing

 2    that in the hard drive, but I did validate that it was.

 3              MR. CARDANI:  I would just like to establish

 4    that this was not in the computer.

 5              THE WITNESS:  The e-mail was in the computer.

 6    BY MR. WAX:

 7       Q.    The e-mail was in the computer?

 8       A.    Yes.

 9       Q.    With the path?

10       A.    With the path, yes.

11       Q.    All right.  And you validated the path through

12    your work?

13       A.    I didn't validate the path, just the e-mail

14    itself.

15       Q.    All right.  Thank you.  I'll move on.  Did

16    you -- do you recall a series of e-mails from

17    Mr. Sedaghaty to Mr. al-But'he during January, February,

18    and March of 2000?

19       A.    Specifically, no.

20       Q.    Were you asked by Agent Anderson to put

21    together a chart of all communications between

22    Mr. Sedaghaty and Mr. al-But'he in January, February,

23    and March of 2000?

24       A.    To put together a chart of all communications,

25    no.

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 77 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 72 of 91
2462

Christianson - X by Mr. Wax                    77

 1    Q.    Similar to JC-4.

 2    A.    I was not asked to do that, no.

 3    Q.    Do you recall from your review roughly 50

 4  e-mails in that period between Mr. Sedaghaty,

 5  Mr. al-But'he, Mr. Sedaghaty, and a number of other

 6  people regarding the humanitarian crisis in Chechnya?

 7    A.    Again, I don't recall those.  My role was

 8  simply to provide the data in a reviewable form for

 9  Special Agent Anderson, and she identified these JC-4

10  exhibits.

11    Q.    All right.  So if you were not asked to put it

12  in JC-4 by Agent Anderson, you would not necessarily

13  have focused on it?

14    A.    Not necessarily.

15    Q.    We were provided, as you understand it, the

16  same mirror hard drives that you were working from?

17    A.    Yes.

18    Q.    Were you provided copies of the exhibits that

19  we had marked for identification some time ago so that

20  you could do a check to see whether the items that were

21  identified from the computer were consistent with your

22  work?

23    A.    Yes.

24    Q.    Okay.  And did you find that all of the items

25  that we had identified from the computer were, according

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 78 of 122   Page ID#:
2463
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 73 of 91
Christianson - X by Mr. Wax                    78

1   to your work, actually on the computer?

2       A.    Yes.

3       Q.    I'd like to ask you a few questions now,

4   please, about some of the computer processes.  And

5   please bear with me if I don't use the precise

6   terminology and correct me as needed.

7       A.    Okay.

8       Q.    If I understood you correctly, the files that

9   are -- excuse me, the exhibits that are included in this

10  SW series were what you called recovered from

11  unallocated space?

12      A.    That's correct.

13      Q.    All right.  Now, in terms of the terms

14  allocated and unallocated space, perhaps it would help

15  if you could provide a little bit more background on

16  them.

17          Are there a number of ways in which items on a

18  computer can be -- I'm not sure if the phrase is

19  transferred to or can be found in unallocated space or

20  get to unallocated space?  What would be the correct

21  phrase?  Transfer to?  Get to?  Help me out.

22      A.    No, that's correct.  There are a number of ways

23  that data could ultimately reside in unallocated space.

24      Q.    For example, if I have an e-mail on my

25  computer, I'm going through my regular e-mail list, I

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 79 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 74 of 91
2464
Christianson - X by Mr. Wax                    79

 1   look at something, and I hit the delete button for that

 2   one e-mail, what happens to it?

 3       A.    Depending on the type of e-mail that you are

 4   using, again I'll go back to the example of Microsoft

 5   Outlook, it simply goes to a deleted items folder inside

 6   the e-mail box.

 7       Q.    Now, my IT people at the office tell me that

 8   I'm terrible, my e-mail grows too big, and that there is

 9   a function for emptying the mailbox, and all I need to

10   do is program it and it can happen automatically in the

11   normal course?

