D3JP911C

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    IN RE:

4

         TERRORIST ATTACKS ON
5        SEPTEMBER 11, 2001                03 MDL 1570 (GBD)(FM)

6

     ------------------------------x
7                                        New York, N.Y.
                                         March 19, 2013
8                                        11:51 a.m.
     Before:
9
                         HON. FRANK MAAS,
10                                          Magistrate Judge

11                       APPEARANCES

12   COZEN O'CONNOR
          Attorneys for Plaintiff Federal Insurance
13   BY:  SEAN P. CARTER, ESQ.
          J. SCOTT TARBUTTON, ESQ.
14
     ANDERSON, KILL & OLICK, PC
15        Attorneys for Plaintiffs O'Neill and Plaintiffs' Executive
     Committee
16   BY:  JERRY S. GOLDMAN, ESQ.

17   MOTLEY RICE LLC
          Attorneys for Plaintiffs Burnett and Euro Broker
18   BY:  ROBERT T. HAEFELE, ESQ.
          BRIAN T. FRUTIG, ESQ.
19
     SPEISER, KRAUSE, NOLAN & GRANITO
20        Attorneys for Plaintiffs Ashton, et al.
     BY:  KENNETH P. NOLAN, ESQ.
21
     KREINDLER & KREINDLER, LLP
22        Attorneys for Plaintiffs Ashton
     BY:  ANDREW J. MALONEY, ESQ.
23
     BERNABEI & WACHTEL, PLLC
24        Attorneys for Defendants Al Haramain Islamic Foundation
     BY:  ALAN R. KABAT, ESQ.
25

D3JP911C

1                          APPEARANCES (Cont'd)

2    TRANSNATIONAL BUSINESS, ATTORNEYS GROUP
          Attorney for Defendants Rabita Trust and Wa'el Jelaidan
3    BY:  MARTIN F. McMAHON, ESQ.

4         Attorneys for Defendant Dubai Islamic Bank
     CLIFFORD CHANCE US, LLP
5    BY:  RONI E. BERGOFFEN, ESQ.
                  and
6    CLEARY, GOTTLIEB, STEEN & HAMILTON, LLP
     BY:  BRANDON ADKINS, ESQ.

7

8    LAW FIRM OF OMAR MOHAMMEDI
          Attorneys for Defendant WAMY, WAMY International
     BY:  LUNA DROUBI, ESQ.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

D3JP911C

```
 1              (In open court)

 2              (Case called)

 3         MR. KABAT:  Alan Kabat for the defendant Al Haramain.

 4         MR. McMAHON:  Good morning, your Honor.  Martin

 5   McMahon for Rabita Trust and for the individual, Wa'el

 6   Jelaidan.

 7         THE COURT:  Good morning.

 8         MS. BERGOFFEN:  Good morning.  Roni Bergoffen on

 9   behalf of Dubai Islamic Bank.

10         MR. HAEFELE:  Morning, your Honor.  Robert Haefele

11   from Motley Rice for the Burnett plaintiffs and the EuroBroker,

12   PC.

13         THE COURT:  Good morning.

14         MR. GOLDMAN:  Good morning, your Honor.  Jerry

15   Goldman, Anderson, Kill, for the O'Neill plaintiffs and the

16   plaintiffs' executive committee.

17         THE COURT:  Morning.

18         MR. CARTER:  Morning, your Honor.  Sean Carter from

19   Cozen and O'Connor for the Federal Insurance plaintiffs.

20         THE COURT:  Good morning.

21         MR. MALONEY:  Good morning, your Honor.  Andrew

22   Maloney for the Ashton plaintiffs.

23         MR. TARBUTTON:  Good morning, your Honor.  Scott

24   Tarbutton from Cozen O'Connor, Federal Insurance plaintiffs.

25         MR. FRUTIG:  Good morning, your Honor.  Brian Frutig
```

D3JP911C

1   from Motley Rice for the Burnett plaintiffs.

2           MR. NOLAN:  Morning, your Honor.  Ken Nolan, Speiser,

3   Krause for the Ashton plaintiffs.

4           THE COURT:  Well, there are three motions before me.

5   Before we get to the first of them, I've tried to proceed with

6   letter briefing rather than formal motion papers, but I seem to

7   be a victim of my own effort to be more informal here.  One of

8   the sets of moving papers, I think it's Al Haramain, is a

9   letter that's 22 pages long; so it's the equivalent of a

10  44-page, double-spaced memorandum.

11          And as to any future letter applications, I'm going to

12  require that any moving or opposition papers be limited to 12

13  pages if the letters are single spaced; 25 pages, obviously, if

14  they're double spaced.  And any replies are to be no more than

15  five pages single spaced and ten pages double spaced.

16          I guess an appropriate way to start is with the

17  Al Haramain application first.

18          MR. HAEFELE:  Thank you, your Honor.  It's Robert

19  Haefele from Motley, Rice.  Your Honor, plaintiffs, as you can

20  tell from the moving papers, are requesting sanctions versus

21  Al Haramain for the failure to comply with three orders of your

22  Honor; the oral order in the transcript of October 8, 2010, and

23  in the transcript of December 2, 2010, as well as your Honor's

24  written order confirming those, an order of December 10, 2010.

25          And, also, for the related failures to produce

D3JP911C

1    responsive documents to document requests served on the

2    defendant 7-31-2012.  Perhaps the primary difficulty, your

3    Honor, that the plaintiffs have faced in this litigation has

4    been what has become apparent as a unified defense scheme,

5    where the defendants, pretty much across the board, are

6    refusing to produce documents unless we come to your Honor and

7    insist that they produce the documents.

8            And I think that's what we're faced here today with

9    one of those defendants, Al Haramain, who has been a repeat

10   offender of violating your Honor's orders.  Throughout the

11   entire litigation, no defendant has voluntarily disclosed any

12   documents unless it was absolutely obligated to disclose.  They

13   haven't disclosed anything under the traditional Federal Rules

14   of Civil Procedure obligations.

15           And I think, as your Honor has said at one point, the

16   disclosure documents in response to the document requests under

17   the federal rules is not something that we should be obligated

18   to come and pursue before your Honor in every instance.  It's

19   an obligation to respond to the documents in the document

20   production requests and produce documents, unless there is a

21   particular issue that can be brought before your Honor and a

22   particular dispute.  That's not really what we've been facing.

23   What we've been facing is pretty much wholesale nondisclosure

24   and forcing us to come to your Honor for huge swaths of

25   documents responsive to the requests.

D3JP911C

1          THE COURT:  Part of your argument is that if

2    Al Haramain had taken seriously its preservation obligations,

3    it would have preserved documents and had them available for

4    production before it was locked out both in Oregon, by virtue

5    of the execution of the search warrant, and in Saudi Arabia.  I

6    guess they literally were locked out of the premises of the

7    parent foundation.

8          But even if they had taken steps to preserve

9    documents, unless they moved them off site, which I'm not sure

10   necessarily would have occurred to somebody being called upon

11   to produce documents, the same result would have obtained;

12   would it have not?

13         MR. HAEFELE:  I think I understand, your Honor, and I

14   would go -- I'm not sure that I would agree with you in terms

15   of limiting it.

16         THE COURT:  Part of what Al Haramain is saying is,

17   gee, we'd love to comply, we just can't, somebody padlocked the

18   doors in Saudi Arabia.  And part of the response here is, well,

19   the Saudi Arabian entity is not even being represented here; so

20   we're just dealing with the Oregon entity, where all of the

21   documents were taken by the U.S. Attorney's Office.  Correct?

22         MR. HAEFELE:  Just so I'm clear, you're characterizing

23   what you understand their argument to be, correct?

24         THE COURT:  Yes.

25         MR. HAEFELE:  And I think what your Honor is saying is

D3JP911C

| | |
|---|---|
| 1 | a correct characterization of what their argument is.  I just |
| 2 | want to be clear that their obligation to collect and preserve |
| 3 | the documents is only an element.  I mean, we would also take |
| 4 | the position that -- particularly as is evidenced by the recent |
| 5 | circumstances.  There's also the fact that if even after they |
| 6 | were seized by the U.S. government, they're still their |
| 7 | documents, and when we requested them, they had an obligation |
| 8 | to go and get them. |
| 9 | I think, as we've seen, there's been this tremendous |
| 10 | delay in going after those documents.  And, yet, when they |
| 11 | asked for them, it took two weeks to get, but it took many, |
| 12 | many months and over years for them to go. |
| 13 | Setting that aside, I think the -- what your Honor has |
| 14 | characterized is true, that there was a failure during the |
| 15 | early part of the litigation for them to secure the documents, |
| 16 | perhaps put them in their lawyers' hands if there was some |
| 17 | concern over, you know, what objections there would be to |
| 18 | production of those documents.  That's certainly something that |
| 19 | the lawyers could have worked out once they were secured and |
| 20 | ready to be produced in a timely manner |
| 21 | THE COURT:  But that's my point.  That would have |
| 22 | required them to anticipate that somebody would seize the |
| 23 | documents or seal them out of their offices in the Saudi |
| 24 | Arabia, where I'm not sure -- if this were purely a domestic |
| 25 | case and it didn't have all the complications of this one, I'm |

D3JP911C

1    not sure if preservation requires removal.  That was the only

2    point I was trying to make.

