# EXHIBIT EE

United Nations

S/AC.37/2003/(1455)/79



# Security Council

Distr.: General
23 October 2003

Original: English

**Security Council Committee established pursuant
to resolution 1267 (1999) concerning Al-Qaida and
the Taliban and Associated Individuals and Entities**

### Letter dated 22 October 2003 from the Permanent Representative of the Philippines to the United Nations addressed to the Chairman of the Committee

Upon the instructions of my Government and with reference to your note of 7 July 2003, I have the honour to transmit herewith the Philippine country report submitted in compliance with resolutions 1267 (1999) and 1455 (2003) (see annex).

(*Signed*) Lauro L. **Baja, Jr.**
Permanent Representative

03-60609 (E)    141103

*0360609*

S/AC.37/2003/(1455)/79

Annex to the letter dated 22 October 2003 from the Permanent Representative of the Philippines to the United Nations addressed to the Chairman of the Committee

# Philippine Country Report
## UN Security Council Resolutions 1267 and 1455
## Al-Qaeda Sanctions Committee
### October 2003

## I. Introduction

Osama bin Laden's activities in the Philippines were reportedly discovered during the early part of 1996. Bin Laden has apparently established numerous organizations, corporations and charitable institutions some of which are under the direct control of his brother-in-law, Mohammed Jamal Khalifa. They were accordingly being utilized as conduits of funds for local extremists and their terrorist-related activities.

It was recorded that the Abu Sayyaf group was a primary beneficiary of the said funds, using them to facilitate their training in guerilla warfare techniques and to acquire high powered weaponry. There are also persistent reports on foreigners conducting training Abu Sayyaf and other terrorists in handling explosives, commando tactics, and related skills.

## II. Consolidated List

II.-2.  The 1267 Committee's list can be easily incorporated in our administrative structure as it is similar to the target list, watch list and wanted list being maintained by the various Philippine law enforcement agencies.

II-3.  The List must include photographs and other pertinent data on past criminal records of the subject, in order to facilitate identification and profiling of the terrorist suspect. An indentification system based only on names is inadequate.

II-4.  After arresting the suspected personalities identified in the list, authorities shall conduct a continued investigation through tactical interrogation of the suspect. However, if the suspected terrorist, whether a foreigner or a citizen of this country, has a pending warrant of arrest or has committed any offense against the law of the state, appropriate charges will be filed against him/her before the court.

ASH000583

II-5. There are numerous arrested suspected terrorist personalities that are under the custody of the Philippine authorities. Availability of information regarding their status is strictly restricted in order not to compromise pending court actions and investigations.

The following personalities have been convicted and were being investigated regarding their connections with the Jemaah Islamiyah and Al-Qaeda Groups:

A. Fathur Rohman al Ghozi, Indonesian national was arrested on January 15, 2002 and was convicted on April 18, 2002 for illegal possession of explosives under Sec. 3 of PD 1866 and was sentenced with 12 years' imprisonment. (However, he had escaped from detention on July 14, 2003, and was killed in October 2003).

B. Agus Dwikarna, Indonesian national, was arrested in Ninoy Aquino International Airport for illegal possession of explosives on March 13, 2002 and was convicted by the Pasay City Regional Trial Court Branch 17 on July 12, 2002.

II-6. As of mid-2003, there are no recorded legal actions filed by any individual or entities against our authorities regarding submissions to the Terrorist Watchlist.

II-7. While domestic legislation is still pending, the Philippines has adopted the generally accepted principles of UN Security Council Resolution 1373 on terrorism. Presently, the Anti-Terrorism bill is now undergoing deliberation both houses of the Philippine Congress. The proposed Senate bill includes salient provisions such as:

a. SECTION 6. ***Participation in an Activity of a Terrorist Organization*** - Any person who knowingly participates in any activity of a terrorist organization or a front of a terrorist organization intended to facilitate or carry out terrorist activity shall suffer the penalty of imprisonment for a period of not less than twelve (12) years but not more than twenty (20) years.

