# Exhibit F

LAW OFFICES OF

# THOMAS H. NELSON & ASSOCIATES

BOX 1211, 24525 E. WELCHES ROAD
WELCHES, OR 97067-1211
TELEPHONE: 503.622.3123
FAX: 503.622.1438

**Thomas H. Nelson**                                                                    **Admitted in:**
E-Mail: nelson@thnelson.cor                                                             Oregon, Washington,
Mobile: 503.709.6397                                                                    Idaho, Connecticut, and
                                                                                        Nez Perce Tribal Court

*Via U.S. Post*

February 2, 2010

The Secretary of the Al-Qaida and Taliban Sanctions Committee
United Nations
S-3055G
New York, NY 10017

**Re: Petition for Delisting – Soliman H. Al-Buthi**

Dear Secretary:

      I am enclosing an original and five copies of the Petition of Soliman H. Al-Buthi, a Saudi Arabian national, to be de-listed by your Committee. Mr. Al-Buthi was listed on September 24, 2004, after the Treasury Department of the United States designated him as a "specially designated global terrorist" on September 9 of that year. The Petition points out in detail why the original listing by the Committee was not justified and requests that the de-listing occur expeditiously.

      I understand that this matter will be referred to an ombudsperson pursuant to Security Council Resolution No. 1904.

      Please let me know if there are any questions or if I can provide any additional information.

Very truly yours,

Thomas H. Nelson
Attorney for Soliman H. Al-Buthi

Enclosures: Petitions (original + 5 copies)

Thomas H. Nelson
Attorney at Law
PO Box 1211
Welches, OR  97067
United States of America
Tel: 503.709.6397
nelson@thnelson.com

# BEFORE THE UNITED NATIONS
# SECURITY COUNCIL RESOLUTION 1267 SANCTIONS COMMITTEE

| | |
|---|---|
| Soliman H.S. Al-Buthi (Ref. No. QI.A.179.04) | No. _____ <br><br> Petition for De-Listing |

## I. INTRODUCTION

Petitioner Soliman H.S. Al-Buthi (occasionally referred to as Soliman H.S. Al-Buthe), through his attorney Thomas H. Nelson of Welches, Oregon, United States of America, respectfully requests the honorable United Nations Security Council Resolution 1267 Sanctions Committee, through the Office of the Ombudsperson, pursuant to Guideline 8 of the Committee's Guidelines, to de-list Petitioner from its "List of Individuals Belonging to or Associated with Al-Qaida Organization."  Petitioner is unable to ascertain the specific facts this Committee relied upon in determining to list him as affiliated with Al-Qaida/Usama bin Laden; however, the Office of Foreign Assets Control ("OFAC") of the United States Department of Treasury ("Treasury"), in a press release dated September 9, 2004, indicated that it was designating Petitioner as a specially designated global terrorist ("SDGT") based upon two factors, *viz.*, (i) alleged "direct links" with Al-Qaida and/or Usama bin Laden, and (ii) his involvement in

Page 1 – Petition of Soliman H.S. Al-Buthi

delivering funds from the United States to the Saudi Arabian charity, Al-Haramain Islamic Foundation, which in turn was to deliver those funds to Chechnya.  A copy of that press release is attached as Exhibit 1.  A recent edition of the American Bar Association Journal, the pre-eminent legal society publication in the United States, devoted an article to the unfairness of the Department of the Treasury's designation of Mr. Al-Buthi; a copy of that article is attached as Exhibit 2.

Petitioner asserts that he is not, and never has been, affiliated in any manner whatsoever with Al-Qaida or Usama bin Laden and that his actions in delivering funds from the United States to Saudi Arabia for Al-Haramain Islamic Foundation's subsequent delivery to Chechnya was solely for humanitarian purposes and thus was completely innocent and otherwise not the basis for listing under the Security Council Resolution 1267 guidelines.  In support of this Petition Mr. Al-Buthi states as follows:

II. <u>DISCUSSION</u>

*General Allegations*

1.      Petitioner is a Saudi Arabian national currently residing in Riyadh, Saudi Arabia.

2.      Petitioner is employed in the position of General Director of the Environmental Health Department for the Municipality of Riyadh.  In that position it is Petitioner's duty to protect the citizens of the City of Riyadh from environmental threats resulting from intentional, negligent, and natural forces.  Petitioner reports directly to the Mayor of the City of Riyadh and supervises more than 500 municipal employees.

3.      Beginning in approximately 1998 Petitioner acted as unpaid volunteer liaison between Al-Haramain Islamic Foundation in Riyadh, Saudi Arabia ("AHIF-SA"),

*Thomas H. Nelson & Associates*
PO Box 1211, 24525 E. Welches Road
Welches, OR  97067
nelson@thnelson.com

AHIF 4431

and its branch in Ashland, Oregon, known as "Al-Haramain Islamic Foundation, Inc."

("AHIF Oregon").  Petitioner ceased acting as liaison when he terminated his

relationship with AHIF-SA in September 2002.

4.      On September 9, 2004, OFAC issued an administrative declaration that

Petitioner was a "specially designated global terrorist" ("SDGT").  At the same time

OFAC issued a similar declaration that AHIF Oregon was a SDGT.

5.      On September 24, 2004, this Committee listed Petitioner as an individual

associated with Al-Qaida organization and AHIF Oregon as an entity associated with Al-

Qaida organization.  The current entry on this Committee's list reads as follows:

> QI.A.179.04. *Name: 1: SULIMAN 2: HAMD 3: SULEIMAN 4: AL-BUTHE
> Title: na Designation: na DOB: ▇▇▇ 1961 POB: Cairo, Egypt *Good
> quality a.k.a.: Soliman H.S. Al Buthi Low quality a.k.a.: na *Nationality:
> Saudi Arabia Passport no.: a) ▇▇▇9614 b) Passport Number ▇▇▇6660
> issued on 5 May 2001 and expired on 11 Mar. 2006 National identification
> no.: na Address: na *Listed on: 28 Sept. 2004 (amended on 23 Apr. 2007)
> *Other information: na.

*"Direct Links" to Usama bin Laden*

6.      Petitioner does not now, nor has he ever had, any relationship whatsoever,

direct or indirect, with Al-Qaida or with Usama bin Laden.

7.      On February 18, 2004, OFAC froze the assets of AHIF Oregon pending an

investigation into its activities.  OFAC took no action whatsoever regarding Petitioner at

that time.

8.      Preparatory to declaring AHIF Oregon to be a SDGT, OFAC provided to

attorneys for AHIF Oregon three packets of materials containing, with one exception,

unclassified materials.  None of the unclassified materials suggested a link between

*Thomas H. Nelson & Associates*
PO Box 1211, 24525 E. Welches Road
Welches, OR  97067
nelson@thnelson.com

AHIF 4432

Petitioner or AHIF Oregon on the one hand and Al-Qaida or Usama bin Laden on the other.

9.     The third packet of materials, which OFAC released to AHIF Oregon attorneys in August 2004, contained a classified document (now popularly referred to as "the Document") containing information derived from March-April 2004 interceptions of privileged communications between Petitioner and two of his/AHIF Oregon attorneys in Washington, D.C.

10.     The interceptions referred to in the previous paragraph led to litigation first filed in the United States District Court for the District of Oregon, *Al-Haramain Islamic Foundation, Inc., et al., v. Bush, et al.*, CIV 06-270-KI, which litigation has been consolidated before United States District Court Judge Vaughn Walker in the Northern District of California as part of litigation challenging the United States' warrantless wiretapping, and the matter has recently been remanded to Judge Walker for further action where it now awaits decision. *Al-Haramain Islamic Foundation v. Bush, et al.,* No. 06-36083 (9th Cir., Nov. 16, 2007).  In this litigation AHIF Oregon and its two attorneys are seeking a declaration that the interceptions of privileged attorney-client communications were illegal and unconstitutional.  The litigation requests statutory damages, costs, and attorneys' fees.

11.     Although Petitioner's assets were not frozen pending investigation when AHIF Oregon's assets were so frozen in February 2004, on September 9, 2004, OFAC designated both AHIF Oregon and Petitioner as SDGTs.  In a September 9, 2004, press release accompanying the designation OFAC asserted, "The investigation shows direct links between the U.S. branch [AHIF Oregon] and Usama bin Laden."  On information

*Thomas H. Nelson & Associates*
PO Box 1211, 24525 E. Welches Road
Welches, OR  97067
nelson@thnelson.com

AHIF 4433

and belief, Petitioner alleges that his designation as a SDGT was a result of information contained in the Document.

12.     The OFAC designations led to this Committee's listing of both AHIF Oregon and Petitioner.

13.     On information and belief, Petitioner alleges that the intelligence officials who prepared the Document misconstrued, misapprehended, or otherwise misunderstood the privileged and allegedly illegally intercepted conversations between Petitioner and his attorneys and, based upon such misconstrued, misapprehended, or misunderstood conversations, the United States claimed that there were "direct links" between AHIF Oregon and Petitioner on the one hand and Al-Qaida and/or Usama bin Laden on the other.  In other words, the intelligence services' misinterpretation of the Document prompted intelligence officials to create a "false positive" link with Usama bin Laden.

14.     Because he understands that the United States wishes to keep the contents of the Document out of the public domain Petitioner has not revealed the contents of the Document to any persons other than his attorneys.

15.     In order to establish the factual basis for Petitioner's de-listing, arrangements may have to be made that will allow the Committee to understand the "false positive" link that intelligence officials drew between AHIF Oregon and/or Petitioner on the one hand and Usama bin Laden on the other.  Lacking such arrangements Petitioner's human and civil rights will continue to be materially impaired.

*Thomas H. Nelson & Associates*
PO Box 1211, 24525 E. Welches Road
Welches, OR  97067
nelson@thnelson.com

AHIF 4434

*Taking Travelers Checks from the United States:  Chechnya Donations*

16.     In 1999 warfare in Chechnya resulted in enormous human suffering of noncombatants, most of whom were Muslims.  As a result of such suffering calls for humanitarian financial aid went out.  AHIF-SA made such solicitations and instructed potential donors to remit such funds (referred to as "zakat" in Arabic) either to the main headquarters in Riyadh or, for donors in West (including Europe), to AHIF Oregon.

17.     After investigating the situation, one Egyptian donor, Mahmoud Al-Fiki, decided to contribute $150,000 US as zakat for Chechnya humanitarian aid.  He therefore instructed his bank in England to wire that amount to AHIF Oregon.  Mr. Al-Fiki at that time and repeatedly thereafter requested confirmation of the transfer and a receipt for the donation, which receipt could be issued only by AHIF-SA.

18.     AHIF Oregon received the Al-Fiki donation in late 1999 or early 2000.

19.     In light of Mr. Al-Fiki's repeated and somewhat urgent requests for a receipt for the donation, Mr. Al-Buthi resolved that on his next trip to the United States he would personally take the funds donated to AHIF Oregon back to AHIF-SA for processing and transmission to Chechnya.

20.     All persons entering the United States by aircraft from abroad are required to complete a customs declaration form that inquires whether money or monetary instruments in excess of ten thousand dollars ($10,000) are being brought into the country.  Although similar requirements apply upon departure, at the time of the facts relevant hereto there were no customs officials stationed at departure points from the United States, no similar forms were routinely available for persons departing the United

*Thomas H. Nelson & Associates*
PO Box 1211, 24525 E. Welches Road
Welches, OR  97067
nelson@thnelson.com

AHIF 4435

States, and no signs or other notices were posted to the effect that such a declaration must be made upon departure.

21.     Mr. Al-Buthi traveled to the United States in March 2000 and complied with the customs requirements upon entry.  During his visit he traveled to Ashland, Oregon, where he obtained from the Bank of America branch there travelers checks in the amount of $130,000 and a cashier's check in the amount of $21,000 in order to transfer the Al-Fiki donation back to AHIF-SA.

22.     In the spring of 2000 Mr. Al-Buthi left the United States with $130,000 in travelers' checks which he had openly purchased from a Bank of America branch in Ashland, Oregon.  He was not aware that he was required to disclose that he was carrying over $10,000 in travelers' checks upon departure from the United States and therefore made no such disclosure upon his departure.

23.     More than four years after the fact – in September 2004 – Mr. Al-Buthi was "designated" as a SDGT by the United States Department of Treasury in part apparently because he had taken $130,000 in travelers' checks from the United States without informing United States customs officials, even though when he left he was not aware of such requirement.

24.     In February 2005 AHIF Oregon and Mr. Al-Buthi were indicted by a federal grand jury sitting in Eugene, Oregon, for taking over $10,000 in travelers checks from the United States without notifying customs officials.  *United States v. Al-Haramain Islamic Foundation, Inc.*, 6:05-cr-60008-HO-1. Neither AHIF Oregon nor anyone associated in any way with AHIF Oregon has ever been indicted for activities related to terrorism.

Page 7 – Petition of Soliman H.S. Al-Buthi

25.    On September 8, 2005, the Federal District Court for the District of Oregon dismissed the indictment against AHIF Oregon because the United States indicated that it did not wish to prosecute the charity within the requirements of the law.

26.    Consequent to this Committee's listing Mr. Al-Buthi's Saudi Arabian bank accounts have been frozen and he no longer has access to them.

27.    In order to protect Mr. Al-Buthi from arrest by United States officials, the government of the Kingdom of Saudi Arabia has prevented him from traveling internationally.

28.    Mr. Al-Buthi has publicly and repeatedly affirmed that he opposes terrorism in all of its forms.

29.    Because AHIF Oregon's assets are frozen and because it is prohibited from undertaking any substantive activities, Mr. Al-Buthi is unable to have any substantive impact on the direction of AHIF Oregon.

### III.  REQUEST FOR RELIEF

WHEREFORE, for the foregoing reasons Petitioner Soliman H.S. Al-Buthi respectfully requests that this Committee to take all steps necessary to remove Mr. Al-Buthi's name from this Committee's list of persons supporting Usama bin Laden.

DATED at Welches, Oregon, USA, this 2nd day of February, 2010.

