# Exhibit H

# AGREEMENT

WHEREAS, on or about October 26, 2001, Ferhad Erdogen executed a Bill of Sale of Midway Networks, Incorporated (hereinafter "Midway") to Datapact, Incorporated (hereinafter "Datapact");

AND WHEREAS, Datapact rejects the purchase of Stock in Midway, and the purchase of Midway;

AND WHEREAS, the execution of the Bill of Sale dated October 26, 2001, was executed by Ferhad Erdogen as a result of a misunderstanding as to the intent of the parties to buy and sell only the assets of Midway to Datapact;

AND WHEREAS, the Bill of Sale dated October 26, 2001, was not executed by a representative of Midway, but only by Mr. Erdogen as an individual, and nto signed by a representative of Datapact.

**IT IS HEREBY MUTUALLY AGREEE:**

The Agreement to Sell executed by Ferhad Erdogen dated October 26, 2001, is not accepted by Datapact, and is not effective as a sale agreement to the extent that it is a Sale Agreement. It is rescinded.

**IN WITNESS WHEREOF,** this Agreement is signed November 13, 2001.

| | |
|---|---|
| FERHAD ERDOGAN | DATA PACT, INCORPORATED |
| MIDWAY NETWORKS, INCORPATED | |
| By: FERHAD ERDOGAN, PRES. (Print Name) | By: [illegible] SEDA (Print Name) |
| Title: PRESIDENT | Title: SECRATARY |

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD/FM), U.S. District Court for the Southern District of New York.

# *AGREEMENT FOR SALE AND PURCHASE OF BUSINESS ASSETS FROM MIDWAY NETWORKS INCORPORATED TO DATAPACT INCORPORATED,*

# *AND RECAPTURE OF SHARES BY MIDWAY NETWORKS INCORPORATED FROM DATAPACT INCORPORATED*

**DATE:** **October 25, 2001**

**PARTIES:** **Midway Networks Incorporated (Midway) and Ferhad Erdogen (Ferhad)**

**1000 Benson Way, Suite 101**
**Ashland, OR 97520**

**"Sellers"**

**Datapact, Incorporated (Datapact)**

**"Buyer"**

**RECITALS:**

A. Seller is a corporation engaged in operating a Computer and Internet Services Business which has heretofore been known as Midway Networks Incorporated. Sellers principal place of business for this activity is Jackson County, Oregon. Sellers own and maintain inventory, tools, equipment, fixtures, specialized and general hand and motorized tools.

B. Buyer desires to acquire substantially all of the assets, (including cash on hand), used or useful, or intended to be used, in the operation of Sellers' business, and Sellers desire to sell such assets to Buyer.

C. Buyer desires to release and Sellers desire to recapture 500 shares of Midway.

**AGREEMENT:**

**1. Assets Purchased; No Liabilities Assumed**

**1.1 Assets Purchased.** Sellers agree to sell to Buyer and Buyer agrees to purchase from Sellers, upon assets referenced in Recitial B above, including, but not limited to the following (the "Assets"):



CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD/FM), U.S. District Court for the Southern District of New York.

**1.1.1** All tools, equipment, fixtures, and specialized and general hand and motorized tools.

**1.1.2** All office equipment, office supplies, manuals, catalogs, sales literature, files, records, patient lists, furniture and fixtures, together with any replacement thereof.

**1.1.3** All inventories of any kind including supplies, together with any replacements thereof or additions thereto, but excluding inventory disposed of in the ordinary course of Sellers' business prior to the closing date.

**1.1.4** All licenses and rights, all property and equipment leases, other contracts of supply or sales, including all customer lists, sales and supply contracts.

**1.1.5** All of Sellers' rights under repair contracts, verbal or written, sales orders, chattels, and contracts of advertising and marketing to which Seller is a party.

**1.1.6** Sellers' name and good will; including trade names, trade secrets, trademarks; the right to use existing telephone numbers, post office box, and all advertising of said business or its assets.

**1.1.7** Accounts receivable for services completed prior to closing.

**1.1.8** No liabilities are assumed.

2. **Excluded Assets.** None

3. **Purchase Price for Assets Including Inventories.** The purchase price for the assets to be conveyed shall be the sum of $10,000, plus accounts receivable as determined by subparagraph (d) below:

(a) Equipment and tools:
(b) Goodwill
(c) Inventory:
(d) Net Accounts Receivable shall be determined as of close of business October 25, 2001. Net accounts Receivable shall mean the "net accounts receivable" figure produced by the computer report generated in the normal course of business by MidwayNetworks.

