**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| In re Terrorist Attacks on September 11, 2001 | 03-md-1570 (GBD)(SN) ECF Case |
|---|---|

This document relates to: *All Actions*

---

## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY OF BRIAN JENKINS AND JONATHAN WINER

---

Jodi Westbrook Flowers
Robert T. Haefele
Donald A. Migliori
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29465
Tel.: (843) 216-9184
Email: rhaefele@motleyrice.com
*For the Plaintiffs' Exec. Committees*

Sean P. Carter
J. Scott Tarbutton
COZEN O'CONNOR
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, Pennsylvania 19103
Tel.: (215) 665-2105
Email: scarter1@cozen.com
*For the Plaintiffs' Exec. Committees*

James Kreindler
Andrew J. Maloney, III
KREINDLER & KREINDLER LLP
485 Lexington Avenue, 28th Fl
New York, NY 10017
Tel: (212) 973-3438
Email: amaloney@kreindler.com
*For the Plaintiffs' Exec. Committees*

January 14, 2022

### Table of Contents

**Contents**

PRELIMINARY STATEMENT ...........................................................................................1

I.   THE PECs' EXPERTS HAVE THE REQUISITE QUALIFICATIONS TO
OPINE ON THE RELEVANT MATTERS OUTLINED IN THEIR REPORTS .............2

    a.  Jonathan Winer's Career Experience Qualifies Him as an Expert.........................3

    b.  Brian Michael Jenkins is Qualified to Offer Expert Testimony on the Issues
Outlined in his Report ....................................................................................12

II.  THE EXPERTS' OPINIONS ARE RELEVANT AND WILL AID THE TRIER
OF FACT ..........................................................................................................13

    a.  Winer's opinions ...........................................................................................13

    b.  Jenkins' Opinions .........................................................................................15

III. THE EXPERTS DO NOT OFFER IMPERMISSIBLE TESTIMONY AS TO
INTENT, MOTIVE, OR STATE OF MIND ..........................................................17

    a.  Winer .............................................................................................................18

    b.  Jenkins ..........................................................................................................20

IV. METHODOLOGY AND SOURCES CONSIDERED ..............................................20

    a.  Methodology ..................................................................................................21

    b.  Plaintiffs' Experts' Methodologies are Reliable, Reliably Applied, and Valid under
the *Daubert* Factors .......................................................................................22

       i.  Winer ......................................................................................................22

       ii.  Jenkins ...................................................................................................26

    c.  Sufficiency of the Factual Predicate and Inadmissible Hearsay ..........................27

    d.  Plaintiffs' Experts Provide a Sufficient Factual Basis for their Expert Opinions............30

       i.  Winer ......................................................................................................30

       ii.  Jenkins ...................................................................................................39

CONCLUSION......................................................................................................40

## Table of Authorities

**Cases**

*American Nat. Fire Ins. Co. v. Mirasco, Inc.*, 2003 WL 22271226 (S.D.N.Y., Sept. 30, 2003) ..................17

*Arista Records LLC v. Lime Group LLC*, 2011 WL 1674796 (S.D.N.Y. May 2, 2011) ...................2, 7, 12

*Bergin v. United States*, 1985 U.S. Dist. LEXIS 19103 (S.D.N.Y. June 7, 1985)...........................................3

*Berman v. Mobil Shipping & Transportation Co.*, No. 14 CIV. 10025 (GBD), 2019 WL 1510941
    (S.D.N.Y. Mar. 27, 2019) .......................................................................................................................2

*Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685 (7th Cir. 2008) ...................................... 28, 29

*Cayuga Indian Nation v. Pataki*, 83 F. Supp. 2d 318 (N.D.N.Y. 2000)............................................................3

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)..................................................passim

*E.E.O.C. v. Morgan Stanley & Co.*, 324 F. Supp. 2d 451 (S.D.N.Y. 2004) .................................................17

*Estate of Steinberg v. Islamic Republic of Iran*, 2019 U.S. Dist. LEXIS 199344 (D.D.C. Nov. 18, 2019) .....3

*Faryniarz v. Nike, Inc.*, 2002 U.S. Dist. LEXIS 15825 (S.D.N.Y. Aug. 23, 2002) ......................................3

*Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc .*, 75 F. Supp. 2d 235 (S.D.N.Y. 1999) .................17

*Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 523 (2012)............................................................................9, 14, 15

*Henkin v. Islamic Republic of Iran*, 2021 U.S. Dist. LEXIS 129541 (D.D.C. July 12, 2021) ......................3

*In re Rezulin Prods. Liab. Litig.*, 309 F. Supp.2d 531 (S.D.N.Y.2004) ................................................2, 18

*In re Zyprexa Prod. Liab. Litig.*, 489 F. Supp. 2d 230 (E.D.N.Y. 2007) ...............................................2, 3, 8

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) .....................................................................................21

*Linde v. Arab Bank, PLC*, 920 F. Supp. 2d 282 (E.D.N.Y. 2011) (*Linde I*) ............................................18

*Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316 (E.D.N.Y. 2013) (*Linde II*) ..........................9, 18, 28, 29

*McCullock v. H.B. Fuller Co.*, 61 F.3d 1038 (2d Cir. 1995) ............................................................................2

*McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 415 (S.D.N.Y. 2014).....................................2

*Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017), *certified question answered,*
    194 A.3d 38 (D.C. 2018), and *vacated and remanded on other grounds sub nom. Opati v. Republic
    of Sudan*, 140 S. Ct. 1601, 206 L. Ed. 2d 904 (2020)..............................................................passim

*S.E.C. v. Tourre*, 950 F. Supp. 2d 666 (S.D.N.Y. 2013).................................................................................2

*Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76 (2d Cir.1997) ...................................................................... 3, 8

*Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414 (E.D.N.Y. 2013) on reconsideration
    in part, No. 06CV702DLIMDG, 2017 WL 4480755 (E.D.N.Y. Sept. 30, 2017) ......... 18, 20, 28, 37

*Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F. Supp. 2d 457 (S.D.N.Y. 2007)...........................................................3

*TV Tokyo Corp. v. 4Kids Entm't, Inc.*, 463 B.R. 610 (S.D.N.Y. 2011) ...........................................................3

*U.S. v. Holy Land Foundation*, 2007 U.S. Dist. LEXIS 51184 (N.D. Tex. July 16, 2007) ......................27

*United States v. Abu-Jihaad*, 553 F. Supp. 2d 121 (D. Conn. 2008) ......................................................18, 29

*United States v. Damrah*, 412 F.3d 618 (6th Cir. 2005)................................................................................28

*United States v. Paracha*, No. 03 CR. 1197 (SHS), 2006 WL 12768 (S.D.N.Y. Jan. 3, 2006),
    *aff'd*, 313 F. App'x 347 (2d Cir. 2008) ............................................................................................21, 22

*United States v. Rahman*, 189 F.3d 88 (2d Cir. 1999) .............................................................................18, 20

*Washington v. Kellwood Co.*, 105 F. Supp. 3d 293 (S.D.N.Y. 2015) .............................................................2

**Other Authorities**

9/11 Commission Report..........................................................................................................................passim

Executive Order No. 13224 .................................................................................................7, 10, 14, 33

<u>Rules</u>

Fed. R. Evid. 402 ....................................................................................................................................1
Fed. R. Evid. 702 ...........................................................................................................................passim
Fed. R. Evid. 703 ............................................................................................................................27, 30

**<u>Articles and Publications</u>**

Countering Terrorist Finance: A Work Mostly In Progress," for *The Annals of the American
   Academy of Political and Social Science* ................................................................................... 10, 11
Globalization, Terrorist Finance, and Global Conflict – Time for a White List?" for the
   European Journal of Law Reform (2002), Volume 4, Issue 2 ............................................10
Jonathan Winer & Trifin J. Roule, *Fighting Terrorist Finance*, 44 Survival 87 (Autumn 2002) ...............10
Maria Ressa, *Seeds of Terror: An Eyewitness Account of Al Qaeda's Newest Center of Operations in
   Southeast Asia 35 (2003)* ......................................................................................................17
Winer, Jonathan and Roule, Trifin J., "The Finance of Illicit Resource Extraction," in Natural
   Resources and Violent Conflict (World Bank Publishing) (2003) ........................................6

## Key to Exhibit Citations

Exhibits cited in this Memorandum of Law are exhibits to the Declaration of Robert T. Haefele, filed with the Memorandum, cited herein as "Haefele Decl."

| | |
|---|---|
| Exhibit A | Excerpted pages from the Deposition of John T. Sidel, taken on April 27, 2021. |
| Exhibit B | Excerpted pages from the Deposition of Olivier Roy, taken on April 20, 2021. |
| Exhibit C | Excerpted pages from the Deposition of Jonathan Winer, taken on July 13, and July 14, 2021. |
| Exhibit D | Expert Report of Jonathan Winer on behalf of the Plaintiffs, dated March 10, 2020. |
| Exhibit E | *The Finance of Illicit Resource Extraction* authored by Jonathan Winer and Trifin J. Roule and published in "Natural Resources and Violent Conflict" in 2003. |
| Exhibit F | *Countering Terrorism Finance: A Work, Mostly in Progress* authored by Jonathan Winer for The Annals of the American Academy of Political Science, published in "Terrorism: What will the Next President Face" in July 2008. |
| Exhibit G | *Fighting Terrorist Finance* authored by Jonathan Winer and Trifin J. Roule and published in "Survival" in 2002. |
| Exhibit H | The Road to 9/11: The September 11 Terrorist Attack on the World Trade Center, which serves as Brian Michael Jenkins' affirmative expert report in this case, dated March 10, 2020. |
| Exhibit I | Excerpted pages from the Deposition of Brian Michael Jenkins, taken on April 12, 2021. |
| Exhibit J | Excerpted pages from The 9/11 Commission Report. |
| Exhibit K | Excerpted pages from the Deposition of Jonathan Marks, taken on July 22, 2021. |
| Exhibit L | Expert Report of Jonathan T. Marks on behalf of World Assembly of Muslim Youth, dated August 7, 2020. |
| Exhibit M | A compilation of documents produced by Wa'el Jelaidan in this litigation. |

| Exhibit N | A compilation of documents produced by the Muslim World League in this litigation. |
|---|---|
| Exhibit O | A compilation of documents produced by the International Islamic Relief Organization in this litigation. |
| Exhibit P | Expert Report of John Sidel, dated July 29, 2020. |
| Exhibit Q | Supplemental Expert Witness Statement of Jonathan Winer, date February 2, 2021. |
| Exhibit R | A June 2021 email exchange between Plaintiffs' Counsel and Counsel for WAMY regarding WAMY Expert Khalid Blankinship. |
| Exhibit S | An excerpted portion of a letter dated January 27, 2021, from WAMY Counsel regarding the "57" audit reports purportedly reviewed by assistants to WAMY Expert Jonathan Marks. |
| Exhibit T | Excerpted pages from the Deposition of Ambassador Charles W. Freeman, taken on April 6, 2021. |
| Exhibit U | Plaintiffs' responsive catalog to Defendants' catalog that was submitted as Exhibit D at ECF No. 7344. |

Declaration of Jonathan Winer, filed with this Memorandum, cited herein as "Winer Decl."

## PRELIMINARY STATEMENT

Plaintiffs respectfully submit this Memorandum of Law in opposition to Defendants'[1] Motion to Exclude and/or Limit testimony of Plaintiffs' expert witnesses Jonathan Winer ("Winer") and Brian Jenkins ("Jenkins") (collectively the "PECs' Experts"). As set out in more detail below, the PECs' Experts' opinions and testimony are within the scope of Fed. R. Evid. 402 and 702. Pursuant to these standards, the opinions they offer are relevant, proper, and were developed from sufficient factual bases. Moreover, both experts are eminently qualified to offer opinions on the identified areas and have reliably applied the methodologies that courts consistently endorse in terrorism cases.

This case, first and foremost, is about an abhorrent act of terrorism whose execution was possible only with wide-ranging support received from nations, individuals, and purported charitable organizations. In litigation that, on its face, concerns the Defendants' alleged material support of, aid to, and conspiracy with, the Al Qaeda terrorist organization, expert testimony is critical on the issue of money laundering, financial crime, international arms dealing, political and religious extremism, and, of course, terrorism. Plaintiffs' proffered experts have spent, collectively, decades studying and working professionally, in public and private service, in capacities where these disciplines converge. Both Jenkins and Winer are of unassailable qualification, backed by decades of hands-on, operational experience in the field of counterterrorism. Indeed, both experts possess the precise type of expertise that has been used by the U.S. government to address the interdisciplinary issues raised by this litigation—*e.g.*, counterterrorism, terror financing, money laundering, and jihadism.

