EXHIBIT F



Countering Terrorist Finance: A Work, Mostly in Progress

Author(s): Jonathan M. Winer

Source: *The Annals of the American Academy of Political and Social Science*, Jul., 2008, Vol. 618, Terrorism: What the Next President Will Face (Jul., 2008), pp. 112-132

Published by: Sage Publications, Inc. in association with the American Academy of Political and Social Science

Stable URL: https://www.jstor.org/stable/40375779

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms of scholarship. For more information about JSTOR, please contact support@jstor.org.

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at https://about.jstor.org/terms



and *Sage Publications, Inc.* are collaborating with JSTOR to digitize, preserve and extend access to *The Annals of the American Academy of Political and Social Science*

This content downloaded from
199.67.16.56 on Mon, 06 Dec 2021 16:27:05 UTC
All use subject to https://about.jstor.org/terms

# Countering Terrorist Finance: A Work, Mostly in Progress

By
JONATHAN M. WINER

Prior to the September 11, 2001, attacks, the United States and the international community had undertaken only limited measures to address terrorist finance. Seven years later, despite vast efforts and stronger counterterrorist finance regimes, major gaps in regulation and enforcement remain. Funds still reach terrorist groups through state sponsors, charities, and criminal activities. In Afghanistan, Saudi Arabia, Pakistan, Iran, and beyond, terrorist financing remains a huge problem. The next administration must do seven things to address terrorist finance: first, implement country-specific strategies to ensure global cooperation, particularly with state sponsors; second, undermine terrorist-affiliated charities by replacing the social services they provide; third, make U.S. law enforcement a truly global entity; fourth, regulate all domestic financial sectors; fifth, address smuggling of bulk currency and high-value commodities; sixth, reinvigorate the UN's support for counterterrorist finance regimes; and finally, improve U.S. domestic enforcement and communication with the American public and the world.

*Keywords:* state sponsor; terrorist finance; counterterrorist finance; narcotics; sanctions; money laundering; law enforcement

To understand where we are now, it is often helpful to look first at where we have been.

Prior to the September 11, 2001, attacks, the United States had undertaken some steps to address terrorist finance at home and internationally. Terrorist finance was criminalized domestically. President Bill Clinton had twice used U.S. sanctions authority under the

*Jonathan M. Winer is a partner with Alston & Bird, LLP, where he represents domestic and foreign clients on regulatory and enforcement matters and on government affairs issues, including data protection and management, information security, and privacy. His practice also extends to issues pertaining to sanctions, money laundering, and national security law. He is the former deputy assistant secretary of state for international law enforcement. He also served as chief counsel to Senator John F. Kerry and on the Steering Committee of the Transnational Threats Initiative of the Center for Strategic and International Studies.*

DOI: 10.1177/0002716208317696

ANNALS, *AAPSS*, 618, July 2008

This content downloaded from
199.67.16.56 on Mon, 06 Dec 2021 16:27:05 UTC
All use subject to https://about.jstor.org/terms

International Emergency Economic Powers Act (IEEPA) to freeze the assets of terrorist groups and to block U.S. persons from doing business with them.[1] The United States, working with the G-7 nations, had successfully secured the adoption by the United Nations of the Convention for the Suppression of Terrorist Financing in December 1999. But as of 9/11, only thirty-six states had signed the Convention—none of them from the Arab Middle East—and just four had taken formal steps to ratify it.[2]

Nevertheless, numerous gaps remained. In the first months of the Bush administration, senior Treasury officials sought to subject existing U.S. anti-money-laundering (AML) laws to a "cost-benefit analysis" to determine whether they were worth keeping.[3] Treasury regulations to require money transmitters to register, a prerequisite to effective oversight of them, remained permanently stalled. No guidance had ever been issued by U.S. bank regulators to domestic financial institutions about how to recognize possible terrorist finance.

Beyond the United States, few other countries had laws in place even criminalizing terrorist finance. Nowhere in the world were charities reviewed for possible terrorist funding risks. And despite U.S. designation of such countries as Iran and Syria as state sponsors of terrorism, neither country suffered reduced access to international financial infrastructures as a consequence. In theory, the architecture had just been created to do this, through the Financial Action Task Force (FATF) at the Organization for Economic Cooperation and Development (OECD) in Paris. The FATF had recently undertaken a "name and shame" exercise, designed to force countries to put AML controls in place or to face reduced access to global payments systems. But as of 2001, the countries that had been targeted were bank secrecy havens and a few other countries without AML regimes, such as Russia and Israel, not countries with serious terrorist finance problems.[4]

The 9/11 hijackers relied on both U.S. and foreign financial institutions to hold, move, and retrieve their money. They deposited funds from overseas into U.S. accounts both by international wire transfers and through direct deposits of cash and travelers checks. Several of them also maintained funds in foreign accounts they accessed in the United States through ATM and credit card transactions.

The hijackers' funds came from al Qaeda associates in Germany and the United Arab Emirates through wires; some came directly from Khalid Sheikh Mohamed when they met him in Pakistan before they left for the United States. The total direct costs of the attack amounted to about $500,000, of which approximately $300,000 passed through the hijackers' U.S. bank accounts for flight training; travel; and living expenses, including housing, food, cars, and auto insurance. As the terrorist finance report to the 9/11 Commission found,

> The money-laundering controls in place at the time were largely focused on drug trafficking and large-scale financial fraud and could not have detected the hijackers' transactions. The controls were never intended to, and could not, detect or disrupt the routine transactions in which the hijackers engaged.[5]

This content downloaded from
199.67.16.56 on Mon, 06 Dec 2021 16:27:05 UTC
All use subject to https://about.jstor.org/terms

Some six years later, a vast international effort has been undertaken to put counterterrorist finance controls (known as CFT) in place to both detect and disrupt terrorist finance at all levels. More than 150 UN member states are now party to the Convention. The World Bank and International Monetary Fund have provided assessments and technical assistance to numerous countries as they rapidly put AML and CFT regimes into place. Not a single country remains on the FATF's "name and shame" list: even laggards such as Burma and Nigeria have come to put at least baseline controls in place, leaving only a renegade such as Iran subject to FATF warnings.[6] In principle, if we are ever to have adequate controls in place to "detect" terrorist finance and to "disrupt" the activities of terrorist financiers, it should by now have been built. But after all this work, one has to ask the obvious question, "Are we there yet?"

## Major Types of Terrorist Finance: Then

### State sponsorship

Prior to 9/11, senior U.S. policy makers had begun to recognize that terrorism was being funded through combinations of three types of support. Historically, the United States had focused primarily on state sponsorship. As of the spring of 2001, in its annual report on "Patterns of Global Terrorism," the State Department reported that Syria, Iran, Iraq, Libya, Cuba, North Korea, and Sudan continued to be the seven governments designated by the United States as state sponsors of international terrorism. As of that time, the United States found Iran to be the most active, providing support to Hezballah, Hamas, and the Palestine Islamic Jihad (PIJ), with the other countries engaging in much narrower categories of state sponsorship.

Notably, the only country listed by the State Department prior to 9/11 as a state sponsor of al Qaeda was Sudan. Less than six months prior to 9/11, the United States had not identified Afghanistan, Pakistan, or Saudi Arabia as state sponsors. The prevailing political understanding among counterterrorism experts held that a state sponsor was a country that willfully, knowingly, and intentionally was providing direct support for terrorist groups. While after the fact it may seem surprising that the Taliban of Afghanistan was not named, at the time all that the State Department was willing to say was that "the United States has been increasingly concerned about reports of Pakistani support to terrorist groups and elements active in Kashmir, as well as Pakistani support, especially military support, to the Taliban, which continues to harbor terrorist groups, including al-Qaida, the Egyptian Islamic Jihad, al-Gama'a al-Islamiyya, and the Islamic Movement of Uzbekistan."[7]

In fact, the Taliban and Pakistan had been harboring al Qaeda, and still are six years later.[8] Saudi financial support for charities, discussed below, if not state sponsorship of terrorist finance, amounted functionally to state acquiescence to terrorist finance. One can argue about whether the failure by the United States

This content downloaded from
199.67.16.56 on Mon, 06 Dec 2021 16:27:05 UTC
All use subject to https://about.jstor.org/terms

to call a spade a spade in the past contributed the development of al Qaeda in these jurisdictions. There should be no question, however, that the equivalent of state sponsorship of al Qaeda prior to 9/11 in these jurisdictions did play a material factor in financing the organization's development; controls on such financing of terrorism were then nonexistent.

