EXHIBIT Q

# UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF NEW YORK

IN RE: TERRORIST ATTACKS   )          03-MDL-1570 (GBD) (SN)

ON SEPTEMBER 11, 2001          )

                            )

---

## REBUTTAL REPORT OF JONATHAN M. WINER

---

1. *Introduction*

1.1.    I have been asked by the law firm of Motley Rice to address in this Rebuttal Report certain issues arising in Expert Reports filed in this case on behalf of the defendants which include critiques and criticisms of my original Expert Report. These are:

 **1.1.1.  The use of audits and other financial controls by the Islamic charities, including WAMY.**

 **1.1.2.  The reliability and significance of U.S. government intelligence and designation reports, including Department of Defense JTF-GTMO reports; and**

 **1.1.3.  The role of Islamic charities in al Qaeda's financial infrastructure and the importance of that support to transforming al Qaeda into a sophisticated terrorist organization capable of carrying out global attacks.**

1.2.    I continue to reserve the right to respond further to any and all critiques or criticisms made by the defendants' experts regarding my Export Report, this Rebuttal Report, my opinions, qualifications, methodology, findings, or relating to any other issue addressed in my Expert Report or this Rebuttal Report.

2. *The Use of Audits and Other Financial Controls Discussed in Reports by Defense Experts.*

2.1.    Defense experts **Marks, Barron**, and **Sageman** each rely on the use of audits and other financial controls by the defendants as proof that they maintained sufficient controls to prevent the Islamic charities from the risk of abuse for terrorist finance. The factual record they cite is not consistent with their assessments. The very audits they cite highlight the weakness of the controls, consistent with the findings of my Expert Report.

## Marks' Findings on the Use of Audits and Financial Controls

2.2.    The most detailed set of assertions about auditing and controls by WAMY were provided by Marks.  Marks asserts that "WAMY performed numerous audits in Saudi Arabia and across its international offices" (p. 9), that he personally "reviewed 57 audit reports/audited financial statements from WAMY and its international offices, both in English and Arabic" (p. 7) and that this "review does not provide any indication that WAMY intentionally sponsored projects and individuals connected with terrorist activities." (pp. 7-8)

2.3.    Marks does not identify and provide a list of each of the 57 audit reports he states that he reviewed. Marks does cite some smaller number of such audits in pp. 11-16 of his report, in discussions of audits of 10 WAMY offices, which I have identified and placed into the list below. From his Expert Report and its footnotes, it is difficult to determine the exact number of the audits referenced, but they appear to be fewer than 57, and some of them are not audits, but financial summaries or collections of disparate documents such as reports on activities rather than audits. They are:

2.3.1. WAMY-Pakistan office (includes Lajnat al Birr) -- 14 audit reports (1994-2002). See WAMYSA 18575-18755 (9 reports total – English) and WAMYSA 9690-9738 (5 reports total – English).

2.3.2. WAMY-Eastern Province office  – Appears to include 3 audit reports in Arabic. See WAMYSA 1070344-1070599 (Arabic).

2.3.3. WAMY-Riyadh office. I cannot determine the number of audit reports this material covers (Arabic). See WAMYSA 1080588-1080745 (Arabic).

2.3.4. WAMY-Bangladesh office. Three audit reports (2000, 2001, 2002). See WAMYSA 66752-66802 (English).

2.3.5. WAMY-Baku office. Six reports. As near as I can discern, these documents do not constitute audits, or even financial statements, for any period. They are merely documents with "information about the programs and events carried out by the organization [WAMY]" from 1997-2002. See WAMYSA 66717-66751 (English).

2.3.6. WAMY-Indonesia office. Four audit reports (1994, 1995, 1996, 1997). These audits appear to have been prepared sometime after June 8, 2010. See WAMYSA 66972-67030 (majority are in English; last 10 pages are solely in Arabic).

2.3.7. WAMY-Somalia office. One audit report (1999-2002), prepared and dated August 31, 2005. See WAMYSA 67482-67515 (English).

2.3.8. WAMY-Sri Lanka office. One audit report (2001), prepared in 2003, financial statements for 2000 and 2002, and miscellaneous ledgers for 1998, 1999 and 2000. See WAMYSA 67542-67657 (English).

2.3.9. WAMY Australia and South Pacific office. One audit report (2002-2003). See WAMYSA 66224-66240 (English).

2.3.10. WAMY South Africa office. These are not audit reports, but financial statements for the office (2002, 2003). They are forwarded by an accounting firm which expressly states that they are financial statements that have not been audited. See WAMYSA 66424-66441 (English).

2.4. Marks is a practice leader of forensics investigations, compliance and integrity services group at Baker Tilly, who lists professional qualifications in the accounting and accounting standards field, and found "very few internal control weaknesses" and its "efforts in correct control deficiencies to be in line with a well-operated organization." However, his report does not explicitly address whether the materials he reviewed complied with international accounting standards, such as the International Accounting Standards (IAS) issued by the International Accounting Standards Board (IASB), the independent international standard-setting body based in London, updated and replaced in 2001 by International Financial Reporting Standards and whose U.S. equivalent remains the  Generally Accepted Accounting Principles issued by the U.S. Financial

Accounting Standards Board (FASB), on whose standards, guidance, and work I have relied upon for years to assess money-laundering compliance.

2.4.1.  As a consequence, Marks' report does not address the practical complications for oversight which are the consequences in practice arising from any deficiencies in WAMY's audits that did not meet these standards.

2.4.2.  An analysis that applies those accounting standards to the audits would find that the deficiencies included lack of verification of activities in the field for the WAMY office in the area at highest risk for terrorist finance, the Pakistan-Afghanistan region covered by WAMY's Peshawar office. These deficiencies made it impossible to determine whether all funds characterized as "stipend" or "student welfare" (for example) were used properly, or alternatively, were also used to house, feed, or train terrorists, or to provide funds for other costs-of-living for those preparing for armed, military, or terrorist activities, as discussed in detail in my Expert Report.

2.4.3.  In the case of WAMY's Indonesian offices, at least, the audits provided and cited by Marks were created at least thirteen years after the periods audited, based on the dates of information contained within them. These undated audits state that they were based on reporting that did not meet generally accepted accounting principles and could not be relied upon by anyone other than WAMY's headquarters, to whom they were apparently provided at some unspecified date after June 8, 2010, although they purported to audit activities taking place from 1994 through 1997. As discussed further in my discussion of the WAMY Indonesia office audits, such audits violate important international accounting standards applicable to the auditors, as well as to the organization they audited. These profoundly belated audits for WAMY Indonesia illustrate the deficient controls put in place by WAMY during the relevant period.

2.5.   In my Expert Report, I stated that the audits made available to me from the defendants were very limited, and that the information provided in these limited audits showed deficiencies in controls. Through further examining the audits relied on by Marks, I have found further evidence of deficiencies in controls in WAMY's Peshawar office throughout the period of 1994-2002.

2.6.   The audits and other materials cited in Mark's Expert Report represent an incomplete subset of the audits that WAMY must have produced over the ten-year period for all of WAMY's offices worldwide. According to WAMY's website, as of 2003, WAMY had "66 regional and local offices and representatives in five continents." That WAMY webpage further lists 122 locations "served" by those offices, including 34 in Asia, 40 in Africa, 25 in Europe, 3 in North America, and 20 in South America.[1] There must have been spending by WAMY associated with at least 66 if not all of these 122 locations, but the audits cited by Marks cover only ten of them. Apart from their lack of completeness, these materials taken as a whole, confirm, rather than refute, the concerns I expressed in

---

[1] WAMY website, FEDPEC0218834

my report about the adequacy of WAMY's controls and the ability of its funds to be diverted to finance terrorist training, logistics, salaries, and infrastructure.

2.6.1.  The audits show widely differing levels of controls in place for later periods than for earlier periods. Audits for WAMY Australia in 2002-2003, WAMY Sri Lanka in 2001 and 2002, and WAMY-Bangladesh for 2000, 2001 and 2002, show detailed tracking of expenses on ledgers. Each was undertaken after the date of reforms Marks contends that WAMY put into place in 2000. These audits also show each of these offices to have small programs, involving annual expenditures of only a few hundred thousand dollars.

2.6.2.  By contrast, in WAMY's office in Peshawar, covering Afghanistan, the geographic heartland for the development of Al Qaeda and the training of its terrorists, the information provided in the audits, covering far larger sums annually, represents exactly the kind of profile one would expect from a charity located in an area that is breeding terrorism that has made its resources available for terrorist use as a result of having minimal controls on expenditures in practice.

2.6.3.  The audits provided for WAMY's office in Indonesia thirteen or more years after the periods covered in the audits further demonstrate the failure of controls over that WAMY office during the critical period of 1994-1997, when Indonesia was an important center for terrorist recruitment, as reflected in the U.S. Department of the Treasury's later designation of the Indonesian branch of another Saudi charity, the International Islamic Relief Organization (IIRO), for terrorist finance.

2.6.4.  Other audits referred to by Marks are either not audits at all, as reflected in the documents he cites pertaining to Baku, Azerbaijan, or are financial statements which expressly are stated not to constitute or represent audits, as in the case of South Africa, and therefore not to be relied on as proving the sufficiency of controls.

2.7.  There are other limitations to the documents relied upon by Marks (and Sageman) and available to me. The dates of the audits and other materials covered in the list above do not cover the entire time period from 1992-2002 for any of the 10 offices. The office providing the most extensive set of audits in terms of time, from 1994-2002, in Peshawar, also provides the clearest documentation of the lack of controls on the uses of funds by WAMY, in an area of exceptionally high risk of abuse for terrorist finance, and lists categories of spending ("stipends," "student welfare") which are consistent with the reports of diversions from charities for support of terrorism in that region in that period.

2.8.  As stated, WAMY's publicly reported that it maintained 66 offices, and its website showed 122 locations for WAMY activities as of 2003. These audits and other materials thus appear to cover less than 1/6[th] of WAMY's stated number of 66 offices. For two of the ten offices (Australia/South Pacific and South Africa), the audits or other reports cover only periods after the 9/11 attack (2002 and 2003), and provide no information on expenditures during the ten years leading to the attack. For Bangladesh and Sri Lanka, they cover only the period from 2000 onward in which WAMY had imposed new

controls, as stated by Marks (p. 17), and thus do not provide information on what controls were in place for the earlier period of 1992-1999.

2.9.   Within the time period 1992-2002 set for discovery in this case, WAMY maintained offices in Kashmir, Kenya, the Philippines, Russia, Sudan, the United Kingdom, the United States, and Yemen, among other locations that were important sources for terrorist finance, recruitment and/or operations. Marks does not provide information on WAMY audits for any of these locations. The missing audits for these locations highlight the limits in scope and completeness of the material that WAMY produced and Marks evaluated .

2.10.   Based on representations that Marks relies on from WAMY's Assistant Secretary General, Abdul Wahab Noorwali, Marks states that "WAMY performed numerous audits in Saudi Arabia and across its international offices," (p. 9). Marks further states that WAMY required audits for every project funded by WAMY on a project by project basis, and that "WAMY would only send funds allocated for a specific project and would require reporting and audits on this funding to track the use of this funding." (p. 12)

2.10.1.   It logically follows that there should be at least hundreds of branch audits (10 years of 66 offices= 660 audits, give or take. Since the 2003 WAMY website despite using the number of 66 offices, actually lists 122 locations for WAMY. If all 122 locations had separate projects, and each was operating throughout the ten year period, there would be as many as 1220 audits needed if all activities that location were covered by an individual audit. If audits were undertaken on a project-by-project basis to track the use of this funding," there should also be thousands of relevant project audits in WAMY's possession for the 1992-2002 discovery timeframe authorized by the Court, which should have been made available for review.

2.10.2.   Whatever the actual number of WAMY offices for each year, there were clearly substantially more than ten, as reflected in the 66 offices and 122 locations listed in the 2003 WAMY website. There is a very large gap between the limited number of audits and reporting Marks states that he reviewed and the totality of the audits that should have existed.

2.10.3.   Fifty-seven audits would therefore necessarily represent only a small fraction of the audits performed while each WAMY office was open. But the number appears to be inflated: based on my review, the documents referred to by Marks as the basis for his review of "57 audits" includes locations and periods in which no audits were actually provided, only unaudited financial statements or merely reports about projects, as discussed further below.

2.10.4.   The limited audit material cited by Marks as an expert retained by the defendants suggests by implication that the vast majority of audits said to be undertaken by WAMY have not been produced or reviewed, including the underlying financial records supporting those audits.

2.10.5. Marks makes no affirmative representation that he reviewed the underlying financial records supporting each of the audits and reports he reviewed.

2.11. It is logically impossible for Marks (or anyone) to evaluate the sufficiency of the implementation of WAMY's controls in locations and periods not covered by the subset of audits Marks reviewed, which are not only a small portion of the whole that must have existed, but in most locations, reflect only practices documented to have been put in place in 2000 or afterwards. This is especially the case as the offices for which no audits were provided included important areas for Al Qaeda recruitment, finance, and/or operations.

2.12. Marks states that WAMY introduced "more strict and centralized controls of its national and foreign offices in 1997." Marks describes these "[i]ncreased accounting controls" as creating centralized recordkeeping, in which "WAMY gradually became aware of issues in their internal controls and made a conscientious effort to improve any control issues. He identifies the introduction of a "new accounting and financial policy" he states to have been "implemented with immediate effect on January 1st, 2000." (p. 17)

2.12.1. The document Marks relies upon for the finding that WAMY placed "more strict and central controls" on its foreign offices from 1997 actually does not address controls for the purposes of financial tracking or accounting. It merely suggests that WAMY should undertake a process to develop a computer network to link WAMY's branches within Saudi Arabia to WAMY headquarters to "unify the work" within Saudi Arabia itself. It does not cover accounting or financial issues. And it does not cover WAMY's offices outside of Saudi Arabia. Marks thus materially overstates its substance.[2]

2.12.2. Marks' acknowledgement that there were "issues in their internal controls" and "control issues" is not accompanied by an analysis of what the internal control issues were and how substantially these internal control issues impaired full and accurate visibility into WAMY's operations in the field. The 1997 document cited above suggests that there were no centralized electronic systems as of that time even for WAMY's communications about activities within Saudi Arabia, let alone extending to its overseas operations, an indicator that regular oversight would have needed to rely on intensive processes to audit activities, which is not reflected in the documentation cited by Marks.

2.12.3. Marks does not address the extent or impact of the "control issues" he acknowledged over WAMY's controls prior to the implementation of the "new accounting and financial policy" in 2000.

2.12.4. Marks does not address the dates for implementation of the new controls in practice after January 1, 2000, other than to note a meeting held with accountants from Saudi regional offices on June 18, 2000 "provide[s] evidence of changing accounting protocols in the eastern provinces to rectify the issues." (p. 18)

---

[2] WAMYSA082520-WAMYSA082521

2.12.5. The disclosures in the Marks report suggest that WAMY concluded its controls were deficient as of 2000 (and therefore throughout the 1990s), and needed to be corrected, and began to implement efforts to do so only after January 1, 2000.

2.13.  Some of Marks' statements about the material he relied on conflict with one another. For example, Marks states that "the records following 1992 substantially exist, and I have not identified any systemic issues related to missing documents following 1992, or systematic patterns of missing documents." He then acknowledges that WAMY's Assistant Secretary General, Abdul Wahab Noorwali, declared that Jeddah faced a "massive flood" in 2008, in which WAMY lost many records. (p. 29)

2.13.1. The citation used by Marks for the reference by Noorwali to a massive flood in 2008 is to "Declaration of Dr. Abdul Wahab Noorwali at ¶25, stating in full: "in 2008 there was a massive flood in Jeddah. Unfortunately, WAMY's office was in the path of the flood. I know that WAMY lost many records in this flood. I do not know exactly which records were lost." This is apparently the same sentence relied on by Sageman, as discussed further in this report, for the proposition that records are missing due to a 2008 flood.[3]

2.13.2. Marks does not specify the date of the Declaration he cites. Noorwali's 1st Declaration of March 30, 2018, contains no such reference to a flood, in any year, at Paragraph 25, or anywhere else. I assume based on Marks' citation, that the reference to the flood must have been made in Noorwali's 2nd Declaration, as cited by Sageman with a date of 04/03/2019, which I understand could not be located in a PACER search of the case docket and has not been made available to me.

2.13.3. Marks' findings that records following 1992 substantially exist and that there are no systemic issues relating to missing documents following 1992, or systematic patterns of missing documents is inconsistent with his acknowledgement that a "massive flood" was stated by WAMY to have destroyed many of WAMY's records. In this regard, Marks' finding appears to be incompatible with the facts.

2.13.4. WAMY failed to provide any audits for numerous WAMY offices, including, for example, those in Kashmir, Kenya, the Philippines, Russia, Sudan, the United Kingdom, the United States, and Yemen. The audits missing in their totality for these WAMY offices provide further evidence, contrary to Marks' findings, that WAMY did indeed have systemic issues relating to missing documents, and systematic patterns of missing documents throughout the 1992-2002 period.

2.14.  These statements about the date of the flood made by Marks are also inconsistent with the public record. Available public information does not report a massive flood in Jeddah in 2008, but reports one took place on November 25, 2009, and a second set of floods took place in December 2010 and January 2011.[4] Accordingly, if WAMY indeed lost massive

---

[3] Marks, p. 29, footnote 67.
[4] There is extensive online reporting in English on both the 2009 and 2011 flooding, and some on a flood which took place in 2010, but no such reporting for 2008.  See e.g. "Analysis on causes of flash flood in Jeddah city (Kingdom

amounts of its records in a flood, as stated by Noorwali, and failed to maintain any back-ups, it appears that the incident would have been in another year than 2008, such as November 2009, December 2010, or January 2011, in which substantial flooding in Jeddah was publicly reported.

2.15.    The presence of the error in Marks report regarding the year in which Jeddah experienced a flood and in which records for which no back-ups were maintained and were ostensibly irretrievably lost reflects his reliance on information provided by Noorwali, a senior officer of WAMY. When Noorwali's information is inaccurate, as in the case of his dating of the flood, his information and assessments similarly follow the inaccuracy provided by him. He appears to have undertaken no cross-checking or verification from readily available public information. Through Marks' reliance on Noorwali's Declaration, Marks fell into an easily discernable error of fact.

2.16.    The audits of WAMY's Pakistan/Afghanistan office in Peshawar further highlight the problem of relying on assurances that are not verified. Many of the audits and reports cited by Marks state their reliance on the "assurance" of the regional director or other senior officials at WAMY as an alternative to undertaking any verification of the underlying activity reported in the financial statements. The approach of 'trust, don't verify' by the auditors was applied throughout the relevant period for the audits provided for one of WAMY's highest-risk locations, in Peshawar, a central location for Al Qaeda's pre-9/11 operations, together with field clinics in Kabul, Nangarhar, and Kunar, Afghanistan. The very audits cited by Marks as proof that controls were in place contain evidence that WAMY's controls over expenditures in an exceptionally high-risk region were minimal to non-existent and insufficient. These audits are in great contrast to the greater precision and detail of audits for some of the other offices of WAMY provided for periods that followed, rather than preceded, the 9/11 attacks, or undertaken by auditors after the 9/11 attacks.

2.16.1.    There are some additional documents accompanying the audits for WAMY/LBI Pakistan for some years, which provide some additional of information about projects undertaken in Afghanistan during the periods covered by the audits. They are described as "Information on Operations Health, Orphans & Education, WAMY/LBI During (1992 to 2002)" and "Annual Reports WAMY/LBI (1992 to 2002)."

2.16.2.    These additional documents (beyond the audits) do provide descriptions and reports on projects. But none of the "Annual Reports" involve financial reporting of the kind found in an annual financial statement. Instead, they include some

---

of Saudi Arabia) of 2009 and 2011 using multi-sensor remote sensing data and GIS," Geomatics, Natural Hazards and Risk, 7:3, 1018-1042, DOI: 10.1080/19475705.2015.1012750 and "Floods in Jeddah, Saudi Arabia: Unusual Phenomenon and Huge Losses, What Prognoses," E3S Web of Conferences, 3rd European Conference on Flood Risk Management (2016)
https://www.researchgate.net/publication/309345158_Floods_in_Jeddah_Saudi_Arabia_Unusual_Phenomenon_and_Huge_Losses_What_Prognoses

single-figure summaries of funds spent by project for some completed projects, and single-figure summaries for funds allocated to some of then-current ones.[5]

2.16.3.  The additional documents provide information that could have been used with additional testing to verify some of WAMY/LBI's spending. But neither the documents do not show that this verification process was actually undertaken by the auditors, or anyone else.