12       A.    Yes.

13       Q.    You are familiar with such things?

14       A.    I am familiar with such things.

15       Q.    What happens when the trash gets emptied

16   automatically in the normal course?

17       A.    Again, back to my example of Microsoft Outlook

18   program, much like a hard drive, the e-mail simply gets

19   deleted within the confines of that mailbox.  And you

20   can relate it to the same thing as data being stored on

21   the hard drive itself.  It actually has an allocated

22   space inside the actual PST file or the Outlook mailbox.

23       Q.    And then when you empty it, then what happens?

24       A.    When you empty it, that frees up space inside

25   your mailbox, and it can be recovered to an extent until

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 80 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 75 of 91
                                    2463
                        Christianson - X by Mr. Wax                    80

 1   it's overwritten by new e-mail.

 2       Q.    So in the normal course, the way in which a

 3   person could have a computer set up, e-mails could go

 4   into unallocated space?

 5       A.    Sure, yes.

 6       Q.    All right.  So there is nothing sinister about

 7   the fact that something is in unallocated space in and

 8   of itself?

 9       A.    In and of itself, no.

10       Q.    Now, from time to time some of us are infected

11   by viruses on our computers.  And when that happens,

12   what do some viruses do?

13       A.    Well, viruses can do a great number of things.

14       Q.    Sure.  With respect to how things could end up

15   in unallocated space.

16       A.    Viruses can simply corrupt data, slow your

17   computer down, and, again, a number of other things.

18       Q.    All right.  So in terms of corruption of data,

19   a virus could render data unreadable when you turn on

20   your computer and log in?

21       A.    It's possible, yes.

22       Q.    And that material, which you couldn't access,

23   you might be able to retrieve with your EnCase tool or

24   some other tool from unallocated space?

25       A.    Yes.

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 81 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 76 of 91
2468
Christianson - X by Mr. Wax                    81

1     Q.     All right.  So assume I'm infected by a virus,

2     assume I'm a teenage boy, and I think I know better than

3     the computer, and I want to try to fix it myself, or

4     assume I'm 62 years old and make the same mistake,

5     reformatting a computer, what does that mean?

6     A.     Reformatting a computer is, again, I'd like to

7     use an analogy.  If you want to -- if you go to the

8     store and buy a three-ring binder, and you want to store

9     notes.  You buy an empty three-ring binder, that's like

10    your hard drive.  Now, before you can actually write or

11    store notes inside that binder, you have to put paper

12    inside.  So you would put paper inside.  And that

13    essentially creates a partition in relative to -- in

14    relation to the hard drive, and you can start taking

15    notes.  Something is there for you to be able to store

16    notes with your writing.

17           So when you partition a hard drive, that's

18    simply saying you take something that's blank and you

19    can't write to it, now you partition and format the hard

20    drive so that you can put things like Windows and things

21    like that.

22    Q.     So if, for example, a computer is corrupted by

23    a virus, one of the things that a person might need to

24    do or could do in an effort to get the computer working

25    again, would be to reformat it?

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 82 of 122   Page ID#:
4407
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 77 of 91
Christianson - X by Mr. Wax                    82

1    A.    Yes.

2    Q.    In that process, would material that had

3  previously been on it before the reformatting now be in

4  unallocated space and potentially recoverable by a

5  person such as yourself?

6    A.    Yes.  If you reinstall Windows, the data that

7  existed on there before you reinstalled, would be

8  deleted.

9    Q.    All right.  Now, one of the things that, again,

10 my IT guys tell me to do is back up onto these little

11 memory sticks or onto discs.  A person might take an

12 e-mail file, delete it, and back it up on a disc?

13   A.    Yes.

14   Q.    You could do that with a legal brief, or

15 anything else you are working on, your poetry?

16   A.    You could, yes.

17   Q.    All right.  So that could be a reason why

18 something would not be retrievable other than through

19 your allocation -- excuse me -- recovery process?