3              But, I mean, Aiken I guess it is now, has entered an

4    order saying, you know, have at it.  Does that move the ball

5    forward here or what?

6              MR. HAEFELE:  Well, certainly, we're not going to turn

7    the document away, no.  Of course, we want the documents, your

8    Honor.

9              THE COURT:  Right.

10             MR. HAEFELE:  But as I was alluding to a moment ago, I

11   think the current circumstances evidence only more the

12   propriety of imposing sanctions as a result of -- it's just one

13   more example of how the immense delays that have been built

14   into the scheme that's been going on in this litigation for

15   years, to delay, to prevent any access to documents in any

16   manner to the plaintiffs until they're absolutely pushed with

17   their backs to the wall before they will give any documents.

18             And in this circumstance, it wasn't until they were

19   actually responding to our second motion in this litigation

20   against Al Haramain, the second motion against Al Haramain,

21   that they finally said, oh, let's go and write to the Judge.

22   Instead of -- you know, it was in response, their reply brief

23   that they were working on at the time, that they sent the

24   letter to the lawyer out in Oregon, and within two weeks the

25   documents were produced.  And now they want to drag it out even

D3JP911C

1    longer.

2              THE COURT:  When you say within two weeks the

3    documents were produced, I want to make sure I understand it.

4              MR. HAEFELE:  To the defendants in this litigation.

5    We still don't have them.

6              THE COURT:  But your understanding is they do?

7              MR. HAEFELE:  Your Honor may not be aware there was a

8    filing yesterday by Al Haramain that indicated that they now

9    have -- as of earlier this month, they have received a number

10   of CDs with the documents from that litigation.  And they're in

11   the possession of, I'm assuming Mr. Kabat's office, but his

12   position is that he wants to take some time to review the

13   documents and do a rolling production.

14             Our position is we want them to produce the documents.

15   We want the CDs now.  We don't want a delay.  Mr. Kabat is

16   saying what he wants to do is categorize which document is

17   responsive to which request.  Our position is we want the

18   documents.  I'm not opposed to him categorizing and fulfilling

19   the obligations under the rules, but I want him to produce the

20   documents now.  He can categorize, as he as obligated to under

21   the rules, which they're responsive to, later on.

22             So in terms of why they should have seized the

23   documents early on in the litigation, there was very early in

24   this litigation that Al Haramain knew they were at the center

25   of the government's investigation.  I mean, they're one of the

D3JP911C

 1   primary examples of the 9-11 Commission report of what's wrong

 2   with the charity process -- the so-called charity process in

 3   the funding of terrorism.

 4          And so very early on, Al Haramain knew that they were

 5   going to be the subject of tremendous scrutiny, and in terms of

 6   their obligations to take the documents and hold onto the

 7   documents, I think that is more indicative of their obligation

 8   here.

 9          And I guess another piece of that is the fact that all

10   of the Al Haramain charity branches were fairly early

11   designated all over the world; so there's not really an

12   indication that they can throw up their hand and say we didn't

13   know it was us.  We didn't know we were going to be focused on.

14   They knew they were going to be focused on.  They knew they

15   were going to be a defendant in this litigation, and they knew

16   it was going to be worldwide.

17          THE COURT:  Let me hear from Mr. Kabat, and then maybe

18   I'll get back to you.  Let's start at the end of this and then

19   work our way backwards.  You now have, I take it, all of the

20   documents in electronic form that were seized pursuant to the

21   search warrant?

22          MR. KABAT:  I have not had to time to review all of

23   them, but there are approximately 30,000 pages of documents.

24   And I understand approximately half of those were seized by the

25   government back in 2004 and roughly the second half are those

D3JP911C

1    that were produced to the grand jury by the federal public

2    defender some years ago, but yet, I've not reviewed all the

3    documents.

4              THE COURT:  Okay.  Are there documents, to your

5    understanding, that the government seized but has not turned

6    back to you?

7              MR. KABAT:  In a sense, you're asking me a negative in

8    a sense because I don't know what the Al Haramain office

9    originally had back in '02, before --

10             THE COURT:  I'm not asking you to verify it.  I'm just

11   asking your understanding based on your discussions with the

12   government.  Do you now have, according to the government,

13   everything that was seized from the Al Haramain office?

14             MR. KABAT:  In terms of paper documents, I believe so.

15   We have not yet gotten the e-mails that were taken off the hard

16   drives.

17             THE COURT:  Okay.  But that's --

18             MR. KABAT:  That's part of our request.

19             THE COURT:  -- that's coming?

20             MR. KABAT:  Yes.

21             THE COURT:  Okay.  I have said repeatedly in this case

22   that I have not understood the delay, particularly after the

23   magistrate judge, who issued the order that Mr. Seda was

24   relying on as a basis for not producing documents, indicated

25   that as far as he was concerned, there was no problem.

D3JP911C

1          But we're at the stage now where you have the

2     documents.  I understand that you want to review them, but

3     given the extensive delay that's occurred here, I'm not sure

4     why I should allow much time at all for that process.  These

5     are, by and large, if not totally, corporate records as to

6     which there's no privilege that can be asserted.

7          So why shouldn't I simply direct that within a very

8     short period of time, ten days, 20 days, something like that,

9     you produce all of them that are responsive to the requests

10    that have been made?

11         MR. KABAT:  Certainly.  We can get that done, I think,

12    by the end of next week.

13         THE COURT:  Okay.

14         MR. HAEFELE:  Your Honor, may I be heard on one issue

15    related to that, and then I'll sit back down?

16         THE COURT:  Sure.

17         MR. HAEFELE:  I just want to be clear, your Honor.

18    There is a corollary set of documents -- there's three

19    categories of documents that were covered by the order, the

20    revision to the order in Oregon, one was the seized documents,

21    one was -- and I'll shortcut the term on it -- grand jury

22    documents --

23         THE COURT:  Right.

24         MR. HAEFELE:  -- and then one was a file by

25    Mr. Wilcox, who's the accountant.  And we want to make sure

D3JP911C

that we get all three of those categories.  We don't want to

just limit it to -- I hear -- the conversation I'm hearing is

limiting it perhaps, hopefully, unintentionally to just seized

documents.  I don't know about whether the grand jury documents

were a set of documents that had also been seized, but I just

want to make sure that we're not just limiting it to that.  The

order allowed us to have possession of all three.

        MR. KABAT:  Yes, I can confirm that the grand jury

documents are in that pile, and there was one CD that was

labeled Wilcox documents.  I have not yet had the time to

review the Wilcox documents.  He's referring to the former CPA,

the accountant, that did the tax returns for Al Haramain.  So

there is one CD with the Wilcox documents, but I can provide

it.

        THE COURT:  And you said that the electronic documents

are not yet in the hands.  Have you been told when you'll

receive those?  You said you didn't have the e-mails.

        MR. KABAT:  Well, we have the e-mails that were

printed out.  We don't have the e-mails that were not printed

out, and I'm going to follow up when I get back to DC tomorrow

afternoon.

        THE COURT:  Okay.  Well, for the materials you have in

hand -- Off the record.

            (Discussion off the record)

        THE COURT:  As to the materials you have in hand, I'm

D3JP911C

1    going to require that you produce all of the documents by

2    March 29th, and if you're claiming privilege as to any of them,

3    that you produce a privilege log on the same date.

4            As to any remaining documents, I'm going to require

5    that you produce them and, again, any privilege log by

6    April 19th.  And unless you feel strongly otherwise,

7    Mr. Haefele, I'm tempted to defer a decision as to the

8    application for sanctions until we see the outcome of the

9    process I've just directed.

10           MR. KABAT:  Thank you, your Honor.

11           MR. HAEFELE:  I'm pausing to think about what you've

12   said, your Honor.  I apologize.  I think that's probably okay.

13           THE COURT:  I think what I'm trying to do is save you,

14   me and Mr. Kabat another motion, if there is to be another

15   motion.  If, for example, at the end of the process, although

16   it doesn't sound like that would be the case, Mr. Kabat said my

17   client had a change of heart, I'm not giving you anything, then

18   you'd want to pile on more.  And there's no point in my

19   resolving the sanctions piece of the Al Haramain motion and

20   then potentially have more litigation.  I think whatever

21   rulings I make concerning sanctions should be made once we have

22   somewhat full information.