Participating in, facilitating of, or contributing to, an activity or a terrorist organization includes:

(1) providing, receiving or recruiting a person to receive training

(2) providing or offering to provide a skill or an expertise for the benefit of, at the direction of, or in association with a terrorist organization.

3

S/AC.37/2003/(1455)/79

    (3) Recruiting in order to facilitate or commit

      (a) an offense under this Act, or

      (b) an act or commission outside of the Philippines that, if committed in the Philippines, would be an offense under this act;

(4) entering or remaining in any country for the benefit of, at the direction of or in association with a terrorist organization; and

(5) making oneself, in response to instructions from any of the persons who constitute a terrorist organization, available to facilitate or commit

    (a) an offense under this act, or

    (b) an act or omission outside the Philippines that, if committed in the Philippines, would be an offense under this act.

The offense described herein will be considered committed, whether or not -

(1) the terrorists organization actually facilitates or carries out a terrorist activity;

(2) the participation of the offender actually enhances the ability of the terrorist organization to facilitate or carry out a terrorist activity; or

(3) the offender knows the specific nature of any terrorist activity that may be facilitated or carried out by the terrorist organization.

b. SECTION 7. ***Materially Supporting or Financing of Terrorism***
Any person, group, organization or entity who knowingly provides properties or finances, or possesses them for or on behalf of terrorist organizations, or facilitates any way the provision or possession of such properties or finances shall suffer the penalty of life imprisonment.

Any person who solicits or invites financial contribution or other support for a terrorist or a terrorist organization shall suffer the penalty of imprisonment of not less than eight (8) years but not more than fourteen (14) years.

4

S/AC.37/2003/(1455)/79

 c. SECTION 8. ***Harboring or Concealing of Terrorists***. - Any person who knowingly harbors or conceals, any person whom he or she knows, or has reasonable grounds to believe, to be a person who has carried out or is likely to carry out a terrorist activity shall suffer the penalty of imprisonment of not less than six (6) years but not more than twelve (12) years.

 d. SECTION 10. ***Membership in a Terrorist Organization***.- Any person who belongs to, or professes to belong to, a terrorist organization or a front of a terrorist organization or arranges or assists in the arrangement or conduct of, or addresses, a meeting of two (2) or more persons, knowing that the meeting is to support or further the activities of the terrorist organization or is to be addressed by a person belonging or professing to belong to that terrorist organization, shall suffer the penalty of imprisonment or not less than ten (10) years but not more than sixteen (16) years.

## III. Financial and Economic Asset Freeze

III-9 Legal basis discussed:

 A. Sec. 10 of Republic Act 9194 (RA 9194) of the Anti Money Laundering law states that "the Court of Appeals upon application *ex parte* by the Anti Money Laundering Council (AMLC) and determination that probable cause exists that any monetary instrument or property is in any way related to an unlawful activity may issue freeze order which shall be effective immediately". In relation to Sec. 3 paragraph 12 of RA 9194 that "unlawful activities" as defined, shall include those acts perpetrated by terrorist against non-combatant persons and similar targets.

 B. Impediments to the assets freezing procedure:

  a. In cases prejudicial to a candidate for an electoral office during an election period (rule 16.1 of RA 9160 as amended by RA 9194).

  b. The Philippine Bank Secrecy Law (RA 1405) (This however has been amended to help enhance the powers of the AMLC, see below).

III.10. President Gloria Macapagal Arroyo's 14 point policy for the campaign against terrorism, specifically under the 4th action point, calls for the enlistment of public and private corporations and personalities in the fight against terrorism. The Securities and

ASH000586

Exchange Commission is conducting an inventory of existing public and private organizations that my be wittingly or unwittingly used by terrorists in their operations, particularly in channeling and accessing funds in support of their illegal activities. The Commission has also identified and verified corporations and charitable institutions that may be used as front organizations by terrorist groups".