Respectfully submitted,

_____
Thomas H. Nelson
Attorney for Petitioner Soliman H.S. Al-Buthi

*Thomas H. Nelson & Associates*
PO Box 1211, 24525 E. Welches Road
Welches, OR  97067
nelson@thnelson.com

AHIF 4437

**UNITED NATIONS**  **NATIONS UNIES**

### OUTGOING FACSIMILE

**DATE:** 28 July 2010

| TO: | Mr. Thomas Nelson<br>Attorney<br>Law Offices of Thomas H.<br>Nelson & Associates<br>Box 1211, 24525 E. Welches<br>Road<br>Welches, OR 97067-1211 | FROM: | Kimberly Prost<br>Ombudsperson<br>Security Council Committee<br>established pursuant to<br>resolution 1267 (1999) |
|---|---|---|---|
| **FAX NO.:** | 503-622-1438 | **FAX NO.:** | (212) 963-1300/3778 |
| **ATTN:** | | **Tel:**<br>**Email:**<br>**Room:** | (212) 963-2671<br>ombudsperson@un.org<br>TB-08041 D |
| **TOTAL NUMBER OF TRANSMITTED PAGES INCLUDING THIS PAGE:   4** | | | |

Please find attached an acknowledgement letter for the delisting request.

Best regards.

AHIF 4447

**UNITED NATIONS**  **NATIONS UNIES**

POSTAL ADDRESS-ADRESSE POSTALE: UNITED NATIONS, N.Y. 10017
CABLE ADDRESS -ADRESSE TELEGRAPHIQUE: UNATIONS NEWYORK

REFERENCE: **OMBP/1267/2010/1/Al-Buthi, S.H.S.**                28 July 2010

Mr. Thomas Nelson
Attorney
Law Offices of Thomas H. Nelson & Associates
Box 1211, 24525 E. Welches Road
Welches, OR 97067-1211
Fax: 503-622-1430

## SUBJECT: <u>DELISTING REQUEST – SOLIMAN H. AL-BUTHI</u>

Dear Mr. Nelson,

     I acknowledge receipt of your request for the delisting of Soliman H. Al-Buthi by the Al-Qaida and Taliban Sanctions Committee established pursuant to resolution 1267 (1999), which request is dated 2 February 2010, with a supplement dated 20 July 2010. This request was formally received in full by my office on 27 July 2010.

### GENERAL PROCEDURE FOR REQUESTS FOR DELISTING

     In the case of requests submitted to my office, the procedure for delisting begins with a preliminary determination that the request properly addresses the designation criteria applicable to the 1267 Sanctions Committee Consolidated List. Also, in the case of a repeat request, I must be satisfied that additional material is being provided in this instance.

     Unless the request is returned on either of these grounds, it will then be assessed in a three-phase process.

     First, I have a period of two months to gather information - notably from States and the Monitoring Team which assists the Committee. This period can be extended for up to two additional months, if I determine more time is needed to gather relevant information.

     This will be followed by a two-month phase for engagement and for the preparation of my report to the Committee. This period can also be extended, again for up to two months, if I decide that additional time is necessary. During this period, I will dialogue and exchange with the Petitioner, as may be necessary, in order to pose any questions or seek clarification or additional information, in coordination with the relevant States, the Committee and the Monitoring Team.

/...

AHIF 4448

- 2 -

Also during this same period, I will draft the report which is intended to provide a comprehensive review of the case to the Committee. The report will summarize the information gathered, specifying the sources of it as appropriate, and describe the interaction and activity undertaken by me with respect to the request. This will include a description of my interaction with the Petitioner. In the report, based on my analysis of the information and my observations, I will lay out for the Committee the principal arguments of the delisting request.

. The Committee will then review the report during a thirty-day period, after which the delisting request will be placed on the Committee agenda for consideration and ultimately a decision. I will communicate the decision of the Committee to the Petitioner.

## CONFIDENTIALITY

In accordance with the procedure established under Annex II of Security Council Resolution 1904 (2009), a delisting request submitted to me will be shared with the Committee, relevant States and other UN bodies. In addition, some additional disclosure of the request may be necessary as part of the information gathering process. Aside from these operational matters, as a general policy, I will treat the requests submitted to my office as confidential.

Obviously, however, you are free to publicly disclose and discuss your request as you deem appropriate. Should you choose to make your request public, I would appreciate it if you could notify me of your intentions in that respect. I will thereafter treat the existence and status of the request as a public matter. I will not, however, publicly comment on or discuss the details of any pending case.

## SPECIFIC DELISTING REQUEST

I have reviewed the request submitted by you on behalf of Mr. Al-Buthi and am satisfied that it is a new request which adequately addresses the designation criteria. Therefore, I will be proceeding with the request in accordance with the procedure outlined above.

Having reviewed the request and supplement, in order to facilitate the process, it would be helpful if you could provide me with the following additional information:

In paragraph 24 of the original petition, you make reference to an indictment issued by a federal grand jury in Eugene, Oregon in relation to AHIF Oregon and Mr. Al-Buthi for taking over $10,000 out of the United States without notifying customs officials. In paragraph 25, you have described that this indictment was dismissed with reference to AHIF Oregon. However, can you advise me of the status of the indictment or those proceedings with reference to Mr. Al-Buthi?

/...

- 3 -

I will provide you with updates as the matter progresses and in the interim, should you have any questions please feel free to contact me as follows:

Ms. Kimberly Prost
Ombudsperson
TB-08041 D
New York, NY 10017
Tel:  212-963-2671
Fax:  212-963-3100/3778
Email:  ombudsperson@un.org

Yours sincerely,

Kimberly Prost
Ombudsperson

Law Offices of
# Thomas H. Nelson & Associates
Box 1211
Welches, OR  97067-1211
Telephone: 503.622.3262

**Thomas H. Nelson**
E-Mail:  nelson@thnelson.com
Mobile: 503.709.6397

**Admitted in:**
Oregon, Washington,
Idaho, Connecticut, and
Nez Perce Tribal Court

*Via E-Mail (ombudsperson@un.org), Facsimile (212) 963-1300, and First Class Post*

August 4, 2010

Kimberly Prost, Ombudsperson
The Al-Qaida and Taliban Sanctions Committee
United Nations
S-3055G
New York, NY 10017

**Re: Response to July 28, 2010, Request for Further Information – Soliman H. Al-Buthi**
**Ref. No. OMBP/1267/2010/1/Al-Buthi, S.H.S.**

Dear Ombudsperson Prost:

     I am transmitting by e-mail and facsimile Mr. Al-Buthi's Response to the July 28, 2010 Request for Further Information, and also am transmitting and original and five copies of that document by first class post.

     Please let me know if you have any questions or if Mr. Al-Buthi or I can provide any further information to assist you in your efforts.

Very truly yours,

Thomas H. Nelson
Attorney for Soliman H. Al-Buthi

Transmitted Herewith:  Response to Request for Further Information

AHIF 4451

Thomas H. Nelson
Attorney at Law
PO Box 1211
Welches, OR  97067
United States of America
Tel: 503.709.6397
nelson@thnelson.com

# BEFORE THE UNITED NATIONS
# SECURITY COUNCIL RESOLUTION 1267 SANCTIONS COMMITTEE

| | |
|---|---|
| Soliman H.S. Al-Buthi (Ref. No. QI.A.179.04) | No. OMBP/1267/2010/1/Al-Buthi, S.H.S.<br><br>Response to Request for Further Information dated 28 July 2010 |

## I. INTRODUCTION

By a letter dated 28 July 2010 the Ombudsperson for the 1267 Committee requested to be informed of the status of Mr. Al-Buthi in relation to his February 2005 indictment by the federal grand jury sitting in Eugene, Oregon.  In summary form (and as developed more fully below), the charges against Mr. Al-Buthi are still pending because, although he enjoys complete freedom within the Kingdom, Mr. Al-Buthi has been requested by his government not to travel to the United States or elsewhere internationally while the charges remain outstanding.   Consequently, because he has not been arraigned and because American jurisprudence generally does not authorize trials *in absentia*, it appears that the criminal process will remain moribund indefinitely.

## II. DISCUSSION

By way of background, Mr. Al-Buthi was one of three directors of the Oregon nonprofit corporation Al-Haramain Islamic Foundation, Inc.  In February 2005 - five months after being designated administratively as a "specially designated global

Page 1 – Response to July 28, 2010, Request
           for Further Information

*Thomas H. Nelson & Associates*
PO Box 1211
Welches, OR  97067
nelson@thnelson.com

terrorist" by the United States Treasury Department - Mr. Al-Buthi was indicted for failing to disclose to U.S. Customs officials in March 2000 that he was taking $130,000 in American Express Travelers Checks with him when he departed the United States.  A second director of Al-Haramain, Pirouz Sedaghaty (commonly known as Pete Seda), was indicted at the same time for filing a false federal tax report for the 2000 tax year, and Mr. Al-Buthi, Mr. Seda, and the nonprofit corporation all were indicated for conspiracy to defraud the United States.[1]

When the indictment was handed up both Mr. Al-Buthi and Mr. Seda were out of the country; Mr. Al-Buthi is and always has been a citizen and permanent resident of Saudi Arabia, and Mr. Seda, a naturalized American citizen of Iranian descent, was in the Middle East attending to other matters.  As indicated in Mr. Al-Buthi's Petition, charges against Al-Haramain were dropped by the United States in 2005, and Mr. Seda returned voluntarily to the United States in the summer of 2007 in order to clear his name.  The trial of Mr. Seda is scheduled to begin on August 30 of this year in Eugene, Oregon; Mr. Seda is represented by the Federal Public Defender's office and by private Portland, Oregon, attorney Larry Matasar.

Mr. Al-Buthi today resides in Riyadh, Saudi Arabia, where he is General Director of the Environmental Health Department for the Municipality of Riyadh.  After his indictment  Mr. Al-Buthi was investigated twice by Saudi internal security personnel and

---

[1] It is noteworthy that the indictment, which under American law need be based only on a mere showing of "probable cause," did not charge any of the defendants with terrorism or "material support"; indeed, the only mention of any possible link between the Oregon foundation and a known terrorist was a September 9, 2004, Department of Treasury Press Release which asserted that, "The investigation shows direct links between the U.S. branch and Usama bin Laden."  As indicated in the Petition, Mr. Al-Buthi believes that this conclusion arose solely from illegally intercepted telephone conversations between him and the foundation's attorneys in the United States -- conversations that themselves were misinterpreted and misconstrued.  Moreover, at no subsequent time, including the Treasury Department's 2008 "redesignation" of Mr. Al-Buthi, has the United States repeated the "direct links" allegation.

Page 2 – Response to July 28, 2010, Request
for Further Information

was told that he had been cleared of any links to Osama bin Laden or to terrorism - this

by a government that considers both Osama bin Laden and Al Qaeda existential

threats.  Notwithstanding his exoneration by his government, however, Saudi authorities

have counseled Mr. Al-Buthi against traveling internationally because, he has been told,

that he could be arrested during such travels and extradited to the United States; the

Kingdom has clearly expressed its desire that it does not wish Mr. Al-Buthi to facilitate a

proceeding in United States courts.  Except for his government's indication that he

should not travel internationally, Mr. Al-Buthi remains completely free; indeed, since his

indictment he has been promoted to a high governmental position of significant

sensitivity and trust.

### III. CONCLUSION

The Kingdom's prohibition against Mr. Al-Buthi's international travel has resulted

in the United States' inability to assert jurisdiction over his person.  Consequently, Mr. Al-

Buthi has not been arraigned and the criminal process has not been commenced

against him.  It is expected that this situation will continue indefinitely unless the United

States drops the outstanding charges against Mr. Al-Buthi.

DATED at Welches, Oregon, USA, this 4th day of August, 2010.

Respectfully submitted,

Attorney for Petitioner Soliman H.S. Al-Buthi

*Thomas H. Nelson & Associates*
PO Box 1211
Welches, OR  97067
nelson@thnelson.com

**UNITED NATIONS**  **NATIONS UNIES**

POSTAL ADDRESS-ADRESSE POSTALE: UNITED NATIONS, N.Y. 10017
CABLE ADDRESS -ADRESSE TELEGRAPHIQUE: UNATIONS NEWYORK

REFERENCE:   **OMBP/1267/2010/1/Al-Buthi, S.H.S.**                    9 November 2010


Mr. Thomas Nelson
Attorney
Law Offices of Thomas H. Nelson & Associates
Box 1211, 24525 E. Welches Road
Welches, OR 97067-1211
Fax:  503-622-1430


### SUBJECT: DELISTING REQUEST – SOLIMAN H.S. AL-BUTHI

Dear Mr. Nelson,

I write with reference to the delisting request by Mr. Al-Buthi. As forecasted in my previous communication of 29 September, on 28 October I concluded the information gathering phase for this petition. While I am still awaiting additional documentation and clarification from some States, I believe that I have sufficient material at this stage in order to conduct a preliminary discussion with Mr. Al-Buthi. In that context, I am attaching a series of written questions for him. While I am not excluding the possibility of some form of oral communication with Mr. Al-Buthi in the dialogue phase, for the moment, I am of the view that my questions can be posed and answered in written form.

Once I receive the outstanding information, I will review the full case - as I see it - with Mr. Al-Buthi to obtain his comments and I may, as well, have some additional questions.

As a preliminary matter, I believe it is of central importance that I am able to have a frank and open discussion with Mr. Al-Buthi in order to present his case fully and fairly before the Committee. Clearly, I will use any answers or information provided strictly for the purposes of my analysis and observations on this delisting request, in accordance with my mandate. However, it will be necessary for me to incorporate or make reference to his responses, as appropriate and relevant, in my ultimate report to the Committee. Thus, in light of the pending criminal proceedings in the United States, if in your view, disclosure to the Committee might raise issues of self-incrimination please alert me to the particular responses such that I can deal with them in an appropriate manner in my report. I emphasize that while I see the pending proceedings as relevant to my overall analysis, given the nature of the charges, I consider that they relate to distinct questions from those under consideration by me in this process.

/...

AHIF 4455

- 2 -

**OMBP/1267/2010/1/Al-Buthi, S.H.S.**

As indicated, I would like to explore some specific areas with Mr. Al-Buthi, as outlined in the attached document. I posing the questions, I have made passing reference to some underlying documents and information which I have reviewed in the course of the information gathering phase. As all of the material I have considered is of a public nature and thus accessible to the Petitioner, I have not made any specific references to the documents nor included any attachments. If, however, there are any questions in that respect, I would be happy to address them.