4. **Payments of Purchase Price:** The price for the assets shall be paid as follows:

$10,000 on October ____, 2001

5. **Adjustments.** The operation of Sellers' business and income and expenses attributable thereto up to the close of business on the day before the closing date shall be for the account of Sellers and thereafter for the account of Buyer. Expenses, including but not limited to, utilities, personal property taxes, rents, real property taxes, wages, payroll taxes and fringe benefits of employees of Sellers, and any income item received for future services or at a future cost to Buyer shall be prorated between



CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD/FM), U.S. District Court for the Southern District of New York.

FPDUS0015647

Sellers and Buyer as of the close of business on October ____, 2001, the proration to be made and paid, insofar as reasonably possible, on the closing date, with settlement of any remaining items to be made within thirty (30) days following the closing date. Prorations shall be paid in cash.

6. **Other Agreements.** At closing, the Sellers shall execute and deliver to Buyer the following agreements:

6.1 Bill of Sale to all non-titled personal property and intangibles sold and purchased.

6.2 Proper documents of conveyance of all titled equipment and personal property. If necessary or convenient, Sellers shall deliver original titles or proper affidavits acceptable to the title authorities to transfer title.

6.3 Proper documents of transfer and conveyance of all necessary permits, licenses and authorizations.

6.4 Security Agreement, Exhibit "A".

6.5 UCC-1 Financing Statement to be placed in escrow.

6.6 UCC-3 Termination Statement to be placed in escrow.

6.7 As of the closing date, Sellers will terminate all of its employees not having employment agreements transferable to Buyer, and will pay each employee all wages, commissions and accrued vacation pay earned up to the time of termination, including overtime pay.

6.8 Buyer shall transfer and Seller shall recapture 500 shares of Midway at no cost. Sellers shall dissolve Midway within five (5) days of this Agreement. Buyers hereby resign from any position held at Midway.

7. **Sellers' Representations and Warranties.** Sellers represent and warrant to Buyer as follows:

7.1 **Business Existence.** Sellers are now and on the closing date will be a corporation in good standing under the laws of the State of Oregon and doing business under the current and valid assumed business name of ________________. Sellers have all requisite power and authority to own and operate the Assets, as the case may be, and to carry on its business as it is now being conducted.

7.2 **Authorization.** The execution, delivery and performance of this Agreement is authorized and approved by the Sellers and there is no third party, corporate, governmental or individual, whose consent or authorization is required for Sellers to execute this Agreement and perform all obligations hereunder.



CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD/FM), U.S. District Court for the Southern District of New York.

7.3 **Title to Assets.** Sellers hold good and marketable title to the Assets, free and clear of restrictions or conditions to transfer, or assignment, and free and clear of liens, pledges, charges or encumbrances; save and except those security interests of public record, if any, all of which will be satisfied and discharged at time of close.

7.4 **Non-Cancelable Contracts.** At the time of closing, there will be no undisclosed or non-cancelable material leases, employment contracts, contracts for services or maintenance and other similar contracts existing or relating to or connected with the operation of Sellers' business.

7.5 **Compliance with Codes and Requisitions.** Sellers have no knowledge that any equipment, tool, furniture, fixtures or asset herein sold violates any provisions of any applicable building code, fire regulation, building restriction or other ordinance, order, statute or regulation.

8. **Risk of Loss.** The risk of loss, damage or destruction to any of the equipment, inventory or other personal property to be conveyed to Buyer under this Agreement shall be borne by Sellers to the time of closing, and by Buyer thereafter.

9. **Indemnification.** Sellers hereby agree to fully indemnify and hold Buyer harmless from and against any and all claims, liabilities and obligations of every kind and description, contingent or otherwise, arising out of or related to the operation of Sellers' business prior to the close of business on the day of closing, except for claims, liabilities and obligations of Sellers expressly assumed by Buyer in writing under this Agreement.

Buyer hereby agrees to fully indemnify Sellers and hold Sellers harmless from and against any and all claims, liabilities and obligations of every kind and description, contingent or otherwise, arising out of or related to the operation of the business following the closing of this transaction. This indemnity shall include, but not be limited to, general business liability, liability arising from condition of equipment or premises, and operation of the business by Buyer.