Defendants, in their arguments opposing the testimony of Winer and Jenkins, resort to baseless personal attacks, shifting standards, and gross mischaracterization of expert testimony of record. These attacks are all the more confounding given that the individuals the Defendants have

---

[1] World Assembly of Muslim Youth ("WAMY"), Muslim World League ("MWL"), International Islamic Relief Organization ("IIRO"), Dubai Islamic Bank ("DIB"), and Yassin Kadi ("Kadi").

proffered as purported experts are comprised of theologians[2], a diplomat[3], and academics who have

admitted that they are not experts on Al Qaeda.[4]  Defendants' brief ignores the overwhelming legal

authorities supporting Plaintiffs' experts' methodologies, the categories of evidence on which they

rely, the appropriateness and critical nature of opinions they offer in litigation of this precise nature,

and the necessity of a holistic approach in analyzing claims of a decades-long conspiracy. For those

reasons, Defendants' motion to exclude the PECs' Experts' opinions must fail.

## I.   THE PECs' EXPERTS HAVE THE REQUISITE QUALIFICATIONS TO OPINE ON THE RELEVANT MATTERS OUTLINED IN THEIR REPORTS

Courts must examine the "totality of the witness's background" to determine whether the

proffered expert meets "one or more of the qualifications listed in Rule 702."[5] Inquiry into experts'

qualifications is "construed with an eye towards the liberal thrust of the federal rules of evidence and

their general approach of relaxing the traditional barriers to opinion testimony."[6] Consistent with this

principle, courts within the Second Circuit take "a liberal view of the qualification requirements of

Rule 702, at least to the extent that a lack of formal training does not necessarily disqualify an expert

from testifying if he or she has equivalent relevant practical experience."[7] Moreover, if the expert has

---

[2] WAMY Expert Khalid Blankinship and MWL/IIRO Expert Sherman Jackson.

[3] WAMY Expert Chas Freeman.

[4] MWL/IIRO Experts John Sidel and Olivier Roy (*See* Exh. A, Deposition of John Sidel 33:22 – 24 (responding unequivocally "no" when asked if he is an expert on Al Qaeda); Exh. B, Deposition of Olivier Roy 219:24 – 220:14 (agreeing he has no expertise on Al Qaeda after bin Laden left Afghanistan and Pakistan in 1989); *see also* Exh. B, Deposition of Olivier Roy 221:2-8 (agreeing he is not an expert about the preparation for the 9/11 attacks).

[5] *Washington v. Kellwood Co.*, 105 F. Supp. 3d 293, 304 (S.D.N.Y. 2015).

[6] *S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 674 (S.D.N.Y. 2013) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, at 588–89 (1993); *see also In re Rezulin Prods. Liab. Litig.*, 309 F. Supp.2d 531, 559 (S.D.N.Y.2004)).

[7] *Berman v. Mobil Shipping & Transportation Co.*, No. 14 CIV. 10025 (GBD), 2019 WL 1510941, at *8 (S.D.N.Y. Mar. 27, 2019) ("Assertions that the witness lacks particular educational or other experiential background[ ] 'go to the weight, not the admissibility, of [the] testimony.'")(citing *In re Zyprexa Prod. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007) (quoting *McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1044 (2d Cir. 1995))(alteration in original); *Arista Records LLC v. Lime Group LLC*, 2011 WL 1674796 (S.D.N.Y. May 2, 2011) (approving expert opinion where testimony involved "broad economic principles" notwithstanding "lack of economics expertise" or training) (citations omitted); *see also McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415 (S.D.N.Y. 2014) (overruling challenge to expert based on lack of educational and practical experience); *TV Tokyo Corp. v. 4Kids Entm't, Inc.*, 463 B.R. 610 (S.D.N.Y. 2011) (finding expert qualified to render opinion on requirements for filing for foreign withholding tax credits under Japanese tax laws despite

"educational and experiential qualifications in a general field closely related to the subject matter in question, the court will not exclude the testimony solely on the ground that the witness lacks expertise in the specialized areas that are directly pertinent."[8]

Courts evaluating experts in terrorism cases, meanwhile, have recognized the interdisciplinary nature of the study of terrorism, and have qualified experts to testify on the basis of their relevant experience in the implicated disciplines.[9] These holdings are in keeping with rulings in a range of other contexts, in which courts have recognized that certain specialized areas of study encompass a wide range of topics, and qualified experts with practical or other experience in the relevant fields.[10]

    a.  **Jonathan Winer's Career Experience Qualifies Him as an Expert**

Winer has nearly forty years of experience, in and out of U.S. government service, analyzing terrorism, money laundering, and myriad other financial issues at the core of this litigation. His extensive professional history is detailed below, as well as in a Declaration filed with this brief.[11] Numerous governmental branches, agencies, and organizations have sought out and relied upon Winer's expertise in the areas in which he is being called to testify in this litigation, including the White House, the U.S. Department of State, the U.S. Central Intelligence Agency, both chambers of the U.S.

---

lack of Certified Public Tax Accountant license, where expert gained knowledge working as CPA with thirty years of experience); *Tiffany (NJ) Inc. v. eBay, Inc.*, 576 F. Supp. 2d 457 (S.D.N.Y. 2007) (finding expert with career experience involving statistical surveying to be qualified notwithstanding lack of education or degree in statistical analysis).

[8] *In re Zyprexa Prod. Liab. Litig.*, 489 F. Supp. 2d at 282 (citing *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 80 (2d Cir.1997)).

[9] *See, e.g.*, *Estate of Steinberg v. Islamic Republic of Iran*, 2019 U.S. Dist. LEXIS 199344 (D.D.C. Nov. 18, 2019) (noting an expert provided expert testimony regarding "international terrorism and terrorist financing"); *Henkin v. Islamic Republic of Iran*, 2021 U.S. Dist. LEXIS 129541 (D.D.C. July 12, 2021) (recognizing the same expert has testified "as an expert on international terrorism, U.S. policy toward the Middle East, countering violent extremism, and terrorist financing and sanctions policy").

[10] *See Faryniarz v. Nike, Inc.*, 2002 U.S. Dist. LEXIS 15825 (S.D.N.Y. Aug. 23, 2002) (addressing expert testimony on the topic of whether Plaintiff's shoelaces could become caught in the manner in which she described, and stating "[b]iomechanics is a[n] interdisciplinary field requiring training in several different scientific fields."); *Bergin v. United States*, 1985 U.S. Dist. LEXIS 19103 (S.D.N.Y. June 7, 1985) (referencing expert testimony regarding Plaintiff's injury, from expert in the field of biomedical engineering, which is an "interdisciplinary field, dealing with applications of engineering to problems in the medical and life science areas"); *see also Cayuga Indian Nation v. Pataki*, 83 F. Supp. 2d 318 (N.D.N.Y. 2000) (finding two experts qualified to offer opinions based on an interdisciplinary approach and citing the increasing complexity of the world and the inability to resolve certain problems without taking such an approach).

[11] *See* Winer Decl.

Congress, the Council on Foreign Relations, the World Bank, and dozens of prominent academic institutions.[12] In the face of his four decades of experience and the trust that has been placed in him by the U.S. government, Defendants resort to personal attacks bordering on libel in their effort to persuade the Court, wrongly, that he is unqualified under FRE 702. Defendants' arguments simply ignore the wealth of expertise outlined in Winer's curriculum vitae and grossly mischaracterize the nature of his work.

Winer's professional history and practical experience establishes that he possesses sufficient "knowledge, skill, experience, training, or education" to provide expert testimony, as provided for by the Federal Rules. From 1985 to 1994, Winer served as counsel to U.S. Senator John Kerry and was the only person to serve in this position.[13] As counsel and senior legislative assistant for then-U.S. Senator Kerry, Winer conducted numerous Congressional investigations of international financial crimes. For example, he was the principal investigator, researcher, analyst and drafter of the 613-page Report on the Bank of Credit and Commerce International ("BCCI") Affair, published by the Senate in 1992, following four years of investigation and two years of public hearings set forth in six volumes.[14] The BCCI Report covered how BCCI was used to fund terrorism and other financial crimes due to its lack of internal controls, and the generally deficient controls in place throughout the Middle

---

[12] These include, for example, the American Academy of Arts and Science, the American Bar Association Committee on Law and National Security, Brookings, Cambridge University, the Center for Strategic and International Studies (CSIS) (where he served on the Steering Committee of its Transnational Threats Initiative from 2002-2013), Georgetown University, George Washington University, Harvard University, Johns Hopkins University, the Middle East Institute, the National Defense University, NATO, New York University, Princeton University, Tufts University, the University of Pittsburgh, and the School of Advanced International Studies in London, among others.

[13] Winer Decl., ¶ 11.

[14] The BCCI Affair, A Report to the Committee on Foreign Relations United States Senate by Senator John Kerry and Senator Hank Brown," December 1992 102nd Congress 2d Session Senate Print 102-140. https://www.hsdl.org/?view&did=449738, cited in Winer's Affirmative Expert Report, references to Winer's role as principal investigator/drafter at 139 and 151 (Winer's work investigating BCCI's terrorist activities, abuse of charities, the lack of regulation in Pakistan and other relevant jurisdictions which made its terrorist finance, charity abuse, and other crimes possible, and the role played by accounting firms' failures reflected in audits of BCCI comprise a portion of Winer's experience and expertise relevant to this matter).

East.[15] The BCCI case included investigation into its use of charities to carry out criminal activities and its abuse of the lack of regulation and controls on charities in Pakistan and elsewhere.[16]

From 1994 to 1999, Winer served as Deputy Assistant Secretary for International Law Enforcement and was the senior U.S. State Department official responsible for countering the threat posed to the United States by international financial criminal activity.[17]  During this period, his work at the State Department involved the study of activity relevant to financial regulation in Middle Eastern countries, including Saudi Arabia, and controls on terrorist finance.[18]

Various Congressional committees have recognized and relied on Winer's expertise on the topic of terrorist financing, particularly as it relates to the September 11th terrorist attacks. On September 26, 2001, the Senate Committee on Banking, Housing and Urban Affairs selected Winer to testify as an expert about combatting terrorist finance in the immediate aftermath of the September 11th terrorist attacks.[19] This testimony included explicit reference to the hydra-headed nature of Al Qaeda's financing, including Al Qaeda's reliance on charities.[20]  The hearing was undertaken for the purpose of strengthening controls within the United States and globally on terrorist financing, and Winer's testimony was part of the official record of considerations leading to the enactment of the USA-PATRIOT Act one month later, on October 26, 2001.[21] On November 20, 2002, the Senate Judiciary Committee selected Winer to testify as an expert on terrorist financing; in that capacity, his testimony focused on the need for tougher regulation and the investigation of charities involved in

---

[15] Winer Decl., ¶ 35.
[16] Winer Decl., ¶ 36.
[17] Winer Decl., ¶ 12.
[18] Winer Decl., ¶ 12.
[19] Winer Decl., ¶ 58.
[20] Remarks prepared by Mr. Jonathan Winer, Counsel, Alston & Bird and delivered at the Dirksen Senate Office Building, Room 538 on Wednesday, September 26, 2011, https://irp.fas.org/congress/2001_hr/092601_winer.html ("Public information demonstrates terrorist funds moving through Islamic charities, travel agents, construction businesses, fisheries, import-export businesses, stock markets, chemical companies, and a number of banks.").
[21] Winer Decl., ¶ 60.

terrorist financing.[22] On July 31, 2003, the Senate Committee on Government Relations requested that Winer testify as an expert on terrorist financing, with a focus on the role of Saudi Arabia and Saudi charities in the financing of Al Qaeda.[23] On May 19, 2004, the Senate Committee on Finance invited Winer to testify as an expert on terrorist financing on issues relating to the regulation of charities.[24] On March 29, 2006, the House Subcommittee on Oversight and Investigations asked Winer to testify as an expert on terrorism, and he provided testimony on under-regulated charities with insufficient controls.[25]

Outside of his government work, Winer has worked extensively with highly reputable private organizations and academic institutions.[26] In 2002, the Council on Foreign Relations, an independent, non-partisan organization, invited Winer to join their Independent Task Force on Terrorist Financing, which directly reviewed and assessed Al Qaeda and its use of charities to fund its activities.[27] In 2003, the World Bank invited Winer to address the financing of illicit resource extraction, including its relationship to terrorist financing. That same year, the World Bank published an article Winer co-authored, which was later included in a book chapter addressing a range of abuses, including incidents related to Al Qaeda's financing of terrorism.[28]

Defendants seek to discount Winer's extensive professional experience and practical expertise by urging the Court to view Winer's experiences in isolation, and to find that he lacks "specialized knowledge" in distinct areas. This fragmented approach is improper. As evidenced by his appointments and scholarship throughout his career, Winer has substantial expertise in financial

---

[22] Winer Decl., ¶ 61.
[23] Winer Decl., ¶ 62.
[24] Winer Decl., ¶ 63.
[25] Winer Decl., ¶ 65.
[26] *See supra*, note 12.
[27] Winer Decl., ¶¶ 67-68.
[28] Exh. E, Winer, Jonathan and Roule, Trifin J., "The Finance of Illicit Resource Extraction," in Natural Resources and Violent Conflict (World Bank Publishing) (2003).

regulation of financial institutions to combat money laundering and terrorist financing—he was a pioneer in this territory, from its beginnings in the late 1980's— and this experience is essential to his deep understanding of the wide-ranging issues, such as illicit financial activity, present in this litigation.