## Charities

Terrorist groups have long exploited charities, providing social services such as education, health care, and religious instruction as mechanisms to generate support for their causes and to propagate extremist ideologies. The intermingling of charitable activities with terrorism allows the terrorists to use the charities to attract large numbers of unwitting donors along with the witting, to increase public support, to discourage government action against them, and to operate in areas of conflict where the terrorists otherwise would have no cover.[9]

Hamas has long been primarily a fund-raising organization, with all of its other activities dependent on that function. Its fund-raising has been marketed to Muslims throughout the world, exploiting the unresolved Palestinian-Israeli conflict and the reality of the unmet needs of many Palestinians. Over decades, Hamas has established networks of highly visible mosques, schools, and relief organizations that are widely seen by many Palestinians as providing services more effectively than the Palestinian Authority. Funds for Hamas have come from many sources—including through online appeals to American Muslims by the Holy Land Foundation in the United States (prior to the foundation's designation as a terrorist financier by the U.S. Treasury in late 2001)—as well as a wide array of other charities operating in Europe and the Middle East.[10]

Al Qaeda similarly depended on fund-raising to support itself, relying on a core of financial facilitators who raised money from wealthy businessmen in Saudi Arabia and from imams who diverted *zakat* donations from mosques to support radical Islamic causes.[11] Most of the funds came in during the Islamic holy month of Ramadan.

As found in the monograph on terrorist financing that accompanied the 9/11 Commission report, al Qaeda's charities strategy before 9/11 had two prongs. When they could, they penetrated specific foreign branch offices of large, internationally recognized Saudi charities, relying on lax oversight and the charities' own ineffective financial controls. In other cases, "entire charities from the top down may have known of and even participated in the funneling of money to al Qaeda. In those cases, al Qaeda operatives had control over the entire organization, including access to bank accounts."[12]

## Self-funders

Many terrorist groups become self-funding, typically by engaging in criminal activity, often in collusion with criminal groups. The link between the illicit production of narcotics and terrorist groups is pervasive and recurrent, playing an

This content downloaded from
199.67.16.56 on Mon, 06 Dec 2021 16:27:05 UTC
All use subject to https://about.jstor.org/terms

ongoing role in maintaining such otherwise diverse groups as Colombian FARC, ELN, AUC, and Peru's Shining Path (coca); al Qaeda in Afghanistan and Pakistan (opium); Hezbollah in Lebanon and Syria (opium, hashish); and PKK in Turkey (opium, hashish). Terrorist groups also engage in tobacco smuggling (IRA, Chechen separatists, Hezbollah), arms trafficking (Basque ETA, IRA, Kurdish PKK), extortion, kidnapping, and armed robbery (May 19th Communist Organization, the United Freedom Front, Commandos of the Armenian Genocide [JCAG], FARC, AUC, PKK).[13] Other terrorists finance themselves with small-scale, low-level criminal activity.[14] To confront these forms of terrorist financing, one has to deal with the state's ability to control organized criminal activity, regardless of its direct capacities against terrorism.

## Terrorist Finance Now

### State sponsorship and facilitation remain

The continuities in the types of terrorist finance today are as impressive as any changes. Six years ago, Iran funded Hezbollah and other groups at a substantial level, and al Qaeda exploited funding opportunities that were at least facilitated by Saudi Arabia, Afghanistan, and Pakistan. While Libya is now officially "out of the business" of state sponsorship, the problem of state funding remains.[15] As discussed further below, Iran remains a major supporter of Hezbollah and Hamas (even leaving aside the significant issues relating to its activities in Iraq, which may or may not be seen as a special case). Afghanistan, Pakistan, and Saudi Arabia do now all have AML/CFT regimes in place. The question remains for each government, however, whether these formal regimes are likely to capture activity that links up with core political and policy goals of some senior officials or entities in those countries.

Afghanistan is faced with a question of capacity and divided loyalty, as drug traffickers, terrorist groups, and extremists continue to operate throughout the country. Illicit economic activity constitutes a very large percentage of the total economy as drug production has doubled during the past two years.[16] The Taliban continues to collaborate with Osama bin Laden's al Qaeda group from bases in southern Afghanistan and northwestern Pakistan, where bin Laden and the Taliban leader Mohammad Omar are believed to be hiding. Terrorists' raids, suicide attacks, roadside bombings, burning of schools, and attacks on civilian targets reflect the growing strength of the Taliban-led insurgency. Rule of law has deteriorated, and the national government has failed to exercise authority over many districts in the south and southeast.[17] According to the World Bank in 2006, roughly 80 to 90 percent of all economic activity in Afghanistan involves persons engaged in economic activity who are not registered under the legal framework and do not pay official taxes.[18] Separately, the World Bank has found that two decades of civil war left informal money service providers, or *hawaladars*, as the central economic agents in Afghanistan. These hawaladars fully replaced the

This content downloaded from
199.67.16.56 on Mon, 06 Dec 2021 16:27:05 UTC
All use subject to https://about.jstor.org/terms

formal banking system prior to 2002 and became host to a mix of both licit and illicit transactions. Unlike the money transmitters in many other countries, including Pakistan, Afghanistan's hawaladars have not historically needed to enter the international payments system through relationships with banks or other formal financial institutions,[19] although enough of them do to allow activities between Afghanistan and Pakistan, and from there to the UAE and the rest of the world. Integrating them into a regulatory system is likely to require a generation of reform. In the meantime, they remain potentially available to funnel funds from narcotics from Afghanistan to wherever a terrorist may need assistance.

In Pakistan, by the U.S. State Department's admissions, terrorist finance remains a gigantic problem. Pakistan remains one of the world's primary drug-transit countries. Afghani opium production has doubled over the past two years, and smuggling, trade-based money laundering, hawala, and physical cross-border cash transfers remain common methods used to launder money and finance terrorism in Pakistan, facilitated by Pakistani criminal networks, which appear to have links to elements of the Pakistani government. Pakistan's lack of control of its border area is exacerbated by corrupt officials, some of whom likely have ideological leanings toward extremist groups. Private, unregulated charities continue to exist in Pakistan, providing a major source of illicit funds for international terrorist networks. The lack of control of *madrassas*, similar to the lack of control of Islamic charities, allows terrorist organizations to receive financial support under the guise of support of Islamic education.[20]

As the State Department has formally found, Saudi donors and unregulated charities have been a major source of financing to extremist and terrorist groups over the past twenty-five years.[21] Charitable giving (*zakat*) is a religious obligation for Muslims, constituting one of the five "pillars of Islam." Many wealthy Saudis contribute approximately 2.5 percent of their annual income or more to charitable causes funding religious education programs, orphanages, hospitals, and other social services around the world. These contributions are estimated to total about $3 billion to $4 billion annually, of which 10 to 20 percent is disseminated abroad. Prior to 9/11, the Saudi government had resisted efforts by the FATF and by U.S. officials to put into place a meaningful AML/CFT regime in its financial system, let alone controls on its charities. Little further work was done prior to al Qaeda attacks within Saudi Arabia, which prompted the Saudi government to undertake a series of significant changes within the kingdom to address terrorist financing. Steps undertaken by the Saudis since then include establishing a joint task force with the United States to investigate terrorist financing in Saudi Arabia, closing some charitable organizations suspected of terrorist ties, enactment of AML/CFT laws, stopping cash collections at mosques, putting centralized control over some charities, closing some unlicensed money exchanges, and undertaking greater oversight of clerics involved in charitable collections.[22]

On the other hand, despite these changes, senior Treasury officials have repeatedly warned that the Treasury believes Saudi donors "may still be a significant source of terrorist financing, including for the insurgency in Iraq," adding that "Saudi Arabia-based and funded organizations remained a key source for the

This content downloaded from
199.67.16.56 on Mon, 06 Dec 2021 16:27:05 UTC
All use subject to https://about.jstor.org/terms

promotion of ideologies used by terrorists and violent extremists around the world to justify their hate-filled agenda." The Treasury has named particular Saudi Arabian charities, including the International Islamic Relief Organization (IIRO), the World Association of Muslim Youth (WAMY), and the Muslim World League (MWL) as sources of continuing terrorist finance concern.[23] The fact that the United States has concerns about intentional Saudi funding for the Iraqi insurgency remains a chilling indicator of the degree to which toleration by foreign governments of forms of terrorist finance provides an ongoing direct threat to the national security of the United States and U.S. citizens, as well as to particular regions and policies.