2.17.  The 2002 Audit of WAMY/LBI, covering the operations directed from WAMY's Peshawar office, states:

    2.17.1.1.  "the receipts reflected in the financial statements are based on the amounts so recorded in the books of WAMY," but does not state that these transactions were actually otherwise verified by the auditors.

    2.17.1.2.  "donations amounting to Rs 58877899 and their intended use for specified projects was not directly confirmed to us by WAMY Saudi Arabia hence remained unverified."

    2.17.1.3.  "undistributed stock of donations in kind comprising of tents food stuff clothes and medicines amounting to Rs 5.244 million as of 30 Zulhijjah 1422 Hijrah was distributed during the current year," but this "said distribution was not subject to our verification, we could not physically verify the inventory of fixed assets as inventory lists were not available for our verification."

    2.17.1.4.  "expenditure incurred inside Afghanistan is not susceptible to independent audit verification. It has been verified by us only to the approval thereof by WAMYs Regional Director."

    2.17.1.5.  "Without qualifying our report we draw attention to the fact that in common with many organizations of similar size WAMY system of internal control is dependent upon close involvement of the Regional Director. Where independent confirmation of the completeness of the accounting record was therefore not available we have accepted assurance from the Regional Director that all WAMYs transactions have been reflected in the records."

    2.17.1.6.  While the auditors for WAMY in 2002 accepted the assurances of the Regional Director on faith where it was unable to verify such basics as:

        2.17.1.6.1.  the sources of donations to the organization;

        2.17.1.6.2.  evidence that the purported donations in the field were actually made as stated in the books; and

---

[5] WAMSA018576, WAMYSA018603-WAMYSA018755

2.17.1.6.3.  evidence that expenditures in Afghanistan was made as recorded.

2.17.1.7.  Such an audit can hardly be considered proof that effective controls were in place for WAMY's operations in Pakistan and Afghanistan, even as late as 2002. I conclude that the inability of the auditor to verify even basics about donations and expenditures provides documentary evidence that effective controls at WAMY's Pakistan/Afghanistan office were not, even in 2002, adequately implemented.[6]

2.17.2.  The earlier audits of WAMY's Pakistan-Afghanistan office by a different auditor are less fulsome on WAMY's reporting deficiencies, but provide similar evidence that controls were insufficient to provide assurance that the audits reflected the actual activity of the charity in the field. Below I provide relevant excerpts from the 2001 Audit of WAMY's Pakistan/LBI office cited by Marks as proof that WAMY actually had proper controls in place:

2.17.2.1.  "Donation in kind comprising of tents food stuff clothes and medicines was received from WAMYs principal office in Jeddah Saudi Arabia for onward distribution to the needy.  Based on local market rates the items received donation were valued at Rs 44.761 million, majority of which amounting to Rs 39517 million were distributed during the year and the balance amounting to Rs 5.244 million remained in stock. **The accompanying -financial statements however neither reflect the receipt of such donation in kind -nor the items distributed and the stock in hand as of 30 Zulhajjah 1422 Hijrah.** [emphasis added] Incorporating the donation would have resulted in increase of the total donations to Rs 134.712 million and -the -net surplus to Rs 14.377 million. Further the expenditure classified as Emergency Relief Afghanistan under the Specified Projects would have increased to Rs 77.534 million and stock would have been reflected in the balance sheet at Rs 5.244 million."[7]

2.17.2.2.  "Without qualifying our report we draw attention to the fact that in common with- many organisations of similar size WAMYs system of internal control is dependent upon close involvement of the Director General. Where independent confirmation of the completeness of the accounting record was therefore not available we have accepted assurance from the Director General that all WAMYs transactions have been reflected in the records."[8]

---

[6] Audit, World Assembly of Muslin Youth, Pakistan OIC Accounts for the year ended 30 Zulhajjah 1423 Hiirah, M. Almas Co, WAMYSA0195478-79.

[7] The audit states that the acronym "Rs" refers to the currency as being Pakistani rupees.

[8] World Assembly Of Muslim Youth Pakistan Office Accounts For The Year Ended 30 Zulhujjah 1422 Hijrah Ford Rhodes Sidat Hyder Co Chartered Accountants, June 12, ____ (year illegible) WAMYSAO18593

2.17.2.3. Thus, the 2001 audit for WAMY again relied on "assurance" from WAMY's official that where the accounting record was incomplete, they could just trust him on the accuracy of the reporting. But in doing so, it further specified that the reported financial statements could not be reconciled with either receipt of Rs 44.761 million in donations, or their distribution. Based on the 2001 audit, it appears that the total donations made to that office of WAMY for 2001 were in the amount of Rs 89,951,290.  Thus, based on the findings of the accounting firm, it appears that just about half of all of the donations made for that year to WAMY were not reflected on WAMY's financial records.

2.17.2.4. A discrepancy of 50% of the total donations in the financial records again highlights the limitations of the audit process to accurately track WAMY's funds and activities. Given the discrepancy, the disbursements labeled as being earmarked for the needy could have gone to anyone for any purpose, as there appears to have been no verification provided to the auditors other than the "assurance" provided by the WAMY director. Notably, the discrepancy from the financial reporting took place at the very time when the area covered by that office of WAMY (the Pakistan-Afghanistan border region) was one of the centers for Al Qaeda and its preparation for attacks on the United States.

2.17.2.5. The date of the 2001 audit is stamped, but partially obscured. The part that is legible shows it to be June 12, with the year illegible. As discussed below, the same date of June 12, with the year stamped as June 12, 2003, using what appears to be the same type of date stamp, is provided as the date for the 2000 audit for the Pakistan/Afghanistan office of WAMY, raising the question of whether both the 2001 and 2000 audits were delayed until June 12, 2003, and if so, why? International accounting standards as reflected in ISA 230 have long required audits to be timely, and to have their date of release documented. [9] The illegible date suggests that this audit did not met these standards.

2.17.3. The 2000 Audit for the Pakistan/Afghanistan office of WAMY has similar qualifying language to that contained in the 2001 Audit, but is sparse in its explanation of what testing was actually done to verify the information. In relevant part it states:

2.17.3.1. "We have audited the accompanying balance sheet as of 30 Zulhajjah 1421 Hijrah and the related statement of receipts and expenditure statement of cash flows and statement of changes in equity of the

---

[9] For audits to serve their purpose, they must be prepared on a timely basis. Timely preparation of audit documentation (working papers) is a mandatory requirement under international accounting standards, as reflected in ISA 230. See e.g. International Standard On Auditing 230, Audit Documentation https://www.ifac.org/system/files/downloads/a011-2010-iaasb-handbook-isa-230.pdf

WORLD ASSEMBLY OF MUSLIM YOUTH-PAKISTAN OFFICE
WAMY for the year then ended. These financial statements are the responsibility of WAMY's management. Our responsibility is to express an opinion on these financial statements based on our audit."

2.17.3.2.   "An audit includes examining on test basis evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management as well as evaluating the overall financial statements presentation We believe that our audit provides reasonable basis for our opinion."

2.17.3.3.   "In our opinion the financial statements give true and fair view of the financial position of WAMY as of 30 Zulhajjah 1421 Hijrah and of the results of its operations and its cash flows for the year then ended prepared in accordance with International Accounting Standards as applicable in Pakistan."

2.17.3.4.   "Without qualifying our report we draw attention to the fact that in common with many organisations of similar size, WAMYs system of internal control is dependent upon close involvement of the Director General. *Where independent confirmation of the completeness of the accounting record was therefore not available we have accepted assurance from the Director General that all WAMYs transactions have been reflected in the records*."[emphasis added][10]

2.17.3.5.   The Audit reports, without further detail, that roughly two-thirds of WAMY's funding, or Rs 33,759,283 for 2000 came from cash provided by WAMY in Saudi Arabia.[11]

2.17.3.6.   The Audit Report is for the year 2000, but is dated June 12, 2003. The Auditors do not provide any explanation for: the two-year delay in preparing the report, nor does the audit specify what, if any, tests were conducted to support any of the amounts and disclosures in the financial statements, and therefore, the basis in fact for the assessment by the auditors that their audit provided a reasonable basis for their opinion – more than two years after the audit should have been completed.

2.17.3.7.   An audit completed two and a half years after the end of the year to which the audit pertains may not meet the internationally accepted accounting standard under ISA 230 that an auditor shall prepare audit

---

[10]World Assembly Of Muslim Youth Pakistan Office Accounts For The Year Ended 30 Zulhujjah 1421 Hijrah Ford Rhodes Sidat Hyder Co Chartered Accountants, June 12, 2003, WAMYSA0188605
[11] Id, at WAMYSA01886011

documentation on a timely basis, which is normally a few months after the period covered by the financial reports.

2.17.3.8. As with the other audits provided by WAMY, it appears that the audit is based in substantial part on the "assurance" made from its Director General. The audit report does not specify any instance in which independent confirmation (verification) was actually undertaken for the expenditures made in Afghanistan, as specified in the 2002 audit.

2.17.3.9. As reflected in the audit report, rather than verify facts on the ground, WAMY's auditor took assurances on faith, without verification, from a charity operating in the Pakistan-Afghanistan border region in the very period that Al Qaeda was carrying out its preparations for the 9/11 attacks in that very region. Such reliance left those funds susceptible to terrorist funding and other abuse. The risk of misapplication of funds for terrorist finance in such a region was high; the verifications of WAMY's activities as reflected in the audit were minimal to non-existent, and the auditor's report provides no verifications that would demonstrate there were effective internal controls on either fundraising or expenditures.

2.17.4. The 1999 WAMY audit, by the same auditor, contains similar language, does not document any effort at verification, and again accepts the assurance received from WAMY's Director General that all WAMYs transactions have been reflected in the records provided the auditors. Notably, in 1999, essentially all of WAMY's Rs 32,240,323 in donations was reporting as coming in as cash from WAMY Saudi Arabia. Due the absence of a release date being specified by the auditors, I cannot determine when the audit was actually prepared and certified. The document is undated, which is inconsistent with the international accounting requirement that audits provide a release date, as one means of demonstrating that they are timely.[12]

2.17.4.1. The sparse 1999 audit provides only very general categories for expenditures, with approximately 1/3 of the total expenditures going to the very non-specific category of "stipend" for "social welfare."

2.17.4.2. This kind of financial reporting exemplifies the obvious internal control weaknesses reflected in this and all of the WAMY Pakistan/Afghanistan audits.

2.17.5. The earlier WAMY Pakistan/Afghanistan audits incorporate the same weaknesses and deficiencies. The 1998 audit does not contain a release date, making it impossible to determine whether it met accounting standards for being timely. There are also no release dates specified for the 1997 audit, the 1996 audit, the 1995 audit, and the 1994 audit, making it not possible to determine whether they

---

[12]World Assembly Of Muslim Youth Pakistan Office Accounts For The Year Ended 30 Zulhujjah 1420 Hijrah Sidat Hyder Qamar Co Chartered Accountants,  undated, WAMYSA018624.

were timely. The 1998 audit's largest category of expenditure after salaries, amounting to nearly one-third of the total is for "students welfare," in the equivalent location of the audit to the location used in 1999 as a reference to "stipend."[13] The lack of controls on such funds for this purpose, in this region, at this time, would have made such funding especially susceptible to abuse for terrorist finance, and is consistent with the reporting on abuses by such charities in this region for terrorist finance during the period leading up to the 9/11 attacks.

2.17.6. With these facts in mind, I return to the statement I made in my Expert Witness report, from which Marks provides the snippet, "Winer states that he has 'not found documentary evidence that an audit was conducted by WAMY or LBI to reconstruct the actual uses of funds." Marks then uses this snippet to suggest that I found that no audits were performed at all. This is not what I stated. My statement in full as related to this issue was as follows:

2.17.6.1. "I have not found documentary evidence that an audit was conducted by WAMY or LBI to reconstruct the actual uses of the funds they provided to Batterjee as he was engaged in terrorist finance activities for al Qaeda. To the contrary, the evidence that exists suggests that WAMY did not track what Batterjee did with funds provided by these charities. Noorwali himself states that Batterjee's management of LBI prior to his departure in 1993 had not been transparent, and one could not track sources or funds or expenditures."[14]

2.17.6.2. Marks misrepresents my statement by using only a snippet of it and stripping it of its context. It is accurate that these is no documentary evidence that an audit was conducted to reconstruct **the actual uses** of the funds WAMY provided Batterjee.

2.17.6.3. Instead, Marks (and Sageman) rely on statements made in this litigation by Noorwali, WAMY's Assistant Secretary General, that such tracking was done and claiming that the audits and all other records for oversight were lost in a massive flood in Jeddah in 2008. Noorwali's statements were not contemporaneous, or proven by contemporaneous document. In my discussion of Sageman's findings below, I address the eight pages of documents from 1989 that he cites as evidence that such processes were in place. They do not prove that spending by Batterjee was reconstructed, or verified, only that in the particular two cases for which documents were provided, there was a listing of particular expenditures.

---

[13] World Assembly Of Muslim Youth Pakistan Office Accounts For The Year Ended 29 Zulhajjah 1419 Hijrah Sidat Ryder Qamar Co Chartered Accountants, WAMYSA018635. Notably, other than salaries, the largest categories for spending shift dramatically from year-to-year, with 1998 being the first year of large payments for "students" and "orphans allowances" being a major category up until 1997. The audit reports do not address these rapid and unexplained shifts in how the funds' uses are categorized.
[14] Winer Expert Report, at Section 12.12.7

2.17.6.4.   Despite the reported loss of most of WAMY's contemporaneous records, there some records that are pertinent to understanding whether or not the audits of Batterjee's activities took place, and undertook the tracking described by Noorwali. And by implication, they suggest that there was no such tracking. These are the audits for WAMY's Pakistan/Afghanistan office in Peshawar. Those audits expressly state that instead of verifying WAMY's underlying activities there, the auditors relied on the word of those involved on trust without undertaking the type of verification Noorwali states took place and were recorded in the documents that are all now missing.

2.18.   Regarding the documents in Arabic relating to the WAMY Eastern Region[15] and the audit those relating to WAMY Riyadh[16] relied on by Marks:

2.18.1. I am not an Arabic reader and accordingly cannot assess the content of the documents in Arabic characterized as audit reports for WAMY Eastern Region or the documents characterized as audit reports for WAMY Riyadh. I assume but cannot independently determine that they documented the unspecified "control issues" in the Eastern Region office acknowledged by Marks, whose substance he chose not to detail in his report. (p. 15)

2.18.2. Marks does not specify in his report whether Marks is himself an Arabic reader. He does not make any positive representation that he has knowledge of the Arab language. Instead, he states that his review of 57 audit reports in English and Arabic was undertaken by him "and others under [his] direct supervision." (p. 7). Marks does not identify the others, or their expertise, making it difficult to assess the extent to which he is relying on analysis by these unspecified persons and regarding any materials he was not able to review personally due to the materials being written in a language he does not know.

2.19.   The three audits for 2000, 2001, and 2002 in Bangladesh are very different from the material provided in the audits of WAMY's Peshawar office.[17] Each audit has a release date. Each audit shows contributions and expenditures tracked in detail. The financial reports do not show broad areas of slush funds such as "stipends" or "student welfare," as exhibited in the Peshawar audits. (The funds involved are also substantially smaller than those involved in Peshawar. Based on my review of historic exchange rates, the funds tracked by the audits for this office amounted to roughly a couple of hundred thousand dollars a year.) There is no statement by the auditor for WAMY Bangladesh that it relied on the "assurance" of a WAMY office that the reported expenditures were real, without undertaking its own independent verification. By contrast, there is a statement, missing from the Peshawar audits, that "the books of account of the ORGANIZATION have been kept as required" and drawn up in conformity with accepted accounting principles.

---

[15] WAMYSA107344-WAMYSA1070599
[16] WAMYSA1080588-WAMYSA1080745
[17] WAMYSA066752-WAMYSA066802

Contrast this statement from WAMY Bangladesh for these years with that made by the auditors for WAMY's Peshawar office in 2002:

2.19.1. "These financial statements are the responsibility of the WAMYs management."

2.19.2. "donations amounting to Rs 58877899 and their intended use for specified projects was not directly confirmed to us by WAMY Saudi Arabia hence remained unverified"

2.19.3. "salaries and allowances etc have been verified by us only to the approval thereof by the WAMYs management and acknowledgement of the recipients."

2.19.4. "undistributed stock of donations in kind comprising of tents food stuff clothes and medicines amounting to Rs 5.244 million as of 30 Zulhijjah 1422 Hijrah was distributed during the current year The said distribution was not subject to our verification."

2.19.5. "we could not physically verify the inventory of fixed assets as inventory lists were not available for our verification."

2.19.6. "expenditure incurred inside Afghanistan is not susceptible to independent audit verification. It has been verified by us only to the approval thereof by WAMYs Regional Director."[18]

2.20. The audits for the Bangladesh office of WAMY demonstrate what types of controls were achievable for the charity when it choose to put them in place as in the Bangladesh case, from 2000 onward. The comparable audits for the Pakistan/Afghanistan office of WAMY in Peshawar demonstrates the profound deficiencies in controls that remained there even as of 2002.

2.21. The materials relating to Baku, Azerbaijan described by Marks as "audit reports" in footnote 42 to his Expert Report are not audits. They are not even financial statements. I do not understand how Marks could characterize them as either, even by implication, in his Expert Report. (p. 16). The materials, which are in several different languages and scripts, appear to be a potpourri of summaries of what WAMY told Azerbaijani officials it was doing in Azerbaijan in the period from 1997-2002. They do not provide documentation on the office's internal controls.[19]

2.22. The audits cited by Marks for WAMY's Indonesia office for the years 1994, 1995, 1996, and 1997 are undated, but each of them refer to an event that took place on June 8, 2010 relating to an MOU signed between the IIRO and the Indonesian government on that date.[20]   Given the inclusion of the June 8, 2010 date of this MOU within each of the audits, it appears that the undated audits were undertaken at least thirteen to seventeen years after the events and activities they purport to audit. These facts suggest that the

---

[18] WAMYSA018579
[19] WAMYSA066717-WAMYSA006751
[20] WAMYSA066972-WAMYSA067030

auditors violated two fundamental international accounting standards, as reflected in ISA 230, which were in place as of that date: timeliness, and the requirement to specify an accurate release date. Notably, the accountants who undertook these four audits many years after the events provided comprehensive caveats to their audits, stating that they should not be relied on for any purpose other than to provide "accountability" from the Indonesian office to WAMY headquarters:

2.22.1.  "Management is responsible for the preparation and fair presentation of these financial statements. . . This responsibility includes: designing, implementing and maintaining internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error; selecting and applying appropriate accounting policies; and making accounting estimates that are reasonable in the circumstances."

2.22.2. "In our opinion, the financial statements present fairly, in all material respects, the fund accountability of World Assembly of Muslim Youth (WAMY). . . Without modifying our opinion, we draw attention to Note B.2 to the financial statements, which describes the basis of accounting. The financial statements are prepared to assist the World Assembly of Muslim Youth (WAMY) Indonesia Office in preparing accountability to World Assembly of Muslim Youth (WAMY) Headquarter Office. As a result, the financial statements may not be suitable for another purpose. Our report is intended solely for World Assembly of Muslim Youth (WAMY) Headquarter Office and should not be distributed to parties other than World Assembly of Muslim Youth (WAMY) Headquarter Office."

2.22.3. Note B2 reads in full as follows: "The Fund Accountability Statement is prepared using the cash basis of accounting whereby revenue is a comprehensive basis of accounting other than generally accepted accounting principles."[21]

2.22.4. Taken together, the statements by the auditors for WAMY's Indonesia office suggest that some thirteen to seventeen years after the audit period, the auditors verified nothing more than the paper their clients provided them to create a paper trail for WAMY's headquarters from WAMY's Indonesia office years after the commencement of this legal case. Rather than show accountability these audits reflect an effort after-the-fact to create the *semblance of accountability* for a WAMY office in which contemporaneous audits and verification of facts behind the numbers presented were absent.

2.22.5. These limitations on the utility and integrity of the audits of WAMY's Indonesian office for the years 1994 through 1997 are not acknowledged, let alone analyzed, by Marks. Nor does Marks address the departure from international accounting

---

[21] World Assembly of Muslim Youth Indonesia Office, Notes of Fund Accountability Statement, for the year ended Dzhullhijjah 30, 1415H, WAMYSA066982. Each of these four audits carry the identical note, and the identical auditor's language and limitations, suggesting that each of the reports for the four years covered were prepared simultaneously at some (undisclosed) date after June 8, 2010.

standards reflected by the absence of a release date on the audits, or their creation sometime on an unspecified date sometime after June 2010.