20   A.    Yes.

21   Q.    All right.  Now, in terms of this word

22 "overwriting" that you've used, every now and then the

23 IT guys tell me to defrag my computer.  To defrag, what

24 does that mean, and what does that tell us about how

25 data is stored on computers that might be relevant to

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 83 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 78 of 91
2468

Christianson - X by Mr. Wax                    83

1    this deletion/recovery process?  Defrag.

2       A.    To defrag means -- we'll take, for example,

3    Microsoft Windows, when it stores files on your hard

4    drive, sometimes the storage places on a hard drive are

5    in fragments, so that naturally can slow down accessing

6    the files.  Most of the time, transparent to you and I

7    as users.

8            If you use the defragment option for your hard

9    drive, it simply brings the pieces of a single file that

10   belong to each other and makes them contiguous on a hard

11   drive, and basically making it more efficient, cleaning

12   it up.

13      Q.    So, for example, if I were to type a brief, and

14   I am sitting there thinking I'm typing straight away,

15   inside the computer that brief could be in a whole bunch

16   of different places?

17      A.    It could be, yes.

18      Q.    And the defragging process, when the IT guys

19   tell me to do it, is going to put some of that stuff

20   back together?

21      A.    Yes.

22      Q.    So with respect, for example, to the QuickBooks

23   files and the fragments of QuickBooks files, you could

24   have a QuickBooks file, and while you're accessing it,

25   you might think it's all in one place, but on the

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 84 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 79 of 91
2409
Christianson - X by Mr. Wax                    84

1    computer, it's really a whole mess of fragments?

2        A.    It's possible, yes.

3        Q.    All right.  So that, in terms of fragments, is

4    one way in which fragments just occur in the normal

5    course of the operation of a computer?

6        A.    Yes.

7        Q.    All right.  Now, with respect to this word

8    "overwriting," when something is deleted, so I have

9    typed something or I've got an e-mail and the computer

10   has it stored somewhere, I hit the delete button, the

11   item is actually still there, as you've described, that

12   you could get to through your recovery tools?

13       A.    Yes.

14       Q.    All right.  If I just, in the normal course,

15   type another brief or write another e-mail, the computer

16   could -- and not could, the computer does on its own

17   decide where to put this new item?

18       A.    Yes.

19       Q.    And it could very well, and does all the time

20   on everyone's computer, overwrite data?

21       A.    Yes.

22       Q.    So when you are talking about overwriting, you

23   are talking about a normal process that goes on with

24   normal computer use?

25       A.    It's possible, yes.

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 85 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 80 of 91
2418
Christianson - X by Mr. Wax                    85

 1    Q.    Okay.  Now, in some cases that we've dealt with

 2    where because of the nature of the material, it actually

 3    had to be put in a way that you just couldn't ever get

 4    to it, classified material, you have to delete forever.

 5    You can overwrite some of that with some programs that

 6    overwrite, you know, 39 times or whatever the magic

 7    number is, correct?

 8    A.    Yes.

 9    Q.    Now, in terms of the overwriting that you

10    observed here, you're talking about you type something,

11    you delete, you type something else, a fragment might be

12    there, the whole thing might be there, or it might have

13    been completely overwritten?

14    A.    Yes.

15    Q.    Okay.  Now, in terms of the work that you are

16    able to do, clearly you are not present when these

17    computers were being used?

18    A.    I was not.

19    Q.    So you do not know who was sitting at the

20    computer typing?

21    A.    No.

22    Q.    Reading?

23    A.    No.

24    Q.    Deleting?

25    A.    No.

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 86 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 81 of 91
2413
Christianson - X by Mr. Wax                          86

1    Q.    For the most part, you do not know when an item

2    was read?

3    A.    No.

4    Q.    You can tell from an e-mail header when the

5    person perhaps sent it, correct?

6    A.    Correct.

7    Q.    But could have been read that day?

8    A.    It doesn't actually flag when it was read, just

9    the fact that, yes, it was read, or, no, it was not.