23           MR. HAEFELE:  I agree, your Honor, and I appreciate

24   that.  The only thing I want to make sure that we're preserving

25   is the fact that our motion goes to much more than just this

D3JP911C

1   subset of documents, which, you know, we don't want to waive

2   our right to receive, particularly since these documents also

3   go to, for example, Mr. Seda and a number of other defendants

4   in the case potentially.  So they're certainly relevant beyond

5   Al Haramain, and we would want those documents regardless of

6   whether or not there was a default entered in the sanction.

7           But, furthermore, I just need to emphasize for your

8   Honor the purpose that this doesn't address the question of the

9   non-production of anything from Al Haramain's office in Saudi

10  Arabia.  It doesn't address the fact that there is destruction

11  of some of the documents, a number of the documents pursuant to

12  the conversation or the testimony of the government's witness

13  in the criminal litigation.  So it still does not cover the

14  full production of the documents that ought to have been

15  produced from Al Haramain's Oregon office.

16          THE COURT:  And both of those are good points.  Let me

17  take them one at a time.  There was information contained

18  within your motion papers that Al Haramain in Oregon

19  intentionally erased its e-mails, but there was also testimony

20  that 20 or 25,000 e-mails were recovered.

21          It was not clear to me from the transcript excerpt I

22  read, and maybe it wasn't clear to the expert who was

23  testifying, whether the government believed that all of the

24  e-mails that had been erased had been recovered.  Do you have

25  any sense of that?

D3JP911C

```
1          MR. HAEFELE:  My reading of it was he was very clear

2    that he was unable to recover all of the e-mails, and that he

3    was -- that he said that because of the -- There's an

4    overarching issue in that that effort, the endeavor to delete

5    the e-mails is evidence of the willfulness, and that's mostly

6    what we've included that in the brief for your Honor's

7    edification is that it demonstrates the willfulness of the

8    conduct, but in terms of --

9          THE COURT:  And, therefore, in your view, should lead

10   to a presumption that that which was destroyed was relevant?

11         MR. HAEFELE:  That was -- I mean, it goes to the --

12   it's one of the factors to consider in whether to impose

13   sanctions and in particular the sanction of default.  But, yes,

14   I think the willfulness, I think is whether it's willful or

15   even less than willful, I think it's wanton, recklessness would

16   be sufficient for the presumption that the evidence was

17   relevant.

18         But I think that the point I was making for your Honor

19   was also that we want to make sure that we're addressing, and

20   I'm not waiving the right to come back later on to address to

21   your Honor's attention even if they produce everything that

22   they've said they're going to produce today, which I'm counting

23   on that they will, it still doesn't address the issue of --

24   they've become one of the -- I mean, you're going to hear more.

25         But they've become one of the poster children in this
```

D3JP911C

1    litigation for why the deterrence of these sanctions is

2    absolutely essential.  Otherwise, we're just going to keep

3    coming back before your Honor in piecemeal motion, which I

4    think your Honor is probably getting tired of, for we need

5    more, we need more, we need more, everybody is not producing.

6    And I think that's what we'd like to be able to avoid by having

7    a little bit more openness in terms of production.

8            But I don't think that we're going to get that unless

9    they, all of the defendants, understand that there are

10   ramifications for their failure to abide by their discovery

11   obligations.

12           THE COURT:  Yes.  By suggesting that I defer decision,

13   I wasn't trying to suggest that I was deciding that it was a

14   circumstance of no harm, no foul.

15           MR. HAEFELE:  Understood, your Honor.  Thank you.

16           THE COURT:  As to the Saudi Arabian part of the

17   foundation, if I can call it that, Mr. Kabat takes the view

18   that these are two separate entities.  I previously made a

19   finding that it, at least for production purposes, is one

20   single entity.

21           But as a practical matter, if Mr. Kabat is taking the

22   view that the Saudi Arabian part of the foundation is not

23   represented in this litigation, in part, because he doesn't

24   have permission from the United States government to represent

25   them, and if I enter a default judgment because it seems clear

D3JP911C

1    that -- or recommend entry of a default judgment, I'm not quite

2    sure how that would play out.  Because no documents have been

3    produced from Saudi Arabia and, indeed, it doesn't appear that

4    the Saudi Arabian piece of this is prosecuting this case.

5           Where does that get you?  Do you get a default

6    judgment against something which apparently no longer exists?

7           MR. HAEFELE:  Well, certainly, your Honor, the

8    presence of Mr. Kabat here representing that he represents a

9    client indicates that Al Haramain does exist in the U.S., an

10   element of Al Haramain does exist in the U.S.

11          THE COURT:  Sure.

12          MR. HAEFELE:  Now, I understand Mr. Kabat's view that

13   he wants to argue that they are separate, but the truth of the

14   matter is, as your Honor has indicated, your Honor has found

15   that they are an alter ego.  The Ninth Circuit has found that

16   they are an indistinguishable entity one from the other.  The

17   United States government when they designated all of the

18   entities, if you look at the rationale for the designations of

19   the entities, as well as the rationale for the designation of

20   Aqeel Al-Aqeel, the head of the Saudi entity, as well as the

21   head of the Oregon entity, you will see that everybody has

22   treated these as one worldwide entity.

23          Your Honor was right when your Honor said that they

24   were an alter ego.  So in terms of what does it get us, it gets

25   us the fact that we can enforce one default judgment against

D3JP911C

1    the other, no matter which way we enforce it because of the

2    alter ego existence.  But your Honor was right when he found

3    that they were alter ego, and it still -- each of the factors

4    that your Honor went through at that long hearing some years

5    ago still apply.

6              THE COURT:  Okay.

7              MR. HAEFELE:  I would also want to emphasize to your

8    Honor that the impracticality and the injustice of allowing

9    Al Haramain, the worldwide entity, to be present here in the

10   U.S. through their branch office for a number of years and get

11   the benefit of that presence, and then when there's an

12   obligation for them to be involved with this litigation, they

13   sever the ties and want to walk away and leave Mr. Kabat here

14   without the ability to be part of that branch, it benefits --

15   you know, it benefits Al Haramain in Saudi Arabia, I suppose --

16   at least by Mr. Kabat's argument, there's some benefit by

17   allowing that severance to exist.

18             But there is certainly no fairness to the world, the

19   rest of the world, particularly the 911 plaintiffs, to allow

20   that severance to happen.  They are part of the same entity and

21   they should not be allowed to divorce themselves just for their

22   own sake.

23             THE COURT:  Well, we'll talk about that more at a

24   future date.  While you were talking, and when I was directing

25   Mr. Kabat to produce not only documents but any privilege log,

D3JP911C

1    to the extent that any privilege is claimed, it occurred to me

2    that I've never entered in this case, and nobody has ever

3    requested, a 502D order, which would enable privileged

4    documents to be clawed back.

5             MR. HAEFELE:  Your Honor, you did do that.

6             THE COURT:  I did?

7             MR. HAEFELE:  Yes.

8             THE COURT:  Oh, thank you.

9             MR. HAEFELE:  And it was at your own argument.

10            THE COURT:  Okay.  Fair enough.  Okay.  Anything

11   further on Al Haramain?

12            MR. KABAT:  No.

13            THE COURT:  Okay.

14            MR. HAEFELE:  Just so I'm clear, your Honor, you're

15   deferring the rest of the motion until another time?

16            THE COURT:  Yes.

17            MR. HAEFELE:  Thank you.

18            THE COURT:  And one of the things we need to talk

19   about at the end of this conference is when to hold the next

20   conference.

21            Why don't we turn then to Jelaidan.

22            MR. CARTER:  Good morning, your Honor.  With your

23   Honor's permission, I think it might be more efficient to do

24   the motion as to Jelaidan and Rabita together, in effect.

25   There's a lot of overlap to the arguments.

D3JP911C

1          THE COURT:  Yes.

2          MR. CARTER:  I think, your Honor, to begin with, I'm

3     going to strike a theme similar to the one that Mr. Haefele

4     offered to the Court, and that is, that these motions don't

5     come before the Court in a vacuum, but rather, against a

6     broader backdrop of the difficulties that we've encountered in

7     trying to get what is essentially normal, affirmative

8     compliance with discovery obligations, as well as the series of

9     directives and admonitions that your Honor has issued both as

10    to particular defendants and the defendants at large concerning

11    what was expected of them during the discovery process and what

12    the consequences of the failure to abide by those directives

13    might be including the potential for case dispositive

14    sanctions.

15          And we've, obviously, noted in the papers the very

16    specific directive the Court issued in November of 2011,

17    indicating in the context of a motion pertaining to defendant

18    Jelaidan, but offered more broadly that there was a requirement

19    that defendants put on a full-court press, and that to the

20    extent they were going to claim the documents could not be

21    retrieved by them, they would have to be able to document

22    serious conscientious efforts to have obtained those for the

23    edification of the court and plaintiffs.  So that we would be

24    able to fairly evaluate whether they had, in fact, undertaken

25    those efforts.