With the assistance of the UK "Charity Commission of England and Wales" the Philippines is now examining ways to improve its regulations of Non-Governmental Organizations (NGOs) particularly with respect to illicit finance.

General assistance in combating money laundering is being provided by the Rapid Reaction Mechanism (RRM) of the European Community.

The Philippines supports the ASEAN Declaration on Joint Action to Counter Terrorism - adopted on November 5, 2001 in Bandar Seri Begawan, Brunei Darussalam to advance efforts in fighting terrorism through the following measures: 1) Early ratification of all relevant anti terrorist conventions. 2) Enhancement of information and intelligence exchange to facilitate the flow of information on terrorist organization, movement and funding for the protection of lives, property and free security of all modes of travel.

The RP-Australia MOU on Cooperation to Combat International Terrorism, signed on March 4, 2003 will facilitate greater cooperation between the Philippines and Australia in preventing and suppressing international terrorism by providing a framework for cooperation for all concerned agencies on areas such as information and intelligence exchange, law enforcement activities, money laundering and terrorist financing, and the development of effective counter-terrorism legal instruments.

III-11. The steps which Banks and/or other financial institution are required to take in case assets identified are attributed to finance Al-Qaeda or Taliban activites are covered under R.A. 9194 as follows:

a. Sec. 6 paragraph c, provides that "Covered institution shall report to the Anti-Money Laundering Council (AMLC) all covered transaction and suspicious transactions within five (5) working days from the occurrence thereof, unless the supervising authority prescribed a longer period not exceeding ten (10) working days.

b. Sec. 10 provides that "The Court of Appeals, upon application of the AMLC and after determination that probable caused exist that any monetary instrument or property is in any way related to an unlawful activity as defined in Sec. 3 hereof, may issue a freeze order which shall be effective immediately.

ASH000587

III-12-13.  The lists of assets of individuals and entities that are frozen under the newly promulgated Anti Money Laundering Act (AMLA) are subject to  strict confidentiality as to the nature of bank deposits, securities, and other assets.

III-14.  Domestic legal basis in controlling the movement of funds and assets:

Par. 1. Under Rule 13.1 of RA 9160 as amended by RA 9194 on **Request for assistance from foreign states -** Where a foreign state makes a request for assistance in the investigation or prosecution of a money laundering offense, the AMLC may execute the request or refuse to execute the same and inform the foreign state of any valid reasons for not executing the requestor for delaying the execution thereof.  The principle of mutuality and reciprocity shall for this purpose, be at all times recognized.

Par. 2. Banks reporting procedure on suspicious transactions under Rule 5.3 of 9160 as amended by RA 9194 states that "As may be directed by the AMLC and/or in the exercise of their supervisory and/or regulatory powers over covered institution under their respective jurisdiction, supervising authorities may require all suspicious transactions with covered institution, irrespective of the amount involved, to be reported to the AMLC when there is reasonable belief that any money laundering activity or any money laundering offenses is about to be, is being or has been committed.

Administrative sanctions for non-compliance with such suspicious transaction reporting requirements may be imposed by supervising authorities as authorized under their respective charter.

Par. 3. Same with Par. 2 requiring Covered Institution which was defined by Rule 3 of RA 9160 referring to Banks, offshore banking units, quasi banks, trust entities, non-stock savings and loan associations, pawnshops, and all other institution, including their subsidiaries and affiliates supervised and/or regulated by the Bangko Sentral ng Pilipinas (BSP).

Par 4-5.  In July 2003,  implementing rules and regulations (IRR) were approved by the Philippine Congress for the amended AMLA providing for the selective lifting of the Bank Secrecy Law. The provisions allow the AMLC and the BSP to examine bank deposits and investments in the course of their investigation of suspected money laundering activities and other crimes specified under the AMLA.

The IRR, which has been approved by the Congressional Oversight Committee (COC), lays the parameters for the implementation of the AMLA and its subsequent amendments as pushed for by the Financial Action Task Force (FATF).