Finally, should you have any questions or require clarification please do not hesitate to contact me.

Yours sincerely,

Kimberly Prost
Ombudsperson

I      **Relationship with Al Haramain Foundation (Saudi Arabia) (AHF (SA))**

1. The Petition indicates that Mr. Al-Buthi served as an unpaid volunteer liaison between AHF (SA) and the Oregon Branch - Al Haramain Foundation (Oregon) (AHF (Oregon)). I have seen documentation which indicates that he also served as a president/chair of the "US Committee" and of the "Internet committee" for AHF (SA). I would appreciate it if the Petitioner could provide me with a more full and detailed description of his relationship with, and functions for, AHF (SA). In particular, can he address the question of his chairmanship of these committees and the work involved, as well as providing a description of any other roles or functions that he had with the organization.

2. Material found on a website of Al Haramain (www.alharamain.org) in the period 1999-2000 has been categorized as demonstrating support for the cause of the mujahideen fighters in Chechnya. What comments does Mr. Al-Buthi have with respect to this material or the position of Al Haramain in that context? Was he aware of, or involved in, any activities for AHF (SA) or personally aimed at providing support to the mujahideen in Chechnya?

3. The Petitioner indicates that his relationship with AHF (SA) was terminated in September 2002. Can he describe the circumstances of that termination and provide any documentation or material to evidence this? Can he confirm that he had no further interactions with AHF (SA) after that date?

II     **Relationship with AHF (Oregon)**

4. I am interested to receive a more detailed description of Mr. Al-Buthi's roles and functions with AHF (Oregon), in particular a listing of any positions which he held, as well as his responsibilities in those positions or otherwise. In particular:

   a) What, if any, involvement did he have with the incorporation of AHF (Oregon) in the United States, and what was his understanding as to the aims and purpose of the entity?

   b) Did he act as an attorney for the organization at any point and, if so, who appointed him to that position?

   c) I have seen documentation indicating that he served as treasurer and director and was involved in contractual matters for the organization. Can he comment on the accuracy of that information and if he agrees he served in those posts, can he indicate what powers and functions he had in those positions? I have also seen information indicating that Mr. Al-Buthi was one of 2 people with access to AHF (Oregon) bank accounts, which would be consistent with the position of treasurer. Is that the case?

   d) As much of the information relating to his involvement with AHF (Oregon) dates from the period of 1999-2000, it is important to clarify his precise role and involvement with that organization after that time and today. Specifically, if he did serve in the capacity of director, treasurer or attorney for the organization, does he still hold any of those positions today? If

1

not, when did he resign from them? If so, what does that entail today especially given that AHF (Oregon) is a listed entity in the United States and under the 1267 regime? Does he continue to perform any functions for AHF (Oregon) in these capacities, in other roles or otherwise? If Mr. Al-Buthi has formally separated from or severed his association with AHF (Oregon), is there any documentation or material which would evidence this?

5. During the course of his involvement with the organization, what knowledge did he have of the day-to-day activities of AHF (Oregon)? What comments does Mr. Al-Buthi have regarding the material seized from AHF (Oregon) as a result of the search conducted in February 2004 specifically:

- Videos depicting mujahideen committing acts of violence against Russian soldiers in Chechnya;
- Graphic photographs of dead mujahideen and dead Russian soldiers;
- Passports of Russian soldiers;
- Maps depicting mujahideen military engagements;
- Photographs of mujahideen commanders including persons included on the 1267 Consolidated List;
- E-mails sent from an AHF employee in Saudi Arabia received by AHF (Oregon) apparently praising the efforts of the mujahideen in Chechnya; and
- A letter enclosing a donation for the support of the mujahideen in Chechnya.

Was he aware of this material, at the time, prior to its seizure? Was he aware that funds from AHF (Oregon) were being sent to the mujahideen in Chechnya?

6. What was Mr. Al-Buthi's relationship with Mr. Seda during his involvement with AHF (SA) or AHF(Oregon)? Did they discuss providing support through AHF (Oregon), AHF (SA) or otherwise for the mujahideen in Chechnya? Aside from the incident in March 2000, did Mr. Al-Buthi have any involvement in transmitting funds to the mujahideen in Chechnya or to Chechnya generally through AHF (Oregon), AHF (SA) or otherwise in the period from 1999 until today?

### III    Transfer of funds in March 2000

7. The Petition makes reference in detail to the transfer of funds facilitated by Mr. Al-Buthi between Al Haramain (Oregon) and Al Haramain (SA) in March of 2000. Given the statement in the narrative summary as to Mr. Al-Buthi's facilitation of support efforts directed toward fighters and Chechen leaders, it is clearly a relevant incident which I will need to consider. Therefore, I have a series of questions surrounding the transaction which follow.

8. There seems to be a variation between the description of the circumstances in which Mr. Al-Buthi came to know of the Al-Fiki[1] donation, as set out in the Petition and in a letter sent to Robert Werner, the then director of OFAC, dated 19 January 2005. Specifically, in the Petition it is stated that:

> "*In light of Mr. Al-Fiki's repeated and somewhat urgent requests for a receipt for the donation, Mr. Al-Buthi resolved that on his next trip to the*

---

[1] Also referenced in some documents as El-Fiki.

2

> *United States he would personally take the funds donated to AHIF Oregon back to AHIF-SA for processing and transmission to Chechnya.*"

In the letter to Mr. Werner (p3) it is stated:

> "*While en route to the United States Mr. Al-Buthi learned that Dr. El-Fiki had contributed $150,000 to AHIF Oregon designating it for Chechen relief efforts.*
> *...desiring to accomplish as much as possible during the short business trip, Mr. Al-Buthi made arrangements to travel to Ashland to obtain Mr. El-Fiki's contribution for the purpose of turning it over to one of the fundraisers in the AHF central office in Riyadh.*"

9.  The Petition suggests to me that Mr. Al-Buthi was aware in advance and in detail of the Al-Fiki donation and that the motivation for his actions related to a receipt. The earlier letter suggests that he had little prior involvement in the matter until he was on his way to the US and makes no mention of the need for a receipt but focuses instead on moving the funds back to Saudi Arabia. Can he explain/reconcile these two statements for me?

10. Does he have any additional information regarding the identity of Mr. Al-Fiki or with respect to his involvement with AHF (SA) or AHF (Oregon)? It is indicated in the letter to OFAC that, as of 2004 at least, Mr. Al-Buthi had not met Mr. Al-Fiki. Can he confirm whether he ever has? What was Mr. Al Buthi's relationship with Mr. Al-Fiki at the time and does he maintain any relationship with him today and if so, of what nature? Does he have any contact information for Mr. Al-Fiki and does he know if he would be willing to speak with me?

11. Why did Mr. Al-Buthi utilize the circuitous route employed to transfer the funds rather than a direct wire transfer?

12. Can he describe to me his understanding as to the purpose of the donation and what he based that on? Also can he provide comment on the following points:

a)  There was an e-mail sent from "s-elfeki" to "haramain" on Feb 20, 2000 in which Mr. Al-Fiki provides details of his contribution and describes his donation as Zakat in order "to participate in your noble support to our Muslim brothers in Chychnia". What knowledge did Mr. Al-Buthi have of this e-mail exchange? Does he have any comments on the notation "support to our Muslim brothers"?

b)  On 21 February 2000 Mr. Al- Aqueel sent a letter to Mr. Al-Fiki thanking him for the donation and assuring him "of our commitment to continue every possible effort to help ending the Chechnyan crisis". Was Mr. Al-Buthi aware of that receipt letter and does he have any comments with respect to its content?

c)  The cashiers check for 21,000 payable to Mr. Al-Buthi carried the notation "Donations for Chichania Refugees" and the agreements between Mr. Al-Buthi and Mr. Seda

3

surrounding the handing over of the funds to Mr. Al-Buthi indicates that the funds were for "Brothers and sisters in Chechnya". Does Mr. Al-Buthi have any comments on the meaning of these notations, particularly the latter?

13. The information I have seen indicates that Mr. Al-Buthi deposited the funds he brought back from the AHF (Oregon) into an account for AHF (SA). Is that the case? If so, appreciating the length of time which has elapsed, can he describe that deposit in any greater detail particularly in terms of the timing of it, what banking facility was used and what reports/records he prepared for AHF (SA) in relation to it? If any such documentation was prepared, is it available to be produced?

14. Does he have any information as to what was done with these funds after the deposit with AHF (SA)? I note, in this regard, that I have a copy of an affidavit from Al Haramain Islamic Foundation dated 3 May 2004 outlining the procedure utilized in general, but is there any other specific documentation on this issue I should be aware of? Did he make any report to Mr. Al-Fiki about the transfer/deposit of the funds and, if so, can he provide the details of the same?. Did he have any involvement in issuing a receipt to Mr. Al-Fiki? What did he believe the funds would be used for?

## IV    Relationships today with former officers/officials AHF (SA) or AHF (Oregon)

15. Does Mr. Al-Buthi maintain any relationships today with former officers/officials of AHF (SA), and if so what is the nature of the relationship? In particular does he have any relationship with Mr. Al Aqueel and if so, of what nature?

16. What is Mr. Al-Buthi's relationship with Mr. Seda today? Does he have a relationship with any other former or current officers or employees of AHF (Oregon) and if so what are the nature of those relationships?

17. Has Mr. Al-Buthi taken steps to distance himself from AHF Oregon? Would he be willing to do so?

## V    Miscellaneous

18. Can he provide details regarding his statement that the Government of Saudi Arabia has prevented him from travelling internationally?

19. Has he been involved in any other fundraising related to Chechnya personally, in the context of AHF or otherwise?

4

Law Offices of

# *Thomas H. Nelson*

Post Office Box 1211
Welches, OR  97067-1211
Telephone: 503.622.3262
Fax: 503.622.3562

**Thomas H. Nelson**                                                                                    **Oregon State Bar # 78315**
E-Mail:  nelson@thnelson.com                                                                       EIN # 93-1215520
Mobile: 503.709.6397

*Via US Post - Certified Mail and E-Mail Transmission*

February 16, 2012

Kimberly Prost
Ombudsperson
United Nations Security Council
Resolution 1267 Sanctions Committee
United Nations
New York, NY 10017

**Re: Petition of Soliman Al-Buthi for Delisting (Ref. No. QI.A.179.04)**

Dear Ombudsperson Prost:

I am enclosing Mr. Soliman Al-Buthi's Petition for Delisting. It consists of the Petition itself and four exhibits, the Declaration of Soliman Al-Buthi (which is accompanied by one exhibit), and the Declaration of Thomas H. Nelson (which is also accompanied by one exhibit). I am also transmitting by electronic mail Adobe Acrobat (.PDF) files of the Petition, Declarations, and exhibits.

Mr. Al-Buthi and I want to thank you for your past courtesies. Please let me know if you have any questions or if Mr. Al-Buthi or I can provide any further information.

Very truly yours,

Thomas H. Nelson

AHIF 4461

Thomas H. Nelson, Attorney at Law
PO Box 1211
Welches, OR 97067
United States of America
Tel: 503.709.6397
nelson@thnelson.com

# BEFORE THE UNITED NATIONS
# SECURITY COUNCIL RESOLUTION 1267 SANCTIONS COMMITTEE

| Soliman H.S. Al-Buthi (Ref. No. No. QI.A.179.04) | Petition for Delisting |
|---|---|

## I. Introduction

This is the second Petition for Delisting submitted by petitioner Soliman H.S. Al-Buthi ("Petitioner"), through his attorney Thomas H. Nelson of Welches, Oregon, United States of America, to the honorable United Nations Security Council Resolution 1267 Sanctions Committee ("Committee"). Like its predecessor, this Petition requests Petitioner's delisting from the "List of Individuals Belonging to or Associated with Al-Qaida Organization" ("1267 Committee List"). The initial petition was forwarded to the Committee on July 28, 2010, and Petitioner learned of its denial by the Committee through a letter to Petitioner dated September 1, 2011. Exhibit 1. This second Petition is being submitted because of recent substantial changes and events that affect the rationale for the denial of the initial Petition. This Petition is based on the facts asserted herein, the declarations of Soliman Al-Buthi and Thomas H. Nelson, and the exhibits accompanying this Petition and accompanying the two declarations, along with the evidence and arguments submitted in connection with Mr. Al-Buthi's initial petition.

PAGE 1 - PETITION FOR DELISTING

In order to minimize unnecessary duplication and repetition, Petitioner respectfully requests that all prior filings by Petitioner and all information previously gathered by the Ombudsperson in connection with the first petition be incorporated into the record of this second petition.

## II. The Denial of Petitioner's First Petition and Subsequent Events

Exhibit 1, the September 1, 2011, letter from the Ombudsperson, quotes the summary of the Committee's rationale for denial of Petitioner's first petition.  It states,

> The petitioner continues his appointment as a director of AHIF-Oregon. Even following AHIF-SA's and AHIF-Oregon's listings, the petitioner took no steps to distance himself from that entity.  The Committee infers from this, and other information contained in your report, his role and senior position in AHIF-Oregon, and the fact that AHIF-Oregon and several other AHIF branches worldwide are still included on the list of entities and thus considered to be associated with Al-Qaida, that he continues to be associated with Al-Qaida. The Committee has decided that in light of the totality of the circumstances, there is a reasonable basis to maintain the listing of the petitioner on the Al-Qaida Sanctions List given his role and behaviour with regard to AHIF.

Exhibit 1 at 7.

Much has changed since the filing of the initial petition, and still more since the release of the denial on September 1, 2011.  Those changes establish that Mr. Al-Buthi should be delisted.  First, Mr. Al-Buthi has formally resigned from AHIF Oregon and thus has completely disassociated himself with from any involvement with that organization. Second, a Federal District Court judge in Oregon, the Hon. Michael Hogan, in a criminal prosecution of Petitioner's co-defendant and former co-director of AHIF Oregon, held that the prosecution had failed to establish that the co-defendant had any links to terrorism (the prosecution had alleged that the co-defendants' transmission of funds for humanitarian relief in Chechnya during the Second Chechen War was intended to

AHIF 4463

support the Chechen mujahedeen). Third, a recent disclosure by WikiLeaks of a classified document from the American embassy in Riyadh regarding Mr. Al-Buthi is demonstrably riddled with errors, thus calling into question the reliability of other classified information upon which the United States' request for Mr. Al-Buthi's designation may have relied.