10. **Closing.** This Agreement shall be closed on the ______ day of October, 2001.

10.2 **Obligations of Buyer at Closing.** At the closing and concurrently with the performance by Sellers of its obligations, Buyer shall deliver to Sellers the Following:

10.2.1 A check in the amount specified in Section 4.2 of this Agreement.

11. **Miscellaneous.**

11.1 **Notices.** Each notice from one to the other party to this Agreement shall be sufficient if served personally or given by U.S. registered or certified mail, addressed to the other party at their address, or as said address may be changed by written notice to the other given pursuant to this paragraph. Reasonable notice, when notice is required, shall be deemed to be delivered three (3) days from date of mailing.



CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD/FM), U.S. District Court for the Southern District of New York.

**11.2 Attorney Fees:** In the event of any litigation between the parties to declare or enforce any provision of this Agreement, the prevailing party or parties shall be entitled to recover from the losing party or parties, in addition to any other recovery and costs, reasonable attorney fees incurred in such litigation, in both the trial and in all appellate courts.

**11.3 Integration.** This Agreement embodies the entire agreement of the parties hereto. There are no promises, expectations, terms, conditions or obligations other than those contained herein. This Agreement supersedes all prior communications, representations or agreements, verbal or written, between the parties hereto.

**IN WITNESS WHEREOF,** this Agreement is signed in three original counterparts this _____ day of ________________, 2001.

FERHAD ERDOGAN

MIDWAY NETWORKS, INCORPATED
By: FERHAD ERDOGAN
**(Print Name)**
Title: PRES.

**"SELLERS"**

DATA PACT, INCORPORATED
By: ________________
**(Print Name)**
Title: ________________

**"BUYER"**



CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD/FM), U.S. District Court for the Southern District of New York.

8-14-01

I received $32,000 from Pete Seda ([illegible]) for all the final payments of the sale of half the shares of Midway Networks, Inc..

Ferhad Erdogan, President
Midway Networks, Inc.

[signature]

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD/FM), U.S. District Court for the Southern District of New York.

**Received from Ferhad 1/29/2002:**

Viewsonic 17" monitor A75f VALUE $100

Zonet 16 port switch (SNzfs3016-021120000256) VALUE $20

UPS: CyberPower 500 VA (CP 500A) VALUE 0

HP Scanjet 4200C (no power supply) VALUE 0

Rachet crimp tool. VALUE 0

Floppy drive VALUE $5

Books-
Java in a nutshell
Java examples in a nutshell
Redhat Linux 7 Server

Noted: "FHE Server," formerly in care of Ferhad, already on premises, and now considered property of Datapact.

[signature]

Ferhad Erdogan

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD/FM), U.S. District Court for the Southern District of New York.

**Received from Ferhad 1/29/2002:**

Panasonic KX-TM100B Answering Machine — Pete just PAID FOR it I CANT UNDRESTAD WHY HE TOOK it

Computer: downtown.Vertexgroup Machine JUNK VALUE $5

[signature]

Ferhad Erdogan

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD/FM), U.S. District Court for the Southern District of New York.

Purchase of all assets of Midway Networks Inc. by Datapact Inc.

I Ferhad Erdogan, 50% stock owner, C.E.O., and President of Midway Networks agree to sell the remaining 50% of Midway Network stock and all assets that are under my or Midway Network Inc.'s name to Datapact Inc. for the sum of $10,000.00. As of now, Datapact is 100% owner of Midway Networks.

[signature]
Signature
Ferhad Erdogan

10-26-05
Date

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD/FM), U.S. District Court for the Southern District of New York.

Purchase of all assets of Midway Networks Inc. by Datapact Inc.

I Ferhad Erdogan, 50% stock owner, C.E.O., and President of Midway Networks agree to sell the remaining 50% of Midway Network stock and all assets that are under my or Midway Network Inc.'s name to Datapact Inc. for the sum of $10,000.00. As of now, Datapact is 100% owner of Midway Networks.

[signature]
Signature
Ferhad Erdogan

10-26-08
Date

CONFIDENTIAL: This document is subject to a Protective Order regarding confidential information in 03 MDL 1570 (GBD/FM), U.S. District Court for the Southern District of New York.