Winer is not merely a "mid-level State Department official" and his experience is not confined exclusively to macro-level policy analysis, as Defendants contend. Winer responded directly to the assertion that his State Department tenure was constrained to high-level policy decisions, testifying "[a]t my bureau, given our responsibility, policy, and programs, the programs part got very operational. So it's a **mistake and inaccurate** to state that it's limited to policy only."[29] Defendants wrongly contend that Winer's work concerned only high-level policy decisions that disqualify him from opining on "compliance with the accounting and auditing standards and requirements in place in the KSA, Pakistan, and other foreign countries between 1992 and 2002,"[30] the "Office of Foreign Assets Control's ("OFAC") Executive Order ("EO") 13224 designation process"[31] and "Al Qaeda's alleged connections to charities…."[32] Given Winer's practical experience, these areas of inquiry are within Winer's expertise and competence.

The absence of specific credentials or academic training does not disqualify Winer from offering expert testimony on issues involving terror financing, money laundering, and financial regulation in the terrorism arena.[33] For example, Defendants challenge Winer's qualifications by emphasizing that he is "not an expert on Islamic religious doctrine nor on all Islamic terms and

---

[29] Exh. C, Winer Dep. 87:6 – 18 (emphasis added). Defendants miss the point in even suggesting Winer's policy experience is a weakness. Having conducted policy analysis of the specific issues addressed in this litigation, Winer developed deep understanding of the threats our nation faced, operational aspects of illicit financial activities (including terror financing), and the key actors and forces in play.

[30] Defs' Memo. at 6.

[31] Defs' Memo. at 7.

[32] Defs' Memo. at 8.

[33] *Arista Recs. LLC,* 2011 WL 1674796, at *2-3.

concepts."[34] Yet such expertise is not mandatory.[35] Though Defendants cherry-pick portions of

Winer's deposition, they omit testimony that directly addresses this issue. In his deposition, Winer

explained:

> I am not an expert on . . . religious doctrine of any kind, **except to the extent that it involves the political impact of different types of interpretations of religion when a religion is politicized into a political movement, where I have expertise**. So when you have a combination of foreign policy, security, and religion, that's an area that I have devoted some extensive work on over a long period of time. And that is an area of expertise, yes. In the Middle East bureau, where I was from 2013 to 2017, we were constantly dealing with -- within the bureau and I was personally -- the competing agendas of political Islam and various strands and strains of political Islam, including that in the Islamic state and al-Qaeda and other groups like Ansar al-Sharia.[36]

Winer further testified in response to a question as to whether he is a religious expert: "I understand

a religion in a political context when religion is used for political purposes as part of my understanding

of relationships among states, as part of my understanding of terrorism. We had national and global

security issues. And so in that context, yes [I am a religious expert]."[37] This experience fits squarely

within "qualifications in a general field closely related to the subject matter in question."[38]

Defendants posit that the fact that Winer has never been "posted" to Saudi Arabia ("KSA")

is evidence of his lack of expertise on the region. At his deposition in this case, Winer testified: "I

know a fair amount about the Kingdom of Saudi Arabia. I dealt with issues relating to it every day in

my last work, the State Departments [sic]. I was not personally responsible for that relationship, but I

---

[34] Defs' Memo at 5.

[35] Most senior officials in the U.S. government charged with protecting the United States from extremist violence do not have a lifetime of training in Islamic religious doctrine. However, they must of course understand the role of radical jihadist doctrine to formulate effective policies to counter potential terrorist attacks. For example, Richard A. Clarke, Stuart Levey, and Juan Zarate, who each held senior executive branch posts charged with developing and overseeing the U.S. government's effective implementation of its counterterrorism strategy, did not have backgrounds in Islamic studies, yet understood the threat posed by Al Qaeda and other religious extremists.

[36] Exh. C, Winer Dep. 74:5 – 75:7 (emphasis added). In fact, if Winer had spent his lifetime studying exclusively religious Islamic doctrine, his testimony would be if anything less relevant, because his testimony, (and this case) is not about Islam per se, and a theologian's expertise is not necessary to address the areas of testimony on which Winer is being called to testify.

[37] Exh. C, Winer Dep. 177:21 – 178:5.

[38] *See In re Zyprexa Prod. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007) (citing *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 80 (2d Cir.1997)).

was in meetings each morning when I was in Washington to discuss the ins and outs of that relationship. And I'm familiar with the modern history of Saudi Arabia."[39] Even more directly, Winer's extensive experience dealing with terrorism financing issues has required him to deal extensively with Saudi Arabia, given its status as the "epicenter" of terrorist financing in the years leading up to September 11th terrorist attacks.[40] Defendants ignore legal authority that discredits this claim; in *Linde v. Arab Bank* the court declined to exclude expert testimony on the basis that the proposed expert had not "done substantial field work in the Palestinian Territories and read[] but d[id] not speak, Arabic[.]"[41] The court held such issues are appropriate topics for cross-examination as they go to the weight of testimony but are not grounds for excluding it.[42]

Other aspects of Defendants' arguments are demonstrably false. For example, Defendants challenge Winer's qualifications on the basis that he has never published any article on Al Qaeda, Islamic charities, or any alleged connections between them; charities in general, alleged abuse of charities to fund terrorism . . . ."[43] In fact, Winer has published articles pertaining to Al Qaeda and its use of charities for its terrorist agenda in several prominent journals. For example, Winer's work "Fighting Terrorist Finance," published in one of the most prominent British international security journals, explains that funds for Al Qaeda came, in part, from "misapplied Islamic charitable

---

[39] Exh. C, Winer Dep. 78:21 – 79:4.

[40] Indeed, as Plaintiffs argue in our *Daubert* brief, merely being posted to the Kingdom of Saudi Arabia as a diplomat does not, in and of itself, endow one with expertise as to every facet of Saudi Arabia. *See* page ECF No. 7346, at 13-14 (arguing that purported WAMY expert Freeman is unqualified despite his short diplomatic post in Saudi Arabia). Moreover, many of the experts charged with leading our nation's counterterrorism policies have never been posted to Saudi Arabia. For example, individuals charged with developing counterterrorism policy in the U.S. in the wake of the September 11th attacks—*e.g.*, Juan Zarate, Stuart Levey, and others, were never posted to Saudi Arabia.

[41] *Linde II,* 922 F. Supp. 2d 316, 325 (E.D.N.Y. 2013).

[42] *Id.*

[43] Defs' Memo. at 5. Defendants also suggest (*id.* at 7) that *Gill v. Arab Bank*, PLC, 893 F. Supp. 2d 523 (2012), supports a ruling here that Winer's testimony should be circumscribed as it was in *Gill*, where he was permitted to opine on "United States banking terminology, standards, and practices," but not about "Hamas's agenda or relationship with terrorist organizations" or "its interaction with charitable organizations." *Id.* at 536. Reliance on *Gill* is misplaced because the *Gill* court offered no rationale for limiting Winer's Hamas testimony, Hamas is not Al Qaeda, and whatever the *Gill* court may have thought about Winer's qualifications about Hamas does not account for his significant expertise about Al Qaeda.

contributions."[44] Winer also wrote about this topic in "Globalization, Terrorist Finance, and Global Conflict – Time for a White List?" for the European Journal of Law Reform (2002), Volume 4, Issue 2, and again in "Countering Terrorist Finance: A Work Mostly In Progress," for *The Annals of the American Academy of Political and Social Science*.[45] Winer has been published in reputable academic journals regarding Al Qaeda, terrorist finance via charitable organizations, and the OFAC designation process and is well qualified to opine on these topics.

Winer has provided both the U.S. government and private sector clients with advice on issues related to terror financing, money laundering, and dealings with OFAC. He testified he "had the government as a client providing . . . academic or analytic work on country studies, principally, … of vulnerability to money laundering, vulnerability to terrorist finance. Their capacities to combat these phenomena. And what measures of performance might look like if they built greater capacity."[46] Winer also testified he represented Middle Eastern charities in relation to designation under EO No. 13224.[47] Winer's expertise on the designation process is demonstrated by his adept descriptions of the requisite standards,[48] interagency coordination,[49] and the array of assessments made when determining designation.[50] Contrary to Defendants' assertions, Winer's experience in this area is neither "unrelated" nor "outsider" experience. Defendants' uncited, conclusory statement that Winer "is not an expert on Al Qaeda, its history, its ideology, or its sources of funding, including specifically from any of the Charity Defendants"[51] completely ignores the spectrum of his practical experience, as outlined in his curriculum vitae, deposition, and declaration. Contrary to Defendants' representations, Winer is an

---

[44] Exh. G, Jonathan Winer & Trifin J. Roule, *Fighting Terrorist Finance*, 44 Survival 87, 89 (Autumn 2002).

[45] The *Annals* began publication in July 1890 and has been uninterrupted ever since. The *Annals* exists "to address society's most important problems and concerns with high-quality research." *See* https://www.aapss.org/the-annals/

[46] Exh. C, Winer Dep. 92:8 – 20.

[47] Exh. C, Winer Dep. 92:21 – 93:8.

[48] Exh. C, Winer Dep. Winer Dep. 203:9 – 23.

[49] Exh. C, Winer Dep. 193:17 – 194:4.

[50] For FN 17,18, 19, *see* Exh C, Winer Dep. 200:2 – 203:23

[51] Defs' Mem. at 6.

expert on Al Qaeda,[52] has extensive expertise in terrorism finance,[53] has been published on terrorism issues,[54] and has worked on issues related to charitable abuse "since the late 1980s."[55] Moreover, Defendants' suggestion that Winer's Al Qaeda experience emanates from "alleged passing conversations" distorts his testimony. In fact, in his deposition, Winer described his experience as follows:

> When the United States government first became concerned about al-Qaeda in the 1990s, I was meeting regularly with Richard Clarke at the NSC who is the United States government's counterterrorism czar at the time. And I was dealing with the interrelated issue of international crime, and in particular international financial crime. And **the two are inexorably intermingled,** and the United States was seeking that period of time, both to understand these phenomena and to begin to build capacity to combat them. And I had regular contact with Mr. Clarke and was working for him and with him, such as with Michael Sheehan, for example, and Rand Beers on these issues in the late 1990s and became aware of his concern.[56]

The passage cited above describes the essence of the operational aspects of Winer's professional responsibilities, and not "passing conversations." Winer also testified that he expanded his expertise on terrorist financing upon his return to private legal practice in 1999.[57] Winer testified that his work on "fraud and money laundering include[ed] terrorism" and he "first encountered the terrorism problem in [his] work for the subcommittee on Terrorism, Narcotics, and International Operations" and "that expertise was the foundation for [his] understanding on terrorist financing."[58]

---

[52] Exh. C, Winer Dep. 59:5 – 10. ("Q: Al-Qaeda. Are you an expert on history of al-Qaeda? A: **In certain contexts, yes.** I know enough about its activities Afghanistan, Bosnia, Chechnya, Sudan, Southeast Asia, and elsewhere to have familiarity with its activities") (emphasis added). It is also worth noting that defense counsel did not ask Winer directly if he was an expert on Al Qaeda beyond its history, yet they affirmatively and improperly state in their Memorandum that he is not.