Then there is Iran. Here, the question is not whether Iran represents an ongoing terrorist finance problem, but what additional steps can be taken to counter it. Important elements of the Iranian government remain a proliferation threat and provide state sponsorship to particular terrorist groups. Beyond that, the country has no AML/CFT system in place and has vast quantities of oil revenues and a culture of corruption that goes to the very top of the regime. Senior Iranian government officials repeatedly have been linked to allegations of grand corruption, related to both the foundations as well as major government procurement, especially involving contracts for purchases of foreign goods and services. Numerous public reports state that Iran also continues to engage in efforts to acquire nuclear technologies.[24] In the past, such efforts have been undertaken by front companies for the government, including the country's largest foundation, Bonyad Mostazafan and Janbazan Foundation.[25] That foundation and related Iranian entities have also been reported to fund Hezbollah and its terrorist activities.[26]

Because senior political and religious leaders benefit from the lack of oversight of their financial activities under the current system, Iran is likely to continue to fail to create meaningful limits on money laundering in its formal and informal banking systems. In practice, these systems remain highly vulnerable not only to state-sponsored illicit finance and "gray market" financial transactions but also to abuse by those engaged in weapons trafficking, drug trafficking, commodities smuggling, human trafficking, and cyber crime, among other illegal activities. Given this situation, the United States was able to persuade the FATF in October 2007 to issue an unusual statement directing the financial institutions of all member states to enhance scrutiny of Iranian transactions.[27] Almost immediately thereafter, the United States put in place further financial sanctions against Iran, effectively cutting off indirect access to the U.S. payments system through its major banks. Beyond the existing direct sanctions, the United States warned that banks in other countries should decide "as a matter of prudence and integrity that Iran's business is simply not worth the risk."[28]

At a time when oil prices remain at historic highs, these U.S. actions would appear to complicate, but not to eliminate, the ability of Iran to continue to carry out business internationally, including its support for proliferation and terrorism. This suggests that cases of state sponsorship of terrorist finance remain very difficult to address and require comprehensive global political support to combat. Notably, while this support is growing in relationship to Iran in Europe, coming

This content downloaded from
199.67.16.56 on Mon, 06 Dec 2021 16:27:05 UTC
All use subject to https://about.jstor.org/terms

with increased strength from France and Germany, neither China nor Russia appears ready to participate in efforts to counter Iranian financial transactions. As both countries have comprehensive access through their financial institutions to the international payments system, significant gaps are likely to continue to facilitate Iran's illicit financial activities in both areas.

### Charities are still a problem

Since 9/11, the United States has designated seventy-two charities and related individuals worldwide as supporters of terrorism, including the al Haramain Islamic Foundation and the Islamic African Relief Agency (IARA), al Qaeda–linked charities that were operating in the United States. According to the U.S. Treasury, these institutions and persons made up more than 15 percent of all U.S.-designated terrorist supporters or financiers, indicating the primary importance of charities as a critical means of support for terrorist organizations.[29]

The United States has put into place guidelines for domestic charities by which they are supposed to be able to protect themselves from terrorist finance risk and has pressed for the broader adoption of these guidelines, which essentially mirror those applicable to financial institutions, transmuted to the nonprofit sector.[30] Thus, the absence of standards applicable globally to charities prior to 9/11 has by now been replaced by comprehensive voluntary guidelines whose substance is widely accepted in principle.

In practice, adoption of these principles remains at best incomplete. Religious charities continue to provide problematic sources of education in Afghanistan and Pakistan. The three major Saudi charities (IIRO, WAMY, and MWL) remain effectively free from oversight and, according to U.S. officials, continue to finance terrorists. Hamas continues to raise money from multiple charities in Europe as well as the Middle East. And closer to home, Canada reported that a "majority" of its terrorist financing cases involved charities as recently as 2006.[31] In the United States, some major investigations of alleged charity abuse for terrorist finance remain stalled.[32] In late 2007, a major case against the Holy Land Foundation, accused of fund-raising for Hamas, resulted in a mistrial after most of the jury voted for outright acquittals,[33] following several other major terrorist finance cases in the U.S. where the defendants had been acquitted on terrorist finance charges and been convicted only on charges not involving terrorist finance.[34]

As the FBI has observed, the problem of terrorist abuse of charities is closely linked to ideological support for the underlying extreme behavior. If large numbers of people have sympathy with the plight of particular groups that are seen as abused, the risks of charitable abuse in connection with social services to those groups will remain a problem, even when controls are ostensibly available and in place.[35] This is an issue in North America and Europe, not just the Arab Middle East.

A second and related problem is the ability of religious charities supporting extremist or terrorist groups to raise funds following a disaster, or in connection with a conflict. The ability of such charities to deliver real assistance at a time when local governments are dysfunctional provides immediate and long-term

This content downloaded from
199.67.16.56 on Mon, 06 Dec 2021 16:27:05 UTC
All use subject to https://about.jstor.org/terms

opportunities for recruiting for later terrorist activity. When governments fail, dangerous alternatives move in to fill the void.[36]

### Self-funders and criminals

The continuing ideological support for terrorism present in Diaspora groups, especially in Western Europe, provides a foundation for self-funding activities, often involving small amounts of funds that are likely to prove very hard to detect prior to a terrorist act. The Madrid train bombers in 2004 financed their activities with money earned from trafficking in hashish and ecstasy.[37] Al Qaeda's affiliate in Southeast Asia, Jemaah Islamiyah, relied on bank robbery and credit card fraud to raise funds, paying for the 2002 Bali bombings through some five pounds of gold stolen in a series of jewelry store robberies.[38] In 2007, Europol found that the range of illegal sources for the funding of terrorism in Europe covered most criminal activities, ranging from vehicle-related crimes to forgery of identity and travel documents or financial crimes, such as the use of false credit cards.[39]

When a government has success in curbing state sponsorship or charitable support for terrorist action, particular terrorist groups planning a single attack present the greatest terrorist finance challenge. These groups may need only limited resources for a dramatic one-time act and their "terrorist finance footprint" is likely to be very small. Larger, organized terrorist groups with a political program are more likely to need an ongoing income stream and therefore to adopt the strategies of local criminal groups, even when they remain functionally separate from them. Although such terrorist self-funders are unlikely to leave discernible terrorist finance trails to follow prior to their carrying out an act of terrorism, their involvement in criminal activity leaves them susceptible to detection and disruption due to their involvement with other criminals in the course of their criminal conduct. Failures to report large transactions in jurisdictions that require such reporting, the presence of false documentation, or involvement in petty violent crime may provide opportunities for enforcement activities, especially if authorities emphasize their interest in terrorist groups as they haul in petty criminals who are in a position to act as informants.[40]

## CFT Infrastructures

### In general

As the 9/11 Commission monograph on terrorist finance found, the United States now has a far better understanding of the methods by which terrorists raise, move, and use money and has employed this knowledge to improve intragovernmental cooperation and to target especially obvious terrorist finance mechanisms. Investigators have overcome obstacles, intelligence and law enforcement agencies are now working together, and the topic has remained a comparative priority.[41] There has been a fundamental change of mindset, with

This content downloaded from
199.67.16.56 on Mon, 06 Dec 2021 16:27:05 UTC
All use subject to https://about.jstor.org/terms

widespread consensus upon a shared set of standards to combat terrorist finance globally.