2.23.  The audit for WAMY's Somalia office is dated August 31, 2005, and purports to cover the years from 1999 through 2002. As stated with regards to the WAMY Pakistan-Afghanistan office audits for 2001 and 2000 and with regarding to the 1994, 1995, 1996, and 1997 WAMY Indonesia office audits, this release date for the audits makes them untimely. The audits themselves reflect detailed financial statements and state that they involved corrections based on the review, which took place nearly four years after the 9/11 attacks, suggesting that the Somalia office likely had not been audited previously. The Somalia audit appears reflects an authentic effort to reconstruct, some years later, the funding of and disbursements for a small office of WAMY, whose total spending is stated to be $167,376.25 over the entire four year period. But this audit was conducted two, three, four, and five years later than it should have been, raising the question of whether there had been any audits undertaken for WAMY-Somalia at any time prior to 1999.[22]

2.23.1.  The lack of timeliness of the audits of WAMY's Somalia office is not addressed by Marks, who states that WAMY placed comprehensive controls in place beginning in January 1, 2000. (p. 17) The August 31, 2005 release date of these audits suggests that implementation of those controls by WAMY remained incomplete for another five years after that.

2.24.  The material cited by Marks for WAMY's Sri Lanka office includes a hodge-podge of material, ranging from financial ledgers from 1998, 1999, and 2000; financial statements from 2000 and 2000 which do not include an auditor's report; and an audit for the year ending March 31, 2001, dated June 13, 2003, making this single audit untimely by about a year.[23]

2.24.1.  It is difficult for me to draw conclusions about this collection of material other than to note that it includes an actual report of the auditors for only a single year of operations of WAMY's Sri Lanka office, covering a period after Marks stated comprehensive reforms were put in place, and that the audit still did not meet international standards for timeliness.

2.24.2.  Again, Marks neither acknowledges nor analyzes whether the delay is consistent with international accounting standards, or the implications for WAMY's overall controls of this incomplete record of documents for WAMY's Sri Lanka office over the course of the ten year period from 1992-2002.

2.24.3.  I note that some of the documents place the financial statements as extending from calendar year to calendar year, ending on December 31 of the year, as reflected in a document labeled "World Assembly of Muslim Youth. Sri Lanka Office, Significant Accounting Policies – Period Ended 31st December 2000."[24]

---

[22] WAMYSA067482-WAMYSA067515
[23] WAMYSA067542-WAMYSA067657
[24] WAMYSA067649

Other documents, including the single audit, address the same information with identical wording for a different period, ending 31st March 2001,[25] the same date applied to the audit for the year ending March 31, 2001. I found no explanation for the change from calendar year to the March 31, 2001 date as reported in the June 13, 2003 audit. Here again, Marks does not address the issue or its implications.

2.24.4. Based on the lack of specificity in his Expert Report, it is not clear how many years of "audits" Marks assesses to be covered by this material for WAMY's Sri Lanka office – whether it is a single year, or multiple ones.

2.25.    The sole audit referenced by Marks for WAMY's Australia office covers the period of July 9, 2002, the date of the founding of the office, to June 30, 2003.[26] The audit finds that this newly established WAMY office had revenues of $234,152 and expenses of $145,338, each of which is tracked in a readily understandable category. This audit has an issue date of 12 December 2003, making it timely. The audit, which identifies no accounting issues, was carried out by the Canberra office of Ernst & Young more than two years after the terrorist attacks of 9/11 for an office that had not existed at the time of those attacks. Accordingly, this particular post 9/11 audit has no relevance to how WAMY carried out its operations, financial reporting, auditing, and internal controls *prior* to the 9/11 attacks.

2.26.    The final WAMY office referenced by Marks as the basis for his finding that WAMY's controls were "in line with a well-operated organization" is WAMY South Africa, for which he cites reports for the years ending February 28, 2002 and February 22, 2003.[27] Both reports are dated on the same day: 9 December 2004, making them outside the normal time period for an audit's release a few months after the end of the relevant time period. Regardless, neither of these documents are audits. They are only unaudited financial statements. Both reflect an office with a comparative small amount of activity, equivalent to perhaps $200,000 or a bit more in the first year, and a similar amount in the second year.[28] Other than the timeliness issue, the unexplained provision of the reports for two different years on the same day, and the fact that these are not audits, I find nothing remarkable in the financial statements provided for this small WAMY office for the period occurring after the 9/11 attacks. The post-9/11 unaudited financial statements for South Africa do not constitute evidence that any such controls were in place in any WAMY office prior to the date of those attacks.

2.27.    To conclude, on the issue of audits, I find that Marks overstates some evidence, which appears to include the number of audits he actually reviewed (at least as to those specifically cited and footnoted by him); fails to apply recognized auditing standards (ISO 230) to other evidence and to consider the implications of the failure to meet these

---

[25] WAMYSA067638
[26] WAMYSA060224-WAMYSA066240
[27] WAMYSA066424-WAMYSA066441
[28] I have not undertaken a precise calculation, as the value of the South African rand against the dollar reportedly fluctuated from 8.13 to one to 10.90 to one in that period. See chart on Business Tech, South Africa, January 11, 2016, https://businesstech.co.za/news/business/108555/how-far-the-rand-has-fallen-from-2000-to-2016/

standards; does not address relevant information relating to assessing deficient controls, such as the vast number of years between the periods of audit and the issuance of audit reports for WAMY-Indonesia and their lack of a release date on this audits; and fails to consider the implications of the information contained in the audit reports for WAMY-Pakistan/Afghanistan, a region of exceptionally high risk for terrorist finance, whose activities in country were, according to the audits themselves, never verified.

2.28.   Taken together, the audits, financial statements, and other information cited by Marks confirm an environment that was conducive to terrorist finance in WAMY's Peshawar office, as reflected by the deficiencies of its controls. This documentary record, combined with the other information cited in my report and the continued absence of audits for many other WAMY offices, underscore my reasons for disagreeing with Marks' judgment in the final section of his Report, Section F, in which he concludes that WAMY had effective controls. The record he himself cites shows that WAMY did not maintain effective controls in its branch offices for the period prior to the 9/11 attacks.

### Sageman's Findings on the Use of Audits and Financial Controls

2.29.   In his findings on WAMY's controls, Sageman largely relies on the statements made by Noorwali during his 2019 deposition, and a declaration that Sageman says that Noorwali authored and that Sageman claims to have reviewed, which declaration is (according to Sageman) dated 4/3/2019. Although Sageman quotes sections from the declaration verbatim (cited in Sageman's report as Noorwali 2nd Declaration), that declaration has not been made available to me and does not appear to have been provided to the plaintiffs in discovery. I have reviewed an earlier declaration by Noorwali dated March 30, 2018 ("Noorwali 1st Declaration"). I do not know the reason that Noorwali and his lawyers chose to prepare  the cited 2nd Declaration, which based on Sageman's specifications of its content, appears to cover the same issues set forth in the 1st Declaration. Having not been provided the 2nd Declaration, I can only compare their contents through relying on Sageman's description of what is in the second one.

2.30.   Citing Noorwali's depositions and the Noorwali 2nd Declaration, Sageman finds that WAMY had policies in place providing for "tight supervision of all the projects" it authorized through reporting to its headquarters in Riyadh. (p. 56)

   2.30.1. Sageman describes the oversight process verbatim, as follows, apparently basing his description entirely on what he states to be contained within the Noorwali 2nd Declaration: "WAMY's policy was not to send any funds unless they were being allocated for specific projects and activities. When a project was funded, WAMY sent money from its bank account in Saudi Arabia to the project or its chapter carrying out this project. When the project was completed, the chapter overseeing the project sent a project report and financial statement. WAMY's finance department reviewed all incoming funds and deposits and properly allocated them to these specific projects based on the annual budget. This department reviewed all the invoices, requested transactions, and project finance documentation, including the provision of aid to individuals or funding of projects. WAMY's field offices in various countries would send all project invoices to the appropriate

office in Saudi Arabia (Pakistan came under the Jeddah office) to confirm the expenditures. WAMY's accountants reviewed these documents and submitted their approval. Once the finance department gave its approval, the chief accountant reviewed the requests and had to give his approval before a project was funded or a check was sent." (p. 56)

2.30.2. The processes Sageman describe above appear to contradict themselves:

2.30.2.1. According to the process described above, WAMY would not send funds until they were allocated, but once the funds were allocated, WAMY did send funds to the project or chapter to conduct the work. Then when the project was completed, the chapter overseeing the project sent a project report and financial statement to WAMY's headquarters for further verification.

2.30.2.2. Sageman then describes a different process, in which a project first had to be approved; then expenditures on the ground were made prior to the transfer of funds; then accountants reviewed the expenditures after they were made and the accountants then approved them. Only after that approval, at the end of the process, after the expenditures had been, reviewed, and approved by accountants, was a check for reimbursement sent out.

2.30.2.3. In the first explanation, WAMY sent out funds before actual project expenditures were made, and the project report and financial statements followed. In the second explanation, WAMY approved a project but deferred sending out funds until project invoices were sent confirming actual expenditures.

2.30.2.4. The explanations are inconsistent, and on the fundamental issue of whether funds were paid prior to expenditures being made, or only after the expenditures were made and verified.

2.30.3. Sageman cites no documents that demonstrate that either of these processes were followed in practice, because ostensibly such documents were among those "lost in the flood." On that documentation issue, Sageman follows the Noorwali declaration's statements to state that "[a]nnual external audits were carried out for all projects to authenticate WAMY's accounting procedures and track where it spent the money," but proofs of all of this are missing, because "[i]n 2008, there was a massive flood in Jeddah that destroyed or carried away many records that were lost." (p. 57 and footnote 215)[29]

2.30.4. The documents Sageman cites as proofs that the processes set forth in the Noorwali 2nd Declaration were followed are eight pages of brief charts dated 07/03/1989 each of which list particular items for LBI on which funds are to be or

---

[29] I could find no reference to the flood in the pages of the Noorwali deposition referenced by Sageman in the citation, which also references Noorwali's 2nd Declaration.

have been expended, which include both categories for physical goods such as furniture, typewriter, and calculators; expenses for overhead items such as utilities, repair and maintenance; and expenditures for salaries and administrative expense for LBI in 1989.

2.30.4.1.  These brief documents are merely lists of items and expenditures headed "Lajnat Al Birr Al Islyamah Accounts and Budgets, Budget Year 1989, Agriculture and Water," and "Lajnat Al Birr Al Islyamah Accounts and Budgets, Budget Year 1989, Headquarters Office Inside."

2.30.4.2.  The eight pages do not provide information showing (i) who created the documents, (ii) to whom they were sent, (iii) who reviewed them; (iv) how they were used, (v) whether funds were sent prior to these lists being created or afterwards, (vi) whether the uses were verified, (vii) when the documents were transmitted from LBI to WAMY, (viii) how they were transmitted; or any other aspect of the process described by Noorwali. They document only that for one date in 1989 some specific pricing for activities and operations of LBI in Pakistan was purportedly provided by someone with access to the information at LBI to someone at WAMY at some point and WAMY retained the documents.

2.30.5.  While the information in these eight pages is sparse, I do interpret it differently from Sageman and assess that it proves exactly the opposite of what he contends that it proves. Sageman goes on at great length and for many pages to explain his view that WAMY did not provide support to LBI itself, but only to LBI's projects prior to the time LBI was formally incorporated in WAMY. As stated by Sageman, citing the Noorwali 2nd Declaration: "WAMY did not fund LBI generally, but instead funded *specific project*s run by LBI." (p. 134, footnote 536, p. 137, footnote 551; p. 138, footnote 554).

2.30.6.  According to Sageman's account in his Expert Report (pps. 54-58), which he states to be based on Noorwali's 2nd Declaration, LBI was supported by WAMY but operated separately from WAMY, and WAMY put controls in place on the projects it funded for LBI, which included two projects for which in 1989 there was some documentation. Sageman states that "Dr. al-Johani" (the head of WAMY) and Noorwali (then the Assistant Secretary General of WAMY) established a board of supervisors over LBI "to supervise Batterjee's handling of the specific projects in the field." He then cites the Noorwali deposition July 24, 2019 at 226-229, 231-2 and Noorwali's 2nd Declaration as the basis for his statements about the function of the board.

2.30.6.1.  Neither the deposition nor the 1st Declaration state that the board was created to supervise what Batterjee was doing in the field, so they do not provide an evidentiary basis for this finding by Sageman. In Noorwali's 1st Declaration, he states merely that "[s]ometimes" Batterjee provided reports to the LBI board.

2.30.6.2.  I am unable to determine what else Noorwali may have stated in his 2nd Declaration cited by Sageman as it has not been provided to me, so I do not know whether Sageman's statements are based on the words used by Noorwali in that 2nd Declaration, or whether Sageman assumes this the existence of WAMY's head and its number two on LBI's Board meant that they must have been using the board to "supervise Batterjee's handling of the specific projects in the field." Such direct board supervision of activities in the field is not typical of what boards of directors usually do.

2.30.6.3.  In his 1st Declaration, Noorwali himself suggests that as a member of the LBI board, he actually ***did not*** supervise the activities of LBI's specific projects in the field. Specifically, he states "[a]s a member of the LBI Board, I was not involved in the daily operations, only the setting of broader policy."[30]  In the 1st Declaration, Noorwali further states that "WAMY was not involved in any LBI fundraising or **daily operations** [emphasis added], but it did financially support projects completed by LBI under the auspices of WAMY until the relationship between LBI and WAMY ended.[31]

2.30.6.4.  Noorwali's own statements in his 1st Declaration are evidence directly countering Sageman's finding that WAMY did supervise the activities it was funding for LBI.

2.30.6.5.  Supervision of activities "in the field" for any charity, as for any company of sufficient size or which has more than one office, is ordinarily undertaken by arrays of managers, accountants and auditing processes, not by members of boards. If a board were to direct the type of supervision Sageman states WAMY's two senior officers imposed on Batterjee and LBI, the board would need to assign personnel to do this and create processes of some kind for carrying it out it – such as those that Noorwali stated were put in place, but for which contemporaneous documentation is essentially absent. The contemporaneous records should have included not only documentation of the supervision, but documentation of the board's direction that it take place. No such documentation has been cited by Sageman to show that the WAMY-controlled board for LBI did this. On this point he relies solely – if repeatedly and at length – on Noorwali's non-contemporaneous 2nd Declaration from 2019, made some three decades after the events took place that it ostensibly describes, and which has never been provided.

2.30.6.6.  The small number of WAMY-LBI documents that have been provided contain evidence that is counter to Sageman's findings. They show

---

[30] Noorwali 1st Declaration, Paragraph 23.
[31] Id, Paragraph 30

WAMY funding not only specific projects, such as the Agricultural and Water Resources Department, and funding general overhead for LBI headquarters in Pakistan.

2.30.6.7. One page of the materials cited by Sageman bears the hearing relating to funding for relating to the funding of LBI headquarters in Pakistan lists expenditures for salaries, administrative expenses, and capital expenses.[32] Another page bearing the same heading for LBI headquarters in Pakistan lists expenditures for office building, living quarters, pickup 4x4, typewriter, calculators, living furniture, and generator.[33]  Another one lists expenditures for headquarters for stationery, utilities, repair and maintenance, and fuel.[34]

2.30.6.8. While the information on the documents is sparse, these categories would seem to be **contemporaneous evidence** that WAMY was budgeting funds **for the operations of LBI's headquarters**, not just particular "projects," contrary to what Sageman says is stated in Noorwali's 2nd Declaration from 2019.

2.30.6.9. I also take note of Noorwali's statements in his 1st Declaration that WAMY never allowed support of al Qaeda, was not involved in any activity for the benefit of al Qaeda, including disguising al Qaeda members as WAMY employees, and that neither WAMY nor LBI ever sent funds to or allowed support of al Qaeda. He states: "WAMY employees were at all times doing exactly what they were supposed to do – providing charitable services through various projects, mostly in the area of war, natural disasters and/or poor regions."[35]

2.30.6.10. But WAMY/LBI's activities contained a broad exception to verification even during the period 1994-2002 for which there were audits – reliance on "assurances" rather than actual checks, and the broad categories for funds budgeted even in those years included exactly the types of activities that were indeed used in Afghanistan for terrorist recruitment and support as set forth in Section 6.7 and elsewhere in my Expert Report.

2.30.6.11. I do not know the basis for Noorwali's statements that neither WAMY funds nor LBI funds could have been used to support the development of terrorism in Afghanistan. The dates of the audits for WAMY/LBI's offices that have been provided begin with the year 2004, one year after the year 2003 which Noorwali states Batterjee to have left the WAMY/LBI relationship. I infer from the date of this first audit there were none undertaken for any of WAMY's operations in Pakistan or

---

[32] WAMYSA031292
[33] WAMYSA031289
[34] WAMYSA031290
[35] Noorwali 1st Declaration, Paragraphs 48-49.

> LBI or WAMY/LBI combined activities out of Peshawar for
> Afghanistan prior to 2004, leaving WAMY's funding for its own
> activities, and for WAMY/LBI combined activities, wide open to
> abuses of all kinds, including for terrorist finance.

2.31.   In summary, the documentary records, incomplete as they are, show that Sageman accepts statements by the former senior officer for his client as gospel, and ignores the substance of documentary evidence that contradicts them.

2.32.   As I stated with regards to Marks' findings, Sageman's uncritical acceptance of statements made by WAMY's former senior officer is separately demonstrated by his uncritical acceptance of Noorwali's statements about a 2008 flood in Jeddah. At least in English, no massive flood has been reported for Jeddah in 2008, including in academic literature produced in English by Saudis describing flooding in Jeddah in other years, such as November 2009, December 2010, and January 2011. Noorwali makes the factual error on the date of the floods said to be contained in the Noorwali  2nd Declaration and Sageman repeats Noorwali's error. Sageman did not undertake any check on his own of the publicly available information on the date of the flooding and takes Noorwali's erroneous statement as accurate, without having made this basic independent check, just as he accepts Noorwali's statements that audits authenticated all of the activities on the ground, but were destroyed by the floods, along with all of the other backup material.

2.33.   Sageman similarly ignores the ***substance*** of the documentary evidence regarding WAMY's audit practices for its Pakistan offices for the years 1994-2002. Sageman cites the audits undertaken for WAMY by the Sidat Hyder firm, but he does not address the core substantive issue of what was contained in them – the failure to state that any of the activity in the field had been verified by the accounts and instead they relied on the "assurance" of WAMY officials.[36] As I have specified in detail in Section 2.16 of this Rebuttal Report, the documentary evidence that was not "destroyed or carried away" by the "massive flood in Jeddah" said by Sageman to have taken place in 2008, suggests WAMY's auditors did ***not*** authenticate or independently confirm WAMY's account procedures and did ***not*** state that they had been able to track where it spent the money. Instead, the auditors relied on the "assurance" of the WAMY's responsible officer for its Pakistan/Afghanistan office, for year, after year, after year, throughout the entire period. The 2002 audit provides the greatest detail on this issue, and explicitly states that ***none*** of the underlying information for all expenditures in Afghanistan was verified.[37]

2.33.1. Sageman does not address the auditors findings that for 2002, donations amounting to Rs 58877899 and their intended use for specified projects was not directly confirmed to us by WAMY Saudi Arabia hence remained unverified; that salaries and allowances had been verified only to the approval thereof by the WAMYs management and acknowledgement of the recipients, rather than by checking financial records or any other independent means; distributions of donations in kind were not verified; fixed assets were not verified because

---

[36] WAMYSA0186609-83, in Sageman's citation.
[37] WAMYSA066752-WAMYSA066802

inventory lists had not been made available for verification; and, as stated, "expenditure incurred inside Afghanistan is not susceptible to independent audit verification."

2.33.2. These 2002 findings by the auditor relate to the last year for which audit information was provided. Though the previous audits are less detailed on the deficiencies, they provide no evidence to show that the auditors were able to "authenticate WAMY's accounting procedures and track where it spent its money." The language in the 2002 report about Afghanistan is the best evidence we have that the underlying information for expenditures by WAMY in that country were not verified in that year, and likely were never verified in any earlier year in the absence of any documentation to prove that they were.