10   Q.    Okay.  Could have been that day?  That week?

11   That month?  That year?  That decade?

12   A.    Yes.

13   Q.    Now, with respect to the Web page question, I

14   think Mr. Cardani asked you about whether the -- some of

15   these Web pages were recovered from the unallocated

16   space.  And I am not sure if he used the word deleted,

17   but I think that that was at least the inference in the

18   question.  I want to ask you, please, about how

19   computers deal with Web pages.

20   A.    Can you be more specific?

21   Q.    I'll try.  When I go to WWW dot whatever, and a

22   Web page pops up, Time Essay, you know, Time.com, with

23   that Web line on it, okay?

24   A.    Okay.

25   Q.    The page image appears on my computer, correct?

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 87 of 122   Page ID#:
2412
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 82 of 91
Christianson - X by Mr. Wax                          87

1      A.     Correct.

2      Q.     Now, let's assume I don't hit save in any way,

3  okay?

4      A.     Okay.

5      Q.     Does the computer nonetheless retain an image

6  of that Web page that I visited?

7      A.     The natural behavior for a Web browser is yes.

8      Q.     Okay.  So I think I'm being sneaky, and I don't

9  want someone to know I visited a Web page, but you come

10 along, and it's right there anyway, correct?

11     A.     Correct.

12     Q.     All right.  Now, with respect, then, to the

13 fact that Web pages are in unallocated space, you have

14 no way to know if they were ever actually saved to the

15 computer?

16     A.     No.

17     Q.     If there was any intentional deletion?

18     A.     No.

19     Q.     Or whether a person read something on the

20 computer, as many of us do, closed it and moved on in

21 the normal course?

22     A.     Yes.

23     Q.     I'd like to ask you now, sir, a little bit

24 about what I think Mr. Cardani was starting with, the

25 length of time that it took you to do this recovery.  If

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 88 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 83 of 91
2413
Christianson - X by Mr. Wax                    88

1    I heard correctly, you told us that this was the largest

2    or one of the largest cases in terms of the amount of

3    data on which you've worked?

4        A.    Yes.

5        Q.    Now, the volume of e-mail that you found and

6    had to deal with, 23 or 25,000 over a multiyear period,

7    there is nothing unusual about that, is there?

8        A.    There is nothing unusual about that.

9        Q.    All right.  Now, with respect to e-mail

10   recovery, help us out here, please.  Is that just in and

11   of itself, regardless of the computer, a time-consuming

12   process that will often need to be done manually?

13       A.    I found it to be a standard process that I run

14   and usually I find results.

15       Q.    What does "file carving" mean?

16       A.    "File carving" means, to put it simply, most

17   files have a unique file signature or fingerprint that

18   make it unique, at least from where a file can be

19   identified, and to carve for a file means to search for

20   that unique signature or fingerprint, and to identify

21   that there is the possibility that that file might be

22   there.

23       Q.    All right.  In terms of e-mails, how does

24   looking for e-mails and this concept of file carving

25   relate?

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 89 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 408-14   Filed 01/15/13   Page 84 of 91
2414
Christianson - X by Mr. Wax                    89

 1      A.      Depending on the type of e-mail, file carving

 2   is actually that technique that I actually used to

 3   recover the Microsoft Outlook mailbox.

 4      Q.      All right.  I thought I heard you use the word

 5   manual in your direct testimony.  Did I?

 6      A.      Yes.

 7      Q.      All right.  Tell us, please, what your

 8   reference to that word meant in terms of this process?

 9      A.      Okay.  So it's actually a several part process.

10   So you can search through, use initial search for that

11   particular fingerprint, and then manually review the

12   data, what we would call like the physical level.

13           Logical data is what you see when you use your

14   computer everyday.  Forensically we look physically at

15   the file on the hard drive.  And the manual process is

16   to find out long or how big the file might actually be

17   to make sure that you can get accurate recovery.

18      Q.      That's in the normal course of this kind of

19   recovery process, whether it's these computers or other

20   computers?

21      A.      It is a normal course, yes.

22      Q.      And it is a very time-consuming process?

23      A.      It is very time-consuming.

24      Q.      And because of the large volume of data that

25   you were attempting to recover, it took you a lot of

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 90 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 85 of 91
2413
Christianson - ReD by Mr. Cardani                    90

1    time?