D3JP911C

```
1           Your Honor also issued a directive a few months
2      earlier of that year at a hearing in July of 2011, in the
3      context of motions we were litigating pertaining to Muslim
4      World League and the International Islamic Relief Organization.
5      At that time, your Honor described the production process, at
6      least pertaining to those defendants, as sort of a death by a
7      thousand paper cuts, and underscored that there hadn't been the
8      kind of affirmative compliance with discovery that you would
9      expect of defendants in litigation of this nature, that
10     certainly the discovery process didn't contemplate that we
11     would be required to come forward and then the defendants would
12     respond by merely searching out the specific items that we
13     identified as being missing from prior productions.  But,
14     rather, that there needed to be a more comprehensive approach.
15          Your Honor also indicated at that time that there
16     were, obviously, some cultural and language barriers and
17     perhaps even financial barriers that had served to sort of
18     undermine the discovery process, but the defendants needed to
19     find a way to overcome those or be faced with case-dispositive
20     sanctions.
21          With regard to defendants Jelaidan and Rabita Trust,
22     the record before the Court right now is abundantly clear that
23     they have made the no serious obligations whatsoever throughout
24     the discovery process to comply with their basic discovery
25     obligations or the Court's very clear order directed at them to
```

D3JP911C

1    undertake this full-court press and document efforts to locate

2    and produce responsive documents.

3        THE COURT:  Just out of curiosity, why did you move

4    with respect to these two to compel rather than for sanctions?

5    I guess it's -- perhaps it's both.

6        MR. CARTER:  It is both, your Honor.  I think when we

7    filed the initial motion, we were unclear as to whether there

8    had, in fact, been diligent efforts undertaken that simply

9    hadn't been produced.  We expected that, at the close of

10   discovery, we were going to receive -- or the close of document

11   production, I should say, we were going to receive responsive

12   materials, as well as documents from these defendants

13   reflecting the efforts that they had undertaken.

14       And so when we initially moved, we thought it prudent

15   to first see what they would respond with.  But when we saw the

16   oppositions, it became clear that there was nothing to support

17   any showing of a good-faith effort during the discovery

18   process, and as a result, we did, in fact, request sanctions.

19       Again, we're dealing with these defendants in terms of

20   just an initial document production.  And in the case of

21   Jelaidan, you have a total of 22 documents been produced.

22   Rabita Trust is in a similar territory.  As to defendant

23   Jelaidan, the scope of the discovery requests that were served

24   upon him were commensurate with his centrality to the claims in

25   this litigation.  He as held principal positions in many of the

D3JP911C

purported charities that feature centrally in the claims.  He
is, himself, according to the U.S. government, a founding
member of Al Qaeda with longstanding ties to Bin Laden.  He has
relationships with a range of other designated terrorist
parties, which he acknowledges, including business dealings
that have apparently continued well after the September 11th
attacks.

          And in the face of, you know, discovery requests
running to all of those issues, including to the numerous bank
accounts under his control, for which he had signatory
authority, we got only 22 documents, and a similar problem
arose with regard to Rabita Trust.  That, obviously, led us to
the motion that we litigated back in November of 2011, where
the rationale he offered for his noncompliance was essentially
that the banks didn't want to deal with him.

          And we set on a very clear course to try and work
through that issue, and the very clear course was that your
Honor directed that Mr. McMahon and Jelaidan's Saudi legal team
undertake diligent efforts at that time to reach out to all of
the financial institutions, identify points of contact, and try
and work through the problems that had punctuated discovery at
that point to obtain the documents.

          At this point, that all occurred, I should say,
against the backdrop of, of course, the Court also setting
deadlines for completion of discovery, which contemplated that

D3JP911C

1    he would complete not only efforts to reach out to these

2    institutions, but also to have produced the documents by August

3    of 2012.

4         And when that date came and passed, there was not

5    another single document.  There was not another document

6    reflecting any effort to obtain documents from the financial

7    institutions or from any other source.  That brought us to the

8    present motion.  And at base level, the opposition --

9         THE COURT:  Which seems to have triggered some of the

10   first efforts to seek documents?

11        MR. CARTER:  Well, that's correct, your Honor.  At

12   base, what the opposition reflects is that it's really not a

13   response to the motion, but rather, a sudden new initiative to

14   do something to prevent the imposition of sanctions.

15        We've heard repeatedly that Mr. Jelaidan, and in

16   particular, his Saudi counsel have been engaged in diligent

17   efforts for many, many years to obtain his documents, but when

18   his Saudi counsel is called upon to attest to the nature of

19   those efforts in an affidavit submitted in response, he

20   identifies two letters; one that was submitted in August of

21   2001, prior to this litigation even being filed, which doesn't

22   request any documents; and another to a Turkish institution

23   that was sent relatively recently and only in response to a

24   letter that they sent to Mr. Jelaidan.

25        There's really not any sort of thorough

D3JP911C

1    documentation -- in fact, there's really no documentation from

2    the relevant period, between the date of the Court's order in

3    November of 2011 and the expiration of the period for document

4    production.  There's essentially nothing.  Even then, looking

5    at the effort that has been undertaken in an untimely matter,

6    after the filing of this motion, it's not even reasonably

7    calculated to produce responsive materials, and it doesn't go

8    to the scope -- full scope of the discovery he's obligated to

9    provide.

10           As we've indicated in the motion, the letters that

11   were sent were sent to a general mailing box in English at

12   financial institutions in countries where English is not the

13   first language.  It reflects that there was not a point of

14   contact previously established.  In addition, the letters are

15   limited to the very specific financial institutions and

16   accounts that we affirmatively identified.

17           There's not any indication that he sent any letters to

18   financial institutions that we did not become aware of through

19   our independent investigation.  And what's notable is, aside

20   from a letter to the Saudi Arabian Monetary Authority, there

21   are no letters to any Saudi financial institutions whatsoever,

22   even though Jelaidan is a longtime resident and citizen of the

23   Kingdom and has resided there for many years during this

24   litigation.

25           With regard to the letter that was sent to Samba,

D3JP911C

additionally, it is curiously sent from Mr. McMahon's office in

English rather than it being sent from Saudi counsel, who one

would expect could speak to them in Arabic and promote some

kind of a response.  The letter that was sent to Al-Rajhi

Banking and Financial Institution was sent solely to the

Malaysian branch office of that financial institution, even

though earlier discovery responses in litigation indicated that

there are accounts in Saudi Arabia under Samba's control.

          And so what we have is just a wholesale failure to, in

any way, meaningfully try to comply with discovery obligations.

Beyond that, the letters, your Honor, don't run to any of the

other issues that are the subject of discovery.  It's limited

only to this isolated area of the few bank accounts that we

specifically identified, but there are a range of other

relationships relative to which we've seen no effort on the

part of defendant Jelaidan to obtain responses.

          THE COURT:  Such as?

          MR. CARTER:  Well, his relationships with Yasin

Al-Qadi, with whom he had business relationships.  There are a

number of commercial enterprises, Maram is one of them,

relative to which -- that's M-a-r-a-m -- relative to which,

Jelaidan was a partner with other parties of interest in this

litigation.

          So, you know, these are relatively broad discovery

requests, and we're just not seeing an effort, aside from a few

D3JP911C

1   isolated things that we pinpoint to, even make any evident to

2   obtain them.  And to the extent there are letters, they're

3   simply not meaningfully calculated to produce anything.

4   There's just not an indication that Jelaidan takes seriously

5   any of the obligations imposed upon him by virtue of the

6   litigation process.

7          With regard to Rabita Trust, if I can turn to that,

8   your Honor.

9          THE COURT:  Yes, sure.

10         MR. CARTER:  There is an even more fundamental

11  problem, and that is, that it is apparent on the record that's

12  before the Court that there has not been a person with the

13  actual authority to represent and direct the activities of

14  Rabita Trust involved in this litigation for a period of many

15  years.

16         When we were trying to get to the heart of the reason

17  for Rabita Trust failure to provide any meaningful

18  documentation, the explanations we were given from Mr. McMahon

19  early on were essentially that it was a dormant, inactive

20  charity, and that raised a number of concerns in our mind.  The

21  first is, if it's dormant and he's unaware of the

22  representative who currently has control, it follows that there

23  may not be a representative who understands the duties and

24  obligations running from the discovery rules.

25         The second issue is a funding problem.  If there's no

D3JP911C

1    one with the authority on behalf of Rabita Trust to make

2    decisions concerning this litigation, there's not going to be

3    funding necessary for the organization to fulfill its discovery

4    obligations.  And, lastly, the concern about, given

5    Mr. Jelaidan's status, a one-time secretary general, who,

6    according to Mr. McMahon during our early meetings, hasn't had

7    any role in the organization for years.