ASH000588

The IRR authorizes the AMLC to file an ex parte application for the issuance of a freeze order if, after an investigation, the council determines that funds or properties are in any way related to any illegal activities covered by the AMLA.

## IV. Travel Ban

IV-15.  Travel bans may be effected through:

    A.  Orders issued by the Office of the President

    B.  Orders issued by the Department of Justice

    C.  Orders issued by the Regional Trial Courts; and

    D.  Sec. 29 of the Philippine Immigration Law

IV-16.  Lists of terrorist personalities coming from the international community together with reports of other intelligence agencies are being consolidated with the Bureau of Immigration's "blacklist" of individuals.

IV-17.  The list of our border control authorities are updated daily through the online network system of the Bureau of Immigration.

General assistance in improving border control management is being provided by the Rapid Reaction Mechanism (RRM) of the European Community.

IV-18.  As of January 2003, 400 foreigners were excluded from the entering the country, 12 of which were recorded in the blacklist of the Bureau of Immigration.  However,  there was no record of personalities encountered  with known links to the al Qaeda organization.

## V.  Arms Embargo

V-20-21.  The Philippines does not have any legislative act at present that specifically criminalizes violations  of  the arms as called for UNSCR 1455.  However, under the proposed "Anti Terrorism Bill", any person who manufacture, possesses, acquires, supplies, uses, or sells, explosives, biological agents, chemical agents, nuclear weapons or equipment and instrument used in the productions, distribution, released or spread of any of the foregoing, with the intent to endanger, directly or indirectly, the safety of one or more individuals, or to cause great damage to property, is liable for terrorism.

8

Furthermore, any person, group, organization or entity that knowingly provides properties, or finances, or possesses them for or on behalf of terrorist or terrorist organizations, or facilitates in any way the provision or possession of such properties or finances shall be penalized for materially supporting or financing terrorism.

V-22. In lieu of the absence of a specific arms broker licensing system that will prevent terrorists from obtaining items under the established arms embargo, the rules governing Customs Brokers under the Tariff and Customs Code of the Philippines shall be applied.

Section 3047 of the Code states that "any person who files and entry or facilitates the processing or release of any shipment shall be liable for smuggling if the ostensible owner importer or consignee and/or the ostensible given address of the owner, importer or consignee is fictitious and the shipment is found to be unlawful. If the violator is a customs broker, his/her license shall be revoked by the Commissioner of Customs.

Higher standards for the qualifications of customs brokers should be established.

V-23. The Philippines does not have specific regulations regarding firearms diversions which could be used by terrorists, but other existing regulations essentially curtail the practice. Presidential Decree 1866, amended by RA 8294, codified the various regulations on illegal/unlawful possession, manufacture of firearms, ammunition or explosives and imposed stiffer penalties for certain violations thereof.

The provisions of the Firearm Acquisition, Possession, Licensing and Revocation of Firearms License regulations, particularly Standard Procedure Nr. 13 (Licensing of Firearms) the qualifications of person and individuals who are qualified to acquire firearms and ammunition are indicated. In relation to Circular No. 2 (Annual Verification of Firearms), the purpose of annual verification of firearms is to determine the actual existence of firearms, to ascertain if the licensee is still qualified to possess the firearms, and to find out if the firearm holder is up to date in the payment of his firearms license fees.

## VI.   Assistance and conclusions

VI-24. The Philippine government as a matter of national policy supports the various international resolutions and covenants against terrorism. With these measures, the Philippines seeks to establish and develop networking/linkages to provide close rapport, working relationships, and coordination with other concerned states in the global campaign against terrorism.

ASH000590

S/AC.37/2003/(1455)/79

VI-25. The Philippines strongly favors increased information and intelligence exchanges between/among member states and concerned regional and international organizations. In particular, enhanced exchange of information on personalities, groups, associations, including entities used as conduits of terrorists funds should be pursued.

10

ASH000591