A.      Termination of Petitioner's Relationship with AHIF Oregon

The Committee denied Mr. Al-Buthi's delisting petition in large part because he remained a board member of AHIF Oregon, a U.S. based charity. He has now formally resigned, thus cutting all ties, even purely formal ones, to AHIF Oregon. Declaration of Soliman Al-Buthi ¶ 10. He resigned from AHIF Saudi Arabia in September 2002.  *Id.* ¶ 4. (AHIF Saudi Arabia itself went out of existence in 2005 and no longer exists). This is a material change in circumstances: Mr. Al-Buthi no longer has any ties to the entity that the Committee found to be the principal basis for his designation.

In addition, the Committee did not adequately consider the fact that Mr. Al-Buthi's prior connection with AHIF Oregon had been purely formal since September 2004, when the U.S. government froze AHIF Oregon's assets.  Since that time, AHIF Oregon has for all practical purposes a defunct entity; it can do nothing until it succeeds in lifting the freeze that the United States has imposed upon it. Declaration of Thomas H. Nelson ¶¶ 3-5. For more than seven years, AHIF Oregon has been unable to engage in any substantive activities whatsoever. *Id.*; Declaration of Soliman Al-Buthi ¶¶ 8, 9. Petitioner did not formally resign earlier (i) because he wished to maintain the status quo of AHIF Oregon for purposes of challenging its designation, (ii) because he was not put on

AHIF 4464

notice that his position was a cause of his listing, and (iii) because, after AHIF Oregon's assets were frozen, he took no actions as director. *Id.* ¶ 11.

In sum, Petitioner (i) has had no practical role in AHIF Oregon since 2004, (ii) resigned from AHIF Saudi Arabia in 2002, and (iii) now has no ties whatsoever with AHIF Oregon.[1]

B.    Judicial Finding of No Ties to Terrorism

The Committee's initial decision predated the conclusion of the federal trial of co-defendant Pirouz Sedaghaty (commonly known as "Pete Seda") late in 2011, and thus the Committee was unable to consider a critical fact: A ruling by Judge Hogan at the conclusion of Mr. Seda's trial held that a link to terrorism had not been proved. By way of background, although the prosecution did not allege terrorism in the indictment, after the jury verdict the prosecutors asserted that Mr. Seda's sentence should be "enhanced" (*i.e.*, increased) because the donation intended for humanitarian relief during the Second Chechen War was actually meant to support the Chechen mujahedeen. As is shown below, the only evidence the government offered that purported to link Mr. Seda with funding mujahedeen in Chechnya (which was the only basis for arguing for a terrorism enhancement) was demonstrably false.

As noted above, in February 2005, the United States Justice Department indicted Petitioner, co-defendant Pete Seda, and AHIF Oregon for activities relating to

---

[1] The undersigned is the sole remaining director of AHIF Oregon as well as being its Registered Agent, President, and Secretary. See Exhibit 1 to Declaration of Thomas H. Nelson. Like Petitioner's former situation, the undersigned's positions are purely formal and intended to keep the charity legally viable pending its challenges to its designation.

PAGE 4 - PETITION FOR DELISTING

transmission of a donation through AHIF Oregon to AHIF Saudi Arabia.[2] The Justice

Department shortly thereafter dismissed all charges against AHIF Oregon; they remain

dismissed today.  This left Petitioner and co-defendant Mr. Seda as the only remaining

defendants in the criminal action. Because the Kingdom of Saudi Arabia has prohibited

Petitioner from traveling internationally, he has been unable to return to the United

States to face the charges. The prosecution of Mr. Seda ended in a conviction and an

Amended Judgment issued by U.S. District Judge Michael Hogan on November 30,

2011. Because the evidence against Mr. Seda is the same evidence that would be used

for the prosecution of Petitioner, it is appropriate to discuss in detail some of the aspects

of the prosecution and sentencing of Mr. Seda.[3]

Although the indictments of Mr. Seda and Petitioner did not allege terrorism or

material support for terrorism, during the sentencing phase of Mr. Seda's trial the

prosecutors sought an "enhancement" to Mr. Seda's sentence that would have

increased his period of incarceration to over eight years.  To do so, the prosecutors

provided detailed testimony regarding both AHIF Saudi Arabia and the Chechen

mujahedeen during the Second Chechen War. At the conclusion of that testimony,

Judge Hogan explicitly concluded that the government had established no link between

Mr. Seda and terrorism and therefore orally from the bench rejected the requested

sentence enhancement. See Exhibit 2 (Associated Press report of sentencing hearing,

---

[2] In a discussion with one of the prosecutors in the case in late winter of 2005 the prosecutor admitted to the undersigned that the government lacked sufficient evidence even to indict Petitioner for terrorism and/or material support of terrorism.  Declaration of Thomas H. Nelson ¶ 6.

[3] The undersigned attended every day of the trial of Mr. Seda and is closely familiar with those proceedings.  Declaration of Thomas H. Nelson ¶ 7.

AHIF 4466

Sept. 27, 2011, *available at* http://cnsnews.com/news/article/islamic-charity-leader-sentenced-nearly-3-years-0).

Addressing the testimony during the trial itself, the only evidence the government even offered in an attempt to link co-defendant Mr. Seda to support for the Chechen mujahedeen was demonstrably false.  The focus of the case was transmission of donated funds through AHIF Oregon to AHIF Saudi Arabia for humanitarian aid to Chechen refugees, which transmission admittedly occurred during the winter of 1999-2000. The United States argued during trial that Mr. Seda had an intention to support the Chechen mujahedeen, but provided only one witness to support that allegation. That witness was Ms. Barbara Cabral who, along with her husband and others, made a pilgrimage to Mecca in March 1999. Ms. Cabral testified during trial Petitioner and Mr. Seda had hosted her and others during her pilgrimage; she further testified that immediately following the pilgrimage Mr. Seda solicited from her and others funds remaining from unused pilgrimage travel vouchers to support the Chechen mujahedeen. Ms. Cabral's testimony is attached as Exhibit 3; highlighting has been provided to the portions of her testimony that indicate that (i) the pilgrimage was in the spring of 1999, (ii) Petitioner hosted Ms. Cabral and others on the pilgrimage, and (iii) Mr. Seda solicited funds to support the Chechen mujahedeen immediately after completion of the pilgrimage. The obvious flaw in Ms. Cabral's testimony was that the Second Chechen War did not even begin until August 1999 at the earliest – at least four months *after* Mr. Seda's alleged solicitation to support the Chechen mujahedeen.[4] Consequently, as a

--------------------------------------

[4] See Council on Foreign Relations, *Chechen Terrorism (Russia, Chechnya, Separatist)*, available at http://www.cfr.org/terrorism/chechen-terrorism-russia-chechnya-separatist/p9181.

PAGE 6 - PETITION FOR DELISTING

AHIF 4467

matter of fact, her testimony necessarily had to be fabricated.

Ms. Cabral's testimony was discredited when the prosecutors were forced to disclose, after trial, (i) that two Federal Bureau of Investigation members of the prosecution team had paid Ms. Cabral and her husband $14,000 in cash before the trial began as compensation for being undercover informants against Mr. Seda, and (ii) that the prosecutors had failed to divulge those pre-trial payments to the defense attorneys as required by American law. These undisclosed pre-trial payments came to light only when an FBI agent assigned to the case sought additional post-trial compensation for Ms. Cabral to reward her for her trial testimony; at that point, the U.S. Attorney for Oregon (who apparently had not been informed of the pre-trial payments) objected, demanding that the pre-trail payments and the current post-trial request be divulged to the defense attorneys. Notwithstanding those pre-trial undisclosed payments, Judge Hogan denied a motion for new trial based on those payments. Docket Entry No. 570 (Aug. 10, 2011), *available at* https://ecf.ord.uscourts.gov/cgi-bin/DktRpt.pl?437928388358968-L_1_0-1.

Mr. Seda has appealed his conviction to the Court of Appeals for the Ninth Circuit and today is free pending the Ninth Circuit's decision on a motion that he remain free pending the resolution of his appeal.

C.    Untested Classified Evidence is Inherently Unreliable

A recently disclosed classified document from the United States embassy in Riyadh regarding Mr. Al-Buthi provides further support for his delisting request. This is because it is so riddled with factual errors that it calls into question the reliability of all classified evidence upon which Mr. Al-Buthi's listing request was based.

AHIF 4468

By way of background, the Treasury Department's initial September 2004 designation of Petitioner asserted that Petitioner had "direct links" to Osama bin Laden. That allegation was based, if not entirely, at least in substantial part upon a highly classified document that recounted illegally intercepted, privileged attorney-client telephone conversations between Petitioner and two of his American attorneys.[5]  This document was discussed in Petitioner's original petition. After AHIF Oregon challenged the Treasury Department's interpretation of these conversations in its litigation challenging its designation, the Treasury Department abandoned the "direct links" argument; Exhibit 4 is OFAC's February 6, 2008, "redesignation" letter that nowhere mentions links of any kind to Usama bin Laden; *see also*, Declaration of Thomas H. Nelson ¶ 8. OFAC's abandonment of the "direct links" argument suggests that classified information is not necessarily reliable.

More recently Petitioner has encountered a second classified document that likewise demonstrates that such information is indeed unreliable. That document is an October 6, 2006, cable from the United States Embassy in Riyadh that contains significant factual errors regarding Petitioner and his circumstances. That cable, with the topic of "Terrorism Finance," has been made available to the public through disclosures

---

[5] As noted in the first petition, challenges to the legality of the United States' interception of privileged attorney-client communications between Petitioner and his attorneys in the United States have been proceeding through the courts. The interceptions were challenged first on the United States District Court for the District of Oregon (*Al-Haramain Islamic Foundation, Inc., et al., v. Bush, et al.*), CIV 06-270-KI, which litigation was consolidated before United States District Court Judge Vaughn Walker in the Northern District of California as part of litigation challenging the United States' warrantless wiretapping under the Bush Administration. *See Al-Haramain Islamic Foundation, Inc., et al v. Bush et al*, No 3:07-cv-00109-VRW, available at https://ecf.cand.uscourts.gov/cgi-bin/iquery.pl?105711803071502-L_1_0-0-187994. On March 31, 2010, Judge Walker issue an Order in favor of AHIF Oregon and the two attorneys. *Id.,* Docket No. 115. Consequent to that Order, the United States was required to pay approximately $2,500,000 to compensate the individual plaintiffs and for plaintiffs' attorneys fees incurred in the litigation. *Id.*, Docket No. 135 (Dec. 22, 2010). The United States has appealed that judgment to the Court of Appeals for the Ninth Circuit, and the matter is presently awaiting oral argument by the parties.

AHIF 4469

by WikiLeaks. (WikiLeaks Doc. # 82200, attached as Exhibit 1 to Declaration of Soliman Al-Buthi.) Those errors are listed in paragraphs 12 and 13 of Mr. Al-Buthi's Declaration, and include demonstrably erroneous statements regarding (i) Petitioner's alleged role and function in his work for his employer, the City of Riyadh, (ii) that the Kingdom of Saudi Arabia's had confiscated Petitioner's travel documents (Petitioner has at all times been allowed to keep his travel documents), (iii) that the Kingdom of Saudi Arabia is paying for the schooling of his children (Petitioner's children have attended and do attend public schools), (iv) the Petitioner and his brother allegedly work in the "export-import business" (neither he nor any of his brothers is engaged in, or have been engaged in, any such work), (v) that his brother allegedly works as a textbook publisher (neither he nor any of his brothers is engaged in, or have been engaged in, textbook publishing), and (vi) that Kingdom of Saudi Arabia's allegedly has "control" over his children's education (it has no greater control over his children's education than it has over any other citizen who sends his/her children to public schools). The falsity of these six allegations can easily be demonstrated by even a cursory investigation. The overriding point is not that sometimes errors creep into classified documents; rather, the point is that, in the two instances in which Petitioner has had access to classified material regarding him (i.e., information in the highly classified document and the WikiLeaks document), the assertions in the documents were demonstrably wrong.  The Committee should consider this factor in determining the weight that it should give to the other classified material that may be provided to it.

AHIF 4470

## III. Conclusion

Three new developments that have occurred since the denial of the first petition establish a strong basis for removing Petitioner's name from the list. First, Petitioner has completely abandoned all connections with AHIF Oregon. Second, a federal court addressing the allegation of links to terrorism has found no basis for such allegations. Third, recently released classified material addressing Petitioner specifically has established the inherent unreliability of such material. For these reasons, Petitioner's name should be removed from the Committee's list.

## IV. Request for Relief

WHEREFORE, for the foregoing reasons Petitioner Soliman H.S. Al-Buthi respectfully requests that this Committee to take all steps necessary to remove Petitioner's name from this Committee's list of persons supporting Usama bin Laden.

DATED at Zigzag, Oregon, USA, this 16Tth day of February, 2012.

Respectfully submitted,

Thomas H. Nelson, Attorney at Law
Oregon State Bar No. 78315
Attorney for Petitioner Soliman H.S. Al-Buthi

PAGE 10 - PETITION FOR DELISTING

AHIF 4471

**UNITED NATIONS**    **NATIONS UNIES**

POSTAL ADDRESS-ADRESSE POSTALE: UNITED NATIONS, N.Y. 10017
CABLE  ADDRESS -ADRESSE TELEGRAPHIQUE:  UNATIONS NEWYORK

REFERENCE:  **OMBP/1267/2010/1/Al-Buthi, S.H.S.**                    1 September 2011

Mr. Soliman H.S. Al-Buthi
c/o Mr. Thomas Nelson
Attorney
Law Offices of Thomas H. Nelson & Associates
Box 1211, 24525 E. Welches Road
Welches, OR 97067-1211
Fax:  503-622-1430

## SUBJECT: <u>DELISTING REQUEST – SOLIMAN H.S. AL-BUTHI</u>

Dear Mr. Al-Buthi,

I write with reference to your request for delisting from the Consolidated List of the Security Council Al Qaida/Taliban Sanctions Committee[1]. This petition was forwarded to the Committee, to start the process in accordance with Annex II of resolution 1904(2009), on 28 July 2010. After an information gathering period of three months and a dialogue phase of four months, my Comprehensive Report to the Committee was submitted on 28 February 2011.