[53] *See* Exh. C, Winer Dep. 88:12 – 91:2.

[54] *See, e.g.,* Exh. F, *Countering Terrorist Finance: A Work, Mostly in Progress,* Jonathan Winer, The Annals of the American Academy of Political and Social Science, Jul., 2008, Vol. 618, Terrorism: What the Next President Will Face (Jul., 2008), pp. 112-132

[55] Exh. C, Winer Dep. 64:25 – 66:3; Additionally, throughout his deposition Winer's attempts to answer questions thoroughly were thwarted by interruptions, confusingly phrased questions, and argumentative examiners (e.g. Winer Dep. 52:15-55:6, 61: 7-8; 75:8-78:17, 143:6-7; 146:16-17 and 277:19-281:3.).

[56] Exh. C, Winer Dep. 59:18 – 60:7

[57] Exh. C, Winer Dep. 88:12 – 15. ("did you gain any expertise in terrorism finance while engaged in private practice during [1999-2008]? A. Yes." Winer again confirms that his work on terrorism financing began before the September 11th Attacks at 96:7 – 14.

[58] Exh. C, Winer Dep. 88:19 – 91:3. This passage is not cited in Defendants' brief.

b. **Brian Michael Jenkins is Qualified to Offer Expert Testimony on the Issues Outlined in his Report**

By raising a limited challenge to Jenkins' credentials, Defendants seemingly concede that his qualifications are unassailable, and that the proffered testimony is within his expertise. [59]

Defendants do not challenge Jenkins' expertise in counter-terrorism, Al Qaeda, or the September 11th Attacks; they only seek to exclude Jenkins' testimony on Islam on the basis that he is not an expert on religion, Islam, or the history of Islam. Yet a witness need not be an expert on theology or Islam to provide opinions as to Islamic extremist violence, as it relates to terrorism. Indeed, U.S. officials tasked with protecting the nation from threats of religious extremists are not–as a rule–theologians. Jenkins testified in his deposition that he studied terrorism and extremist violence in the context of his professional career since 1972. That experience and training qualifies him to offer testimony on Islamic extremist violence.

Jenkins has the requisite experience in the relevant interdisciplinary fields of counterterrorism and national security to offer the opinions outlined in his expert report. Jenkins has demonstrated a "valid connection" between his expertise to the "pertinent inquiry."[60] He was an adviser to the National Commission on Terrorism, a member of the World Economic Forum's Global Agenda Council on Terrorism, has authored several books and articles on terrorism and September 11th specifically, and was an advisor to the Presidential Commission on Aviation Security and Terrorism.

As discussed *supra* at 2-3, an expert need not possess specific credentials or academic training to offer expert testimony.[61] While Defendants claim Jenkins is not qualified to offer opinions on the

---

[59] Jenkins' opinions address "the origin, planning, and development of the 9/11 plot (including discussion of various precursors and testing of previous plots); the roles of relevant actors in originating, planning, and developing the plot; the training and selection of operatives; operational aspects of the plot and attack; and the events of the day of the 9/11 attack." Exh. H, Expert Report of Brian Michael Jenkins, at 1.

[60] Jenkins is a current senior adviser at the global policy research firm the RAND Corporation.

[61] *Arista Recs. LLC*, 2011 WL 1674796, at *2-3.

ethical implications of religious beliefs, or his personal views on Al Qaeda's "radical interpretation" of jihad, there can be no dispute that he has garnered a familiarity with the terminology and basic concepts through his practical experience. Indeed, in the field in which Jenkins is an expert – terrorism and extremist violence – these are concepts that are foundational and well understood. Defendants have presented no credible basis to disqualify Jenkins, or to exclude his testimony[62]

## II.    THE EXPERTS' OPINIONS ARE RELEVANT AND WILL AID THE TRIER OF FACT

The legal standard governing the requirement that expert opinions must be relevant is fully set forth in Plaintiffs' *Daubert* brief.[63]

### a.    **Winer's opinions**

The expert opinions that Winer offers in this litigation bear directly on the issues regarding the material support, resources, and aid provided to, and conspiracy with, Al Qaeda, in furtherance of its terrorist agenda and, specifically, the September 11th Attacks. Defendants seize on two particular aspects of Winer's testimony to undermine his testimony on terror financing, money laundering, and financial regulations. In both respects, this testimony is critical to the jury's understanding of the environment in which the Defendants were operating and the flexibility that they had to engage in terror financing.

First, Defendants challenge Winer's opinions regarding the KSA's susceptibility to corruption, and the lack of financial regulations that permitted, and also enabled, terror financing. Winer's opinion that KSA historically suffered from financial corruption[64] serves as a building block to his opinion that the absence of Ministry of Finance oversight or controls for "off-budget" programs allowed Saudi

---

[62] The 9/11 Commission noted that, prior to the September 11th attacks, one school of thought saw Al Qaeda as the "point of the spear of radical Islam." Exh. J, *9/11 Commission Report* at 343.

[63] ECF No. 7346, at 2-3.

[64] *See* Defs' Memo. at 11; Exh. D, Winer Report 9.13 – 9.13.4.

13

charities to operate with impunity and little oversight. This opinion is not a legal conclusion, and it is directly relevant to issues in this case. Winer's reliance on a U.S. State Department cable as a basis for this opinion (among other sources and experiences) is entirely in keeping with the methodologies used by other experts in this field, and his specialized knowledge of the issues raised in the cable, and the context in which they are presented, is within the bounds of expert testimony, and helpful to the trier of fact.

Second, by characterizing Winer's opinions about the designation process under EO No. 13224 as "irrelevant and unhelpful," Defendants ignore the fact that an understanding of the U.S. government process for listing and de-listing terror support entities is directly relevant to the core claims in the litigation. Winer's opinions provide more than mere recitation of the designation status of referenced entities, and instead offer helpful analysis to aid a jury in assessing the import of designation (or a decision to not designate) and/or de-designation. Winer provides key information regarding the government process that involves a thorough assessment of classified and unclassified evidence relating to entities that have, or are alleged to have, links to terrorism. Winer's knowledge and experience as to the rigorous standard applied by the government for imposing sanctions goes to the heart of whether or not there is evidence that the entity in question was engaged in providing material support, resources, and aid to, or conspiring with, a terrorist organization. In addition, Winer's opinions regarding the designation process are directly relevant to several arguments raised by Defendants, who have wrongly theorized that the designation process is not rigorous and should be disregarded, and that the decision not to list (or to delist) an entity, is tantamount to exoneration. Defendants concede in a footnote to their brief[65] that designation testimony is a proper ground for expert testimony. In *Gill*, the case Defendants cite, the court permitted such testimony as useful "to

---

[65] *See* Defs' Memo. at 12 n.63.

explain the procedure by which individuals and organizations are designated as terrorists by the United States government."[66] Defendants' arguments challenging the evidence relied upon by OFAC may go to the weight of testimony, but do not support Defendants' claims to exclude Winer's opinions.

Finally, even a cursory examination of Winer's expert report demonstrates that it is patently absurd for Defendants to assert that Winer's opinions are "unsupported legal conclusions."[67] Defendants seek to bolster this claim by reference to ¶ 3.11 section in Winer's "Executive Summary," wherein Winer opines that "IIRO, MWL, and WAMY[] each provided significant material support to [A]l Qaeda without which is would not have achieved its global capabilities." As Defendants have sought to do with all evidence, they endeavor to isolate ¶ 3.11 and present it in a vacuum, while neglecting to mention that this section, included within a section of Winer's report specifically titled "Executive Summary," is supported throughout the report by Winer's exhaustive research, analysis, and expertise.[68] Winer's opinions that the Defendant charities provided material support, resources, and aid to, and conspired with, Al Qaeda, and that this material support, resources, aid, and conspiring contributed to the organization's global strike capabilities, are supported by a broad spectrum of information, government reports, secondary source materials, and practical experience. Defendants' arguments are nothing more than an attempt to exclude potentially damaging testimony by unilaterally declaring the contents of Winer's report "baseless."

b. **Jenkins' Opinions**

Jenkins' opinions regarding terrorist activities and the historical context are necessary to assist the jury in its analysis of the events leading to the September 11th Attacks. Defendants seek to exclude this testimony on the basis that it provides "incomplete, inaccurate, and irrelevant history." These

---

[66] *Gill v. Arab Bank, PLC*, 893 F. Supp. 2d 523, 535 (E.D.N.Y. 2012).
[67] *See* Defs' Memo. at 12-13.
[68] *See* Exh. D, Winer Report ¶¶ 6, 7, 9, 10, 12, and 13.

15

arguments may be presented on cross-examination, but do not form a basis for excluding the proper expert testimony. To the contrary, this case presents a clear example of history informing the present; as Jenkins explains, the September 11th Attacks were a multi-part, first-of-their-kind series of attacks requiring years of planning, coordination, and support. In telling the "day of" story, Plaintiffs cannot ignore the full scope of the planning and preparation that went into the 9/11 operation. Expert testimony is critical to assist the jury in understanding how the plot was developed, the period of time over which it was planned, and the manner in which it was carried out.[69]

After claiming broadly that Jenkins offers a "protracted discussion" involving "actors around the globe with no connection whatsoever to Al Qaeda" and a "wide assortment of events with absolutely no relation to 9/11," Defendants focus singularly on Jenkins' testimony regarding the 1993 World Trade Center bombing and the Bojinka plot, arguing that it is not helpful, and should be excluded. This argument does not account for the fact that these earlier events provide highly relevant context that is critical to the jury's understanding of the emergence of the terrorist threat, and the historical developments that contributed to and enabled the September 11th Attacks. Defendants' position further disregards that Khalid Sheikh Mohammed is considered a principal architect of the Bojinka plot and the September 11th Attacks, and that an understanding of the earlier attacks is fundamental to understanding the relationships between the principal actors and the resources provided to them by their benefactors in furtherance of acts of terror.

Jenkins' testimony, when viewed in its totality, is relevant, and draws a clear connection between the Bojinka plot, 1993 WTC bombing, Al Qaeda, and the September 11th Attacks. Although Defendants selectively cite to portions of Jenkins' testimony to suggest that these events are distinct

---

[69] As discussed in Jenkins' report, the September 11th Plot was the result of Al Qaeda "taking advantage of its organizational strength and global network" the likes of which had never before been seen. Brief discussions of notable preceding terror attacks are relevant in that they make it more likely that large-scale, global coordination of the September 11th Attacks was not possible without world-wide support and infrastructure.

and unrelated,[70] that point is manifestly untrue. For example, in addressing his opinion about the connection between Bojinka and Al Qaeda, Jenkins explained:

> …we've had this discussion before, you know, as I say, it was not – Bojinka was not an Al Qaeda operation, it was carried out by individuals who were part of this broader constellation and who had previously, in some case, had previously had connections with Al Qaeda or subsequently had connections with Al Qaeda.[71]

Jenkins is unequivocal in his opinion that the Bojinka plot was a "predecessor"[72] of the September 11th Attacks regardless of the Defendants' mischaracterization in an attempt minimize the connections between the two. John Sidel, Defendants' own expert, similarly acknowledged the link between the Bojinka plot and Al Qaeda. Sidel described the book *Seeds of Terror* by Maria Ressa as the "most detailed published account of the Bojinka Plot."[73] In her writing, Ressa made clear the Al Qaeda connection, and called the Bojinka plot "al-Qaeda's most imaginative plot at that time."[74] Jenkins' expert opinions provide further context to these connections and are highly relevant and helpful to the jury's understanding and awareness of the rising terrorist threats directed to the United States by the very forces with whom the Defendants were collaborating. Of course, to the extent the Defendants take issue with the expert's testimony, they are free to cross examine him.

## III.   THE EXPERTS DO NOT OFFER IMPERMISSIBLE TESTIMONY AS TO INTENT, MOTIVE, OR STATE OF MIND

As noted in Plaintiffs' *Daubert* brief (ECF No. 7346 at 10), it is improper for an expert to testify about topics that bear no relevance to the actual claims at issue.[75] This includes expert testimony as to

---

[70] *See* Defs' Memo. at 13-14.

[71] Exh. I, Jenkins Dep. 94:3-12.

[72] Jenkins affirmatively stated in his deposition that the "Bojinka plot was a predecessor or a precedent or a precursor for the 9/11 attacks…I believe that it was." 172:18 – 25.

[73] Exh. P, Expert Report of John Sidel at n.47.

[74] Maria Ressa, *Seeds of Terror: An Eyewitness Account of Al-Qaeda's Newest Center of Operations in Southeast Asia* (2003).