---

*[T]he United States now has a far better understanding of the methods by which terrorists raise, move, and use money. . . . Investigators have overcome obstacles, intelligence and law enforcement agencies are now working together, and the topic has remained a comparative priority.*

---

### Legal regime changes

UN Security Council Resolution 1373 was adopted on September 28, 2001, which requires all UN member states to put into place comprehensive measures against terrorist finance.[42] In practice, most countries have criminalized terrorist finance, generally including funds that are provided for the purpose of terrorist finance as subject to freezing or confiscation, not just funds actually used in connection with a terrorist act. Licensing and registration of hawaladars, previously rare, now is required in almost all jurisdictions and has resulted in changed behaviors in many countries, bringing substantial portions of the underground economy and alternative remittance system closer to the formal banking system.

The FATF, which previously had been an AML organization only, expanded its mission to address terrorist finance with Eight Special Recommendations on Terrorist Financing and created a Working Group on Terrorist Financing (WGTF) to put these new standards into effect around the world. The FATF issued interpretive guidance on the Eight Special Recommendations, particularly with respect to freezing terrorist-related assets, regulating and monitoring alternative remittance systems such as hawala, ensuring accurate and meaningful originator information on cross-border wire transfers, and protecting nonprofit organizations from terrorist abuse. In 2004, the WGTF developed language for a ninth FATF Special Recommendation, which focuses on cash couriers.[43] As a result of the adoption of FATF Special Recommendation VII, financial regulators almost everywhere are also now requiring financial institutions to include originator information on cross-border wire transfers, providing another tool to combat terrorist financing.[44] These are important legal and technocratic changes that

This content downloaded from
199.67.16.56 on Mon, 06 Dec 2021 16:27:05 UTC
All use subject to https://about.jstor.org/terms

over time make the system less vulnerable to anonymous movements of funds and, therefore, deter terrorist finance risk.

Where no Middle Eastern country previously had controls on terrorist finance prior to 9/11, today most have comprehensive AML/CFT regimes, with at least some evidence of implementation, and controls have also been developed to provide some degree of transparency and AML/CFT protection for Islamic banking.

All of this constitutes discernable progress. And yet another side to the picture remains: the reality that very few countries have actually brought terrorist finance cases against anyone; asset seizures since the first weeks after 9/11, which brought in some $200 million in all, have been few; and the political element in deciding who is and who is not a terrorist remains a central problem, reflected in the inability to enforce sanctions in the places where they are most needed.

*Sanctions lists*

There has been near universal adoption of the requirement to freeze funds and to prohibit transactions with al Qaeda and other terrorist groups and persons listed by the United Nations under the authority of UN Security Council Resolution 1267.[45] As of November 2007, this included 479 persons and entities associated with al Qaeda, subject by global concurrence to being banned from the global payments system.[46]

On the other hand, the UN sanctions list extends to al Qaeda only, and even its list has been subject to considerable dissension, with prominent persons such as Yassin al-Qadi repeatedly challenging his designation as an al Qaeda supporter and, in some countries, winning his case and, in other countries, including his home of Saudi Arabia, appearing to be subject to no sanctions, UN designation notwithstanding.[47] Legal challenges on the basis of due process and human rights violations continue, and notably, the United States and the UN have chosen to remove from listings even some persons and institutions previously listed as prominent terrorist financiers.

For example, on November 15 to 16, 2007, the United States and the UN, without explanation, removed Ahmed Idris Nasreddin and twelve of his companies from the terrorist sanctions list, freeing them from sanctions on a global basis.[48] The unusual move reflected a reversal from previous assessments of Nasreddin, as articulated by the U.S. Treasury when he and his companies were designated as terrorist financiers by the G-7 on April 19, 2002, and by the UN a week later. At that time, the U.S. Treasury stated that Nasreddin operated an extensive financial network providing support for terrorist-related activities through commercial holdings that included "an extensive conglomeration of businesses" from which he derived income and conducted transactions.[49] It had also linked Nasreddin directly to al Qaeda, stating he provided "direct support for Youssef Nada and Bank al Taqwa, both of which were designated as terrorist financiers by the Department of Treasury on November 7, 2001." The report stated that Nada and Bank al Taqwa in turn provided investment advice and cash transfer mechanisms for Osama bin Laden, al Qaeda, and other radical Islamic groups.[50] As of

This content downloaded from
199.67.16.56 on Mon, 06 Dec 2021 16:27:05 UTC
All use subject to https://about.jstor.org/terms

mid-November 2007, the United States claimed that Nasreddin had severed his relationships to the al Qaeda–related entities and therefore deserved delisting.[51] However, this kind of sudden recharacterization of a figure previously described as having substantial involvement in terrorist finance highlights the problems inherent in the listing process. It raises questions of just what intelligence and law enforcement information has been available behind the U.S. drive to apply sanctions and threatens to undermine the credibility of the entire listing process.

More broadly is the reality that only al Qaeda and related entities are subject to universal listing. The European Union (EU) lists a number of other terrorist groups, although they are only a subset of the groups listed by the United States, and until September 2003 included only the "military wing" of Hamas. Even following the listing, EU enforcement of the ban on Hamas fund-raising has been inconsistent, due to political sympathies in a number of EU countries for the Palestinians.[52] Elsewhere, Hamas continues to retain significant sources of support, including from official or semiofficial sources in Iran, Qatar, and Sudan.[53] The problem illustrates the political element of combating terrorist finance: where there is a will to fund a terrorist group, there certainly is a way.

### Sanctions structures

The "sanctions list" problem, of different lists applicable in different jurisdictions, is exacerbated by the lack of any agreed-upon mechanism to enforce sanctions internationally. Governments have now put in place a standard approach to the sharing of financial information regarding money laundering and, in some cases, regarding terrorist finance: the Financial Intelligence Unit (FIU), which collects suspicious activity reports (SARs) and, for countries with currency reporting requirements, currency transaction reports (CTRs). These in turn communicate with one another through the Egmont Group information system, moving financial information for cooperative investigation around the world. In contrast, there is no such group to share information regarding sanctioned persons and entities. The U.S. Treasury's Office of Foreign Assets Control (OFAC), which administers U.S. sanctions, does not have formal counterparts in most countries. The function of sanctions enforcement, to the extent to which it exists at all in other countries, is held at Ministries of Treasury or Finance, at Central Banks, or even in Justice Ministries. The lack of dedicated institutions focused on sanctions enforcement and review makes it difficult even to track what a country is actually doing and not doing regarding sanctions. In the absence of such institutions, it is not possible to determine, for example, if any financial institution in a country has ever been penalized for failure to enforce a sanction. This lack of institutional structure for sanctions enforcement remains a real gap in countering terrorist finance.

### Sectoral limitations

While Hawala systems are now largely covered by legal and regulatory regimes in most countries (on paper and increasingly in practice), a number of financial

This content downloaded from
199.67.16.56 on Mon, 06 Dec 2021 16:27:05 UTC
All use subject to https://about.jstor.org/terms

sectors remain outside most or all AML/CFT systems. The first steps have been undertaken to gain oversight of bulk currency movements, at least as they cross borders, through the recent FATF Special Recommendation VIII, although implementation of the recommendation on a global basis is likely years away. But other mechanisms for stored value, some ancient and some twenty-first century, remain almost outside oversight. There remains no system for tracking the movements of gold and other precious metals internationally, and both remain very vulnerable to abuse for terrorist finance.[54]

New mechanisms for holding wealth, including stored value cards, are becoming increasingly widely distributed yet are not now subject to effective AML/CFT controls, due to their availability in anonymous forms. Stored value cards use a variety of technologies, from embedded data-processing chips to magnetic strips, to merely requiring access numbers and passwords. Many operate within an "open system" allowing them to connect to global debit and automated teller machine (ATM) networks and, thus, to access cash globally. Open system cards generally do not require a bank account or face-to-face verification of cardholder identity, which makes them readily vulnerable to abuse by money laundering or terrorist financiers. A person in one country can load a card and ship it to another person in another country, who can then use the card to access cash, thereby circumventing all existing forms of AML/CFT controls.[55] They remain outside regulation in the United States, and except for limited areas (e-cash offered by nonbanks, covered in part by EU regulations), in the EU and elsewhere.