2.33.3. Although Sageman cites the WAMY audits, he does not address the issues of the lack of verification and the reliance on "assurance" that they reflect for the years 1994-2002. He also does not address the implications of large expenditures for such slush fund categories as "stipends" "student welfare," and "social welfare," without any further detail, listed in the audits. For the reasons explained in my Expert Report, these are the types of categories of spending that of especially high risk for providing support to the training of Islamic militants in training camps in Afghanistan who in the course of indoctrination and training became recruitable and recruited by al Qaeda. Sageman repeatedly mischaracterizes my Expert Statement to suggest that I found no evidence that WAMY provided funds to terrorists. My view, for the reasons expressed at some length in my Expert Report, is that no charity, anywhere, WAMY or otherwise, reports that it is funding terrorist activity, so labels such as "support for arming militants," "arms purchases," "funding to pay for transport of militants," "funding for military training camps," are not line-items in their financial records. This is an obvious point. The line items in WAMY's own audits for areas representing exactly the categories of spending most likely for abuse in Afghanistan in the relevant period provide an evidentiary basis reflecting the reality that controls were not in place to prevent these kinds of funds from being used for supporting Islamic militants preparing to engage in fighting and in terrorism, and being recruited and trained for groups that included al Qaeda.

2.33.4. In failing to address the issue of the lack of verification by the auditors of what was actually being spent on the ground in Afghanistan, as set forth in the WAMY audit reports for 1994-2002, Sageman's methodology is inconsistent with the process he states that he carried out, and which he states to be a necessary requirement for any competent scholar or expert. Sageman states in his Expert Report:

2.33.4.1. "A competent scholar or expert cannot simply accept uncritically third-party assertions without checking them out. . . . [O]ne must corroborate what a source says when other more reliable documents are available." (p. 4)

27

2.33.4.2.   "A competent expert cannot simply omit evidence he does not like." (p. 5)

2.33.5.   Here, Sageman has accepted uncritically the assertions of Noorwali without checking them out, or considering the substance of the information in the more contemporaneous, document-based evidence contained in the WAMY audits, which reflected WAMY's apparent practice overall of not having its auditors actually verify activities in Afghanistan.[38] Their substance is inconsistent with Noorwali's First Declaration, which was made in 2018, some 30 years after the events it purportedly covers, and well-after the commencement of the litigation, by a person who spent his career as a senior officer for one of the defendants. It is also inconsistent with what Sageman has quoted from Noorwali's 2nd Declaration from 2019, which has not been made available to me.[39] Rather than assess the documents that were available, Sageman uncritically accepts the assertions of an interested person defending his own past actions, and fails to consider evidence he does not like.

2.33.6.   Contrary to Sageman's findings, the documentary evidence to the extent it exists does not show that WAMY authenticated where it spent its money in Afghanistan during the critical period that al Qaeda built up its infrastructure there. The audits show that instead of authentication of what was happening on the ground, auditors accepted "assurances" and did not verify spending.

2.34.   It is also important to consider the question of whether the statement provided by Noorwali in his 2019 2nd Declaration that the Jeddah flood wiped out all of WAMY's missing financial records is the actual reason they are not available, rather than the result of documents being willfully withheld from production by WAMY personnel, as well as WAMY's failure to implement controls. I understand that WAMY's counsel, in a pre-motion meet-and-confer discussion with plaintiffs' counsel on March 19, 2018, represented that WAMY's overseas branch officers were recalcitrant and that many of the offices did not properly maintain office records and did not submit required financial, administrative, operations, and activity reports to WAMY headquarters, as documented in a Plaintiffs' Reply Memorandum of Law dated April 13, 2018 whose substance on that issue defendants did not refute.[40]

---

[38] I say "apparent practice" because I can only base my opinion on the documents that exist and have been provided to me. The defendants have not cited documents showing that auditors did verify the activities of WAMY in Afghanistan in the 1992-2002 period, so I conclude that such documents do not exist. What would have been true for WAMY's direct activities in Afghanistan logically would have been true for the LBI projects in Afghanistan funded by WAMY and approved by WAMY's two senior officials, al Johani and Noorwali as two members of LBI's board, on which they sat with Batterjee as LBI's chair.

[39] I have inquired as to the existence of the 2nd Declaration, for which Sageman cites no Bates number. I have been advised that the attorneys for the plaintiffs have been unable to find a reference to it in the record of filings with the court in this matter, or anywhere else. Sageman quotes from the 2nd Declaration some seventeen times, so it forms a substantial part of his reliance material for matters pertaining to WAMY and LBI.

[40] Letter from MDL 1570 Plaintiffs' Executive Committee In Re Terrorist Attacks on September 11, 2001 (S.D.N.Y.) to Omar T. Mohammedi, Esq. and Frederick J. Goetz, Esq, March 30, 2018, summarizing statements made in meet-and-confer of March 19, 2018.

2.35.   I further understand that the plaintiffs then filed a April 13, 2018 reply brief in support of its February 28, 2018 motion to compel (ECF NO. 3910), explaining to the Court that "counsel indicated that many WAMY branch offices and branch office managers had historically ignored the directives and requirements of WAMY headquarters, often failed to provide required reports to WAMY headquarters and ignored requests from the headquarters for reports and information, and likely failed to maintain records required by WAMY's own rules.  But immediately after relying on that explanation, WAMY's counsel explained that WAMY's compliance with its discovery obligations depended almost entirely on those same branch offices and branch office managers exercising diligence in collecting documents in response to a request from the headquarters, without any audit or review procedure in place to ensure that the incoming documents were complete or to identify and follow up on obvious omissions.  Given that the WAMY branch offices and their managers had a known history of ignoring the headquarters, coupled with the certain unfamiliarity of those foreign (presumably non-lawyer) officials with U.S. legal procedures and obligations, WAMY had no reasonable basis to expect them to exercise diligence, and the content of the production indicates that they did not."[41]

2.36.   I understand that none of the defendants' expert witnesses have addressed the implications of the admission from WAMY's own counsel that WAMY employees ignored the direction of WAMY headquarters with apparent impunity, not only in the years of 1992-2002 covered by the discovery process, but as late as 2018.

2.37.   I find this information about the refusal of WAMY personnel to cooperate with the discovery process, in addition to their ignoring directions to provide reporting to WAMY's headquarters, provides a further explanation for the incompleteness of the information available to me regarding WAMY's actual activities in the field in such countries as Pakistan and Afghanistan. The inability of WAMY to secure the cooperation of its own employees in required discovery processes, based on statements of its own counsel to counsel for the plaintiffs, highlights its failure over the decades to maintain the types of controls needed to prevent diversion of its funds from lawful purposes to any other purpose or use, including the types of support for terrorism I have addressed in my Expert Report.

**Corrections by Sageman of Information in My Expert Report**

2.38.   Sageman spends many pages of his report to reiterate that the Chairman of WAMY during the relevant period was Maneh Al-Johani, rather than Adel Batterjee, as I stated in my Expert Report, based on a statement made by Batterjee to the New York Times in 1992, which I excerpt here as follows, eliminating only paragraph spacings:

2.38.1. "The Islamic institutions, especially those in Saudi Arabia, are well financed. Saudi officials say that the Government has donated $100 million to the Islamic

---

[41] Plaintiff's Reply Memorandum of Law in Support of the Motion to Compel Defendants World Assembly of Muslim Youth-Saudi Arabia and World Assembly of Muslim Youth-International to Produce Responsive Documents Pursuant to Federal Rule of Civil Procedure 37(a), April 13, 2018, pp 2, 5, 6, Case 1:03-md-01570-GBD-SN Document 3962.

institutions for Bosnia relief efforts and that private donations, which according to a new law must be funneled through the Government, have added $50 million. Despite formal denials from the relief organizations, Saudi officials say an increasing amount of the charity on behalf of the Bosnians is now used to provide arms and logistical support for Arab volunteers. "Since August most of the money raised for relief has been turned over to the Bosnians for weapons," a Saudi official said. "And most contributors probably support this." Reports from the Balkans suggest that the Arab assistance has significantly improved the firepower of the Muslim-dominated Bosnian Government forces, providing assault rifles, mortars, rockets and other weapons to troops who had been equipped largely with hunting rifles and shotguns at the beginning of the war. The Saudi-based Islamic Relief Organization, one of the largest charity organizations, funnels money, relief workers and supplies to Bosnia, although its officials strenuously deny that they provide any backing for the military effort. "If a relief worker decides that he wants to join the fighting forces, we would not stop him," said Adel A. Batterjee, the chairman of the World Assembly of Muslim Youth. "But he can no longer officially represent our organization." The authorities forbid any public acknowledgement that any Saudi citizens are involved directly in the Balkan conflict. But Government officials say men who volunteer for the relief work often end up as soldiers."[42]

2.38.2. I have cited this contemporaneous article from 1992 in my Expert Report and again here because it provides a contemporaneous account of Saudi and other Arab fighters coming to Bosnia funded by private sources, which the article says "by law" must be overseen by the Saudi Arabian government, and funding from charities, with most of the money raised "for relief" actually being used in Bosnia to purchase weapons. The article contains statements by "a Saudi official" on background. It also explicitly quotes Batterjee as stating that he is chairman of WAMY, and as acknowledging that relief workers can become fighters in the Bosnian conflict, but no longer "officially represent" WAMY.

2.38.3. The substance of this article is consistent with a great deal of other information that I have reviewed, such as the account of the involvement of bin Ladin, al Qaeda, and Khalid Sheikh Mohammed, among others, in the Bosnian war described by the 9/11 Commission,[43] and the account by Hegghammer of the involvement of the Saudi government for fighters in the Bosnian war in exactly the 1992 period described in the New York Times article. Hegghammer's account is quite specific and is based in part on his own interviews of knowledgeable Saudis:

2.38.3.1. The next step was the establishment of a fundraising committee chaired by Prince Salman. On 5 June 1992, the government set up the 'High Committee for Fundraising to the Muslims of Bosnia-Herzegovina'

---

[42] "Muslims From Afar Joining 'Holy War' in Bosnia," New York Times, December 5, 1992. https://www.nytimes.com/1992/12/05/world/muslims-from-afar-joining-holy-war-in-bosnia.html
[43] 9/11 Commission, p. 57 and p. 155, https://govinfo.library.unt.edu/911/report/911Report.pdf

which incorporated a number of local branches known as 'People's Committees'.[citation omitted] The Saudi government also ran a sustained media campaign to raise funds and public awareness about Bosnia. The Saudi Ministry of Information organised trips for Saudi journalists to Sarajevo, as well as a series of extensively advertised telethons featuring senior religious figures and members of the royal family. Many of the symbolic displays of Islamic solidarity used during the Afghan jihad were repeated. The kingdom sponsored pilgrimage travel and organised Id celebrations for Bosnian Muslims, just as it had done for Afghan refugees during the 1980s. . . Several Saudis and veteran expatriates interviewed by this author have insisted that the Bosnian jihad was even more visible in the public sphere than the Afghan jihad had been in the 1980s. [citation omitted] A good measure of the scope and impact of the media campaign is the amount of money raised for the Bosnian cause. By its own figures, the High Commission had collected an astonishing SAR 1.4 billion (US$373 million) from public and private donors between 1992 and 1997. No other international cause has ever solicited a similar level of popular Saudi donations in such a short space of time."[44]

2.38.4.   Hegghammer's more recent retrospective research is fully consistent with the reportage in the contemporary 1992 New York Times article that I relied upon.

2.38.5.   There has been no correction published by the New York Times to any point in the article, which it does as a policy when it is notified that a fact it cites is wrong. Accordingly, I assume that neither WAMY nor anyone else has ever contacted the New York Times to ask for such a correction.

2.38.6.   Having read Sageman's report, and gone back through the material available to me, I accept that Johani, rather than Batterjee, chaired WAMY during the relevant period, and that Batterjee chaired the related organization LBI, which received funding from WAMY. I do not accept uncritically the statements made decades later by Noorwali on behalf of WAMY that WAMY only funded "projects" of LBI and did not fund LBI itself. As showed in the handful of pages cited by Sageman, WAMY appears to have funded items constituting overhead for LBI as of 1989, and the lack of other documentary information provided does not allow one to reconstruct what additional support it provided, how it provided it, how much it provided, what controls were on the funds provided, where the funds went, and so forth.

2.38.7.   Instead, we have audits of WAMY-Pakistan from 1994 (two years after the period covered by the New York Times article) to 2002 which refer to the organization throughout as the "WAMY/LBI Office," highlighting the close connection of the two organizations, notwithstanding Sageman's extensive

---

[44] "Jihad in Saudi Arabia, Violence and Pan-Islamicism since 1979," Thomas Hegghammer, Cambridge University Press (2010), p.33-35.

efforts to segregate them between the period in which Batterjee ran the activities and operations funded by WAMY under the LBI name, from the period when he no longer did, but in which WAMY retained the WAMY/LBI name.

2.38.8.  My original Expert Report's references to Batterjee should therefore be corrected to reflect this framework: Batterjee headed an organization that was substantially funded by WAMY and overseen by its two senior officers in addition to Batterjee. The fact that Batterjee described himself to the New York Times as an official of WAMY, in his role for LBI, itself reflects the intertwined nature of those entities. WAMY's funding to LBI was used in part for funding LBI's headquarters and overhead, as reflected in the documents cited by Sageman. WAMY and Batterjee came to a parting in approximately 1993. WAMY took over LBI and its projects and incorporated its name into WAMY. WAMY has not retained audits of any activities it funded of Batterjee and LBI prior to 1994, and does not appear to have ever conducted any such audits given the lack of documentation to prove that any were undertaken. Indeed, I conclude that WAMY likely did not conduct audits of *any* of the activities it undertook in Afghanistan prior to 1994, given the lack of documentation of any such audits.

2.38.9.  The two acronyms of "LBI" and "BIF" have been used interchangeably in the past by the U.S. government and others, as both the original LBI operating out of Pakistan, and the later-established BIF, which included officers in the United States, are sometimes treated as the same organization, due to their overlaps with Batterjee and his activities, their name, and the fact that (regardless of Sageman's position to the contrary) LBI was indeed a precursor to BIF, with Batterjee playing a central role in both.

2.38.10.  Thus, my reference to "Benevolence" in Section 12.8 of my Expert Report is the term used by the U.S. government in its proffer of evidence in the Arnaout case, which ended with Arnaout's guilty plea for racketeering. The full reference in the U.S. government proffer is as follows: "In or about 1991, at the time when the leadership of the al Qaeda organization relocated to the Sudan, the LBI/BIF organization (each referred to in Arabi as "al Birr" or "Benevolence") followed suit and opened its first office in Sudan specifically to support al Qaeda and the mujaheddin in the Sudan. . . . BIF's collaboration with al Qaeda in the Sudan mirrored how LBI worked in Afghanistan."[45]

2.38.11.  I continue to consider Batterjee's activities at LBI, which were funded by WAMY, and LBI itself, to be precursors to BIF and his activities with BIF, a similarly named-institution. My reference to BIF (Benevolence) in Section 12.12 of my Expert Report as being funded by WAMY was based on the statement made by former al Qaeda member al Fadl which I understand to have been originally in Arabic and which has been translated as "Benevolence" from

---

[45] Government Evidentiary Proffer Supporting the Admissibility of Co-Conspirator Statements," *U.S. v. Aranout*, NDIL, Case No 02 CS 892, 7 January 2003, p. 23.

"al Birr.") Following al Fadl, I used the acronym, BIF, for a sentence in which I was referring to the activities in Afghanistan of LBI. Accordingly, I correct that reference in Section 12.12 of my Expert Report, which should state as follows:

2.38.11.1. Section 12.12 (corrected): Some of these activities were carried out through other charities, such as LBI, which WAMY funded and with which it had an affiliation, and which LBI used to provide material support to bin Ladin.

2.38.12. With the correction to the acronym from BIF to LBI in Section 12.12 of my Expert Report, the corrected sentence follows precisely the assessment of the United States government, as expressed in its terrorism designation of Batterjee, and as cited in my Expert Report at Section 12.12.4. For clarity, I recapitulate the Treasury findings here:

2.38.12.1. "In the late 1980s, Batterjee founded the precursor to BIF, LBI, in Saudi Arabia and Pakistan.   LBI provided financial and operational support to mujahedeen elements in Afghanistan and around the world, including fighters associated with UBL and Gulbuddin Hekmatyer, who was named a SDGT by the Treasury on February 18, 2003.   LBI was affiliated with Makhtab Al-Khidamat (MK), which was co-founded and financed by UBL and is the precursor organization of al Qaida.   LBI later joined al Qaida upon the dissolution of MK."[46]

2.38.13. Sageman also finds an instance in which material I quoted had words dropped during the writing and editing process. I accept the correction that the Canada Revenue Agency audit quote I cite should read: "Christians living with Muslims in the east . . . have always enjoyed the tolerance and good treatment of Islam" at Section 12.11 of my Expert Report, where the first three words were inadvertently dropped. I have this phrase stated correctly in my Expert Report at Section 10.3.7.1.  The three additional words of "Christians living with" should be added to Section 12.11 to read as it does at Section 10.3.7.1. of my Expert Report.

2.38.14. For the reasons I have described above in my review of Sageman's findings on WAMY's oversight of its own projects in Pakistan both before and after it became WAMY/LBI, and of the funding it provided LBI during and before the time WAMY's senior officers sat on LBI's board, I disagree with Sageman's other findings regarding WAMY's supposed tracking of both its own, and LBI's expenditures in Afghanistan throughout the 1992-2002 period covered by the discovery, and prior to it, and the many pages of arguments he makes to support his findings based primarily on the Noorwali 2nd Declaration to which he repeatedly refers.

---

[46] "U.S. Treasury Designates Two Individuals with Ties to al Qaida, UBL Former BIF Leader and al-Qaida Associate Named Under E.O. 13224," December 21, 2004, https://www.treasury.gov/press-center/press-releases/Pages/js2164.aspx

**Barron's Findings on the Use of Audits and Financial Controls**

2.39.   The clear pattern of deficiencies in controls on WAMY's activities for its Pakistan/ Afghanistan offices was also exhibited in the IIRO's Pakistan office, as reflected in the undated audit undertaken by Sidat Hyder at the request of IIRO's headquarters for the period January 1, 1996 through February 22, 2001.[47]

2.40.   Counsel for the Muslim World League, the IIRO, and other defendants retained Barron to evaluate the audit to offer an opinion as to whether it conformed to the standards of professional accountants, as set forth in the Section 1 of Barron's Expert Report, as well as to review opinions offered by me and another expert for the plaintiffs in this matter.

   2.40.1. In his Expert Report, Barron blasts that audit, contending that it did not reach fair, balanced, and reliable conclusions with respect to internal controls, and describes its conclusions to be misleading. His principal argument is set forth in Paragraphs 6 and 7 of his opinion, which is that because IIRO's local officials in Pakistan engaged in "collusion, forgery, intentional destruction of documents, and coercion, it is unlikely that even well-designed internal controls [put into place by IIRO] would have prevented or detected the fraud in the Pakistan office." He therefore finds there was no "basis for Sidat Hyder's conclusion that proper records were not maintained prior to their destruction" or that adequate internal controls were not maintained by IIRO.[48] He then suggests that Sidat Hyder, the accounting firm selected by IIRO, showed a "lack of impartiality and fairness and potential bias and prejudice" because it concluded that there was a "complete mess" at the IIRO organizational level. (Paragraph 36.2)

   2.40.2. Barron contends that statements made by Adnan Khalil Basha, the IIRO's Secretary General from 1997 through 2013, provides evidence of adequate internal controls, due to the IIRO having an annual budget process, hiring external auditors (although not in the case of IIRO-Pakistan prior to the Sidat Hyder review), having a committee to provide policies and procedures to its various offices, establishing committees to manage the affairs of its offices when the position of office manager becomes vacant, requiring joint teams from its headquarters and its field offices to go into the field to oversee funding for disaster relief to prevent misuse of funds, and requiring that a department of IIRO approve the distribution of gifts from the Saudi government to others in coordination with the Saudi Embassy, among other unspecified controls.

   2.40.3. These are very general management processes. The extent to which these processes were actually implemented in regard to any of the IIRO's offices is not set forth in Barron's report and he does not state what value they actually had in practice to constitute effective oversight over any particular IIRO office. In any

---

[47] IIRO02469-IIRO02491.

[48] Barron did not state he found evidence that such records had ever existed. But the lack of proof was not merely because records were destroyed by IIRO's officers in Pakistan, but because IIRO's headquarters had never commissioned audits or requested the material over the years before the embezzlement issue finally emerged.

case, they did not constitute effective controls with regard to IIRO's activities in Pakistan.

2.40.4. As reflected in the IIRO audit, as with WAMY, IIRO's headquarter in Saudi Arabia failed to have effective controls in place on the actual operations and spending of a Saudi charity operating in Pakistan and Afghanistan in the very period that Al Qaeda was carrying out its preparations for the 9/11 attacks in that very region. The failure of controls left the funds of that charity susceptible to abuse, including not only the embezzlement described by Basha in his deposition, but diversion for any other purpose due to the lack of controls. In this region, at this time, the lack of controls created a substantial terrorist finance risk, as set forth in my Expert Report.