2       A.    It took me a lot of time, yes.

3             MR. WAX:  May I have a moment, please, Your

4    Honor?

5             THE COURT:  Yes.

6             (Discussion held off the record.)

7             MR. WAX:  Thank you, sir.  I have no further

8    questions.

9             THE COURT:  Redirect.

10             MR. CARDANI:  Thank you.

11                    REDIRECT EXAMINATION

12    BY MR. CARDANI:

13       Q.    Following up on some of counsel's questions,

14    Mr. Christianson, talking about the Sheeshaan things

15    about Chechnya and the mujahideen, do you remember him

16    asking you about that?

17       A.    Yes.

18       Q.    All right.  So you reviewed some on direct, and

19    we took out -- we went over a few of them.  And you know

20    that there are several more exhibited that we didn't go

21    over in your testimony?

22       A.    Yes.

23       Q.    Those are all -- there is a lot of other

24    Sheeshaan e-mails regarding Chechnya, correct?

25       A.    As I recall, yes.

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 91 of 122   Page ID#:
2418
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 86 of 91
Christianson - ReD by Mr. Cardani                    91

1      Q.      Mujahideen?

2      A.      Yes.

3      Q.      And funding issues?

4      A.      Yes.

5      Q.      And are you aware that there were literally

6   hundreds and hundreds of these types of e-mails in the

7   deleted sections of these computers?

8      A.      I'm not sure of the exact number, but yes.

9      Q.      Many, many, many more than what's been

10   exhibited here?

11      A.      Yes.

12      Q.      Involving the same subject?

13      A.      Yes.

14      Q.      All right.  Now, your inventory, JC-4, starts

15   in January 4th of 2000 and goes right up through page 4,

16   March 8, 2000, into page 5 of a 7-page document.

17          My point is, are the ones in here, search

18   warrant exhibits that are listed on the Sheeshaan group

19   of Chechnya, mujahideen, and funding issues, are they

20   representative of a certain time period, January and

21   March?

22      A.      Yes.

23      Q.      But there are others, many, many others

24   regarding these same subjects that involve different

25   time periods?

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 92 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 87 of 91
2417

Christianson - ReD by Mr. Cardani                          92

 1     A.     There were others, yes.

 2     Q.     You know that this trial involves the time

 3   period that is very sensitive to that time period,

 4   January to March of 2000?

 5     A.     Yes.

 6     Q.     Now, Mr. Wax asked you about viruses and

 7   corruption of computers and things like that.  Are there

 8   ways to preserve data before computers are worked on or

 9   reformatted -- and when you are reformatting a computer,

10   you're jeopardizing the loss of tremendous amounts of

11   information?

12     A.     That's possible, yes.

13     Q.     Are there ways to prevent that from happening?

14     A.     Yes.  You can buy an external hard drive, or a

15   USB device, some kind of storage device, and back up the

16   data that you would like to save, and then reformat your

17   hard drive.

18     Q.     All right.  So if I've got this virus that he's

19   alluding to, and I think I've got serious problems and

20   somebody has to wipe them, then I buy one of these

21   external hard drives, download all of my important

22   information --

23     A.     Yes.

24     Q.     -- reformat the thing, and then migrate the

25   information back onto the computer?

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 93 of 122   Page ID#:
2418
Case 1:03-cv-05071-GBD-SN   Document 1808-14   Filed 01/15/13   Page 88 of 91
Christianson - ReD by Mr. Cardani                    93

 1       A.      Yes, that's one way to do it.

 2       Q.      All right.  And is that common in business when

 3  computers are reformatted?

 4       A.      Based on my experience, that's common.

 5       Q.      Because you don't want to lose the data?

 6       A.      Yes.

 7       Q.      Now, Mr. Wax spent quite a bit of time talking

 8  about the amount of time spent looking for these e-mails

 9  and things like that.  I just want to get right back

10  into this one.  Explain the difference between looking

11  for deleted e-mails and the entire absence of the whole

12  mailbox system for the jury.