8           The question is whether or not someone might be using

9    Rabita Trust as a proxy for some improper purpose, whether it

10   be exhausting resources of the plaintiffs or extending the

11   litigation, and we simply wanted to get some basic answer to

12   those questions.  And we were promised repeatedly, and there

13   have been multiple communications, as is reflected in the

14   briefing pertaining, to that specific issue.  In response to

15   all of those repeated inquiries and the promises, we never got

16   a sound answer to that question.

17          When we look now, though, at the full record before

18   the Court, it's apparent that Jelaidan can't possibly have

19   authority to direct Rabita Trust efforts in this litigation.

20   One of the few documents that we received in discovery, and I

21   have it here today, your Honor, is the Rabita Trust deed.  And

22   the Rabita Trust deed provides that the founder of the Rabita

23   Trust is the Muslim World League, and it is establishing the

24   Rabita Trust with the consent and approval of the government of

25   Pakistan.

D3JP911C

1        And, in furtherance, Rabita Trust will have a board of

2   directors.  That board of directors, it provides, will be

3   populated by six members from the Muslim World League and six

4   individuals appointed by the government of Pakistan.  So the

5   Muslim World League and the government of Pakistan each hold

6   equal participation in the board of directors.

7        It goes on to specifically provide, your Honor, that

8   it is the board of directors that shall administer and manage

9   the trust; that the board shall take all policy decisions in

10   respect thereof; that the board is required to have meetings at

11   least four times in a calendar year; that the board at those

12   meetings is required to maintain minutes.

13        Now, defendant Jelaidan acknowledged that he's had no

14   contact with this organization for years.  It's the board

15   that's empowered to represent it in these proceedings.  It's

16   the board that he would have to be communicating with.  If he

17   hasn't been to a meeting of the board in a number of years,

18   then it's apparent he's not active in the organization.

19        What the deed and related documents also underscore is

20   that there has not been an effort in the course of discovery to

21   pursue the most obvious channel for obtaining information

22   concerning the current organizational and operational

23   structure, as well as to locate responsive documents.  Again --

24        THE COURT:  Which is what?

25        MR. CARTER:  -- the Muslim World League was the

D3JP911C

1   founder.  Mr. McMahon was simultaneously, at all times,

2   representing the Muslim World League, Rabita Trust and

3   Jelaidan.  All of the documents we have that provide any

4   information concerning the composition of Rabita Trust board

5   indicate that the secretary general of the Muslim World League

6   holds a position.

7          Various of the documents indicate that, at least at

8   one time, Adnan Basha, the secretary general of the IRO with

9   whom Mr. McMahon indicated he was liaising closely with regard

10   to the IIRO discovery, held a position on the board.  There's

11   information that, at one time, Samir Al Radhi, who was

12   purportedly the point person for IRO's production, held a

13   position on the Rabita Trust board.

14          Yet, all of the information we have indicates that any

15   effort to obtain Rabita documents has been targeted solely at

16   contacts in the Pakistani government, and that there's been no

17   effort to go to the Muslim World League, the founder of the

18   entity, which has a controlling interest in the entity, to

19   obtain the documents.

20          The exclusion, the conspicuous exclusion of Muslim

21   world league in this process speaks further to the Rabita Trust

22   lack of good faith here.  So with all of these different

23   problems punctuating this, we do think that, at this point,

24   it's apparent that this is a willful refusal to comply with

25   discovery obligations that warrants the imposition of a default

D3JP911C

1    judgment against Rabita.

2              THE COURT:  Thank you.

3              MR. CARTER:  Thank you.

4              THE COURT:  Mr. McMahon?

5              MR. McMAHON:  Thank you, your Honor.  I think it would

6    be appropriate if we do separate out Rabita Trust and Wa'el

7    Jelaidan.  Excuse me, your Honor.

8              THE COURT:  Before we separate them out, as to both of

9    them back, in November of 2011 I directed that efforts be made

10   to locate and produce documents.  And when I read your

11   materials, it looks like, basically, nothing happened for two

12   years, and then in February of this year there was an effort to

13   sort of paper that over by having you send letters to some

14   financial institutions.

15             It struck me that if I had retained you to produce

16   documents for me in a litigation where I was the defendant,

17   rather than me going to the bank, where I had a relationship

18   and seeking the documents, if you sent letters akin to the

19   letters that were sent to these foreign banks, even domestic

20   banks would not have produced documents.

21             So it doesn't strike me as anything approaching an

22   adequate effort to seek those documents from those financial

23   institutions.

24             MR. McMAHON:  Your Honor, the reason I'm making the

25   suggestion that we keep them individually looked at is, the

D3JP911C

status of the Rabita Trust situation, your Honor, is that they
are then jurisdictional discovery.  We filed a motion to
dismiss.  The judge did not grant it, but he did grant their
application for some limited discovery, jurisdictional
discovery.

       So I don't know, your Honor, whether or not you
currently have jurisdiction over Rabita Trust because nothing
has been decided with respect to that outstanding motion.  And
the reason I say that is this --

       THE COURT:  Well, you haven't filed any motion seeking
to narrow the discovery, correct?

       MR. McMAHON:  No, your Honor, because it was limited,
I thought, jurisdictional discovery.  But my point, your
Honor --

       THE COURT:  Let's stick with some narrow questions as
to the trust.

       MR. McMAHON:  Well, I'd like to, your Honor.

       THE COURT:  Who's running it today?

       MR. McMAHON:  Well, here is my problem which I was
going to convey to you.  I'm not an expert in Pakistani law,
nor are these colleagues.  Who can determine, for example, when
somebody can direct litigation pursuant to Pakistani law?  That
is the Pakistani law governs the attorney-client relationship
here.  Who can make a determination as to how you direct
somebody in litigation?

D3JP911C

1          Now, I took a position with Mr. Carter, Sean, that

2     many years ago I was mandated to try to dismiss out Rabita

3     Trust.  Now --

4          THE COURT:  Okay.  And when you say were mandated, who

5     retained you for that purpose?

6          MR. McMAHON:  Mr. Wa'el Jelaidan, and I have not yet,

7     your Honor, been relieved of that directive.

8          THE COURT:  And when was that?

9          MR. McMAHON:  Well, that was approximately eight, nine

10    years ago.

11         THE COURT:  Okay.

12         MR. McMAHON:  No one knows, under Pakistani law, can

13    you fire an attorney.  As far as I'm concerned, I'm still the

14    attorney because, to the extent Mr. Carter has articulated this

15    view, that at least the Pakistani government is in part

16    controlling the show, if you will.  The Pakistani government

17    has not indicated to me that I can no longer represent them.

18         In fact, when I was at the Pakistani -- not embassy,

19    I'm sorry -- attache in Washington, D.C., it was made clear

20    they were very happy that somebody is trying to do something

21    here.  But my point is that under Pakistani law, can he tell

22    me, for example, when you can revoke a directive?

23         THE COURT:  Well, I'm not sure that Pakistani law much

24    matters.  We're not in a Pakistani court.

25         MR. McMAHON:  But there's an attorney-client

D3JP911C

relationship, your Honor, that was started under Pakistani law
with respect to representing this Trust, and I can't just walk
away from a client.  And he talks about the fact that Wa'el
Jelaidan has been in charge of this organization, or that it's
dormant.  The situation your Honor --

THE COURT:  But wait, wait.  Part of representing a
client or part of participating in an action in the United
States is to play an active role in the case, and I gather your
position is, correct me if I'm wrong, but Mr. Jelaidan has not,
for a number of years, had any role in the trust; is that
correct?

MR. McMAHON:  Well, your Honor, here's the facts.  He
submitted a letter of resignation about, I don't know, four
years ago or so.  Nothing was ever done with that letter, to
the best of my knowledge.  I communicated with Mr. Wa'el
Jelaidan's attorney about that particular issue.  In other
words, under Pakistani law, or under any law, was that letter
of resignation accepted, in other words, he's no longer
secretary general.  Well, as far as I know --

THE COURT:  Well, forget whether it was accepted or
not.  He, to your understanding, is not acting as secretary
general on a day-to-day basis, correct?

MR. McMAHON:  Up to a certain number of years ago,
that's correct, your Honor.

THE COURT:  Well, you say up to.  He didn't resume

D3JP911C

1    that role.  As of several years ago, he's no longer acting as

2    secretary general?  Whether he should be or not is a different

3    question, but --

4              MR. McMAHON:  The problem is, your Honor, is nobody is

5    acting.  Musharraf was on this board of directors when we

6    learned --

7              THE COURT:  So wait, wait, wait.  The answer to my

8    question is, Mr. Jelaidan is not acting as the secretary

9    general and hasn't been for at least several years, correct?

10             MR. McMAHON:  That's correct, your Honor.

11             THE COURT:  Okay.  So then we get to the question of

12   who is acting on behalf of the trust today; do you know?