By letter dated 25 August 2011, the Committee has conveyed to me its decision to deny the delisting petition in your case, and thus to continue the listing. The Committee has set out the rationale for its decision, which I will outline in detail below.

In accordance with resolution 1989 (2011), drawing from my Comprehensive Report, I will describe the overall process and recount relevant factual information gathered, to the extent possible and necessary.

### Sources of Information

In this case I received information relevant to the listing from several States including the Designating State(s), the State of Nationality/Residence and others. I also obtained considerable information from court decisions of relevance to the listing, as well as non classified records arising from those decisions.

You have provided substantial information to me in this case, through the original petition and supplementary material supplied over the course of the dialogue phase. I also had a lengthy interview with you in Riyadh, Saudi Arabia in January of this year, during which additional information was submitted orally and in writing, including further documents.

---

[1] By virtue of resolutions 1988(2011) and 1989(2011), the regimes with respect to Al Qaida and the Taliban have been divided such that this listing is now under the regime for association to Al Qaida.

UNITED NATIONS    NATIONS UNIES    PAGE 2

**Summary of Information**

All of the information which I gathered from States or otherwise was conveyed to you in the course of the dialogue phase of the process, both in writing and during our meeting in Saudi Arabia in January 2011. I also sent a summary of the factual information in the case, prior to its inclusion in my Comprehensive Report and received comments on the same. As a result, I am satisfied that you are fully aware of the factual information gathered with respect to your listing.  I can advise that no additional factual information was included in the Comprehensive Report.

For that reason, I will provide only highlights of the factual information in this letter, concentrating in particular on the elements of the case which underlie the reasons for the Committee's decision to maintain the listing.

**Information from the State of Residence/Nationality**

Saudi Arabia - the State of residence and nationality - has provided information as to your current status in that State. The authorities of that State have also advised of relevant investigations conducted, which have revealed nothing which required any further action and, through which, they have discovered no information showing any links between you and Al Qaida.

**Information with respect to the Narrative Summary**

As you are aware, the Narrative Summary in this case reflects the basis for your inclusion in the Consolidated List. The premise is involvement with Al Haramain Islamic Foundation (hereafter referred to as "AHIF") during the period from 1997 until essentially 2002/2003. More specifically, what is relied upon is your role as a founder,  director and officer of the United States Branch of Al Haramain Islamic Foundation established in the State of Oregon ( "AHIF (Oregon)"), which is an entity listed by the Al Qaida Sanctions Committee since 2004. Service as the President of the Internet Committee of AHIF (SA) is also a factor in terms of your relationship to AHIF. Particular reference is made to involvement in a financial transaction in March 2000 through which a donation of  $150,000, destined for Chechnya, was moved by you from AHIF (Oregon) to the head office of AHIF located in the Kingdom of Saudi Arabia (hereafter referred to as "AHIF (SA)"). Based on the general activities of AHIF, it is believed these funds may have ultimately gone to support Al-Qaida activities in Chechnya, Russian Federation.

The information gathered, including statements and material which you provided, essentially confirms these statements. At the same time, the information gathering process revealed additional details and new information, which in some instances clarified certain actions, roles or events or altered the inferences which could be drawn from the same. I will touch on that information in the summary below.

### Role with AHIF (SA)

Information was gathered which clarified your status and involvement with AHIF (SA). Your contribution was as a volunteer and you did not serve as either a director or officer of the organization. In summary, your role was limited to participation in the distribution of educational material, assistance with the establishment and running of the English website and service as President of the Internet Committee. With respect to the latter functions, information obtained, including a recent statement from Mr. Abdul-Quadir the former "webmaster", showed that the Internet Committee as a whole had general oversight for the website and you had some supervisory responsibilities. However, your role in day to day management and operation of the AHIF (SA) website was limited.

### Role with AHIF (Oregon)

With respect to AHIF (Oregon), it is undisputed that you were a founder, director and officer of the company. The detailed information gathered shows that you were involved in major transactions, such as the purchase of property, had bank signing authority and the power to enter into contracts on its behalf. You were concerned particularly in the educational activities of the organization and in "troubleshooting" with respect to problems that would arise. On a number of occasions you transported funds from AHIF (SA) to AHIF (Oregon) and on one occasion you carried monies in the reverse direction.

However, Mr. Seda, who was resident in Oregon, was the day to day manager. Throughout the relevant period, you continued to reside and work in Saudi Arabia. As a result, you did not have a role in every day activities nor did you oversee any regular financial transactions or take part in the preparation of tax returns. Thus, except in the case of the transactions in which you are directly implicated or have acknowledged, the information gathered fails to show knowledge on your part of information held at AHIF (Oregon) or of particular transactions which may have been conducted from there.

### March 2000 Transfer of Funds

Much detailed information was gathered about the March 2000 transfer of $150,000 from AHIF (Oregon) to AHIF (SA) including new information from the donor of the funds. The highlights of the same are as follows.

In early 2000, Dr. Mahmoud Talaat Hasan El-Fiki, Ph.D, an Egyptian engineer and businessman who had seen an AHIF flyer on the subject of the Chechen humanitarian crisis, decided to make a donation of $150,000 to AHIF "to the cause of supporting widows, orphans and refugees in Chechnya." In response to an e-mail which he sent to AHIF (SA), he was provided with two bank accounts as alternatives for submission of the donation. The first option was an AHIF (Oregon) account at the Bank of America in Ashland, Oregon and the second option was an AHIF (SA) account in Riyadh, Saudi Arabia. Dr. El-Fiki chose the first option because the bank was better known and he had more confidence in the United States banking system at the time. He made arrangements through his bank in the United Kingdom of Great Britain and Northern Ireland for the transfer of $150,000 to the Bank of America account in Ashland, Oregon. None of the information gathered shows any relationship

UNITED NATIONS     NATIONS UNIES       PAGE 4

between Dr. El-Fiki and you or between Dr. El-Fiki and AHIF prior to, or since, this donation.

Seeking confirmation and a receipt for his donation, Dr. El-Fiki sent follow up e-mails to AHIF in February and March 2000. He subsequently received confirmation of the transfer from his bank in England and later he was provided with a receipt from AHIF (SA).

Having seen Mr. El-Fiki's email, you decided to bring the funds back from AHIF (Oregon) for deposit to the AHIF (SA) account, to make sure that the donation was used as requested by the donor (Zakat for use in Chechnya). To that end, when you travelled to Ashland, Oregon, in March 2000 as planned, you obtained traveller's cheques in the amount of $130,000 and $21,000 in the form of a cashier's cheque from the relevant Bank of America branch. You carried these back with you to Saudi Arabia. You ultimately deposited the funds with AHIF (SA). There are multiple records, created in the course of this transaction, which confirm the details outlined above and which were openly available and have been maintained. Several of these were provided to me by you. These include receipts from the relevant banks, as well as from AHIF (SA). You and Mr. Seda also signed an agreement related to this transaction.

According to summarized confidential information provided by US authorities in the course of the Seda trial, Sami 'Abd Al 'Aziz Al-Sanad, who worked for AHIF (SA) in 2000/2001, was responsible for providing currency from AHIF, including this specific donation, to a representative of Muhammad Al Sayf to be smuggled into Chechnya, Russian Federation. Muhammad Al Sayf is said to have been the principal representative of Al-Qaida in the North Caucasus. He died in November 2005.

Mr. Al-Sanad claims the monies were destined for needy Chechen families. You have advised me, and it is clear from the information, that you were aware that these funds were destined for Chechnya, Russian Federation. However, you have indicated that you did not know any of the specifics as to how the funds were to be transported there or that they would be used for other than humanitarian efforts. No information to the contrary has been gathered.

### Bank transfer from AHIF (Oregon)

Some information was obtained which indicated a link between a bank account of AHIF (Oregon) and funding of armed groups in Chechnya, Russian Federation. This information, however, related to a bank account and was not specific to any person or officer, with no details and no time period indicated. You have denied any knowledge of financing of this nature and no information has been gathered to show involvement on your part in any such transfer.

### Other Information

All of this information was summarized in detail in the Comprehensive Report. The Report also examined the issue of videos, digital photos and other material seized at the Ashland property, albeit no information was obtained to demonstrate any knowledge on your

part of that material. The Comprehensive Report also detailed your associations with Sami Al Hussayen, Ali al Timimi, and Aqeel Abdulaziz Aqeel Al-Aqeel and your involvement in the 9/11 litigation.

### Time Lapse/Future Involvement

The Comprehensive Report highlighted that the acts and information relied upon in support of the listing date from the period 1997-2003 at the latest, with the movement of funds having occurred in 2000. Based on the information gathered, it also noted that your involvement with AHIF (SA) ended in 2002 and substantive involvement with AHIF (Oregon) ceased in 2003. The fact that you have remained as a director of AHIF (Oregon) and the reasons you provided for that continuing role, were also detailed in the Comprehensive Report. The Committee was also advised of your statement that you would not become re-involved with AHIF(Oregon) (should it be delisted) or in any form of financing or fundraising activity.

### Provision of Information

As indicated, all of the information which I gathered was put to you in the course of dialogue phase of the process, such that I am satisfied that you were made aware of the case against you. All of the information and explanations which you provided in response to that case, and more generally, were included in the Comprehensive Report which was presented to the Committee.

### Analysis, Observations and Principal Arguments

In the Comprehensive Report, I analysed the information gathered, provided observations on the same – including my view as to the sufficiency of the information - and set out for the Committee the principal arguments in this case. In doing so, I applied the standard and approach of whether "there is sufficient information to provide a reasonable and credible basis for the listing presently"[2]

As the Report was prepared in conformity with resolution 1904(2009), no recommendation was provided to the Committee, in contrast to the current practice with respect to resolution 1989(2011).

### Rationale for Committee Decision and Related Information

In the communication to me, the Committee has made some general statements as to its approach to designations under the sanctions regime, which are of specific relevance to your case.

---

[2] See Approach To And Standard For Analysis, Observations And Recommendations And Principal Arguments which is available on my website: http://www.un.org/en/sc/ombudsperson



Notably, they have emphasized that evidence of "specific intent" is not required for making designations or maintaining them as this would be inappropriate for a preventative regime not reliant on criminal standards. At the same time, the Committee indicates that the objective of the measures is not to address unintentional or inadvertent association with Al Qaida by an individual.

I understand this to mean that it is not necessary for the information gathered to show intent on the part of an individual who carries out an act or acts which provides support or assistance or financing to Al Qaida. However, information which supports that the individual did not know of or intend the resulting support or assistance or which shows that the act was not deliberate, will be of relevance in assessing the listing. The Committee goes on to note, however, that it will consider the totality of the circumstances of each case and "typically will not consider an action unintentional or inadvertent if an individual (or entity in which the individual holds a position of responsibility) has a period of ongoing association with Al-Qaida."

The Committee has also highlighted that individuals serving as officers of a group, undertaking or entity listed based on its association with Al Qaida can be considered as "associated with," Al Qaida irrespective of whether that group, undertaking or entity is exclusively dedicated to terrorism.  In the Committee's view, "requiring evidence of personal involvement by an officer in the impugned activity of a listed group, undertaking or entity would allow individuals to avoid sanctions by setting up, for example, charity front organizations through which to pass money to carry out terrorist attacks.  The ability to make designations based on information which shows an inferred association with Al-Qaida is crucial to ensuring the measures remain an effective tool in combating terrorism."

In the context of the facts of your case, it is my view that these statements highlight the significant weight which the Committee attaches to your involvement, particularly with AHIF (Oregon), in the assessment of this delisting petition.

The Committee has further noted as important "the assessment of the likelihood of the petitioner's continued or renewed association with Al Qaida, as well as the threat of the petitioner engaging in proscribed behaviour in the future."

The Committee went on to outline the basic facts and circumstances of this case notably:
- your role as a founder of AHIF (Oregon);
- your service as Head of AHIF (SA) internet committee;
- your ongoing responsibility, at the relevant time, for moving money between AHIF (SA) and AHIF (Oregon);
- movement of the 150,000 to AHIF (SA), with those funds being later used in Chechnya, Russian Federation, combined with the fact that at that time AHIF as a world wide entity, was providing support to Al Qaida-linked mujahedeen;
- the fact that various branches and directors of AHIF worldwide have been the subject of action by the Committee for their worldwide support of terrorism and terrorists including Al Qaida.

UNITED NATIONS    NATIONS UNIES                    PAGE 7

The Committee goes on to provide its reasons for decision as follows:

"The petitioner continues his appointment as a director of AHIF-Oregon. Even following AHIF-SA's and AHIF-Oregon's listings[3], the petitioner took no steps to distance himself from that entity. The Committee infers from this, and other information contained in your report, his role and senior position in AHIF-Oregon, and the fact that AHIF-Oregon and several other AHIF branches worldwide are still included on the list of entities and thus considered to be associated with Al-Qaida, that he continues to be associated with Al-Qaida. The Committee has decided that in light of the totality of the circumstances, there is a reasonable basis to maintain the listing of the petitioner on the Al-Qaida Sanctions List given his role and behaviour with regard to AHIF." (footnote added)

Should you or counsel require any additional information or have any questions with respect to this matter, do not hesitate to contact me.

Yours sincerely,

Kimberly Prost
Ombudsperson

---

[3] I note that this statement is inaccurate in so far as AHIF (SA) was never listed by the Security Council Al Qaida/Taliban Sanctions Committee.