[75] *See, e.g., American Nat. Fire Ins. Co. v. Mirasco, Inc.*, 2003 WL 22271226, at *2 (S.D.N.Y., Sept. 30, 2003) (precluding expert who attempted to connect unrelated facts, finding the expert's testimony irrelevant); *E.E.O.C. v. Morgan Stanley & Co.*, 324 F. Supp. 2d 451, 464 (S.D.N.Y. 2004); *Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc*., 75 F. Supp. 2d 235, 241-42 (S.D.N.Y. 1999).

a party's intent, motive, or state of mind.[76] It is permissible, however, for an expert to provide testimony regarding the objectives and goals of a terrorist organization, as informed by the expert's specialized knowledge, experience, and expertise.[77] Such testimony is fundamental to the understanding of the organization and its objectives and well within the bounds of proper expert testimony. Here, Defendants resort to personal attacks on the Plaintiffs' experts, in an obvious attempt to distract from the absence of any cognizable legal argument on this basis. Their arguments provide no grounds for excluding the expert opinions referenced herein.

    a. **Winer**

Winer's testimony regarding the goals and objectives of the charity Defendants, or of terrorist organizations, is informed by his expertise and practical experiences. He is not offering testimony on a particular Defendants' state of mind, nor are Defendants able to pinpoint any such impermissible opinions.

Defendants resort to *ad hominem* attacks, predicated on gross mischaracterizations of his testimony, to paint Winer's conclusions as formulated by bigotry. This underscores their lack of substantive legal arguments and ignores facts derived from investigations and intelligence gained from not only the U.S. and western governments, but also from Islamic governments and Islamic

---

[76] *United States v. Rahman*, 189 F.3d 88, 136 (2d Cir. 1999) (improper to "tell the jury the defendant's intentions through the mouths of witnesses other than [itself]."); *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d 531, 547 (S.D.N.Y. 2004) (Defendant's expert's opinions as to the state of mind, intent, or motive of a government, a charitable entity, or a person, do not contain relevant expert evidence); *Linde v. Arab Bank, PLC*, 920 F. Supp. 2d 282, 285 (E.D.N.Y. 2011) (*Linde I*) (same); *Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316, 328 (E.D.N.Y. 2013) (*Linde II*) (ruling on limits to Benthall's testimony, stating "an opinion as to the state of mind of an organization is inadmissible. *See Linde I*, 920 F. Supp. 2d at 285-87.").

[77] *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 436 (E.D.N.Y. 2013) (accepting expert testimony regarding connection between "13 Charities and Hamas, including shared leadership and an active support of Hamas' ideology and goals"), on reconsideration in part, No. 06CV702DLIMDG, 2017 WL 4480755 (E.D.N.Y. Sept. 30, 2017); *United States v. Abu-Jihaad*, 553 F. Supp. 2d 121, 123, 127 (D. Conn. 2008) (Accepting Mr. Kohlmann as an expert in terrorism who would provide testimony regarding "the history, structure, and goals of Al Qaeda" but not about why individuals like Mr. Abu–Jihaad would want to order jihadi videos).

cooperating witnesses.[78] Defendants' assertion that Winer's statements are in any way race-related is an invention of the Defendants' imagination, divorced entirely from his actual testimony and the actual engagements and geopolitical realities Winer personally observed and described in his report.

Winer's assessment that individuals and entities engaged in terrorism would seek to evade alerting authorities of their illegal activities is based on his decades of experience and common sense, which stands in contrast to Defendants' argument that Winer engaged in "race-baiting." Defendants argue Winer rests simply on the notion that asserts "absence of evidence…is itself evidence."[79] Yet courts routinely acknowledge the covert nature of terrorist activities. For example, in *Owens v. Republic of Sudan*, the court noted that requiring firsthand evidence of covert atrocities committed by the DPRK would "effectively immunize" the regime from responsibility.[80] The same rationale applies here, where the secretive nature of terrorism and terrorist financing is at issue and analysis of circumstantial evidence is required. Winer combines experience, facts, and reason to reach conclusions. Defendants conveniently ignore that the portion of Winer's report[81] they cite includes extensive analysis regarding the Al Haramain Foundation, which, as Winer explained, "never disclosed" that its charitable relief services were a cover to support Al Qaeda. This is a clear example that Winer is not simply opining that "absence of evidence is evidence" and that he provides important context based on his experience to analyze the facts before him.

Defendants further allege that Winer opines as to the motivations and decision-making of the 9/11 Commission. Winer's well-grounded opinion on the findings of the 9/11 Commission are fully

---

[78] Defendants' baseless attacks on Winer's character also ignore that the U.S. Secretary of State awarded Winer the Secretary's Distinguished Service Award, awarded at the Secretary's discretion in recognition of "exceptionally outstanding leadership, especially in the management of safety and security issues; professional competence, including ensuring employee accountability and the effective management of inappropriate employee behavior; and significant accomplishment over a sustained period of time in the field of foreign affairs." 3 FAM4822.2-1(a).

[79] Defs' Memo. at 16.

[80] *Owens v. Republic of Sudan*, 864 F.3d 751, 788 (D.C. Cir. 2017), *certified question answered*, 194 A.3d 38 (D.C. 2018), and *vacated and remanded on other grounds sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601, 206 L. Ed. 2d 904 (2020).

[81] Exh. D, Winer Report ¶ 9.7

discussed below.[82]

b. **Jenkins**

Jenkins' testimony regarding motive, state of mind, and intent is admissible because it is based on his proper sourcing of the parties' own statements. Expert witnesses may not infer as to the intent or motive of parties, *i.e.* "tell[ing] the jury the defendant's intentions through the mouths of witnesses other than [itself]."[83] However, an expert is free to quote a Defendant and draw conclusions.

Defendants seek to exclude certain of Jenkins' opinions on the basis that they are speculative. Even the snippets included in Defendants' brief reflect that Jenkins is offering opinions based on his research and analysis of source material, such as criminal complaints, trial transcripts, and detainee statements. By way of further example, in Jenkins deposition, he testified that "[w]hen bin Ladin was alive, he regularly communicated at length in terms of various speeches and communications, so did [Ayman al] Zawahiri."[84] Jenkins continued, "[i]n some cases immediately after 9/11, bin Ladin and Zawahiri gave interviews to the press and so you have what they said in those" and he additionally referred to material written directly by Al Qaeda strategists.[85] Statements of Al Qaeda strategists offer valuable insight into the organization's strategies and goals, but also require expert analysis and consideration to assist the trier of fact. Indeed, courts have found expert opinions regarding origin, leadership, and operational structure of terrorist organizations are permissible testimony.[86] On his basis, Jenkins' testimony must not be excluded.

## IV. **METHODOLOGY AND SOURCES CONSIDERED**

---

[82] *Infra.* § IV (d) (i).
[83] *United States v. Rahman*, 189 F.3d 88, 136 (2d Cir. 1999).
[84] Jenkins Dep. 127:2-6.
[85] Jenkins Dep. 127:8-21.
[86] *See, e.g., Strauss v. Credit Lyonnais, S.A.* 925 F. Supp. 2d 414, 438-9 (E.D.N.Y. 2013) (noting "courts in this circuit have admitted testimony from experts based upon hearsay analyzing the 'origin, leadership, and operational structure' of terrorist organizations, analogizing such testimony 'to the type of expert testimony regularly permitted by the United States Court of Appeals for the Second Circuit in cases involving organized crime families.'" (Citation omitted)).

a.  **Methodology**

Under the standard articulated in *Daubert*, the Court may consider five factors in determining whether a methodology is valid: (1) whether the theory or technique can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) its known or potential error rate; (4) the existence and maintenance of standards controlling its operation; and (5) whether it has attracted widespread acceptance within a relevant scientific community."[87]   In terrorism cases specifically, proposed expert testimony is not "of a technical nature, but rather falls within the ambit of social science" and Courts should be "guided by the objective of the *Daubert* factors, and not a mechanical application of each one."[88]

Federal Rule of Evidence 702 allows an expert to offer an opinion if (1) "the testimony is based upon sufficient facts or data", (2) "the testimony is the product of reliable principles and methods", and (3) "the expert has applied the principles and methods reliably to the facts of the case." Courts must ensure, "that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."[89]   Intertwined with an examination of methodology is the expert's selection and consideration of reliance materials. Experts are permitted to rely on "sources encountered in their research and professional experience."[90]   In *U.S. v. Paracha*, Plaintiffs' expert Evan Kohlmann described his methodology as "consist[ing] of gathering multiple sources of information, including original and secondary sources, cross-checking and juxtaposing new information against existing information and evaluating new information to determine whether his conclusions remain

---

[87] *Daubert,* 509 U.S. 579 (1993).

[88] *United States v. Paracha*, No. 03 CR. 1197 (SHS), 2006 WL 12768, *20 (S.D.N.Y. Jan. 3, 2006), *aff'd*, 313 F. App'x 347 (2d Cir. 2008).

[89] *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).

[90] *Owens v. Republic of Sudan*, 864 F.3d 751, 791 (D.C. Cir. 2017), *certified question answered*, 194 A.3d 38 (D.C. 2018), and *vacated and remanded on other grounds sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601, 206 L. Ed. 2d 904 (2020) (concluding that a "layperson" could not have reliably reached the same conclusion as experts.).

consonant with the most reliable sources"[91]   The Court in *Paracha* found that his methodology is "similar to that employed by his peers in his field" and thus was permissible.[92]

>   b.  **Plaintiffs' Experts' Methodologies are Reliable, Reliably Applied, and Valid under the *Daubert* Factors**

>   >   i.  **Winer**

Winer's methodology is reliable, and he reliably applied it to form his expert opinions, in accordance with the Federal Rules. Winer testified that he applies an "all-source" approach, which he described as taking "as many sources as you can and then weigh the sources and bring them together to form your analytic finding on a topic."[93] This approach is fundamentally comparable to what was described by Plaintiffs' expert Evan Kohlmann in the *Paracha* case, which this Court previously found a "sufficiently reliable methodology to meet the requirements of Fed. R. Evid. 702."[94]

In describing his methodology, Winer also details how his substantial experience influences his analysis:

>   I draw on my own personal experience in the field, and … -- whatever period of time that I worked on an issue directly when I was in the government, I draw on my experience as a practitioner, as a lawyer, … I draw upon, as well, analysis and academic work that I've undertaken in the past and the research I did in connection with that.[95]

Winer testified that he applies this methodology to all facts available to him, helpful and unhelpful.[96] Winer further testified:

>   [I]n light of my own experience and knowledge, which included the academic analytic work that I did for the U.S. government, as well as my own tenure working for the Senate and my two tenures at the State Department, and the work that I've done on behalf of my clients, I looked at the materials provided to me by the attorneys in this case, supplemented it with additional research into the secondary literature of some scholars, who I cite in my reliance material, and that's how I came to my formulations.

---

[91] *Paracha, 2006 WL 12768, *20 (S.D.N.Y Jan. 3, 2006).*

[92] *Id.*

[93] Exh. C, Winer Dep. 119:1-12; *see generally* Exh. C, Winer Dep. 117:24 – 119:12; 119:24 – 120:22 (Winer discussing his methodology).

[94] *Paracha*, 2006 WL 12768, *20 (S.D.N.Y. Jan. 3, 2006).

[95] Exh. C, Winer Dep. 118:1-11.

[96] Exh. C, Winer Dep. 120:23 – 121:1.

When there was first-hand information that I thought was particularly relevant, I looked at it. And when I didn't have it, I asked for more of it.[97]

Defendants argue that it is somehow improper that Plaintiffs' counsel identified documents for Winer's review, despite acknowledging that there are *millions* of production documents at issue in this case, many of which are in Arabic, and despite the fact that defense counsel admitted to doing the same for their experts.[98] As is commonplace in litigation involving massive document productions, Plaintiffs provided documents relevant to the experts' area of analysis and inquiry. It would have been profoundly irresponsible to turn over millions of irrelevant documents to experts for review. That Plaintiffs did not do so is not a valid challenge to Winer's methodology. Winer requested and received dozens of documents produced in the litigation from both WAMY and IIRO and relied on these documents to form the opinions in both his reports.[99] The key inquiry is whether Winer engaged in a reliable methodology, and reliably applied it to the facts; the quantity of documents reviewed alone is not indicative of reliability.