Still newer mechanisms for storing and transferring value are also under development, including online sites, such as e-gold, that purport to maintain their own independent currency, which can later be exchanged for traditional currencies,[56] or personal mobile phone to mobile phone transfers.[57] Each of these mechanisms can hold value, store it, and transfer it, to date, anonymously. The risks for terrorist finance are obvious and growing.

Somewhere between the ancient mechanisms of gold and the futuristic ones of stored value are the innovations of the late twentieth century as yet largely uncovered by the world's AML/CFT system. Of these, hedge funds remain a significant source of potential risk. These unregulated investment vehicles have rapidly increased the size of their assets under management in recent years to $1.6 trillion or more, becoming influential, and largely invisible, participants in global financial markets. As minimally regulated entities with substantial transparency gaps, hedge funds appear to be vulnerable to money laundering and terrorist finance risk, especially to the extent that hedge fund managers do not know the sources of funds they manage.[58] Hedge funds can be used to launder money through three principal mechanisms: First, the managers of the funds could be using them to carry out fraud, to disguise their ownership of assets, and/or to avoid taxes. Second, the investors in the funds could be using them to transform illicitly acquired funds into funds that upon distribution appear to be legitimate. Finally, the managers and the investors could be acting collusively to use the hedge funds to carry out a particular scheme, such as market manipulation or insider trading. Hedge funds may be especially vulnerable to money laundering

This content downloaded from
199.67.16.56 on Mon, 06 Dec 2021 16:27:05 UTC
All use subject to https://about.jstor.org/terms

in cases in which they retain liquidity of interests and structures, allowing investment and valuation on a monthly, quarterly, or annual basis. Notably, the recent trend of retail hedge funds makes these products more accessible with lower minimum investments than has historically been the case.

Other hedge funds have substantial "lock-up" periods, making the funds they hold under management illiquid. For such funds, the main laundering risk may be persons who have generated illicit proceeds, or sanctioned persons and entities that are able to have funds held and protected through hedge funds, then laundered over the long term for ultimate reintegration in the financial system as clean funds, rather than using the funds in the placement or layering phases of laundering. In light of the large reporting gaps on hedge funds, the location of many in offshore secrecy havens, and the arms-length structure of the funds separating managers from asset holders, it is also possible that hedge funds are being widely used by wealthy asset holders from any number of countries to evade domestic taxation obligations.

In principle, the existing international money laundering standards arising out of the FATF should require hedge funds to be subject to AML risk management. However, countries have generally been slow to apply specific AML rules to hedge funds due to their otherwise unregulated status. In the United States, AML hedge fund regulations required to be issued under the Bank Secrecy Act, as modified by the USA-PATRIOT Act of 2001, have remained stalled since a proposed rule was issued on September 26, 2002, by the U.S. Treasury.[59]

EU law requires all of its member states to regulate hedge funds managed out of the EU to put AML policies and procedures in place. It is not clear that this obligation is being met in practice, given that the domicile and administration of most hedge funds remain offshore, with only the investment management in the EU.[60]

## Work for the Coming Administration

Despite the substantial effort made by competent and dedicated people in the United States and elsewhere to build a global system to combat terrorist finance, initiated in the late 1990s and pressed with enhanced focus after 9/11, a new administration will have much work to do to sustain the existing progress on terrorist finance issues, let alone move forward.

First, profound political problems still need to be addressed to ensure global cooperation against terrorist threats. Of primary concern is state sponsorship, beginning with Iran but also including the facilitation of terrorist finance that continues through Afghanistan, Pakistan, and by Saudi elites (with or without the support of particular Saudi officials). Country-specific strategies are required, supplemented by further strategies to deal with support for Hamas and Hezbollah by Syria, and support for Hamas by governments elsewhere in the Muslim world.

This content downloaded from
199.67.16.56 on Mon, 06 Dec 2021 16:27:05 UTC
All use subject to https://about.jstor.org/terms

Such country-specific strategies should include a mixture of cooperative efforts against agreed-upon targets when possible (Afghanistan, Pakistan, Saudi Arabia) and a call for multilateral support for comprehensive economic sanctions when appropriate (Iran). They likely should also involve, when appropriate, unilateral enforcement actions when such actions can leverage sustainable U.S. power and result in further protection of the global financial infrastructure from terrorist finance vulnerability. The United States has already used authorities given it under Section 311 of the Patriot Act to target particular financial institutions and countries for enhanced scrutiny by U.S. (and by implication, all international) financial institutions, thus threatening access to the payments system of any entity unfortunate enough to be named by the Treasury. It has yet to use for terrorist finance purposes Section 319 of the Patriot Act, which allows the United States to seize funds in any foreign bank with an account in a U.S. financial institution that in turn is handling tainted funds in another country, although the Justice Department has used this authority in some criminal cases unrelated to terrorism. The authority remains a powerful one that could leverage further changes of behavior by even remote financial institutions wanting to avoid the risk of loss due to handling funds of uncertain or dangerous provenance.

Second, the United States needs to complete the work begun on charities. Specific approaches need to address very specific charities found to have very specific problems, not only with enforcement directed at the charities where they are located beyond the United States (Section 319 comes to mind as a mechanism), but also with an approach that addresses the success of the charities through trying to *replace them*. To date, the Bush administration has been unable to reach agreement even inside the interagency process on any mechanism to facilitate the provision of social services to Muslims under particular stress and thus especially susceptible to exploitation by terrorist groups abusing the provision of social services to carry out violent political agendas. As one U.S. official candidly told me, it would be a career-killer to promote any charitable alternative to Hamas in the West Bank or Gaza that ultimately could be found to provide funding, direct or indirect, for some terrorist group, even if Israeli officials supported the idea. The feckless corruption of the Fatah government under Yassir Arafat provided a textbook example of a situation in which a terrorist group could exploit the gap in social services left by the incapacity of the then–elected government. Risky as it may be, a terrorist finance strategy needs to provide solutions for nonterrorist charitable contributions to provide social services to people in need in places such as the West Bank, Gaza, and Pakistan, because politics, like nature, abhors a vacuum. If the United States, the EU, and other countries joined together to facilitate alternatives, their credibility might be enhanced as they undertook enforcement again against charities that continued to abuse their status to fund extremism and violence.

Third, U.S. law enforcement needs to continue its two-decade-old migration to becoming not merely cross-border but global. Criminal groups and terrorist groups will continue to learn from one another and the interactions between these two types of activities will continue to provide opportunities for governments to

This content downloaded from
199.67.16.56 on Mon, 06 Dec 2021 16:27:05 UTC
All use subject to https://about.jstor.org/terms

counter both. There is no substitute for countries putting law enforcement pro-
fessionals cheek-by-jowl next to one another to investigate joint targets, although
bilateral and multilateral training are also effective ways of building bridges
among separate systems that need to come together. INTERPOL's greatly
increased information capacities under its current executive director, Ron Noble,
have provided a useful spine for some forms of information sharing, as has the
growing number of Egmont Group members for information on AML/CFT. An
incoming administration will need to carefully review the existing capacities of
both groups with a view to determining whether additional types of data should
be collected and subject to sharing. Development of some enhanced mechanism
to track sanctions activity and to provide counterparts for OFAC in administer-
ing and monitoring sanctions programs is essential.

Fourth, the United States needs to complete on its own the regulation of all
financial sectors required of it by the Patriot Act and to finish the job of issuing
regulations on hedge funds and any other uncovered sectors. These may need to
include at least some forms of stored value cards and other new technologies,
defined to be replicable internationally and feasible to the needs of card opera-
tors, issuing banks, merchants, and consumers. The U.S. Treasury has already
been able to develop tailored regulations for money transmitters, who are not
required to adhere to the identical customer identification procedures required
of institutions, such as banks and brokers that hold customer accounts. The first
steps have already been undertaken, by a group at the FATF that in October 2006
published an initial report on new technologies, including stored value.[61] Further
work to understand the technologies and to develop controls should be expe-
dited, with the goal of policy outputs for action by the incoming administration.