2.40.5. I assess Barron's Export Report, and his attack on the IIRO's own auditors for finding that its headquarters had non-existent controls, to be an effort to do what he can for the defendants in the face of a damning factual record.

2.40.5.1. Persons responsible for the fraud at IIRO Pakistan and the destruction of its documents included its accountant and its Secretary General, both people selected and approved by IIRO headquarters.

2.40.5.2. The accounting firm whose work Barron derides, Sidat Hyder, were similarly selected by IIRO headquarters, "for the purpose of determining the maintenance of proper books of account and financial records and ascertaining weakness and non-compliance, if any, which may have resulted in financial mismanagement and/or misappropriation of funds at the Pakistan Branch. Thus, the core objective of the assignment was to determine the loss of funds due to misuse or embezzlement, if any, and submit report on our findings."[49]

2.40.5.3. The accounting firm then laid out its scope of work, which was to verify receipts for donations from Saudi Arabia, verify conversion rates, verify payments and ensure that underlying documents were attached to them, verify that the underlying documents were authentic, show that receipts for medical services were properly recorded and banked, and to submit a report on findings.

2.40.5.4. On July 16, 2001, the scope of the audit was cut back at the direction of IIRO from covering the period January 1, 1996 to January 31 2001, to covering only the period January 1, 1999 to January 31, 2001 in a number of areas, except for remittances received from Jeddah during two selected periods covering most of 1995 and five weeks from February 23, 2001 to March 28, 2001, to check and reconcile whether the funds sent by IIRO's Jeddah office to IIRO Pakistan were deposited in IIRO's bank account during that period.

---

[49] IIRO026471, 2. Engagement Objective

2.40.5.5.   The auditing firm then systematically took on the scope of the work set out for it. It made numerous findings that are not disputed by Barron regarding the state of books and records and systems in place in Pakistan, and their implications, such as concluding "[t]he concerned accounting and any other staff responsible failed to discharge the basic function of preparing and maintaining proper books of account and underlying accounting record which is an essential requirement of any organization. Thus, they failed to perform their functions due to which it was not possible to perform any conclusive verification and checking of receipt s and payments transactions. This not only facilitated financial mismanagement it created opportunities for misuse misappropriations of funds and fraud. We are, however, unable to determine whether the non-maintenance of books of account was done deliberately or was only due to inability or carelessness, for which the management is also equally responsible."[50]

2.40.6.   Where Barron takes exception to the work of IIRO's accountant, is in its allocation of blame to the IIRO's Jeddah office (headquarters or "H.O.") for failing to have sufficient controls in place to monitor what had been taking place at its Pakistan office for the years covered by the audit. The decision by the IIRO to limit the audit of the disbursements from IIRO headquarters to the Pakistan office and a number of areas of disbursements to the final three years meant that it did not cover all of IIRO's activities in Pakistan prior to 1999, or the controls in place (if any) regarding those activities during that prior period. Further, it appears that no audits were undertaken by *anyone* of IIRO's activities in Pakistan prior to January 1, 1996.

2.40.7.   The auditors findings about the controls in place at IIRO's head office are devastating: "We found that the internal controls relating to proper monitoring of funding to Pakistan were not in place at H.O. The H.O. management neither established any system or mechanism for financial discipline nor required proper reporting from Pakistan office relating to disbursements or activities carried out at Pakistan branch. Moreover, no internal or external audit was ever carried out for Pakistan branch and H.O, management never asked local management to provide them audit report on some fixed interval/periodic basis. We were also not able to check the H.O. record relating to Pakistan operations due to non-availability of information duly translated in English and because of incomplete and unreconciled details."[51]

2.40.8.   Barron does not dispute the underlying facts on which these findings were based. He does not cite evidence that IIRO's headquarters ordered internal or external audits for IIRO's Pakistan branch *at any time, for any period* prior to the Sidat Hyder audit. Barron does not cite evidence that IIRO's headquarters ever asked IIRO's Pakistan branch to provide audit reports on a periodic basis. He does not

---

[50] IIRO026474
[51] IIRO026475

cite evidence that IIRO's headquarters ever provided requested information on its Pakistani operations to the auditors. Instead of providing evidence to contest the auditor's findings that internal controls relating to proper monitoring of funds to Pakistan were not in place at the IIRO's headquarters, Barron attacks the IIRO's own hand-picked auditor.[52]

2.41. In summary, I find that Barron's criticism of the Sidat Hyder audit commissioned by the IIRO unsupported by the factual record he cites.

2.42. Finally, I wish to take note of the very limited opinion provided by Barron regarding the internal control weaknesses at the IIRO set forth in Paragraph 13 of his Rebuttal Opinion. He states: "I have seen nothing in the materials cited by Mr. Kohlmann and Mr. Winer nor the other materials I reviewed in preparing this report showing that IIRO senior management **intended for there to be internal control weaknesses designed to permit improper diversion of IIRO funds** [emphasis added] and indeed IIRO senior management took steps that reflected lack of such intent."

2.42.1. I read Barron's narrow finding that IIRO senior management did not *intend* to permit improper diversion of funds due to internal controls to be an acknowledgement that the necessary internal controls to prevent such improper diversions were in fact, inadequate, and therefore, that improper diversion of funds from the IIRO's office in Pakistan could have taken place.

3. *The reliability and significance of U.S. government intelligence and designation reports, including Department of Defense JTF-GTMO reports as criticized by defense experts.*

3.1. Brown and Sageman each attack the reliability and significance of U.S. government intelligence and terrorist designation reports, arguing that they are political in nature, rather than evidence based. The fundamental mission of U.S. intelligence is to gather and share intelligence to protect the United States from threats, which requires objectivity and integrity, as well as teamwork and excellence. In my experience, while there are occasional instances in which this ideal is not maintained, such as the reporting and analysis on the Iraq WMD problem cited by Sageman, they are the exceptions, not the rule. In my experience, the tens of thousands of dedicated professionals at the Central Intelligence Agency, Defense Intelligence Agency, National Security Agency, as well as the intelligence analysts at the State Department, Treasury Department and elsewhere in the U.S. government do their very best to provide intelligence that is accurate and worthy of the trust of the policy makers who rely on it, of the Congress, and ultimately of the American people. It is in this context, and with some two decades of working inside the U.S. government with intelligence professionals, that I analyze the assessments of Brown

---

[52] I am reminded of the old lawyers' adage: "If the facts are against you, argue the law. If the law is against you, argue the facts. If the law and the facts are against you, pound the table and yell like hell." I note that in Barron's complaints about IIRO's auditor, he fails to note that the audit does not contain a release date, as required by International Standard on Auditing (ISA) 230. Basha states that the IIRO committee reviewing the issue completed its work in 2004 (Basha Deposition, February 21, 2019, p. 223), making a possible date for the audit as being completed shortly before that, absent additional clarifying information.

and Sageman that U.S. intelligence and designation reports pertaining to terrorism are
unreliable and of no probative value.

## Brown's Findings on the Reliability and Significance of USG Information

3.2.  The final nine pages of the Expert Report provided by Brown sets forth his views on
"The Probative Value of the Treasury OFAC Designations" (pp. 91-94) and the
"Probative Value of Indictments, Prosecutorial Documents, and the JTF-GTMO Threat
Matrix" (pps. 94-99).  In these sections, Brown sets forth his views as to why official
statements and documents made by various components of the United States
Government, including the White House, the U.S. Department of the Treasury, the U.S.
Department of State, the Central Intelligence Agency, various components of the U.S.
military, and various components of the U.S. intelligence community regarding terrorists
and terrorism should all be given no weight and disregarded. I will also deal with both the
OFAC designations to address further contentions made by Brown, because of its
implication for the reliability and significance of U.S. government intelligence and
designation reports as well.

## Treasury OFAC Designations

3.3.  Brown's background as he has reported it does not specify experience involving the
preparation of material by the U.S. government in connection with Executive Orders, the
implementation of regulations, official reports to the Congress or the public, testimony,
or legal cases pertaining to terrorism and terrorists. Based on his CV and statement, his
experience in the U.S. government has been limited to preparing terrorist profiles and
teaching about Islamism and Islamist political violence (Brown, p. 6 and Brown CV)

3.4.  Brown characterizes himself as a historian engaged in historical research relying on "a
totality of known relevant primary sources" regarding al- Qaeda (pp. 6-7).  From 2005-
2010, he undertook research compiling terrorist profiles for the Combating Terrorism
Center at West Point, and from 2010-2013, his CV shows him to have worked on a
contract basis at that center as an instructor on Islamism and Islamist political violence to
Department of Homeland Security audiences.

3.5.  Brown makes no representations that he has participated in U.S. government interagency
processes at any time, such as the designation processes I participated in during both the
Clinton and Obama Administrations, including any relating to the designation of
terrorists or terrorist groups.

3.6.  In lieu of having direct experience of knowledge of the Treasury designation process,
Brown rests his attack on the integrity of judgments made by the U.S. through cherry-
picking, and in the process, mischaracterizing the implications of, statements about how
the U.S. approached terrorist finance in the first days after the 9/11 attacks. For example,
he cites a snippet from a book by Juan Zarate, a senior Bush Administration official for
terrorist finance in that period "Treasury's War." Zarate accurately writes that OFAC's
rules for designations are undertaken on the basis of a "reasonable basis to believe"
standard, rather than the standard of proof beyond a reasonable doubt that would apply to

a criminal trial. (p. 93) As Zarate explains in his book, the U.S. government had the goal after 9./11 of stopping terrorist finance of Al Qaeda and its affiliates to save American lives, and to do so as rapidly as possible, rather than to await to perfect criminal indictments to convict and imprison all those responsible for the attacks. Numerous components of the U.S. government properly apply "reasonable basis" or "rational basis" standards to their decision-making in any number of areas of the law. That is because the standard of "reasonable basis" or "rational basis" is the standard that a government action must have to be constitutional and lawful. The requirement is that the designations have a rational connection between the facts found and the decision to designate. OFAC has always used this standard in connection with its designations, both before the 9/11 attacks, and since.

3.6.1. Zarate makes clear in "Treasury's War," the book cited by Brown, that Treasury was applying the proper legal standard for sanctions designations as follows:

3.6.2. "[Sanctions] was a powerful administrative weapon that had to be wielded carefully, because the impact on individuals and businesses designated under this power – especially the label of "terrorist supporter" – could be devastating. There needed to be evidence and an administrative record attached to listing someone under these powers – the secretary of the treasury had to have a reasonable basis to believe the designee fit the criteria of the executive. **Whole tribes of lawyers from the Treasury, State and Justice departments would review any designation proposal for sufficiency of evidence.**"[53] [emphasis added]

3.6.3. Brown accurately cites the material in my Expert Report as going "into depth about the accuracy and intricacy of OFAC's designations," but then contends, without evidence, that I was "inflating the fact-finding efficacy of the Treasury Department's processes to support the allegation that IIRO's branch offices provided material support to terrorism." (p. 91) His basis for this assessment is the snippets he quotes from Zarate which refer *only* to the process undertaken in the frantic first weeks and months after 9/11 when the United States was trying to quicky assemble information about the threat posed by Al Qaeda to the safety of the American people. Brown does not address the specifics of any portion of the concrete fact-finding process I describe in Section 15 of my Expert Report.

3.6.4. In response, I reaffirm the facts and analysis set forth in Section 15 of my Expert Report, whose substance Brown does not like, but which he has not shown to be inaccurate.

3.6.5. Brown inaccurately states that "OFAC designations are also subject to the whims of politics, further undercutting their utility as evidence" and provides as an example the designation of the Majahedin-e Khalq (MEK), (pp. 93-94). Quoting a journalistic account of the MEK's lobbying effort to be removed from the terrorist list, he states that the original listing of the MEK as a terrorist group was purely political, and that the MEK's delisting by OFAC was also purely political.

---

[53] Zarate, Treasury's War (Public Affairs, 2013), p. 28

Brown's assessment about the MEK's listing, and delisting, as being political, rather than legally-based, is inconsistent with the facts which I know as a result of my work as the lead person in the U.S. government responsible for securing the safety of the 3000 surviving members of the MEK out of Iraq to sanctuary in Albania in the period 2013-2016 during a period when they were being subject to terrorist attacks by agents of Iran.

3.6.6.   Brown's statement on p. 94 that "[t]here is little question . . . that the initial designation, as well as the subsequent de-listing by OFAC, **were driven by political considerations and not on the merits of evidence of the MEK's involvement in terrorism**"[emphasis added] is false. Both the decision to list the MEK and to delist them were based on objective criteria.

3.6.7.   The original designation of the MEK being a terrorist group, was made in October 1997 by then-Secretary of State Madeleine K. Albright. The MEK was among the first thirty groups designated as Foreign Terrorist Organizations after the law authorizing such designations was enacted on April 24, 1996.[54] Rather than being political in nature, the designation was made to protect U.S. national security, by preventing terrorists from coming to the United States, protecting Americans from associating with members of terrorist groups, and making it harder for terrorists to obtain and use funds to victimize others. The U.S. applied the sanctions to the MEK for the same reason it later applied them to al Qaeda. At the time they were designated, each group was engaged in terrorist activity that threatened the security of U.S. nationals or the national security (national defense, foreign relations, or the economic interests) of the United States. The MEK were listed in the original listing. The listing of al Qaeda came later, on October 8, 1999.[55]

3.6.8.   Contrary to Brown's suggestion that the designation of the MEK was done as a favor to Iran, the factual basis for the designation of the MEK was based on the group having carried out terrorist bombings over decades, which included the MEK's responsibility for killing some six Americans in Iran during the 1970s during the period of the Shah's rule. Bombings by the MEK continued after the fall of the Shah, redirected at the Iranian clerical regime, and did not cease until

---

[54] Congress created the Foreign Terrorist Organizations List as part of the Antiterrorism and Effective Death Penalty Act of 1996. This terrorist list differs from the others in that it identifies groups rather than individuals and bars members and representatives of those groups from immigrating to the United States. To be listed as an FTO, a foreign organization must engage in—or retain the capability and intent to engage in—a terrorist activity or terrorism (as defined by statute) that threatens the security of U.S. nationals or U.S. national security. Designation occurs through an interagency process with public notice in the Federal Register, but the ultimate decision lies with the Secretary of State. Designation lasts two years and may be renewed. The secretary may cancel the designation at any time if circumstances or national security concerns warrant. See 18 USC §1189 https://www.law.cornell.edu/uscode/text/8/1189. The listing of al Qaeda came later than the MEK, but the U.S. was focused on bin Ladin as a terrorist threat from 1993 onward, and al Qaeda it as a terrorist organization from no later than 1996 onward, and developing efforts to snatch bid Ladin in Afghanistan in 1996 and 1997, as reported by the White House's then terrorist czar, Richard Clarke in "Against All Enemies," Free Press (2004), pp, 148-149
[55] "Foreign Terrorist Organizations," Bureau of Counterterrorism, U.S. Department of State, providing dates for listing of each terrorist group, and each delisting that took place since.  https://www.state.gov/foreign-terrorist-organizations/  The MEK is among 13 groups that have been delisted to date by the Secretary of State, consistent with the criteria established by the laws governing FTO designations and delistings.

March 2001. These terrorist activities entirely drove, and justified, the Treasury sanctions on the MEK in the very first group of FTO designations after the enabling legislation to sanction them as a group came into force.[56] Notably, the U.S. terrorist designation of the MEK was also joined by other countries, including the entire EU, the UK, Canada, and Japan.

3.6.9. After the group was designated as terrorists, the MEK came to renounce violence, and no violent incidents have been attributed to the group by the U.S. since March 2001. When the U.S. government invaded Iraq in 2003, the MEK gave up its weapons to U.S. forces, underscoring the group's commitment to no longer being a violent threat to anyone. The MEK's disarmament left the group unable to defend its members against repeated lethal attacks against them by Iranian-backed groups, necessitating the group's removal from Iraq as a means of enabling them to avoid being further slaughtered. The MEK's renunciation of violence enabled the U.S. government to conclude, after watching over the group for more than a decade after the MEK's last attack on Iran, that the organization no longer posed a national security threat to the U.S., and accordingly, enabled the removal of the group from the OFAC sanctions list. The EU and UK delisted the MEK a few years before the U.S. did; Canada and Japan did so afterwards. In every case, the countries had concluded the MEK no longer presented a threat.

3.6.10. Finally, the circumstances surrounding the designation of MEK obviously say absolutely nothing about the evidentiary predicates for the designations of the IIRO's offices.

3.7. Brown's inaccurate statements about the listing and delisting of the MEK under the OFAC sanctions regime are consistent with his effort to paint a picture in broad strokes that the U.S. designation process at OFAC is principally a political one, not reflecting considered legal judgments based on the merits of evidence. The truth is quite different: since the 9/11 attacks, the U.S. government has systematically built-up the processes at OFAC, which for many years have followed a basic approach that I witnessed first hand in the period 2013-2016, when I served in senior roles at the State Department and again participated in interagency sanctions processes. I set forth that approach in some detail in Section 15 of my Expert Report. I do so again here, to describe specifically the basis for giving OFAC designations probative value:

3.7.1. They are the product of intensive interagency consultation, and reflect in-depth work by teams, typically led by career professionals, doing their scrupulous best to follow the law as well as to protect the American public from foreign threats.

3.7.2. As set forth in Section 15 of my Expert Report, in identifying targets, U.S. law enforcement and intelligence follow leads, which can include a mix of confidential information from intelligence, law enforcement, diplomatic and other channels, as well as open source information. Initial leads are routinely

---

[56] For a detailed history of the MEK and how it came to be listed for sanctions, see the detailed 2009 report by RAND for the National Defense Research Institute, "The Mujahedin-e Khalq in Iraq, A Policy Conundrum," https://www.rand.org/content/dam/rand/pubs/monographs/2009/RAND_MG871.pdf. See Chart C-1, pp 80-89.

supplemented by a broader mix of open source information which can include corporate records, bank records, transcripts of depositions or court proceedings, as well as by confidential debriefings conducted by U.S. law enforcement investigators or by investigators at OFAC. Some of this information is very sensitive. The process typically takes months. It is undertaken with considerable care.

3.7.3.   OFAC works with other agencies such as Justice, Homeland Security, and State, and relevant U.S. law enforcement and intelligence agencies, to sort through this information, which is often voluminous, to determine there is a reasonable basis for believing the target meets the specific criteria for designation under the terms of the applicable Executive Order, such as those sanctioning people for terrorism and terrorist-related activity, such as terrorist finance.

3.7.4.   Once the evidence is collected, the investigators draft an evidentiary document summarizing the various exhibits acquired through their investigation and research. The evidentiary document can run into hundreds of pages of text and exhibits. The summary lays out how the information provides reason to believe that the target meets the specific criteria for designation. This package is then reviewed by senior career officials at multiple agencies as well as by attorneys at multiple agencies. No one can be sanctioned unless the determination is made that the target meets the specific criteria for designation under the particular Executive Order, such as terrorism. The lawyers in the multiple agencies involved in the process are required formally to sign off for the process to proceed.

3.7.5.   At the end of the process, which may involve a further interagency review held at Treasury or the White House involving principals or their designees, a final evidentiary package is prepared, and presented to the director of OFAC for signature which triggers actual designation.

3.7.6.   The depth and breadth of this process grounds my assessment that the designation reports are probative. Similarly serious processes are also used to generate indictments, prosecutorial documents, and, among many other types of documents, the JTF-GTMO Threat Matrix, to which I now turn.

## JTF-GTMO Documents

3.8.   Brown describes the JTF-GTMO Threat Matrix as a document that lacks "methodologic rigor," whose indicators are of no probative value in determining whether someone was involved in al Qaeda. He states that "[a]s an expert in the history of al-Qa'ida," he finds "many of these indicators extremely dubious as tools for an assessment of some al-Qa'ida-related threat." Indicators he considers dubious include such elements as "association with 'al-Qaida network leaders, network operatives, or key members.'" And other indicators he defines as "extremely dubious as tools for an assessment of some al-Qa'ida-related threat." (p. 95)  Brown also criticizes my report (and that of Evan Kohlmann) for using the Threat Matrix stating that "[b]oth Winer and Kohmann cite

these documents [the JTF-GTMO Matrix of Threat Indicators for detainees at Guantanamo Bay, hereafter, "Threat Matrix"] many times." (p. 94)

3.8.1.   I was surprised to read Brown's reference to my relying on this document and citing it "many times." Brown has not cited any page of my Expert Report in which I refer to this document. It is merely included in my extensive list of reliance materials as something I considered. While I considered it, I did not, in fact, rely on the Threat Matrix to make any findings.