13       A.      Explain it again?

14       Q.      Yes.

15       A.      In this particular case, I go to the example of

16  the type of e-mail that I recovered.  Again, Microsoft

17  Outlook, if you want to delete an e-mail, it's

18  self-contained inside your personal storage folder,

19  which is a single file.  But in this particular case, I

20  recovered entire mailbox files.

21       Q.      Okay.  So the whole system of e-mails was gone,

22  the Outlook e-mail system was gone on these computers?

23       A.      That's correct.

24       Q.      Is that significant?

25       A.      That's fairly significant.

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 94 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 89 of 91
2419
Christianson - ReX by Mr. Wax                    94

1    Q.    Was it that absence of the entire system that

2    made your work in part so time-consuming?

3    A.    Yes.

4    Q.    The search warrant e-mails that are listed in

5    your JC-4 were all opened by someone on the computer?

6    A.    They were opened, yes.

7         MR. CARDANI:  Excuse me one minute.

8         (Discussion held off the record.)

9         MR. CARDANI:  That's all I have.  Thank you.

10        MR. WAX:  A couple of questions, please, Your

11   Honor.

12                  RECROSS-EXAMINATION

13   BY MR. WAX:

14   Q.    Mr. Christianson, with respect to this question

15   about external hard drives, were you provided any backup

16   discs or hard drives to review?

17   A.    I was not.

18   Q.    Are you aware that there was a box found in the

19   search warrant that was labeled backup discs?

20   A.    I was not aware of that.

21   Q.    And you weren't given that, obviously?

22   A.    I was not.

23   Q.    All right.  With respect to the deletion of or

24   the recovery of the entire mailbox, the reformatting

25   issue that we discussed and the problem of viruss or

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 95 of 122   Page ID#:
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 90 of 91
2428
Christianson - ReX by Mr. Wax                               95

 1   reformatting, that could very well lead to the

 2   elimination of an entire mailbox?

 3       A.    That's possible, yes.

 4       Q.    And that mailbox could very well have existed

 5   on any of the backup media that were found but not

 6   provided to you?

 7       A.    That's possible, yes.

 8             MR. WAX:  Thank you, sir.

 9             MR. CARDANI:  Nothing else, Your Honor.

10             THE COURT:  Thank you.  You may step down.

11   We'll take a short break, Jurors.

12             MR. CARDANI:  May the witness be excused, Your

13   Honor?

14             THE COURT:  Excuse me?

15             MR. CARDANI:  May the witness be excused?

16             THE COURT:  Yes.

17             (Jury exits the courtroom at 11:09 a.m.)

18             THE COURT:  Which exhibits do you need a ruling

19   according to your records?

20             MR. WAX:  Excuse me, Your Honor?

21             THE COURT:  Which exhibits do you need a ruling

22   according to your records?

23             MR. WAX:  The SW-1, EK-7, and EK-7A.

24             MR. CARDANI:  Don't -- we have some confusion,

25   Your Honor.  EK-7 as having been admitted by the court.

Case 6:05-cr-60008-HO   Document 456   Filed 09/11/10   Page 122 of 122   Page ID#:
2447
Case 1:03-cv-05071-GBD-SN   Document 308-14   Filed 01/15/13   Page 91 of 91

122

```
 1                          CERTIFICATE

 2          I, Deborah Wilhelm, Certified Shorthand Reporter

 3   for the State of Oregon, do hereby certify that I was

 4   present at and reported in machine shorthand the oral

 5   proceedings had in the above-entitled matter.  I hereby

 6   certify that the foregoing is a true and correct

 7   transcript, to the best of my skill and ability, dated

 8   this 1st day of September, 2010.

 9

10

11

12

13                        /s/ Deborah Wilhelm
                          _____
14                        Deborah Wilhelm, RPR
                          Certified Shorthand Reporter
15                        Certificate No. 00-0363

16

17

18

19

20

21

22

23

24

25
```