13             MR. McMAHON:  I'm sorry, your Honor?

14             THE COURT:  Who is acting today on behalf of the trust

15   in terms of such issues as producing documents and directing

16   what you should or shouldn't do?

17             MR. McMAHON:  Well, your Honor, the communication that

18   I had solely, and I still have, is with Wa'el Jelaidan and with

19   his counsel in Saudi Arabia, in Jeddah, and those were the

20   folks that originally had, I think, some documents and some

21   communications about the Rabita Trust, and I continue to deal

22   with them, but --

23             THE COURT:  But we just established that Mr. Jelaidan

24   is not actually operating as the second general of the trust.

25   So I understand he has some lingering interest in seeing that

D3JP911C

1    it's adequately represented, but in point of fact, he doesn't

2    speak for the trust today, correct?

3          MR. McMAHON:  That's correct, Judge.  And the problem

4    is that there is no trust.  There is no activity.  It's been

5    dormant since 1994.  It was set up specifically -- and if they

6    would consult their usual research sources, the media, they

7    would find out that that entity was set up specifically to

8    bring back Pakistanis from Bangladesh.  It has nothing to do

9    with directing activities toward Americans, consistent with the

10   Second Circuit, your Honor.  My point is the Second Circuit

11   hasn't yet to rule on this issue.

12         THE COURT:  Well, one thing both sides keep talking

13   about in their papers, which strikes me as almost entirely, if

14   not entirely, irrelevant in this case is the merits.  So

15   whether Mr. Jelaidan is, you know, somebody running a harmless

16   charitable organization, or one of the world's leading

17   terrorists, is largely irrelevant to the issues before me.

18         What I'm left with is a defendant who, at some point,

19   may have retained you, but who, it appears, has abandoned this

20   lawsuit in terms of defending it because there is no nobody who

21   can direct your actions with respect to the trust today who

22   you've been able to identify.

23         MR. McMAHON:  That is correct, your Honor.  To the

24   extent the Pakistani government and the Muslim World League

25   direct the activities -- or could direct the activities and are

D3JP911C

1    empowered to do so, those are the two entities that could call

2    the shots about whether or not, I guess, I would continue as

3    counsel, now, among other issues.

4           But I'm telling you, your Honor, there's nothing going

5    on with that entity.  I don't know what you do.  Musharraf

6    resigned.  Everybody that was on the board of directors was

7    with the Pakistani government.  The Pakistani government takes

8    the position that, indeed, if you want documents, Mr. McMahon,

9    we can't help you.  They're in storage someplace.  My question

10   is, why can't the 9-11 attorneys pursue our allies Saudi

11   Arabia, our ally Pakistan.

12          THE COURT:  Wait.  The documents, and that seems to be

13   reflected in the papers, are in storage someplace.  Has --

14          MR. McMAHON:  What happened was --

15          THE COURT:  Wait, wait.

16          MR. McMAHON:  -- the Pakistani government officials

17   locked up those premises.  Someone took the files, we don't

18   know who.  They believe they ended up in some Pakistani

19   ministry.  That's the bottom line, your Honor.

20          THE COURT:  And what efforts have you or Mr. Jelaidan

21   or Mr. Jelaidan's Saudi counsel undertaken to find out where --

22          MR. McMAHON:  I've sent letters to the last-known

23   address of the custodian for the records for that entity.

24          THE COURT:  In English, I presume?

25          MR. McMAHON:  Yes, your Honor.  Well, in Pakistan, a

D3JP911C

1    lot of --

2              THE COURT:  Let me rephrase the question.  What

3    efforts have Mr. Jelaidan or his Saudi counsel undertaken to

4    determine where those documents are?

5              MR. McMAHON:  Well, I think, your Honor, at my behest,

6    they have done everything they possibly --

7              THE COURT:  Well, you say "I think."

8              MR. McMAHON:  Well, I know they have, your Honor, but

9    it's been a futile gesture in terms of the Pakistani government

10   takes the position those records are in storage someplace.

11             THE COURT:  You told me it was a futile gesture.

12   That's not telling me what exactly they did.

13             MR. McMAHON:  Well, I'd have to go back and chronicle

14   it specifically, your Honor.  To be candid with you, I just

15   know that efforts were made to try to get whatever documents

16   the Pakistani government had, and I said at some stage, listen,

17   I'll take this over and I'll do it because I want to find out

18   what the story is.  I'll go to the embassy, and we'll find out

19   where these records are, and we'll see what we can do.

20             I've been staying in the case on this issue, I think

21   as a courtesy to my brethren.  I don't need this.  Those

22   documents are somewhere in the Pakistani government.  No one's

23   trying to hide them.  We have agreed, your Honor, to an

24   in-camera inspection.  If somebody thinks that we're trying to

25   hide the ball with respect to the Rabita Trust or even Wa'el

D3JP911C

1    Jelaidan, but I've done what I can --

2              THE COURT:  I appreciate that, but it sounds like
3    Mr. Jelaidan has instructed you to do what you can, not only
4    for himself but for the trust, and that you've made some
5    efforts in that direction.  But that, in point of fact,
6    particularly if the trust, in Mr. Jelaidan's view, doesn't
7    exist anymore, there's no entity to participate in this
8    litigation and nobody who can speak for the trust in terms of
9    seeking documents, who you represent; and that, therefore, at
10   least as to the trust, a default judgment should be entered.
11   Am I missing something?

12             MR. McMAHON:  Well, your Honor, I don't know what a
13   default judgment, first of all, is going to accomplish.

14             THE COURT:  Probably nothing, but rather than playing
15   sort of a shell game here in terms of saying I represent an
16   entity that I haven't been in contact with -- I appreciate
17   you're trying to do what you can, but I think it just muddies
18   the waters.

19             In point of fact, you're purporting to represent a
20   defunct organization, where the organization, as opposed to you
21   or Mr. Jelaidan, who has no continuing role he says in the
22   organization, have tried to do some things to try and help.
23   But the organization itself, either through the Pakistani
24   government or through Muslim World League, has taken no steps
25   to determine where the documents are, much less produce them.

D3JP911C

1          MR. McMAHON:  I don't know what else it can do.  If

2     the Pakistani government takes the position it does, what do

3     you do, your Honor?

4          THE COURT:  It may be that there's nothing to do, but

5     I think the inexorable result of that conclusion that flows

6     from that is that a default is appropriate.  You know, I'm

7     willing to be convinced otherwise, but I haven't heard anything

8     yet that tells me, as to the trust, that that's not the result

9     that should obtain.

10          MR. McMAHON:  You don't think that the 9-11 lawyers

11     should make an attempt to contact the Pakistani government and

12     see what they can get through their subpoena power that I can't

13     get?

14          THE COURT:  Sure.  I think they should do that if

15     they're interested in getting the universe of documents, but

16     that begs the question of whether a defendant, who nominally is

17     in this case, is participating in the case and going to produce

18     documents.  There's nobody here who --

19          MR. McMAHON:  We've produced everything we have, your

20     Honor.

21          THE COURT:  No, you've produced everything

22     Mr. Jelaidan has.  You haven't produced everything that the

23     trust potentially could get because you've just told me, in

24     several different ways, that the trust or the people who

25     potentially might speak for the trust, haven't done anything as

D3JP911C

1    opposed to you or Mr. Jelaidan around the edges trying to do

2    some things.

3              MR. McMAHON:  Well, your Honor, the trust has been

4    dormant since 1994; that's 13 years ago.

5              THE COURT:  So why are you fighting me on the notion

6    of a default being entered against the trust?  Correct me if

7    I'm wrong, I presume the trust hasn't been paying you legal

8    fees --

9              MR. McMAHON:  That's correct, your Honor.

10             THE COURT:  -- for a number of years.

11             MR. McMAHON:  That's correct, your Honor.

12             THE COURT:  So I'm not quite sure why we're having

13   this -- I was going to say argument; I'm not sure it rises to

14   the level of an argument, but why we're having a dispute here

15   when --

16             MR. McMAHON:  Well, to the extent the trust cannot

17   access any more documents that it already has, or Wa'el

18   Jelaidan can't produce any more documents than he already has,

19   or Wa'el Jelaidan's attorney can't produce any more documents

20   than he already has, what are they supposed to do?

21             THE COURT:  Well, you said that we're in

22   jurisdictional discovery as to the trust; so if I wanted to

23   hold a hearing, say, tomorrow on the issue of whether there's

24   jurisdiction to proceed against the trust, what are you in a

25   position to put on at that hearing?

D3JP911C

1          MR. McMAHON:  That we've complied in a reasonable

2      fashion with everything that the plaintiffs have served us with

3      in terms of jurisdictional discovery.

4          THE COURT:  But that speaks to discovery.  As to the

5      issue of jurisdiction, it sounds like you'd have no witnesses,

6      and except for 22 pieces of paper, you'd have no documents,

7      correct?