# DEPARTMENT OF THE TREASURY
### WASHINGTON, D.C. 20220

Lynne Bernabei, Esq.                                          VIA FACSIMILE
The Bernabei Law Firm, PLLC
1775 T Street, NW
Washington, DC 20009-7124

Thomas Nelson, Esq.                                          FEB 06 2008
Box 1211
24525 E. Welches Rd.
Welches, OR 97067

### Re: Al Haramain Islamic Foundation, Inc.-Oregon and Soliman al-Buthe

Dear Ms. Bernabei and Mr. Nelson:

I write in response to Ms. Bernabei's letter of January 4, 2008, and in furtherance of our letter to you of November 14, 2007, which provided notice that OFAC was considering redesignating Al Haramain Islamic Foundation, Inc.-Oregon ("AHIF-Oregon") and Soliman al-Buthe. As set forth below, after a thorough investigation and review of the evidence in the record regarding AHIF-Oregon and Mr. al-Buthe, OFAC has determined that AHIF-Oregon and Mr. al-Buthe continue to meet the criteria for designation under Executive Order 13224 ("Blocking Property and Prohibiting Transactions with Persons who Commit, Threaten to Commit, or Support Terrorism") ("E.O. 13224") and, based on an updated and revised Administrative Record, including submissions by your clients, they are hereby redesignated. Accordingly, AHIF-Oregon's and Mr. al-Buthe's pending requests for delisting are denied. Separately, please see the last section of this letter for an update concerning OFAC policy on the use of blocked funds for the payment of legal expenses.

Redesignation

In reaching the decision to redesignate, OFAC has considered the following: (1) all communications between OFAC and your offices or other counsel on behalf of AHIF-Oregon and Mr. al-Buthe, including submissions made both prior to and following the original designation in September 2004; (2) a revised version of the initial designation memorandum and supporting exhibits; and (3) additional unclassified, privileged, and classified information. As you have requested, all of the submissions you have made on behalf of AHIF-Oregon and Mr. al-Buthe have been incorporated into the Administrative Record. The additional unclassified material OFAC has obtained and reviewed in response to AHIF-Oregon's petition for reconsideration (in addition to the unclassified material upon which the original designation was based) has been provided to you previously and will also be available to you in the course of the litigation associated with this matter.

Your arguments related to why AHIF-Oregon should not be designated pursuant to E.O. 13224 primarily consist of the following:

- AHIF-Oregon was an independent organization that was involved exclusively in charitable activities and was not involved in the support of terrorism, Specially Designated Global Terrorists, or other alleged supporters of terrorism;
- AHIF-Oregon funds transferred to AHIF in Saudi Arabia for use in Chechnya were not used to support terrorism, but rather in support of AHIF/Saudi Joint Relief Committee activities in Chechnya that were approved of by the Russian Government;
- AHIF-Oregon's distribution of Islamic literature was constitutionally protected activity and not an appropriate basis for designation.

After considering your arguments and submissions, and reviewing the whole Administrative Record, I have determined that the Administrative Record compiled by OFAC provides reason to believe that AHIF-Oregon meets the criteria for designation pursuant to E.O. 13224 on the following bases: (1) being owned or controlled by SDGTs Aqeel al-Aqil and al-Buthe, (2) acting for or on behalf of SDGTs al-Aqil and al-Buthe, and (3) supporting and operating as a branch office of AHIF, an international charity that employed its branch offices to provide financial, material, and other services and support to al Qaida and other SDGTs.[1] Among the information relating to AHIF-Oregon supporting the redesignation is the fact that two of the founding directors of AHIF-Oregon were — and remain — Specially Designated Global Terrorists, namely Mr. al-Buthe, who was the Treasurer of AHIF-Oregon, and Mr. al-Aqil, who was the founding President of both AHIF-Oregon[2] and AHIF in Saudi Arabia. Both classified and unclassified reporting indicates that the AHIF parent organization in Saudi Arabia, and in particular Mr. al-Aqil himself, maintained strong and direct control over activities of the branches. Mr. al-Aqil himself confirmed in a 2002 interview that the AHIF parent organization in Saudi Arabia maintained "tight control" over its branches.

Substantial classified and limited unclassified reporting, including the Staff Report to the National Commission on Terrorist Attacks Upon the United States: Monograph on Terrorist Financing that Ms. Bernabei provided to OFAC in 2004 for consideration, reveals the extent and nature of AHIF's longstanding and significant support, through its international branches, of SDGTs and terrorist activity around the world, including al Qaeda and the mujahideen in Chechnya, and dating back as far as the 1998 bombings of the U.S. Embassies in Kenya and Tanzania. AHIF-Oregon was an

---

[1] AHIF-Oregon's distribution of Islamic literature is not a basis upon which AHIF-Oregon has been redesignated, nor was it a basis for the designation in September 2004.

[2] As set forth in Ms. Bernabei's correspondence of August 4, 2004, Mr. al-Aqil and another senior al Haramain official, Mansur al-Kadi, purportedly submitted formal resignations from the AHIF-Oregon board in 2003. Nevertheless, classified and unclassified information indicates that Mr. al-Aqil retained effective control over the activities of all branches until his departure from AHIF in 2004, and according to some reports, even following his purported departure from the parent organization.

AHIF 4485

active arm of this worldwide organization, and its operations, including its direct
provision of funding to AHIF in Saudi Arabia,[3] enabled the global AHIF to continue
supporting terrorist activities.  Finally, your arguments regarding AHIF activities in
Chechnya were considered, but rejected in light of the classified and unclassified
administrative record.

### Additional Issues Raised by AHIF-Oregon

I would also like to respond to several concerns raised in Ms. Bernabei's January
4, 2008 letter.[4]  First, Ms. Bernabei indicates that there is no basis in E.O. 13224 or the
applicable regulations for a redesignation.  A redesignation is, in essence, a process
whereby OFAC updates and supersedes its original designation on the basis of a revised
administrative record.  OFAC undertakes the redesignation process pursuant to the same
standards as apply to any designation action under E.O. 13224.  Specifically, OFAC
analyzed the applicability of designation criteria set forth in section 1 of the E.O. based
on all information currently available to it.  OFAC also provided AHIF-Oregon notice of
the pending determination and allowed AHIF-Oregon to provide any additional
information it wished OFAC to consider.  In the end, this redesignation has provided
more process for the benefit of AHIF-Oregon than would have been provided were
OFAC simply to have amended the original designation record administratively, which,
as Ms. Bernabei points out, the OFAC regulations provide for.

In sum, we are confident that the redesignation process --- particularly when
considered in light of the extent of materials provided to you by OFAC during the
original designation process, as well as the willingness of OFAC to accept numerous
submissions from AHIF-Oregon for consideration and incorporation into the
administrative record — has provided AHIF-Oregon with a constitutionally sound level
of due process, as several courts have found in analogous circumstances.  *See Holy Land
Found. v. Ashcroft*, 219 F. Supp. 2d 57, 77 (D.D.C. 2002), *aff'd* 333 F.3d 156, 163 (D.C.
Cir. 2003); *Islamic American Relief Agency v. Unidentified FBI Agents*, 394 F. Supp. 2d
34, 49 (D.D.C. 2005), *aff'd in part and remanded*, 477 F.3d 728 (D.C. Cir. 2007); *Global
Relief Found., Inc. v. O'Neill*, 207 F. Supp. 2d 779, 804 (N.D. Ill. 2002), *aff'd*, 315 F.3d
748 (7th Cir. 2002).  Of particular note, the Holy Land Foundation raised claims nearly
identical to those in Ms. Bernabei's letter when it challenged OFAC's redesignation.  The
court rejected these arguments and upheld the redesignation.  *See Holy Land Found.*, 219
F. Supp. 2d at 76, n.29.

Second, the January 4 letter also raises concerns about the unclassified, non-
privileged materials provided to you.  Specifically Ms. Bernabei asserts that not every
exhibit pertains to AHIF-Oregon or AHIF in Saudi Arabia.  OFAC is entitled to consider
the full panoply of relevant information available to it, and all the information provided

---

[3]  Both Ms. Bernabei's correspondence of September 21, 2005, and the Complaint filed challenging AHIF-
Oregon's designation, admit such direct funding of AHIF in Saudi Arabia. *See. e.g.*, Compl. ¶ 63.
[4]  As this matter is currently in litigation, this letter only touches upon several of the matters raised in the
January 4 correspondence.  OFAC reserves the right to provide responses in the litigation to any arguments
raised by AHIF-Oregon in the litigation.

3

to you either relates directly to AHIF-Oregon or AHIF or provides context for such other information. *Cf. Holy Land Found.*, 333 F.3d at 162 ("it is clear that the government may decide to designate an entity based on a broad range of evidence, including intelligence data and hearsay declarations"). Moreover, OFAC is aware of the concerns presented by any media reporting, foreign and domestic, and considers the reliability of such reporting when relying upon such information.

In many cases, the media reporting provided to AHIF-Oregon has been used in conjunction with classified materials. OFAC's use of classified information is provided for by statute and has been upheld by numerous courts. *See* 50 U.S.C. § 1702(c); *Global Relief Found. v. O'Neill*, 207 F. Supp. 2d 779, 791 (N.D. Ill.), *aff'd*, 315 F.3d 748, 754 (7th Cir. 2002); *Islamic American Relief Agency v. Gonzales*, 394 F. Supp. 2d 34, 45 (D.D.C. 2005), *aff'd* 477 F.3d 728 (D.C. Cir. 2007); *Holy Land Found. v. Ashcroft*, 333 F.3d 156, 162 (D.C. Cir. 2003).

Third, OFAC and the Department of Justice requested that each agency that provided classified information used by OFAC in the redesignation process review that information to determine whether it remained appropriately classified. After several months of close coordination with multiple agencies, OFAC has been informed that, as of the date of this letter, all classified material used in the final Administrative Record remains properly classified.

In sum, as stated above, AHIF-Oregon and Mr. al-Buthe are thus redesignated, and all pending requests for delisting are hereby denied. This constitutes final agency action on this matter. A copy of the unclassified version of the evidentiary memorandum will follow shortly under separate cover.

### Use of Blocked Funds for Legal Expenses

Regarding the use of blocked funds for payment of legal expenses, OFAC has recently adopted a policy to authorize the release of a limited amount of blocked funds for the payment of legal fees and costs under certain circumstances. Specifically, the policy would allow a limited amount of blocked funds to be released for the payment of legal fees and certain costs incurred in seeking administrative reconsideration or judicial review of the designation of a U.S. person pursuant to the Global Terrorism Sanctions Regulations, 31 C.F.R. Part 594. Accordingly, the policy would potentially apply to your representation of AHIF-Oregon.

In order to complete the processing of your license request(s) pursuant to this policy, OFAC requests the following information:

- The hourly rate and number of hours billed per attorney for legal services directly related to the request for administrative reconsideration of the designation and the legal challenge thereto, divided by each phase of the case (i.e., administrative filings to OFAC and proceedings at the district court);

4

AHIF 4487

- An itemized statement and description of costs incurred in seeking administrative reconsideration or judicial review of AHIF-Oregon's designation;
- A certification, signed under penalty of perjury, that AHIF-Oregon has no assets, property, or economic resources of any type outside the United States, and does not have access to any AHIF funds worldwide; and
- A certification that to the best of your knowledge the blocked funds do not represent the property interest of another or serve as security for other obligations of AHIF-Oregon.

OFAC will evaluate your request(s) for the release of blocked funds for payment of attorney fees and costs incurred in seeking administrative reconsideration and judicial review of AHIF-Oregon's designation pursuant to the policy upon receipt of the information requested.

Sincerely,

Adam J. Szubin
Director
Office of Foreign Assets Control

AHIF 4488
TOTAL P.05

## BEFORE THE UNITED NATIONS
## SECURITY COUNCIL RESOLUTION 1267 SANCTIONS COMMITTEE

| | |
|---|---|
| Soliman H.S. Al-Buthi (Ref. No. No. QI.A.179.04) | Declaration of Soliman Al-Buthi |

Upon being placed under oath, Soliman H.S. Al-Buthi deposes and says:

1.    I am a Saudi Arabian national currently residing in Riyadh, Saudi Arabia.

2.    I am employed in the position of General Director of the Environmental Health Department for the Municipality of Riyadh. In that position it is my duty to protect the citizens of the City of Riyadh from environmental threats resulting from intentional, negligent, and natural forces. I report directly to the Mayor of the City of Riyadh and supervise more than 700 municipal employees.

3.    Beginning in approximately 1998 I acted as unpaid volunteer liaison between Al-Haramain Islamic Foundation (Saudi Arabia) ("AHIF Saudi Arabia") and Al-Haramain Islamic Foundation, Inc., a separate Islamic charity operating under Oregon law ("AHIF Oregon").

4.    For personal reasons I resigned my participation and position with AHIF Saudi Arabia in September 2002. I retained my position on the board of directors of AHIF Oregon.

5.    On September 9, 2004, OFAC issued an administrative declaration that I am a "specially designated global terrorist" ("SDGT"). At the same time OFAC issued a similar declaration that AHIF Oregon was a SDGT. OFAC did not state whether I was being designated for my relationship to AHIF Oregon, whether AHIF Oregon was being designated for its relationship to me, or whether we were both designated for the same or independent reasons.

Page 1 – Declaration of Soliman Al-Buthi

AHIF 4489

6.    On September 24, 2004, this Committee listed me as an individual associated with Al-Qaida organization and AHIF Oregon as an entity associated with Al-Qaida organization. The Committee did not state the evidentiary basis for its actions, or any of the specific allegations underlying its action. Like OFAC, it did not state whether I was being designated for my relationship to AHIF Oregon, whether AHIF Oregon was being designated for its relationship to me, or whether we were both designated for the same or independent reasons. The current entry on this Committee's list reads as follows:

> QI.A.179.04. *Name: 1: SULIMAN 2: HAMD 3: SULEIMAN 4: AL-BUTHE
> Title: na Designation: na DOB: ██████ 1961 POB: Cairo, Egypt *Good
> quality a.k.a.: Soliman H.S. Al Buthi Low quality a.k.a.: na *Nationality:
> Saudi Arabia Passport no.: a) ████ 9614 b) Passport Number ████ 660
> issued on 5 May 2001 and expired on 11 Mar. 2006 National
> identification no.: na Address: na *Listed on: 28 Sept. 2004 (amended on
> 23 Apr. 2007)
> *Other information: na.

7.    I do not now have, nor have I ever had, any relationship whatsoever, direct or indirect, with Al-Qaida, the Taliban, or with Usama bin Laden. Moreover, I have never supported mujahedeen in Chechnya or anywhere else in the world.