Defendants criticize the scope of Winer's review and argue that Winer did not undertake the all-source analysis he described because, in part, he did not review as many audits as Defendant WAMY's expert Jonathan Marks. First, Marks admitted that he had others review documents and

---

[97] Exh. C, Winer Dep. 122:1-15.

[98] Defendants went even further than providing their experts with documents. At least in some instances, defense counsel provided the experts with document summaries and mapped out which of the discovery documents responded to various aspect of the experts' reports. For instance, Khalid Blankinship evidently received an Excel chart referencing certain documents selected by defense counsel as he cited it within his report at fn. 113 as "Cell 321 in 2020-02-20 Topics Index for Experts" and again in fn. 32 regarding a different cell within the chart. *See* Exh. R, Email between WAMY Counsel and Plaintiffs' Counsel. When Plaintiffs' counsel requested a copy of the document as material on which Blankinship relied, WAMY counsel refused to produce the spreadsheet, explaining that it was a topical index of the documents prepared by counsel for WAMY's experts, and was attorney work product. *Id.*

[99] Winer testified that he requested more production documents for his rebuttal report. Exh. C, Winer Dep. 282:5 – 12 ("The audits that were provided me and I asked for more did not correspond to the number described in your expert reports…"); Exh. C, Winer Dep. 27:22-25 ("I was given an initial group of documents. After going through those documents, I asked for more documents. And that took place a couple of times."); Exh. C, Winer Dep. 122: 12-15 ("When there was first-hand information that I thought was particularly relevant, I looked at it. And when I didn't have it, I asked for more of it.").

orally summarize them.[100] In addition, no one – not even Marks – knows what audits he purportedly considered, because Marks never identifies them. In Marks' report and in the exhibit listing his reliance materials, Marks merely stated that he reviewed "57 audit reports" without ever identifying what reports he considered or offering any analysis of those reports.[101] Despite request for clarification, WAMY still has not identified the 57 audit reports, and Plaintiffs have been unable to identify 57 audit reports within WAMY's production.[102]

Defendants also raise contested facts as support for their unfounded challenge to Winer's expert report. Specifically, Defendants assert as a fact that the Benevolence International Foundation, Inc., ("BIF") is a "separate" charity, not "intertwined" with WAMY subsidiary Lajnat Al-Birr Al-Islamiah ("LBI"), through their shared leadership by Adel Batterjee.[103] WAMY suggests Winer did not consider, cite, or discuss, documents WAMY uses to support its *argument* that WAMY was not intertwined with LBI.[104] But this assertion is easily discharged as inaccurate. When asked in his deposition as to whether he would consider particular documentary evidence, Winer responded,

> I try to consider everything. In the case of Arnaout and LBI and BIF, and WAMY, you have a very complicated environment in which Arnaout and Batterjee are meeting with key people who are part of al-Qaeda early on, in which WAMY provides early support to LBI, which is simultaneously Saudi and Pakistani.[105]

Regarding Defendants' claim as to the veracity of the documents on which Winer relied, Winer

---

[100] Exh. K, Marks Dep. 78:23-82:2.
[101] Exh. L, Marks' Report, p. 7.
[102] Exh. S, Letter response from WAMY counsel regarding "57" audit reports reviewed by Jonathan Marks.
[103] Defs' Memo. at 31; *See* Fed. R. Evid. 702 advisory committee's note ("When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the amendment on 'sufficient facts or data' is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.").
[104] As Winer stated in his deposition "I don't think it's fair to say that [I have not reviewed documents produced in this case as to the role of Batterjee with LBI]. I reviewed Noor Wali's deposition, which goes into it in some depth about Batterjee's role. I reviewed other documents in which Batterjee was characterized as the founder of LBI. This includes the U.S. government, and I think the UN's findings about Batterjee, which in turn are consistent with the proffer in the Arnaout case, put together by Patrick Fitzgerald." Exh. C, Winer Dep. 221:9 – 20.
[105] Exh. C, Winer Dep. 224:8 – 19.

stated his opinion is not based solely on a proffer but "all the information available to him."[106] Winer also directly responded to the assertion that Batterjee was allegedly "dismissed," stating "[i]t looks to me from this document that at some point in this period, a new executive director took over from the old executive director. It doesn't say that the old executive director was dismissed."[107] This alone evinces Winer's application of his methodology – he was presented with a single ambiguous document and analyzed it with a critical eye by comparing it to other evidence he has seen in this litigation. Winer testified "[t]he statement that he's dismissed…is not set forth in this document."[108]

Defendants' assertions that Winer "completely ignored" the findings contained in the 9/11 Commission's Monograph on Terrorist Financing ("the Monograph") are similarly unfounded. When asked if he'd considered a portion of the Monograph, Winer responded affirmatively[109] and also elaborated on other sources of information he considered contemporaneously, stating:

> Complex financial crime cases, I've seen repeatedly, run into problems even when it was clear to me, in connection with such cases, that there was serious criminal activity. I've seen this repeatedly. They are hard cases to make, because the actions that relate to complex international crime cases, which include terrorist finance cases, can take place over a long time. They can involve people who aren't available for testimony in the United States. The source is going to be a mixture -- can involve intelligence sources which can't be readily converted into physical evidence. So they are hard case to make. In this case, there is a reference here to at least after al-Qaeda was designated a foreign terrorist organization in 1999. One of the issues in the BIF case, as I understand it, was in the time period that the -- that was relating to the proofs. Some of the activity that the government alleged was from older activity. So all of those, that has to be taken into consideration, as one thinks about this paragraph.[110]

During Winer's deposition, defense counsel similarly insinuated Winer "ignored" documentary evidence and asserted that "you have better understanding of all of these findings than

---

[106] Exh. C, Winer Dep. 225:9 – 14.
[107] Exh. C, 229:16-23.
[108] Exh. C, Winer Dep. 230:1-3.
[109] Exh. C, Winer Dep. 256:6-8 ("Yes, I read the terrorist financing staff monograph. And these cases, complex financial crime cases from all counts.").
[110] Exh. C, Winer Dep. 256:10-258:1.

those exhibits that we entered into evidence today" to which Winer replied "[t]hat's a misstatement of my testimony."[111] There, as here, Defendants seek to undermine Winer's methodology by stating that he "ignored" material that he clearly considered. Winer's testimony evidences that he reliably applied an accepted methodology, and that he weighed certain material against other material to credit, discredit, or leave as neutral a fact, as part of that methodology. That the Defendants disagree as to the weight due to certain agreements creates an issue for cross-examination but does not provide a basis to exclude reliable expert testimony. A *Daubert* motion is not the place to make such challenges.

### ii. Jenkins

Jenkins reviewed source material and properly applied his expertise to provide analysis critical to an evaluation of the Plaintiffs' claims. Defendants improperly frame their disagreements with Jenkins' conclusions as criticisms of his methodology. Jenkins' inability to provide immediate precise citations during his deposition does not evidence a lack of methodological rigor.

Defendants point to two exchanges in Jenkins' deposition that, in their view, are illustrative of their complaints. First, Defendants claim that Jenkins' methodology is deficient based on his assertion that "terrorists seek symbolic targets."[112] Yet Jenkins applied his expertise to the relevant source material in forming this opinion, and Defendants' efforts to misconstrue his statements do not render his opinions unreliable. Jenkins listed several locations that, at one time or another, were terror targets.[113] Jenkins was *not* asserting all of these were Al Qaeda plots, nor was he discussing the Bojinka plot in this section of his report. Defendants apparently do not take issue with the substance of this section of his report, but instead try to tie an irrelevant, and off-topic question asked of Jenkins during his deposition to an unrelated section of his report by querying Jenkins as to whether any of these

---

[111] Exh. C, Winer Dep. 258:11 – 10.
[112] Exh. H, Jenkins' Report, at 12.
[113] *Id.*

plots involved Al Qaeda. Jenkins correctly answered that the Bojinka plot, at one time or another, targeted the CIA headquarters.[114] Jenkins was even asked to "make a list of each and every piece of evidence that supports the conclusion that the Bojinka plot was reportedly financed in part by bin Ladin"[115] – which falls well outside the scope of his responsibilities at a deposition. Defendants' attempt to couch an irrelevant semantic dispute about Al Qaeda's involvement in the Bojinka plot does not serve as not a valid criticism of Jenkins' methodology. As their second point, Defendants point to a discussion regarding Ramzi Yousef and claim that because Jenkins did not immediately recall the full basis for his opinion at his deposition, it follows that he "never performed the work of a historian." This is a significant mischaracterization of his efforts. Jenkins' report and testimony are replete with evidence that he evaluated reliable source material and applied his expertise to form his opinions. Accordingly, Defendants' challenges to Jenkins' methodology should fail.

c.  **Sufficiency of the Factual Predicate and Inadmissible Hearsay**

The materials relied upon by PECs' Experts, together with their extensive individual experience and research, and methodical application of analysis to the facts in this matter, provide a sufficient factual basis for their expert opinions. That the underlying materials may be inadmissible themselves is irrelevant to determining whether the expert may rely on the materials in forming an opinion. "Under Federal Rule of Evidence 703, a properly qualified expert may base his opinion upon otherwise inadmissible sources of information as long as those sources are reasonably relied upon in his field of expertise."[116]  In *U.S. v. Holy Land Foundation*, the court explained, the "purpose of Rule 703 is not to limit the evidence upon which the expert may rely; rather it is designed to limit the portions of the facts or data relied upon that can be disclosed to the jury."[117]

---

[114] Exh. J, *9/11 Commission Report*, page 153.
[115] Exh. I, Jenkins Dep. 226:11-15.
[116] *Owens v. Republic of Sudan*, 864 F.3d 751, 789 (2017).
[117] *U.S. v. Holy Land* Foundation, 2007 U.S. Dist. LEXIS 51184 at *14 (N.D. Tex. July 16, 2007).

In this vein, courts have consistently held that materials of the ilk relied on by the PECs' experts, such as trial testimony of Al Qaeda informants, U.S. Government intelligence reports, and secondary source material, provide a sufficient basis for expert testimony on terrorism.[118] In *Damrah*, the district court recognized the inherent constraints present in terrorism cases and stated, "Given the secretive nature of terrorists, the Court can think of few other materials that experts in the field of terrorism would rely upon."[119] Examining this issue in *Linde*, the court cited *Damrah* in agreeing that books, press releases, newspaper articles, and government publications were among the materials on which terrorism experts would appropriately rely.[120] In *Strauss v. Credit Lyonnais, S.A.*, the court explained that the expert "must form his own opinions by applying his extensive experience and a reliable methodology to the inadmissible materials."[121] The *Strauss* court provided additional context for this concept in deeming proposed expert testimony admissible. Recognizing that the experts relied on news reports, academic materials, and secondary sources, the court explained:

> [C]ourts in this circuit have admitted testimony from experts based upon hearsay analyzing the 'origin, leadership, and operational structure' of terrorist organizations, analogizing such testimony 'to the type of expert testimony regularly permitted by the United States Court of Appeals for the Second Circuit in cases involving organized crime families.' . . . Indeed, courts, including this one, have allowed [an expert] to testify about similar terrorist organizational matters over objections that his testimony only repeated inadmissible hearsay . . .[The experts'] reports do not only regurgitate the hearsay, but bring to bear their terrorism expertise, and the types of sources they use are reasonably relied upon by experts in the field.[122]

In *Linde*, the court admitted the testimony of an expert on terror groups, including Hamas, holding that he was not "a mere conduit for inadmissible evidence."[123] The court held the expert did

---

[118] *Owens,* 864 F.3d at 791 (citing *United States v. Damrah*, 412 F.3d 618, 625 & n.4 (6th Cir. 2005) (approving an expert's reliance upon books, press releases, newspaper articles and the State Department *Patterns of Global Terrorism* reports) and *Boim v. Holy Land Found. for Relief & Dev.*, 549 F.3d 685,704-05 (7th Cir. 2008) (approving reliance upon terrorist websites and observations from prior criminal trials)).

[119] *Damrah*, 412 F.3d at 625.

[120] *Linde II*, 922 F. Supp. 2d 316, 324 (E.D.N.Y. 2013).

[121] *Strauss*, 925 F. Supp. 2d 414, 438 (E.D.N.Y. 2013).