Fifth, further strategies need to be developed to address bulk currency smug-
gling, gold, diamonds, and other high-value commodities capable of readily hold-
ing and transferring stored value. One possible technique could involve
micro-labeling commodities by the consent of participating countries in a form of
mini–bar code that would provide evidence of the last licit owner. While this
approach has its limitations, especially with gold, which is easily smelted and
reconstituted, it might be usefully combined with micro-tags, which, once mark-
ing a high-value commodity, would be difficult to remove. The costs, benefits,
and feasibility of these kinds of approaches need further study and cannot work
without broad, international commitment to the principle that labeling high-
value commodities is in the national security interest of essentially all govern-
ments. In such areas, the United States should be prepared to suggest topics for
discussion, study, and analysis, rather than pushing too hard in the absence of
interest from other countries, many of which have their own distinct, and serious,
terrorism and terrorist finance problems. But technologies continue to change,
and those changes provide opportunities for the hunters as well as the game.

Sixth, the United States should consider whether United Nations activity
against terrorism can be reinvigorated. From 2001 to 2003, the UN was unusu-
ally vigorous in facilitating a global response against terrorism in general and ter-
rorist finance in particular, with the Counter-Terrorism Committee under Jeremy

This content downloaded from
199.67.16.56 on Mon, 06 Dec 2021 16:27:05 UTC
All use subject to https://about.jstor.org/terms

Greenstock remarkably efficient at causing member states to report on their CFT capacities, gaps, and plans to fill the gaps. The process catalyzed a speedy process in many countries as dozens quickly changed their laws and created foundations for a CFT regime, aided by training programs and technical assistance facilitated by the World Bank and IMF and by FATF regional bodies. Greenstock's departure at the time of the invasion of Iraq in 2003 ended this phase of UN activity. A new administration should explore possible opportunities for the UN to play a constructive role in further harmonization.

Finally, the United States needs a hard look at its own enforcement activities, as well as its communications about terrorist finance to its own public and the world. Too many U.S. law enforcement cases involving terrorist finance have turned out poorly for the government. Why this should be the case is not something that an outsider can readily assess, other than to observe that the relatively poor results in front of U.S. juries speak for themselves.[62] More broadly, too little is available to document what information the U.S. government actually has to justify particular terrorist finance designations, placing the United States in a poor position to explain itself when it chooses to remove a previously prominent "terrorist financier" from a sanctions list. To sustain the necessary public support for a comprehensive international approach to combating terrorist finance, we need to be able to make our case in public against any target and make that case stick.

## Notes

1. In 1995, he addressed transactions with Abu Nidal, Hezbollah, the Popular Front for the Liberation of Palestine (PLFP), and other organizations deemed to threaten Mideast Peace in Executive Order 12947—Prohibiting Transactions with Terrorists Who Threaten to Disrupt the Middle East Peace Process, http://www.treasury.gov/offices/enforcement/ofac/legal/eo/12947.pdf. This was broadened in August 1998 to include Osama bin Laden and other terrorist groups. See Executive Order 13099, http://www.treasury.gov/offices/enforcement/ofac/legal/eo/13099.pdf.

2. Botswana, Sri Lanka, United Kingdom, Uzebekistan. Some UN members do not need to undertake further domestic legislation to ratify a treaty, requiring only a signature. The United States did not ratify the Convention until June 26, 2002. http://untreaty.un.org/English/TreatyEvent2003/Treaty_11.htm.

3. See, e.g., Testimony of Secretary of the Treasury Paul O'Neill before Senate Permanent Subcommittee on Investigations, 107th Cong., 1st sess., July 18, 2001, at http://useu.usmission.gov/Article.asp?ID= 464414B9-5185-47F6-AFEE-04FA6CAEF335.

4. The pre-9/11 list of Financial Action Task Force (FATF) "non-cooperative territories and countries" was Bahamas, Cayman Islands, Cook Islands, Dominica, Israel, Lebanon, Liechtenstein, Marshall Islands, Nauru, Niue, Panama, Philippines, Russia, St. Kitts and Nevis, and St. Vincent and the Grenadines. None of these are primary terrorist finance threats, although Lebanon, Liechtenstein, and Panama have all been used at various times in connection with terrorist finance, the former primarily relating to Hezbollah, the latter two involving Hezbollah and various Muslim Brotherhood entities. See original assessment by FATF of noncooperative countries and territories at http://www.fatf-gafi.org/dataoecd/56/43/33921824.pdf.

5. National Commission on Terrorist Attacks upon the United States, Staff Monograph on Terrorist Financing, at http://www.9-11commission.gov/staff_statements/911_TerrFin_Monograph.pdf.

6. FATF Statement on Iran, Paris, October 11, 2007, "The Financial Action Task Force (FATF) is concerned that the Islamic Republic of Iran's lack of a comprehensive anti-money laundering/combating the financing of terrorism (AML/CFT) regime represents a significant vulnerability within the international financial system. FATF calls upon Iran to address on an urgent basis its AML/CFT deficiencies, including those identified in the 2006 International Monetary Fund Article IV Consultation Report for Iran. FATF

This content downloaded from
199.67.16.56 on Mon, 06 Dec 2021 16:27:05 UTC
All use subject to https://about.jstor.org/terms

members are advising their financial institutions to take the risk arising from the deficiencies in Iran's AML/ CFT regime into account for enhanced due diligence." http://www.fatf-gafi.org/dataoecd/1/2/39481684.pdf.

7. "Patterns of Global Terrorism," April 19, 2001, U.S. Department of State, http://www.state.gov/ s/ct/rls/crt/2000/2441.htm.

8. Testimony of John Negroponte, Director of National Intelligence, U.S. Senate Select Committee on Intelligence, 110th Cong., 1st sess., January 11, 2007, http://intelligence.senate.gov/070111/negroponte.pdf.

9. See, e.g., Matthew Levitt, *HAMAS: Politics, Charity and Terrorism in the Service of Jihad* (New Haven, CT: Yale University Press, 2006) (documenting the logistical and financial support Hamas charities provide for the group's political and terrorist activities); Robert F. Worth and Hassan M. Fattah, "Relief Agencies Find Hezbollah Hard to Avoid," *New York Times*, August 23, 2006 (describing Hezbollah's efforts to cultivate support by controlling the provision of charitable resources and services across southern Lebanon); Laila Bokhair, *Political Struggle over Earthquake Victims* (Oslo: Norwegian Defense Research Establishment, November 23, 2005) (documenting terrorist organizations such as Lashkar-e-Taiba and Jaish-e-Mohammed efforts to provide humanitarian aid to affected areas in the months following the earthquake in South Asia); Christopher Kremmer, "Charities Linked to Extremists Lead Quake Relief," *Age*, November 21, 2005 (reporting that in addition to providing relief in South Asia, terrorist organizations are recruiting and indoctrinating orphan children in their extensive network of orphanages); Evan Kohlmann, *The Role of Islamic Charities in International Terrorist Recruitment and Financing* (Danish Institute for International Studies, 2006), available at http://www.diis.dk/graphics/Publications/WP2006/ DIIS%20WP%202006-7.web.pdf (tracing the historical link between charitable organizations and terrorist activities from the Soviet-Afghan war through to the present); BBC News, "Faith, Hate and Charity," Transcript, BBC One, Recorded from Transmission, July 30, 2006 (reporting on one of Britain's leading Islamic charities, Interpal, and illustrating Interpal's use of a network of charities in Gaza and the West Bank to support and fund Hamas, a terrorist organization designated by the U.S. government and the European Union).