3.8.2.   After reading Brown's Expert Report, I rechecked my Expert Report, and of course, I do not cite the report "many times." I do not cite it even once, except as something I considered. Accordingly, Brown's statement that I cited this report "many times" is factually wrong.

3.8.3.   Brown further states experts for the plaintiffs who use any of the indicators in the Threat Matrix "betrays a lack of serious methodological treatment of source materials." Since I did not rely on it as evidence and my Expert Report does not mention it other than as information I considered, this statement by Brown is also, with regard to me, factually wrong. But I also consider it to be wrong in its substance, as Brown willfully misreads the document.

3.8.4.   On the substance, I find the indicators used in the JTF-GTMO detainee assessments to determine detainee's capabilities and intentions to pose a terrorist threat to be intuitive and sensible. The Threat Matrix states that the indicators "are used in assessments **in concert with each other, and need to be read in the context in which they are placed within an assessment**." [emphasis added]  The reliance on multiple facts, taken together, is a standard mechanism by which government investigators in both the intelligence community and in law enforcement make assessments about facts. Brown attempts to misread this approach by citing particular indicators he finds insufficient to prove involvement with al-Qaida. The Threat Matrix itself says that any one factor or even combination of factors may not be enough to provide "proof" for determining the threat posed by a particular Guantanamo detainee. One has to look at the whole picture.

3.8.5.   The indicators used in the Threat Matrix are extensive and I will not list all of them here. I emphatically disagree with Brown that none of them "provide evidence to support, connection in some way to al-Qaida." (p. 94). A partial sampling of the indicators includes:

3.8.5.1.   The detainee admitted being in Tora Bora [note – this is where the U.S. had determined that bin Ladin was based in the period just after the 9/11 attacks, and where the U.S. military engaged in battle with al Qaeda and the Taliban from December 6 through 17, 2001]

3.8.5.2.   The detainee's name was found on al-Qaida documents

3.8.5.3.   The detainee trained at a military camp being used by al-Qaida (al-Faruq)

3.8.5.4.   Another detainee identified him as a fighter on the front lines

3.8.5.5.   Captured attempting to enter Afghanistan following 11 September 2001

3.8.5.6.   Captured by US or Coalition forces in a raid on a suspected compound or safe house

3.8.5.7.   Captured with other al-Qaida or extremist group members

3.8.5.8.   Operated or captured in an area dominated by al-Qaida or Taliban forces or network operatives

3.8.5.9.   Captured with false, forged, unauthorized or illegally obtained, or altered documents

3.8.5.10.   At time of capture, detainee was in possession of a suspicious item such as a military radio/transceiver, satellite phone, large sums of money

3.8.5.11.   Detainee admitted participating in hostilities

3.8.5.12.   Detainee attacked US or Coalition forces

3.8.5.13.   Identified by other detainees or government agencies as having participated in hostilities

3.8.5.14.   Identified as severing in a leadership role during hostilities, including carrying communication equipment during hostilities

3.8.5.15.   Identified being at the front lines or other known battlegrounds, such as Tora Bora

3.8.5.16.   Travel for or shows commitment to violent jihad

3.8.5.17.   Received or sought weapons training in Afghanistan or Pakistan, often in an al-Qaida affiliated camp or on the battle front

3.8.5.18.   Identified as a fighter in another jihad such as Bosnia and Herzegovina or Chechnya

3.8.5.19.   Admitted membership in al-Qaida or identified as a member of al-Qaida by other associates, members, media or documents

3.8.5.20.   Facilitated, recruited, or provided other support to [al-Qaida] or its members

3.8.5.21.   Name or alias found on al-Qaida membership lists, computer hard drive, other electronic media, or documents found with known al-Qaida or support elements; or on media or documents which identify al-Qaida personnel or support elements

3.8.5.22.   Acknowledged or identified as serving under al-Qaida leadership

3.8.5.23.   Associated with or recognized by al-Qaida network leaders, network operatives, or key members, such as Usama bin Laden, Khalid Shaykh Muhammad, etc.

3.8.5.24.   Volunteered to perform special tasks for al-Qaida (e.g. martyrdom operations, special training, etc.)

3.8.6.   These indicators incorporate a wide range of factors, some of which on their own might merely be cause for further investigation and others of which are literally or metaphorical smoking guns. The literal smoking gun would be a detainee captured with weapons immediately following hostilities with the United States in Afghanistan in the battle at Tora Bora. A metaphorical one would be someone who admitted to swearing allegiance to bin Laden and to being a member of the organization. The presence of other indicators would be of greater or lesser evidentiary value based on the total of the whole picture – exactly as the Threat Matrix suggests it should be used for evaluating whether someone should be determined to pose a terrorist threat if the detainee were given the opportunity.

3.8.7.   Brown accurately states that the Threat Matrix is designed to help assess the threat from individual detainees, not as evidence to provide that person's guilt or innocence. This caveat and limitation in the use of the Threat Matrix by the U.S. government is a further sign of the integrity of its methodology, and the care with the U.S. government put the indicators together, and limited their uses. The caveat does not mean that they are non-probative in other contexts. It merely means that the U.S. government created them for a particular purpose at the time, and not for other uses.

3.8.8.   As the list I have excerpted above illustrates, the indicators represent a common-sense approach by the U.S. government to assess a person's relationship to al Qaeda and to terrorism. The probative value of the individual indicators will vary, based on context and the totality of the information. Its approach is certainly more rigorous than that of an expert who erroneously claims that I cited the document multiple times as "evidence" in my Expert Report, when in fact, I did not cite the document as something I relied on for any of my findings.

**The 1996 CIA Document Regarding Charities and Terrorism**

3.9.   Brown then attacks the probative value of the 1996 CIA document, which he refers to as a "so-called CIA document." He describes its provenance as "mysterious," and that it is of "unknown provenance." In fact, the provenance is traceable. The document has been relied upon by the UN Security Council Monitoring Group on al Qaeda and the Taliban,

which references it, describing it on December 2, 2003, as a "recently published report by the United States Central Intelligence Agency" and providing excerpts from the text of the CIA Report through the Internet at a URL which was listed at the time as http://www.centerforsecuritypolicy.org/cia96/charities.pdf. The document is no longer obtainable at that URL, but its provenance has been attested to in this case, as reflected in Document 516, Filed 11/01/04, Affirmation of Sean P. Carter.[57]

3.10.　The UN Security Council Monitoring Group relied on this document, stating: "A recently published report by the United States Central Intelligence Agency also indicated that IIRO funds directly supported six Al-Qaida training camps in Afghanistan prior to 11 September 2001."[58]

　　3.10.1. Brown's contention that the report is a "so-called CIA document" (p. 96) of "unknown provenance" (p. 96) and "of dubious origin" (p. 65) is inconsistent with the attestation to its authenticity and its use by the UN group responsible for monitoring the UN's sanctions on al Qaeda and others involved in terrorism relating to the 9/11 attacks, in which that expert group expressly references it as an authentic CIA document. Among the five international monitors participating in that Monitoring Group at that time was a former senior U.S. diplomat, Victor Comras, where he served under appointment by Secretary General Kofi Annan, to oversee the implementation of Security Council measures against terrorism (al-Qaeda) and terrorism financing. Comras, whose previous work would necessarily have involved reading many other CIA documents, and the other professionals acting as monitors found the document to be real, and relied on it.

3.11.　This same monitoring group report provided additional information, consistent with the CIA Report, regarding the abuse of charities by terrorists, from which I provide relevant excerpts:

　　3.11.1. 40. One important example of the use by Al-Qaida of charities and the difficulties in dealing with this issue touches directly on the activities of one of the largest Islamic umbrella charities, the International Islamic Relief Organization (IIRO) headquartered in Jeddah, Saudi Arabia. Most of that organization's activities, and the activities of its associated charities, relate to religious, educational, social and humanitarian programmes. But IIRO, and some of its constituent organizations, has also been used, knowingly or unknowingly, to assist in financing Al-Qaida. While IIRO has not been presented to the Committee for possible listing, the United States has asked Saudi Arabia to look closely into the organization's

---

[57] Affirmation of Sean P. Carter Transmitting Supplemental Evidence in Opposition to the Motions to Dismiss of the Kingdom of Saudi Arabia, International Islamic Relief Organization, Rabita Trust, Wa'el Hamza Julaidan, Saudi High Commission, Al Haramain Islamic Foundation (Saudi Arabia), Prince Salman bin Abdul Aziz Al Saud, Prince Naif bin Abdul Aziz al Saud, and Mohammad Jamal Khalifa, Case 1:03-md-01570-GBD-SN, Document 516, Filed 11/01/04.

[58] Letter dated 1 December 2003 from the Chairman of the Security Council Committee established pursuant to resolution 1267 (1999) concerning Al-Qaida and the Taliban and associated individuals and entities addressed to the President of the Security Council, p. 15.　https://undocs.org/pdf?symbol=en/S/2003/1070

questionable activities. They have also offered to provide investigative assistance in this regard.

3.11.2. 41. The International Islamic Relief Organization has branch offices throughout the world, including 36 in Africa, 24 in Asia, 10 in Europe and 10 in Latin America, the Caribbean and North America. The bulk of its financial contributions come from private donations in Saudi Arabia. An endowment fund (Sanabil al-Khair) has been established to generate a stable income to finance its various activities. The charity also works in close association with the Muslim World League. Many prominent Middle East figures and financiers have associated themselves with this mainstream Islamic charity.

3.11.3. 42. Evidence produced recently in a Canadian court linked IIRO funding directly to Al-Jihad, a designated entity tied closely to Al-Qaida, and responsible for the bombing in 1998 of the American Embassies in Dar es Salaam and Nairobi. A recently published report by the United States Central Intelligence Agency also indicated that IIRO funds directly supported six Al-Qaida training camps in Afghanistan prior to 11 September 2001. After that date, Pakistan also identified and expelled some two dozen Al-Qaida supporters who had been working for the IIRO-sponsored organizations in Pakistan.

3.12. Like the UN Panel of Experts monitoring the sanctions on al Qaeda, its supporters, and its terrorist financiers, I have relied on the 1996 CIA Report. I disagree with Brown's assertion that it "is of not historical value," (p. 98). As set forth in Section 6.6 of my Expert Report, I continue to find it prescient, providing a historically-early analysis of the threat posed by Islamic charities operating in a conflict zone, including the IIRO, and the Muslim World League, the outgrowth of which ultimately included the 9/11 attacks.

**Sageman's Findings on the Reliability and Significance of USG Information**

**OFAC Designation Documents**

3.13. Sageman rejects the use of reliance on designations by OFAC of Specially Designated Global Terrorists or SDGNs as probative information regarding WAMY. The gist of his argument is that the legal standard for national security designations is lower than the standard of proof for a criminal or for a civil case. He is accurate in describing the standard of proof, which as I explain earlier in this Rebuttal Report is the standard of "reasonable basis" or "rational basis," the standard that a government action must have to be constitutional and lawful, and which is used for Administrative proceedings in many contexts. As I have stated, OFAC has always used this standard in connection with its designations, both before the 9/11 attacks, and since. This Administrative law standard does not mean there is something wrong or inappropriate in OFAC's findings. It is simply the standard that the law requires OFAC to live by. If OFAC does not have enough evidence to justify its findings, a sanctioned person or entity can go in to court and challenge the designation. Those designated for sanctions have a legal right to do this, and occasionally, but not often, a court decides in favor of the sanctioned person, which may be because the person no longer poses a threat, because the government is

unwilling to declassify enough evidence to prove their case against the sanctioned person, or other reasons.

3.14.   A person such as Batterjee has the right to challenge his designation by OFAC on all of these grounds, including whether he ever engaged in terrorist finance. As of the end of January 2021, I have found no information that suggests that he has done so, and he remains sanctioned by the United States. Sageman accurately states that he undertook a delisting process with the United Nations, and was delisted by the UN on January 14, 2013, without further explanation. Such delistings are common. After a person or entity has been designated, the economic and travel sanctions provide serious disincentives for anyone to continue engaging in terrorist-related activity. As with the MEK, after a period of time, delistings for those formerly involved in sanctioned activity may become possible, as Batterjee found with the UN. Delisting of someone sanctioned for involvement in terrorism or terrorist finance does not constitute exoneration. It merely means a finding that listing is no longer necessary because the delisted person or entity no longer presents a terrorist threat.

3.15.   In Section 3.7 of this Rebuttal Report, I summarize the extensive interagency process involved in applying designations to a person for terrorist sanctions. This process is the process used to applying designations to a person under essentially all OFAC programs that involve person-by-person and organization-by-organizations sanctions under specially-designated national programs, as well as the SDGT program. Sageman's line-of-argument suggests that the many hundreds of persons and entities who have been designated by OFAC as major drug traffickers, criminals, terrorists, sanctions-violators and the like are being designated for reasons that are arbitrary and capricious. Of course, judges have generally found the opposite. There are exceptional cases, where the government gets it wrong or has other reasons for being unable or unwilling to defend its case, such as a decision to protect intelligence or other protected information that it is unable to disclose before a court. They are the exception, not the rule, and when it comes to cases involving terrorism, and as reflected in Section 3.7 of this Rebuttal Report, multiple parts of the U.S. government contribute to building reliable evidentiary packages.

**JTF/GTMO Documents**

3.16.   Sageman mirrors Brown in his attack on relying on material set forth in JTF GTMO documents, which I cite three times in the course of my Expert Report.

3.17.   Sageman first argues that the documents expressly state that they should not be used to prove a person's guilt or innocence. (p. 203) They do say this. The limitation is important for a number of reasons. For one thing, intelligence often includes information that cannot and should not be used in a criminal trial, even when it is probative. Other information may not be admissible in a criminal trial for legal reasons, having been obtained, for example, through a wiretap that is lawful for intelligence purposes but cannot be used in a criminal trial. In any case, I have not cited them in connection with any criminal trial, but for a civil one.

3.18.    Sageman then argues that the Guantanamo documents are particularly unreliable as a source for legal proceedings, because they were not prepared for public release. (p. 203) I find this argument specious: the material resulted from a constellation of intelligence and law enforcement information, as well as interviews of detainees at Guantanamo. This does not make it inherently unreliable, it means that one needs to look at it as part of an overall picture about how the United States government was assessing the subject matter, which included the role of certain charities in the funding of terrorism directed against the United States, which was an area in which some detainees had relevant information.

3.19.    Finally, Sageman attacks the probative value of any and all information at Guantanamo on the ground that some of it has been acquired in the course of interrogations that were improper and amounted to torture. (pp. 204-208) One result of abusive interrogations in the case of the terrorists responsible for the 9/11 attacks has been the unwillingness of the U.S. government to proceed with criminal trials of central perpetrators of these terrorist attacks, including Khalid Sheikh Mohammed, who is widely recognized to have been a central architect of them. The question is whether the abusive interrogations taint all documentation from Guantanamo, so that none of it should be relied on for any purpose whatsoever. Sageman takes this position. My view is that one needs to look carefully at the particular documents and the particular case and assess them. It is appropriate to rely, as I have here, on U.S. government documents when the information in them reflects an assessment made by a U.S intelligence agency of the status of an organization as a terrorist financier, based on all-source intelligence and evidence.

3.20.    In Section 12.10.3, I cite the Guantanamo information as stating the following:

    3.20.1. "WAMY supports terrorist ideals and causes."

    3.20.2. "WAMY is listed as a Tier 1 NGO. Tier 1 NGOs are defined as having demonstrated sustained and active support for terrorist organizations willing to attack US persons or interests."

    3.20.3. "WAMY is a non-government organization operating in Afghanistan that may be affiliated with Usama Bin Laden and al Qaida operations."

    3.20.4.  "According to top WAMY officials, both the United States and Israel must be destroyed."

3.21.    Two of these four statements (3.14.2 and 3.14.4) provide internal U.S. government assessments of WAMY. When I was in the U.S. government, the term "Tier 1 NGO" meant that the NGO was a "Tier 1" threat, which is the highest type of threat that the U.S. government faces, and therefore, is one for the highest priority for our intelligence agencies for the purposes of intelligence collection. That is how I understand the term to have been used in the Guantanamo documentation – namely, that the U.S. had concluded at the time that WAMY had demonstrated sustained and active support for terrorist organizations willing to attack US persons or interests. These could be terrorist organizations other than al Qaeda. The sentence that WAMY is an NGO operating in Afghanistan is obviously accurate. The statement that it "may be affiliated with" bin

Ladin and al Qaeda would reflect the nature of the inquiry that U.S. intelligence agencies were being asked to understand – given WAMY's "sustained and active support for terrorist organizations," was WAMY affiliated with bin Ladin and al Qaeda, or not?

3.22.   The information about WAMY being a "Tier 1 Counterterrorism NGO target, defined as those that have demonstrated sustained and active support for terrorist organizations willing to attack U.S. persons or interests," is stated in a footnote by an Analyst in a GTMO assessment of an individual detainee who tried to get a job at WAMY and was not hired, and then went to work for the IIRO where he was hired.[59] Thus, the statement is not the result of any interrogation of the detainee. It is merely provided by the Analyst within that document as a statement of fact about WAMY. There is no good reason to reject it as being an inaccurate statement of the conclusions reached by the U.S. government at the time about WAMY. One either is a Tier 1 counterterrorism target, or not. Sageman provides no basis for concluding that the Analyst's footnote falsely represented the U.S view at the time, or was based on torture or other human rights abuses. In the absence of evidence to the contrary, I accept the footnote as an accurate statement of the U.S. government's view of WAMY at the time, which was May 27, 2005.

3.23.   For similar reasons, I find the repeated references in the materials from JTF/GTMO regarding the designation of IIRO as a Tier 1 Counterterrorism target, set forth in the same document cited above, and elsewhere, to be similarly accurate as a statement of the U.S. government's view of IIRO at the time they were made.[60]

3.24.   The statement "[a]ccording to top WAMY officials, both the United States and Israel must be destroyed," was made by the designated military officer carrying out an interrogation of the detainee.[61] Because it is not a statement about the U.S. government's treatment of WAMY as a status (e.g. Tier 1 NGO terrorist threat), I give it less weight than the other statements from the JTF/GTMO documents I have cited.

3.25.   In summary, I would not rely on the JTF GTMO documents that I cited in my Expert Report for making a criminal prosecution of a defendant. They were not created for that purpose. But I see no reason to reject information in the JTF-GTMO documents to the extent they reflect an overall U.S. government assessments of organizations they had determined were Tier 1 terrorist threats, or reflect statements by U.S. government

---

[59] Department of Defense Office for the Administrative Review of the Detention of Enemy Combatants at US Naval Base Guantanamo Bay, Cuba, 27 May 2005, To: Balkhair, Rashed Awad Khalaf, Unclassified Summary of Evidence for Administrative Review Board in the case of Balkhair, Rashed Awad Khalaf, DMO Exhibit 1, Page 2 of 3. (The Bates number on the copy of the document provided to me is illegible.) See also PEC-KSA 002737

[60] Department of Defense, Id., see also Memorandum for Commander, United States Southern Command, 10 September 2004, Subject: Recommendation to Transfer to the Control of Another Country for Continued Detention (TRCD) for Guantanamo Detainee (The Bates number on the copy of the document provided to me is illegible.) This document states that "[t]he IIRO is a Tier 1 NGO that has been directly linked to Al-Qaida and Usama Bin Ladin. The IIRO has provided financial assistance, funds transfers and legitimate cover for moving money under the pretense of humanitarian relief to Al-Qaida."

[61] FED-PEC 0141772.

officials. This is how I continue to understand the statements about WAMY and IIRO set forth in those documents.

**Prosecutorial Documents**

3.26.   Sageman takes the position that a range of prosecutorial documents, including indictments, proffers and affidavits for warrants are essentially worthless, because they are "one-sided, presenting only the prosecution's theory of the case and illustrating its best-case arguments." He then undertakes his own version of the circumstances of the Arnaout case and the histories of LBI and BIF with formulations that minimize their connections.

3.27.   The core reason for the court's rejection of the proffer, as expressed in the published opinion cited by Sageman, was that Arnaout's coconspirators were not identified other than Batterjee, making it impossible for the prosecutors to satisfy requirements of the coconspirator exception to the hearsay rule.[62]  As a result, he pled guilty to racketeering conspiracy, and was not convicted of terrorism.

3.28.   Sageman assesses this to mean that "Arnaout and BIF were vindicated of any charge of supporting terrorism." (p. 230). This is not correct. No jury was able to hear and weigh the evidence. The outcome of the case was due to limitations in what the prosecutors could bring to the court regarding statements made by coconspirators.  Ultimately, Arnaout was sentenced to a ten-year term in prison, and was reported as having served eight years before being released.[63] An outcome of ten years in prison and the serving of eight does not constitute vindication, and Sageman's opinion to the contrary misreads its meaning.