8          MR. McMAHON:  Well, there's a complete history of what

9      this organization is all about, your Honor.  It was set up by

10     the Pakistani government in 1992.  '94 they stopped funding it

11     because of politics.  They bring back Pakistanis from

12     Bangladesh.  What in God's name does that have to do with

13     attacking or purposeful activity towards America?  I'm just

14     astounded by the fact that it's still in this case.

15         THE COURT:  Well, I've indicated what I'm likely to do

16     with respect to the trust.  Let's talk about Mr. Jelaidan

17     himself.  One thing that appears, although I haven't seen what

18     you've offered to produce in-camera, but just taking what is

19     part of the record on this motion, it looks like Mr. Jelaidan

20     did nothing between November 16th of 2011 and February 21st of

21     2013, more than two years.

22         MR. McMAHON:  That may be a result, your Honor, of

23     some --

24         THE COURT:  Start again.

25         MR. McMAHON:  I'm sorry.  It may be the result of some

D3JP911C

1    communication between us that I was trying to basically carry

2    the water here in terms of getting to the bottom of these

3    documents with the banks and everything.  I was informed many

4    years ago, when I sent off a letter to the Swiss bank account,

5    that they just don't deal with him in certain ways.

6            I've had experience that maybe they haven't had.

7    Banks are skittish, your Honor, overseas.  They don't want to

8    touch an American lawyer.  You mention anything about America

9    and they freeze up.  They don't want to have anything to do --

10           THE COURT:  Well, I'm not surprised that letters sent

11   to foreign banks by an American lawyer, particularly to a

12   generic address, yielded no results.  But, for example, as

13   Mr. Carter pointed out, there are a number of institutions

14   potentially in the Kingdom, which I gather is where

15   Mr. Jelaidan --

16           MR. McMAHON:  Which Kingdom are you talking about,

17   Saudi Arabia, your Honor?

18           THE COURT:  Yes, which is where Mr. Jelaidan is these

19   days; is that correct?

20           MR. McMAHON:  He is -- he is, your Honor, yes.

21           THE COURT:  One thing that didn't happen is

22   Mr. Jelaidan strolling down the street and say I'd like to get

23   copies of my own banking records.  I'm not saying that that

24   would have --

25           MR. McMAHON:  I believe he submitted an affidavit way

D3JP911C

1   back, your Honor, when all this started percolating about the

2   fact that he's tried to secure information but he hasn't gotten

3   any.  So the government is --

4           THE COURT:  I don't have any such thing as -- do I, as

5   part of the papers in opposition to this motion?

6           MR. McMAHON:  Well, I'm pretty sure, your Honor, we

7   had him submit something to the extent that he has had any

8   dialogue or dealings with the Saudi government in terms of

9   trying to get a travel restriction lifted.  In other words, if

10  he could travel himself to Switzerland, he wanted to do that to

11  meet with the banks and --

12          THE COURT:  Suddenly you jumped from Saudi Arabia to

13  Switzerland.  I was asking about efforts he's made in Saudi

14  Arabia to deal with Saudi institutions relating to his bank

15  accounts --

16          MR. McMAHON:  Yes, your Honor.

17          THE COURT:  -- and suddenly I find myself in

18  Switzerland.

19          MR. McMAHON:  As I recall, your Honor, we had

20  something from him in the form of an affidavit of some kind,

21  and he basically had tried to cooperate with or receive the

22  cooperation of the Saudi government, and he was stonewalled

23  there.  He got nothing.

24          THE COURT:  Well, the record in this case is

25  sufficiently voluminous that I'm not going to go through the

D3JP911C

1    zillions of documents that have been filed and the attachments

2    thereto.  If there's some such affidavit, I suggest you get it

3    to me quickly.

4            MR. McMAHON:  And the content of that affidavit, your

5    Honor, is simply that he attempted to make some contact with

6    the Saudi government official and was basically boxed out,

7    couldn't get any records, or --

8            THE COURT:  Well, that speaks to his effort to contact

9    a Saudi official, not to his efforts to deal with his banks

10   directly.

11           MR. McMAHON:  Are you talking about Saudi banks, your

12   Honor?

13           THE COURT:  Yes.  I mean, Mr. Carter made the point

14   that bank records are not all that they seek, but it's

15   certainly one --

16           MR. McMAHON:  Your Honor, can we talk about that for a

17   second?  What good is a bank statement?  Suppose I have an

18   account in a Switzerland bank and I had $10 in it ten years

19   ago, and I'm Wa'el Jelaidan.  I now have $12 in it.  What are

20   they going to do with that information with that bank

21   statement?  Because that's the only thing Mr. Gurule says we

22   can get, basically, financial records, I guess, but we could

23   get a statement of the account.

24           You've got to ask yourself, your Honor, what are we

25   fighting over here?  Does the account now have $12?  We'll

D3JP911C

1  stipulate it has $12.

2          THE COURT:  Well, suppose the account had $100,000 and

3  a check was written to somebody who was in the United States in

4  a way that the plaintiffs believe they can show was terrorist

5  related?  We're talking about hypotheticals without knowing

6  what the documents are.  You're asking me to --

7          MR. McMAHON:  This is not a hypothetical, your Honor.

8  This is the bank saying, okay, I'll give you a statement, say.

9  They're going to give us, according to Gurule, they can give us

10  a statement of account.  In other words, there's now $12,000 in

11  that bank account.  Are you happy?

12          THE COURT:  In November of 2011 I directed that

13  efforts be made to obtain bank documents.  Here we are in March

14  of 2013, and you're telling me that you've been told that you

15  could get some documents, but I guess you or Mr. Jelaidan or

16  somebody decided they're not relevant; so you haven't produced

17  them.

18          MR. McMAHON:  No, your Honor.  No.  You're missing the

19  boat here.  Professor Gurule said that we can get statements of

20  the account.

21          THE COURT:  Oh, okay.

22          MR. McMAHON:  So I'm saying suppose ten years ago the

23  account had $10.  It now has $12.

24          THE COURT:  So you're not disputing his statement that

25  you could get those statements, correct?

D3JP911C

1          MR. McMAHON:  Well, I don't know.  He says it.  That's

2     his opinion.  I don't know.

3          THE COURT:  Well, what efforts did you make, other

4     than sending a generic --

5          MR. McMAHON:  Well, I'd have to hire an expert, your

6     Honor, who's quite expensive, to counter his opinion.  I mean,

7     this is not rocket -- I mean, it is rocket science in terms

8     of --

9          THE COURT:  Somehow again we found ourselves in

10    Switzerland.  And as to the Saudi banks, apart from this

11    earlier document that was not submitted in opposition to the

12    current motion, the only things that happen to seek documents

13    from the Saudi banks, that I'm aware of, are that in February

14    of 2013, a couple of weeks ago, you submitted some letters in

15    English to the banks, not directed to specific people.  Am I

16    missing something?  Let me hear from Mr. Carter.

17         MR. CARTER:  Your Honor, with apologies, the discovery

18    process, both with Jelaidan and Rabita, is a little like trying

19    to nail jelly to the wall and, you know, it's exhausting and

20    it's time consuming.

21         The affidavit, as I understand it that Mr. McMahon is

22    talking about that Mr. Jelaidan submitted of records to

23    document his efforts, is the affidavit he submitted in October

24    of 2011, which the Court passed upon in November of 2011, and

25    said the activities described in this affidavit and in your

D3JP911C

1    response are fundamentally inadequate.

2          And it was the inadequacy of all of those descriptions

3    of activities that led the Court to tell Mr. Jelaidan, right

4    now, go out and thoroughly document, in a way that the

5    plaintiffs can track and see whether or not there's been good

6    faith effort, attempts to obtain responsive documents.  And

7    there is nothing that Mr. McMahon has said in the course of

8    this --

9          THE COURT:  And I apologize.  That is the affidavit

10   that's part of the materials here.  I didn't look at the date

11   on it.  I should have.

12         MR. CARTER:  That's correct, your Honor.  It's

13   October.

14         THE COURT:  That's the -- I guess it's October 29th,

15   2011, affidavit.

16         MR. CARTER:  So in effect, your Honor, we're just

17   re-litigating and arguing over the issues that we already

18   disposed of in November of 2011, and the record going forward,

19   the relevant record, is that nothing's been done.

20         MR. McMAHON:  Would you be satisfied, your Honor, if

21   we received a letter from somebody in Saudi Arabia, whoever

22   they want, the plaintiffs, whatever official they want that

23   says we're not going to give any records to our citizen named

24   Wa'el Jelaidan?  What is it that he'd have to get from the

25   Saudi government to satisfy you, your Honor?

D3JP911C

<div style="margin-left:2em">

1          THE COURT:  Well, I'm not going to tell you how to

2     litigate this case.  A motion was filed.  There was an

3     opposition to it.  The only thing from Mr. Jelaidan that I have

4     is this two-year-old affidavit, and I'm going to decide the

5     case on the record that I have -- let me correct that.