8.    On February 18, 2004, OFAC froze the assets of AHIF Oregon pending an investigation into its activities. OFAC took no action whatsoever regarding me at that time. On September 9, 2004, OFAC extended the freeze of AHIF Oregon's assets and designated the organization, making it illegal to engage in any transaction with it or on its behalf. AHIF Oregon challenged its designation in court, and that challenge is still pending. Since the initial freeze in February 2004, however, AHIF Oregon has been effectively shut down, unable to operate in any manner as a result of the OFAC restrictions.

9.    Because the assets of AHIF Oregon have been frozen and the organization has effectively been shut down since February 2004 I have not been

Page 2 – Declaration of Soliman Al-Buthi

able to take any action whatsoever to further the activities or aims of AHIF Oregon. Thus, while I remained as a director of the AHIF Oregon while the organization and I challenged the validity of our designations, I had no operational role and engaged in no activities on the organization's behalf.

10.     I did not resign earlier because I sought to maintain the status quo while AHIF Oregon and I challenged our listings and designations; because I was never put on notice that my board membership was a cause of my listing; and because my involvement once the organization was subject to a freeze was purely formalistic, in that I could do and did nothing in furtherance of the organization's activities.  Now that the Committee's response to my prior petition has put me on notice that my listing is due to my continuing relationship with AHIF Oregon, I have severed even the purely formalistic relationship I maintained until this time.

11.     I have now formally resigned as a member of the board of directors of AHIF Oregon.  Consequently, except for my supporting legal challenges to AHIF Oregon's designation, in addition to having taken no actions on behalf of AHIF Oregon since February 2004, I now have no ties with or relationship with AHIF Oregon whatsoever.  As the Ombudsperson's September 1, 2011 letter to me in connection with my earlier delisting request stated that a principal reason for the denial of my delisting was that I continued to be a board member of AHIF Oregon, and AHIF Oregon is listed, that material fact has now changed.

12.     In reviewing the classified files released publicly by Wikileaks since the filing of my initial petition, I discovered a document discussing me.  That document is an October 6, 2006, cable from the American Embassy in Riyadh to the United States Treasury Department in Washington D.C., and is attached as Exhibit 1 to this Declaration.  As I have never been informed as to the basis for my

Page 3 – Declaration of Soliman Al-Buthi

listing by the Committee, I cannot know what evidence the Committee has considered, if any. But to the extent that the allegations in this document are in any way relevant to my listing, I would like to note that this document contains significant and material misstatements of objective facts. Specifically, in two short paragraphs Exhibit 1 makes seven false claims regarding me:

(i)    That I have "control of [Riyadh Municipality's Department of Gardens and Beautification's] finances," Exhibit 1 at ¶ 2,

(ii)    That the government of the Kingdom of Saudi Arabia required me "to turn in seven passports," *id.*,

(iii)    That the government of the Kingdom of Saudi Arabia "is paying for the schooling of [my] three children, *id.*,"

(iv)    That "[i]n addition to working for [the Saudi Arabia Government], Al-Buthe has an export-import business," *id.*,

(v)    That I am engaged in that export-import business "with his brother," *id.*,

(vi)    That my brother "is a textbook publisher in the KSA," *id.*, and

(vii)    That the government of the Kingdom of Saudi Arabia has "control over [my] children's education." *Id.* ¶ 3.

13.    Each of the seven statements of fact quoted above is in error:

(i)    I never had control over the finances of the Department of Gardens and Beautification,

(ii)    I never had seven passports (I have had only one valid passport at any one time), and the government of the Kingdom of Saudi Arabia never required me to turn in any passport or other travel document;

Page 4 – Declaration of Soliman Al-Buthi



indeed, I today have in my possession the Saudi Arabian passports I have ever had, all of which have expired;

(iii)   My four (not three) children all attend or attended public schools and thus the government never was "paying for the schooling of [my] three children,"

(iv)   I never have had and do not now have an "export-import business,"

(v)   None of my brothers has had and does not now have an "export-import business,"

(vi)   None of my siblings is a "text-book publisher" or, for that matter, a publisher of any other written materials, and

(vii)   The government of the Kingdom of Saudi Arabia never has had and does not now have "control over [my] children's education."

14.   In short, to the extent that the Committee declined my delisting because of my position as a member of the board of directors of AHIF Oregon, I no longer hold such a position.  Moreover, as made clear above, except for participating in the legal challenges to AHIF Oregon's designation, for all practical purposes I have done nothing on AHIF Oregon's behalf since February 2004, nearly eight years ago.  Accordingly, I respectfully request that the Committee consider delisting me in light of this new information and these materially changed circumstances.


DATED at Riyadh, Kingdom of Saudi Arabia, this 9th day of December 2011.


Soliman H.S. Al-Buthi

Page 5 – Declaration of Soliman Al-Buthi

AHIF 4493

| | |
|---|---|
| **Reference id** | `06RIYADH83` aka Wikileaks id #82200  ? |
| **Subject** | TERRORISM FINANCE: UNSC 1267 DESIGNEE, SULIMAN AL-BUTHE, FEATURED IN LOCAL PRESS, STILL ON SAG PAYROLL |
| **Origin** | Embassy Riyadh (Saudi Arabia) |
| **Cable time** | Tue, 17 Oct 2006 15:34 UTC |
| **Classification** | SECRET//NOFORN |
| **Source** | http://wikileaks.org/cable/2006/10/06RIYADH8314.html |
| **Referenced by** | 06RIYADH8415, 06RIYADH8416, 06RIYADH8858 |
| **History** | First published on Thu, 1 Sep 2011 23:24 UTC |

VZCZCXRO1845 OO RUEHDE DE RUEHRH #8314 2901534 ZNY SSSSS ZZH O 171534Z OCT 06 FM AMEMBASSY
RIYADH TO RUEATRS/DEPT OF TREASURY WASHDC IMMEDIATE RUEHC/SECSTATE WASHDC IMMEDIATE 2719 INFO
RHEHNSC/NSC WASHDC PRIORITY RHMCSUU/FBI WASHINGTON DC PRIORITY RUEAIIA/CIA WASHDC PRIORITY
RUEHZM/GULF COOPERATION COUNCIL COLLECTIVE RUEHJI/AMCONSUL JEDDAH 7830
Hide header S E C R E T RIYADH 008314 SIPDIS NOFORN SIPDIS E.O. 12958: DECL: 10/17/2031 TAGS:
EFIN *[Financial and Monetary Affairs]*, PTER *[Terrorists and Terrorism]*, KTFN *[Terrorism Finance Traffic]*,
ETTC *[Trade and Technology Controls]*, PREL *[External Political Relations]*, SA *[Saudi Arabia]*
SUBJECT: TERRORISM FINANCE: UNSC 1267 DESIGNEE, SULIMAN AL-BUTHE, FEATURED IN
LOCAL PRESS, STILL ON SAG PAYROLL Classified By: Counselor for Economic
Affairs Robert Silverman for reas ons 1.4 (b), (d), and (g). ¶1. (U) United
Nations Security Council Resolution (UNSCR) 1267 Designee, Suliman H. Al-
Buthe (aka Solaiman Al-Buthi) was featured in an article published in the
Saudi Gazette, a mainstream Saudi publication censored by the Saudi Arabian
Government (SAG). Al-Buthe, the Assistant General Manager for the Department
of Gardens and Beautification, Riyadh Municipality, boasted about Saudi's
three-day Eid celebration, which includes a circus and fireworks. ¶2. (C) Al-
Buthe, who was designated in 2004 by the UNSC 1267 Committee for ties to the
Taliban and Al'Qaida through the Al Haramain Islamic Foundation, has worked
for the Riyadh Municipality, Department of Gardens and Beautification, for
over twenty years and has control of its finances. Following his 1267
Designation, the SAG has promoted Al-Buthe twice. Currently Al-Buthe oversees
a SAR 30 million (USD $8 million) project for a sporting complex in Riyadh.
In 2004, the SAG enforced UNSCR 1267 sanctions by freezing Al-Buthe's assets
and forcing him to turn in seven passports; he has been unable to leave the
Kingdom of Saudi Arabia (KSA) since this time. Due to these restrictions, the
SAG pays his salary in cash and is paying for the schooling of his three
children in Riyadh. In addition to working for the SAG, Al-Buthe has an
import/export business in Riyadh with his brother, who is a textbook
publisher in the KSA. ¶3. (S/NF) Comment. According to intelligence sources,
the SAG may have provided at least two radical clerics with government
employment to keep a watchful eye on them; the SAG's employment of Al-Buthe
and its control over his children's education may be a way for the SAG to
monitor Al-Buthe. However, while the SAG has complied with the minimum
sanctions imposed by UNSCR 1267, their continued comfortable employment of
this 1267 designee, specifically giving him budgetary responsibilities, is a
troubling indicator of the seriousness with which the SAG takes the
designation - at least in this case. Post plans on raising this case in our
post-Eid meetings with counterterrorism officials. End comment. OBERWETTER



Exhibit 1



**UNITED NATIONS**          **NATIONS UNIES**

POSTAL ADDRESS-ADRESSE POSTALE: UNITED NATIONS, N.Y. 10017
CABLE  ADDRESS -ADRESSE TELEGRAPHIQUE:  UNATIONS NEWYORK

30 August 2013

Mr. Thomas Nelson
PO Box 1211
Welches, Oregon 97067
nelson@thnelson.com

Dear Mr. Nelson,

I write further to my communication to you on 10 February 2013, through which I advised that the Security Council Al-Qaida Sanctions Committee had decided to remove Mr. Suliman Hamd Suleiman Al-Buthe's name from the Al-Qaida Sanctions List. In a letter dated 29 August 2013, I received a formal communication from the Chairman of the Security Council Al-Qaida Sanctions Committee, confirming the delisting and providing the reasons of the Committee with respect to the same.

The Committee reached its decision after close consideration of the Comprehensive Report which I prepared and submitted in this case. In that report, I reviewed, analysed and provided observations on the gathered information and set out the principal arguments in the case. I also made a recommendation with respect to delisting.

After review of the Ombudsperson's Comprehensive Report, the Committee noted the following points:

The Committee underlined that all decisions to remove names from its Al-Qaida Sanctions List are made on a case by case basis, in light of the criteria for designation set out in paragraph 4 of Security Council resolution 1989 (2011) and reaffirmed in paragraph 2 of resolution 2083 (2012). The Committee noted that, in common with all delisting decisions, this decision to remove a name from the Al-Qaida Sanctions List was a *de novo* decision which looked at the circumstances, as they stood at the time of the delisting request, to determine the appropriateness of a continued listing. The Committee emphasized that the decision to delist is separate from and does not reflect on the original decision to list

Should you have any questions or require further information or assistance with respect to this matter, please do not hesitate to contact me.

Yours Sincerely,

Kimberly Prost
Ombudsperson

AHIF 4518

# BEFORE THE UNITED NATIONS
## SECURITY COUNCIL RESOLUTION 1267 SANCTIONS COMMITTEE

| Soliman H.S. Al-Buthi (Ref. No. No. QI.A.179.04) | Declaration of Soliman Al-Buthi |
| --- | --- |

Upon being placed under oath, Soliman H.S. Al-Buthi deposes and says:

1.      I am a Saudi Arabian national currently residing in Riyadh, Saudi Arabia.

2.      I am employed in the position of General Director of the Environmental Health Department for the Municipality of Riyadh. In that position it is my duty to protect the citizens of the City of Riyadh from environmental threats resulting from intentional, negligent, and natural forces. I report directly to the Mayor of the City of Riyadh and supervise more than 700 municipal employees.

3.      Beginning in approximately 1998 I acted as unpaid volunteer liaison between Al-Haramain Islamic Foundation (Saudi Arabia) ("AHIF Saudi Arabia") and Al-Haramain Islamic Foundation, Inc., a separate Islamic charity operating under Oregon law ("AHIF Oregon").

4.      For personal reasons I resigned my participation and position with AHIF Saudi Arabia in September 2002. I retained my position on the board of directors of AHIF Oregon.

5.      On September 9, 2004, OFAC issued an administrative declaration that I am a "specially designated global terrorist" ("SDGT"). At the same time OFAC issued a similar declaration that AHIF Oregon was a SDGT. OFAC did not state whether I was being designated for my relationship to AHIF Oregon, whether AHIF Oregon was being designated for its relationship to me, or whether we were both designated for the same or independent reasons.

Page 1 – Declaration of Soliman Al-Buthi

6.      On September 24, 2004, this Committee listed me as an individual associated with Al-Qaida organization and AHIF Oregon as an entity associated with Al-Qaida organization. The Committee did not state the evidentiary basis for its actions, or any of the specific allegations underlying its action. Like OFAC, it did not state whether I was being designated for my relationship to AHIF Oregon, whether AHIF Oregon was being designated for its relationship to me, or whether we were both designated for the same or independent reasons. The current entry on this Committee's list reads as follows:

QI.A.179.04. *Name: 1: SULIMAN 2: HAMD 3: SULEIMAN 4: AL-BUTHE Title: na Designation: na DOB:        1961 POB: Cairo, Egypt *Good quality a.k.a.: Soliman H.S. Al Buthi Low quality a.k.a.: na *Nationality: Saudi Arabia Passport no.: a)    9614 b) Passport Number     6660 issued on 5 May 2001 and expired on 11 Mar. 2006 National identification no.: na Address: na *Listed on: 28 Sept. 2004 (amended on 23 Apr. 2007)
*Other information: na.

7.      I do not now have, nor have I ever had, any relationship whatsoever, direct or indirect, with Al-Qaida, the Taliban, or with Usama bin Laden. Moreover, I have never supported mujahedeen in Chechnya or anywhere else in the world.

8.      On February 18, 2004, OFAC froze the assets of AHIF Oregon pending an investigation into its activities. OFAC took no action whatsoever regarding me at that time. On September 9, 2004, OFAC extended the freeze of AHIF Oregon's assets and designated the organization, making it illegal to engage in any transaction with it or on its behalf. AHIF Oregon challenged its designation in court, and that challenge is still pending. Since the initial freeze in February 2004, however, AHIF Oregon has been effectively shut down, unable to operate in any manner as a result of the OFAC restrictions.