[122] *Id.*

[123] *Linde II*, 922 F. Supp. 2d at 322-23.

a sufficient job in showing how he "reasonably rel[ied] on [hearsay] evidence in forming [his] opinions" by explaining he "applied his expertise to analyze the underlying evidence…pull[ing] together information from discrete sources, including sources that may be independently admissible, and cross-references it against other supportive or contradictory information in reaching his conclusions." When the Defendant in *United States v. Abu-Jihaad* argued for Evan Kohlmann's testimony to be stricken because it was not based on sufficient facts and was not the product of reliable principles, the court disagreed and further explained:

> While Mr. Kohlmann must, perforce, rely often on hearsay, he testified that he gathers information from multiple sources and cross-checks factual information he receives with existing information from other sources. He also works collaboratively with his peers and relies upon original information provided directly by the terrorist organizations themselves.[124]

Citing to other cases approving Mr. Kohlmann as an expert, or otherwise permitting expert testimony in the terrorism context, the *Abu-Jihaad* court explained that it would be acceptable to base the testimony on "books, press releases, and newspaper articles" and that it "is more reliable than a simple cherry-picking of information from websites and other sources."[125]  Even so, under certain circumstances, websites are acceptable and even preferred sources of information for terrorism experts. For example, when the *Linde* court denied a motion to exclude Kohlmann's expert testimony and approved his methodology, it reasoned it was "not fatal to his testimony that his research was conducted solely on the Internet."[126]  In explaining the acceptability of another expert's reliance on websites, the *Linde* court cited Judge Posner, writing for the *en banc* majority in *Boim*, explaining, "the websites of Islamic movements and Islamic terrorist organizations have long been accepted by security experts as valid, important, and indeed indispensable sources of information."[127]

---

[124] 553 F. Supp. 2d 121, 126 (D.D.C. 2008).
[125] *Id.* at 126 (quoting *Paracha* at 21).
[126] *Linde II* at 322.
[127] *Id.* at 323 (quoting *Boim* at 704).

The District of Columbia Circuit Court in *Owens* found it "hard to imagine what other than hearsay an expert on terrorism uses to formulate his opinion."[128]   Quoting Judge Posner, the *Owens* district court addressed this point as well: "to confine experts' analysis to admissible evidence alone 'would be a crippling limitation because experts don't characteristically base their expert judgments on legally admissible evidence; the rules of evidence are not intended for the guidance of experts.'"[129]   Of paramount importance is the expert's application of his or her expertise to the underlying facts and data, whether or not the sources considered by the expert would be individually admissible. To the extent the Defendants seek to invalidate or strike the opinions that are more than mere "regurgitation" of the secondary sources or other hearsay, then that result would create a precedent entirely inconsistent with FRE 703 or the application of these principles in the context of US government prosecutions.

    d.  **Plaintiffs' Experts Provide a Sufficient Factual Basis for their Expert Opinions**

        i.  **Winer**

The materials on which Winer relied to support his expert opinions are consistent with those relied on by experts in these fields, and are the precise sources that courts have approved when admitting expert testimony in the terrorism arena. Winer's opinions regarding terror financing and the involvement of Saudi charities are, in large part, grounded in factual information presented in books, press releases, newspaper articles, criminal indictments, and government publications including the *9/11 Commission Report*, the National Commission on Terrorist Attacks Upon the United States Monograph on Terrorist Financing Staff Report to the Commission, and testimony before Senate committees.[130] This documentary material provides a sufficient factual basis to support Winer's expert

---

[128] *Owens* at 791.
[129] *Owens v. Republic of Sudan*, 174 F. Supp. 3d 242, 279 (D.D.C. 2016), *rev'd on other grounds*, 864 F.3d 751 (D.C. Cir. 2017).
[130]  *See* Winer Report, *passim.*

opinions, particularly when informed by his practical experience, professional training, and specialized knowledge.

Defendants make no credible claim that Winer's opinions lack sufficient factual basis, and instead raise this complaint in response to any instance in which Winer relies on facts that they do not like. Winer's opinions on MWL, IIRO, and WAMY's support for Al Qaeda and the factual bases for those well-reasoned opinions are set forth throughout his report in unembellished, unprovocative language.[131] Without legal justification for their claims, Defendants resort to personal attacks on Winer; for example, Winer did not conclude that "Islam is the fatal problem," – as Defendants contend – this soundbite is a summation invented by the defense to smear Winer in the same tenor as other attacks leveraged against his character rather than his expertise.

An examination of Winer's expert report and deposition testimony leave no doubt that there is more than a sufficient factual basis for his opinions. For example, Winer offered his reasoned opinion that the phrase "international charities…such as the Saudi-based al Haramain Islamic Foundation" also implicitly refers to WAMY, MWL, and IIRO.[132] Although Defendants dismiss this opinion as speculative, and without a factual basis, Winer's testimony reflects the factual predicate underlying his opinions. In the *9/11 Commission Report,* this phrase appears in a paragraph in which al Haramain Islamic Foundation is cited as an example of one of several corrupt charities Al Qaeda could rely on for material support.[133] When questioned on how the phrase supported his conclusion, Winer explained that he was able to construe the phrase "such as" to referring to the Defendant charities

---

[131] Including, but not limited to, the 1996 CIA Report, testimony from high-ranking US Government officials, testimony of Jamal al Fadl, deposition testimony given by fact witnesses in this case, and documents produced by Defendants in this case.

[132] Defs' Memo. at 20.

[133] Exh. J, *9/11 Commission Report* at 170 -171 (emphasis added) (according to the Notes, 117-119, p. 498, the source of these statements is attributed to three different CIA analytic reports: (1) "Identifying al-Qa'ida'a Donors and Fundraisers: A Status Report (Feb. 27, 2002); (2) "How Bin Laden Commands a Global Terrorist Network" (Jan. 27, 1999); and (3) "Al Qa'ida's Financial Ties to Islamic Youth Programs" (Jan. 17, 2003).

because:

> "…there were a limited number of large international charities in Saudi Arabia. And the one the United States government referred to repeatedly as a particular concern in public testimony and in private communications to the Saudi Arabian government were IIRO, the Muslim World League, and WAMY."[134]

Winer's opinion in this regard is not mere speculation; it is based on Winer's decades of experience in government, and his analysis of "many statements made by U.S. government officials in other forums about these entities."[135]

Defendants' characterization of Winer's assessment of the Rabita Trust-MWL relationship is also misleading. Contrary to the Defendants' assertion that "[d]ocuments produced in discovery … make clear that the Rabita Trust was not a subsidiary of MWL," documents produced by Defendants MWL, IIRO, and Wa'el Jelaidan do in fact confirm that the MWL and IIRO: (1) were directly involved in the founding of Rabita Trust, including its initial funding;[136] (2) populated Rabita Trust's Board of Trustees with senior high-ranking officials of the MWL and IIRO;[137] (3) exerted significant oversight and control over Rabita Trust's operations and activities from 1988 through at least 2004;[138] (4) were responsible for appointing the individuals to lead Rabita Trust, including the appointment of Executive Order No. 13224 Specially Designated Global Terrorist ("SDGT") Wa'el Jelaidan as Secretary General of Rabita Trust;[139] (5) permitted Rabita Trust to operate out of MWL-IIRO offices, including the MWL's office in Mecca, Saudi Arabia and the MWL-IIRO branch office in Islamabad,

---

[134] Winer Dep. 143:12-19.

[135] Exh. C, Winer Dep. 144:23 – 145:2, Winer goes on to say that one only needs to "put two and two together and it makes four." Winer's specific testimony as to the involvement of IIRO is predicated on designations, State Department cables, CIA Reports, UN Reports, and UN Security Council Letters and similar documents. *See e.g.* Exh. D, Winer Report fns. 26-29.

[136] Exh. M, Jelaidan 017.

[137] Exh. M, Jelaidan 016, 017; Exh. N, MWL 30817-30819

[138] Exh. M, Jelaidan 016, 017, 020, 021; Exh. N, MWL 8691, 30890-30892; Exh. O, IIRO 149628, 149633-149636, 149637-149639, 149661, 149642-149644.

[139]Exh. M, Jelaidan 022; Exh. N, MWL 30817-30819.

Pakistan;[140] (6) coordinated responses and actions following the E.O. No. 13224 designation of Rabita Trust;[141] (7) ordered the closure of Rabita Trust's office in Lahore, Pakistan and the seizure of all documents in the office;[142] and (8) coordinated efforts to petition the U.S. Treasury Department to remove Rabita Trust from the E.O. No. 13224 designation list.[143]

Defendants' simple disagreements with Winer's conclusions do not support exclusion of his expert opinions. Defendants draw a false equivalence between Winer's reliance on well-founded materials that support contrary conclusions and an entire lack of factual support underlying his opinions. Winer did not, for example, ignore certain documentary evidence or facts, such as the 2003 congressional testimony of OFAC's then-director Richard Newcomb, or the continued existence of WAMY, but instead viewed this information through the lens of his expertise. These isolated pieces of information, on their face, do not exonerate WAMY. That Winer reached a different conclusion does not suggest that his conclusion lacked factual support.

Defendants present a similarly flimsy argument with regard to their claim that Winer did not provide adequate support for his conclusions regarding the charity Defendants' provision of funding for madrassas. The fact that Winer did not identify Al Qaeda members who attempted WAMY-funded madrassas in his deposition testimony does not call into question all of his conclusions on that topic; Winer testified that he "knows that there are people who became members of al-Qaeda who attended madrassas."[144] Defendants state – misleadingly – that "[t]he only source [Winer] provides is footnote 86" for his discussion of madrassas, yet neglect to mention that footnote 86 contains eight separate sources. Winer's opinion that WAMY propagated the same extremist and violent material found in

---

[140] Exh. N, MWL 8691, 30890-30892; Exh. O, IIRO 149661, 149642-149644.
[141] Exh. O, IIRO 149628, 149630, 149633-149636, 149637-149639.
[142] Exh. N, Jelaidan 020.
[143] Exh. N, Jelaidan 021.
[144] Exh. C, Winer Dep. 219:12-17.

madrassas that sought to radicalize attendees for recruit by Al Qaeda is supported by a sufficient factual basis. The statements outlined in subparagraphs to Winer's report at 12.11 include direct quotes from WAMY and MWL pamphlets and materials which state, *inter alia*, "the Jews are humanity's enemies",[145] and "[T]each our children to love taking revenge on the Jews and the oppressors."[146] Winer also cites, at footnote 88, to the 2003 testimony of Dore Gold to Congress where Gold named WAMY, IIRO, MWL, and Al Haramain, as organizations originally purposed with spreading Wahhabi Islam but which had "become penetrated by prominent individuals from al-Qaeda's global jihadi network."[147] Winer's expertise and analysis of these documentary materials provides a sufficient factual basis for his opinions.

Defendants wholly ignore Winer's testimony supporting his opinion that WAMY lacked controls, and instead repeat the refrain that Winer's opinions are speculative and lack supporting facts. In consideration of source material and his own experience researching and analyzing financial controls and regulations, Winer identified various "red flags" as evidence of lack of regulatory controls. Far from being unsupported, Winer's opinion in this regard is premised on materials published by the Financial Action Task Force ("FATF"), an international standard-setting entity to combat financial crimes, with whom Winer worked while he was in government service.[148] Despite Defendants' insistence that Winer's opinion is based on only one factor, Winer explained "student welfare" is the "kind of slush fund category that would enable a charity operating in an area of conflict to provide support for a terrorist group…" and "it's more difficult to know what's being done when the people

---

[145] *See* Exh. D, Winer Report 12.11.1.2 quoting <u>A Handy Encyclopedia of Contemporary Religions and Sects</u>, published by WAMY.
[146] *See* Exh. D, Winer Report 12.11.2.2 quoting <u>Islamic Views</u>, an Arabic language book written by WAMY and printed by the Saudi Government's Armed Forces Printing Press.
[147] *See* Exh. D, Winer Report ¶ 9.4.4.5.
[148] Exh. C, Winer Dep. 83:17 – 85:1; 296:22 – 297:7; 320:2-15; *see also* Winer Report p. 66 and fn. 104, "Mutual Evaluation, Anti-Money Laundering and Combating the Financing of Terrorism, Saudi Arabia" (including examples of "red flag indicators" including shipments involving "a high risk jurisdiction.")

to whom the funds are being provide[d] are in an area of conflict or in an area that…has got a substantial number of terrorist training camps and a terrorist presence in it."[149] During Winer's deposition, defense counsel sought to discount Winer's factual analysis. Counsel repeatedly mischaracterized Winer's statements, by suggesting that "because it's in an[sic] conflict zone that then it should be used to support terrorism; correct?" to which Winer responded "[t]hat's not a correct statement of my views or--" before he was interrupted.[150] It should have been obvious this was not Winer's opinion, as he had stated explicitly in the deposition that the mere presence of a charity in a conflict zone does not mean it is necessarily engaged in terrorist activity.[151] Further supportive of Winer's opinions, FATF, the foremost body responsible for establishing standards to combat international money laundering and terrorist financing, has said "NGO's operations in areas of conflict are viewed as the most high-risk for terrorist abuse because of the low governance capacity in such areas."[152] Defendants also suggest that Winer's admission that there is "no proof" that weak controls cause individuals to join terrorist organizations is tantamount to a finding that there are no supporting facts, or an "absence of evidence."