10. See the testimony of David F. Aufhauser, General Counsel, U.S. Treasury, before the House Financial Services Committee Subcommittee on Oversight and Investigations, 108th Cong., 1st sess., September 24, 2003, http://www.ustreas.gov/press/releases/js758.htm. For the most comprehensive overview of Hamas fund-raising, see Matthew Levitt, *Hamas: Politics, Charity, and Terrorism in the Service of Jihad* (New Haven, CT: Yale University Press, 2007), excerpts at http://books.google.com/books?id=CGAjU3rra QC&pg=PA143&dq=foreign+funding+of+hamas+levitt&sig=IcBrMFZLFjarLFgF51FPZmsXEBc.

11. Working with NATO, FBI agents discovered a handwritten list of twenty alleged al Qaeda financiers during a March 2002 raid on Benevolence Foundation, a Saudi-based charity in Sarajevo, Bosnia. Bin Laden referred to the group as "the Golden Chain." Further details were submitted to the U.S. District Court for the Northern District of Illinois by federal prosecutors in January 2003. The 9/11 Commission Report cites the following document: "Government's Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements, United States v. Enaam Arnaout, No. 02-CR-892" (N.D. Ill. filed January 6, 2003).

12. National Commission on Terrorist Attacks upon the United States, Staff Monograph on Terrorist Financing, at http://www.9-11commission.gov/staff_statements/911_TerrFin_Monograph.pdf.

13. The literature on this topic is extensive and is reviewed in Yvon Dandurand and Vivienne Chin, "Links between Terrorism and Other Forms of Crime," a report submitted to Foreign Affairs Canada and the United Nations Office on Drugs and Crime (International Centre for Criminal Law Reform and Criminal Justice Policy, April 2004), at http://www.icclr.law.ubc.ca/Publications/Reports/TNOC_LINKS_ STUDY_REPORT.pdf.

14. EU Terrorism Situation and Trend Report 2007, Europol, at http://www.europol.europa.eu/ publications/EU_Terrorism_Situation_and_Trend_Report_TE-SAT/TESAT2007.pdf.

15. Five countries remain on the official U.S. government list as state sponsors: Cuba, Iran, North Korea, Sudan, and Syria, none of which were directly or indirectly involved in 9/11 or in attempts on attacks on the United States since. http://www.state.gov/s/ct/c14151.htm. The fact that no countries have been added since 1993 could be seen as a victory against state sponsorship or, alternatively, as an unwillingness to confront ambiguities in difficult countries.

16. United Nations Afghanistan Opium Study 2007, released August 2007, Executive Summary, http://www.unodc.org/pdf/research/AFG07_ExSum_web.pdf. "On aggregate, Afghanistan's opium production has thus reached a frighteningly new level, twice the amount produced just two years ago."

This content downloaded from
199.67.16.56 on Mon, 06 Dec 2021 16:27:05 UTC
All use subject to https://about.jstor.org/terms

17. Ali Jalali, "Security and Stability in Afghanistan: Opportunities and Challenges," Testimony before the Committee on Armed Services, U.S. House of Representatives, 110th Cong., 1st sess., January 30, 2007, available at http://armedservices.house.gov/pdfs/FC%20hearing_013007/Jalali%20Testimony.pdf.

18. William Byrd, "Afghanistan Needs Pro-Private Sector Growth," Rough Draft (World Bank, June 8, 2005), http://siteresources.worldbank.org/INTSARMACECOGRO/34004316-1120417814980/20750193/Pro-privatesectorgrowthpaperdraft60805.pdf.

19. "The Nexus of Drug Trafficking and Hawala in Afghanistan" (World Bank, November 2006), http://siteresources.worldbank.org/SOUTHASIAEXT/Resources/Publications/448813-1164651372704/UNDC_Ch6.pdf.

20. *2007 International Narcotics Control Strategy Report*, vol. 2, *Money Laundering, Country Report, Pakistan* (U.S. Department of State, March 2007), http://www.state.gov/documents/organization/82219.pdf.

21. *2006 International Narcotics Control Strategy Report* (U.S. Department of State, 2006).

22. "Saudi Arabia, Terrorist Finance Issues," CRS Report, RL32499, September 14, 2007, at http://www.fas.org/sgp/crs/mideast/RL32499.pdf.

23. Testimony of Stuart Levey, Under Secretary Office of Terrorism and Financial Intelligence, U.S. Department of the Treasury, before the Senate Committee on Banking, Housing, and Urban Affairs, 109th Cong., 1st sess., July 13, 2005, http://www.treasury.gov/press/releases/js2629.htm.

24. See, e.g., Naser Karimi, "Iran's New President Hardens Nuke Stand," Associated Press, August 30, 2005, available at http://www2.dailynews.com/news/ci_2983963.

25. There are numerous public references to this activity in 1996, arising from the release of information on this topic of a report prepared by the German Economics Ministry. For example, the Wisconsin Project on Nuclear Arms Control cites the foundation as making purchases "for several hundred companies in Iran" and "buying equipment for the Iranian nuclear weapon, chemical/biological weapon and missile programs," acting as "go-betweens" in arranging and financing technology transfers from Dubai. See "Dubai Is a Growing Division Risk, German Officials Say," *The Risk Report* 2, no. 4 (July-August 1996), available at http://wisconsinproject.org/countries./dubai/divrisk.html.

26. See, e.g., "Islamic Iran's American Base," *The American Spectator*, December 1995, http://www.iran.org/news/AS_9512.html.

27. FATF Statement on Iran, Paris, October 11 2007, http://www.fatf-gafi.org/dataoecd/1/2/39481684.pdf.

28. The U.S. action involved effectively eliminating, at least for most purposes, a provision of sanctions known as the "U-Turn," by which Iran previously was able to use dollar clearances in the United States for foreign financial institutions, thus keeping Iranian oil payments in dollars, through designating the country's major banks, Bank Melli, Bankl Mellat, and Bank Saderat, as facilitators of proliferation and terrorism, making funds that have passed through them subject to blocking by the United States. See *Fact Sheet on Iranian Sanctions* (U.S. Treasury, October 25, 2007), http://www.treasury.gov/press/releases/hp644.htm.

29. "U.S. Department of the Treasury Anti-terrorist Financing Guidelines: Voluntary Best Practices for U.S.-Based Charities," October 2, 2006, http://www.treasury.gov/offices/enforcement/key-issues/protecting/docs/guidelines_charities.pdf.

30. See Treasury guidance at http://www.treasury.gov/offices/enforcement/key-issues/protecting/charities-intro.shtml, FATF standards and guidelines set forth at http://www.fatf-gafi.org/dataoecd/39/19/34033761.pdf; and MENA-FATF guidelines on best practices regarding charities at http://www.menafatf.org/images/UploadFiles/CharitiesEng.pdf.

31. "Majority of Terrorist Finance Cases Involve Registered Charities: RCMP," *Vancouver Sun*, September 21, 2007, http://www.canada.com/cityguides/winnipeg/info/story.html?id=f66f6880-a995-4d59-b34c-8a65e2988325.

32. Douglas Farah, "U.S. Links Islamic Charities, Terrorist Funding, Affidavit Alleges Role of Northern Va. Groups," *Washington Post*, August 20, 2003, http://www.washingtonpost.com/ac2/wp-dyn?pagename=article&contentId=A17354-2003Aug19&notFound=true.

33. "Mistrial Declared in Islamic Charity Case, Jurors Find No Proof That Donations Indirectly Aided Militant Hamas," October 22, 2007, http://www.washingtonpost.com/wp-dyn/content/article/2007/10/22/AR2007102200731.html.

34. See the excellent summary provided by David Feige in *Salon*, "Pyrrhic Acquittal: The Holy Land Foundation defendants aren't off the hook," October 24, 2007, at http://www.slate.com/id/2176561/.

This content downloaded from
199.67.16.56 on Mon, 06 Dec 2021 16:27:05 UTC
All use subject to https://about.jstor.org/terms

35. Statement of John Miller, Assistant Director Office of Public Affairs, Federal Bureau of Investigation, before the U.S. Senate Committee on Homeland Security and Governmental Affairs, "Violent Islamist Extremism: Government Efforts to Defeat It," 110th Cong., 1st sess., May 10, 2007, http://hsgac.senate.gov/_files/051007Miller.pdf.