3.29.   The statement made by then-U.S. Attorney General Ashcroft following the plea agreement summarized the view the Justice Department retained of the case, despite its inability due to the judge's role on statements by coconspirators to bring the terrorism charges forward to trial where they could have been tested by a jury: "Arnaout defrauded donors by using their money to fund Jihad fighters in Chechnya and Bosnia. He provided fighters with anti-mine boots, uniforms, tents and even an ambulance. All of these were purchased with funds that donors thought were going for peaceful purposes."[64] It's a succinct summary of how Arnaout's charity was abused to fund terrorism.

3.30.   Below, I provide the text of the entire U.S. Treasury terrorist designation of Batterjee on December 21, 2004, which does a good job of laying out the LBI and BIF history – after the Arnaout case had already concluded with his guilty plea for racketeering conspiracy. Its text shows that Sageman's anodyne account of the Arnaout case and its implications

---

[62] *U.S. v. Arnaout*, N.D. Illinois, Eastern Division, No 02 CR 892 (SBC), Memorandum Opinion and Order, February 3, 3003.
[63] "Enaam Arnaout, an American who had been imprisoned for supporting Islamic fighters, is stranded in Egypt," Chicago Tribune, October 9, 2012,  https://www.chicagotribune.com/news/ct-xpm-2012-10-09-ct-met-stranded-20121009-story.html
[64] "Transcript of Attorney General John Ashcroft Regarding Guilty Plea by Enaam Arnaout," February 10, 2003 https://www.justice.gov/archive/ag/speeches/2003/021003agenaamaranouttranscripthtm.htm

for the role played by terrorist finance for LBI fails to describe what the U.S. government had learned about the historic relationship of Batterjee to LBI, to BIF, and to al Qaeda and bin Ladin. (I provide my Comments to the Treasury text in the inset paragraphs below.)

3.30.1.   Adel Abdul Jalil Batterjee served as the Executive Director and a member of the Board of Directors of Benevolence International Foundation (BIF), which was designated as a Specially Designated Global Terrorist (SDGT) by the Treasury in November 2002 for its support to al Qaida and UBL.

3.30.2.   "Adel Batterjee has ranked as one of the world's foremost terrorist financiers, who employed his private wealth and a network of charitable fronts to bankroll the murderous agenda of al Qaida.   A worldwide asset freeze, including in his home country of Saudi Arabia, will deal a serious blow to this key terrorist facilitator," said Stuart Levey, Treasury's Under Secretary for the Office of Terrorism and Financial Intelligence (TFI).

3.30.3.   In the late 1980s, Batterjee founded the precursor to BIF, Lajnat al-Birr al-Islamiah (LBI), in Saudi Arabia and Pakistan.   LBI provided financial and operational support to mujahideen elements in Afghanistan and around the world, including fighters associated with UBL and Gulbuddin Hekmatyer, who was named a SDGT by the Treasury on February 18, 2003.   LBI was affiliated with Maktab Al-Khidamat (MK), which was co-founded and financed by UBL and is the precursor organization of al Qaida.   LBI later joined al Qaida upon the dissolution of MK.

3.30.4.   In the early 1990s, LBI began operating under the name Benevolence International Foundation (BIF) in an effort to widen its appeal to the general public and increase its credibility with other governments.   BIF and LBI remained one organization with interchangeable assets under Batterjee's control.

3.30.4.1.   Comment: Noorwali's deposition and 1st Declaration do not challenge Batterjee's control of LBI for the period prior to 1993 when Noorwali states Batterjee was removed from LBI. Noorwali states that as a board member, he was not involved in the day-to-day operations of LBI. I know of no documentation to suggest that WAMY's other senior official on LBI's board, al Johani, did either. The "interchangeable assets under Batterjee's control" were suitable for terrorist abuse, as set forth further in the designation below.

3.30.5.   In 1993, Batterjee incorporated BIF in the United States, where it also provided financial and operational support to mujahideen fighters worldwide, including members of al Qaida in Afghanistan, the Sudan, Bosnia-Herzegovina and Chechnya.   At one point, UBL confirmed to an associate that BIF was one of the non-governmental organizations providing funds to al Qaida.

3.30.6.   According to information available to the U.S. Government, it was around that time that a BIF employee in the Sudan traveled to Saudi Arabia attempting to meet Batterjee.   Instead, the employee reported he was detained and questioned by Saudi authorities regarding BIF links to UBL.   Once released, he returned to the Sudan where he met with UBL and informed him of his detainment.   As a result, BIF operations were curtailed for a period of time.

3.30.7.   Batterjee subsequently resigned as Director of BIF and personally selected UBL confidant Enaam Arnaout to serve as the organization's head.   Documents obtained by the U.S. Government demonstrate that Arnaout, while employed with LBI and BIF, worked with members of al Qaida to procure weapons for use in al Qaida training camps.   While employed by Batterjee at LBI, Arnaout reported directly to Batterjee, which was outside the usual chain of command.

3.30.8.   Batterjee remained active in BIF despite having officially resigned as Director.   Evidence shows that Arnaout made an effort to conceal Batterjee's continued involvement in BIF.   In 2002, when Arnaout learned that U.S. authorities were scrutinizing BIF's activities, he warned Batterjee through an intermediary against transferring funds to any BIF offices.

3.30.9.   Evidence of BIF's ties to al Qaida surfaced in March 2002 searches by Bosnian authorities of the organization's Sarajevo offices.   These searches uncovered numerous handwritten documents detailing the origin and history of the al Qaida organization.   Among the recovered files was a copy of a 1988 handwritten draft listing wealthy financiers of UBL's mujahideen operations in Afghanistan, referred to within al Qaida as the "Golden Chain."

3.30.10.  This list contains 20 names with a parenthetical after each name, likely indicating the person who received funds from the specified donor.   "Usama" appears after seven of the listings and "Baterji" appears after an additional six listings.

3.30.11.  Also uncovered from the Bosnian raid were photographs of Arnaout with UBL and an administrative diagram of UBL's close associates, along with cover names and assignments within al Qaida of mujahideen trained in Afghanistan.

3.30.12.  In October 2002, Arnaout was indicted in the United States for operating BIF as a racketeering enterprise and providing material support to organizations, including al Qaida, that are engaged in violent activities.   Batterjee was named as an unindicted co-conspirator in the indictment.   On February 10, 2003, Arnaout pled guilty to criminal racketeering conspiracy for diverting BIF funds to pay for supplies to armed jihadists in Bosnia and Chechnya.

3.31.   Sageman deals with some of this only to dismiss any of it as having probative value. As I have stated, Treasury's designations are based on the U.S. government accumulating a significant array of information. It is truly an all-source effort, and in this case, that effort had been going on for three years prior to the time the designation of Batterjee was made.

Batterjee remains designated to this day. I have seen no evidence that Batterjee has gone to a federal court to challenge any of it, and Sageman cites none. Instead, he contends that this kind of information is "secondary source" information, because experts cannot review all of the data that is contained in the evidentiary packages put together by Treasury. Instead, he purports to rely on "primary source" information, such as Noorwali's declarations about events taking place decades earlier, even when those declarations are not backed by and are actually inconsistent with, the contemporaneous documentary record.

3.32.    More generally, Sageman's analysis of court cases and law enforcement actions by the U.S. government reflects an approach that confuses standards applicable to criminal cases with standards applicable elsewhere. The Justice system quite rightly requires proof to be provided "beyond a reasonable doubt" before a person is convicted of a crime and sent to prison. Civil cases have a different standard, generally, requiring merely a preponderance of the evidence. Under the Administrative Procedure Act, agency decisions typically require "substantial evidence," defined as such amount of relevant evidence which a reasonable mind might accept as adequate to support a conclusion. Throughout his analysis, Sageman roams amongst these standards and tries to pick off particular pieces of evidence as not credible, typically by overstating and misrepresenting the meaning of evidence he likes, such as the eight pages of budget-related documents from LIB in March 1989 preserved by WAMY and ignoring information he does not like, such as the statements in the 2002 WAMY audit that nothing the charity did in Afghanistan was actually verified on the ground.

**The 1996 CIA Report on NGOS with Terror Links**

3.33.    Sageman criticizes the 1996 CIA Report on NGOs with terror links as unreliable and useless for any analytic purpose. (p. 234-235) This is consistent with his general dismissal of information that contradicts his thesis, that there is no evidence of any kind connecting any of the defendants in this case to terrorist support. I continue to see it as an early, prescient summary of how Islamic charities operating in Bosnia were linked to terrorist finance. The report described the fluid interconnections of these charities with jihad, terrorist finance, and one another. It appropriately asks questions about the parentage of LBI as a terrorist financier, and queries whether the parent is the Muslim World League.  It is also valuable in listing LBI this early as a charity financing a terrorist training camp, and linking it as well to IIRO, given the fluidity of relationships among Saudi charities operating in areas of conflict in this period.

**Reliance on US Government Testimony and Assessments Generally**

3.34.    Sageman's position is that my use of senior government officials' testimony is indicative of misunderstanding of the scientific method, and places himself in the position of Galileo against the Catholic Church, where Galileo was right and the Catholic Church was wrong. My reliance on the myriad statements of U.S. government officials about the involvement of Islamic charities, and in particular, Saudi charities, in terrorist finance in the period leading up to the 9/11 attacks is not based on either blind respect for authority or on a political form of religious faith. It is based on my own participation in the inter-

agency process involving terrorist designations, my experience of discussions at the White House and CIA on money laundering, international crime, and related cases during the 1990's, and my experience in working with government officials from myriad U.S. government agencies over decades of working on financial crime and intelligence matters (including counter-terrorism), as well as on these issues in discussions with foreign governments. When an array of U.S. government officials in multiple Administrations headed by different political parties, as well as career officials representing no political party, as well as foreign governments and UN bodies reach assessments and in back of those assessments cite facts, the assessments are not faith-based. They are assessments based on understanding the constellation of information available. Nearly two decades after the 9/11 attacks, the insight the U.S. government had even prior to 9/11 attacks that Islamic charities were fueling terrorism was been proven correct.

**4.** ***The role of Islamic charities in al Qaeda's financial infrastructure and the importance of that support to transforming al Qaeda into a sophisticated terrorist organization capable of carrying out global attacks, as discussed in reports by defense experts.***

4.1.   This section of my Rebuttal Report addresses the findings of Brown, Freeman, and Sageman regarding the role of Islamic charities, which they either deny entirely (Brown), deny as regards to any charity supported by the Saudi government or its ruling family (Freeman), or deny regarding the charity/defendants (Sageman).

4.2.   As set forth in detail in my Expert Report, and summarized in the Executive Summary in Section 3 of that report, the funds and support from the charities assisted al Qaeda and its affiliates in essentially every aspect of their terrorist activities. Al Qaeda used the infrastructure it was able to develop with the support of the charities, such as its training camps and curriculum, to train Muslims to become terrorists and to succeed in carrying out terrorist attacks. The training included weapons training, training in land mines, bomb making, how to carry out guerilla warfare, how to kill unarmed people and how to carry out chemical weapons attacks. The infrastructure provided by or made possible by the charities also enabled al Qaeda to recruit and select candidates for major terrorist operations against Western targets such as the United States and to provide them the specific training they needed to carry out such attacks. These skills and others developed and taught at the training camps provided the foundation for the planning and operational activities necessary for al Qaeda to succeed in striking the United States.

4.3.   As set forth in my Expert Report, the charities that helped Al Qaeda were engaged in two principal types of activities. The first of these was religious propagation activities of an extreme form of Islam, Wahhabism, which included the dissemination and teaching of texts justifying armed conflict, violent jihad, and the killing of non-believers. The second type of activities were relief efforts aimed at Muslims in need, especially in conflict zones. The propagation activities of the charities were essential for indoctrinating and recruiting Muslims to become jihadists and terrorists. The relief activities of charities aligned with al Qaeda and other extremist organizations facilitated the recruitment of terrorists, provided space for their training and operations, and provided a cover so that al Qaeda operatives could undertake terrorist activities under the guise of being relief workers. Funds from the relief agencies were also used to help al Qaeda and other

terrorist groups by purchasing weapons and other things the terrorists needed, or were given to al Qaeda and affiliated groups for their own direct spending.

4.4.  The UN Panel of Experts summarized these activities in the 2nd Monitoring Report I have discussed and which relied in part on the (authentic) 1996 CIA Report:

4.4.1.  34. From its inception Al-Qaida has relied heavily on charities and donations from its sympathizers to finance its activities. Charities provide Al-Qaida with a very useful international channel for soliciting, collecting, transferring and distributing the funds it needs for indoctrination, recruitment, training, and logistical and operational support.  These funds are often merged with and hidden among funds used for other legitimate humanitarian or social programmes. Al-Qaida supporters and financiers have also established front charity networks whose main purpose is to raise and deliver funds to Al-Qaida. The roots of these charity networks stem from the anti-Soviet jihad in Afghanistan during the late 1980s. During that time Al Qaida could draw on the support of a number of State-assisted charities and other deep-pocket donors that supported the anti-Soviet cause.

4.4.2.  35. Today, Al-Qaida continues to rely heavily on those charities to facilitate and mask the collection and movement of its funds. Activities range from collection boxes at mosques and Islamic centres to direct fund-raising and solicitations, the merging of funds for both legitimate relief purposes and terrorism, the misuse or embezzlement of legitimate charitable funds, and the creation of front charities to channel funds from community collections or deep-pocket supporters. Al-Qaida has also benefited from, and relies heavily on, the activities of legitimate charities that support the propagation and teaching of more radical forms of Muslim fundamentalism.

4.4.3.  36. Controlling charities that are used, or abused, for purposes of supporting terrorism is proving extremely difficult. The close association of such charities with both religious and humanitarian relief purposes has made government regulation and oversight a very sensitive issue. Many of the charities that have been involved with Al-Qaida have also funded important humanitarian programmes in Afghanistan, Bosnia and Herzegovina, Chechnya (Russian Federation), Kosovo (Serbia and Montenegro), Pakistan, Somalia and the Sudan and in rural areas in South-East Asia. In many countries, particularly in South-East Asia and the Middle East, there is a strong tradition that supports the independent operation of charities and the anonymity of their donors.[65]

4.4.4.  43. Allegations have surfaced in India and the Philippines that local IIRO officers and employees were directly implicated in Al-Qaida-related terrorist activities, including planned attacks against the American Consulates in Madras and Calcutta. The IIRO office in Zamboanga City, the Philippines, reportedly served

---

[65] Letter dated 1 December 2003 from the Chairman of the Security Council Committee established pursuant to resolution 1267 (1999) concerning Al-Qaida and the Taliban and associated individuals and entities addressed to the President of the Security Council, pp. 13-14.   https://undocs.org/pdf?symbol=en/S/2003/1070

during the early 1990s as the coordinating centre for secessionist Islamic activities, and as late as 1996 channelled money to the Abu Sayyaf group, another designated entity. That office was established and run by Mohammed Jamal Khalifa, the brother-in-law of Osama bin Laden.

4.4.5.   45. Attention has also centred on the Al-Haramain Islamic Foundation. On 11 March 2002 the United States and Saudi Arabia jointly designated the Bosnia and Herzegovina and Somalia offices of Al-Haramain. A Saudi Arabia-based charity, Al Haramain raises almost $30 million a year in donations. According to its web site, it has active branches in about 49 countries. It draws its support and funding from across the Middle East, and other Muslim centres. The Somalia and Bosnia branches had been directly implicated in Al-Qaida funding activities. Al-Haramain Somalia had funneled money to Al-Ittihad al-Islami, a designated terrorist group, by disguising the funds as contributions for an orphanage project and for Islamic school and mosque construction. The Bosnia office was linked to Al-Jemaah al-Islamiyah al-Masriyah and to Osama bin Laden.

4.4.6.   46. Al-Haramain's offices in Indonesia have also been implicated in the funding of the Bali bombing. Omar al-Farouq, the Al-Qaida senior representative in South-East Asia, who was arrested in June 2002, told interrogators that Al-Haramain was the "principal source" of funding for the Indonesian Islamic group suspected of carrying out that attacked Al-Haramain has also continued as a conduit for funding to the Jemaah Islamiyah, another designated entity. Many of the leaders of the Jemaah Islamiyah also reportedly continue as branch officers and members of Al-Haramain. The Government of the Russian Federation has also complained to Saudi Arabia about funding provided by Al-Haramain to Chechen rebels.[66]

4.5.   The audits for the Pakistan/Afghanistan office in Jeddah of WAMY illustrate the mechanics of how such support is disguised. The audits of course do not specify any funds as being expended for "terrorism." But they do specify large categories of funding for items in such slush-fund categories as "student welfare," "social welfare," and "stipends," that was never verified, illustrating the point made by the UN Monitoring Group of the commingling of charity activities with the support for armed conflict and terrorist group activities, including that of al Qaeda.[67]

**Brown's Findings on the Role of the Charities**

4.6.   Brown characteristically misrepresents my Expert Report regarding the magnitude of funds required by al Qaeda. He states that it is my "belief" that al Qaida spent $30 million yearly to operate, of which $20 million went to the Taliban. (p. 60) These numbers were not developed by me. They were developed over the course of the work of the 9/11

---

[66] Letter dated 1 December 2003 from the Chairman of the Security Council Committee established pursuant to resolution 1267 (1999) concerning Al-Qaida and the Taliban and associated individuals and entities addressed to the President of the Security Council, pp. 16-174.  https://undocs.org/pdf?symbol=en/S/2003/1070.

[67] See World Assembly Of Muslim Youth Pakistan Office Accounts, id., for the period prior to the 9/11 attacks, that is, 2000, 1999, 1998, 1997, 1996, 1995, and 1994.

Commission, which I relied on, and footnoted.[68] So far as I know, the numbers specified by the 9/11 Commission remain authoritative.

4.7.    Brown's finding that "[t]here is no evidence that al-Qa'ida made use of religious charities to fund its activities" is inconsistent with the review of evidence made by the 9/11 Commission, and does not address the findings by the UN group responsible for monitoring terrorist finance relating to al Qaeda in the aftermath of the 9/11 attacks.[69] The 9/11 Commission's Monograph on Terrorist Financing describes its methodology as being based on review of an extensive compilation of data and a rigorous process:

4.7.1.    "The volume and quality of the intelligence appear to have improved since the summer of 2002, mostly because a flood of information is being derived from custodial interviews of captured al Qaeda members. Reliance on this information, of course, has its perils. Detainees may provide misinformation and may misrepresent or mischaracterize their roles or the roles of others. As a result, corroborating their information, through other custodial interviews, documentary evidence, or other intelligence collection, is critical in assessing what we know about al Qaeda financing. Even if what detained al Qaeda members tell us is accurate, the information can be stale, as it necessarily describes the state of affairs before their capture, and it is unlikely to be "actionable"—that is, sufficient to create an opportunity for disruption or to enable investigators to follow a money trail forward to operational elements or backward to the donors or facilitators. Understanding al Qaeda's money flows and providing actionable intelligence present ongoing challenges because of the speed, diversity, and complexity of the means and methods for raising and moving money; the commingling of terrorist money with legitimate funds; the many layers and transfers between donors and the ultimate recipients of the money; the existence of unwitting participants (including donors who give to generalized jihadist struggles rather than specifically to al Qaeda); and the U.S. government's reliance on foreign government reporting for intelligence."[70]

4.8.    Having reviewed the available intelligence, and evidence, the 9/11 Commission concluded in its Monograph on Terrorist Financing that al Qaeda did indeed make use of religious charities to fund its activities:

---

[68] "As the 9/11 Commission staff found, once bin Ladin returned to Afghanistan, the largest single al Qaeda expense was its support for the Taliban in Afghanistan, which the staff estimated to itself account for spending of about $20 million per year (out of the $30 million annual total). As stated in the staff report, bin Ladin also used money to train operatives in camps in Afghanistan, create terrorist networks and alliances, and support the jihadists and their families." Winer Expert Report, Section 4.8, citing 9/11 Commission Monograph on Terrorist Financing, Id., p. 4.
[69] The 9/11 Commission Report, July 22, 2004, pp. 19-21, 366
https://govinfo.library.unt.edu/911/report/911Report.pdf  and National Commission on Terrorist Attacks Upon the United States, Monograph on Terrorist Financing, Staff Report to the Commission,  available at
https://govinfo.library.unt.edu/911/staff_statements/911_TerrFin_Monograph.pdf  "al Qaeda was funded, to the tune of approximately $30 million per year, *by diversions of money from Islamic charities* [emphasis added] and the use of well-placed financial facilitators who gathered money from both witting and unwitting donors, primarily in the Gulf region Staff Monograph, p 4, p13.
[70] Monograph on Terrorist Financing, Staff Report to the Commission, id., p 19

4.8.1.   Al Qaeda's charities' strategy before 9/11 had two prongs. In some instances, al Qaeda penetrated specific foreign branch offices of large, internationally recognized charities. In many cases, lax oversight and the charities' own ineffective financial controls, particularly over transactions in remote regions of the world, made it easy for al Qaeda operatives to divert money from charitable uses. These large international Gulf charities donated money to end recipients, usually smaller in-country charities, whose employees may have siphoned off money for al Qaeda. In the second class of cases, entire charities from the top down may have known of and even participated in the funneling of money to al Qaeda. In those cases, al Qaeda operatives had control over the entire organization, including access to bank accounts.[71]

4.8.2.   The 9/11 Commission's findings were evidence based. Brown's repeated statements that there is no evidence that al Qaeda made use of religious charities to fund its activities is inconsistent with the totality of the facts, necessitating his series of challenges to multiple bodies, multiple compilations, individual analyses, assessments, and contemporaneous documents that he finds inconvenient, as well as his recurrent mischaracterizations of and/or distortion of the statements of others, as I have documented in this Rebuttal Report.