6          I'm going to decide the motion on the record that I

7     have, with the exception that I told you, if you wish to submit

8     some documents in-camera to me to show further efforts, I'm

9     glad to review that.  Do you wish to do that?

10          MR. McMAHON:  Yes, your Honor.  We do.

11          THE COURT:  Okay.  Within one week?  Okay?

12          MR. McMAHON:  I need at least two weeks, your Honor.

13     I'm not feeling great, and it's --

14          THE COURT:  Okay.  Two weeks.

15          MR. CARTER:  Your Honor, obviously, we trust the

16     Court's review, but the difficulty remains that the efforts

17     were supposed to have been documented in a way that we could

18     review them, and we're not going to get that; so I guess we'll

19     cross the next bridge.

20          THE COURT:  If it moves me, then we'll have to deal

21     with that.  If it doesn't, it's sort of a moot point.

22          MR. McMAHON:  The only thing, your Honor, I would

23     offer in terms of, before you would enter a default judgment or

24     some severe sanction, is that we can make Mr. Wa'el Jelaidan --

25     because we have nothing to hide, apart from the in-camera

</div>

D3JP911C

1    inspection offer, your Honor, we can make Mr. Wa'el Jelaidan

2    available for a full-blown document discovery deposition by the

3    9-11 lawyers.

4         They can ask their questions until the cows come home,

5    and then you won't be involved in the middle here trying to,

6    you know, ferret out what does that mean?  In other words, give

7    them an opportunity to confront Mr. Jelaidan about this

8    particular issue, what did you do with the Saudi government.

9    Let him explain, and I won't be involved -- I mean, I'll be at

10   the table, but I think it would be very helpful to hold off on

11   that until such time that they have a chance to depose him and

12   have all these questions answered.

13        MR. CARTER:  Your Honor, we're back to the scenario

14   where there's a very specific order, and Mr. McMahon's response

15   to that is, I have another idea, why don't we do this instead?

16   There's an imperative that parties to litigation follow the

17   Court's orders, and the history of this litigation sort of puts

18   an exclamation point on that requirement.

19        MR. McMAHON:  He hasn't called me a repeat offender

20   yet, your Honor; so....

21        No, but I think there are situations where I'm caught

22   in the middle, whether it's the Rabita Trust or Wa'el Jelaidan,

23   and maybe I'm not completely explaining to your Honor's

24   satisfaction, and I apologize, some of the nuances of the stuff

25   that we're involved with dealing with somebody in Saudi Arabia.

D3JP911C

1          So I was thinking maybe, bright idea No. 1, let them

2     depose this guy and them find out from their own questions,

3     gee, that's the answer.  Okay.

4          THE COURT:  But I gather what you're proposing is a

5     deposition which is limited to what he did or didn't do in

6     terms of responding to the document demands?

7          MR. McMAHON:  Well, I think, your Honor, you're

8     talking about the parameters of what's going to be in a

9     deposition.  We're not going to today say you can't do this,

10    that or the other thing.  You can't get into substantive

11    issues, obviously, but anything pertaining to discovery, they

12    would be perfectly --

13         THE COURT:  Well --

14         MR. McMAHON:  -- entitled to.

15         THE COURT:  As you view the state of play, the current

16    substantive issue is jurisdictional; is that correct?  At least

17    as to the trust, maybe not as to Mr. Jelaidan.  I'm not sure

18    where we stand in terms of him.

19         MR. McMAHON:  Mr. Jelaidan has no pending

20    jurisdictional issue like the Rabita Trust, your Honor.

21         THE COURT:  Yeah, but you're not proffering him, or

22    are you, for all purposes?

23         MR. McMAHON:  No, your Honor.  I'm proffering him for

24    this, that under discovery and discovery obligations that we

25    have, he will comply with any questions that are posed to him,

D3JP911C

1   subject to attorney-client privilege, obviously.

2            THE COURT:  Even though he doesn't have a

3   jurisdictional motion pending, you're not proffering him at

4   present for all purposes, correct?

5            MR. McMAHON:  Right, your Honor.  I'd have to give

6   that some thought.  This is not -- Like I say, I'm --

7            THE COURT:  Well, you're not at the present moment,

8   and based on that, I take it your answer, Mr. Carter, is the

9   same as you just told me, correct?

10           MR. CARTER:  It would be, your Honor.  And,

11  additionally, just a point of clarification, Mr. McMahon's

12  offered to share with the Court in-camera some correspondence,

13  we would object to any briefing relating to that or

14  supplemental declarations postdating the underlying efforts.

15  We think this should be restricted.

16           THE COURT:  No, the only thing I would entertain is

17  the documents and, if need be, translations.

18           Anything else that we should be taking up today?

19           MR. McMAHON:  Your Honor, I want to just clarify.

20  There's no type of letter that you would be satisfied with that

21  would come from the Saudi government pertaining to all of these

22  issues that he has raised, that we've examined the following,

23  you can't have your files, you can't do this, you can't do

24  that?

25           THE COURT:  Well, the Saudi government would not be

D3JP911C

speaking for the banks and would not be speaking for banks in

countries other than in Saudi Arabia, just by the way of

example.  So it's difficult to envision what the Saudi

government could submit that would speak to all of the numerous

complaints that the plaintiffs have here.

But in any event, there was a briefing schedule for

this, and I don't have any such letter before me.

When is the next conference before Judge Daniels?

MS. BERGOFFEN:  It's scheduled for April 15th, your

Honor.

THE COURT:  Okay.  Have I scheduled a conference for

that same day?

MS. BERGOFFEN:  We would appreciate that, your Honor.

THE COURT:  Let me just make sure that that's okay.

(Pause)

MR. HAEFELE:  Your Honor, there's --

THE COURT:  Hang on a second.

(Discussion off the record)

THE COURT:  What time has Judge Daniels scheduled?

MS. BERGOFFEN:  I believe it's 11:00 a.m.  Your Honor,

there is a pending motion to compel with regard to a privilege

log.  We've served it on, I believe, February 26th.  So there's

time to complete that briefing in advance of the hearing.  We

expect that it will be, in fact, ripe at the April 16th

conference.

D3JP911C

1          THE COURT:  So whether or not the conference goes

2     forward before Judge Daniels, I will hold a conference on

3     April 15th sometime after 11:00 a.m.

4          MS. BERGOFFEN:  You said 15th, your Honor, just to be

5     clear --

6          THE COURT:  15th.

7          MS. BERGOFFEN:  15th, okay.

8          THE COURT:  Sometime after 11:00 a.m.

9          MR. HAEFELE:  And, your Honor, just so it is clear, I

10    am under the impression that there isn't going to be adequate

11    time to have any briefing time for that.  I know what counsel

12    said, and again, we had planned on meeting and conferring after

13    this, but I was under the impression that that motion had been

14    withdrawn and there would be a new -- I understand they may

15    have some disputes, but we haven't met and conferred on the

16    issue.  I don't know that there's a motion pending.

17         MS. BERGOFFEN:  Your Honor, there's certainly a motion

18    pending.  We are continuing to meet and confer to try to narrow

19    the issues with regard to that briefing, but it was fully

20    submitted to opposing counsel as of the end of February, and it

21    certainly will be ripe.

22         The position is actually due today.  We've agreed to

23    give a potential extension on the due date for the oppositions

24    so we can continue to meet and confer.  So I don't see any

25    scenario in which their opposition and our reply won't be fully

D3JP911C

1   briefed in advance of April 16th.

2                THE COURT:  I'm not going to worry about that today.

3   Certainly, the motion hasn't been withdrawn.  So I'll wait to

4   see what the result of your discussion is, and if there's a

5   dispute as to whether it should be heard that day, I'll deal

6   with that, and you can inform me on that.

7                MS. BERGOFFEN:  Just to clarify, you had mentioned the

8   15th.  So you're anticipating doing it on the day before Judge

9   Daniels' conference?

10               THE COURT:  Oh, I thought you said the 15th.

11               MS. BERGOFFEN:  Sorry if I wasn't clear.  It's the

12  16th.

13               THE COURT:  I may have misheard you.  Let me check

14  again.  I guess I have April 15th on my mind.  Yes.  For some

15  reason, I don't have anything in this case on my calendar, but

16  I can put it on.  So subject to whatever may be raised with me

17  later on about whether it should be held or not, at the present

18  whether or not Judge Daniels holds his conference that day, I

19  will hold a conference at 11:00 or thereafter on April 16th.

20  Okay?  Thank you all.

21               MR. HAEFELE:  Thank you, your Honor.

22               MR. CARTER:  Thank you, your Honor.

23               MR. GOLDMAN:  Thank you, your Honor.

24               MR. KABAT:  Thank you, your Honor.

25               MS. BERGOFFEN:  Thank you, your Honor.
                 (Adjourned)