9.      Because the assets of AHIF Oregon have been frozen and the organization has effectively been shut down since February 2004 I have not been

Page 2 – Declaration of Soliman Al-Buthi

AHIF 4653

able to take any action whatsoever to further the activities or aims of AHIF Oregon. Thus, while I remained as a director of the AHIF Oregon while the organization and I challenged the validity of our designations, I had no operational role and engaged in no activities on the organization's behalf.

10.    I did not resign earlier because I sought to maintain the status quo while AHIF Oregon and I challenged our listings and designations; because I was never put on notice that my board membership was a cause of my listing; and because my involvement once the organization was subject to a freeze was purely formalistic, in that I could do and did nothing in furtherance of the organization's activities. Now that the Committee's response to my prior petition has put me on notice that my listing is due to my continuing relationship with AHIF Oregon, I have severed even the purely formalistic relationship I maintained until this time.

11.    I have now formally resigned as a member of the board of directors of AHIF Oregon. Consequently, except for my supporting legal challenges to AHIF Oregon's designation, in addition to having taken no actions on behalf of AHIF Oregon since February 2004, I now have no ties with or relationship with AHIF Oregon whatsoever. As the Ombudsperson's September 1, 2011 letter to me in connection with my earlier delisting request stated that a principal reason for the denial of my delisting was that I continued to be a board member of AHIF Oregon, and AHIF Oregon is listed, that material fact has now changed.

12.    In reviewing the classified files released publicly by Wikileaks since the filing of my initial petition, I discovered a document discussing me. That document is an October 6, 2006, cable from the American Embassy in Riyadh to the United States Treasury Department in Washington D.C., and is attached as Exhibit 1 to this Declaration. As I have never been informed as to the basis for my

Page 3 – Declaration of Soliman Al-Buthi

listing by the Committee, I cannot know what evidence the Committee has considered, if any. But to the extent that the allegations in this document are in any way relevant to my listing, I would like to note that this document contains significant and material misstatements of objective facts. Specifically, in two short paragraphs Exhibit 1 makes seven false claims regarding me:

(i)     That I have "control of [Riyadh Municipality's Department of Gardens and Beautification's] finances," Exhibit 1 at ¶ 2,

(ii)    That the government of the Kingdom of Saudi Arabia required me "to turn in seven passports," *id.*,

(iii)   That the government of the Kingdom of Saudi Arabia "is paying for the schooling of [my] three children, *id.*,"

(iv)    That "[i]n addition to working for [the Saudi Arabia Government], Al-Buthe has an export-import business," *id.*,

(v)     That I am engaged in that export-import business "with his brother," *id.*,

(vi)    That my brother "is a textbook publisher in the KSA," *id.*, and

(vii)   That the government of the Kingdom of Saudi Arabia has "control over [my] children's education." *Id.* ¶ 3.

13.     Each of the seven statements of fact quoted above is in error:

(i)     I never had control over the finances of the Department of Gardens and Beautification,

(ii)    I never had seven passports (I have had only one valid passport at any one time), and the government of the Kingdom of Saudi Arabia never required me to turn in any passport or other travel document;



AHIF 4655

indeed, I today have in my possession the Saudi Arabian passports I have ever had, all of which have expired;

(iii)    My four (not three) children all attend or attended public schools and thus the government never was "paying for the schooling of [my] three children,"

(iv)    I never have had and do not now have an "export-import business,"

(v)    None of my brothers has had and does not now have an "export-import business,"

(vi)    None of my siblings is a "text-book publisher" or, for that matter, a publisher of any other written materials, and

(vii)    The government of the Kingdom of Saudi Arabia never has had and does not now have "control over [my] children's education."

14. In short, to the extent that the Committee declined my delisting because of my position as a member of the board of directors of AHIF Oregon, I no longer hold such a position. Moreover, as made clear above, except for participating in the legal challenges to AHIF Oregon's designation, for all practical purposes I have done nothing on AHIF Oregon's behalf since February 2004, nearly eight years ago. Accordingly, I respectfully request that the Committee consider delisting me in light of this new information and these materially changed circumstances.


DATED at Riyadh, Kingdom of Saudi Arabia, this 9th day of December 2011.


Soliman H.S. Al-Buthi

Page 5 – Declaration of Soliman Al-Buthi

| | |
|---|---|
| **Reference id** | 06RIYADH83 ............ aka Wikileaks id #82200 ? |
| **Subject** | TERRORISM FINANCE: UNSC 1267 DESIGNEE, SULIMAN AL-BUTHE, FEATURED IN LOCAL PRESS, STILL ON SAG PAYROLL |
| **Origin** | Embassy Riyadh (Saudi Arabia) |
| **Cable time** | Tue, 17 Oct 2006 15:34 UTC |
| **Classification** | SECRET//NOFORN |
| **Source** | http://wikileaks.org/cable/2006/10/06RIYADH8314.html |
| **Referenced by** | 06RIYADH8415, 06RIYADH8416, 06RIYADH8858 |
| **History** | First published on Thu, 1 Sep 2011 23:24 UTC |

VZCZCXRO1845 OO RUEHDE DE RUEHRH #8314 2901534 ZNY SSSSS ZZH O 171534Z OCT 06 FM AMEMBASSY RIYADH TO RUEATRS/DEPT OF TREASURY WASHDC IMMEDIATE RUEHC/SECSTATE WASHDC IMMEDIATE 2719 INFO RHEHNSC/NSC WASHDC PRIORITY RHMCSUU/FBI WASHINGTON DC PRIORITY RUEAIIA/CIA WASHDC PRIORITY RUEHZM/GULF COOPERATION COUNCIL COLLECTIVE RUEHJI/AMCONSUL JEDDAH 7830 Hide header S E C R E T RIYADH 008314 SIPDIS NOFORN SIPDIS E.O. 12958: DECL: 10/17/2031 TAGS: EFIN *[Financial and Monetary Affairs]*, PTER *[Terrorists and Terrorism]*, KTFN *[Terrorism Finance Traffic]*, ETTC *[Trade and Technology Controls]*, PREL *[External Political Relations]*, SA *[Saudi Arabia]* SUBJECT: TERRORISM FINANCE: UNSC 1267 DESIGNEE, SULIMAN AL-BUTHE, FEATURED IN LOCAL PRESS, STILL ON SAG PAYROLL Classified By: Counselor for Economic Affairs Robert Silverman for reas ons 1.4 (b), (d), and (g). ¶1. (U) United Nations Security Council Resolution (UNSCR) 1267 Designee, Suliman H. Al-Buthe (aka Solaiman Al-Buthi) was featured in an article published in the Saudi Gazette, a mainstream Saudi publication censored by the Saudi Arabian Government (SAG). Al-Buthe, the Assistant General Manager for the Department of Gardens and Beautification, Riyadh Municipality, boasted about Saudi's three-day Eid celebration, which includes a circus and fireworks. ¶2. (C) Al-Buthe, who was designated in 2004 by the UNSC 1267 Committee for ties to the Taliban and Al'Qaida through the Al Haramain Islamic Foundation, has worked for the Riyadh Municipality, Department of Gardens and Beautification, for over twenty years and has control of its finances. Following his 1267 Designation, the SAG has promoted Al-Buthe twice. Currently Al-Buthe oversees a SAR 30 million (USD $8 million) project for a sporting complex in Riyadh. In 2004, the SAG enforced UNSCR 1267 sanctions by freezing Al-Buthe's assets and forcing him to turn in seven passports; he has been unable to leave the Kingdom of Saudi Arabia (KSA) since this time. Due to these restrictions, the SAG pays his salary in cash and is paying for the schooling of his three children in Riyadh. In addition to working for the SAG, Al-Buthe has an import/export business in Riyadh with his brother, who is a textbook publisher in the KSA. ¶3. (S/NF) Comment. According to intelligence sources, the SAG may have provided at least two radical clerics with government employment to keep a watchful eye on them; the SAG's employment of Al-Buthe and its control over his children's education may be a way for the SAG to monitor Al-Buthe. However, while the SAG has complied with the minimum sanctions imposed by UNSCR 1267, their continued comfortable employment of this 1267 designee, specifically giving him budgetary responsibilities, is a troubling indicator of the seriousness with which the SAG takes the designation - at least in this case. Post plans on raising this case in our post-Eid meetings with counterterrorism officials. End comment. OBERWETTER

**Exhibit 1**



# United Nations    Nations Unies

HEADQUARTERS • SIEGE     NEW YORK, NY 10017

TEL : 1 (212) 963 1234 • FAX: 1 (212) 963 4879

REFERENCE:  SCA/2/13 (3)

**[GENERIC VERSION – INDIVIDUAL COPIES WILL BE FORWARDED TO PERMANENT MISSIONS TO THE UNITED NATIONS IN NEW YORK]**

The Chairman of the Security Council Committee pursuant to resolutions 1267 (1999) and 1989 (2011) concerning Al-Qaida and associated individuals and entities presents his compliments to the Permanent Representatives and Observers to the United Nations and wishes to convey the following:

On **11 February 2013**, the entry specified below was **deleted** from the Al-Qaida Sanctions List. The entry was deleted after the Committee concluded its consideration of a de-listing request submitted through the Ombudsperson established pursuant to Security Council resolution 1904 (2009), and of the Comprehensive Report of the Ombudsperson on this de-listing request. The assets freeze, travel ban and arms embargo set out in paragraph 1 of Security Council resolution 2083 (2012) adopted under Chapter VII of the Charter of the United Nations accordingly no longer apply to this entry.

### Removed from Section A. Individuals associated with Al-Qaida

**QI.A.179.04. Name:** 1: SULIMAN 2: HAMD 3: SULEIMAN 4: AL-BUTHE

**Name (original script):** حمد سليمان البطحي سليمان

**Title:** na **Designation:** na **DOB:** ▮▮▮▮. 1961  **POB:** Cairo, Egypt  **Good quality a.k.a.: a)** Soliman H.S. Al Buthi **b)** Sulayman Hamad Sulayman Al Batha  **Low quality a.k.a.:** na  **Nationality:** Saudi Arabian  **Passport no.: a)** Saudi Arabia passport number ▮▮▮9614  **b)** Saudi Arabia passport number ▮▮▮6660, issued on 5 May 2001, expired on 11 Mar. 2006  **National identification no.:** na  **Address:** Riyadh, Saudi Arabia  **Listed on:** 28 Sep. 2004 (amended on 23 Apr. 2007, 13 Dec. 2011)  **Other information:** General Director of the Environmental Health Department of the Municipality of Riyadh, Saudi Arabia (as at Feb. 2010). Review pursuant to Security Council resolution 1822 (2008) was concluded on 25 May 2010.

The names of individuals and entities removed from the Al-Qaida Sanctions List pursuant to a decision by the Committee may be found in the 'Press Releases' section on the Committee's website. Other information about de-listing may be found on the

Committee's website at: http://www.un.org/sc/committees/1267/delisting.shtml.

To obtain a fully updated version of the List of individuals and entities subject to the sanctions measures, Member States are encouraged to consult, on a regular basis, the Committee's website at the following URL: http://www.un.org/sc/committees/1267/aq_sanctions_list.shtml. The Al-Qaida Sanctions List is available in HTML, PDF and XML format.

In accordance with paragraph 19 of resolution 1526 (2004), the Committee's Secretariat automatically conveys updates of the Al-Qaida Sanctions List to States, regional and sub-regional organizations by e-mail shortly following the postings of such updates on the Committee's website. Member States are invited to submit any updated or new contact information for this purpose to the Secretariat by e-mail to SC-1267-Committee@un.org or fax +1 212 963 1300/+1 212 963 3778. The Committee encourages all States to allow implementation of updates of the Al-Qaida Sanctions based on e-mails, soft-copy notices, or website postings.

The Committee's Al-Qaida Sanctions List is updated regularly on the basis of relevant information provided by Member States and international and regional organizations. This is the third update of the List in 2013.

11 February 2013

AHIF 4660



**DEPARTMENT OF THE TREASURY**
WASHINGTON, D.C. 20220

Case Nos. SDGT-573a; SDGT-788                                    APR  9 2007

Thomas H. Nelson, Esquire
Law Offices of Thomas H. Nelson & Associates
Box 1211
24525 E. Welches Road
Welches, OR  97067

Dear Mr. Nelson:

This responds to the licensing matters raised in your letters of January 23, 2007, February 10, 2007, February 20, 2007, February 27, 2007 and February 28, 2007 to the Office of Foreign Assets Control ("OFAC") on behalf of Al-Haramain Islamic Foundation, Inc. ("AHIF") and Soliman H.S. Al-Buthe. The other matters raised in your letters will be addressed separately.

You will find enclosed License No. SDGT-573a, authorizing your firm to receive payment for legal fees and reimbursement of incurred expenses for the provision to AHIF of legal services authorized by general license in § 594.506 of the Global Terrorism Sanctions Regulations, 31 C.F.R. Part 594 (the "Regulations").  Also enclosed is License No. SDGT-788, authorizing your firm to provide certain services not covered by the general license to Mr. Al-Buthe, and to receive payment for providing those services as well as generally licensed services to Mr. Al-Buthe, as described in your letters.  Please note that this is not a retroactive license.  Also, please note that the licenses now require reports with respect to the source of funds for the payment of legal fees in matters involving the Regulations.  You will find this reporting requirement in Section IV (b) of the License.

You also ask that the licenses cover payment for legal services provided to AHIF by J. Ashlee Albies and to Mr. Al-Buthe by Zaha Hassan. As noted above, the general license set forth at § 594.506 of the Regulations authorizes U.S. persons to provide the stated legal services without obtaining a specific license from OFAC.  However, Ms. Albies must submit a separate application to OFAC before she may receive payment for providing such services to AHIF, unless she is an employee of your firm.  Ms. Hassan must submit a separate application to OFAC before she may provide services not authorized by the general license or receive payment if she is not an employee of your firm.

Finally, please note Section III(b) of each license, which cautions that the authorizations in the licenses apply only to laws or regulations administered by OFAC, and then only as specifically set forth therein, and should not be interpreted to excuse you or your clients from compliance with any other laws, regulations, rulings or orders which may apply, or from civil or criminal liability for violation of any such rules.

                                    Sincerely,

                                    Barbara C. Hammerle

                                    Barbara C. Hammerle
                                    Acting Director

Enclosures