Defendants decontextualize Winer's testimony. Winer pointed to the obvious fact that weak controls subvert the ability to reconstruct the relevant facts. But Winer continued, explaining:

> …one has to rely on a lack of controls and the material deficiencies in the controls, the presence in the location, the nature of the people who were being served, the fact that they're foreign fighters rather than domestic or local -- they're foreigners rather than domestic or local people, and a variety of other factors as I've illustrated in the report. Moreover, the report goes into facts such as the provision of travel documents and facilitation and so on. One would then have to get quite granular, and you've not asked me about those granular issues.[153]

---

[149] Exh. C, Winer Dep. 320:2-5; 320:24 – 321:4
[150] Exh. C, Winer Dep. 322:7-11.
[151] Exh. C, Winer Dep. 137:20 – 138:6.
[152] FATF Report: Risk of Terrorist Abuse in Non-Profit Organizations (June 2014) at 70 (https://www.fatf-gafi.org/media/fatf/documents/reports/Risk-of-terrorist-abuse-in-non-profit-organisations.pdf).
[153] Exh. C, Winer Dep. 327:9-21.

In other words, Winer underscored the need to *analyze* the relevant data points as evidence; he did not rely on an "absence of evidence."

Lastly, Defendants challenge the factual basis of Winer's opinions by criticizing a Canada Revenue Agency ("CRA") report, without even addressing the factual basis that Winer considered in regard to the CRA report. Defendants' suggestion that Winer is not qualified to render an opinion on the CRA report because he is not a certified public accountant or forensic auditor ignores both Second Circuit authority establishing that formal training is not required for expert testimony, and also Winer's vast experience and expertise in the realm of international financial crimes. In fact, Winer discusses the CRA Report at length in his deposition, and this testimony highlights the factual predicate underlying Winer's opinions. Winer states that the report is "also consistent with what [he had] I've seen in many… international financial crime cases, in which the purposes of the transactions are mischaracterized for the purpose of transactions that went through banks or that were recorded."[154] Again, Winer refers to the significant body of facts and data that support his opinions, based on his decades of experience investigating international financial crimes. To the extent that Defendants take issue with the report itself, it is a report of a government agency – a document routinely relied on by experts in this filed – and remains a proper basis for expert testimony.

As discussed *supra,* courts experts are permitted to rely on hearsay to inform their expert opinions, notwithstanding the fact that the documents themselves otherwise would be inadmissible. Despite this generally accepted case law, Defendants claim that Winer is "regurgigat[ing] hearsay evidence" without offering "analysis or opinion of his own." Defendants refer to section 6 of Winer's report as demonstrative of what they claim forms an inadmissible expert opinion.

A comprehensive analysis of this section, and Winer's report and testimony generally, confirm

---

[154] Exh. C, Winer Dep. 166:5-10.

that Winer is forming his "own opinions by applying his extensive experience and a reliable methodology to the inadmissible materials."[155] The simple fact that Winer quotes his supporting documentation does not render his opinions inadmissible. Further, Winer offers his assessments in the paragraphs following his quotations – at 6.4 and 6.5. Quoting the *9/11 Commission Report* and then offering insightful analysis and appropriate context based on his expertise is not acting as an impermissible conduit for hearsay. By way of example, paragraph 6.5 of Winer's affirmative expert report explicitly offers his expert opinion on quoted passages and describes their consistency with other "information developed by various federal government agencies both before the 9/11 attacks and afterwards."[156] In applying his own expertise to the source material, Winer is providing valuable insight into the veracity of the Commission's conclusions. Winer's extensive background offers context critical to understanding the full significance of documents produced by the U.S. government and the United Nations Security Council.

Winer's methodology and application of his expertise to materials that themselves are hearsay is evident from his testimony. For example, regarding the 1996 CIA report and the query as to whether he "corroborates" the information contained within it, Winer responded:

> I looked at that report in the context of everything else that I know about terrorist finance. I look at that report in the context of what I was hearing about terrorist finance in the last years of the Clinton administration, which is consistent with that report. I look at it with a continued expression of concern about some of the entities listed in the report by the United States government all the way up to and including … two thousand -- December 2009. I look at it in connection with the academic research in findings of a number of different academic researchers. I look at it in connection with the findings of the 9/11 Commission. And so I weigh it with a lot of other material.[157]

Defendants acknowledge the breadth of source material and expertise on which Winer relies to

---

[155] *Strauss v. Credit Lyonnais, S.A.*, 925 F. Supp. 2d 414, 438 (E.D.N.Y. 2013).
[156] Exh. D, Winer Report, ¶ 6.5.
[157] Exh. C, Winer Dep. 125:6-19.

contextualize the quoted hearsay material, including conversations with U.S. governmental officials, the 1996 CIA Report, and excerpts of statements from senior U.S. government officials.[158] Defendants seek to undercut Winer's expertise by framing his opinions as "occasional[]" comments, "speculation," or a "layperson's summary of the testimony" that lacks factual support. Yet these conclusions are not, as Defendants suggest, within the province of a layperson and instead require expert analysis to assist the trier of fact in understanding the key issues presented. Here, it is clear Winer's extensive experience would aid a factfinder in determining not only the import of the particular documentary evidence, but also  the veracity of the contents. For example, Winer's extensive explanation of several aspects of the 1996 CIA Report are assuredly beyond the purview of a layperson. Winer discusses how CIA documents in the 1990s may or may not be numbered, that it is not unusual for them to not be numbered, that the UN has referred to this document as a CIA document; and that it was not unusual for reports such as this to not be marked as classified depending on the then-current stage of intelligence development. Winer then provides an explanation of different types of intelligence, all outside of a layperson's experience, and accurately categorizes the 1996 Report as analytic intelligence.[159] Winer also provides assessment and analysis of the U.N. Security Council Report, which cited the 1996 CIA Report, in finding that the IIRO was used "knowingly or unknowingly to assist in financing al Qaeda."[160] Defendants' illogical argument that Winer's  conclusions are improper expert opinions, and, at the same time, are devoid of expert analysis, cannot be sustained.

At its core, Defendants' argument is not that Winer failed to review adequate documents to reach his conclusion; it is that he did not review or duly consider the documents that Defendants deem important, or favorable, to their position. These issues relate to the credibility of Winer's opinions,

---

[158] Defs. Mem. at 38.
[159] Full discussion at Exh. C, Winer Dep. 371:18 – 373:6.
[160] Exh. C, Winer Dep. 364:22 – 365:20.

and not to admissibility. Winer plainly testified he "looked at every audit that [he] was able to get [his] hands on and the financial records associated with them."[161] Defendants intimate that Winer could only have a sufficient factual basis for his opinion if he reviewed the more than two million documents, many of which are irrelevant.[162] It is worth noting, too, that WAMY expert Ambassador Chas. Freeman admitted that he did not rely on production materials or *any* documents in forming his opinion.[163] Defendants' argument—that Winer's failure to review millions of documents, whether relevant to his opinion or not, should void his entire opinion—cannot set the standard.[164] The quantity, scope, and type of documents on which Winer relied to form his opinions are those that experts in this field rely on routinely, and these documents, coupled with Winer's experience and expertise, provide sufficient factual basis for Winer's expert opinions.

### ii.    Jenkins

Jenkins' expert report is narrow in scope, and his citations and reliance materials are a reflection of that scope. As evidenced in his report and testimony, Jenkins presents sufficient factual basis for his opinions, premised on his experience and specialized knowledge regarding the issues presented.

Defendants essentially argue that Jenkins' opinions are improper because he did not cite

---

[161] Exh. C, Winer Dep. 42:20 – 43:

[162] By way of example, WAMY has consistently advanced this fictional narrative that it produced over one million pages of "responsive" documents in this litigation. The reality is that WAMY's productions consisted of tens of thousands of pages of largely irrelevant materials, randomly inserted into its productions without any internal logic or order, for purposes of boosting its raw production numbers. Those documents included thousands of insignificant invoices and receipts for office furniture, painting materials, car maintenance and washing services, fuel expenses, utility expenses, office supplies, perfumes and cosmetics, clothing, and other immaterial expenses. *See e.g.*, ECF No. 3911 at p. 2, n.5.

[163] Exh. T, Deposition of Chas. Freeman, 33:2-34:13 and 354:10-14 (Q: "And to the extent that you relied on any documents for your opinion, they are listed in your report, I take it; is that fair?" A: "I did not rely on documents.").

[164] In Winer's own succinct words on this issue, he explained:

> I don't know how I or any other human being who is an expert witness could review millions of pages of documents in the case. There wouldn't be enough time in a year to do that. There wouldn't be enough time maybe in five years or ten years for one person to do that. So that cannot be what's required of an expert.

Exh. C, Winer Dep. 121:18-25.

authority for facts that were well-known or accepted in his field, and only provided citations to "more obscure"[165] references – but this is exactly what an expert should do. There is no numerical requirement for expert report citations, and no magical support ratio of statements to source. That Jenkins did not include an arbitrary number of citations deemed sufficient by Defendants is not a legally cognizable reason to exclude portions of his testimony.

Jenkins' report and testimony offer extensive analysis of the *9/11 Commission Report*, which remains an early and reliable direct source for information regarding the events leading up to and culminating in the September 11th Attacks. It is eminently reasonable that this report would serve as the primary foundation for Jenkins' opinions.[166] In addition, because Jenkins testified before the 9/11 Commission and knows several of the commissioners personally, he can attest to information contained in the 9/11 Report.[167] As Jenkins explained, his expertise is rooted in a "lifetime of previous research,"; it is not unusual or deficient for experts to not cite to information or facts they consider self-evident.[168] In addition, to the extent Jenkins' report contains widely disseminated, publicly available information, such material does not require citation or direct attribution; however, the availability of particular information does not obviate the need for the expert analysis and contextualization that Jenkins provides on the core issues before the Court.

## CONCLUSION

For the foregoing reasons, the Defendants' Motion to exclude the expert testimony of Jonathan Winer and Brian Michael Jenkins should be denied.

---

[165] Defs' Memo. at 25.
[166] It is also worth noting that defense expert Marc Sageman also heavily relies on the *9/11 Commission Report*, and it has been thoroughly cited and discussed broadly across nearly every expert in this litigation.
[167] Exh. I, Jenkins Dep. 130:25 – 131:9.
[168] Exh. I, Jenkins Dep. 163:7-22.

Dated:  January 14, 2022

MOTLEY RICE LLC

By:  /s/ Robert T. Haefele
JODI WESTBROOK FLOWERS
DONALD MIGLIORI
ROBERT T. HAEFELE
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29465
Tel.: (843) 216-9184
Email: rhaefele@motleyrice.com
For the Plaintiffs' Exec. Committees

KREINDLER & KREINDLER LLP

By: /s/ Andrew J. Maloney
JAMES P. KREINDLER
ANDREW J. MALONEY, III
KREINDLER & KREINDLER LLP
750 Third Avenue
New York, New York 10017
Tel.: 212-687-8181
Email: amaloney@kreindler.com
For the Plaintiffs' Exec. Committees

Respectfully submitted,

COZEN O'CONNOR

By:  /s/ Sean P. Carter
SEAN P. CARTER
SCOTT TARBUTTON
COZEN O'CONNOR
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, Pennsylvania 19103
Tel.: (215) 665-2105
Email: scarter@cozen.com
For the Plaintiffs' Exec. Committees

**Certificate of Service**

I hereby certify that, on January 14, 2022, I caused an electronic copy of the Memorandum of Law in Opposition to Defendants' Motion to Exclude Expert Testimony of Brian Jenkins and Jonathan Winer and all accompanying papers to be served electronically by the Court's Electronic Case Filing (ECF) System. Notice of this filing will be served upon all parties in 03 MDL 1570 by operation of the Southern District of New York's Electronic Case Filing ("ECF") system.

_____
Robert T. Haefele