36. "Banned jihadi groups and welfare organizations have played a very active role in the relief and rescue activities in quake-affected areas. They have been transporting relief goods to remote areas since the earthquake struck. The groups that are working in the area include Jamaat ul-Dawa, al Rasheed Trust, al Akhtar Trust, al Furqan Trust, Amina Welfare Trust, Islamic Relief Council, Jamaat-e Islami, al Khidmat, students from Lal Mosque of Islamabad, and Jamiat Afridia." Islamabad Ausaf, October 21, 2005, http://www.treasury.gov/offices/enforcement/key-issues/protecting/docs/charities_post-earthquake.pdf.

37. "Spain Says Bombers Drank Water from Mecca and Sold Drugs," *New York Times*, April 15, 2004, http://query.nytimes.com/gst/fullpage.html?res=9C02E6DB143BF936A25757C0A9629C8B63.

38. "Bali Bomb 'Planner' Charged," BBC, March 21, 2003, http://news.bbc.co.uk/1/hi/world/asia-pacific/3045857.stm.

39. *Europol Terrorist Situation and Trend Report for 2007*, http://www.europol.europa.eu/publications/EU_Terrorism_Situation_and_Trend_Report_TE-SAT/TESAT2007.pdf.

40. See Center for Intelligence and Security, Canada, "Trends in Terrorism Series Actual and Potential Links between Terrorism and Criminality Volume 2006-5," http://www.csis-scrs.gc.ca/en/itac/itacdocs/2006-5.asp.

41. There is some concern that the need to devote intelligence assets to Iraq, including to Iraqi-related financial activity, and Iranian-related financial activity, may have attenuated some of the focus on terrorist finance, but it remains unclear whether this has had a material impact in practice on U.S. CFT (or counterterrorist finance controls) efforts.

42. See text of UN Resolution 1373 (2001), available at http://www.un.org/News/Press/docs/2001/sc7158.doc.htm.

43. Interpretive Notes to Special Recommendation IX of FATF, available at http://www.fatf-gafi.org/dataoecd/5/48/34291218.pdf, calling for FATF member states to implement either a declaration or disclosure system for cross-border currency movements to address money laundering and terrorist finance risk associated with bulk currency.

44. FATF Special Recommendation VII, http://www.fatf-gafi.org/dataoecd/34/56/35002635.pdf.

45. See text of UN Resolution 1267 (1999), which became the authority for the establishment of the al Qaeda sanctions committee, at http://www.un.org/News/Press/docs/2001/sc7158.doc.htm.

46. http://www.un.org/sc/committees/1267/consolist.shtml.

47. While al-Qadi lost his challenge in the EU, he apparently won another challenge to state freezes of his assets in Turkey. Yasin al-Qadi was designated by the U.S. Treasury Department on October 12, 2001, as a "specially designated global terrorist" pursuant to Executive Order 13224. The statement issued by the Treasury stated that al-Qadi was responsible for running the Muwafaq Foundation and that "Muwafaq [Blessed Relief is the English translation] is an al-Qaeda front that receives funding from wealthy Saudi businessmen. . . . Saudi businessmen have been transferring millions of dollars to bin Laden through Blessed Relief." Al-Qadi's name was subsequently submitted for UN designation jointly by the United States and Saudi Arabia. The U.S. Treasury designation of al-Qadi was based, in part, on a series of FBI investigations into activities that linked al-Qadi to various charities and companies implicated in channeling money to al Qaeda and Hamas. See *Yassin Abdullah Kadi v. Council of the European Union and Commission of the European Communities*, Judgment of the Court of First Instance (CFI), September 21, 2005; see also "Turkey Clears Qadi of Links with al-Qaeda," *Arab News*, March 20, 2005, http://www.arabnews.com/?page=1&section=0&article=60698&d=20&m=3&y=2005; and Victor Comras, "Turkey Prosecutor Absolves Yasin al-Qadi, But Is He Right," Counter-Terrorism Blog at http://counterterror.typepad.com/the_counterterrorism_blog/2005/03/turkey_prosecut.html. Notably, al-Qadi appears not to be subject to sanctions where he lives, and where he maintains control over his assets, in Saudi Arabia.

48. http://www.un.org/News/Press/docs/2007/sc9172.doc.htm.

49. http://www.ustreas.gov/press/releases/po3380.htm.

50. http://www.ustreas.gov/press/releases/po3014.htm.

51. Personal communication, U.S. Treasury official, November 16, 2007.

This content downloaded from
199.67.16.56 on Mon, 06 Dec 2021 16:27:05 UTC
All use subject to https://about.jstor.org/terms

52. "Allies Resisting as U.S. Pushes Terror Label for Hezbollah," *New York Times*, February 17, 2005, http://www.nytimes.com/2005/02/17/international/middleeast/17diplo.html?_r=1&oref=slogin.

53. See, e.g., "'This Looks Like Civil War'—Palestinians Battle on the Streets, Clashes between Hamas and Fatah Leave 30 Injured, Rival Accused of Trying to Assassinate PM Haniyeh," *The Guardian*, December 16, 2006, http://www.guardian.co.uk/israel/Story/0,,1973445,00.html, reporting on funding commitments of $350 million from those states to Hamas's political leader, Prime Minister Haniyeh.

54. "Terrorist Financing, U.S. Agencies Should Systematically Assess Terrorists' Use of Alternative Financing Mechanisms" (General Accounting Office, November 2003), http://www.gao.gov/new.items/d04163.pdf.

55. *U.S. 2007 Money Laundering Threat Assessment*, http://www.treas.gov/press/releases/docs/nmls.pdf.

56. "Gold Rush, Online Payment Systems Like e-gold Ltd. Are Becoming the Currency of Choice for Cybercrooks," *Business Week*, January 9, 2006, http://www.businessweek.com/magazine/content/06_02/b3966094.htm.

57. See, e.g., "Mobile Phones and Social Activism, Why Cell Phones May Be the Most Important Technical Innovation of The Decade," *Tech Soup Online*, June 20, 2007, http://www.techsoup.org/learning center/hardware/page7216.cfm.

58. In one real-world example, the author of this study met with two dozen U.S.-based hedge fund managers in New York in April 2007, representing funds of widely varying sizes, and was told that they did not know the sources of funds of their customers, as the funds they managed generally came to the United States from other countries through intermediaries. By contrast, senior officials of another well-regarded U.S. hedge fund advised the author that they put stringent anti-money-laundering (AML) controls in place at their fund regardless of the law because they saw it as an inexpensive means of reducing their long-term regulatory and transactional risks.

59. http://www.fincen.gov/352unreginvest.pdf.

60. Article One(b)(4) of the EU's 2nd Directive on money laundering, enacted in 2001, expressly includes collective investment vehicles that market their shares or units to investors to be within the obligations for AML policies and procedures, without exempting such vehicles that are unregistered. This provision is now incorporated in the Third Money Laundering Directive, DIRECTIVE 2005/60/EC OF THE EUROPEAN PARLIAMENT AND OF THE COUNCIL of 26 October 2005, on the prevention of the use of the financial system for the purpose of money laundering and terrorist financing (text with EEA relevance), *Official Journal of the European Union* L309/15 (November 25, 2005), into force on December 15, 2005.

61. "Report on New Payment Methods," FATF typologies report, October 2006, http://www.fatf-gafi.org/dataoecd/30/47/37627240.pdf.

62. An outsider cannot readily assess whether current U.S. intelligence assets are appropriately deployed and oriented to deal with terrorist finance and related illicit finance issues. Any incoming administration needs to understand how those assets are operating against this target, their degree of integration with foreign counterparts and domestic law enforcement and regulators, and whether adequate resources are being devoted to data collection and data analysis on appropriate targets.

This content downloaded from
199.67.16.56 on Mon, 06 Dec 2021 16:27:05 UTC
All use subject to https://about.jstor.org/terms