**Freeman's Findings on the Role of the Charities**

4.9.   Freeman does not address evidence in his Expert Report, but provides an ideological framing of the issues, that boils down to a syllogism: bin Ladin opposed the Saudi ruling family; the Saudi ruling family controlled its charities; the Saudi ruling family would have taken drastic measures against anyone who misused the charities to support bin Ladin, therefore the charities could not have been supported, been used, or been abused by bin Ladin, al Qaeda or other terrorist groups. He states that ['n]either the Saudi government nor WAMY, have ever shared "common goals" with al Qaeda, whose openly stated objective has always been the overthrow of the Kingdom's government and ruling family." (p. 16) Freeman's statement is inconsistent with the extensive record of both bin Ladin and the Saudi ruling family supporting Islamic resistance in Afghanistan, the Balkans, Chechnya, and Syria (for example), and the focus of charities sponsored by the Saudi government of helping those engaged in resistance against actual threats to Muslims in these countries and elsewhere. As aptly expressed in Congressional testimony provided by Daniel L. Byman, Senior Fellow - Foreign Policy, Center for Middle East Policy who was among the senior staff of the 9/11 Commission, the common goal of the Saudi government and al Qaeda was promotion of the global jihadist movement through supporting Muslim fighters in areas of conflict with non-Muslims:

4.9.1.   "In the 1960s, however, King Faysal bin Abdel-Aziz sought to form alliances based on a shared Muslim identity. A religious identity was meant to counter the radical pan-Arabism of Egyptian leader Gamal Abdel Nasser that was then threatening the legitimacy of monarchies throughout the Arab world. Such an identity would also unite states against international communism, which Faysal

---

[71] Id, p 21

and the Saudi leadership vehemently opposed, and support Palestinian independence. Domestic politics also played a role: Faysal had essentially usurped the throne from his inept brother Saud, and support from the religious establishment was vital to ensuring his legitimacy. To this end, Faysal created the Organization of the Islamic Conference and the Muslim World League and otherwise embraced an array of religious causes abroad."

4.9.2.   "The oil price surge after the 1973 war between Israel and its neighbors, and the resulting oil embargo and production cutback, enabled Saudi Arabia to contribute massive amounts to Islamic causes around the world. In the decades that followed, Faysal's successor as king, his brother Fahd, supported the building of mosques, Islamic centers and schools "by the thousands around the world." His website claims that Saudi scholars helped create and administer 200 Islamic colleges, 210 Islamic centers, 1,500 mosques and 2,000 schools for Muslim children in non-Muslim countries. Senior Treasury Department official David Aufhauser put the total figure for spending on these causes at 'north of $75 billion.'"

4.9.3.   "Much of this religious teaching and proselytizing was done outside the Saudi state by various charities that educated, provided health care, and otherwise offered services as part of their mission. A European Parliament report claimed the Saudis spent $10 billion to promote Salafism, the austere and puritanical version of Islam often referred to as "Wahhabism" after an important Saudi preacher, through charities like the Muslim World League, International Islamic Relief Organization, the al-Haramain Foundation, the Medical Emergency Relief Charity, and the World Assembly of Muslim Youth. Some of these charities were linked to terrorist groups like Al Qaeda and became an important part of the organization, particularly before 9/11. The Muslim World League reportedly funded training camps and religious schools in Pakistan and Afghanistan, exposing Afghans, Pakistanis, and foreigners to extremist ideologies. Al Haramain had a presence in roughly 50 countries and spent tens of millions: most went to proselytizing and humanitarian work, but some went to jihadist networks."

4.9.4.   "The Kingdom in general was often slow to recognize the threat of terrorism and reluctant to cooperate with the United States. After the 1996 Khobar Towers bombing, the Saudi government did not share vital information with U.S. intelligence. Many of the causes linked to the global jihadist movement, like the fighting in Kashmir and Chechnya, enjoyed wide legitimacy within the Kingdom, and citizen support for these conflicts seemed to pose no direct threat to Saudi security. The Interior Minister in the 1990s, Nayef bin Abdelaziz (the father of the current crown prince) believed Bin Laden's terrorist reputation was a product of U.S. propaganda, and after 9/11 initially blamed the attacks on a 'Zionist plot.'"[72]

---

[72] The U.S.-Saudi Arabia counterterrorism relationship," Testimony, Daniel L. Byman, House Committee on Foreign Affairs' Subcommittee on Terrorism, Nonproliferation, and Trade,  May 24, 2016, https://www.brookings.edu/testimonies/the-u-s-saudi-arabia-counterterrorism-relationship/#four

4.10. Norwegian terrorism scholar Thomas Hegghammer similarly describes the convergence of state interests in Saudi Arabia and extremism developing over a period of decades, including the Saudi state and its charities, as one component of the infrastructure for the development of the Muslim foreign fighter movement relied on by al Qaeda. As Hegghammer explains in his analysis of the Islamic foreign fighter movement, al Qaeda and the foreign fighter movement supported by Saudi Arabia were not identical, but they overlapped, as did their goals. To quote Hegghammer:

4.10.1. "No one ideologue can be credited with articulating the discourse; rather it developed gradually through incremental rhetorical escalation. Many of its themes echoed those of earlier pan-Islamists and anticolonial activists, but the Hijazi pan-Islamist discourse was more alarmist and more global in outlook than any of its predecessors. The following extract from a speech by Muslim World League Secretary-General Muhammad Ali Harakan from April 1980 is representative: "Jihad is the key to Muslims' success and felicity, especially when their sacred shrines are under the Zionist occupation in Palestine, when millions of Muslims are suffering suppression, oppression, injustices, torture and even facing death and extermination campaigns in Burma, Philippines, Patani, USSR, Cambodia, Vietnam, Cyprus, Afghanistan, etc. This responsibility becomes even more binding and pressing when we consider the malicious campaigns being waged against Islam and Muslims by Zionism, Communism, Free Masonry, Qadianism, Bahaism and Christian Missionaries."

4.10.2. "This message was spread through a massive propaganda effort whose centerpiece was a range of magazines with a global distribution. Most important was the Muslim World League weekly News of the Muslim World and the monthly Journal of the Muslim World League, published in both Arabic and English (for Asian and African audiences), but many other IIOs had their own magazines."[73]

4.10.3. In his book, "Jihad in Saudi Arabia, Violence and Pan-Islamism since 1979, Hegghammer is explicit about the connection between Saudi government support for what he terms "extreme pan-Islamism" and "the development of a peculiar political culture in which support for suffering Muslims abroad became a major source of political legitimacy and social status." As Hegghammer writes, "the kingdom cultivates its identity as the heartland of Islam by conceding considerable power and funds to the Wahhabi religious establishment and making religion a central part of its own discourse. . .  It is indeed possible to view pan-Islamism as a macro-nationalism centred on the imagined community of the umma, which is defined by religion and to some extent by language (Arabic having a special status in Islam). Although the Muslim nation is by definition aterritorial – the umma is wherever Muslims are – pan-Islamics have a clear sense of what constitutes Muslim territory, namely all lands once ruled by Muslims, from Andalucia in the West to Indonesia in the East. . . .  Extreme pan-Islamism

---

[73] "The Rise of Muslim Foreign Fighters," Thomas Hegghammer, in "Islam and the Globalization of Jihad," International Security, Vol. 35, No. 3 (Winter 2010/11), pp. 53–94

thus seems to have been the dominant, though not the only, rationale behind Islamist military in the kingdom in recent decades. The history of Saudi jihadism is therefore largely the history of the extreme pan-Islamist subcurrent of Saudi Islamism." [74]

4.10.4. Hegghammer grounds his analysis on a collection of 539 biographies of Saudi militants, whose activities spanned Islamic conflicts from the 1980's Afghan jihad forward until it came home to Saudi Arabia in 2003 to fuel a terrorist campaign against the Saudi government itself. He explains that the terrorism that was ultimately directed by al Qaeda against the Saudis began in "local struggles of national liberation such as Afghanistan, Bosnia, and Chechnya in the name of pan-Islamism" that had been supported by the Saudi government, through spending "billions of dollars to liberate countries thousands of miles away." He describes the charities founded by Saudi King Faisal as a central foundation for this pan-Islamism, and specifies the two most important of them as the Muslim World League and the Organization of the Islamic Conference (OIC).[75]

4.11.  As documented and analyzed in depth by Hegghammer, the religious charities sponsored by the Saudi government became an important component of support for a common pan-Islamic movement, which carried out armed conflict in multiple locations, and thereby created a common infrastructure relied on by al Qaeda. Freeman may feel that this alignment on the armed conflict side of pan-Islamism "fails every conceivable test of logic." But the historical record belies Freeman's largely fact-free assessment. The historical record shows that Al Qaeda and a range of Saudi interests, including Saudi-based charities, were aligned in supporting wars of redemption in areas where Muslims lived, such as Afghanistan, Bosnia, Chechnya, and Kashmir. Moreover, the phenomenon of Saudi Arabia arming Islamic militant terrorists for wars in other countries was not merely a historical reality, but continued through recent years, where it became a factor in arming extreme jihadists in Syria.

4.11.1. The Al Nusra group is a terrorist group operating in Syria that is also known as "al Qaeda in Syria," designated as a terrorist group by the United Nations on May 30, 2013, and characterized by the UN as an al Qaeda affiliate.[76]

4.11.2. As stated by then Vice President Biden at Harvard University in October 2014 regarding the fight against terrorism and the Islamic State in Syria, "[o]ur allies in the region were our largest problem." The then-U.S. Vice President said that Turkey, the Saudis and the Emirates "were so determined to take down Assad and essentially have a proxy Sunni-Shia war…. They poured hundreds of millions of dollars and tens of thousands of tons of weapons into anyone who would fight

---

[74] Hegghammer, T. (2010). Jihad in Saudi Arabia: Violence and Pan-Islamism since 1979 (Cambridge Middle East Studies). Cambridge: Cambridge University Press, introduction, doi:10.1017/CBO9780511809439
[75] Hegghammer, id
[76] Letter dated 13 November 2014 from the Chair of the Security Council Committee pursuant to resolutions 1267 (1999) and 1989 (2011) concerning Al-Qaida and associated individuals and entities addressed to the President of the Security Council https://www.securitycouncilreport.org/atf/cf/%7B65BFCF9B-6D27-4E9C-8CD3-CF6E4FF96FF9%7D/s_2014_815.pdf

against Assad – except that the people who were being supplied were Al-Nusra and Al-Qaida and the extremist elements of jihadists coming from other parts of the world."[77]

4.11.3. Freeman's Expert Report does not acknowledge, let alone address, the history of Saudi support for extreme pan-Islamism and jihadist action in armed conflicts, including but not limited to al Qaeda's recent terrorist activities in Syria.[78] As reflected in Biden's statement at Harvard, Freedman's syllogism that Saudi charities could not have provided support to al Qaeda because the Saudi Arabian government opposed al Qaeda, is counter-factual.

## Sageman's Findings on the Role of the Charities

4.12.    Sageman repeatedly cites the 9/11 Commission's conclusion that the origin of the money for the 9/11 attacks is unknown, as if that were all the Commission concluded about terrorist finance. (p. 245) Of course it is not. It made a number of additional findings about the role of Islamic charities and the governments sponsoring them, and their role in providing support that helped bin Ladin and Al Qaeda. I refer to these findings of the 9/11 Commission recurrently in my Expert Report, including in Sections 4.6, 4.7, 4.8, 5.3, 5.34, 6.3, 6.4, 6.5, 7.6, 7.7, 8.5, 8.7, and 8.9.

4.13.    I agree with Sageman's statement that "[b]y all accounts, the work of the Islamic charities was chaotic, and they did not strictly distinguish humanitarian relief of refugees from support of mujahedin and then Arab Afghans." (p. 248) I disagree with Sageman's unfootnoted statement that in doing so, they were following the general trend established by USAID.

4.14.    I disagree with Sageman's statement that WAMY's contributions to LBI were "not as freewheeling as some of the other charities in Peshawar at the time." (p. 249) My analysis of the documentation provided by WAMY for the activities it funded in Pakistan differs greatly from Sageman. As specified in Section 2.30 of this Rebuttal Report, Sageman inflates the documentary record, misinterprets it, and ignores evidence that contradicts his position.[79]

---

[77] Vice President Biden Delivered Remarks on Foreign Policy, Institute of Politics, Harvard University, October 2, 2014, see in particular Biden's statements from 53:24 to 59:12 minutes https://www.youtube.com/watch?v=dcKVCtg5dxM.

[78] In July 2016, about 21 months after Vice President Biden's speech, Al-Nusra declared its separation from al Qaeda, reportedly in response to Saudi and Qatari pressure applied because those countries wished "to protect themselves from being accused of backing al-Qaeda." See "Analysts: Saudi Arabia, Qatar, pushed al-Nusra Front to break with al-Qaeda," EFE.com, July 29, 2016, https://www.efe.com/efe/english/portada/analysts-saudi-arabia-qatar-pushed-al-nusra-front-to-break-with-qaeda/50000260-2999392

[79] Sageman's report is sprinkled with small mischaracterizations as well as major ones such as those I have discussed in this Rebuttal Report. For example, he incorrectly states that plaintiffs' experts "ignore the excellent Monograph on Terrorist Financing by the commission staff." Sageman p. 239.  In fact, I cited the report in Sections 4.6 and 4.8 of my Expert Report. Sageman incorrectly states that plaintiffs' experts have not "shown any familiarity" with scholars he respects and whose work he finds relevant. He names among them Thomas Hegghammer on the topic of Abdallah Azzam and the Arab Afghans. I not only cited Hegghammer's work, but cited it on that specific topic in Sections 12.6.1 and 12.6.4 of my Expert Report.

4.15.   Sageman accuses plaintiffs' experts of "compressing time" in linking events from the late 1980s and throughout the 1990s to what took place in the 9/11 attacks, as if nothing which took place in the previous years contributed to al Qaeda and bin Ladin's ability to carry out those attacks. (p. 252) He calls this the "methodological error or anachronism" and suggests that it "should be corrected by the plaintiffs' experts." To the contrary, it is Sageman's findings and approach that demonstrates systemic methodological error, as is easy to determine through comparing his truncation of events with that of others who have reviewed massive amounts of relevant material to come to their conclusions.

4.16.   An example of Sageman's flawed methodology is provided in his statement: "The U.S. State Department designated al Qaeda a Foreign Terrorist Organization on October 8, 1999. [citation omitted] This was the date that al Qaeda and its members officially became terrorists for the United States. ***All those who refer to them as terrorists before this date are guilty of anachronism from an official U.S. perspective.***" [emphasis added] (p. 91)

    4.16.1. As set forth in former White House counterterrorism czar Richard Clarke's book "Against All Enemies," the U.S. government began focusing on bin Ladin as a terrorist financier working with a terrorist organization in 1993 and 1994.[80] It identified al Qaeda, by name, as his terrorist organization, in the spring of 1996.[81]

    4.16.2. Sageman's conclusion that it is an "anachronism" to refer to bin Ladin and al Qaeda as terrorists prior to October 8, 1999 is wrong.

4.17.   Rather than "compressing time," Sageman would have us sever from consciousness and responsibility the array of activities and actions that led to the 9/11 attacks and made them possible. The account of the 9/11 Commission tells a different story, one going back to the 1980's, and involving in particular, the government of Saudi Arabia and Saudi and other Gulf State charities, as reflected in the following excerpts, all from the 9/11 Report:

    4.17.1. In the 1980's, awash in sudden oil wealth, Saudi Arabia competed with Shia Iran to promote its Sunni fundamentalist interpretation of Islam, Wahabbism. The Saudi government . . . joined with wealthy Arabs from the Kingdom and other states bordering the Persian Gulf in donating money to build mosques and religious schools that could preach and teach their interpretation of Islamic doctrine. (p. 52)

    4.17.2. A decade of conflict in Afghanistan, from 1979 to 1989, gave Islamist extremists a rallying point and training field. . . Bin Ladin understanding better than most of the volunteers the extent to which the continuation and eventual success of the jihad in Afghanistan depended on an increasingly complex, almost worldwide organization. This organization included a financial support network that came to be known as the "Golden Chain," put together mainly by financiers in Saudi Arabia and the Persian Gulf states. Donations flowed through charities or other nongovernmental organizations (NGOs). Bin Ladin and the "Afghan Arabs" drew

---

[80]Richard Clarke, "Against All Enemies," Free Press (2004), p. 135.
[81] Id, p. 148.

largely on funds raised by this network, whose agents roamed world markets to buy arms and supplies for the mujahideen, or "holy warriors." (p. 55)

4.17.3. Bin Ladin and his aides did not need a very large sum to finance their planned attack on America. The 9/11 plotters eventually spent somewhere between $400,000 and $500,000 to plan and conduct their attack. Consistent with the importance of the project, al Qaeda funded the plotters. . . .  The origin of the funds remains unknown, although we have a general idea of how al Qaeda financed itself during the period leading up to 9/11. . . al Qaeda relied primarily on a fund-raising network developed over time. The CIA now estimates that it cost al Qaeda about $30 million per year to sustained its activities before 9/11 and that this money was raised almost exclusively through donations. . . Al Qaeda appears to have relied on a core group of financial facilitators who raised money from a variety of donors and other fund-raisers, primarily in the Gulf countries and particularly in Saudi Arabia. . . These financial facilitators also appeared to rely heavily on certain imams at mosques who were willing to divert zakat donations to al Qaeda's cause. (pp. 169-170)

4.17.4. Al Qaeda also collected money from employees of corrupt charities. It took two approaches to using charities for fund-raising. One was to rely on al Qaeda sympathizers in specific foreign branch offices of large, international charities – particularly those with lax external oversight and ineffective internal controls, such as the Saudi-based al Haramain Islamic Foundation. Smaller charities in various parts of the globe were funded by these large Gulf charities and had employees who would siphon the money to Al Qaeda. (p. 170)

4.17.5. In addition, entire charities, such as the al Wafa organization, may have wittingly participated in funneling money to al Qaeda. In those cases, al Qaeda operatives controlled the entire organization, including access to bank accounts. Charities were a source of money and also provided significant cover, which enabled operatives to travel undetected under the guise of working for a humanitarian organization. (pp. 170-171).

4.17.6. Saudi Arabia has long been considered the primary source of al Qaeda funding, but we have found no evidence that the Saudi government as an institution or senior Saudi officials individually funded the organization. (***This conclusion does not exclude the likelihood that charities with significant Saudi government sponsorship diverted funds to al Qaeda.)*** (emphasis added) (p. 171)

4.18. Taken together, these passages from the 9/11 provide a context for my findings that Saudi religious charities which had lax external oversight and ineffective internal controls, such as WAMY, IIRO and MWL put al Qaeda sympathizers, such as Batterjee, in the position where they could divert funds for the support of armed conflict and terrorism through such mechanisms as enabling terrorist "operatives to travel undetected under the guise of working for a humanitarian organization." They also provide the context for my concluding that "charities with significant Saudi government sponsorship diverted funds to al Qaeda."

4.19.   Sageman's methodology and assessments wrongly segregate the events of 9/11 from the array of events and activities that gave them birth. As the 9/11 Commission found, the pot had been brewing for a long time, and the Islamic charities played a fundamental role in providing the fuel.


_____          _____
Jonathan Winer                                    02/02/2021
                                                          Date